IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al.,      )
                           )
     Plaintiffs         )
                           )
v.                         )     Cause No. 14-cv-01490 - HEA
                           )
THOMAS JACKSON, et al.,   )
                           )
     Defendants.      )

## MEMORANDUM OF LAW OF DEFENDANTS JON BELMAR, SGT. DAVID RYAN, OFFICER TERENCE MCCOY, OFFICER MICHAEL MCCANN, DET. DERIK JACKSON, DET. JOE PATTERSON, DET. AARON VINSON, DET. WILLIAM BATES, DET. NICHOLAS PAYNE, OFFICER DANIEL HILL, OFFICER ANTONIO VALENTINE, AND ST. LOUIS COUNTY, MISSOURI IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**Preliminary Statement**

There are 10 St. Louis County police officers who have been sued in their individual and official capacities by plaintiffs. Some of the claims that were initially filed were dismissed when a Motion to Dismiss was ruled upon. These include state law claims for Intentional Infliction of Emotional Distress and Negligent Supervision, and also William Davis' claim that he was assaulted. The individual St. Louis County police officers who are defendants are Sgt. David Ryan, Officer Terence McCoy, Officer Michael McCann, Det. Derik Jackson, Det. Joe Patterson, Det. Aaron Vinson, Det. William Bates, Det. Nicholas Payne, Officer Daniel Hill and Officer Antonio Valentine. They have filed a Motion for Summary Judgment for all claims that are still pending against them. This is a Memorandum in Support of their Motion for Summary Judgment.

The 10 plaintiffs have also sued St. Louis County Chief of Police Jon Belmar, and St. Louis County, Missouri. Chief Belmar and St. Louis County are also requesting summary

judgment. When an earlier Motion to Dismiss was ruled upon this Court noted that there are no

state law claims pending against Chief Belmar. This Memorandum of Law is also in support of

Chief Belmar's motion for summary judgment of the Federal claims pending against him and in

support of St. Louis County's motion for summary judgment of the Federal and State claims that

are pending.

**Statement of Facts**

Paragraphs 36 and 37 of the 3rd Amended Complaint allege that the "community of

Ferguson was particularly outraged" and also allege that "protests"…."led to civil unrest in the

streets of Ferguson." The "civil unrest in the street" involved criminal activity as documented in

the statement of facts presented in defendants' statement of material facts. Testimony from some

plaintiffs and defendants describes burning of buildings, looting, destruction of property,

gunshots, and assaultive behavior such as the throwing of rocks, bricks, bottles.

It should not go unnoticed that despite the criminal activity, despite gunshots, despite

rocks, bottles, batteries, threats and more directed at police, that there was restraint employed by

the police. It should also not go unnoticed that despite plaintiffs claims that they were subjected

to excessive force, most of the plaintiffs had no injuries; and even the two plaintiffs who were

examined at an emergency room were not admitted to the hospital, but were discharged from

the emergency room within hours with no positive findings from any scan or X-Ray.

*Claims filed by Tracey White and William Davis pending against David Ryan, Terrence McCoy*
*and Michael McCann.*

It should not go without saying that the claims made by Tracey White and William Davis

in the initial Complaint, the Amended Complaint, the 2nd Amended Complaint, and the 3rd

Amended Complaint are false. This assertion that the claims are false is not just argument of

defendants; Tracey White admitted so in her deposition. So it can be argued that the Motion to

2

Dismiss was not sustained because this Court viewed the facts that were alleged in the 3rd Amended Complaint in the light most favorable to them, the facts alleged in the Complaint were admitted to be false in Tracey White's deposition, and so on that basis perhaps summary judgment is appropriate.

In her deposition Tracey White stated that she was <u>not</u> thrown to the ground inside the McDonalds, as alleged, her son William Davis was <u>not</u> arrested inside the McDonalds restaurant as alleged, these officers did not order her out of the McDonald's as alleged, the police did not "accost" her son once he came out of the restroom of McDonald's as alleged; she was not told inside the McDonald's to shut up when she expressed concern about her son as alleged, she was not arrested inside the McDonalds's as alleged; no officer laid a hand on Tracey White or on William Davis inside the McDonald's, as alleged, there was no assault of either Tracey White or William Davis, as alleged. Even the allegation that she attended a rally that had been sponsored by *her AME* church was false; as she does not belong to an AME church, and she did not even know who the pastor was who spoke at the rally. There was video footage that was captured, without the knowledge of plaintiff, or for that matter St. Louis County, which showed that Tracey White and her son were arrested on a street called Sharondale Ave., without any force, and for that matter Ms. White was actually handcuffed and escorted away by St. Charles County SWAT officers, not St. Louis County officers. This footage was recorded by a St. Charles County paramedic wearing a "Go-Pro" device. The video footage captured Ms. White walking with her hands behind her back while she was under arrest, and then the footage captured her hands falling out of the handcuffs, and she admitted in her deposition that the footage doesn't show her being thrown to the ground. Beyond the footage, Ms. White's credibility for even minor matters was exposed when in her deposition she at first denied that she had ever been a

3

party to any other action filed in any court in Missouri, but when confronted with what is a public record on the internet on Missouri Case Net, she admitted that she had been a party to actions filed in court, including but not limited to a permanent order of protection entered against her, after which she refused to answer questions regarding what she had done to have a permanent order of protection issued against her. Although her state claim of assault and her 42 U.S.C.§1983 claim of excessive force were not dismissed in the initial filing of the Motion to Dismis in part because she alleged that she suffered bodily injury during the arrest, Tracey White admitted in her deposition that she is not claiming injury.

To briefly summarize the facts established with respect to the three individual defendants that Tracey White and William Davis sued: There was a crowd of people who had dispersed from West Florissant Ave. to Sharondale upon directions of the police, but then there was a truck with a trailer that was stuck on Sharondale, which became an event in itself, and for purposes of safety the police directed the crowd to go down a little farther to either a nearby parking lot or a nearby street, the crowd did follow the directions of the police with the exception that Tracey White and William Davis did not leave that street as directed. Finally after numerous requests to leave were ignored at a time when the police were trying to handle the problem with the truck/trailer, and because the police were trying to secure areas because of anticipated continuation of or repeat of rioting/criminal activity that had occurred the nights before, Sgt. David Ryan ordered the arrest of Tracey White. She was handcuffed by St. Charles County Officers and escorted by St. Charles County officers. Officer Terrence McCoy arrested William Davis but only after Davis not only had refused to leave the area along with his mother, but continued to remain in the area even after his mother was being arrested, and even after several warnings were given to him that he had to go to the nearby street or parking lot, and that

4

if he did not that he too would be arrested. After he continued not to move, his arrest occurred without incident or the use of force. Officer Michael McMann was not involved in the arrests of either Tracey White or William Davis, but rather he was nearby attempting to get the truck out of its predicament.

The situation with the truck and the movement of the crowd away from this, and the dispersal of the rest of the crowd who did move all occurred on Wednesday August 13th, 2014, as sundown was approaching. The video captured a low sun.

*Claims filed by Dwayne Matthews that are still pending against Detectives Derik Jackson, Joe Patterson, William Bates, Aaron Vinson, and Nicholas Payne.*

Later during the night of August 13th, 2014 Dwayne Matthews was walking on West Florissant, which he admitted was "pretty dark" and which he admitted was filled with smoke and tear gas. He admitted that he walked through a cloud of tear gas and smoke, and admitted that as he walked, the tear gas got thicker. He claims that his hands were in the air, and that he had something in one hand which he claims was a bus transfer. He admitted that he knew that he was walking toward police, and he said that the police that he was walking towards were wearing gas masks. He was shot with non-lethal bean bag rounds. He admitted that after being hit with the first round that he continued to move forward. He was shot a 2nd and 3rd time with the non-lethal bean bag rounds. It is undisputed that after the last bean bag round struck him that Matthews went down into a culvert which contained water. Matthews testified that when he went into the culvert, that his head hit the pavement. He claims that when his head hit the pavement that he lost consciousness. So just to summarize material facts admitted by Dwayne Matthews, on a dark night, when there rioting and tear gas and smoke, , he knowingly

5

approached police, he knowingly entered a cloud of tear gas and smoke, he emerged from the tear gas and smoke, he continued to approach the police, and then he was hit with three (and his attorney says possibly four) bean bag rounds, which rounds of course will bruise him, and he hit his head on a pavement hard enough to, as he claims, lose consciousness.

Arguably a plaintiff could attempt to avoid summary judgment by making gruesome allegations of a beating that are not supported by facts. In his deposition Mathews even used the word "gruesome" to describe what he said was a beating at the hands of the police. He claimed that the police "drowned" him for three to five seconds, picked him up, slammed him into the pavement, then the police took turns punching him and scraping his face on the pavement, and that this punching and scraping lasted a full two to three minutes, after which he was "Maced" everywhere, after which he was placed into a van without being able to see paramedics until 45 minutes to an hour later when he was finally transported to the Ferguson police department. One problem with his story is that the County police turned Matthews over to St. Charles County SWAT members right away, one of whom was a paramedic, and another problem for plaintiff is the paramedic was wearing a Go-Pro, which capture what occurred after plaintiff was lifted out of the culvert and placed on flat ground, but no beating was captured on the video. Another problem is that although he was taken to the emergency room after this "gruesome" beating, he was discharged a couple hours later and all X Rays and scans were negative. Another problem is he testified that the officers who did the "gruesome" beating for 2-3 minutes were all wearing military type uniforms with boots, but each of the St. Louis County police officers that he is suing were wearing blue jeans, T-shirts and tennis shoes that night, as they are members of the Drug Enforcement Bureau Street team and were wearing the same clothes that they normally wear on duty. Another problem for plaintiff is that he testified that he does not know what

Officer Derik Jackson is being sued for, or what Officer Aaron Vinson is being sued for, and if we went down the line with the names of all of the St. Louis County officers he would not be able to say what each did.

A brief summary of what each officer did is as follows: Det. Derik Jackson fired non-lethal bean bag rounds at Matthews, and then had no physical contact with Matthews; Det. Joe Patterson had no physical contact with Matthews except that he saw that there was a struggle that was not ending despite officers trying to hold Matthews to handcuff him while telling Matthews to stop resisting, and so Patterson first gave a warning that he would use Mace, and then he deployed one burst of the department issued OC spray, which was effective, allowing the officers who were attempting to handcuff Mathews to handcuff him. After Matthews had fallen into the culvert containing water, Detectives Vinson reached his arm out to Matthews, but because Matthews would not grab Vinson's hand, Det. Vinson then grabbed the shirt of Matthews, but then was unable on his own to pull Mathews out of the culvert, and so Detective Bates grabbed both Vinson and Matthews, and pulled both Vinson and Matthews from the water and out of the culvert onto flat land, where, as it turns out, there would be footage because a St. Charles County paramedic who was wearing a Go-Pro approached Matthews as officers attempted to handcuff him. On flat land Det. Matt Burns, who is not a defendant, attempted to hold Matthews as Matthews was moving and flailing. Det. Payne yelled at Matthews while Matthews was avoiding being handcuffed while moving and fighting. After Matthews was handcuffed, Det. Payne assisted Matthews to his feet, and assisted walking Matthews to the St. Charles County SWAT officer and paramedic. Detectives Vinson and Bates' involvement on flat land was attempting to place cuffs on Matthews, but Mathews was wet, Vinson was wet, Mathews was moving and struggling, and so they were unsuccessful with their efforts to handcuff, until the

burst of OC spray was deployed by Det. Patterson. There was no other involvement of these officers.

As mentioned, the only involvement of Det. Derik Jackson was that he had been assigned the duty of being responsible for the non-lethal shotgun, he fired the non-lethal bean bag rounds because he thought that it was appropriate to do so, but then, because he was responsible for the non-lethal weapon, he did not participate with anything else involving Matthews. Each of his fellow officers thought that the firing of the non-lethal rounds was appropriate with the scenario of a violence from the crowd, dispersal of the crowd with announcements, smoke, and tear gas, and then Matthews emerged from the smoke and tear gas coming to the police even when they yelled out for him to stop. . Although Matthews claims that he did not hear all the yelling out by all the officers for him to stop and turn around, there is no dispute that all of the officers say that they were all yelling, and Detective Patterson even went the extra mile by removing his own gas mask, exposing himself to tear gas, and yelling out to Matthews to stop and turn around. There is nothing to dispute that there had been criminal activity on this street including rocks and bottles thrown at police, a Molotov cocktail was thrown on the roof of a building near the police. Commanders were making decisions. It was decided to order dispersal and to deploy tear gas. A different team, the tactical operations team made the announcements and tactical operations deployed the tear gas. There is no material dispute that the crowd did disperse, likely because of the announcements, the tear gas, and the smoke, and then from the direction opposite of the dispersal, Matthews emerged from the smoke and tear gas, and kept approaching the police with, according to some police, clenched fists, or at least with something in his hand. Matthews claims what was in his hand on this dark night as he emerged from the smoke and tear gas was a

bus transfer, but then he claims that the bus transfer fell out of his hand when he was hit by the non-lethal round, and so there is no evidence that he had a transfer in his hand.

In his deposition Matthews admitted that he was taken to the hospital by paramedics, that X rays and CT scans were taken at the hospital, that he was told that the results of the scans and X-rays were all normal, and that he was not admitted to the hospital as a patient, but rather was discharged from the emergency room at 1:15 a.m. after which a friend drove him home, and Matthews admitted that he did not have any follow up treatment with any doctor or other health care provider.

*Claims filed by Kerry White, Sandy Bowers, and Kai Bowers against Michael McCann, Terrence McCoy, Antonio Valentine, and Daniel Hill*

During the late afternoon (according to Kai Bowers) of August 12th, 2014, Kerry White, Sandy Bowers, and Kai Bowers arrived in Ferguson. They stayed in the area until they were arrested after midnight on February 13th, 2014. Kerry White was driving an automobile, and in the auto were Sandy Bowers and Kai Bowers. Kerry White testified that he took photos of the burned Quik Trip store, other places that were looted, and took photos of broken glass and racks and stuff knocked over inside stores. He also testified that he could hear distant gunfire coming from way down on West Florissant, that he had observed maybe 75 people near the police line, people were yelling, announcements were made over a loud speaker to disperse, and he noticed smoke, and he noticed people were dispersing, and he saw the police line enter into a street called Lorna. Sandy Bowers testified that he had been aware of violence occurring in Ferguson at night. Sandy Bowers claimed that he was in the back seat. While riding with Kerry White, Sandy Bowers noticed that the police had the street blocked off at Chambers and West Florissant; Sandy Bowers could see smoke and gas. When the car drove on Lorna, Sandy Bowers observed 10 people running, believing that they were dispersing. Kai Bowers testified

that he saw 20-30 people coming down the street scattering different ways. Kerry White estimated the number of people to be about 50. There is no dispute that there was tear gas that had been deployed on the street. There is no dispute that it was loud, in view of Kerry White's testimony that even with his windows rolled up while driving on Lorna, it was loud outside. It was on Lorna Ave. that the three were arrested. So there is no material fact in dispute that there was a danger in that area, and that the crowd was dispersing. There is no material dispute that the automobile that Kerry White, Sandy Bowers and Kai Bowers were in drove on Lorna, and that the automobile actually drove towards the police line; there is no dispute that there was no other vehicle traffic on Lorna, just this one car that was headed toward the police line, and there is no dispute that the driver and passengers were arrested after the vehicle stopped, and there is no dispute that the vehicle stopped close to the police line. After the vehicle stopped, there is no dispute that police all had their weapons drawn, as testified to by Kai Bowers, and by the police. There is no dispute that the occupants, at the direction of police, held their hands out the window, and there is no dispute that Kerry White had a dark object in his hand, on this dark street, and that the dark object turned out to be a camera. There is no dispute that the police told the driver and passengers to get out of the car, and that when they exited the vehicle, that the three were taken to the ground and handcuffed. Kai Bowers said that what hurt him was not being taken to the ground, but that the officer who was holding him down on the ground had a knee on his neck and shoulder area. Kai Bowers indicated that the three of them were zip tied and walked down the street to where the liquor store was and from there they were transported in a police wagon to Clayton, where they were booked and released. So there is no dispute that the arrest team, made the arrest and then quickly turned over these plaintiffs to conveyance officers. There is no dispute that none of the three went to a hospital, and none of the three saw a doctor at any time

afterwards, for anything relating to this arrest. Kerry White testified in his deposition that he was not injured. Although the occupants may or may not have noticed a helicopter overhead as they were driving at the police line, there is no dispute that Sandy Bowers testified that once he was arrested, that he noticed that there was a helicopter overhead that had its lights shining on them. There is no dispute that all of the officers say that while they were on a police line dispersing a crowd that a helicopter radioed them and alerted them that a car was driving toward the police line. There should be no dispute that no officer intentionally damaged any property, based on Kai Bowers' testimony that he saw an officer drop the camera, explaining "I don't know how he dropped it, it's just like the camera fell somehow" and then Kerry White said to the police, (according to Kai Bowers) "don't break my camera, just put my stuff in the car. There is no dispute that Kai Bowers testified that he saw the officer place the camera in the car. There is no dispute that when Kerry White retrieved his car the next day, that the camera was inside the car, in the back seat, on the floor.

From the viewpoints of the police officers involved, there aren't material differences in what they saw and what they did. Officer Dan Hill explained that his unit had been staged at the command post but after nighttime occurred, that his unit was deployed as a supporting role with the tactical operations team, to the area of Chambers and West Florissant. Upon arrival he observed a large gathering and observed rocks and bottles being thrown at police. He heard repeated commands from loud speakers for the crowd to disperse, saying that it was no longer a peaceful assembly. Commanders were on the ground nearby as there was steady movement of the crowd and the police line. Then the line reached Lorna and Chambers, and broke up with some of the crowd continuing on Chambers and some of the crowd going on Lorna. Orders to disperse were made on Lorna and tear gas was deployed on Lorna. There was a heavy presence

of tear gas in the air on Lorna. There was a radio call given by the helicopter air unit alerting police that a car was driving toward the police line. Officer Hill soon saw the vehicle moving northbound towards the police line. A backdrop of this is that gunshots had been heard earlier. Numerous shouts were made for the vehicle to stop. It kept coming. Det. Hill perceived the car to be a threat as it was heading toward the police. He drew his gun. Finally the car stopped. Officer Hill approached the passenger door, ordered the occupants out, they complied. Hill thinks he had his hand on the hand of the passenger who had been sitting behind the driver, as he assisted him to the ground, but primarily the passenger laid down. "It wasn't a big production." They were placed under arrest. When asked why, Det. Hill answered that they had placed the officers in fear, the officers had given numerous commands to flee the area, they were not fleeing the area, and the totality of the situation that had been going on for three or four days.

Officer Antonio Valentine, normally a member of the Neighborhood Enforcement Team along with Hill and others, arrived with his team and observed individuals throwing rocks, liquor bottles, glass bottles, batteries, bricks, and water bottles at police. He heard the commands that had been given to the crowd to disperse. As the police attempted to disperse the crowd, Officer Valentine even observed members of the crowd trying to flank the police. Valentine reported the attempt by the crowd to flank the police to his immediate supervisor. The throwing of rocks and batteries and glass intensified. Tear gas was deployed. The crowd went in multiple directions. The police did not pursue those who dispersed. The police line reached Lorna Street. The higher up command told the police to stop there. Then a crowd gathered on Lorna. Officers turned onto Loran. While going on Lorna, Officer Valentine was alerted by the air unit that there was a white vehicle with no lights traveling toward the police. The helicopter even shined its light on the vehicle a few times. Officer Valentine saw the vehicle traveling toward the police

with no headlights on. The police yelled to stop. The vehicle continued; more commands to stop were given. Officer Valentine felt threatened. He and other officers drew their weapons. The car finally stopped. Officer Valentine and other officers yelled out, "show me your hands." Valentine approached the passenger, opened the door, told the passenger to get out, and the passenger did get out. Valentine took control of the left wrist and the right arm and assisted the man to the ground, and placed him in flex cuffs. Valentine asked the passenger if he had heard the commands to stop. The passenger said yes. Valentine believed that there was probable cause to arrest this man for something. This was based on his training and experience, and of course the back drop was all that was going on. Officer Valentine had no other involvement with any of the three, as other officers took over control of the three people.

Detective Nicholas Payne around midnight also observed the unruly crowd at Chambers and West Florissant, including the throwing of objects and gunshots. He observed smoke and tear gas being deployed. Payne testified that what worried him while going up Chambers Road was being shot. Then they came to Lorna and the crowd was still throwing rocks and bottles and yelling. Then Det. Payne heard over the radio that there was a white vehicle approaching the police line. Then Payne saw the vehicle. He considered it a threat. He drew his weapon because he was afraid. Payne testified "we were yelling for the vehicle to stop." He even testified that the commands to stop were amplified. When the vehicle stopped, the driver got out of the car voluntarily, laid on the ground, and then after Kerry White was on the ground, Det. Payne placed his hands on him and assisted placing flex cuffs on Kerry White.

Officer Michael McCann had heard gunfire and had heard the crowd make threats to kill police. The crowd moved to Lorna. McCann heard a radio alert from a helicopter that a white vehicle was headed toward the police line. Then he saw it for himself, and saw also that the

vehicle was heading toward police with no headlights on. McCann removed his gas mask and started yelling at the car to stop and repeated this over and over. The car stopped near the police McCann, who already had his weapon out, approached the car, and yelled show us your hands. The occupants did, there was no resistance. McCann was polite and professional, and believed in good faith that there was probable cause to arrest.

Officer Terence McCoy also perceived a danger after hearing gunshots a little earlier, seeing a crowd disperse, then seeing a car drive toward the police, then yelling at the car to stop, then it didn't stop until it got close to police, McCoy grabbed an arm of a passenger but did not use other force. Officer McCoy overheard a passenger tell Officer Valentine that they had heard the police yelling at them to stop.

Officer Dan Hill gave similar testimony. He perceived a threat when the vehicle drove at the police. He approached a passenger, all the occupants were ordered out, all complied, he helped a passenger to the ground and flex cuffed a passenger

*Claims filed by Damon Coleman and Theophilus Green. There are no claims filed against St. Louis County police officers individually.*

Neither Damon Coleman nor Theophilus Green filed claims against or sued any individual police officers employed by the St. Louis County police department. It is believed that the Maryland Heights police officers who are being sued did not violate the constitutional rights of Coleman and Green and did not commit any state torts against Coleman and Green. Since no individual St. Louis County police officer has been sued by Damon Coleman and Theophilus Green, and since the Maryland Heights officers who are being sued are being defended by others, there will be no further discussion at this time regarding Coleman and Green

*Claim filed by Antwan Harris. There is no claim filed by Antwan Harris against any individual*
*St. Louis County officer , or for that matter, against any individual officer from any other police*
*department. The deposition of Harris will be briefly discussed so that the Court can be*
*comfortable that there is no viable claim against any one named in the lawsuit.*

      According to the deposition of Antwan Harris, on August 11, 2014 at approximately 7:40 p.m. Harris was on West Florissant Ave. near the burned down Quik Trip. He had seen tear gas and knew that the crowd was to disperse. In the 3rd Amended Complaint, Harris alleges that he was shot with a rubber bullet. In his deposition he testified that he does not know one way or the other if this really was a rubber bullet. At his deposition he was questioned about the video that plaintiff produced from his cell phone. Neither Harris nor the people whose voices were heard on the video who spontaneously exclaimed that maybe it was a BB, or maybe it was a rock, or maybe it was a rubber bullet, retrieved the projectile that struck Harris on the bridge of his nose. Harris also stated in his deposition that he has no evidence that the person who shot the projectile that struck the bridge of his nose was a St. Louis County police officer. After he was hit, he was walked home. Within 10 minutes, a photo was taken of the bridge of his nose. No powder or powder spray was on his face. Before the photo was taken, he had not wiped off his face with a towel or otherwise cleaned his face. Five minutes after the photo was taken, Harris' father drove him to Christian Hospital Northwest Emergency Room. Apparently there was a wait at the E.R. because his admission clock in time was 9:26 p.m. He was discharged at 11:05 p.m. He did not follow up with a doctor or any other health care provider for anything related to this incident. He was treated at a hospital sometime after August 11[th], 2014 but that subsequent treatment was for an unrelated problem, and while at that subsequent hospital, Harris made no complaints related to the August 11th incident. Harris did not fill a prescription for the August 11th incident. The

history that he gave the nurse at Christian Hospital Northwest when he was examined was that he did not lose consciousness, he denied visual changes, but his eyelids felt heavy, and for 10 minutes it was difficult for him to open his eyes. Mr. Harris was not arrested by any police department. In fact no police officer talked to him.

*Claims filed by Nathan Burns and pending against Terrence McCoy, Michael McCann, and Daniel Hill.*

As a backdrop, it is interesting to know what was said by the man who accompanied Nathan Burns. According to Christopher Shearer, Nathan Burns is Shearer's best friend. The two of them went to West Florissant Ave. on August 11, 2014. According to Mr. Shearer, the area that they went to was within walking distance of Nathan Burns' apartment, but they chose to drive instead of walking, and they parked on a street called Gage, a street over from West Florissant. Mr. Shearer heard the police make announcements over a loud speaker, but Shearer does not remember the number of announcements that were made. Mr. Shearer was not subjected to tear gas. When Mr. Shearer heard police say to get off the street, Shearer left, did not see what happened to Nathan Burns, and drove off in Nathan Burns' car. Mr. Shearer testified that he did not know where Burns was when he drove off in Burns' car.

Nathan Burns agreed that he heard orders to disperse over loud speakers. He remained. Nathan Burns observed tear gas or smoke in addition to the three orders to disperse that he admitted hearing. But he remained. Although he sued Detectives Terence McCoy, Dan Hill, and Mike McCann, he does not know what they did that evening. He claims that he was Maced by police. Before he was subjected to Mace, he had been with a large group of people, he cannot give a number. Then people scattered into subgroups. After he was arrested, Nathan Burns was transported to the St. Louis County Justice Center, which he refers to as the jail. Upon arrival he

admits that he was seen by a nurse who performed an intake examination. The nurse's exam will be explained shortly but getting back to the deposition of Christopher Shearer, Nathan Burns, who is the best friend of Christopher Shearer, did not ever tell Mr. Burns that he had been injured by what happened with his encounter with police on August 11th..

The intake assessment by the Corrections Medicine nurse had some straightforward questions and answers. One question was: "Does patient report having any special limitation at this time?" The answer was no. Another question was "Does patient require special care for a physical condition at this time?" The answer was no. Another was "Current Chief Complaint." The answer was, "Other, Recurrent lumbar pains past two months, TX by chiropractor." The diagnosis was "*routine* history and physical examination" (emphasis added). So Nathan Burns had the opportunity to tell a nurse that he needed treatment for something related to the arrest, whether it was Mace, or bruises, or anything, all that is recorded is lumbar pains for two months, treatment by a chiropractor. The intake examination by the nurse was written to be "routine."

In the deposition of Officer Terrence McCoy, he described the civil unrest; large crowds, property destroyed, things thrown at police officers, multiple shots fired. On the night of August 11th, 2014 McCoy was part of the arrest team. A different team had made several announcements over a loud PA to disperse after which a good portion of the crowd did disperse, but some in the crowd continued to throw rocks. The police were instructed not to chase anybody that ran from the group. Nathan Burns did not run. So McCoy assisted Officers Hill and McCann with the arrest of Burns. After Burns was arrested, the arrest team "passed him off to officers who transported Burns." McCoy was aware that Burns had been pepper sprayed. In fact McCoy said that Burns "told me his eyes were burning...he was talking, he was very calm." McCoy testified that the deployment of pepper spray onto Burns, was not done by him or any St.

Louis County police officer, but was done by City of St. Louis police. In other words, the City of St. Louis police deployed Mace, and then the involvement of McCoy and the arrest team was merely to arrest Burns. After the arrest, Burns was turned over to transport officers, and McCoy had no further involvement.

Officer Michael McCann was also assigned to the arrest team on August 11th. McCann was on a running board on the side of a City of St. Louis police armored vehicle. Officer McCann testified that he observed Nathan Burns throw a rock at the police vehicle. Burns was in a group of several people that were throwing several rocks. McCann testified that City of St. Louis police officers deployed Mace on Mr. Burns, and in so doing the City officers used an aerosol can that was about the size of a small fire extinguisher. When the City of St. Louis officers used this spray, some of the Mace spray inadvertently went into the eyes of Officer McCann, and as a result it was Officers McCoy and Hill who handcuffed Nathan Burns, but McCann assisted with moving Burns to the conveyance officer.

Officer Dan Hill on August 11, 2014 was given an assignment to be on an arrest team, but it was a dual assignment because the radio systems of the City and the County police department were not yet able to communicate with each other, and so he was on a City of St. Louis armored vehicle called the "Bear," standing at the rear side on a running board that he called a "skid." Officer Hill also was given instructions not to chase anyone who dispersed. The City tactical operations had made announcements over loud speakers to disperse. The Bear drove down West Florissant. Rocks and bottles were thrown at it. City of St. Louis police officers would yell "duck" and so Hill would duck and would hear objects strike the Bear. Hill observed rocks being thrown from a group. Hill observed the City of St. Louis police to shoot Mace at a person or persons in the group. The group scattered, dispersed, except that Nathan Burns did

not. Officer Hill went over to arrest Burns. Burns did not resist. Flex cuffs were placed on Burns, and then Burns was walked to a conveyance officer, and Officer Hill returned to the Bear to resume his assignment. Hill did not strike Burns.

### *Claims filed against Chief Jon Belmar and St. Louis County*

There is no personal involvement alleged between Chief Belmar and the individual plaintiffs. In his affidavit, Chief Belmar affirmed that he had no personal involvement with them. Chief Belmar addressed the custom, policy and practice of the St. Louis County police department in his affidavit which are listed and summarized in the statement of material facts. An even shorter summary of that summary is as follows.

St. Louis County police department is CALEA accredited. CALEA is the premier accrediting agency in the United States (and maybe the world). Policies, practices, and practices of law enforcement, communications and training are rigorously examined by CALEA in order to accredit police departments. St. Louis County did not squeak by with a barely passing score, but met all 484 standards. The hiring process of St. Louis County police officers is thorough and exhaustive. Discipline rules and discipline procedures are in place and they meet all CALEA standards. Supervisors go through a probationary period and must be evaluated and must meet CALEA standards. All training is POST certified, and police officers are POST certified. Training is thorough and includes issues raised in this lawsuit such the use of force, probable cause for arrest, and Civil Disturbance Riot Training, which, coincidentally, was mandatory for each and every St. Louis Police officer in the Spring of 2014, just months before the Ferguson civil disturbance/Riots. Municipalities were invited by St. Louis County to send their police officers to the St. Louis County Civil Disturbance training in the Spring of 2014. Coincidentally, Maryland Heights chose to participate. (In this lawsuit, Maryland Heights officers were sued by

Damon Coleman and Theophilus Green). During the unprecedented events of Ferguson Chief Belmar, command officers, and supervisors were on ground level, making assessments, keeping officers calm, maintaining discipline, having frequent contact with commanders of other jurisdictions. Chief Belmar, in his affidavit, not only described the training of the St. Louis County police officers but also his awareness of the training of the City of St. Louis Police Officers and the City of Maryland Heights police officers, and that he discussed the supervision of all officers who responded to the events in Ferguson. (Also note there were allegations made in the 3rd Amended Complaint that Ferguson Officer Justin Cosma arrested Tracey White and William Davis inside the McDonald's but Tracey White admitted in her deposition that all allegations inside the McDonald's were false, so there is no involvement of Ferguson officer Cosma or Ferguson Chief of Police Jackson).

State law claims against St. Louis County were not dismissed in the motion to dismiss because plaintiffs alleged that St. Louis County had waived immunity. The summary judgment statement of facts and affidavits shows that St. Louis County had a self-insurance plan does not waive sovereign immunity. The minor injuries of plaintiffs do not make an excess policy an issue, but if, for example the claim of no injury of Tracey White somehow reached the excess policy threshold, the excess policy also does not waive sovereign immunity.

**Statement of Law**

Legal Standard

Rule 56 (a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law. *Hill v. Walker*, 737 F. 3d 1209, 1216 (8th Cir. 2013). In ruling on a motion for summary judgment the court is required to view the

facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F. 2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U. S. 574, 586-87 (1986). Rule 56 mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett*, 477 U. S. 317, 322 (1986).

Individual defendants

"Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. Section 1983 does not sanction tort by association." *Smith v. City of Minneapolis*, 754 F. 3d 541, 547 (8th Cir. 2014). An officer may only be held liable for his or her own use of excessive force. *Id* at 547-48, quoting *Smith v. Kan. City, MO Police Dep't,* 586 F. 3rd 576, 581 (8th Cir. 2009). So an officer "not involved in the allegedly unconstitutional acts" of another could not have violated a plaintiff's constitutional rights based on the other officer's use of excessive force. *Heartland Acad. Cmty. Church v. Waddle*, 595 F. 3rd 798, 805 (8th Cir. 2010).

The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person. *Copeland v. Locke*, 613 F. 3d 875, 881 (8th Cir. 2010). However Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use

some degree of physical coercion or threat thereof to effect it. *Crumley v. City of St. Paul, Minn*, 324 F. 3d 1003, 1007 (8th Cir. 2003) (quoting *Graham v. Connor*, 490 U. S. 386, 396 (1989). Therefore not every push, shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Id.* (internal quotation and citation omitted).

Whether an officer's use of force is "excessive" is a question of whether the force used was "objectively reasonable under the particular circumstances." *Copeland*, 613 F. 3rd at 881 (citation omitted). Determining the objective reasonableness of a particular seizure under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U. S. at 396. In completing this balancing, courts evaluate the totality of the circumstances. *Id.* In determining the reasonableness of force used, the Supreme Court has identified as considerations "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Henderson*, 135 S. Ct. 2466, 2473 (2015). Courts should not allow "the 20/20 vision of hindsight" to cloud "the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Schoettle v. Jefferson County, Mo*, 788 F. 3rd 855, 859 (8th Cir. 2015), quoting *Graham*, 490 U.S. at 396-97). In other words, to comport with the Fourth Amendment, the force must have been objectively reasonable in light of the facts and circumstances confronting the officers at the time it was used. *Id* at 397. Also see *Carpenter v. Gage*, 686 F. 3rd 644, 650 (8th Cir. 2012) where it was held that deputies on the scene reasonably

could have interpreted the plaintiff's actions as resistance and responded with an amount of force that was reasonable to effect the arrest.

The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Chambers v. Pennycook*, 641 F. 3rd 898, 905 (8th Cir. 2011), citing *Graham,* 490 U. S. at 396. The focus should be on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time that force was used. *Id.* Handcuffing inevitably involves some use of force. *Wertish v. Krueger*, 433 F. 3d 1062, 1067 (8th Cir. 2006). To prove that the force applied was excessive in the context of being handcuffed, a plaintiff must demonstrate something more. *Fisher v. City of Las Cruces*, 584 F. 3rd 888,898 (10th Cir. 2009). Reasonable applications of force may well cause pain or minor injuries with some frequency. *Chambers*, 641 F. 3rd at 907. The degree of injury is relevant insofar as it shows to show the amount and type of force used. *Chambers*, 641 F. 3rd at 906 (internal citations omitted). Also see *Johnson v. Carroll*, 658 F. 3d 819, 830 (8h Cir. 2011) (finding force not excessive in part because the plaintiff "sustained no injury"). As a matter of law, an officer was not to have used excessive force removing an arrestee from his vehicle and placing him on the ground without injury. *Grider v. Bowling*, 785 F. 3rd 1248, 1252 (8th Cir. 2015).

A *de minimis* use of force is insufficient to support a claim; and the court may consider the degree of injury sustained "insofar as it tends to show the amount and type of force used." *Chambers v. Pennycook*, 641 F. 3rd 898, 906 (8th Cir. 2011).

When a suspect waves the white flag of surrender, the use of force in connection with the arrest may, as an objective matter, become unnecessary and inappropriate, but not all surrenders are genuine, and the police are entitled to err on the side of caution when faced with an uncertain

or threatening situation. *Johnson v. Scott*, 576 F. 3d 658, 69 (7th Cir. 2009). So even though it is established that a police officer may not use force against a person who is subdued and complying with the officer's orders, that principle depends critically on the fact that the suspect is subdued. *Johnson*, 576 F. 3d at 660.

For a plaintiff to succeed on a claim of false arrest there must be confinement without legal justification. *Rustici v. Weidemeyer*, 673, S. W. 2d 762, 767 (Mo. banc. 1984). Probable cause for arrest exits when the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. *Borgman v. Kedley*, 646 F. 3d 518, 522, 523 (8th Cir. 2011). Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable. *Id*, quoting *Linn v. Garcia*, 531 F. 2d 855, 861 (8th Cir. 1976). The law does not require law enforcement officers to conduct a perfect investigation to avoid a suit for false arrest. See *Stepnes v. Ritschel*, 663 F. 3d 952, 961 (8th Cir. 2011). Additionally, an arrest on a facially valid warrant, such in the case of Kerry White, generally does not give rise to an action under 42 U.S.C. §1983. *Moiser v. Blum,* 875 F.2d 202, 204 (8th Cir. 1989).

Qualified Immunity shields government officials from liability in a §1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. *De Boise v. Taser Int'l. Inc.*, 760 F. 3d 892, 896 (8th Cir. 2014). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This immunity permits officers to make reasonable errors. *Habiger v. City of Fargo et al.*, 80 F. 3d 289, 295 (8th Cir. 1996). Because qualified immunity is an immunity from suit rather than a mere defense to liability, it is

effectively lost if a case is erroneously permitted to go to trial. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), (quoting *Mitchell v. Forsyth*, 472 U. S. 511, 526 (1985).

A government official is shielded from a suit for damages if a reasonable official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official. *Olson v. Bloomberg*, 339 F. 3d 730, 735 (8th Cir. 2003). Deliberate indifference is akin to criminal reckless and requires something more than mere negligent misconduct. *Drake ex rel. Cotton v. Koss*, 445 F. 3d 1038. 1042 (8th Cir. 2006).

With regard to punitive damages, the defendant's conduct must be motivated by evil motive or intent or involve a reckless or callous indifference to the federally protected rights of others. *Hollins v. Powell*, 773 F. 2d 191, 197 (8th Cir. 1985). In this case the deposition pages of the parties and affidavits, clearly have no hint of evil motive or intent or reckless indifference.

Supervisory Liability

As an initial matter, a supervisor cannot be held liable where there is no underlying constitutional violation. *Abbott v. City of* Crocker, 30 F. 3d 994, 998 (8th Cir. 1994) Without personal involvement in the claimed constitutional torts, supervisors are not liable under §1983. *Johnson v.* Blaukat, 453 F. 3d 1108, 1113 (8th Cir. 2006); *Jane Doe "A" v. Special School Dist.*, 901 F. 2d 642, 645 (8th Cir. 1990). Plaintiff must demonstrate that the supervisory defendant had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Tlamka v. Serrell*, 244 F. 3d 1069, 1078 (8th Cir. 1996). Under this theory of liability, plaintiff must show that the supervisory defendants were "deliberately indifferent to or tacitly authorized the offending acts." *Vaughn v. Greene County, Arkansas*, 438 F. 3d 845, 851 (8th Cir. 2006), quoting *Wever v. Lincoln County, Nebraska*, 388 F. 3d 601, 606

(8th Cir. 2004). Supervisors cannot be vicariously liable under §1983 for the actions of a subordinate. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

With regard to training, accreditation is prima facie evidence that standards and practices of an agency meet constitutional due process requirements. *Woe v. Cuomo*, 729 F. 2d 96, 106 (2nd Cir. 1984). Plaintiffs cannot prevail unless they can show deliberate indifference such as the supervisor having notice that the training and supervision were inadequate and likely to result in a constitutional violation. *Andrews v. Fowler*, 98 F. 3d 1069, 1078 (8th Cir. 1996); citing *Thelma D. v. Bd. of Educ. Of City of St. Louis*, 934 F. 2d 929, 934 (8th Cir. 1991).

Supervisors such as the Chief of Police are also entitled to Qualified Immunity, which protects public officials from damage actions if their conduct did not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity gives governmental officials room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012).

Municipal Liability

As an initial matter with the County, an unconstitutional act on the part of a county employee is a prerequisite to imposing liability. *Reasonover v. St. Louis County, Mo et* al, 447 F. 3d 569, 583 (8th Cir. 2006); *Avalos v. City of* Glenwood, 382 f. 3d 792, 802 (8th Cir. 2004). St. Louis County cannot be held liable under a theory of respondeat superior. *Monell v. Department of Soc. Servs.*, 436 U. S. 658, 691 (1978); *Szabla v. City of Brooklyn Park, Minn*, 486 F. 3d 385, 389 (8th Cir. 2007). A municipality may be liable for unconstitutional acts when those acts

implement or execute an unconstitutional policy or custom. *Mettler v. Whitledge*, 165 F. 3rd 1197, 1204 (8th Cir. 1999). To establish a constitutional violation arising from a custom, a plaintiff must show that the injury was "caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized." *Russell v. Hennepin County*, 420 F. 3rd 841, 849 (8th Cir. 2005), *citing Larson v. Miller*, 76 F. 3rd 1446, 1453 (8th Cir. 1996). In this instance, plaintiff must show that there was a widespread and persistent failure to follow policy, that a policymaker was aware of this failure and was either deliberately indifferent to or tacitly approved of the conduct, and that the unconstitutional act was caused by the custom of failing to follow the policy. *Id.* Also see *Ware v. Jackson County, Mo,*150 F. 3d 873, 880 (8th Cir. 1998), that misconduct must be so pervasive as to constitute a custom or usage with the force of law.

Under section 537.600 of the Missouri Revised Statutes, public entities enjoy sovereign immunity for state claims sounding in tort. *Gregg v. City of Kansas City*, 272 S. W. 3d 353, 358 (Mo. Ct. App. 2008). A public entity does not waive its sovereign immunity by an insurance policy where that policy includes a provision stating that the policy is not meant to constitute a waiver of sovereign immunity. *Brooks v. City of Sugar Creek*, 340 S. w. 3d 201, 208 (Mo. App. Ct. 2011), (quoting *Langley v. Curators of Univ. of Mo.*, 73 S. W. 3d 808, 811 (Mo. App. W. D. 2002) (citing *State ex rel. Bd. of Trustees v. Russell*, 843 S. W. 2d 353, 360 (Mo. banc 1992). Here, the affidavit of Bruce Kozozenski with the self-insurance policy, and even an excess policy that does not apply demonstrate that St. Louis County did not waive sovereign immunity. Also see *State ex rel. Cass Medical Center v. Mason*, 796 S. W. 2d 621, 623 (Mo. bank 1990); *Topps v. City of Country Club Hills*, 272 S. W. 3d 409, 415-16 (Mo. Ct. App. 2006).

Assault and Battery Claims

Under Missouri law, a law enforcement officer is answerable in damages for assault and battery only when in the performance of his duty in making the arrest he uses more force than is reasonably necessary for its accomplishment. *Schoettle*, 788 F. 3rd at 861, citing *Neal v. Helbling* 726 S. W. 2d 483, 487 (Mo. Ct. App. 1987).

In addition, under state law all of the St. Louis County officers are shielded from civil liability for their discretionary acts performed in the exercise of their official duties under the state law doctrine of official immunity. See e.g. *Harris v.Munoz*, 43 S. W. 3d 284, 387 (Mo. App. W. D. 2001); *Bryan v. Missouri State Highway Patrol*, 963 S. W. 2d 403, 406 (Mo. App. 1998)

**Conclusion:**

Sgt David Ryan, Officer Terence McCoy, Officer Michael McCann, Det. Derik Jackson, Det. Joe Patterson, Det. Aaron Vinson, Det. William Bates, Det. Nicholas Payne, Officer Daniel Hill, Officer Antonio Valentine did not commit constitutional torts or state torts and are entitled to summary judgment. In addition under Federal Law they are entitled to summary judgment on the basis of Qualified Immunity, and under state law on the basis of Official Immunity.

Since there was no underlying violations, Chief Belmar and St. Louis County, Missouri are entitled to summary judgment. In addition under Federal law they are not liable under the doctrine of respondeat superior, and there is no basis to support that the policies, practices and customs of St. Louis County caused a constitutional violation under Federal Law. Further, being CALEA certified is prima facie evidence that standards and practices of an agency meet constitutional due process requirements. Further there is no evidence of deliberate indifference. Under Missouri Law, St. Louis County has sovereign immunity. Finally there is no evil motive

or intent or callous indifference of the individual defendants and the claims of punitive damages should be dismissed on summary judgment.

Respectfully Submitted

PETER J. KRANE
COUNTY COUNSELOR

___/s/ Michael E. Hughes_____
Michael E. Hughes #23360MO
Associate County Counselor
Mhughes2@stlouisco.com
Priscilla F. Gunn #29729MO
Assistant County Counselor
Pgunn@stlouisco.com
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042
(314) 615-3732 (fax)

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was delivered to all attorneys of record through the Court's electronic filing system this 13th day of May, 2016.

___/s/ Michael E. Hughes_____