IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al.,                    )
                                         )
        Plaintiffs                       )
                                         )
v.                                       )        Cause No. 14-cv-01490 - HEA
                                         )
THOMAS JACKSON, et al.,                  )
                                         )
        Defendants.                      )

**STATEMENT OF MATERIAL FACTS OF DEFENDANTS BELMAR, SGT. DAVID RYAN, OFFICER TERENCE MCCOY, OFFICER MICHAEL MCCANN, DET. DERIK JACKSON, DET. JOE PATTERSON, DET. AARON VINSON, DET. WILLIAM BATES, DET. NICHOLAS PAYNE, OFFICER DANIEL HILL, OFFICER ANTONIO VALENTINE, AND ST. LOUIS COUNTY IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT**

*Regarding claims filed by Tracey White and William Davis pending against David Ryan, Terrence McCoy and Michael McCann*

1.      Tracey White's son at the time of the incident was 17 years old, and he was turning 18 the following month (T. White depo p. 98).

2.      Tracey White denied under oath that she had ever been a party to an action filed in any court in Missouri (T.White depo p. 17).

3.      When told what is on Missouri Case Net, Tracey White agreed that she is a defendant in an action for nonpayment of a credit card. (T. White depo p. 18)

4.      Tracey White then also agreed that in 2014 there was an order of protection served against her (T. White depo p. 19).

5.      Pursuant to that order of protection, Tracey White agreed to stay 100 feet away from the petitioner's home. (T. White depo p. 19).

1

6.      In her deposition, Tracey White refused to answer the question asking what it was that she had done that led to a permanent order of protection being issued against her. (T. White depo p. 24).

7.      Tracey White also agreed that in 2008 she was arrested in Florissant, charged with interfering and resisting arrest went to court, but the charge was dismissed (T. White depo pp 27-28, 118).

8.      Tracey White also agreed that she was also charged with assault third and disorderly conduct in the municipality of Country Club Hills in 1999 (T. White depo p. 119).

9.      Before the Complaint in this lawsuit was filed, Tracey White discussed with her attorney what happened to her in this case (T. White depo p. 41).

10.     Tracey White attended a rally on August 13th, 2014.  (T. White depo p. 45).

11.     This rally was sponsored by a pastor. Tracey White does not know who this pastor is.  The rally was not sponsored by Tracey White's church, and she does not belong to an AME church.  (T. White depo p. 47, 52).

12.     After the rally Tracey White and her son William Davis walked to the McDonald's (T. White depo p. 53).

13.     Tracey White arrived at the McDonald's around 6:00 or 6:05 pm, and stayed there for about an hour (T. White depo p. 57).

14.     Tracey White walked out the door of the McDonalds; the reason for doing so was that her phone was not charged. (Tracey White depo p. 67).

15.     Before Tracey White walked out of the McDonalds she had not seen any police officers.  (T. White depo p. 68).

16.    After Tracey White was outside she noticed one police officer who she described as an African American but was otherwise unable to say which police department he belonged to. (T. White depo pp 69-70-71-72).

17.    Outside the McDonalds, Tracey White talked to the officer about her husband, while she waited for her son to come out (T. White depo p. 70).

18.    During their conversation the officer told Tracey White that she and her son could wait on the corner when her son came out. (T. White depo p. 70).

19.    Tracey White was <u>not</u> thrown to the ground inside the McDonalds restaurant. (T. White depo p. 99).

20.    Tracey. White's son was <u>not</u> arrested inside the McDonalds restaurant. (T. White depo p. 99, and 102).

21.    The paragraph in the Third Amended Complaint that alleges that Defendants Ryan, McCoy, McCann and Cosma, were wearing what appeared to be army uniforms and helmets, and were carrying rifles and sticks, and ordered Tracey White to get out of the McDonalds is false (T. White depo 106, 107).

22.    The paragraph of the Third Amended Complaint that alleges that after Tracey White's son left the restroom inside the McDonalds, officers accosted her son, is also false (T. White depo p. 107).

23.    The paragraph in the Third Amended Complaint that alleges that when Tracey White expressed her concern that she was told to shut up is also false (T. White depo p. 107).

24.    The paragraph in the Third Amended Complaint that when Tracey White continued to express her concerns about the way her son was mistreated, she was then advised that she was being arrested is also false. (T. White depo p. 108).

25.     It is false that Defendant McCoy or anyone else arrested Tracey White's son inside the McDonalds (T. White depo p 109).

26.     No officer placed a hand on Tracey White inside the McDonalds (T. White depo p. 128).

27.     Tracey White's son never told her that any officer placed his or her hands on him inside the McDonalds (T. White depo p. 128).

28.     Outside the McDonalds there was a crowd of people who were instructed by police to move back, and they did as instructed (Tracey White depo pp 74-75).

29.     Tracey White denied that she got into any sort of confrontation with police in front of the McDonalds or that she spoke loud with police or that she argued with police (T. White depo p. 76, 77, 78).

30.     The encounter that Tracey White had with police occurred on a side street. (Tracey White depo p. 82).

31.     Tracey White is not certain of the amount of time that elapsed between her leaving McDonalds and her arriving at the location where she was arrested; it could have been 30 to 45 minutes. (T. White depo p. 83).

32.     Tracey White remembers that on the other street which she and members of the crowd went to, that there was a truck that was stuck and trying to get out, and that this halted the movement of the crowd, and the movement of the police. (T. White depo p. 86).

33.     Tracey White recalls that the police were then directing the crowd to a different specific street (T. White depo p. 89).

34.    Tracey White claims that when she asked a police officer "how much farther do we have to get pushed back into this crowd," that a police officer then grabbed her, threw her to the ground, put his knee on her back and arrested her. (T. White depo p. 94, 96).

35.    Tracey White does not know what color uniform that this police officer was wearing (depo p. 94).

36.    Tracey White agreed that she was told to disperse, to keep moving backwards (T. White depo p. 167).

37.    When Tracey White viewed the video during her deposition, she could see the truck with the trailer was in the video. (T. White depo p. 186).

38.    When Tracey White viewed the video of her arrest during her deposition, she admitted that the video showed the truck that was stuck, it showed her, and it showed an officer placing hand ties on her. She agreed that video showed an officer placing hand ties on her, and that she was not on the ground, and there was no knee in her back (T. White depo p 180, 181).

39.    The footage from the video shows Tracey White's son walking by holding an iPad in his hand, and so she agrees that the officer may have handed the iPad to her son (T. White depo pp 187-188).

40.    Tracey White viewed footage showing where her son is walking, and that he was holding a soda and ice cream that were still in his hands (T. White depo p. 188).

41.    Tracey White agreed that when her son was walking by with the soda, ice cream sundae, and iPad in his hands, he was not handcuffed and he was not yet arrested. (T. White depo pp. 205-206).

42.     The video footage then shows Tracey White walking with her hands behind her back; she agrees that at this point she is under arrest, and that she should be compliant and should walk with the officers (T. White depo p. 192-193).

43.     The footage then shows that Tracey White's hands have fallen out of the handcuffs; nonetheless she disagreed on the record that she had been pulling her hands away to become uncuffed (T. White depo p. 196).

44.     When shown the footage, Tracey White admitted that: "I wasn't thrown to the ground, doesn't appear that way." (T. White depo p. 196).

45.     In all the videos, Tracey White is never shown being thrown to the ground. (T. White depo p. 202).

46.     Tracey White had never seen the police officers before this incident, and as far as she knows the police officers did not know her. She is not suggesting that officers already knew her and had some sort of evil motive to try to arrest her. (T. White depo pp 168-169).

47.     Tracey White does not recall (then Ferguson) Officer Cosma arresting her. (T. White depo p. 99).

48.     Tracey White is not certain about Officers McCoy, McCann and Ryan, and she does not know what these officers look like. She does not know what color uniform the officer who allegedly threw her to the ground was wearing (T. White depo p. 100).

49.     Tracey White cannot describe what the officer who arrested her son looks like, other than to say that he appeared to be Caucasian (T. White depo p. 109, 110).

50.     Tracey White does not know the name of the officer who threw her to the ground, and cannot recall what he was wearing (T. White depo p. 133).

51. No racial epithets or slurs were used against Tracey White. (T. White depo p. 136).

52. Tracey White observed her son being arrested (T. White depo 141).

53. Tracey White cannot recall any force being used against her son (T. White depo p. 142), but she believes an ice cream that her son was holding was knocked out of his hand (*Id.*) This was the ice cream that had been purchased 30-45 minutes before while inside the McDonalds (T. White depo 166).

54. No medical claim is being made by Tracey White. (T. White depo p. 137).

55. William Davis is aware that there was civil unrest in streets of Ferguson, that there was chaos, that buildings were burned, that there was looting, that there were gunshots in the streets of Ferguson, and that rocks and bottles were thrown at police (Davis depo pp 15-16).

56. William Davis had seen the Quik Trip burned down and the hair salon broken into. (Davis depo p. 20, 22).

57. After the shooting of Michael Brown, and before August 13, William Davis had gone to Ferguson five times, three times with his mom and two times with his dad. (Davis depo pp 16-17, 19).

58. On August 13, 2014 his dad dropped off Davis and Davis' mom, (Tracey White) near the burnt out Quik Trip. (Davis Depo p. 33).

59. Then Davis and his mother walked down the street where there was a peace rally, but he cannot remember if he heard any of the speakers at the rally. (Davis Depo p. 33).

60. William Davis heard the police saying to get out of the street. (Davis Depo p. 38).

61. William Davis and his Mom left the rally after 10 minutes. (Davis Depo p. 40).

62.     William Davis and his Mom walked 15 minutes to a McDonalds on West Florissant, and then stayed at the McDonalds for about an hour.  (Davis Depo p. 41),

63.     At some point perhaps 20-25 minutes after arrival at the McDonalds, William Davis' Mom walked out of the McDonalds to look for Davis' stepdad. (Davis depo pp. 41-42).

64.     While his mother was outside, William Davis remained inside the McDonalds for perhaps an hour.  (Davis depo pp 42-43).

65.     While William Davis remained inside the McDonalds, Davis sat, ate food, and watched CNN. (Davis depo p. 44).

66.     No police officer touched William Davis inside the McDonalds.  (Davis depo pp 44-45).

67.     After SWAT officers came inside the McDonalds and told people to leave, William Davis walked out the door, where his Mom was talking to a SWAT tall Black officer, dressed in black, who was not wearing a helmet.  This officer did not have any weapons or sticks in his hands (Davis depo pp. 45-46).

68.     William Davis could not hear what the officer was saying to his mom because the officer was talking low and there was a lot of commotion and stuff in the background.  (Davis depo p. 47).

69.     William Davis saw the police or SWAT members forming a line. (Davis depo p. 48).

70.     After that, there was a large group of people, including William Davis and his mother, who were moved up some street that Davis was not familiar with; but Davis and his mother were then following the directions of the police.  (Davis depo p. 49).

71.     During the deposition, William Davis watched the video of his mom's arrest and observed the video showing his mom being escorted with two officers. (Davis depo p. 52).

72.     When his mom was arrested, all that William Davis heard the officers say was "You're being arrested, you're being arrested." (Davis depo p. 53, 55).

73.     At that moment when his mom was being arrested, William Davis was about 5 feet away from his mom. (Davis depo p. 54).

74.     William Davis did not hear what the police had said before saying "You're being arrested, you're being arrested" because at that time there was a lot of commotion and other sounds in the background, which included talking and screaming, and officers telling people to keep moving forward. (Davis depo p. 57, 58).

75.     William Davis saw the video, which showed that after his mother was arrested, he was seen walking and carrying what looked like a large soda, an iPad, and what may be an ice cream. At that point Davis was not handcuffed. (Davis Depo p. 61).

76.     William Davis denies that an African American officer had a discussion with him after his mom was arrested. (Davis Depo p. 63).

77.     Davis does remember an officer saying to him "You're under arrest," after which Davis placed his hands behind his back and allowed to be handcuffed, and no force was used." (Davis depo p. 65).

78.     At the time that William Davis was arrested, the rest of the crowd, other than Davis and his mom, had moved on, had moved down. (Davis depo p. 66).

79.     Sgt. David Ryan was dressed in a brown uniform with the external vest in the front and the back. (David Ryan depo p. 10).

80.     Sgt. David Ryan testified that the officers under his command were wearing helmets due to the fact that on previous days there had been shots to the head and rocks thrown at them; he further testified that the officers also wore vests because of what had been going on the nights before. (David Ryan depo pp. 10-11).

81.     Sgt. David Ryan testified that the objective was to clear persons from the area to make sure they are safe securing businesses so that they are not looted or burned down. (David Ryan depo p. 17).

82.     Sgt. David Ryan further testified that the police wished to clear Ferguson Market off the back by securing a line up towards Sharondale Ave., due to the fact that the evenings before the police were attacked from people on that hill. (David Ryan depo p. 17).

83.     Sgt. David Ryan further testified that the Ferguson Market parking lot became secure, and that Ferguson Ave. and West Florissant Ave. had been closed; the line continued to the top of the hill. (David Ryan depo p. 18).

84.     Sgt. David Ryan further testified that the street to the right is Ferguson Ave., and the first street that you come to is Sharondale. He further testified that there is a way out of the apartment complex; that there is one entrance here and another entrance farther up. (David Ryan depo p. 19).

85.     Sgt. David Ryan testified that in addition to St. Louis County police being in the area, there were officers from St. Charles, Ferguson, and the Missouri Highway Patrol. (David Ryan depo p. 20).

86.     Sgt. David Ryan agreed that the video shows him standing by the truck. (David Ryan depo p. 22).

87.     Sgt. David Ryan testified that he had instructed officers to go talk to people to get them to move a little further up to where the police could get the truck out,. Everything would have to be cleared, and this was after he had instructed Tracey White to go up to the top of the hill on Sharondale.   (David Ryan depo p. 23).

88.     Sgt. David Ryan testified that Tracey White would be able to go into the apartment complex, or to keep walking to Ferguson Ave., where she could be picked up.  (David Ryan depo p. 25).

89.     Sgt. David Ryan agreed that the police had been moving people to the area of Ferguson and Sharondale, but Sgt. Ryan said, "I have to call an audible due to…where the truck was located…..our objective was to move that truck out of the way, make sure nobody got hurt, which happened." (David Ryan depo p. 26).

90.     Those officers who effectuated the arrest of Tracey White, did so under the supervision of Sgt. David Ryan, and St. Louis County police were in charge of the scene when Tracey White was arrested.  (David Ryan depo p. 38).

91.     Officer Terence McCoy testified that the Neighborhood Enforcement Team is almost the same idea as hot spot policing. The Neighborhood Enforcement Team tries to address crime trends and to prevent home burglaries, car larcenies, shootings, or drug activity in an area. (Terence McCoy p. 7)

93.     Officer McCoy further testified that The Neighborhood Enforcement Team's duties include doing search warrants, responding to armed and barricaded subjects, instructing at the academy, teaching at schools, and training.   (Terence McCoy depo p. 7).

94.     Officer McCoy testified that there had been civil unrest in Ferguson; large crowds, property being destroyed, police officers assaulted by having things thrown at them,

multiple shots fired, people injured, large crowds throwing rocks at officers. (Terence McCoy depo p. 12).

95.     With regard to Tracey White and William Davis, Officer Terence McCoy testified that what was occurring was that there was a certain area that was trying to be secured and there was a truck that was stuck and they were in the area where the police were attempting to get the truck out of the spot it was stuck in. (Terence McCoy depo p. 51).

96.     Officer McCoy testified that a truck was at the corner of Sharondale and Ferguson. (Terence McCoy depo p. 52).

97.     Officer McCoy testified that the truck was hooked up to a trailer. (Terence McCoy depo p. 53).

98.     In the video Officer McCoy is shown grabbing Tracey White's left arm. (Terence McCoy depo p. 54).

99.     Officer McCoy testified that Tracey White and William Davis were arrested because the police had asked them to leave the area and the police were trying to get this truck out of the area safely. (Terence McCoy depo p. 60).

100.    Officer McCoy testified that White and Davis had been instructed to go into the apartment complex or up the street to the next intersection. (Terrence McCoy p. 61).

101.    Officer McCoy did not order the arrest of Tracey White. (Terrence McCoy depo p. 83).

102.    Officer McCoy is the one who arrested William Davis; Officer McCoy testified that Davis was told that he had to leave the area, and Officer McCoy told Davis that the police are not hurting his mom, and that he still had to leave the area; that "we're giving you an opportunity to either go into the apartment complex or go up the street;" that Davis stared, he

didn't say anything, and then McCoy said: "I'm going to have to arrest you if you don't choose either to go into the apartment complex or go up the street. McCoy further testified that Davis just stayed there and stared. Then McCoy placed Davis under arrest. There was no resistance, and Davis was completely compliant. (Terence McCoy depo pp, 83-84).

103.    Regarding Tracey White and William Davis, Officer McCann testified that he was in the area but did not make the arrest. (Michael McCann depo p. 36).

104.    Officer McCann testified that he was dealing with the truck that had gotten itself pinned between a street sign, had gone off the road, and was stuck. (Michael McCann depo p. 42, 43,44).

105.    Officer McCann testified further that he was motioning the truck driver forward and back, and there was a group of people. McCann testified: "we were afraid they were going to get run over by this vehicle if it became unlodged quickly. From what I remember the trailer was kind of like jackknifed." (Michael McCann depo p. 44).

106.    Officer McCann testified further that "while maneuvered him forward, back, motioned this way, that way, and while they were dealing with crowds of people, the skirmish line was dealing with people. Because this….now became an event itself." (Michael McCann depo p. 44).

107.    Officer McCann testified further that he did not personally engage Ms. White or Mr. Davis. (Michael McCann depo p. 45).

***Regarding claims filed by Dwayne Matthews pending against Detectives Derik Jackson, Joe Patterson, William Bates, Aaron Vinson and Nicholas Payne:***

108.    On August 13, 2014, Dwayne Matthews said that he caught the 61 Chambers bus at the North Hanley Station and took it to West Florissant and Chambers. (Matthews depo p. 11).

109.    Dwayne Matthews testified that he walked towards West Florissant and Highmont.  He kept walking.  The tear gas got thicker.  He kept walking on West Florissant.  It is "pretty dark."  There aren't many street lights.   It is dark plus tear gas and smoke. (Matthews depo p. 16).

110.    According to the testimony of Dwayne Matthews, when he saw the tear gas and smoke, if he had wanted to walk to a parallel street, he could have walked down to West Florissant and made a right on Highmont, which connects to South Dellwood.  From there he could have  made a right on South Dellwood, walked across the road closing, and then his mother's house is right there (Matthews depo p. 17).

111.    Dwayne Matthews testified he had his hands in the air and he said in one hand he held a bus transfer ticket.  (Matthews depo p. 18).

112.    Dwayne Matthews testified that he walked towards a line of police officers, who he describes as were wearing military uniform(s) and gas masks.   (Matthews depo p. 19).

113.    Dwayne Matthews walked through a cloud of smoke and walked through tear gas (Matthews depo p. 20).

114.    Dwayne Matthews was affected by the tear gas when he was walking through the tear gas. (Matthews depo p. 21).

115.    Dwayne Matthews was shot with a first bean bag round, but continued to move forward. (Matthews depo p. 24).

116.    Dwayne Matthews said that he was hit in his stomach, his arms, hand and pinkie (which he says caused his transfer to drop from his hand), and  in the left shin. He fell into a creek where he was followed by the police.  (Mathews depo p. 24).

117.     Dwayne Matthews also described the shooting in the following ways: "They shot me with the bean bag, I fell into the creek water, hit my head on the pavement, they drowned me for about five, six seconds;" " when they shot me with the bean bag, it took my leg off, like my leg just—by force it went off the pavement, so I'm standing on one leg and I'm leaning to the left, I fell by gravity;" "like you shot me, by force it took my leg off my feet, like I'm standing on one leg." (Matthews depo pp. 28-29).

118.     Dwayne Matthews also testified that after he fell into the creek, they "drowned me for about three to five seconds, I was unconscious from the contact of my head hitting the concrete." He was lifted out of the water after which his face was slammed into the pavement, his face was scraped on the ground, and then "they took turns punching, kicking me." The police used racial slurs. Meanwhile Mr. Matthews yelled out "I'm not part of the protest; I'm trying to get home. Then he was cuffed after which he was "Maced" "everywhere" including his wounds, his face, his nose, and his mouth. He called it gruesome. (Matthews depo pp24- 25).

119.     Further describing the events, Dwayne Matthews claimed that someone grabbed him by the throat, two others grabbed his arm, and one grabbed his legs. They flipped him over like a cross, his head was grabbed, and was slammed like a wrestling maneuver. (Matthews depo p. 29).

120.     Further describing the incident, Matthews testified that one man was on his back with a knee and all of his weight on Matthews. While this was occurring five or six officers were beating him; he was punched five or six times; his dreads were grabbed; and his face was scraped on the pavement. (Matthews p. 30, 31).

121.     The beating lasted two to three minutes. (Mathews depo p. 32).

122.    During this time the officers were taking turns just doing anything they wanted. (Matthews depo p. 33).

123.    Dwayne Mathews was placed in a police van for "45 minutes to an hour, burning, leg's fractured, and excruciating pain." (Matthews depo p. 33).

124.    Dwayne Matthews said he did not meet with an ambulance until 45 minutes to an hour later. (Mathews depo p. 25). The location of the paramedics that he finally saw was at the Ferguson police department. (Matthews depo p. 34). Matthews stated: "I was seen by paramedics once I got to Ferguson." (Matthews depo p. 32).

125.    Dwayne Matthews is unable to identify any of the officers who did this; he cannot say if the officers were white or black, but says that they were all wearing military uniforms, and were not wearing blue jeans or tennis shoes. (Matthews depo p. 26, 27).

126.    Matthews is not aware of any witnesses to what he says happened to him; there were only the officers and him. (Matthews depo p. 51).

127.    The paramedics took Dwayne Matthews to a hospital, where he was seen and then released. He went straight home thereafter. (Matthews depo p. 36).

128.    When the paramedics asked Dwayne Matthews questions, he tried to be very honest. (Matthews depo p. 37).

129.    At the hospital Dwayne Matthews tried to be very honest to the person who did the initial paperwork, he tried to be very honest with the nurses who saw him, and he tried to be very honest with the physicians who saw him. (Matthews depo p. 39).

130.    Matthews has seen his medical records. When asked if he disagrees with what is in his medical records he answered no. (Matthews depo p. 39).

131.     When read the history that was recorded by the paramedic, which  said: "Patient states that he was walking through the area and was told to evacuate by police.  Patient admits that he did not immediately evacuate, was shot with rubber bullets and tear gas."  Matthews denied that this is what he had said but instead stated: "I told them the same story I told you." (Matthews depo p. 41).

132.     Matthews was asked to admit as true that the doctor had asked him if he had lost consciousness and that Matthews had told the doctor no, Matthews stated: "I told the doctor the same story that I've told you."  (Matthews depo p. 45).

133.     Matthews disagreed with the doctor's assessment that Matthews appeared to be in moderate pain, but Matthews agreed that the doctor put his hands on him and palpated him and that the doctor examined his forehead, face, right upper abdomen, right upper leg, lower leg, pupils, ear, nose throat, neck, heart pulses abdomen, and skin.  (Matthews depo pp. 47-48).

134.     Matthews agreed that after X-rays and CT scans were taken at the hospital,  he was told that the results were normal.   (Matthews depo pp 48-49).

135.     Matthews agreed that he was <u>not</u> admitted to the hospital overnight as a patient; that he was discharged at 1:15 a.m.; and that a friend drove him home.  (Matthews depo p. 49).

136.     After the initial treatment at the emergency room, Dwayne Matthews did not have any follow up care with any doctor (Matthews depo p. 51), or with any psychiatrists or psychologists or licensed clinical social workers. (Matthews depo p. 52).

137.     Matthews never saw any doctor, and never went to any hospital or clinic after his release from the emergency room.  (Matthews depo p. 66).

138.     Matthews does not know what any of the individual police officersthat he is suing did to him.  (Matthews depo p. 60).

139. Matthews does not know what Officer Jackson is being sued for. (Matthews depo p. 60).

140. Matthews does not know what Officer Vinson is being sued for. (Matthews depo p. 61).

141. If we went down the line with each officer that he has sued, he could not tell what each individual had done. (Matthews depo p. 61).

142. He does however remember that each officer was wearing a "military uniform." (Matthews depo p. 63).

*(Note that the deposition of Det. Nicholas Payne was taken by plaintiffs' attorneys. Although Det. Payne was questioned in his deposition about other events, he was not questioned about Dewayne Matthews. So the numerical references below that appear after each statement of Payne refer to the paragraphs of his affidavit.)*

143. On August 13, 2014, Det. Nicholas Payne and the other members of the Bureau of Drug Enforcement street team were wearing their normal dress, blue jeans and T-shirts. (Payne, Par. 2).

144. Det. Payne and other team members reported to the command center, were given instructions that they would assist with crowd control if needed and would act as an arrest team. They were told that the focus would be on crowd control for the safety of people and property. (Payne, Par. 3).

145. At 9 p.m. Det. Payne and his team were called to assist on a skirmish line near 9400 West Florissant where there was a large unruly crowd. (Payne, Par. 4).

146.    When Det. Payne arrived, he personally witnessed objects being thrown at police and personally heard numerous announcements made by the Tactical Operations Unit over loud speakers instructing the crowd to disperse. (Payne, Par. 5).

147.    In addition, Det. Payne personally observed what he thought was a Molotov cocktail thrown onto the roof of a nearby building, after which announcements to disperse were stepped up, and smoke and tear gas was deployed. (Payne, Par. 6).

148.    Then the crowd began dispersing northbound on West Florissant; the police skirmish line also moved northbound, with a focus on dispersing the crowd instead of arresting anyone. (Payne, Par. 7).

149.    It was very dark in the area. Not only was it night time, but there was smoke and tear gas. (Payne, Par. 8).

150.    While the movement of the police who were dispersing the crowd was northbound on West Florissant, Dwayne Matthews emerged from the smoke heading southbound towards the police line. (Payne, Par. 9).

151.    Det. Payne could hear Det. Joe Patterson yelling at Matthews to stop and turn around. Although Det. Payne was wearing a gas mask, he also was yelling at Mathews to stop. (Payne, Par. 10).

152.    Matthews continued coming towards the police line. (Payne, Par. 11).

153.    Det. Payne saw that Matthews had his hands up, but because he kept coming toward the police after being told to stop, Det. Payne still considered Matthews to be a threat. (Payne, Par. 11).

154.    The member of their team who had been issued the less lethal shotgun that night was Det. Derik Jackson. (Payne, Par. 12).

155.     After several commands were made by Det. Patterson, and by Det. Payne, and by other detectives telling Matthews to stop, Det. Payne then heard Det. Derik Jackson yell out the words "Less lethal, less lethal, less lethal." After those words were yelled out by Det. Derik Jackson, Det. Jackson then fired the less lethal shotgun. (Payne, Par. 13).

156.     Det. Payne considered what Det. Jackson did to be appropriate, and he fully supports the firing of the less lethal rounds in the situation that occurred. (Pane, Par. 14).

157.     What Det. Payne believes that he saw next was Matthews stumble and fall into a culvert that had water in it. (Payne, Par. 15).

158.     Det. Payne observed first Det. Vinson, followed by Det. Bates going to the culvert to get Matthews out,. Det. Bates actually helped both Det. Vinson and Dwayne Matthews out of the culvert onto a grassy area. (Payne, Par 16).

159.     Det. Payne observed that Matthews was fighting and moving after being placed on the grassy area next to the sidewalk. (Payne, Par. 17).

160.     During the struggle, i.e. when Matthews kept moving and fighting, Det. Payne and others yelled at Matthews to stop resisting, and that he was under arrest. Matthews kept moving and fighting, and then Payne overheard Det. Patterson warn Matthews that he would be pepper sprayed. Then Payne observed one spray of OC spray, after which the resisting stopped. Matthews was handcuffed, searched and placed in a sitting position. (Payne, Par. 18).

161.     After Matthews was sat up, he was leaning against the leg of Det. Payne. Det. Payne then assisted Matthews to his feet and walked Matthews to St. Charles County SWAT officers, one of whom told Det. Payne he was a paramedic. (Payne, Par. 20).

162.     After turning Matthews over to the St. Charles County paramedic and the St. Charles County SWAT officer, Det. Payne and the other members of the team resumed their crowd control assignment on the police skirmish line. (Payne, Par. 21).

163.     Det. Payne did not strike Matthews, and did not observe anyone else strike Matthews. (Payne, Par. 19).

*(Note, Matthew Burns was not named in the style of the case as a defendant, and was not served and is not a party to the lawsuit, but there was a paragraph in the  Third Amended Complaint where he was referred to as a defendant.  Initially plaintiffs made overtures to take his deposition but then indicated they would not take his deposition.  Since his deposition was not taken, he has signed an affidavit.  The numerical references below refer to paragraphs from the affidavit of Det. Matt Burns).*

164.     On the night of August 13, 2014, the members of the drug enforcement bureau, consisting of Detectives Derik Jackson, Joe Patterson, William Bates, Aaron Vinson, Nick Payne, and Matt Burns, under the supervision of Sgt. Brandt Wathen reported to the Buzz Westfall Command Post for instructions and assignment as needed. (Burns, par. 5).

165.     At approximately 9 p.m. they were assigned to a police skirmish line on West Florissant near Highmont to act as an arrest team.  Sgt. Walthen was nearby as were higher ranked officers. (Burns par. 6).

166.     Their instructions included that all persons arrested should  be turned over to conveyance officers, and then the arrest team would return to the skirmish line. (Burns par. 7).

167.     This detectives in this group were each wearing jeans, T-shirts, and a vest with the word "Police" on the front and back, and they had their badges exposed.  They were not dressed in military type uniforms. (Burns par. 8).

168.     After arrival, Burns noted rocks and bottles being thrown at the police, and a Molotov cocktail was thrown at a building near the police. (Burns par. 9).

169.     A different team, the tactical operations division, made numerous orders for the crowd to disperse over loud speakers.   The decision to issue the orders to disperse were not made by the arrest team, but by others higher in the chain of command. (Burns par. 10 and 12).

170.     Smoke was deployed and tear gas was deployed (not by the arrest team, but by the Tactical Operations division).   The decision to deploy smoke and tear gas was not made by the arrest team but by others higher in the chain of command. (Burns par. 11 and 12).

171.     The smoke and the tear gas that was deployed, was deployed after numerous announcements had been made to disperse. (Burns par. 13).

172.     After smoke and tear gas was deployed, the crowd was dispersing.  While the crowd was dispersing, the arrest team remained on the skirmish line. (Burns par. 13).

173.     While the crowd was dispersing, Det. Burns was standing on the skirmish line next to Det. Jackson.  Det. Derik Jackson was on the other side of Det. Burns, and so Det. Burns believes that he was standing between Detectives Patterson and Jackson. (Burns par. 13).

174.     Det. Burns suddenly observed Dwayne Matthews come through the smoke and tear gas heading toward the police. (Burns par. 14).

175.     Det. Burns observed that Matthews had clenched fists, and it appeared to Det. Burns that Matthews was moving quickly. (Burns par. 15).

176.     Because the crowd was disbursing away from the police while Matthews was running toward the police, Det. Burns "had no idea what he was doing, or why he was running toward police."  Matthews actions put Det. Burns on "higher alert."  (Burns par. 16).

177. Det. Burns yelled at Matthews to stop and turn around; other officers near Det. Burns yelled at Matthews to stop and turn around. Det. Joe Patterson "somewhat removed his gas mask" exposing his mouth, and yelled loud commands, telling Matthews to stop and turn around. (Burns par. 17).

178. Matthews continued coming at police. (Burns par. 18).

179. With Matthews still coming at the police, Det. Burns could hear Det. Derik Jackson yell out the words: "Less lethal, less lethal, less lethal." (Burns, par. 18).

180. According to Det. Matt Burns Matthews was hit twice with bean bag rounds that were not effective in stopping him. Det. Jackson fired a third bean bag round that was effective. (Burns par. 19).

181. Then Matthews went into the culvert. From the perspective of Matt Burns, it appeared that Matthews had jumped into the culvert, rather than falling into the culvert. (Burns par. 20).

182. Det. Burns observed Detectives Vinson and Bates to go to the edge of the culvert to try to retrieve Matthews, while it appeared to Burns that Matthews was trying to get away. (Burns par. 21).

183. Matthews was pulled out of the culvert by Detectives Vinson and Bates, placed on flat ground, and then Det. Burns and others approached them. (Burns par. 22).

184. Det. Burns observed Matthews flailing and struggling, when officers were telling him to stop; while this was occurring, Det. Burns was attempting to hold Matthews. (Burns par. 22 and 24).

185. Det. Burns observed Det. Patterson deploy one short burst of OC spray in Matthews facial area. (Burns par. 22).

186.     After the burst of OC spray, Matthews was handcuffed. (Burns par. 24).

187.     The involvement of Det. Burns was to attempt to hold Matthews when he was flailing before the burst of OC Spray, and then after Matthews was handcuffed, to make sure that the handcuffs fit properly. Burns had no other involvement. (Burns par. 24).

188.     Matthews was turned over to St. Charles County SWAT team officers, one of whom was a tactical paramedic. (Burns par. 25).

189.     Det. Burns on that night had not been aware that the St. Charles County paramedic had been recording what was happening, but the footage confirms that Matthews was turned over to the St. Charles County officers. (Burns par. 26).

190.     Det. Burns did not strike Matthews, and did not see anyone strike Matthews. (Burns par. 23).

191.     On August 13, 2014, as a member of the seven detective unit called the street enforcement team, Det. Derik Jackson was dispatched with the rest of the team to the area of Canfield and West Florissant to assist with reinforcing the skirmish line. He and other street enforcement team members were wearing blue jeans, a shirt, a black clad vest that had the words "Police" on the front and the back, and a neck badge. (Derik Jackson pp7-8).

192.     When his team of officers reinforced the skirmish line, they encountered a large crowd that was unruly, and had been throwing rocks, bottles, and even a Molotov cocktail. There were gunshots, which Derik Jackson believed were directed at officers. The street team members then also put on their protective masks. (Derik Jackson p. 8, 9).

193.     A different team, called the Tactical Operations Team used loud speakers to tell the crowd to leave, turn around, and go north on West Florissant. (Derik Jackson p. 9).

194.     According to Derik Jackson, a lot of peaceful protesters did leave.  Those who did not leave continued to throw projectiles.  (Derik Jackson p. 9).

195.     Tactical Operations then began to deploy smoke canisters.  (Derik Jackson p. 9).

196.     As the line of police advanced forward, there were still people who were still actively showing aggression.  (Derik Jackson p. 35).

197.     Det. Derik Jackson noticed one individual with shoulder length hair come forward on the east side of West Florissant south towards the police position.  (Derik Jackson 10).

198.     Det. Derik Jackson testified that efforts were made to communicate with the individual, later identified as Dwayne Matthews. Clear verbal commands were given to him to turn around.  These efforts included Detective Patterson removing his gas mask and give directions to Matthews to turn around.  (Derik Jackson p. 11).

199.     Matthews kept coming toward the officers.  (Derik Jackson depo pp 11-12).

200.     Detective Derik Jackson testified that with Matthews still coming toward the officers, Jackson  feared that assault could be imminent, and he yelled out the words "less lethal, lethal, less lethal."  He then fired what he believed to be three less lethal rounds. (Derik Jackson, pp 11-12).

201.     Mathews came towards officers, ran toward the skirmish line, and Det. Derik Jackson feared that an assault was imminent.  Det. Derik Jackson did not see what was in Matthews' hands, but Jackson believed that Matthews' hands were clenched.  ( Derik Jackson p. 28).

202.     Derik Jackson believes that Dwayne Mathews was struck with less lethal rounds three times, after which Matthews went into a culvert.  (Derik Jackson p. 12).

203.     Det. Joseph Patterson testified that on August 13, 2014, he along with other members of the Drug Enforcement street team were assigned to act as an arrest team for the bureau of patrol support and tactical operations unit. (Joseph Patterson depo p. 7).

204.     Det. Patterson testified that "at approximately 9 p.m we were on the skirmish line near West Florissant and Canfield when the crowd became hostile…there was reports of gunfire, there was at least one Molotov cocktail that was thrown and several rocks and bottles." (Joseph Patterson depo p. 7).

205.     Det. Joseph Patterson testified that *commanders on the scene* (emphasis added) had declared an unlawful assembly, that there were dozens of warnings to disperse northbound on West Florissant away from Canfield. (Joseph Patterson depo p. 8).

206.     Det. Joseph Patterson testified that 90% of the crowd did disperse, but some in the crowd refused to leave, and then the skirmish line of police officers moved the remaining crowd toward Chambers Road. This was occurring with a human chain of police officers. On the interior of the chain of police officers, there were two armored vehicles equipped with loud speakers as well as police lights. Also there were continual announcements made to the crowd to disperse. (Joseph Patterson depo p. 9).

207.     Det. Patterson testified that there was also tear gas and smoke. (Joseph Patterson depo p. 10).

208.     Det. Patterson testified that the SWAT officers were the ones who deployed tear gas. (Joseph Patterson depo p. 35).

209.     Det. Patterson testified that "through the police radio we were getting reports that even at West Florissant and Chambers at the lot of the Mobil, they were also experiencing a hostile environment." (Joseph Patterson depo p. 20).

210.    Det. Patterson testified that as this report was occurring, the police line reached West Florissant and Highmont.  There they encountered the man later identified as Dwayne Matthews.  (Joseph Patterson depo p. 9).

211.    Det. Patterson testified that Matthews "was running at us and he refused our orders to stop." (Joseph Patterson depo p. 21).

212.    Det. Patterson testified that he (Det. Patterson) was wearing a gas mask, but that he (Det. Patterson) removed his gas mask, and told this man to stop.  The man stopped for a brief moment, but then continued moving forward.  (Joseph Patterson depo p. 24).

213.    Det. Patterson testified that "I had no idea why a person would act so unreasonably after hearing so many warnings from those loud speakers..." (Joseph Patterson depo p. 24).

214.    Det. Patterson testified that he (Det. Patterson) was standing in a cloud of tear gas when this was happening.  There was tear gas and smoke lingering in the area, and what Patterson said to Matthews was "this is the police, stop." (Joseph Patterson depo pp 24-25).

215.    Det. Patterson testified that after Matthews, stopped for a brief moment Matthews responded "I'm coming through," and that it was at that point that Det. Derik Jackson shot at the man with his less lethal round. (Joseph Patterson depo p. 25).

216.    When asked why Matthews was shot with less lethal, Det. Patterson answered that Matthews was shot "because he continued his forward advancement towards police officers after refusing dozens upon dozens of warnings...we have no idea what his intentions are, especially after he proclaims to us that I'm coming through....fearing an assault was imminent, that is when Detective Jackson first deployed the less lethal rounds."  (Joseph Patterson depo p. 38).

217. Det. Patterson testified that when the less lethal rounds were deployed, there was a lot of yelling going on. (Joseph Patterson depo p. 49).

218. Det. Patterson testified that when the less lethal round took, the man fell or hobbled or stumbled; there was a sort of a culvert that had probably two or three feet of water, and the man fell into that. (Joseph Patterson depo p. 51).

219. Det. Patterson testified that he (Patterson) did not go into the culvert but went right up to the edge. (Joseph Patterson depo pp 51-52).

220. Det. Patterson testified he observed Det. Vinson jump into the water to get Matthews out, and because the culvert was steep, Detective Bates was pulling out both Det. Vinson and Matthews. (Joseph Patterson depo p. 52).

221. Det. Joseph Patterson testified he observed that after Matthews was pulled out of the water, Matthews was put on the ground, but Matthews was thrashing and kicking about. Matthews was wet, the officers were wet, the officers were having a very difficult time securing Matthews' arms and legs, and the officers were saying "stop resisting, stop resisting." (Joseph Patterson depo pp 52-53).

222. Det. Patterson testified that he observed Detectives Vinson and Bates struggle while attempting to place handcuffs on Matthews. Patterson knew that Det. Jackson had the less lethal, and knew that his sergeant had a (lethal) rifle. Det. Patterson realized that he was the only person to get this under control, and so after observing more thrashing, Patterson removed his department-issued OC standard personal use spray from his belt, gave a warning to Matthews, and then gave a one second burst of spray above the man's eyebrows. The spray took effect in a second or two, the man sort of gave up, and placed his hands behind his back. (Joseph Patterson depo p. 54).

223.    Det. Patterson testified that from that point, Matthews was immediately brought over to two St. Charles County SWAT officers, one of whom was a paramedic. (Joseph Patterson depo pp. 54-55).

224.    When Matthews was handed off to the St. Charles County medic, Mathews was calm and cooperative.  (Joseph Patterson depo pp. 54-55).

225.    Det. Patterson testified that once they handed off Matthews to the St. Charles paramedic, that "we continued on;"…… "with the crowd being the way that it was  and the external circumstances of the situation, no one was allowed to be around there." (Joseph Patterson depo p. 55).

226.    William Bates, Jr. is a detective with the St. Louis County police department. (William Bates depo p. 4).

227.    On the night of August 13, 2014, Det. Bates was wearing blue jeans, a T-Shirt, and a clad black raid vest with a "Police" insignia on it.  The attire was typical attire for his unit (William Bates depo p. 8).

228.    There were six people from Det. Williams Bates' unit there; but also on the skirmish line there were officers from other jurisdictions.   (William Bates depo p. 11).

229.    Det. Bates testified that on the night of August 13, 2014 he was assigned to the street team.  "We met up at the command post, we got…requested to come out there and join the skirmish line…..when it started to get darker…it turned more violent.  I remember…threats and people throwing bottles and rocks and…..just yelling at us.  I remember there was a Molotov cocktail that was thrown…landed on a roof."  (William Bates depo p. 7).

230.     Upon further questioning, Det. Bates remembered "our tactical operations gave multiple commands for people to stop throwing bottles, stop throwing rocks….pretty much stop throwing things at us. (William Bates depo p. 8).

231.     The commands to disperse were generally made to the whole crowd.  As stated by Det. Bates: "the whole crowd as a whole was responsible for the throwing the bottles, the rocks,…so at that time they made commands to disperse for everybody." (William Bates depo p. 13).

232.     Det. William Bates testified that he first observed Dwayne Matthews in the general area of Canfield and West Florissant after multiple commands had been given for the crowds to disperse.  There was tear gas, and some of the crowd was moving back but no one was coming toward the police.  Then "it shocked me when I saw him, Mr. Matthews, coming toward us." (William Bates depo p. 10).

233.     Upon further questioning Det. Bates stated: "I just remember him coming straight at us." (William Bates depo p. 15).

224.     Det. Bates testified that he (Det. Bates) focused on Matthews' hands more than anything else to make sure he did not draw a weapon, "but he's still running at us, I remember hearing commands being given to him to stop, turn around, leave the area." (William Bates depo pp. 12-13).

225.     Det. Bates testified that the skirmish line was in the street, but it extended  to the grass part . (William Bates depo p. 32).

226.     When asked if Matthews was on the grassy knoll or the street when Det. Bates first saw him, Bates answered "I believe he was coming down the sidewalk…..from my recollection." (William Bates depo p. 32).

227.     Det. Bates remembers that his group was furthest right than the rest of the skirmish line", and also remembers that there were points when he was in the grass.  (William Bates depo p. 35).

228.     Det. Bates further testified that he remembers the man "refuses to stop," "somebody saying he was under arrest," and "he kept coming,…I remember hearing 'Less Lethal' and "I thought I heard three of the bean bag rounds."  (William Bates depo p. 15).

229.     Det. Bates remembers that Mathews "kind of reacted to the first shot…..I don't know exactly where it hit him."  (William Bates depo p. 23).

230.     When Det. Bates was asked if he saw Mathews fall into the ravine, his answer was: "He jumped into the ravine…..He took both of his feet and he jumped towards the ravine and into the ravine."  (William Bates depo p. 24).

231.     When questioned further, Det. William Bates agreed that the "ravine…sort of fell off a cliff after that grassy knoll."  (William Bates depo p. 29).

232.     When asked whether he actually saw whether or not the bean bag shots took effect, Det. Bates answered: "Out there….it was so smoky and tear gassy, so I couldn't see where they specifically hit him but…….I could definitely tell by his body reaction that …..he was hit by one of them at least."  (William Bates depo p. 25).  Det. Bates further explained "The reaction was….it's just  like his body just moved a little bit,….he still come forward."  (William Bates depo p. 26).

233.     When questioned regarding what was done once Mathews was in the ravine, Det. Bates answered: "Detective Vinson was trying to get a hold of Matthews…he told Matthews to grab his hand…..and then basically I remember he was having trouble getting Matthews…so I grabbed onto him (Vinson) and I grabbed onto Matthews, and kind of was both of them at the

same time…..we all came, came out…to the top part….and then there was multiple people getting in there, he was kicking and flailing and everything like that, and basically we were telling him, you know, he's under arrest, put his hands behind his back, refused to do that, so there were multiple officers trying to, you know, assist in that once he got to the top, but then he was taken into custody." (William Bates depo pp. 36-37).

234. Det. Bates testified that after Matthews was handcuffed, he was turned over to a couple other officers. Det. Bates does not know the other officers were. Det. Bates had no other involvement with Matthews after that. (William Bates depo p. 44).

235. Aaron Vinson is assigned to the Bureau of Drug Enforcement as a detective. (Aaron Vinson depo p. 4).

236. On August 13, 2014, Det. Vinson was with other members of the street enforcement team assigned to the command post. He was then dispatched to areas that needed reinforcements. (Aaron Vinson depo pp 6-7).

237. On August 13, 2014 Det. Vinson was dressed in blue jeans, a department issued vest that was marked "Police" front and back, and a badge hanging around his neck. (Aaron Vinson depo p. 7).

238. Det. Vinson's unit consisted of six detectives, and a sergeant. (Aaron Vinson depo p. 7).

239. Det. Vinson was part of a skirmish line, on the eastern side of the line, which would be in the southbound lanes of traffic. (Aaron Vinson depo p. 32).

240. Det. Vinson testified that when he saw the man later identified as Dwayne Matthews, Matthews' fists were clenched. (Aaron Vinson depo p. 22).

241.     Det. Vinson observed Detective Patterson lift his gas mask, after which Vinson heard Det. Patterson tell Matthews that he could not come through there, and that he needed to go in another direction. Several other detectives said the same thing, but Patterson is the only detective who lifted off his mask. (Aaron Vinson depo pp. 32. 33).

242.     The first contact that Det. Vinson had with Dwayne Matthews was after Mathews had been hit with the non-lethal and was in the ravine. (Aaron Vinson depo p. 38).

243.     Det. Vinson was the first detective to arrive at the ravine, followed by Detectives Bates, Patterson, and Burns. Sgt. Wathen was present, but did not engage in any physical contact. (Aaron Vinson depo p. 39).

244.     Det. Vinson pulled Mathews out of the water, by wrapping his hand up in Matthews' shirt. Vinson was assisted by Det. Bates. The assistance that Vinson remembers is that Det. Bates grabbed the arm of Detective Vinson. (Aaron Vinson depo p. 40, 41, 42).

245.     Det. Vinson said that Det. Bates did not grab the man, but rather assisted Vinson. (Aaron Vinson depo p. 44).

246.     The detectives were attempting to get Matthews to a flat surface so that neither Mathews nor the detectives would fall back into the ravine. (Aaron Vinson depo p. 40).

247.     Det. Vinson testified that Mathews was thrashing his body and arms. The detectives told Matthews to stop resisting. Det. Patterson administered the department issued OC spray, the thrashing stopped, and Mathews was handcuffed. (Aaron Vinson depo p. 40).

248.     Det. Vinson testified that once Matthews was placed on the flatter surface, Mathews continued to thrash about the ground, "his elbows were flying," and Matthews was told to stop resisting. (Aaron Vinson depo p. 60).

249.     There is a video that shows this man being brought to the flat surface.  (Aaron Vinson depo p. 50).  The video picks up after the man is brought out of the ravine.  (Aaron Vinson depo p. 58).

250.     Det. Vinson stated that he had grabbed the jersey worn by Matthews to pull Matthews out of the ravine.  He also grabbed Matthews' wrists and hands to handcuff Mathews, but did not touch any other parts of Matthews' body.  (Aaron Vinson depo pp 60, 61, 62).

***Regarding claims filed by Kerry White , against Michael McCann, Terence McCoy, Antonio Valentine and Daniel Hill, and regarding the claims made by Sandy Bowers, and Kai Bowers against Michael McCann, Terrence McCoy, Antonio Valentine, Nicholas Payne and Daniel Hill***

251.     Kerry White has never been employed by any news agency.   (K. White depo p. 11).

252.     Kerry White has never been paid for any media photographs that he has done. (K. White depo p. 12).

253.     Kerry White did not have an employer that sent him to Ferguson. (K. White depo p. 15).

254.     Kerry White was arrested before midnight, perhaps around 10 p.m.  (K. White depo p. 19).  Perhaps he was arrested at 10:45 p.m. (K. White depo p. 44).

255.     With his camera, Kerry White took photos of the burned Quik Trip store, other places that were looted, people cleaning up, the liquor store that was looted, of stores around New Halls Ferry, broken glass, and racks and stuff knocked over.  (K. White depo pp 21-23).

256.     On the night that he was arrested, Kerry White was in the drivers' seat, Sandy Bowers was in the passenger seat, and Kai Bowers was in the back.  (K. White depo p. 76).

257.     On the night that he was arrested, Kerry White could hear distant gunfire coming from way down West Florissant.  (K. White depo p. 75).

258.    That night Kerry White observed maybe 75 people near the police line.  He described this as a "hostile moment" where "people had their tempers and everybody was yelling." (K. White depo p. 33).

259.    Kerry White could hear announcements from the police over a loud speaker, saying to disperse the area (K.White depo p. 35).

260.    Kerry White had noticed smoke. (K. White depo p. 35).

261.    Kerry White did not initially see tear gas on Lorna Lane, but once the police started firing tear gas on Lorna Lane he was there. (K. White p. 35).

262.    Kerry White saw the police at the end of Lorna. (K. White depo p. 40).

263.    Kerry White was stopped on Lorna with his windows rolled up, but nonetheless could hear what was going on outside because "it was loud." (K. White depo p. 41).

264.    He saw people running and  he saw people dispersing.  He estimates the number of people to be about 50.  (K. White depo p. 45).

265.    He cannot say the number of people who were in front of the police line because people were running and dispersing.  He could not really count how many people there were. (K. White depo p. 47).

266.    He heard a lot of what he described as negative comments directed toward police, including shouting and all types of obscenities.  (K. White depo p. 48).

267.    He saw the police enter onto Lorna, like a police line.  (K. White depo p. 49).

268.    He turned the car around and then the police line began marching from the front, and they were being fired upon from the back.  (K. White depo p. 52).

269.    Kerry White made a U Turn and the police line was there. (K. White depo p. 43).

270.     When he saw the police line, he pulled up a little, stopped, and held his camera out the window. (K. White depo p. 52).

271.     The time between when the police turned onto Lorna Lane and when he was actually arrested was a matter of seconds. The police marched fast and surrounded the car quickly. (K. White depo pp 75-76).

272.     A police officer snatched the camera out of Kerry White's hand and threw it to the ground. (K. White depo p. 54).

273.     The officer who snatched the camera had a gas mask on. (K. White depo p. 61).

274.     Kerry White described the size of his camera as "pretty big." (K. White depo p. 56).

275.     Kerry White described the force that was used as "not out of the ordinary." He also said that "they slammed us to the ground and handcuffed us." (K. White depo p. 77).

276.     Kerry White was not injured. (K. White depo p. 77).

277.     The occupants of the car were escorted by police to Chambers and Lorna. White did not hear any profanity. (K. White depo p. 67).

278.     Kerry White had been initially placed in metal handcuffs. When he got to the back of the police van, the handcuffs were replaced with zip ties. (K. White depo p. 64).

279.     White sat in the back of the wagon with Sandy and Kai Bowers for about 40 minutes. He was then taken to Clayton. (K. White depo p. 67).

280.     Kerry White found his camera inside his vehicle the day after he was arrested. The camera had not been taken to Clayton. (K. White depo p. 65).

281. When Kerry White retrieved his vehicle from a tow lot on Lindbergh the next day, the camera was in the back seat on the floor, but the memory card was missing. (K. White depo p. 71).

282. The day after the arrest, Kerry White and Sandy Bowers returned to where they had been arrested. They saw empty canisters in the street, which Kerry photographed. Kerry described the empty canisters as "expired flash bangs that was used by police." There were two of these. (K. White depo pp. 78-79).

283. Sandy Bowers has never done professional work as a photographer. (S. Bowers depo p. 10).

284. The event of this lawsuit occurred the night of August 12 to the 13, 2014 (S. Bowers depo p. 11).

285. Sandy Bowers does not recall what time he arrived in Ferguson the night of August 12th but it was early in the night, maybe 9 ish or 10. (S. Bowers p. 20).

286. He had been aware that there was violence going on in Ferguson after Michael Brown's death, but the violence was in the nighttime. (S. Bowers depo p. 27).

287. Prior to August 12 , he had gone to Ferguson for a daytime peaceful protesting, but August 12th was the first time that Sandy Bowers had gone during the nighttime. (S. Bowers depo p. 21).

288. The time that Sandy Bowers went to Ferguson during the day was after the riots, which is the day after the Quik Trip store burned. (S. Bowers depo p. 25).

289. The night that Sandy Bowers was arrested was the first and only night that he was at Ferguson at night (after the Michael Brown shooting). (S. Bowers depo p. 40).

290. Kerry White was driving a white Impala. (S. Bowers depo p. 42).

291.    Sandy Bowers was in the back seat behind the driver, and Kai Bowers was in the front seat of the car that Kerry White was driving. (S. Bowers depo p. 46).

292.    Sandy Bowers saw that the police had the street blocked off at Chambers and West Florissant, and he saw smoke and gas. (S. Bowers depo p. 44, also p. 49).

293.    The car was moving (S. Bowers depo p. 55), towards Chambers on a street that could have been Lorna. (S.Bowers depo p. 56).

294.    Sandy Bowers cannot recall that the street had any street lights. (S. Bowers depo p. 80).

295.    There was no other traffic on the street that Sandy Bowers can recall, but no more than 10 people running past. (Bowers depo p. 58).

296.    Regarding the ten people who were running, Sandy Bowers thought that they were dispersing. (S. Bowers depo p. 63).

297.    Sandy Bowers does not recall if the headlights of the car they were in were on or not. (S. Bowers depo p. 60).

298.    When the police officers came toward them, the police came in a formation like a triangle. one officer got there first and went to Kerry's door; the other officers came around to the side of the car in a quick second; all that Sandy Bowers knows is that it happened so quick. (Sandy Bowers depo p. 81).

299.    The brother of Sandy Bowers was on the other side of the car; Kerry White was in front of the car; Sandy Bowers could not see what was going on with them. (Bowers depo p. 76).

300.    Sandy Bowers can only describe one of the officers, an African American. (Bowers depo p. 75).

301.    The African American officer did not handcuff him but he was cussing.  (Bowers depo p. 76).

302.    When asked  if he remembers anything the police were saying to him when they arrested him initially Sandy Bowers answered "get on the F-ing ground;"  and then apparently the officers thought that he was not complying and so they said "they was going to break my arm or something like that;" but there were no racial slurs that were used.  (S. Bowers depo p. 106).

303.    Once he got arrested, Sandy Bowers noticed that there was a helicopter overhead that had "the lights on us."  (S. Bowers depo p. 63).

304.    The African American officer did not have gloves, (and that was how Sandy Bowers knew that he was an African American),  and then there was a Caucasian officer who was decent, but he cannot describe any other officer because the officers had gas masks on and gloves, and suited up.  (Bowers depo p. 88).

305.    After the police put them in handcuffs, the police walked them to Chambers Road, in front of the convenience store, sat the three of them on the curb and made them wait for the van.  (S. Bowers depo p. 86).

306.    After four or five minutes there, a van took them to Clayton.  (S. Bowers depo p. 91).

307.    At Clayton, "they did a book and release,"  which took about 4 or 5 hours.  (S. Bowers depo p. 92).

This time in Clayton was spent in a holding area; he was not placed in a cell.  (S. Bowers depo p. 93).

308. The next day, around 9 a.m. or 10 a.m., Sandy Bowers and Kerry White drove back to Lorna Lane where they found items such as casings from things like flash bombs and smoke bombs. (S. Bowers depo p. 96).

309. Sandy Bowers did not see any doctors or receive any medical care for whatever pain that he might have had after this incident. (S. Bowers depo pp 19-20).

310. The day after the Quik Trip burned, Kai Bowers and Sandy Bowers accompanied Kerry White to Ferguson as Kerry White took photos of the area. (K. Bowers depo p. 30, 35).

311. There also were lot of different newspaper, TV and different cameramen also out there taking photos. (K. Bowers depo p. 30, 31).

312. The night that Kai Bowers was arrested involved the night of August 12th carrying into August 13th, 2014. (K. Bowers depo p. 9).

313. On August 12th, Kai and Sandy Bowers and Kerry White arrived in Ferguson around 5 or 6 p.m. (K. Bowers depo p. 36).

314. After arrival they parked at Red's Barbecue lot. (K. Bowers depo p. 42).

315. Kai Bowers was involved in some protesting on the 12th. (K. Bowers depo p. 37).

316. The three of them arrived in late afternoon on the 12th and did not leave the area until they were arrested. (K. Bowers depo p. 41).

317. At about 10 p.m. the three of them went to Rally's on Chambers Rd. and Halls Ferry. (K. Bowers depo p. 53).

318. Before they went to Rally's there was tear gas. (K. Bowers depo p. 45).

319. (After this tear gas) they were able to get into their car at Red's Barbecue and leave. (K. Bowers depo p. 131).

320. They had been on West Florissant before they went to Rally's and when they were on West Florissant previously they heard police telling people to disperse. (K. Bowers depo p. 61).

321. They had previously left West Florissant when the police started tear gassing. (K. Bowers depo p. 62).

322. Kai Bowers was sitting in the front seat, his brother Sandy Bowers was in the back seat sitting behind the driver; the driver was Kerry White. (K. Bowers depo p. 54).

323. When the three of them left Rally's, they started driving towards West Florissant. (K. Bowers depo p. 55).

324. Before they got to West Florissant, they turned onto the street that they later got arrested on (Kai Bowers could not remember the name of the street), but to describe the street he said that the street that he got arrested on has the liquor store on the corner. (K. Bowers depo p. 64).

325. Kai Bowers saw 20-30 people coming down the street, those people were scattering different ways. (K. Bowers depo p. 72 and 88).

326. When the three of them went down the side street, there was a military vehicle blocking the end, and there were people who were walking and then those people took off running. (K. Bowers depo p. 70).

327. The military type vehicle was at Lorna and Kappel. (K. Bowers depo p. 77).

328. Kerry White pulled the car into a driveway to turn around, and then they saw another military type vehicle, and then the car pulled over (to the curb), and Kerry White held his hands out the window showing a camera. (K. Bowers depo p. 83).

329. The police who came to the car were a combination of African American and Caucasian. (K. Bowers depo p. 105).

330. The police came to the car with weapons drawn, told them to get out of the car, told Kai Bowers to put his hands up, "they grabbed me out the car, put me down, put his knee in…" (K. Bowers depo p. 95). When again describing this, Kai Bowers said that the officer "dragged me out of the car, put me on the ground, put his knee in the back of my head, and held me with force." (K. Bowers depo p. 106).

331. Kai Bowers did not go to the hospital, but because the officer had a knee on his neck and shoulder, "I felt like I was hurt." (K. Bowers depo p. 106-107). There was just one officer holding him down. (K. Bowers depo p. 107).

332. What hurt Kai Bowers was not being taken to the ground, but the pressure on the neck and back. (K. Bowers depo p. 108).

333. Kai Bowers overheard Kerry White say to the police, don't break my camera, just put my stuff in the car. (K. Bowers depo p. 110).

334. Regarding the camera, Kai Bowers said that he saw an officer drop the camera. Explaining further he said: "I don't know exactly how he dropped it, it's just like the camera fell somehow, and then that's when Kerry was like, 'Oh, man, you trying to break my camera,' and then they picked it up.' After the officer picked it up, Kai saw the officer put the camera back in the vehicle. (Kai Bowers depo p. 112).

335. Regarding being cuffed, Kai Bowers said "they zip-tied us all and they walked us down….next door to the liquor store." (K. Bowers depo p. 116).

336. They were transported in a police wagon to Clayton where they were booked and released. (K. Bowers depo p. 119).

*(Note that the deposition of Officer Michael McCann was taken by plaintiffs' attorneys. Although Officer McCann was questioned in his deposition about other events, he was not questioned about Kerry White, Sandy Bowers, and Kai Bowers. So the numerical references below that appear after each statement of Michael McCann refer to the paragraphs of his affidavit.)*

337.    Near midnight on August 12, 2014 the members of the Neighborhood Enforcement Team, which included Officer Michael McCann, were assigned were assigned to assist with what was going on near West Florissant and Chambers Road.  (McCann par. 2).

338.    This group was assisting with a police line which, after midnight, reached Chambers Road and Lorna Lane.  (McCann par. 3).

339.    Some of the crowd moved south on Lorna Lane, and the police line also moved onto Lorna Lane.  (McCann par. 3).

340.    Officer McCann was on the left side of Lorna Lane, and so were Officers Valentine and Hill.  (McCann par. 4).

341.    On Lorna Lane warnings were given by tactical operations to disperse; in addition tactical operations dispersed tear gas on Lorna Lane.  (McCann par. 4).

342.    Officer McCann heard sounds of gunfire.  (McCann par. 5).

343.    Officer McCann had also earlier heard threats from the crowd to kill police. (McCann par. 5).

344.    Officer McCann heard a radio transmission from a helicopter that there was a white vehicle heading toward the police line on Lorna.  (McCann par. 6).

345.     After Officer McCann heard the radio transmission from the helicopter, he actually observed the car driving toward the police line, and observed that this car did not have its headlights on. (McCann par. 6).

346.     Officer McCann removed his gas mask and yelled "Stop." He repeated this over and over. (McCann par. 7).

347.     The car did not stop until it was very near the police line. Before the car stopped, Officer McCann removed his weapon. (McCann par. 7).

348.     Officer McCann yelled out, show us your hands. Other officers also yelled this out. The occupants did show their hands. (McCann par. 8).

349.     When the driver showed his hands, there was a black object in one hand. Officer McCann yelled drop it; he did drop it. (McCann par. 8).

350.     McCann approached the vehicle. Other officers approached the vehicle. There were at least two sergeants nearby. (McCann par. 9).

351.     The driver was removed from the car, taken to the ground, a pat search was performed, all with very little force used. (McCann par. 10).

352.     Kerry White admitted to Officer McCann that he had heard the commands to stop. (McCann par. 11).

353.     Officer McCann believed in good faith that there was probable cause for arrest. (McCann par. 11).

354.     Officer McCann believes that he was polite and professional with Kerry White. (McCann par. 12).

355.     Observations were made of equipment inside the car, discussion was had whether it was safe to leave the car on the street, a decision was made by a sergeant. (McCann par. 13).

*(Note that the deposition of Officer Terence McCoy was taken by plaintiffs' attorneys. Although Officer McCoy was questioned in his deposition about other events, he was not questioned about Kerry White, Sandy Bowers, and Kai Bowers. So the numerical references below that appear after each statement of Terence McCoy refer to the paragraphs of his affidavit.)*

356. On August 12th-13th, 2014 Officer McCoy was a member of the Neighborhood Enforcement Team. (McCoy par. 2).

357. On August 12th, continuing past midnight, Officer McCoy's team was deployed to West Florissant to assist, and was assigned to be part of a skirmish line. (McCoy par. 3).

358. Officer McCoy heard gunshots that seemed to be coming from West Florissant and Chambers Road, and heard gunshots that seemed to be coming from further east on Chambers Road. (McCoy par. 3).

359. That night at on West Florissant, Officer McCoy saw objects thrown at police and heard threats directed at police. (McCoy par. 3).

360. Officer McCoy heard several loud warnings on loud speakers instructing the crowd to disperse, he observed smoke, he observed the crowd begin to disperse, and then the police line moved east. (McCoy par. 4).

361. When the police line reached Chambers Road and Lorna Lane, some of the crowd moved to Lorna Lane, so many officers, including Officer Terence McCoy, also moved south on Lorna Lane. (McCoy par. 4).

362. Once the line moved onto Lorna Lane, members of the crowd were dispersing by running through yards and running away from the police line. (McCoy par. 5).

363.     Officer McCoy then heard a report from a helicopter saying that a car was driving on Lorna Lane toward the police. (McCoy par. 5).

364.     After hearing the report from the helicopter, Officer McCoy then personally observed an automobile driving toward the police line with no headlights. (McCoy par. 5).

365.     Officer Terence McCoy heard officers around him yelling for the car to stop, but the car did not stop.   Officer McCoy pulled out his weapon. (McCoy par. 6).

366.     Officer McCoy thought that this was a danger, not only because the car was driving at the police line but also because he had earlier heard gunshots, and so this was a concern. (McCoy par. 7).

367.     The car braked and stopped close to the police, Officer McCoy and other officers yelled to the occupants to show their hands. (McCoy par. 8).

368.     Officer McCoy approached a passenger, grabbed his arms, but otherwise did not use any force and did not place the passenger on the ground. (McCoy par. 10).

370.     Officer McCoy overheard Officer Valentine ask a passenger if he had orders to stop, and overheard the passenger say yes. (McCoy par. 11).

371.     Officer McCoy observed what appeared to be expensive equipment inside the car, took part in a discussion whether or not the car with the equipment should be left on the street, McCoy expressed his opinion that would be dangerous, with his opinion based on actually having this area as his permanent beat prior to what his present assignment was. (McCoy par. 12),.

372.     Officer Dan Hill was asked generally about circumstance where police would disperse crowds on August 11th-13[th], 2014 in Ferguson, and he answered that under circumstances that it became violent unlawful assembly the commanders gave the police the

directive when it wasn't safe to be out there, but other than that, they did not disperse anyone. (Dan Hill depo p. 21).

373.    Upon more general questioning, not specific to the plaintiffs, Officer Hill described the police actions saying: "I think we were incredibly restrained….We did what our commander told us to do…..We did what we were told.   (Dan Hill depo. Pp. 45-46).

374.    Officer Hill testified that on August 13th, 2014, after his unit had first been staged at the command post,  his unit was deployed as a supporting role with the tactical operations team to the area of Chambers and West Florissant.  (Dan Hill depo pp11-12).

375.    Officer Hill testified that when they arrived, they saw the police units who had requested additional support; there was a large gathering; there were rocks and bottles being thrown; his unit was directed to form a scrimmage line.  (Dan Hill depo p. 13).

376.    Officer Hill testified there were numerous repeated commands from loud speakers for crowds to disperse, it was no longer a peaceful assembly, and they were subject to arrest. (Dan Hill depo p. 14).

377.    Officer Hill testified that his unit was to be the arresting unit that would do the handcuffing; (Dan Hill depo p. 15); and he explained it further by saying "Our assignment was to support the tact unit, and if a commander decided that somebody needed to go to jail, they would direct us to that person and we would handcuff them." (Dan Hill depo p. 18).

378.    Officer Hill testified there was a steady movement up Chambers, the commanders were there on the ground and were concerned that some parts of the line were moving too far ahead and some were moving too slowly, and the commanders tried to keep everyone shoulder to shoulder; the movement was very coordinated from the commanders on the ground. (Dan Hill depo p. 16).

379.     Officer Hill testified that when the line reached Lorna and Chambers Rd., that the large group basically broke up, and one group continued east on Chambers and another turned onto Lorna; Hill was then in the group of officers that turned onto Lorna.  (Dan Hill depo p. 22).

380.     Officer Hill testified that orders were given, tear gas was deployed, and the crowd on Lorna began running in between houses and into people's back yards.  (Dan Hill depo p. 22).

381.     Officer Hill testified that not everyone was dispersing.  (Dan Hill depo p. 25).

382.     Officer Hill testified that there was a heavy presence of gas in the air. (Dan Hill depo p. 23).

383.     Officer Hill testified that a "warning had been put out over the radio by the air unit" something to the effect that there was a car "approaching the scrimmage line."  (Dan Hill depo p. 28).

384.     Officer  Hill testified that as the officers were in a line moving down the street, a vehicle was driving northbound on Lorna; numerous commands were given for the vehicle to stop.  (Dan Hill depo p. 26).

385.     Officer Hill perceived the vehicle as a threat.  (Dan Hill depo p. 29).

386.     Officer Hill described the movement of the vehicle as "driving at us;" at which point he drew his gun.  (Dan Hill depo p. 26).

387.     Det. Hill testified that the vehicle drove "within 25 feet of us," and further testified that "I don't recall headlights being on," but conceded he does not remember if the headlights were on or off.   (Dan Hill depo p. 32).

388.     When the vehicle stopped, it pulled over; Officer Hill approached the passenger door, and described the encounter as follows:  "We ordered them out. They complied.  We

helped them to the ground. They were flex cuffed with their hands behind their back." (Dan Hill depo pp 26).

389. When further questioned, Officer Hill testified that when the vehicle stopped, that his approach to the vehicle "was a slow cautioned approach," and that he was yelling "Show us your hands, show us your hands," and that a lot of people were yelling. (Dan Hill depo pp 30-31).

390. Officer Hill testified that when he got to the passenger door, the door was open. (Dan Hill depo p. 32).

391. Officer Hill described his encounter with a passenger as "I may have had my hand on his hand, on his arm and assisted him going to the ground, I don't recall....it wasn't a big incident. It wasn't a big production. It was he got out of the car, got on the ground, laid down." (Dan Hill depo p. 30).

392. Upon further questioning, Officer Hill stated that he "was focused purely on the passenger," and so he has "no idea" how the driver got out of the car, and further stated that he did not see anyone thrown to the ground, and when asked if he was saying that all of the occupants got out of the vehicle and on the ground voluntarily, he answered "We directed them to, and they did voluntarily, yes." (Dan Hill depo p. 33-34).

393. When asked to state the reason that the officers apprehended the occupants of the vehicle Officer Hill stated: "We had given numerous commands for everyone to flee the area, and they were approaching us, making no attempts to flee the area. Like you pointed out earlier, they could have turned around and drove away, but they did not." (Dan Hill depo p. 32).

394. Upon further questioning, Officer Hill stated, "Of all the things that he could have done, he chose to come toward us and approach us and put us in fear......the totality of the

situation from the last three or four days, we were doing everything as safely for everyone as we could."  (Dan Hill depo pp. 34-35).

395.    Officer Hill testified that the arrested persons were then walked to an intersection and placed in a conveyance van.  (Dan Hill depo p. 36).

396.    Antonio Valentine, now a detective, on August 13th, 2014, was an officer with the Neighborhood Enforcement Team.  (Antonio Valentine depo p. 4).

397.    When Asked, Officer Valentine testified that two of the six officers, including Valentine, who were part of the Neighborhood Enforcement Team are African American officers; the briefings after Officer Valentine's first day at the unrest included instruction on not to respond to banter directed at African American officers who were called out by others so as not to escalate or incite the crowd.  (Antonio Valentine depo pp. 17-18-19).

398.    On August 12th when Officer Valentine arrived on duty, there were briefings which included relaying information to supervisors who can relay back up to higher ups. (Antonio Valentine depo pp 20-21).

399.    Briefings on when to disperse a crowd came from Valentine's chain of command. (Antonio Valentine depo p. 21).

400.    On August 12th when it was dark, Officer Valentine's group was involved in a dispersal of a crowd when individuals were throwing rocks, liquor bottles, glass bottles, batteries, water bottles at police.  (Antonio Valentine depo p. 22).

401.    Officer Valentine additionally testified that members of the crowd also confronted officers and told them what they were going to do to the officers and that they would shoot the officers.  (Antonio Valentine depo p 23).

402.     Officer Valentine testified that on August 13th, 2014 ten or more commands were given to the crowd that they were not peacefully protesting anymore and that they needed to disperse; at that time "it wasn't just batteries and bottles of water, it was glass, bricks were thrown, we were being confronted, threatened, they were coming at us." (Antonio Valentine depo p. 29).

403.     Additionally, Officer Valentine told his immediate supervisor that individuals were actually flanking the police by running in between the businesses like Exquisite Cuts and Zisser Tire. (AntonioValentine depo p. 31).

404.     In this area near the barber shop, Mr. Malik Shabazz was wearing a yellow shirt, khaki pants, and holding a bullhorn, and being an active participant.  (Antonio Valentine depo pp 74-75).  (Note  Mr. Shabazz is the attorney who took the deposition of Det. Valentine.).

405    Officer Valentine further testified that the officers were told to stop moving forward because the throwing of rocks, batteries and glass intensified.  (Antonio Valentine depo p. 31).

406.     Officer Valentine further testified that after it intensified, that more commands were given and then smoke and tear gas were deployed.  (Antonio Valentine depo p. 32).

407.     From the area where the officers were being flanked, there was debris or various items being thrown at the police.  (Antonio Valentine depo p. 32).

408.     Officer Valentine further testified that after tear gas was deployed, the crowd started going back east on Chambers Rd; and  also the crowd went in multiple directions between businesses; the police did not pursue those that dispersed.  (Antonio Valentine depo p. 33).

409.     Officer Valentine testified that the police line continued to move further east on Chambers, moving about 20-30 feet and then the crowd would stop and "engage" the police;

then they reached the intersection of Chambers and Denis; then the intersection of Chambers and Vickie. (Antonio Valentine depo p. 37).

410. Officer Valentine further testified that there was still a crowd of 40 to 50 people going back and forth, and also vehicles were involved darting in and out of adjacent streets. (Antonio Valentine depo p. 38).

411. While this was going on, Officer Valentine learned of a call that one of the businesses further down was actually being looted. (Antonio Valentine depo p. 39).

412. When again asked whether people were pursued, Officer Valentine again stated that he and his unit did not pursue anyone. (Antonio Valentine depo pp 39-40-41).

413. When the police line reached Lorna, there was a command by higher ups to stop. (Antonio Valentine depo p. 44).

414. When the police line stopped at Lorna, the officers checked on each other to make sure there were no injuries; and further noted there had been persons and vehicles that had turned down Lorna, and persons going down Lorna cutting in between houses. (Antonio Valentine depo p. 45).

415. Officer Valentine testified further that it was being said that a large crowd was gathering on Lorna toward the middle of the street; he did not see that because he was then facing Chambers, but there was a command to go down Lorna, and then he actually saw a crowd of 10 to 15 people on Lorna. (Antonio Valentine depo pp 46-47).

416. Officer Valentine testified that "we turned on Lorna and actually started to go down Lorna." (Antonio Valentine depo p. 48).

417.     Officer Valentine testified that "From there, we actually (were) informed by the air unit that there was a white vehicle, no lights, that was actually headed back toward us." (Antonio Valentine depo p. 49).

418.     When questioned further on the role of the helicopter, Officer Valentine testified that the helicopter "brought it (the white vehicle) to our attention;" and upon even more questioning testified that the helicopter did shine its light on the white vehicle a few times. (Antonio Valentine depo pp 70-71).

419.     Officer Valentine testified that the white vehicle "had no lights, it was roughly driving at approximately 20-25 miles an hour, was not swerving or anything, but it was coming at us, coming north on Lorna."    (Antonio Valentine depo p. 50).

420.     Commands were given by police officers to "stop, pull over," the vehicle continue to travel, more commands were given.  (Antonio Valentine depo p. 50).

421.     After five or six commands were given, officers drew their guns; he testified that no command was given to draw their weapons, but the officers did draw their weapons after the warnings were given.  (Antonio Valentine depo p. 51).

422.     Officer Valentine testified that the reason that they drew their weapons was that the vehicle with the headlights off was "actually coming at us," and further said "it was really not complying with our commands and it's still coming at us," and further stated "I felt threatened." (Antonio Valentine depo p. 52).

423.     Officer Valentine testified that commands were given by the officers to the occupants, to "show me your hands," and then Valentine approached the rear passenger door, opened the door, told the passenger to step out, took control of his left wrist, placed that behind

the man's back, took control of the right arm, and assisted the man to the ground, did not throw the man to the ground. (Antonio Valentine depo p. 53).

424.    Officer Valentine patted down that man to make sure that he did not have any weapons, and placed him in flex cuffs. (Antonio Valentine depo p. 56).

425.    Officer Valentine testified that after handcuffing the man, Valentine asked if he had heard the commands to stop; with the response being "Yeah, we heard it, but he kept driving," while motioning to the driver. (Antonio Valentine depo p. 56, and p. 72).

426.    Officer Valentine believed, based upon his training and experience, that there was probable cause to have this man arrested for something. (Antonio Valentine depo pp. 72,73.).

427.    While other officers then maintained control of the people who had just been removed from the vehicle Officer Valentine inventoried the vehicle, found various electronic equipment,. (Antonio Valentine depo pp 56-57).

428.    Officer Valentine agreed that when a tow truck was initially requested, it was denied which means that either the tow truck driver or someone on behalf of the tow truck driver decided that it wasn't safe for the tow truck to come into that area to tow the car from Lorna Ave. (Antonio Valentine depo pp 73-74).

429.    When Officer Valentine was questioned by plaintiffs' attorney about training; Officer Valentine answered that he felt that he was adequately trained; that St. Louis County had conducted riot training or crowd control training the year prior, which was part of the in service training of the department which training was done annually if not biannually since 2011. (Antonio Valentine depo pp 65-66).

430.    When questioned regarding his reactions when he was called names by the crowd, and when others threatened to kill the police, Officer Valentine answered: "I have a lot of self-

restraint and tact," and that he understands that people say a lot of things in the heat of moments." (Antonio Valentine depo pp. 67-68).

431.    Nicholas Payne, St. Louis County police officer, assigned to the drug unit and has been for five years. (Nicholas Payne depo pp 4-5).

432.    He has had formal training on crowd control; with the last training prior to August 9th 2014 was about a month or two before. (Nicholas Payne depo pp13-14).

434.    The regular police gear for the men in his unit is blue jeans and T-shirts. (Nicholas Payne depo p. 27).

435.    On August 13th, 2014 (after midnight) the crowd was getting unruly; a hundred or more persons were in the crowd at Chambers Rd and West Florissant where there was yelling and throwing of objects and gunshots going on. (Nicholas Payne depo p. 31).

436.    The order was given several times to disperse; the crowd was not disbursing; the crowd continued to throw rocks and bottles at the police; then a decision was made for the tact operations unit to begin using smoke and tear gas to disperse the crowd. (Nicholas Payne depo p. 45).

437.    As the police were moving on Chambers from West Florissant, the crowd would be dispersed and then reformed, and rocks and bottles would be thrown at police again, after which the tactical operation unit would deploy what they felt necessary to disperse the crowd. (Nicholas Payne depo p. 50).

438.    When questioned by one of plaintiffs' attorneys regarding what Det. Payne's feelings were as they were going up Chambers with objects being thrown at him and cursing

directed at them, Det Payne answered: "The only thing I was probably worried about was being shot, at that point." (Nicholas Payne depo p. 52).

439.    Then they went down Lorna; the numbers on Lorna were 20-25 people and they were throwing rocks and bottles and yelling. (Nicholas Payne depo p. 55).

440.    As the police were moving on Lorna, Det. Payne heard over the radio that there was a white vehicle approaching the police line. (Nicholas Pane depo p. 55).

441.    Det. Payne drew his weapon because "the vehicle was moving and I was afraid I was going to be hit by a car." (Nicholas Payne depo p. 57).

442.    Upon further questioning, Det. Payne stated "As long as the vehicle is moving, I would consider it a threat." (Nicholas Payne depo p. 67, also see p. 66).

443.    When Det. Payne first saw the vehicle, it was "Maybe 100 yards, maybe 100, 200 yards;" and Det Payne stated: "We were yelling for the vehicle to stop;" and when questioned further by one of plaintiffs' attorneys Det. Payne agreed that he considered the vehicle to be a threat.    (Nicholas Payne depo p. 66).

444.    When questioned further regarding who was telling the vehicle to stop, Det. Payne answered "Everybody" and said that the sound was "Amplified and verbally." (Nicholas Payne depo p. 69).

445.    Det. Payne testified that Kerry White got out of the vehicle voluntarily, and that Kerry White laid on the ground, and that Det. Payne "assisted him in getting him into the flex cuffs and get him into custody." (Nicholas Payne depo p. 73).

446.    Det. Payne did put his hands on Mr. White to place him in custody once he was on the ground; no one threw Kerry White onto the ground. (Nicholas Payne depo p. 63).

***Regarding claims filed by Damon Coleman and Theophilus Green, there are <u>no</u> claims pending against individual St. Louis County police officers.***

*Regarding claims filed by Antawn Harris, there are __no__ claims filed against or pending against any individual St. Louis County police officer. But the following are facts from the deposition of Antawn Harris*

447.    On August 11, 2014 at around 7:40 p.m. Antawn Harris was on West Florissant Ave. near the burned down Quik Trip. (Harris depo pp 22-25).

448.    He had seen tear gas and knew that the crowd was to disperse. (Harris depo pp 26-27)

449.    He was using his cell phone to film the police and the crowd. (Harris depo pp 27,28, 29).

450.    While he was filming people throwing tear gas and people leaving, one police officer shot Harris in the face. (Harris depo p. 30).

451.    Harris has no evidence that the person who shot him in the face was a St. Louis County officer. (Harris depo p. 32).

452.    The officer was wearing riot gear, but Harris cannot say if this was a St. Louis County police officer or not. (Harris depo p. 33).

453.    Harris agrees that in In Harris' cell phone video that was still operating after he was hit, that Harris indicated on the video that Harris said that he did not know what hit him. When asked isn't it true that on the video someone else is heard saying that maybe it was a BB, Harris answered "I don't know," and that someone else is heard saying it was a rock, Harris answered "I don't know."   (Harris depo pp 40-41)

454.    From the knowledge of Harris, at the time when it happened, he did not know if he had been struck with a rubber bullet or a real bullet.  (Harris depo p. 41).

455.    Neither Harris nor the people whose voices were heard on the video looked around to see if there was anything laying on the ground.  (Harris depo  p. 41).

456.     Harris does not know one way or the other if this was really a rubber bullet. (Harris depo p. 41).

457.     After he was hit, he walked home, and within 10 minutes of the incident a photo was taken of the bridge of his nose (the question mistakenly referred to the tip of the nose but it is undisputed that it was the bridge of the nose).  (Harris depo pp 37, 38, 57, 58).

458.     Before the photo was taken, he had not wiped off his face with a towel;  he had not cleaned off his face.  (Harris depo p. 42).

459.     There is no powder or powder spray on his face. (Harris depo p. 43).

460.     Five minutes after the photo was taken, the father of Mr. Harris took him to Christian Hospital Northwest emergency room (Harris depo p. 45).

461.     Mr. Harris saw the nurse at 8 or 8:16 p.m. (Harris depo p. 48).

462.     At the E.R., Mr. Harris tried to give honest answers to questions that the nurse asked him. (Harris depo p. 48).

463.     Harris told the nurse that he did not lose consciousness, he denied visual changes, but his eyelids felt heavy and it was difficult for him to open his eyes for 10 minutes.  (Harris depo p. 49).

464.     It sounds relatively accurate to Harris that official hospital records show that his admission time was clocked in at 9:26 and his discharge time was 11:05 p.m. (Harris depo p. 50).

465.     After discharge from the hospital, Harris did not follow up with another doctor for examination and did not ever get a prescription filled (Harris depo p. 50).

466.     Harris has never been to any other doctor or health care provider or clinic relating to the injury.  (Harris depo p. 57).

467.    Harris was treated at a hospital after August 11, 2014 for a problem unrelated to what happened on West Florissant; at that subsequent unrelated treatment Harris gave a history that his vision was normal and he had no other complaints, other than the subsequent unrelated condition. (Harris depo p. 54).

468.    Mr. Harris was not arrested by any police department.  (Harris depo p. 54).

***Regarding the claims filed by Nathan Burns and pending against Terrence McCoy, Michael McCann, and Daniel Hill.***

469.    On August 11, 2014 Nathan Burns was arrested around 10:30 p.m.  (Burns depo p. 8).

470.    Before being arrested, Nathan Burns had heard police give orders to disperse, which orders were given over loud speakers.  (Nathan Burns depo p. 11, 12, 22, 62. 63).

471.    Nathan Burns had heard "maybe three" orders to disperse that night.  (Nathan Burns depo p. 12, and also see p. 22 where he stated "about three.").

472.    At first Nathan Burns was with a large group of people; he cannot give a number, and then right before he was "Maced," people were scattered out into subgroups.  (Nathan Burns depo pp 76-77).

473.    When asked if he had wanted to leave, could he have gone through a yard, he answered "My car was actually on the street and I didn't want to leave my car out there.  (Nathan Burns depo p. 15).

474.    Before OC spray was used, Nathan Burns had observed tear gas or smoke being used, and heard three orders to disperse.  (Nathan Burns depo p. 62-63)

475.    Mr. Burns does not know who Detectives Terence McCoy, Dan Hill or Mike McCann are; and Nathan Burns does not know what they did the evening of August 11, 2014. (Burns depo p. 29).

476.   That night, Nathan Burns was transported to the Justice Center, which he refers to as the jail. (Burns depo p. 39).

477.   At the Justice Center there was a nurse who performed an intake examination of Nathan Burns. (Nathan Burns depo p. 40).

477.   County Exhibit E, according to the affidavit, are medical records of Nathan Burns kept in the ordinary course of business of Saint Louis County Department of Public Health pertaining to Nathan Burns on August 12, 2014. (Exh. E).

478.   The intake RN Assessment had a question: "Does patient report having any limitation at the time?" The recorded answer is "No." (County Exh. E, designation Page4/4.

479.   The intake RN Assessment contained a question: "Does patient require special care for a physical condition at this time." The recorded answer is "No." (Id)

480.   The Intake RN Assessment included the Word: "Behaviors." The notation afterwards is "Cooperative." (Id).

481.   The Intake RN Assessment included the words: "Current Chief Complaint: Following that it is written: "Other (Recurrent Lumbar pains past 2 months tx by Chiropractor." (Id).

482.   Christopher Shearer considers Nathan Burns to be his best friend. (Shearer depo p. 8).

483.   The area that Nathan Burns and his best friend Christopher Shearer went to was within walking distance of Nathan Burns' apartment. (Shearer depo p. 10).

484.   Nathan Burns and Christopher Shearer did not walk; they drove in Nathan's car and parked on a street called Gage, over from West Florissant; (Shearer depo p. 11-12).

485.   Before tear gas was deployed, Mr. Shearer heard announcements from police to "Go to your homes." (Shearer depo p. 19).

486.   That announcement was made on the loud speaker; Mr. Shearer cannot remember the number of times that the announcement was made. (Shearer depo p. 20).

487.   Mr. Shearer was not subjected to tear gas (Shearer depo pp. 18-19).

488.   Mr. Shearer had run from where he had been and did not see Nathan Burns get "Maced." (Shearer depo p. 52).

489.   Mr. Shearer did not hear any police officer say anything directly to Nathan Burns because Shearer did not even know where Nathan Burns was; when the police told Shearer to get off the street, Shearer drove off in Nathan's car. (Shearer depo p. 55).

490.   Nathan Burns did not ever tell Christopher Shearer that he was injured at all by what happened that night. (Shearer depo pp 61-62).

*Note that the deposition of Officer Dan Hill was taken by plaintiffs' attorneys. Although Officer Hill was questioned in his deposition about other events, he was not questioned specifically Nathan Burns.   So the numerical references below that appear after each statement of Dan Hill refer to the paragraphs of his Affirmation.)*

491.   On August 11, 2014 Officer Dan Hill was a member of the Neighborhood Enforcement Team, and reported to the Command Center for briefing and assignment. (Hill par. 2-3).

492.   His team was assigned to be an arrest team, but in addition Officer Hill and Officer McCann were detached to be liaisons with the St. Louis Metropolitan Police Department (i.e. City of St. Louis Police Department) because the radio systems of the City and County police departments were unable then to communicate with each other. (Hill par. 4).

493. Officers Hill and McCann were riding on a City of St. Louis Armored Vehicle which they called the "Bear" on West Florissant Ave. (Hill par. 5).

494. While riding on the Bear, Hill and McCann stood on a skid, at the very rear, on the outside of the Bear. City police officers were standing near them but in front of Hill and McCann. (Hill par. 5).

495. Officer Hill observed rocks and other objects thrown at police and heard announcements made by the City of St. Louis Tactical Operations over loud speakers commanding the crowd to disperse. (Hill par. 6).

496. As Hill was riding on the outside of the Bear on West Florissant Ave. he could hear the City police officers yell "Duck," and as he ducked he could hear objects strike the Bear. (Hill par. 6).

497. Hill observed rocks thrown at the Bear form a small group; then Hill observed a City of St. Louis tactical operations officer deploy Mace at the group; then he observed people from that group scatter and run away, except that Nathan Burns, who was in the midst of the group, did not scatter and run away. (Hill par. 7).

498. The instructions that had been given to Hill's team that night was not to chase people who dispersed and ran away, but they could arrest someone, with probable cause, who did not run away. So Hill went to where Burns was standing to arrest Burns. (Hill par. 8).

499. The reason for arresting Burns was he had not dispersed, plus Hill had observed Nathan Burns to be standing within a small group of person throwing rocks at police, and Burns was then Maced by City police. (Hill par. 8).

500. Nathan Burns did not resist arrest. (Hill par. 9).

501.     The arrest of Nathan Burns was uneventful, consisting of placing him on the ground, placing flex cuffs on him, picking him up, taking him to conveyance officers. (Hill par. 9).

502.     After Burns was given to conveyance officers, Officer Hill returned to the Bear to resume his assignment. (Hill par. 9).

503.     Officer Hill did not strike Nathan Burns and used what he called minimal and appropriate force. (Hill par. 10).

504.     Officer McCoy described the civil unrest in Ferguson; large crowds, property was destroyed, police officers were assaulted by having things thrown at them, multiple shots fired, people injured, large crowds throwing rocks at officers. (Terence McCoy depo p. 12).

505.     Officer McCoy was involved in the arrest of Nathan Burns on West Florissant near Highmont. (Terence McCoy depo p. 11).

506.     Officer McCoy testified that that night McCoy was wearing brown pants, a black shirt with police officer vest and a helmet and boots. (Terrence McCoy depo p. 13).

507.     Officer McCoy was part of the arrest team that night. (Terence McCoy depo p. 15).

508.     Officer McCoy testified that there was a different unit that had made several announcements from a "loud PA" to disperse; after which a good portion of the crowd did disperse; but some members of the crowd continued to throw rocks. (Terence McCoy depo pp 15-16).

509.     Officer McCoy testified that the police had been instructed not to chase anybody that ran from the group; Nathan Burns did not run; Burns was taken into custody. (Terence McCoy depo p. 22).

510.     Officer McCoy testified that he assisted Officers Hill and McCann with the arrest. (Terence McCoy depo p. 28).

511.     Officer McCoy testified that "we (the arrest team) pass(ed) him off" to officers who transported Burns; Burns at that time was pretty disoriented because he had pepper spray in his face. (Terence McCoy depo p. 39).

512.     Officer McCoy testified that Nathan Burns "told me his eyes were burning,….. he was talking, he was very calm." (Terence McCoy depo p. 43).

513.     Officer McCoy testified that the deployment of OC spray was done by St. Louis City police as opposed to St. Louis County police. (Terence McCoy depo p. 47).

514.     On August 11th, 2014 Officer Michael McCann was involved with the arrest of Nathan Burns. (Michael McCann depo p. 5).

515.     The arrest of Nathan Burns occurred at West Florissant and Highmont. (Michael McCann depo p. 9).

516.     Officer McCann testified that there were officers riding on running boards on the side of the armored vehicle. (Michael McCann depo p. 10).

517.     Officer McCann testified that he had seen Nathan Burns "in a crowd of people at the intersection of Highmont and West Florissant, east end, I saw Mr. Burns throw a rock at the ….we call it the Bear, it's an armored personnel vehicle that St. Louis City was using to move the crowds along." (Michael McCann depo p. 9).

518.     Officer McCann testified that besides Mr. Burns, there were several rocks thrown; St. Louis City deployed Mace in the direction of the group that was throwing rocks. (Michael McCann depo pp 9-10).

519.     Officer McCann testified that City officers who deployed Mace used an aerosol can that was about the size of a small fire extinguisher, to deploy the Mace. (Michael McCann depo p. 10).

520.     Officer McCann, when questioned further, repeated that it was Members of the St. Louis city police department who used OC spray on Mr. Burns. (Michael McCann depo pp. 29-30).

521.     Also when questioned further, Officer McCann repeated that Nathan Burns did throw a rock towards the vehicle; that officers were on the running boards holding onto the vehicle as it proceeded up West Florissant. (Michael McCann depo p. 30).

522.     Officer McCann testified that he was probably 2-3 feet from the City officer who used the OC spray; that some of the spray inadvertently went into McCann's eyes; that McCann nonetheless still walked in the general direction of where Nathan Burns had been standing and saw Officers Hill and McCoy place Burns under arrest; that McCann believes that it was Hill and McCoy who cuffed Nathan Burns but McCann assisted with picking Burns up from the ground, placing him under arrest, and moving Burns to the sprinter van (where the conveyance officer was). (Michael McCann depo pp 33-35).

### Regarding claims made against Chief Jon Belmar and St. Louis County

(Note: the numerical references below are from paragraphs of Chief Jon Belmar's affidavit.)

523.     Jon Belmar is chief of police of St. Louis County now and has been since January 31, 2014, and has responsibility for the overall operation of the St. Louis County Police Department, and overall responsibility for making sure that the department complies with accreditation standards, and the Board of Police Commissioners, per the County charter, approves policies. (Belmar par 1, 4, 5).

524. Jon Belmar has been a St. Louis County Police Officer for 30 years having risen through the ranks to chief. (Belmar par. 2).

525. St. Louis County has been accredited by CALEA, the Commission on Accreditation of Law Enforcement Agencies, since 1988). (Belmar par. 6).

526. Chief Belmar is familiar with CALEA, summarized CALEA in paragraphs 8, 10-20. These include: CALEA is the premier accrediting association within the United States, there is a rigorous accreditation process every three years which includes on site assessment, review of policies, procedures, and practices, the accreditation covers law enforcement, Communications, and training. The last two accreditation cycles, which included the time period before and after the events mentioned in the lawsuit, St. Louis County met all 484 standards. The areas involved in accreditation are Law Enforcement, Communications, and training, and the review of the activity of the department during the preceding assessment cycle. As a result, the 2015 cycle included a review of the activity, the policies, the practices and the training occurring during the Ferguson civil unrest time period were reviewed. (Belmar Par.7, 8, 10-20).

527. The hiring process of St. Louis County police officers includes background checks of driving history, criminal history, financial status, education verification, reference checking, checking of prior law enforcement and military employment when applicable including internal affairs history, testing, psychological test, polygraph test, and interview. Chief Belmar makes the ultimate decision on who to hire and has not hired anyone with a history of assaultive behavior, or a sustained complaint of excessive force or unlawful arrest, or anyone with a pattern of complaints involving unlawful arrests or excessive force, and is not aware that his predecessors. (Belmar par. 21-24).

528.    St. Louis County has Conduct and Discipline Rules and Procedure Manual in place, and a discipline procedure in place. All allegations of employee misconduct are investigated by the Bureau of Professional Standards.   If there is a sustained complaint of excessive force or unlawful arrest the discipline is significant.  Arrests without probable cause are not tolerated and excessive force is not tolerated. CALEA requires 25 standards pertaining to internal affairs and disciplinary policies and procedures, and St. Louis County met all of them in the 2012 and 2015 reaccreditation process.   (Belmar par. 25-31, 34).

529.    The training and certification of St. Louis County officers includes:  all officers must graduate from a police academy and must pass license exams, they must be POST certified Peace Officer Standards and Training); POST licensing of basic training centers and  basic training instructors, and POST approval of curricula, 48 hours of POST approved continuing education every 36 months. (Belmar par 35-38).

530.    Some specific ongoing training of St. Louis County officers includes basis for warrantless arrests, probable cause, use of force. The use of force policy is attached as an exhibit. (Belmar par.20, 39-40).

531.    A few months before August of 2014, St. Louis County police officers were required to undergo Civil Disturbance Riot Training in the spring of 2014 by an instructor trained by the United States Department of Homeland Security.  In addition to requiring its own officers to attend, St. Louis County invited police officers from municipalities located within St. Louis County to attend, and perhaps coincidentally, the City of Maryland Heights participated in the training, and  Chief Belmar himself attended. (Belmar par. 41-43).

532.	Even before the Spring of 2014, Civil Disturbance Training that was required for all officers. New recruits have been receiving Civil Disturbance and Riot Training for seven years. (Belmar par. 44).

533.	Supervision of St. Louis County police includes: a chain of command; meeting CALEA standards that apply to supervision, regularly evaluating supervisors, having a probationary period for supervisors. (Belmar par.45-50).

534.	The unprecedented, events of Ferguson, which included gunfire, looting and burning and other criminal activity, were addressed by Chief Belmar beginning in paragraph 51; actions of the chief included telling his officers at the very beginning to remain calm and maintain discipline, frequent contact with commanders of the Missouri Highway Patrol and the St. Louis Metropolitan Police Department and others, providing the bulk of the manpower, (who as mentioned were POST certified and well trained as accredited by CALEA), working with and knowing the other departments who were present such as the St. Louis Metropolitan Police Department and Maryland Heights, and knowing that they are well trained and professional; Chief Belmar personally remained present to supervise during heightened criminal activity, along with St. Louis County supervisors and commanders who were actually on the ground supervising, and more (Please see paragraph 51-88 which are incorporated herein by reference). (Belmar par. 51-88).Chief Belmar has no knowledge, or reason to believe that the officers from the City of St. Louis and/or from the City of Maryland Heights who were in the Ferguson area between August 11 and 13, 2014, were inadequately trained, or had a pattern of making arrests without probable cause or of using excessive force. Belmar Affidavit ¶33

535.	Chief Belmar had had regular and frequent contact with both the Highway Patrol and the St. Louis Metropolitan Police Department ("SLMPD") prior to August 2014. He viewed

both of them to be highly competent and well trained law enforcement agencies. Belmar Affidavit ¶64

536.    Chief Belmar knew that SLMPD was a CALEA certified agency in 2014. Belmar Affidavit ¶65

537.    Chief Belmar was not aware of a pattern of unaddressed unconstitutional behavior on behalf of any SLMPD officer. Belmar Affidavit ¶66

538.    Both the Highway Patrol and SLMPD brought their own senior level commanders and supervisors with them to Ferguson. Belmar Affidavit ¶67

539.    The City of Maryland Heights responded to the Code 2000 in Ferguson with police officers. Belmar Affidavit ¶68

540.    Chief Belmar had worked with the Maryland Heights Police Department over the years, and knew the officers in that Department to be professional and well trained. Belmar Affidavit ¶69

541.    Maryland Heights responded as a unit with its own supervisors. Belmar Affidavit ¶70

542.    Chief Belmar was comfortable that the Maryland Heights officers who were on the scene in the Ferguson area were properly supervised. Belmar Affidavit ¶70

543.    Chief Belmar was aware that Maryland Heights had participated in the County Civil Disturbance Riot Training, and that all of its officers were POST certified.  Belmar Affidavit ¶71

544.    Maryland Heights had participated in County Incident Control Training, where County officers trained with officers from other law enforcement agencies in the area to respond to a disaster. Belmar Affidavit ¶72

545.    Chief Belmar was not aware of a pattern of unaddressed unconstitutional behavior on behalf of any Maryland Heights police officer. Belmar Affidavit ¶73

546.    Chief Belmar personally remained present in the Ferguson area to supervise the police activities for as long as his physical stamina permitted during the heightened protesting and criminal activity in August, 2014. Belmar Affidavit ¶74

547.    Chief Belmar had no personal involvement with the plaintiffs in this lawsuit (and it is not even alleged that he did), and has no knowledge that officers who were personally involved with them had had a pattern of arrest without probable cause or use of excessive force. (Belmar par. 89,32, 33).

**Regarding plaintiffs' claims that sovereign immunity has been waived for State Claims.**

548.    St. Louis County Self-Insurance Policy provides for coverage of "only those claims for which sovereign immunity is not authorized under Section 537.600 et seq. R.S.Mo. (2007 as amended)." Under the first section, titled "NON-WAIVER OF SOVEREIGN IMMUNITY," the Policy states that the "County expressly does not hereby waive, and County does hereby avail itself of and reserve, any and all rights, immunities, protections and defenses available under Section 537.600 et seq., under any present and future state or federal provisions, or under common law as it develops. Kozozenski Affidavit ¶3; County Exhibit C.

549.    Excess Insurance Coverage is not an issue in this case because there is either no injury or very minor injuries.   But if the Excess Coverage were an issue, the County's Excess Insurance Contract with Starr Indemnity & Liability Company contains a statement expressly declaring that the policy does not include "coverage for any suit, claim or liability against which St. Louis County is immune pursuant to Sec. 537.600 R.S.Mo. et seq, or any other statute or law granting counties of the State of Missouri governmental, or sovereign, immunity, to the fullest

extent to which such immunity is applicable." Further, the policy clarifies that nothing in the

policy "shall be construed to broaden the liability of the Named Insured beyond the provisions of

Sections 537.600 to 537.610 of the Missouri Statutes. . . nor to abolish or waive any defense at

law which might otherwise be available to the Named Insured, its officers or employees.

Kozozenski Affidavit ¶3; County Exhibit D.

550. Kerry White had an outstanding arrest warrant from the City of Maryland Heights

at the time of his arrest in Ferguson. (Kerry White Deposition p. 82).

PETER J. KRANE
COUNTY COUNSELOR

___/s/ Michael E. Hughes___
Michael E. Hughes #23360MO
Associate County Counselor
Mhughes2@stlouisco.com
Priscilla F. Gunn #29729MO
Assistant County Counselor
Pgunn@stlouisco.com
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042
(314) 615-3732 (fax)

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was delivered to all attorneys of

record through the Court's electronic filing system this 13th day of May, 2016.

___/s/ Michael E. Hughes___