IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ORIGINAL

TRACEY WHITE, et al.,        )
                             )
            Plaintiffs,      )
                             )
    vs.                      )    Cause No. 14-cv-01490-HEA
                             )
THOMAS JACKSON, et al.,      )
                             )
        Defendants.          )


VIDEO DEPOSITION OF TRACEY WHITE

Taken on behalf of the Defendants
RYAN, McCOY, McCANN, BELMAR, and ST. LOUIS COUNTY

September 29, 2015


Reported by:  Christine A. LePage, CCR #1000

LePAGE REPORTING SERVICE
1465 Wilkesboro Drive
Dardenne Prairie, Missouri 63368
(314) 616-2113

EXHIBIT
County
Exhibit F

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al.,           )
                                )
        Plaintiffs,             )
                                )
    vs.                         )    Cause No. 14-cv-01490-HEA
                                )
THOMAS JACKSON, et al. ,        )
                                )
        Defendants.             )

        VIDEO DEPOSITION OF TRACEY WHITE, taken on behalf of

the Defendants RYAN, McCOY, McCANN, BELMAR, and ST. LOUIS

COUNTY, on the 29th day of September, 2015, between the

hours of eight o'clock in the forenoon and six o'clock in

the afternoon of that day, at the St. Louis County

Government Center, 41 South Central, St. Louis County,

before Christine A. LePage, a Registered Professional

Reporter, Certified Court Reporter, and Notary Public.

1  patients.

2      Q    Are you still a contract employee or is that

3  over with at St. Alexius, I mean, at Longterm Care

4  Psychiatric Management?

5      A    I'm -- Currently that's my only -- Yes, I am an

6  employee.

7      Q    Okay.  Well, is there a set fee that you get

8  when you see patients or how's that determined?

9      A    So my contract says that no matter what I will

10  always receive a fee, monthly fee.

11     Q    What does that mean, no matter what?

12     A    That I will always receive 2,800 a month at

13  minimum.

14     Q    Even if you don't see any patients?

15     A    Even -- Well, if that should ever happen, then,

16  yes.

17     Q    And if you do see patients, do you -- does it go

18  up to $2,800 and sometimes exceed it then?

19     A    It can far exceed $2,800.

20     Q    Okay.  Have you ever been a party to an action

21  filed in any court in Missouri?

22     A    None that I'm aware of.

23     Q    I saw, you know, in Missouri CASE.NET that

24  there's a pending case filed in Associate Circuit Court

25  against you where you're being sued by Portfolio Recovery

1    Associates for nonpayment of a credit card?

2         A    Yes.

3         Q    So you were aware of that?

4         A    The one that just came about?

5         Q    Yes.

6         A    Thirty, maybe 30 -- 30 days ago?

7         Q    Yeah.

8         A    Yes.

9         Q    Okay.

10        A    So did you say party to a class action lawsuit?

11        Q    No, any case pending or that was once pending in

12   any court, any type of case.  Have you ever been named as

13   a defendant, have you ever filed any lawsuits, or have you

14   ever had to appear in court for any reason?

15        A    Yes.  Yes.

16        Q    So, okay, you have that pending action --

17        A    Yes.

18        Q    -- in Associate Circuit Court.  What else?  What

19   else have you had in the state of Missouri?

20        A    As far as an action against me?

21        Q    Yeah.

22        A    None that I can recall.

23        Q    Well, you could not recall the case involving

24   nonpayment of a credit card till I just mentioned it to

25   you, so --

```
 1      A    Most recent, yeah, this is --

 2      Q    So you're sure you -- You want me to refresh

 3  your memory or --

 4      A    Well, you can, if --

 5      Q    There is -- Just in 2014 there was an order of

 6  protection served against you; isn't that correct?

 7      A    An order of protection against me?

 8      Q    Yes.

 9      A    Oh, with Stacy, an order of protection,

10  temporary, yes, there was.

11      Q    And, well, it was initially temporary.  Were you

12  ordered to stay 100 feet away from petitioner's home,

13  petitioner's car, petitioner's job, or any other place

14  where petitioner may be found?

15      A    I wasn't ordered, I agreed.  My attorney said --

16  I agreed, I didn't -- I wasn't ordered, I agreed.

17      Q    Do you remember in January 2014, you say this

18  person, Stacy?

19      A    Uh-huh.

20      Q    Is that a yes?

21      A    Yes.

22      Q    Stacy who?

23      A    Stacy White.

24      Q    Stacy White is --

25      A    A female.
```

1        MR. HUGHES:  So either she -- She should answer

2    the question unless you instruct her not to.

3        MR. LATTIMER:  Again, maybe I missed it, maybe

4    it went over my head.  What is the proffer?

5        MR. HUGHES:  I want to find out her tendency to

6    yell and threaten people and --

7        MR. LATTIMER:  Well, then ask her that, do you

8    have a tendency to yell and threaten people.

9        Q    (by Mr. Hughes)  No, tell me, why don't you

10   explain to us why Tracey [sic] White got a protection

11   order against you to stay away from her home, her car, her

12   job, and any other place that she may be found?

13       MR. LATTIMER:  She's not getting into that.

14       A    Tracey White?  It's not Tracey White, it would

15   be Stacy White.

16       Q    (by Mr. Hughes)  Stacy White, I'm sorry.

17       MR. LATTIMER:  She's not -- We're not getting

18   into that.  You're asking the witness to tell you why

19   somebody else did something, that doesn't even make sense

20   to me.

21       Q    (by Mr. Hughes)  What did you do?  What did you

22   do that led to this order of protection, permanent order

23   of protection?

24       MR. LATTIMER:  Mr. Hughes, she's not answering

25   questions along these lines unless and until we get

1    hearing?

2      A    Can I -- Is there a way I can speak with my

3    counsel?

4          MR. LATTIMER:   If you don't know, just --

5      A    I don't understand.

6      Q    (by Mr. Hughes)   Well, I didn't know if maybe

7    you were just a witness to some other child's safety, but

8    were you named --

9      A    Well, there a previous incident that you

10    mentioned that surrounded child safety, and so -- Any

11    other court hearing. 2008. 2008, I believe, the date, I

12    had an attorney, I believe it was 2008, I had to get an

13    attorney.

14      Q    Did someone file an action against you

15    complaining about child safety?

16      A    No, it did not surround child safety, no.

17      Q    Well, you said it was a child safety hearing,

18    so --

19          MR. LATTIMER:   No, she didn't, you said that.

20    She said no such thing.

21          MR. HUGHES:   She did, too.

22          MR. LATTIMER:   Well, the record will reflect.

23    Obviously I'm losing it.

24      Q    (by Mr. Hughes)   Okay.   You said in 2008 you had

25    an attorney, you went to court, for what type of action?

1    A    Police misconduct.  It surrounded -- Yeah,

2  police misconduct.

3    Q    Okay.  Where was -- What court was that?

4    A    I don't remember the court, but I know what

5  district it was surrounding, Ferguson court.

6    Q    Was that in federal court or state court?

7    A    I have no idea.

8    Q    Did you sue the police for police misconduct?

9    A    I didn't sue anyone, but it was nolle prosequi,

10 it was thrown out, or they didn't --

11   Q    You say that you were charged with something and

12 it was nolle prossed, is that it, and you're saying there

13 was police misconduct involved?

14   A    Yes, because I complained.  I don't know what my

15 attorney did with that, but --

16   Q    So you were arrested for something?

17   A    Yes.

18   Q    And then when you went to court it was nolle

19 prossed?

20   A    Yes, they told me that I was not married, and,

21 in fact, I was, and they arrested me, because my husband

22 and I have two separate last names.

23   Q    They arrested you for being not married?

24   A    They arrested me.  They arrested me.

25   Q    For what charge?

1    filed in this case that said that?

2        A    Have I -- Okay.  What document are you asking me

3    have I seen?

4        Q    Well, one document was -- this was the third

5    amended complaint, you know, where the first two named

6    plaintiffs are Tracey White and William Davis, and then,

7    you know, it sued lots of police officers and made lots of

8    allegations, and it's signed -- I mean, it was filed by,

9    looks like, three of your attorneys.  Have you --

10       A    And I'll -- I have not reviewed it.  I'll say I

11   received something in the mail from an attorney and I did

12   not review it.  I just know that there was a lawsuit

13   coming for the -- for the arrest that was made.

14       Q    But before the lawsuit was filed, you certainly

15   must have discussed the facts, is that correct, with your

16   attorneys?

17       A    I discussed what happened to me, yes.

18       Q    Okay.  Well, let me ask you this:  In Paragraph

19   37 of your third amended complaint you indicate that there

20   was a public outcry about the shooting death of Michael

21   Brown.  Do you agree with that?  Do you think that's

22   accurate?

23       A    That there was a public outcry?

24       Q    Yes.

25       A    That was my statement?  Are you saying that that

1  building -- that the QuikTrip had burned, but you were not

2  aware of anything else going on for the several days prior

3  to August 13th?

4      A    I am aware that a death took place, and, again,

5  because you recalled it, the QuikTrip, and that there were

6  protesters.

7      Q    You say a death took place?

8      A    Yeah, of Michael Brown, the death of Michael

9  Brown.

10     Q    Okay.  But you allege that you attended a rally

11 on August 13th, 2014?

12     A    Uh-huh.

13     Q    Is that a yes?

14     A    Yes.

15     Q    The reason I ask is the court reporter can't

16 record --

17     A    Yes.

18     Q    -- an uh-huh, it doesn't make sense if you read

19 it, so it has to be yes or no, if you don't mind, okay?

20 And so was this -- Well, what was the name of this rally?

21     A    I don't recall the name, I only know the

22 emphasis of the rally.

23     Q    How did you hear about it?

24     A    Miss Noodel, a fellow -- a fellow social worker.

25     Q    Who's that?

1  the death of Mike Brown.

2      Q    And who sponsored that rally?

3      A    A pastor of a church.

4      Q    Do you know what church?

5      A    No, sir, I don't.

6      Q    And it says in the lawsuit that it was sponsored

7  by your AME church group in Ferguson.  Is that true or

8  not?

9      A    Of my AME?

10     Q    Yes.

11     A    No, that is not true, I don't belong to an AME

12 church.

13     Q    Okay.  So just so I understand, this is called a

14 peace and love rally by you in the lawsuit, but that's not

15 what it was called, that's not the title of it, right?

16     A    No, sir.

17     Q    And it says that it was sponsored by your AME

18 church group in Ferguson, but that's not correct?

19     A    It was not my church.

20     Q    Okay.  But somehow you learned that there was

21 going to be a rally because of a social worker that you

22 seen in passing mentioned it to you; is that right?

23     A    In addition to media, the television.  So it

24 brought it back to my recollection that there are going to

25 be social workers to help heal the community, watch the --

1     Q   Okay.  And it is a pastor -- Some pastor was

2 leading the rally; is that correct?

3     A   Yes.  Yes, sir.

4     Q   Do you know who that pastor was?

5     A   No, sir.

6     Q   Did you know who anyone was who talked?

7     A   Who was -- That talked?  That spoke?  No, that

8 spoke on the mike, no, I didn't know anyone specifically

9 that spoke on the mike.

10     Q   So what happened at that rally?  I mean, what

11 did you hear?  What did you see?

12     A   Okay.  So there was a pastor, African-American

13 male, he spoke about the recent event and just the need to

14 heal the community.  He allowed individuals in the

15 community to use the mike and to kind of express

16 themselves.  And I know this because there was a lady who

17 just got up there and she talked about her fear of when

18 she -- of when she heard about Mike Brown and how she had

19 felt, and she was hoping that the young people could heal

20 from this.  And so I didn't know individuals getting on

21 the mike, because they allowed people to come up and

22 speak.

23     Q   When you said individuals expressed themselves,

24 did people express anger and make any threats?

25     A   No, no, not that I can recall, it was more

1  uplifting and a need to come together, like that more, as

2  a matter of fact, there was emphasis on coming together to

3  more as a group of people where there is no conflict and

4  not --

5       Q    I'm sorry, go on.

6       A    That was it.

7       Q    Were people saying there should be burning and

8  looting?

9       A    No, not -- not that -- I didn't hear any of

10 that, no, sir.

11      Q    And, anyway, you think that you left that rally

12 about what time, 6?

13      A    I'm going to say like 6.

14      Q    Then what did you do?

15      A    We walked to the McDonald's, because -- we

16 walked to the McDonald's.

17      Q    Why?

18      A    Because we were waiting for my husband to

19 arrive.  We didn't drive.  I hadn't driven.

20      Q    When was he scheduled to arrive?

21      A    He was to call my phone, because I didn't know

22 the time frame for the event, when it would end, so --

23      Q    Did he call your phone?

24      A    He may have.

25      Q    What is your phone number?

1      Q      He would have come even though you did not call

2   him?

3      A      He would have come because he dropped us off.

4      Q      Okay.  But he would have come even without

5   calling you?

6      A      Absolutely.

7      Q      Okay.  So you're at McDonald's for how long?

8      A      I'm guessing maybe an hour.

9      Q      Okay.  So you're saying maybe you arrived

10  sometime around 6 o'clock?

11     A      Six, 6:05, somewhere around there, guessing.

12     Q      And then you stayed there about an hour?

13     A      Uh-huh.

14     Q      Is that a yes?

15     A      Yes.  Yes.

16     Q      And what are you doing during this hour or so

17  inside McDonald's?

18     A      We ordered food, we ordered dessert and were

19  seated, and we're engaged with a young man that's seated

20  in the McDonald's.

21     Q      Okay.  Who is this young man?

22     A      Well, it turns out his name is Wesley.

23     Q      Okay.  Tell me about that.

24     A      Wesley is seated in the McDonald's, he's very

25  busy, he looks very busy working on a laptop, and I made a

1      MR. DAVIS:  No, the thing fell off.

2      MR. LATTIMER:  Oh, it cut off.

3      MR. HUGHES:  So we're back on the record?

4      THE VIDEOGRAPHER:  Yes.

5      Q    (by Mr. Hughes)  So you indicated that you were

6  in the McDonald's for about an hour, during this time you

7  spoke to Wesley.  Is there anybody else that you spoke to

8  other than someone at the counter, I assume, when you

9  ordered food?

10     A    My son.

11     Q    Okay.

12     A    Mr. Wesley, that's all I can recall.

13     Q    Okay.  Fine.  And then at some point you left

14  the McDonald's?

15     A    Yes, I left out of the door, yes.

16     Q    And any particular reason why you left?

17     A    My phone was not charged.

18     Q    Okay.  Could you explain that to me?  Your phone

19  was not charged so you left the McDonald's?

20     A    Yes, sir.

21     Q    What were you planning on doing without -- What

22  were you planning on doing because your phone was not

23  charged?

24     A    I went to see if my husband had made it.

25     Q    Okay.  So you just stepped outside to see if

```
 1   your husband had arrived at the McDonald's; is that
 2   correct?
 3        A    Or in that -- yes, in that -- right there at
 4   that area, yes, sir.
 5        Q    Okay.  And then when you stepped outside, what
 6   did you see or what did you do?
 7        A    I believe I looked for my husband, I know I
 8   looked for my husband, and at some point when I turned
 9   around to reenter the McDonald's there was an officer in
10   front of the door.
11        Q    Okay.  So before you left the McDonald's you did
12   not see any officers; is that correct?
13        A    No, sir.  No, sir.
14        Q    So that is correct?
15        A    That's correct.
16        Q    And so -- And before you stepped out of the
17   McDonald's to see -- to look around for your husband, did
18   you say anything to your son such as I'm going to look for
19   my husband and, you know, come on out when you can or --
20        A    My son was ordering ice cream with my debit
21   card.  I'm not sure if I told him I was going to look for
22   Mohamed at that -- my husband at that exact point, but we
23   were both aware that he was to pick us up and that our
24   phone was dead.
25        Q    What does your son call your husband?
```

1      A      Mohamed.

2      Q      Okay.  So were you expecting your son to step

3   outside with you after he finishes the ice cream or what?

4      A      No.

5      Q      Okay.  So anyway, you stepped outside, and you

6   looked around for your husband?

7      A      Uh-huh.

8      Q      Is that correct?

9      A      Yes.

10     Q      And then what happened?

11     A      At some point I came to the door of the

12  McDonald's and there was an officer who -- there was an

13  officer at the door.

14     Q      Okay.  And can you describe that officer?

15     A      To my recollection he was an African-American,

16  very fair skin, and he had on all black, from what I --

17     Q      He had all black clothing or what?

18     A      Yeah, his uniform was all black from what I

19  recall.

20     Q      All right.  And what else do you recall?

21     A      I remember having a conversation with him about,

22  well, what's going on, my son is in the McDonald's, and

23  just being kind of really anxious about my son being in

24  there and not knowing what's going on in the McDonald's.

25     Q      Okay.  And what did this African-American

1    officer say to you?

2         A    He said, oh, ma'am, well, it's all right,

3    they're -- I guess they're clearing everybody out of the

4    McDonald's, like he'll be out.  He had -- He'll be out.

5         Q    Okay.  All right.  And then so you -- did you

6    decide to wait for your son to come out or what did you

7    do?

8         A    I waited for my son to come out, and the officer

9    and I spoke about my husband, I spoke to him about my

10   husband, and he told me where I could go to wait for my

11   husband.

12        Q    Where did he tell you you could go?

13        A    There's a corner at the -- there's a McDonald's,

14   and I believe there's a store or another commercial

15   property next door or whatever, but not too far, there's a

16   corner, he told me that me and my son would be allowed to

17   wait on the corner for my husband.

18        Q    You mentioned that this African-American officer

19   had some dark clothing?

20        A    From what I recall.

21        Q    Okay.  Do you know what kind of police officer

22   he was?

23        A    No.  I noticed people weren't wearing their --

24   it didn't look like they were wearing their badges or ID.

25        Q    But you knew it was a police officer?

1    A    I knew that he was blocking the door when I
2  tried to reenter the McDonald's and he was dressed in gear
3  like an officer.
4    Q    You don't know if he, you know, if he was a
5  St. Louis County officer, Ferguson officer, Maryland
6  Heights officer, St. Charles officer, do you?
7    A    No, sir.
8    Q    Okay.  And did you talk to any other officer
9  besides that African-American officer?
10   A    At that time?  No, just him at that point.
11   Q    Did you talk to any Caucasian officer?
12   A    At that location, I don't recall talking to --
13 not right then.  I believe as they were dispersing people,
14 I mentioned that this officer had told us to go wait on
15 the corner to a Caucasian officer, or one -- again --
16 yeah, to an officer, who were telling people to get into
17 their cars and stuff.
18   Q    You remember you spoke to an officer?
19   A    Yes, from --
20   Q    Who was that?
21   A    I have no idea.
22   Q    I mean, was he white or black?
23   A    I believe he may have been Caucasian.
24   Q    Could you tell if he had a brown uniform on
25 or --

```
 1      A    I'm not sure, no, sir.

 2      Q    So you don't know if he was a St. Louis County

 3  officer?

 4      A    I don't know.

 5      Q    Did he have sergeant stripes, could you tell?

 6      A    What are sergeant stripes?

 7      Q    You don't know what sergeant stripes are?

 8      A    No.  No.

 9      Q    You're saying if you saw a sergeant, you

10  wouldn't know what a sergeant is?

11      A    No.  No.

12      Q    Okay.  But the other officer who you don't

13  know --

14      A    Yes.

15      Q    -- what conversation did you have with him that

16  you recall?

17      A    Reiterating or stating that there was an officer

18  at the door who stated that my son and I could wait there

19  on the corner for my husband.

20      Q    Okay.  And so did that officer explain anything

21  to you?

22      A    He did not, not to my recollection, no.

23      Q    So did your son come out?

24      A    He came out, yeah, he came out.

25      Q    And when your son came out, who were you -- who
```

1  Q   Okay.  And these people that were instructed,

2  these people on foot who were instructed to move back,

3  were they in the street in West Florissant or --

4  A   They were pedestrians, they were I guess some of

5  the people who were in the McDonald's who didn't drive,

6  some of the people who were on West Florissant.

7  Q   Okay.  And how many people were there

8  approximately?

9  A   I don't know.  It wasn't a huge crowd, but there

10 were enough.

11 Q   When you say there was enough, can you be more

12 specific?

13 A   No, I can't.

14 Q   Was there more than 20? more than 30?

15 A   There was more than two, there was more than me

16 and my son.  I don't know, I wasn't focused on that, I was

17 focused on trying to get home.

18 Q   Was it -- My question was was it more than 10?

19 more than 20? more than 30?

20      MR. LATTIMER:  That's been answered.  If you can

21 do better, give it a shot.

22 A   I can't recall.

23 Q   (by Mr. Hughes)  You can't give me your best

24 estimate of the number of people there were?

25      MR. LATTIMER:  Don't guess or speculate.

1    A    I can't recall.

2    Q    (by Mr. Hughes)  But the people who were

3    instructed by the police to move back, did they follow the

4    instructions?

5    A    Yes, sir.

6    Q    Okay.  Were there any threats made to the police

7    that you heard at that time?

8    A    Not that I heard at that time, no, sir.

9    Q    All right.  And then what did you do?

10   A    I continued to move backwards as the police

11   instructed.

12   Q    You're with your son?

13   A    Yes.  Yes.

14   Q    And you did as the police instructed?

15   A    Yes, sir.

16   Q    And so what did you do exactly?

17   A    They instructed us to move back some, we halted

18   for some reason, they instructed us to move back some

19   more, we continued to move back, and then I began to

20   question, because -- yeah, I began to question, because

21   around this time nighttime is falling, 7 something, 8

22   something, and I'm getting afraid, but I continued to move

23   back, but I asked the question and tried to explain that

24   my husband was coming to get us, and --

25   Q    Where were you when this happened, when you

1   tried to explain?

2       A   We were on that street that they were pushing us

3   back up in.  We were further back on the street then from

4   the McDonald's, we were halfway up -- down -- halfway up,

5   excuse me, up or back, we were up -- we were in the street

6   where they were directing us to go, at least halfway from

7   the point of start.

8       Q   Do you know what the name of that street is?

9       A   No, sir.

10      Q   Okay.  Let's get back in front of the

11  McDonald's.

12      A   Okay.

13      Q   Do you remember, did you get in any sort of a

14  confrontation with the police in front of the McDonald's?

15      A   None that I remember.  I remember there -- as I

16  was -- when I came -- when I turned around, made it to the

17  door, there was an officer there that I spoke to, and

18  there may have been some -- two women, two women that were

19  arguing back and forth, but, no, I did not get into any

20  confrontation.

21      Q   Who were those two women --

22      A   I have no idea.

23      Q   -- arguing back and forth?  Were they arguing

24  with each other or arguing with someone else?

25      A   I believe they were arguing with each other.

1    Q    Okay.  So just so I understand, I just asked you

2    did you have a confrontation with the police in front of

3    the McDonald's, and you answered no, not that you

4    remember?

5        A    Yes.

6        Q    And earlier I asked you, I believe -- Strike

7    that.  So you had no confrontation with the police inside

8    the McDonald's, you just agreed to that, and it's correct

9    that you had no confrontation -- Wait, I might have

10   misspoken, I'll start over.  You just said you had no

11   confrontation with the police outside the McDonald's, in

12   front of the McDonald's.  So my next question is you also

13   did not have any confrontation with the police inside the

14   McDonald's; is that correct?

15       A    There were no -- No.  No.

16       Q    So that's correct?

17       A    That's correct.

18       Q    What about outside of McDonald's, do you recall

19   speaking very loud --

20       A    I don't recall.

21       Q     -- at a police officer?

22       A    I don't recall that, no, sir.

23       Q    Well, did you or did you not?

24       A    I don't recall speaking loud to an officer.  I

25   recall speaking to an officer about me looking for my

1  husband.

2      Q   Do you remember complaining loudly to any

3  officer, officers, outside the McDonald's by the front

4  door?

5      A   Say that again.

6      Q   Do you remember speaking loudly to any police

7  officers outside the McDonald's?

8      A   I remember stating that my son was inside the

9  McDonald's.

10     Q   Do you remember arguing with police officers

11 outside -- or a police officer or police officers outside

12 the McDonald's?

13     A   I do not.

14     Q   While you were outside McDonald's, do you

15 remember a police officer offering to allow you to use the

16 cell phone that he had?

17     A   I do not.

18     Q   Do you remember a police officer offering his

19 cell phone to you and you said, "No, you are a white man"?

20     A   Absolutely not.  Certainly not.

21     Q   What is your husband Mohamed's cell phone

22 number?

23     A   (314) 651-8758.

24     Q   Does your husband have the same provider as you

25 do or a different one?

```
 1      Q      And did you hear some members of the crowd
 2   making any statements towards the police?
 3      A      No, sir, none at all.
 4      Q      You mentioned you were making statements.  Are
 5   you the only member of the crowd that was making
 6   statements to the police?
 7      A      I'm the only one I was focused on.
 8      Q      And you know the street called Sharondale; is
 9   that correct?
10      A      I do not know the street called Sharondale.
11      Q      Do you know the street called Ferguson?
12      A      I saw Ferguson.  Ferguson is over in that
13   vicinity.
14      Q      Well, did you have any encounter with the police
15   that day?
16      A      Yes.
17      Q      You were arrested?
18      A      Yes.
19      Q      Tell me where you were --
20      A      On a side --
21      Q      -- when you were arrested.
22      A      On a side street, not too far from the
23   McDonald's, and I don't know the name of that street.
24      Q      And you mentioned a truck?
25      A      Yeah.
```

1      Q     The truck had a trailer; is that correct?  It

2   was --

3      A     I recall the truck -- I don't know.  I remember

4   the truck being stuck.

5      Q     You don't remember the truck having a trailer in

6   the back?

7      A     No, sir.

8      Q     And how much time elapsed between your leaving

9   McDonald's and your arriving at this location where you

10  were arrested?

11     A     I'm not certain.

12     Q     Was it 30, 45 -- 30 to 45 minutes?

13     A     It could have been.

14     Q     By the way, before I get any further, did you

15  ever talk to Mohamed afterwards regarding whether or not

16  he came looking for you or whether or not he called you?

17     A     Yes.

18     Q     What did he tell you?

19     A     He said yes.

20     Q     He said yes to what?  What --

21     A     He said he came looking for us, he went back to

22  the area searching for us.

23     Q     When did he come looking for you?

24     A     Maybe around the 7, 8-ish, that's a guesstimate.

25     Q     I mean, did he tell you what time?  I don't want

```
 1   that you were arrested.

 2       A    I was moving backwards with a crowd that the

 3   officers who were locked shoulder to shoulder were

 4   demanding that we move backwards.

 5       Q    And the officers were -- Well, first of all, you

 6   mentioned there was a truck there; is that correct?

 7       A    At one point there was a truck that halted the

 8   progression of the crowd to move.

 9       Q    So what we had is you had a line of officers

10   that was moving a crowd, that's one thing; is that

11   correct?

12       A    Yes, sir.

13       Q    And in addition to that you had a truck that was

14   stuck; is that correct?

15       A    So the -- Yes, correct.

16       Q    And the officers were trying to get that truck

17   moved out; is that correct?

18       A    The individual -- Yes.

19       Q    The officers were trying to assist the person

20   who was stuck?

21       A    I don't recall the officers helping him, I

22   remember them trying to direct him as to what to do.  I

23   just recall the truck being stuck and trying to get out

24   and out because it halted their -- the police officers'

25   movement and the crowd's movement.
```

1       MR. LATTIMER:   That's not what she just read

2   back.

3       Q   (by Mr. Hughes)   Okay.   In addition to directing

4   him -- directing the truck driver in what to do, do you

5   remember that the police were also directing the crowd to

6   move?

7       A   I don't.   I don't.   I feel like that's a

8   two-part -- I don't understand that question actually.

9       Q   Okay.   Did -- The police were both directing the

10  crowd and directing the truck driver; is that correct?

11      A   I don't believe that the police were directing

12  the truck driver.   The police had always been directing

13  the crowd.

14      Q   And do you remember the police telling the crowd

15  to leave the area?

16      A   I don't understand the question.

17      Q   Did the police direct the crowd to go up the

18  hill, to go to a nearby apartment complex, to just leave

19  the area where you and everyone else was?

20      A   The police were directing us -- the crowd back

21  into a specific street area, that's what I recall.

22      Q   Okay.   And do you know what that street area --

23  where that street area was?

24      A   I know the area, and I know approximately where

25  it's located.

1  the arrest?

2    A    I had asked a question about the officer, about

3  this officer, and asking how long, because it's getting

4  dark, and I stated it's getting dark, my husband is

5  coming, how much further do we have to get pushed back

6  into this crowd, how much further are we going to go back.

7    Q    And then what happened?

8    A    He -- He said -- There was a male, it wasn't a

9  female, he said, "All right, that's it," and he grabbed me

10  and he threw me to the ground and put his knee in my back

11  and arrested me.

12    Q    Could you describe this officer who grabbed you

13  from the crowd, threw you to the ground, put the knee on

14  your back, and arrested you?

15    A    I only know that he was white, that's it.

16    Q    What color uniform was he wearing?

17    A    I only know that he was white, that's it.

18    Q    So you don't know?

19    A    I don't know.  I can't recall.

20    Q    I'm going to -- Well, okay.  So at this point

21  you're arrested, and tell me about your son.

22    A    I had my son's iPad in my hand, at the time I

23  was carrying it, and I -- when the officer stepped forward

24  and arrested me I told my son, "Here, get your iPad,

25  William, get your iPad."  When he stepped forward to

1    police and refusing to do what they asked you to do?

2              MR. LATTIMER:  Asked and answered four times.

3         A    Absolutely not.

4         Q    (by Mr. Hughes)  When the -- Did -- How many

5    officers grabbed you and arrested you?

6         A    I remember one stepping forward, snatching my

7    arm, throwing me to the ground, putting his knee on the

8    back, on my back, and pulling my hands behind me, and

9    another officer to come forward and making sure he was

10   able to -- or doing his job, that he had everything.  So I

11   believe there was one, and one stepped over to assist him.

12        Q    And did the police put some sort of cuffs on

13   you?

14        A    Some type of plastic tie cuffs.

15        Q    So --

16        A    Yes, sir.

17        Q    So some plastic tie flex cuffs?

18        A    Yes, sir, they were behind my back, but it was

19   plastic, it wasn't --

20        Q    And actually you -- you wiggled out of them or

21   got out of them at first; is that correct?

22        A    When he -- No, sir.  He was trying to -- I guess

23   you can tighten them or something, and something he did,

24   this is why this officer -- I speculate that this officer

25   stepped forward, I don't know.  This officer, when he

1    you went down with two officers, with an officer holding

2    you on each arm?

3        A    No to the first part.  I had been thrown to the

4    ground when they put the cuffs on.  No to the second part

5    of me lifting my feet up anywhere, doing any of the sort,

6    and I didn't hear the third part.

7        Q    Isn't it true when you were arrested you were

8    told you were being arrested for interfering with the

9    duties of a police officer?

10       A    Absolutely not.

11       Q    You mentioned that your son was 17 years old at

12   the time and then he was turning 18 the following month;

13   is that correct?

14       A    Yes, sir.

15       Q    So at the time of this incident when he was 17

16   years old, he was not a minor?

17            MR. LATTIMER:  What?

18       A    What's the definition of a minor?  I don't -- He

19   was in high school, he was 17, he was -- I'm his guardian.

20       Q    (by Mr. Hughes)  Yeah, 17, age 17.

21       A    I'm his --

22       Q    I mean, you're a licensed -- Are you a licensed

23   social worker?

24       A    Yes, I am.

25       Q    You're aware that people only go to juvenile

1   court, for example, if they're under the age of 17?

2        A    Yes.

3        Q    So he was 17?

4        A    Yes.

5        Q    And it's not true that you were thrown to the

6   ground inside the McDonald's restaurant?

7        A    I was not thrown to the ground inside of a

8   McDonald's restaurant.

9        Q    And it's true that -- It's true that your son

10  was not arrested inside the McDonald's restaurant?

11       A    That's true.

12       Q    It's true that you were not arrested inside the

13  McDonald's restaurant?

14       A    That's true.

15       Q    You've sued several individual officers saying

16  that they arrested you and assaulted you, one is Officer

17  Cosma.  Do you know what he looks like?

18       A    No, sir.

19       Q    Do you know one way or the other if an Officer

20  Cosma arrested you?

21       A    I don't recall Officer Cosma arresting me, I

22  only -- No, I don't know that.

23       Q    And also Officer Cosma did not assault you?

24       A    I'm not certain that it was Officer Cosma, I'm

25  not certain it was him.

1    Q    And what about Officer McCoy?

2    A    I'm not certain.  They didn't have on badges.

3    Q    What about Officer McCann?

4    A    I'm not certain that -- of an Officer McCann.

5    Q    What about Officer Ryan?

6    A    No, I'm not.

7    Q    Could you tell me now what Ryan looks like?

8    A    No, sir.

9    Q    Can you tell me what McCann looks like?

10   A    No, sir.

11   Q    Can you tell me what McCoy looks like?

12   A    No, sir.

13   Q    Can you tell me what Cosma looks like?

14   A    No, sir.

15   Q    The officer who threw you on the ground, you

16   indicated you don't know what color uniform he was

17   wearing; is that correct?

18   A    I don't recall what color uniform.

19   Q    Do you recall what his race was?

20   A    Caucasian.

21   Q    Okay.

22   A    Yeah, he appeared to be Caucasian.

23   Q    So at the time you were on the ground and being

24   cuffed, it was at that point you said that an officer

25   placed his knee on your back?

1    you indicated that there is footage taken on the day of

2    the incident by a reporter which shows officers entering

3    McDonald's and also shows my son, William Davis, and you

4    said this was aired by local media?

5         A    Yes, sir.

6         Q    So do you remember seeing that footage?

7         A    I remember seeing it, yes, sir.

8         Q    And in answer to Interrogatory 4 you said, "I

9    did record the local news coverage;" is that correct?

10        A    Yes, sir.

11        Q    What happened to your recording of the local

12   news coverage?

13        A    I DVR'd it, we switched cable companies, we no

14   longer have it.  I digital recorded it.

15        Q    What do you remember about that footage inside

16   the McDonald's that shows your son?

17        A    On that footage I remember seeing William inside

18   the McDonald's and there were officers in there and my son

19   looking confused as to what to do and him standing closer

20   by the counter area.  In that footage it shows a reporter

21   being arrested.

22        Q    Okay.  But your son William was not arrested?

23        A    Not inside the McDonald's.

24        Q    He walk by or anything in that footage, do you

25   see him walk by?

1      Q    Okay.

2      A    Not the actual receipts, but the -- something

3  reflecting the purchase.

4      Q    Okay.  Now, going on, I'm at the point, I mean,

5  I just read shortly thereafter plaintiff's son went to the

6  rest room and I read that you went to the counter to

7  purchase a sundae.  Then the next sentence is, "Just as

8  she did that, Defendants Ryan, McCoy, McCann, and

9  Defendant Cosma, in what appeared to be Army uniforms,

10 carrying rifles and sticks and wearing helmets, approached

11 the door and ordered Plaintiff White to," quote, "get

12 out," period, unquote.  Do you see that?

13     A    Yeah.

14     Q    Did I read that correctly?

15     A    I see that.

16     Q    Did I read that correctly?

17     A    I don't know, but I see where ordering Plaintiff

18 White to get out, yeah.

19     Q    Do you want me to -- My question is:  Did I read

20 that correctly?  And if you don't know, I'll read it

21 again.

22     A    Read it again.

23     Q    Okay.  Follow with me.  "Just as she did that,

24 Defendants Ryan, McCoy, McCann, and Defendant Cosma, in

25 what appeared to be Army uniforms, carrying rifles and

1    sticks and wearing helmets, approached the door and

2    ordered Plaintiff White to get out."  Did I read that

3    sentence correctly?

4         A    You did.

5         Q    And that sentence is false; isn't that correct?

6         A    I would say it's false.

7         Q    Okay.  The next sentence, "Plaintiff White was

8    terrified and tried to tell these people that her son was

9    in the rest room and that she was there waiting for her

10   husband to pick them up."  Did I read that sentence

11   correctly?

12        A    Yes, sir.

13        Q    That sentence is false?

14        A    False.

15        Q    Okay.  Paragraph 43, "After her son exited the

16   rest room, Plaintiff White observed him being accosted by

17   defendant police officers."  Did I read that correctly?

18        A    Yes, sir.

19        Q    That sentence is false; is that correct?

20        A    That's false.

21        Q    "When she expressed her concern, she was told to

22   shut up."  I'll read that again.  "When she expressed her

23   concern, she was told to," quote, "shut up," period,

24   unquote.  Did I read that correctly?

25        A    Yes, sir.

```
 1        Q    That's false?

 2        A    Yes, sir.

 3        Q    "When plaintiff continued to express her

 4   concerns about the way her son was being mistreated, she

 5   was advised she was being arrested because she would not,"

 6   quote, "shut up," period, unquote.  Did I read that

 7   correctly?

 8        A    Yes, sir, you did.

 9        Q    And that's false, correct?

10        A    That's false.

11        Q    "Plaintiff White was then thrown to the ground

12   and handcuffed."  Did I read that correctly?

13        A    Yes, sir.

14        Q    And that's false; is that correct?

15        A    Not at that point.  That's false.

16        Q    "Plaintiff White realized that her son's iPad in

17   her hand and summoned him over to retrieve the item.  When

18   he did, Defendant McCoy placed the minor under arrest as

19   well for no reason at all."  Did I read that correctly?

20        A    You did.

21        Q    And that's false?

22        A    That event happened, but not inside the

23   restaurant.

24        Q    Okay.  It's alleged here that it happened inside

25   the restaurant.
```

```
1       A    That's false.

2       Q    And that's false; is that correct?

3       A    That's false, yes, sir.

4       Q    And it's alleged that Defendant McCoy placed

5  your son under arrest for no reason at all; is that

6  correct?

7       A    Yes.  Yes, sir.

8       Q    It's false that Defendant McCoy or anyone

9  arrested your son inside the McDonald's; is that correct?

10      A    Yes.  Yes, sir.

11      Q    Tell me what Defendant McCoy looks like.

12      A    I can't tell you what Defendant McCoy looks

13  like.

14      Q    Tell me what the officer who arrested your son

15  looks like.

16      A    I can't tell you what the officer looks like.  I

17  can only tell you the -- what appears to be the race,

18  that's it.

19      Q    Okay.  What was the race?

20      A    Caucasian, it appeared to be, the gentleman, it

21  was a male, and he appeared to be Caucasian.

22      Q    Okay.  So you're saying that a Caucasian male

23  arrested your son in that area where you were arrested up

24  the street or down the street, wherever it was, and that

25  this was a Caucasian?
```

1     A    He appeared to be Caucasian, he didn't appear to

2 be -- Yeah.

3     Q    All right.  Did your son ever tell you what an

4 officer said to him before he was arrested?

5     A    To him specifically?

6     Q    Yes.

7     A    No, he only stated what was said inside of the

8 restaurant out loud.

9     Q    Your son was arrested outside?

10    A    Yes.

11    Q    Like you were?

12    A    Yes.

13    Q    My question is:  Did your son tell you what the

14 officer said to him before your son was arrested?

15    A    No.

16    Q    Did he ever tell you the officer asked him

17 several times to leave and your son just stayed there?

18    A    Do I understand you to say -- ask me were we

19 having a conversation during our arrest time?

20    Q    No, no, no.  At some point you talked to your

21 son --

22    A    Yes.

23    Q    -- about his arrest?

24    A    Yes.

25    Q    Did you -- Did your son tell you that the

```
1    identification.)

2         Q    (by Mr. Plunkert)  Okay.  Have you seen this

3    document before, ma'am?

4         A    This is the document I picked up downstairs,

5    yes.

6         Q    Okay.  And let's turn to the second page, if you

7    don't mind, where it's dated June 7th of 2008.  Do you see

8    that?

9         A    Yes.

10        Q    It looks as though the citations -- Well, if you

11   look over to the right column, it says arresting agency is

12   Florissant, right?

13        A    Yes.

14        Q    Is that what we've been discussing now about the

15   2008 arrest?

16        A    Yes.

17        Q    Okay.  And the charges, do you see resisting,

18   interfering with arrest, in parenthesis, misdemeanor; do

19   you see that?

20        A    I'm sorry, did you say up until now that's what

21   we've been discussing?

22        Q    Ma'am, no, on the 2008 arrest.

23        A    Okay, yes.

24        Q    Yeah.  I understand 2014's a different --

25        A    Yes.
```

1      Q    Okay.  And, again, you also see nolle prosequi

2  to the right of misdemeanor, right?

3      A    Yes.

4      Q    And you told us earlier that that was a nolle

5  prosequi was what happened with that case, and so far as

6  you know the charges were dropped, correct?

7      A    Yes.

8      Q    Now, I want to ask you about -- right below

9  that, what we haven't discussed yet today is an arresting

10  agency of Country Club Hills on March 26th of 1999.  Do

11  you see that?

12      A    I see that.

13      Q    Okay.  That says assault third and disorderly

14  conduct; is that right?

15      A    Yes.

16      Q    Okay.  Do you recall what the disposition -- in

17  other words, if there was a sentence or if you pleaded

18  guilty or were convicted or anything?

19          MR. LATTIMER:  I'm going to have a -- just put

20  out a continuing objection to this entire line of

21  questioning, particularly with respect to arrests.  But

22  you can answer.

23      Q    (by Mr. Plunkert)  Okay.  Subject to that, go

24  ahead.

25      A    What, do I remember?

1    the ground and with a knee in your back that you're

2    alleging was excessive force?

3        A    I believe it was excessive force for the

4    officers that were present to come on the premises of a

5    place where there was no -- it was peaceful and start to

6    move people into a crowd, I mean, I agree with that part,

7    too.

8        Q    Well, let's talk about that.  How many times did

9    an officer place his or her hands on you on August 13th of

10   2014?

11       A    I can only recall when I was arrested.  When I

12   was arrested.

13       Q    So when you were thrown to the ground with a

14   knee on your back, right?

15       A    Yes, sir.

16       Q    Okay.  And we heard your testimony regarding

17   McDonald's, no officer placed a hand on you at McDonald's,

18   correct?

19       A    Correct.

20       Q    No officer placed a hand on your son, Mr. Davis,

21   in McDonald's, did they?

22       A    That I -- That I saw, no, I wasn't -- No.

23       Q    And Mr. Davis has never told you that an officer

24   has placed his or her hands on Mr. Davis in the

25   McDonald's, right?

1    of course they were red, but there was no permanent, no.

2         Q    Okay.  Did you take any photographs of your

3    wrists?

4         A    No.

5         Q    So I believe we have four instances where you

6    believe there was excessive force used.  You say you were

7    thrown to the ground, there was a knee in your back, when

8    the handcuffs -- the zip tie, the ties were placed on your

9    wrists, and when you were assisted into the vehicle,

10   correct?

11        A    Yes.

12        Q    Okay.  Are those the only four instances that

13   you believe where excessive force was used against you?

14        A    That's all that I can recall right now.

15        Q    Okay.  Let's talk about the first.  Do you know

16   what the name of the officer was who threw you to the

17   ground?

18        A    I have no idea.

19        Q    Do you recall the race of that officer?

20        A    He appeared to be Caucasian.

21        Q    Do you recall what he was wearing?

22        A    I cannot recall what he was wearing.

23        Q    And I'm saying he, I don't want to be -- I don't

24   want to assume anything.  Was it a male that did it?

25        A    It appeared to be a male.

1   officers that assisted you into the back of the vehicle?

2      A    I cannot.

3      Q    And were they African-American or Caucasian or

4   other race?

5      A    Appeared to be Caucasian.

6      Q    Do you know how many there were?

7      A    I have no idea.

8      Q    How many Caucasians do you recall seeing,

9   officers do you recall seeing assisting you into the back

10   of the vehicle?

11      A    I don't -- I can't recall how many there were.

12      Q    So you just recall at least one Caucasian

13   officer face?

14      A    At least, yes, sir.

15      Q    Were there any racial epithets used against you

16   at all on August 13th of 2014 by the police officers?

17      A    None that I can recall at this time.

18      Q    Okay.

19      A    Are you saying --

20      Q    A racial slur, for example.  You're not alleging

21   that the officers used racial slurs against you, are you?

22      A    No, I'm not.

23      Q    You're not alleging at any point that you were

24   punched or kicked?

25      A    I'm not -- No.

1       Q    Now, did you ever -- Now might be a fine time

2    when we go off on the break.

3            MR. PLUNKERT:  I believe the parties are willing

4    to stipulate that there is no medical claim by Miss White

5    regarding her allegations; is that right?

6            MR. LATTIMER:  Correct.

7       Q    (by Mr. Plunkert)  Okay.  With respect to the

8    hand ties, was the pain in your wrist, I assume?

9       A    Yes, sir.

10      Q    Okay.  Did you try and break out of those hand

11   ties ever?

12      A    No, sir.

13      Q    Okay.  You agree that trying to break loose of

14   hand ties, you shouldn't do that, right?

15      A    Do I agree that you shouldn't do that?  I agree

16   that you shouldn't do that.

17      Q    And that's because you'd hurt yourself, for one,

18   correct?

19      A    Right.

20      Q    But also it could be resisting an arrest, okay?

21      A    Okay, yes.

22      Q    You agree with that?

23      A    I would agree to try and break free from them,

24   yes.

25      Q    That would be an effort to resist arrest, right?

1    A    Yes.

2    Q    So was your son, correct?

3    A    Yes.

4    Q    Did you observe any force used on your son on

5    August 13th of 2014?

6    A    During the arrest, when they arrested him.  I'm

7    sorry.

8    Q    Well, I'll tell you, it was my understanding

9    that your son was compliant, but correct me if I'm wrong

10   or if the officers used force against him in effectuating

11   the arrest, tell me what you observed.

12        MR. LATTIMER:  Objection to the form of the

13   question.

14   Q    (by Mr. Plunkert)  Tell me -- Okay, let me

15   rephrase.

16        MR. LATTIMER:  Compliance and use of force

17   aren't necessarily interchangeable.

18   Q    (by Mr. Plunkert)  I'll rephrase.  Ma'am, please

19   tell me what you observed with respect to any force used

20   in the arrest of your son on August 13th of 2014.

21   A    I observed the police officers arrest my son for

22   no probable cause, that I felt was no probable cause.

23   Q    And I understand what you're saying, I'm asking

24   a little bit of a different question.

25   A    Okay.

1    Q    I'm asking with respect to what you observed

2    regarding force used and his arrest.

3    A    I can't remember -- recall that any force.

4    Q    From what you recall, he was placed into zip

5    ties right after you tried to hand him the iPad, right?

6    A    Yes.

7    Q    And you heard officers place him under arrest,

8    correct?

9    A    Let me -- You said force.  I recall my son

10   having ice cream and it being knocked out of his hand by

11   an officer at some point, I can't -- I don't know when, I

12   think it was during the arrest, so that would have been

13   force to me.

14   Q    Did you see an officer physically knock it out

15   of his hands, were you looking in that direction?

16   A    I was -- I believe so.  I believe I was turning

17   my head to look back at my son.  Yeah, I would have --

18   Yes, I would have, because I was -- I would have looked

19   back to see my son when they were arresting him.

20   Q    Okay.  And so you are sure of that through your

21   observations he didn't drop the ice cream?

22   A    From what I recall, no.  No.

23   Q    Okay.  Other than what you described as knocking

24   ice cream out of your son's hands, was there any force

25   used against your son?

1    Q    And do you recall any interactions with this

2    officer at all?

3    A    Not that I can recall.

4    Q    And you mentioned that your son had an ice cream

5    cone that was -- you think some officer knocked out of his

6    hand at the time he was arrested.  And just so I

7    understand, this is the ice cream cone that was purchased

8    at the McDonald's; is that correct?

9    A    Yes, sir.

10   Q    So that was purchased 30 to 45 minutes before?

11   A    I believe it was a sundae.  Yes.  Yes, sir.

12   Q    Well, you used the term --

13   A    Yes, sir.  It was ice cream.  It was ice cream.

14   Q    -- ice cream cone, but also maybe when you said

15   ice cream cone you're referring to a sundae?

16   A    It's ice cream.  It was ice cream, yes, sir.

17   Q    And this is sort of similar to a question that

18   Mr. Plunkert asked you.  Would you agree if officers are

19   asking you to leave the scene when they are attempting to

20   assist a motorist that you should leave the scene?

21        MR. LATTIMER:  Calls for a legal conclusion.

22   Answer if you can.

23   A    I don't -- It sounds like -- It sounds like two

24   questions to me you said.  Did I understand you to say

25   when there's a vehicle or something --

1    Q    (by Mr. Hughes)  No, no.  When officers are

2    attempting to assist a motorist and they ask you and

3    others to clear the way, to move out of the way, to move

4    down there, that you should do so?

5         MR. LATTIMER:  Is it a hypothetical?

6    Q    (by Mr. Hughes)  Do you agree with that?

7         MR. LATTIMER:  Calls for a legal conclusion,

8    assumes facts not in evidence, has nothing to do with this

9    case, but --

10   A    So to move down to assist a motor vehicle.  I

11   don't know how to answer that.

12   Q    (by Mr. Hughes)  Well, have you ever been on a

13   scene when officers are telling a crowd to leave?

14        MR. LATTIMER:  Relevance and materiality.

15   A    Have I ever been on a scene where officers are

16   telling a crowd to leave?  In this case I was, I was --

17   Q    (by Mr. Hughes)  Okay.  Very good.  Let's --

18   A    I was told to disperse, to keep moving

19   backwards.

20   Q    And also up in -- up on the street that may be

21   Sharondale or whatever the street is near where the

22   motorist was, you agree that the officers were telling the

23   crowd to move and keep going down; is that correct?

24   A    No, absolutely not, the -- Absolutely not.

25   Q    But you did talk about there was a crowd?

1      A      There was a crowd.

2      Q      And at the time you were arrested that the rest

3  of the crowd was gone but you were still there; isn't that

4  correct?

5      A      I did not say that.

6      Q      But isn't that true?

7      A      That is not true.

8          MR. LATTIMER:  This is the fourth time you've

9  asked this.  I thought you said you had something

10 different.

11     Q      (by Mr. Hughes)  And as far as the police

12 officers who arrested you, I think you answered to

13 Mr. Plunkert that you've never seen the police officers

14 since this incident on August 13th, 2014; is that correct?

15         MR. LATTIMER:  Asked and answered.  Asked and

16 answered.

17     A      Not that I recall.

18     Q      (by Mr. Hughes)  And as far as you recall, you

19 never saw them before?

20         MR. LATTIMER:  Asked and answered.

21     A      Not that I can recall.

22     Q      (by Mr. Hughes)  So as far as you know, you

23 didn't know these officers, and as far as you know the

24 officers didn't know you?

25     A      I don't think -- Right, yes.  Yes, sir.

1      Q    So you're not alleging that some officers

2   already knew you and they had some sort of evil motive to

3   try to arrest you or do something; is that correct?

4      A    No, sir.

5      Q    And Mr. Plunkert was asking you about, you know,

6   your money that you earn.  Do you still have your income

7   tax returns for the year 2014 and 2013?

8      A    I have 2014.  2013, I would have to look for it

9   or try and get a copy of.

10     Q    I mean, do you -- like you use TurboTax yourself

11  or do you go to some company, some company that does

12  taxes?

13     A    Yes, sir, my husband does -- this year we --

14  yes, sir.

15     Q    Who does the taxes for you?  How are the taxes

16  done?

17     A    An individual.  Is it the same?  No.  Is it a

18  company?  Yes.  Is it the same company?  No.

19     Q    So but you would know which company it is?

20     A    My husband would know.

21     Q    Okay.  So even if you don't have the 2013 at

22  home right now, you would know where to go to get it; is

23  that correct?

24     A    Yes, sir.

25     Q    Okay.  I guess that's all for now.

1    not sure as you sit here?

2         A    I'm not sure, because I didn't even -- I didn't

3    see myself, I didn't even see me move from the McDonald's,

4    so I don't know.

5         Q    Okay.  And just based on the voice, you're

6    unable to tell?

7         A    I'm unable to tell right now.

8         Q    Okay.  Why don't we play 101, go ahead and take

9    a look.  Let me pause it at 57 seconds, ma'am.  Was that

10   you?

11        A    That appears to be me, yes, sir.

12        Q    Okay.  And the vehicle that we had discussed

13   that was in need of help from the officers, that you saw

14   that nearby?

15        A    That was in need of help?  It hadn't -- Okay,

16   yes.  Yes, sir.

17        Q    Okay.  Okay.  Now we're looking at 1:02, and the

18   female on the right in the street, that's you, correct?

19        A    Yes, sir, that's me.

20        Q    And one of the officers is fixing you with hand

21   ties, correct?

22        A    Yes, sir.

23        Q    Okay.  You're not on the ground, right?

24        A    No, sir.

25        Q    And there's no knee in your back, correct?

```
1         A      Right.

2         Q      Okay.  It doesn't appear as though you have --

3    Well, tell me this:  Do you know whether you were thrown

4    to the ground before this point in time, 1:02?

5         A      I hadn't been anything before this point in time

6    that I recall, no, sir.

7         Q      Okay.  So the first thing that happened was that

8    you were placed in the hand ties?

9         A      Yes, sir, it appears.

10        Q      So what you told us earlier, you were just

11   mistaken as to what occurred chronologically with respect

12   to on the ground, knee in the back, and the hand ties

13   being placed on you?

14        A      Okay.

15        Q      Right?

16        A      Yes, sir.

17        Q      Okay.  Ma'am, it looks that at 1:07, are you

18   requesting a CNN card?

19        A      No, I'm saying, "William, get this CNN" -- So I

20   had things in my hand, one was a card from a CNN -- a

21   person who works for CNN, because they had been there at

22   the rally earlier.

23        Q      Okay.  And why did you obtain a CNN card?

24        A      My son had taken pictures with the person for

25   CNN and he collects business cards.
```

1     Q    (by Mr. Plunkert)  Ma'am, you see the truck with

2  the trailer, right?

3     A    Right, right.  Okay, yes, I see it.

4     Q    And that's the vehicle that we were discussing

5  that was in a problem that needed assistance, right?

6     A    Yes, sir.

7     Q    Okay.  We'll go ahead, that's at 45 seconds, and

8  now we'll go ahead and hit play again.  Could you hear a

9  voice?  And I'm stopping at 1:01.  Did you hear a voice

10  saying "You're under arrest" several times?

11     A    To me?

12     Q    Yes.

13     A    I heard, "You're under arrest, you're under

14  arrest."

15     Q    Okay.

16     A    I'm sorry, can you go back?

17          MR. LATTIMER:  There's no -- Just let him ask

18  questions, okay?

19          THE WITNESS:  Yes, sir.

20     Q    (by Mr. Plunkert)  Sure, ma'am, we can go back.

21  What was it that you wanted to look at or --

22     A    Can you go back right -- like right there,

23  (indicating).

24     Q    Okay.  At 52?

25     A    Yeah, that'll be fine.  And I need you to pause

```
 1    it.

 2        Q    Okay.

 3        A    Well, go back a little bit more.

 4        Q    Sure.  Go to 43, okay?

 5        A    Okay.  Can you pause it?

 6        Q    Of course.

 7        A    Not yet.

 8        Q    Oh, I'm sorry.

 9        A    So what I'm saying is in this footage, you see

10    the iPad up under my arm, and then when you see William

11    walking by it appears my son has the iPad in his hand.  In

12    this footage you don't see me hand it off to William.  How

13    did that happen?  Let's go back a little bit more.

14        Q    Perhaps you handed it to him off the camera, is

15    that possible?

16        A    And so what I'm saying is how would -- if it

17    hasn't been spliced or whatever, how did that happen?

18    What I'm saying, there's no continuance, something

19    happened there.  Go back a little bit, sir.

20        Q    Okay.  Sure.  We'll put it at 46.  Ma'am, I'm

21    stopping at 1:17.  It appears as though your son as the

22    iPad at this point?

23        A    It looks like it to me.

24        Q    Isn't it possible that an officer may have taken

25    it from you and handed it to your son?
```

1        A       Possibly.

2        Q       Okay.  And then you also see your son's holding

3   a soda and the ice cream; is that right?

4        A       Yes, sir.

5        Q       Okay.  So it's still in his hands at this point,

6   right?

7        A       What's still in his hand, the ice cream?

8        Q       Yes, ma'am.

9        A       And the soda?

10        Q       Yes.

11        A       It looks like it's in his hand at this point.

12        Q       And it hasn't been knocked out at this point,

13   has it?

14        A       It has not been.

15        Q       Okay.  Let's go play it from 1:17; is that okay?

16        A       Uh-huh.

17        Q       Did you say, "Why are you arresting my son when

18   we don't live over here?"

19             MR. LATTIMER:  The tape speaks for itself.

20        A       Yes.

21        Q       (by Mr. Plunkert)  Okay.  And what did you say

22   after that?

23        A       "Why are you arresting my son and we don't live

24   over here?"

25        Q       Okay.  And what did you say right after you said

1     THE WITNESS:  I don't understand completely.

2     MR. PLUNKERT:  Sir, I would like for you to

3  object as to --

4     MR. LATTIMER:  I do.  If I don't understand a

5  question, I know she doesn't.  What does that mean?

6     MR. PLUNKERT:  The witness just responded in the

7  affirmative, and then after the instruction from the

8  counsel she now says she doesn't know what it means.

9     A     (by Mr. Plunkert)  So why don't we backtrack and

10  I'll ask you:  Do you understand what it is to be

11  compliant with an officer's orders?

12     A     Compliant means -- if you mean follow

13  directions?

14     Q     Yes.

15     A     Yes.

16     Q     Okay.  And you understand that if -- You

17  understand at this point you're under arrest, correct?

18     A     Yes, sir.

19     Q     And that's because you have your hands behind

20  your back, correct?

21     A     Yes, sir.

22     Q     And you agree that when you're under arrest you

23  should, to be compliant, you should walk with the officers

24  to where you're being directed?

25     MR. LATTIMER:  Objection, calls for a legal

```
 1    conclusion.

 2         Q     (by Mr. Plunkert)  Go ahead.

 3         A     Yes, sir.

 4         Q     In other words, if an officer -- And these

 5    officers are leading you to an area, correct?

 6         A     Uh-huh.

 7         Q     Is that a yes, for the record?

 8         A     Oh, yes.

 9         Q     And you should walk with them, right?

10         A     Yes.

11         Q     Okay.

12         A     Can I speak to my counsel for a second?

13               MR. LATTIMER:  Yeah.

14         A     Something that I --

15               MR. LATTIMER:  There's no question pending, she

16    can take a break.

17               MR. HUGHES:  Can we show her talking to her

18    counsel?

19               MR. LATTIMER:  No, you're not, because we're

20    going to step outside.

21               MR. HUGHES:  Well, I think she should answer the

22    question.

23               MR. LATTIMER:  There's no question pending.  We

24    waited till you answered the question, there's no question

25    pending, now we're going to step outside.  Of course
```

```
 1    objection, ma'am, you want to keep going through and we'll

 2    play through here at 1:36, okay?

 3        A    Do you want to -- Okay, yes.

 4        Q    All right.  Ma'am, and do you see here at 1:42

 5    that your hands have now fallen out of the handcuffs?

 6        A    If they were cuffed.  It appears that -- I

 7    didn't see my -- Okay.

 8        Q    Now, having viewed this video, ma'am, you would

 9    admit that you were pulling your hands away to become

10    uncuffed, correct?

11        A    I would disagree with that.

12        Q    Okay.  Do you know how your hands became

13    uncuffed?

14        A    No, I do not.

15        Q    Okay.  Did you notice that you were trying to

16    stop walking?

17        A    No, I did not notice that.

18        Q    Okay.  You would admit that you -- you would

19    admit that you tried to stop walking right here before you

20    fell to the ground; is that right?

21        A    I would say no.

22        Q    Okay.  You admit that you weren't thrown to the

23    ground, right?

24        A    I would say no, I wasn't thrown to the ground,

25    doesn't appear that way.
```

1    weren't thrown to the ground on August 13th of 2014?

2         A    That's not true.  In this video, I don't see it

3    in this video.

4         Q    Okay.

5         A    In this footage.

6         Q    Well, give me a time frame of when it would have

7    happened with respect to this video.

8         A    I can't give you a time frame or a time, yeah, I

9    can't give you a time frame.

10        Q    On all the videos that we've watched, did you

11   ever observe an officer -- the officer who it was that you

12   allege threw you to the ground?

13        A    I did not observe it in any of these videos.

14        Q    Okay.  So as you sit here, you don't know who it

15   was, right?

16        A    Who it was that --

17        Q    -- that you allege threw you to the ground?

18        A    I don't -- No, sir.

19        Q    Okay.  And we watched where you identified what

20   you thought was a knee to your back and then another

21   period at I think 1:46 where it could have been the left

22   knee and you're just not sure; do you remember that

23   testimony?

24        A    Yes, sir.

25        Q    Okay.  Was there any other point in time where

1   got different stuff, and you've come back and asked that

2   question five times, two times after you finished

3   questioning.  What, you think you're going to get a

4   different answer if you ask it a number of times, is that

5   the objective?

6           MR. HUGHES:  I didn't ask it five times.

7           MR. LATTIMER:  You have asked it five times, I

8   said four the last time you asked her, and if you did it

9   four the last time, this time makes five, and you did it

10  two times after you finished questioning.  The last time

11  you asked questions in between Mr. Plunkert you asked that

12  same question, and now you're asking it again.

13      Q    (by Mr. Hughes)  Do you know why he said,

14  "That's it"?

15          MR. LATTIMER:  You're asking her why somebody

16  else said something?

17      Q    (by Mr. Hughes)  Do you have any idea why he

18  said that?

19          MR. LATTIMER:  Objection, calls for speculation.

20      A    No, sir.

21      Q    (by Mr. Hughes)  Okay.  At the time he -- After

22  he said, "That's it," soon thereafter we saw in the video

23  that your son was walking by, and you noted he's got --

24  still has a large soda in his hand and he had a -- you

25  said he had a sundae in his hand, he had an iPad in his

1    hand; is that correct?

2         A    Yes, sir.

3         Q    He was not handcuffed as he was walking with

4    those items; is that correct?

5         A    Yes, sir.

6         Q    And he was not yet arrested as far as you know

7    at that point; is that correct?

8         A    Yes, sir.

9         Q    Okay.  Thank you.  I have no other questions.

10             MR. LATTIMER:  We'll read.

11             THE VIDEOGRAPHER:  Okay.  This concludes the

12   deposition, we're off the record at 2:51 p.m.

13                            *****

14

15

16

17

18

19

20

21

22

23

24

25