```
 1           IN THE UNITED STATES FEDERAL DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF MISSOURI

 3                          EASTERN DIVISION

 4
     TRACEY WHITE, et al,      )
 5                             )
                 Plaintiffs,   )
 6                             )
            vs.                ) No. 14-cv-01490-HEA
 7                             )
     THOMAS JACKSON, et al,    )
 8                             )
                 Defendants.   )
 9

10

11

12

13

14

15            DEPOSITION OF NICHOLAS PAYNE

16         TAKEN ON BEHALF OF THE PLAINTIFFS

17                ON OCTOBER 14, 2015

18

19

20

21

22

23

24   REPORTER: LINDA HANAGAN, MO-CCR 309, CSR No. 084-002846

25                   RIVER BEND REPORTING
                         618-466-1123
```

RECEIVED NOV 13 2015 COUNTY COUNSELOR

EXHIBIT County Exhibit Y

```
 1    For the Defendants:

 2    Mr. Michael E. Hughes
      St. Louis County Counselor
 3    Associate County Counselor
      41 S. Central Ave.
 4    Clayton, MO 63105
      314-615-7042
 5    mhughes2@stlouisco.com

 6           and

 7    Mr. Robert Plunkert
      Pitzer Snodgrass, PC
 8    100 S. Fourth St; Suite 400
      St. Louis, MO 63102
 9    314-335-1334
      plunkert@pspclaw.com
10

11    ALSO PRESENT:

12    Mr. Dan Hill
      Mr. Antonio Valentine
13

14                    NICHOLAS PAYNE,

15    being first duly sworn to tell the truth, the whole

16    truth, and nothing but the truth, deposes and says on

17    behalf of the plaintiffs as follows:

18

19                    DIRECT EXAMINATION

20    BY MR. SHABAZZ:

21       Q.    State your full name for the record.

22       A.    Nicholas Daniel Payne.

23       Q.    Okay.  And how are you employed, Mr. Payne?

24       A.    I'm a police officer with the St. Louis County

25    Police Department.
```

1    Q.    Okay.  Is there any specific unit you're
2    assigned to?
3    A.    I'm in the drug unit.
4    Q.    Okay, the drug unit.  How long have you served
5    in that unit?
6    A.    Close to five years.
7    Q.    Okay.  How long have you been employed in that
8    department?
9    A.    Roughly seven and a half years, sir.
10   Q.    Before the drug unit, where did you serve?
11   A.    I was on the -- in the first precinct of
12   St. Louis County Police Department.
13   Q.    Okay.  What did you do in the first precinct?
14   A.    Patrol officer.
15   Q.    Okay.  My name is Malik Shabazz.  I am the
16   president of Black Lawyers for Justice and I also
17   represent the plaintiffs in this lawsuit that has been
18   filed against you and other officers that are here
19   today.
20         This is a deposition.  There's a court
21   reporter here who has placed you under oath, and
22   everything that we say here is part of the trial
23   proceedings in this case as part of the court record.
24   A.    Yes, sir.
25   Q.    Have you ever taken a deposition before?

```
 1    A.   I was terminated from a job, yes, sir.
 2    Q.   Okay.  Which one?
 3    A.   Masonry Forte.
 4    Q.   What was the reason for that?
 5    A.   I never got a reason, to be honest with you.
 6    Q.   Okay.
 7    A.   I came into work one day, and my boss told me
 8  to go home.
 9    Q.   Let me ask you this.  Have you ever been
10  arrested?
11    A.   No.
12    Q.   Have any other -- has any disciplinary action
13  ever been filed against you by your department that
14  you currently work for?
15    A.   Other than the complaints, no, sir.
16    Q.   All right.  Have you ever received any formal
17  training on crowd control?
18    A.   Yes, sir.
19    Q.   Okay.  Could you explain that to me?
20    A.   I think it was the last in-service we went to
21  before August 9th, the latter half of our in-service
22  class was CBRT trainer civil service response.
23    Q.   What date was that?
24    A.   I don't remember the exact date.
25    Q.   Was it right before August 9th, was it --
```

1    A.   It was -- I wouldn't say it was right before
2  August 9th, but it was fairly close.  Maybe it was a
3  month or two before.
4    Q.   A month or two.  And that was the first time
5  you had training on --
6    A.   No, not the first time.  That was the last
7  time we had training.
8    Q.   The last time you had training on it, okay.
9  And could you explain to me what -- the training?
10   A.   They go over formations.  They go over who the
11 team leaders are, who the supervisors are, what
12 they're gonna be shouting, what are the commands
13 they're gonna be giving in order to do certain things,
14 how you move, what to say, things like that.
15   Q.   Okay.  And do you feel that -- let me ask you,
16 in the events that occurred after Mike Brown's
17 killing, how do you -- do you feel that that training
18 helped you?
19        MR. HUGHES:  Before you answer, I object to
20 the form of the question.  It's argumentative -- after
21 Mike Brown's killing.
22        MR. PLUNKERT:  Join.
23        MR. SHABAZZ:  I'll rephrase that.
24   Q.   (MR. SHABAZZ CONTINUING)  How helpful was that
25 training to you in the incidents that occurred after

1  what kind of equipment did you have on?
2       A.   I had a black raid vest that has "police"
3  written on the front and the back. I had blue jeans
4  on, a T-shirt, and my duty holster and belt.
5       Q.   Okay.  No gas mask?
6       A.   No.
7       Q.   No type of -- no helmet?
8       A.   No.
9       Q.   Not on that day?
10      A.   Not on that day.
11      Q.   But on other days did you?
12      A.   Yes, sir.
13      Q.   Okay.  But on your first day, it was just like
14  regular police gear?
15           MR. HUGHES:  Just object to the form of the
16  question.  It's vague as to what you mean by that.
17      Q.   (MR. SHABAZZ CONTINUING)  Were you wearing
18  just regular police gear on that day?
19           MR. HUGHES:  Same objection.
20           THE WITNESS:  It's not regular police gear.
21  It's not what the patrolmen were wearing.  We were
22  wearing blue jeans and T-shirts.  So it's our regular
23  police gear for our unit; however, it's not regular
24  for the department.
25      Q.   (MR. SHABAZZ CONTINUING)  So you were wearing

1   we're talking here about the arrests of Kerry White,
2   Sandy Bowers and Kia Bowers.
3       A.   Okay.
4       Q.   Okay?  Have you spoken to Officer Valentine
5   and Hill about their arrests?
6       A.   No.
7       Q.   Okay.  Now, I'm going to take you to this day
8   we're talking about now which is August the 13th --
9   August the 13th, Wednesday.  Do you remember that day?
10      A.   Yes.
11      Q.   That's the Wednesday after the killing.
12           MR. HUGHES:  Same objection.  It's
13  argumentative.
14      Q.   (MR. SHABAZZ CONTINUING)  What time did you
15  report to duty on that day, August 13th?
16      A.   I want to say it was around four o'clock in
17  the afternoon.  Either four or six.
18      Q.   Where did you report to on that day?
19      A.   Buzz Westfall.
20      Q.   Where was that?
21      A.   The parking lot of the Schnuck's at Buzz
22  Westfall and -- or Lucas and Hunt in West Florissant.
23      Q.   What was happening there?
24      A.   That was the command post where everybody
25  checked in.

1  an individual speaking through a loud speaker, was it
2  coming from a -- or was it coming from a vehicle?
3      A.   It was coming from an individual inside a
4  vehicle.
5      Q.   Individual inside of a vehicle. One of the
6  tactical military style vehicles?
7      A.   I believe it was coming from one of our
8  tactical units, yes, sir.
9      Q.   Okay. And at some point, the order was given
10 for the crowd to disperse?
11     A.   Yes, sir.
12     Q.   What happened from there?
13     A.   The order was given several times. Once the
14 order was given several times and the crowd was not
15 dispersing and they continued to throw rocks and
16 bottles at us, then the decision was made for our tact
17 operations unit to begin using smoke and tear gas to
18 disperse the crowd.
19     Q.   Okay. And what was your role?
20     A.   We were just on the scrimmage line supporting
21 the tactical operations unit and to effect arrest of
22 anybody that tried to charge the scrimmage line or...
23     Q.   Okay. So what happened from there?
24     A.   From there, the crowd was dispersed and we --
25 our scrimmage line went eastbound on Chambers and we

1  officers who you all were with in unity, some members
2  of the unit that you were with were continuously using
3  these devices to disperse that crowd, right?
4          MR. HUGHES:  Object to the form.
5          THE WITNESS:  If -- now, let me -- so I'm
6  assuming you mean we were just walking and launching
7  gas.  Is that what you're assuming happened?
8      Q.  (MR. SHABAZZ CONTINUING)  Yes, sir.
9      A.  That's not the case.  As we're moving up west
10  -- or Chambers, eastbound Chambers from West
11  Florissant, if there was a crowd that was dispersed
12  initially, if they reformed and began throwing rocks
13  and bottles at us again, then our tactical operations
14  unit would deploy whatever means they felt necessary
15  to disperse that crowd.
16      Q.  Now, how could they reform when you all never
17  stopped?
18      A.  Well, we were moving slower than they were, so
19  they were able to get distance and then stop and
20  reform.
21      Q.  Now, this is a pretty -- this is a pretty
22  rebellious crowd, wouldn't you say?
23          MR. HUGHES:  Just object to form of the
24  question.  I'm not sure what you mean by that.
25      Q.  (MR. SHABAZZ CONTINUING)  Would you

```
 1   question.  It's vague.
 2        Q.   (MR. SHABAZZ CONTINUING)  You may answer.
 3             MR. HUGHES:  No foundation as to what your
 4   -- time or place.
 5             THE WITNESS:  The majority of the time,
 6   yes, they, I would say, listen to my commands.  They
 7   listen to my advice maybe would be a proper term.
 8        Q.   (MR. SHABAZZ CONTINUING)  In your time as a
 9   police officer, you have not encountered persons
10   cursing at you and throwing objects at you?
11        A.   Oh, I have.
12        Q.   But not in groups?
13        A.   Not of this magnitude, no, sir.
14        Q.   Not of this magnitude?
15        A.   No, sir.
16        Q.   Okay.  So once again, this had -- you had no
17   feelings about that whatsoever as you walked up
18   Chambers?
19        A.   The only thing I was probably worried about
20   was being shot at that point.
21        Q.   That worried you?
22        A.   Yes, sir.
23        Q.   Okay.  Were you angry?
24        A.   No.
25        Q.   I'll take you now to the corner of -- okay,
```

1  A.  Yes.

2  Q.  Okay. And you say that -- and how many,
3  again, people did you say were on Lorna, roughly?

4  A.  20, 25.

5  Q.  And they were doing what?

6  A.  Throwing rocks and bottles and yelling.

7  Q.  So that means they had -- they were not
8  running away, were they?

9  A.  Well, as I said before, they would move
10 further away and then they would stop and then begin
11 to protest again and throw rocks and bottles, and then
12 as we got closer, they would move away some more,
13 they'd stop and do the same thing.

14 Q.  Okay. So how did you come in contact --
15 strike that.

16      So at some point in time, you came into
17 contact with Kerry White.

18 A.  Yes, sir.

19 Q.  Tell us about that.

20 A.  We were moving our way down Lorna and we heard
21 over the radio that there was a white vehicle
22 approaching our scrimmage line or our line with the
23 headlights out, and Officer McCann observed it --
24 observed the vehicle coming up on Lorna. It pulled
25 over, and then McCann -- we were advising them stop

```
 1    Q.    Did you think it was a gun?
 2    A.    I wasn't sure what it was.
 3    Q.    So you drew your weapon for what reason?
 4    A.    Because the vehicle was moving and I was
 5  afraid I was going to be hit by a car.
 6    Q.    What rate of speed was the vehicle moving?
 7    A.    I don't -- maybe five to ten miles an hour.
 8    Q.    Okay.  Now, what happened after that?
 9    A.    They were taken into custody, and then I
10  walked them back to -- myself and a couple other
11  officers walked them back to the -- to Chambers and
12  Lorna where there was a conveyance van waiting.
13    Q.    Let's back up for a minute.
14    A.    Sure.
15    Q.    What happened when you first approached the
16  vehicle?
17    A.    As I said, Mr. White had his hands outside the
18  car, and Mr. -- the two Bowers brothers had their
19  hands in the air.  We told them that they were under
20  arrest and to get out of the vehicle, at which time
21  they exited the vehicle and they were taken into
22  custody.
23    Q.    Okay.  Which one of them did you apprehend?
24    A.    I assisted in the apprehension of Mr. White.
25    Q.    Mr. White.  Were any of them placed on the
```

```
 1   our coming in contact with him, but there was no
 2   damage done to the camera when we got there.
 3        Q.   And none of these officers here, including
 4   you, have put your hands on Mr. White?
 5        A.   I did put my hands on Mr. White.
 6        Q.   At what point?
 7        A.   To place him into custody.
 8        Q.   Once he was on the ground?
 9        A.   Yes, sir.
10        Q.   No one threw Kerry White onto the ground?
11        A.   No, sir.
12        Q.   Okay.  And did any of the other officers that
13   were with you, did you -- did you see them throw any
14   of the other suspects to the ground --
15        A.   No, sir.
16        Q.   -- that were in the vehicle?
17        A.   No, sir.
18        Q.   No man was thrown to the ground?
19        A.   No, sir.
20        Q.   Okay.  Give me one moment, please.  Now, the
21   other people that were on the block of Lorna, what
22   happened to them as you all moved then down Lorna?
23        A.   They began dispersing into yards and through
24   back -- through people's yards.
25        Q.   Okay.  And were they pursued?
```

```
 1    Lorna, the helicopter light was shining down on Lorna;
 2    is that fair to say?
 3         A.    Yes.
 4         Q.    And a vehicle that you could see was coming
 5    towards you?
 6         A.    Yes, sir.
 7         Q.    Then you heard this on the radio?
 8         A.    Heard it on the radio while we were making the
 9    turn on Lorna or shortly thereafter.
10         Q.    All right.  And about how long did it take for
11    -- well, how far down the block was the vehicle
12    coming?  How far down the block?
13         A.    I don't know where it started from.
14         Q.    When you first saw it -- when you first saw
15    the vehicle moving towards you, how far away was it?
16         A.    Maybe 100 yards or so.  Maybe 100, 200 yards.
17         Q.    Maybe 200 yards.  And what happened then?
18    Those 200 yards, it's coming towards you, what
19    happened then?
20         A.    We were yelling for the vehicle to stop.  Our
21    tact operations unit was, over the loud speaker,
22    yelling to stop, stop the vehicle.
23         Q.    You considered it to be a threat?
24         A.    I did; yes, sir.
25         Q.    At what point did you consider it to be a
```

```
 1   threat?  The entire time?
 2        A.   As long as the vehicle is moving, I would
 3   consider it a threat.
 4        Q.   That vehicle can, in fact, be a deadly threat
 5   to you, can't it?
 6        A.   Yes, sir.
 7        Q.   And it was a deadly threat to you, according
 8   to what you're saying?
 9        A.   It could be used as a deadly weapon; yes, sir.
10        Q.   Okay.  But you chose to use restraint in that
11   instance; is that what you're saying?  You chose not
12   to open fire?
13        A.   Correct.
14        Q.   Because?
15        A.   Because the vehicle pulled over.
16        Q.   I mean but as it was coming to you, you didn't
17   know it would stop.
18        A.   I did not.
19        Q.   And you said it got within one car length of
20   you.
21        A.   I don't remember saying that.
22        Q.   Well, how far did it get to you before it
23   pulled over?
24        A.   Maybe ten, twelve yards, somewhere around
25   there.
```

1    Q.    Okay.  And who was telling the vehicle to
2    stop?
3    A.    Everybody.
4    Q.    Verbally just out of their mouths or was it
5    the amplified sound?
6    A.    Amplified and verbally.
7    Q.    Okay.
8    A.    Flashlights were used to, you know, let them
9    know we were there if they didn't see us.
10   Q.    All right.  Just a couple more questions here.
11   At some point in time, were you aware that the command
12   in control of St. Louis County Police was -- strike
13   that.
14         Are you aware at some point in time that
15   commanding control of St. Louis County Police was
16   given over to the state highway patrol?
17   A.    Yes.
18   Q.    What date was that?
19   A.    I don't remember the exact date.
20   Q.    Was it -- was it like -- was it before or
21   after this incident?
22   A.    I don't recall.  I want to say it was after.
23   I'm not sure.
24   Q.    And were you given new instructions on
25   dispersing crowds once the highway patrol took over?

1   Q.   Which consists of?

2   A.   A khaki shirt, brown pants.

3   Q.   Okay.  But there were other officers there
4   that were dressed differently, is that right?

5   A.   Our tactical operations unit.

6   Q.   Okay.  What were their uniforms?

7   A.   They were in green pants, green shirt, green
8   vests, helmets, gas masks.

9   Q.   Now, Kerry White, he got out the vehicle
10  voluntarily, is that right?

11  A.   Yes, sir.

12  Q.   You told him to exit the vehicle.  He got out
13  and laid on the ground?

14  A.   Yes, sir.

15  Q.   And then you went and picked his -- when he
16  got out on the ground again, then you went to him and
17  did what?

18  A.   We -- I assisted him in getting him into the
19  flex cuffs and get him in custody.

20  Q.   You just went and just pretty much put him in
21  cuffs.  When he laid on the ground, did he lay on his
22  stomach?  Did he lay on his -- how did he --

23  A.   On his stomach.

24  Q.   He was told to do that or he just did it?

25  A.   He just did that.