IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al.,           )
                                )
    Plaintiffs                  )
                                )
v.                              )   Cause No. 14-cv-01490 - HEA
                                )
THOMAS JACKSON, et al.,         )
                                )
    Defendants.                 )

### AFFIDAVIT OF JON BELMAR

I, Jon Belmar being of lawful age do upon my oath state as follows:

1. I have been the Chief of the St. Louis County Police Department since January 31, 2014, and have personal knowledge of all statements contained within this affidavit.

2. I have been a police officer with the St. Louis County Police Department for thirty years, and moved up through the ranks.

3. There are approximately 850 sworn police officers and 300 professional staff in the St. Louis County Police Department.

4. I have responsibility for the overall operation of the St. Louis County Police Department, although I am not the final policy making authority for the Department.

5. The St. Louis County Board of Police Commissioners is the final policy making authority.

6. St. Louis County has been accredited by the Commission on Accreditation of Law Enforcement Agencies ("CALEA") since 1998.


EXHIBIT
County
Exhibit CC

7. I am familiar with CALEA through the various positions I have held with the Police Department, and as Chief I have overall responsibility for making sure that the Department complies with the accreditation standards.

8. CALEA also offers information, resources, and networking opportunities for its clients, which I take advantage of.

9. I am a member of the International Association of Chiefs of Police ("IACP"), which is a nationally recognized organization for the professional development of command level police officers. The Association offers training, information and resources for its members. I regularly participate in conferences, and obtain information from the Association that I use and pass on to others in the Department.

10. CALEA is the premier accrediting association of law enforcement agencies within and outside the United States.

11. Every three years the Police Department must go through a rigorous accreditation process which involves on-site assessment by CALEA auditors, and a review of St. Louis County's policies, procedures, practices and information.

12. Prior to August, 2014, St. Louis County had been through the audit process, and was reaccredited by CALEA in December 2012.

13. The Police Department went through the reaccreditation process in 2015, and once again achieved accreditation in December 2015.

14. There are three separate areas eligible for CALEA accreditation: Law Enforcement, Communications, and Training. St. Louis County has been CALEA accredited in all three areas since 1998.

23. I have not hired any officer with a history of assaultive behavior. I also have not hired any officer with a sustained complaint of excessive use of force, or unlawful arrest. Nor have I hired an officer with a pattern of complaints involving unlawful arrests or excessive force.

24. I am not aware of any hires made by my predecessors of officers with a history of assaultive behavior; sustained complaint of excessive force; sustained complaint of unlawful arrest; or pattern of complaints involving unlawful arrests or excessive force.

25. Even prior to my assumption of the position of Chief of Police, St. Louis County has had a Conduct and Discipline Rules and Procedures Manual in place.

26. Article 14 in the Manual provides for the discipline, up to and including termination for any officer who engages in unlawful or oppressive exercise of authority. Excessive force and unlawful arrests fall under the Article.

27. The Department has a Bureau of Professional Standards that is responsible for investigating all allegations of employee misconduct, and for making recommendations on the appropriate discipline.

28. The Chief of Police must approve all disciplinary recommendations.

29. Police Officers have a right to a due process hearing before the Board of Police Commissioners on the Chief's decision.

30. I am not aware of an instance where a police officer has not received significant discipline on a sustained complaint of excessive force or unlawful arrest.

31. I have never tolerated arrests without probable cause or excessive uses of force under my administration.

15. A law enforcement agency must meet 80 percent of the CALEA standards to be accredited.

16. St. Louis County met all 484 standards in the Law Enforcement area, which entitled it to Accreditation with Excellence over the last two accreditation cycles. A large component of Law Enforcement accreditation is a review of policies.

17. St. Louis County is also accredited with excellence in the area of Communications. In 2015, the County only missed accreditation with excellence in the area of Training by one standard.

18. During each accreditation cycle, the CALEA Commission reviews the activity of the law enforcement agency during the preceding assessment cycle.

19. Therefore, during the 2015 assessment cycle, the CALEA Commission reviewed the policies, practices and training that were in place during the Ferguson unrest.

20. St. Louis County had a Use of Force Written Policy that was in place in August, 2014. A true and accurate copy of the policy is County Exhibit A.

21. Since becoming Chief, I make the ultimate decision on who to hire, and am familiar with the hiring process. I did not make any changes in the hiring process once I assumed the position of Chief.

22. The hiring process includes a background check of driving history, criminal history, arrest history, financial status, educational verification, and reference check. Also if an applicant worked for another law enforcement agency or was in the military, the internal affairs history is checked. Testing is required, including a psychological test and a polygraph test. There is also an interview.

32. I have no knowledge of or reason to believe that Sgt. David Ryan, Officer Terence McCoy, Officer Michael McCann, Det. Derik Jackson, Det. Joe Patterson, Det. Aaron Vinson, Det. William Bates, Det. Nicholas Payne, Officer Daniel Hill, or Officer Antonio Valentine had a pattern of making arrests without probable cause, or of using excessive force.

33. I had no knowledge of or reason to believe that the officers from the City of St. Louis and from the City of Maryland Heights who were in the Ferguson area between August 11 and 13, 2014, were inadequately trained, or had a pattern of making arrests without probable cause or of using excessive force.

34. CALEA has in excess of twenty five standards that apply to internal affairs/disciplinary policies and procedures. St. Louis County met all of them in its 2012 and 2015 reaccreditation processes.

35. All St. Louis County Police Officers must be certified by the Missouri Department of Public Safety, and comply with Peace Officer Standards and Training ("POST").

36. The POST Program licenses law enforcement basic training centers, basic training instructors, approves law enforcement training curricula, and provides staff support for the Peace Officer Standards and Training (POST) Commission.

37. St. Louis County and Municipal Training Academy and all of its instructors are licensed by the POST Commission.

38. To be POST certified, a police officer must graduate from a Police Academy and pass the Missouri peace officer license examination. All officers are also required

5

to take 48 hours of POST approved continuing education credits every thirty six months.

39. Police Officers are trained in the Academy, and on an on-going basis that in order to effectuate a warrantless arrest, he or she must have probable cause to believe the suspect has committed an offense.

40. Officers are further trained that he or she may use no more force than is reasonably necessary to effectuate an arrest, or other legitimate law enforcement purpose.

41. All County Police Officers without legitimate extenuating circumstances, were required to undergo Civil Disturbance Riot Training, in the spring of 2014 by an instructor who was trained by the United States Department of Homeland Security. The County invited police officers from County municipalities to attend as well.

42. The City of Maryland Heights participated in the training.

43. I personally attended the training. The topics covered were police response to civil disturbances and riotous situations, including skirmish lines and how to reduce the use of force.

44. Civil Disturbance and Riot Training has also been given in the St. Louis County and Municipal Academy for new recruits over the past seven years.

45. St. Louis County has a chain of command for the supervision of officers.

46. CALEA has standards that apply to supervision, and in 2012 and 2015, St. Louis County met all the standards.

47. In order to ensure that St. Louis County Police Officers are properly supervised, supervisors are regularly evaluated.

48. Each supervisor receives a performance evaluation every three months during his or her probationary period, and is evaluated twice a year thereafter.

49. There are nine categories that supervisors are rated on, over and above the evaluation of non-supervisors.

50. I am confident that there is not a widespread pattern of unconstitutional conduct within the St. Louis County Police Department because of the hiring process, the policies in place, the training, the supervision, the discipline, and the CALEA certification.

51. On August 9, 2014, I learned that Michael Brown had been shot and killed by a City of Ferguson Police Officer.

52. Thereafter, and in the days that followed in the month of August, 2014, large groups of protestors assembled in the City of Ferguson, and nearby communities.

53. The amount of criminal activity in the area increased significantly beginning on the evening of August 10, 2014. There was gunfire, looting, and the Quick Trip burned on August 10.

54. I had never before encountered such a large assembly of angry protestors or rioting during my years of policing. Nor had I encountered the sustained level of angry protesting and lawless behavior as the days progressed.

55. When I arrived on West Florissant Avenue on the evening of August 10, I spoke with all officers who were present, and told them to remain calm, and maintain their discipline.

56. A code 2000 was called, which means that help from other law enforcement agencies was summoned.

57. The activities in the Ferguson area in August, 2014, were unprecedented for the St. Louis County Police Department, and taxed the available resources.

58. Responding to the events in Ferguson called for extraordinary measures.

59. Commanders from both the Missouri Highway Patrol and the St. Louis Metropolitan Police Department were present, and assisted with law enforcement from August 10 through August 13 in response to the Code 2000.

60. I had an understanding with Chief Jackson from the Ferguson Police Department that the County Police Department would work with the Ferguson Police Department to maintain the safety and security of the area. The County had the bulk of the manpower available.

61. No St. Louis County police officer was under the direction, control, or supervision of the City of Ferguson or Chief Thomas Jackson in August, 2014.

62. All County officers were always under the direction, control and supervision of the St. Louis County Police Department.

63. The Missouri Highway Patrol assumed responsibility for the incident command on August 14, 2014, at which time officers took orders from the Highway Patrol as well.

64. I had had regular and frequent contact with both the Highway Patrol and the St. Louis Metropolitan Police Department ("SLMPD") prior to August 2014. I viewed both of them to be highly competent and well trained law enforcement agencies.

65. I knew that SLMPD was a CALEA certified agency in 2014.

66. I was not aware of a pattern of unaddressed unconstitutional behavior on behalf of any SLMPD officer.

67. Both the Highway Patrol and SLMPD brought their own senior level commanders and supervisors with them to Ferguson.

68. Another law enforcement agency that responded to the Code 2000 in Ferguson was Maryland Heights.

69. I had worked with the Maryland Heights Police Department over the years, and knew the officers in that Department to be professional and well trained.

70. Maryland Heights responded as a unit with its own supervisors, so I was comfortable that the Maryland Heights officers who were on the scene were properly supervised.

71. I was also aware that Maryland Heights had participated in the County Civil Disturbance Riot Training and that all of its officers were POST certified.

72. Maryland Heights had also participated in County Incident Control Training, where County officers trained with officers from other law enforcement agencies in the area to respond to a disaster.

73. I was not aware of a pattern of unaddressed unconstitutional behavior on behalf of any Maryland Heights police officer.

74. I personally remained present in the Ferguson area to supervise the police activities for as long as my physical stamina permitted during the heightened protesting and criminal activity in August, 2014.

75. Beginning at 4:00 am on August 11, 2014, a command post was set up at the Buzz Westfall Center.

76. Officers from all of the participating law enforcement agencies met at the command post at the beginning and end of each shift to receive orders and to debrief.

77. There were St. Louis County commanders and supervisors on the ground supervising at all times between August 10 even before criminal activity began to escalate, and August 26.

78. I made sure that all police officers who reported for duty in the Ferguson area between August 10 and August 13 were supervised.

79. If an officer was from a department I was not comfortable with, or who did not have a supervisor of his or her own reported for duty, I placed the officer with a team of St. Louis County officers who were supervised.

80. St. Louis County tracked all arrests that were made and processed through the St. Louis County Justice Center.

81. I put a detective in charge of keeping track of the arrests.

82. I received confirmation that St. Louis County could account for probable cause for every arrest between August 10 and 26 in the Ferguson area that was processed through the St. Louis County Justice Center.

83. I do not know what arrests City of Ferguson Police Officers made, however.

84. I did instruct St. Louis County officers and departments responding to the Code 2000 to process all arrests through the St. Louis County Justice Center.

85. The procedures for making sure that excessive force was not used, first was by deploying as much supervision on the ground as possible. Also, I continued to require the preparation of use of force reports in accordance with the Use of Force Policy.

86. I never gave any indication that it was permissible to make an arrest without probable cause.

87. I never gave any indication that it was permissible for any police officer to use more force than was reasonably necessary to effectuate an arrest or law enforcement purpose.

88. I had no notice that the training or supervision of the police officers under my supervision on August 11-13 was inadequate.

89. I had no personal involvement in any interactions that Tracey White, William Davis, Dwayne Anton Matthews, Jr., Damon Coleman, Theophilus Green, Kerry White, Antwan Harris, Nathan Burns, Kai Bowers, or Sandy Bowers may have had with any law enforcement officials in August, 2014.

FURTHER THE AFFIANT SAITH NOT.

_____
Jon Belmar

Subscribed and sworn to me this 6th day of MAY, 2016.

_____
Notary Public

My commission expires: July 26, 2019

```
SHARON A. McBAIN
Notary Public - Notary Seal
STATE OF MISSOURI
St. Louis County
My Commission Expires: July 26, 2019
Commission # 15218710
```