**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **TRACEY WHITE et. al.,** | * |
| **Plaintiffs,** | * |
| **vs.** | * **Case No. 4:14-cv-01490** (HEA) |
| | * |
| **THOMAS JACKSON, et. al.,** | * |
| | * |
| **Defendants.** | * |
| | * |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN**
**OPPOSITION TO THE MOTION OF DEFENDANTS CITY OF FERGUSON,**
**THOMAS JACKSON,  JUSTIN COSMA, MATT DELIA, BRANDON**
**MCKINNON, AND RYAN DEVOUTON'S MOTION FOR SUMMARY JUDGMENT**

Come now the plaintiffs, by and through counsel, and hereby submit their opposition to the motion of defendants City of Ferguson, Thomas Jackson, Justin Cosma,[1] Matt Delia, Brandon McKinnon and Ryan DeVouton.

## I.  Introduction

The City of Ferguson's liability is premised upon knowingly allowing a practice and policy of violating the civil rights of its citizens by law enforcement agencies following the shooting death of Michael Brown to exist; the liability of Chief Jackson is premised on the his failure to exercise proper supervisory authority by allowing a practice and policy of violating the civil rights of the City of Ferguson's citizens by law enforcement agencies following the shooting death of Michael Brown to exist; the liability of defendants Delia, DeVouton, and McKinnon is premised upon their actions

---

[1] Defendant Cosma was not involved in the arrest of plaintiffs Green and Coleman. Instead, plaintiffs alleged in their complaint that defendant Cosma was involved in the arrest of plaintiffs White and Davis. Based on discovery, the plaintiffs admit that defendant Cosma was not an active participant in the arrests of any of the plaintiffs.

as Maryland Heights Police Officers of falsely arresting, and imprisoning plaintiffs Green and Coleman, subjecting them to an assault and battery, for subjecting them to an unlawful and unwarranted seizure, and excessive force and/or for standing by while these 4th Amendment violations took place without intervening or attempting to intervene.

## II.  Statement Of Relevant Facts

On August 8, 2014, Travis Wilson of the Ferguson, Mo., police department and Michael Brown, a teenaged African American encountered one another.  A violent confrontation ensued, and Michael Brown, who was unarmed, was shot to death by Travis Wilson.  Although the fact that an unarmed African American was shot and killed by a police officer, is not an unusual event in the United States, the Michael Brown shooting was somewhat unique in that it occurred between 12:00 p.m. and 1:00 p.m. in the afternoon, and there were several independent witnesses.  As a result of the number of witnesses, technology and the internet, the shooting of Michael Brown was seen by millions of people.  The African American community in Ferguson was particularly enraged by what appeared to be an excessive use of force which culminated with Michael Brown being shot in the forehead with the final shot fired by an officer who had already shot Mr. Brown several times prior to that.

Public outrage about the shooting turned into protests which subsequently led to civil unrest in the streets of Ferguson.  In response, the Ferguson Police and the St. Louis County Police took up arms and in militaristic displays of force and weaponry engaged U.S. Citizens as if they were war combatants.  In doing so, the City of Ferguson and the St. Louis County Police Departments used wanton and unnecessary force and acted as if the civil rights of the citizenry that they encountered had been revoked during the period of August 11-13, 2014.

The plaintiffs in this case were all victims of the atrocities committed by the City of Ferguson and the St. Louis County Police Departments during that period.  Specifically, on August 11, 2014, plaintiffs Coleman and Green set out to visit Mr. Coleman's mother.  Green dep at 20.  Exhibit 1. While in route, plaintiff's Green and Coleman were traveling on West Florissant when they observed some protesters or a crowd gathered.    They decided to park and watch what was going on.  *Id*. at 22.  Neither of them joined in any of the protests, it was of interest because that is where they grew up so they were curious.  They watched and took pictures of the goings on.  *Id*.

Where plaintiffs Green and Coleman parked, was where the incident giving rise to their claims occurred.   They chose to park where they did "Because it was away from the crowd and just seemed like a nice safe spot to park."  *Id*. at 23.  The plaintiffs got out of their vehicle and walked toward the Quiktrip taking photographs.  *Id*. at 24.  Nothing happened with the police while they were taking pictures and videos near the Quiktrip.  Id. at 25.  According to plaintiff Green - - *I started walking towards my car after we seen the officers come down, they just came down, and out of nowhere they shot the little smoke canisters, that let me know that basically time to get out of there and go to my car.  Id*. at 29.  At that point, the police just came down the middle of the street, they had a couple tanks, and some officers were in front of the vehicles.  No warning was given, no "You must leave, this is a lawful command," nothing was said, as to orders, none that were heard were given.  The only thing heard was sirens and a boom.  They went back to the parking lot where they had parked because they felt it was time to leave.

The police were still throwing smoke canisters, and then tear bombs within inches of their faces. The plaintiffs were just recording what was going on because it seemed unbelievable so they just kept recording.  The police were engaged with people down by the QuikTrip, and out of nowhere

they turned and started firing at the plaintiffs.  The plaintiffs made sure their hands were still in clear sight so that the police could not confuse anything, yet they still continued to fire at the plaintiffs. They got down on their knees to let the police know that thy were not a threat. Even while they were on their knees, the plaintiffs had to shield themselves because the police kept shooting.  At this point, the plaintiffs were back in the parking lot near plaintiff Green's truck.  It was his and plaintiff Coleman's intention to get into their vehicle and to leave once everything was clear.  Because of the confusion, plaintiff Green determined that the best place for them was to have their hands up and to remain on the side of the vehicle.

In the parking lot at that time, were the plaintiffs, and then another gentleman who was in front of them who they later realized was Alderman Antonio French, and there was probably three or four more vehicles in the parking lot, but nobody that they knew.  At no time when plaintiff Green was in the  parking lot did the plaintiffs observe there to be more than six people in the lot.  At no time did plaintiff Green throw anything at the police nor did he mimic throwing anything at the police.  Green dep at 29-36.  Nor did plaintiff Coleman.  Coleman dep at 37.  Exhibit 2.  Plaintiffs were being shot repeatedly with rubber bullets and mace pellets this entire time.  In fact, plaintiff Green was struck in the back of the head with a mace pellet which he described as kind of like a paint ball, that kind of explodes on impact and instead of paint it's mace.  The plaintiffs retreated to the back of the parking lot to escape the assault by the approaching officers.  When they did that, they were intercepted by officers who had come around the building who began shooting at them as well.  The only time that the plaintiffs heard anyone tell them to disperse was not until the officers actually came around the building and even then, the police continued to fire at them.

The plaintiffs thought that if they did not get mixed up with the wrong crowd, and stayed by

-4-

themselves, nobody could misconstrue anything.  The police never stopped shooting, however, there were marks and dents in their vehicle from all the projectiles being fired at them.  Green dep 38-49. In addition to plaintiffs Coleman and Green, a disinterested witness, Alderman Antonio French was also in the parking lot and he noted that the two guys in the parking lot on the 11th, one with a white shirt and one with a black shirt, were not assembled with anyone as well.  French dep. at 61-64. Exhibit 3.  At no time were plaintiffs Green and Coleman part of an unlawful assembly or any assembly for that matter.  At no time did the police give them a **lawful** order that they failed to obey. And neither plaintiff Coleman or Green failed to disperse inasmuch as they were never **assembled** with anyone.   It is significant to note that plaintiffs Green and Coleman were not initially arrested for or charged with failure to disperse.  According to defendant DeVouton, plaintiffs Green and Coleman were arrested because defendant Delia told him to arrest them.  DeVouton dep at 16.  The probable cause, as he understood it to be, was based what defendant Delia had observed and based on his observations, he ordered the arrest of the plaintiffs.  Those observations "were throwing motions."  *Id*.  Although he was directed to arrest plaintiffs Green and Coleman by defendant Delia, he did not ask what they were supposedly throwing even though a throwing motion is not a crime. *Id*.

In essence, defendant DeVouton admits that the reason that plaintiffs Green and Coleman were arrested was because defendant Delia ordered their arrest he complied without regard to whether or not probable cause existed.  DeVouton dep at 16.  Plaintiffs Green and Coleman were arrested in Ferguson, Mo.  The City of Ferguson and Chief Jackson created and/or allowed an environment of lawlessness that led to their arrests without probable cause and them being subjected to excessive force.  Pusins dep at 275-76, 278-80.  Exhibit 5.  It is against the backdrop of these facts

that the defendants have moved for summary judgment.

### III. <u>Argument</u>

#### 1. <u>Standard Of Review</u>

Summary judgment is only appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine if the alleged undisputed facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all reasonable and justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The nonmoving party may defeat summary judgment with factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675, (D.C. Cir. 1999) (quoting *Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993))*, or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338, (D.C. Cir. 2006).  On a motion for summary judgment, 'facts must be viewed in the light most favorable to the

nonmoving party and credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir 2011).

### 2. Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ortiz v. Jordan*, 131 S. Ct. 884, 888, (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). The Supreme Court in *Saucier v. Katz*, 533 U.S. 194, (2001), established a two-step test for determining whether a government official is entitled to qualified immunity. First, the court asks whether "the facts alleged show the officer's conduct violated a constitutional right." 533 U.S. at 201. If so, then the court must determine "whether the right was clearly established" at the time of the alleged violation. *Id*. The Supreme Court has since clarified that "the sequence set forth in Saucier," although "often appropriate," is not mandatory. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Courts may "exercise their sound discretion" in deciding which question to address first "in light of the circumstances in the particular case at hand." *Id*.

### 3. No Probable Cause Existed For The Arrest Of Plaintiff Green And/Or Coleman For Any Offense

"As a general rule the defense of probable cause is a question of fact for the jury." *Vaughn v. Sears Roebuck & Co*., 643 S.W.2d 30, 33 (Mo. App. E.D. 1982). In claims under 42 U.S.C. § 1983, where a genuine issue of fact on the existence of probable cause for arrest is presented, the question should be submitted to the jury. *Hoffmeyer v. Porter*, 758 F.3d 1065, 1068 (8th Cir. 2014).

As indicated in the response to the defendants' alleged statement of uncontroverted facts,

there is not a single undisputed material fact in this case.   Any alleged probable cause was manufactured after the fact.   In fact, defendant Delia claims that Green and Coleman were arrested for failure to disburse, Delia dep at 28, Exhibit 6, while defendant DeVouton was directed by defendant Delia to arrest Green and Copeland because they were making throwing motions, DeVouton dep at 28. Exhibit 7.   As to defendant McKinnon, he indicates that he did not see either Green or Copeland engage in any illegal conduct, and that they were arrested because defendant Delia ordered that they be taken into custody.   McKinnon dep at 18-19.   Exhibit 8.   In addition to the fact that the reason for the arrest of plaintiffs Green and Coleman is not agreed upon by the defendant officers themselves, no probable cause existed for their arrest for either failure to disperse or assault.

### a.  Failure To Disburse

"[A] person commits the crime of refusal to disperse if, being present at the scene of an unlawful assembly, or at the scene of a riot, he knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly or riot." Mo. Rev. Stat. § 574.060.   In order for there to be a refusal to disburse clearly, there must be an unlawful assembly or a riot.   An "unlawful assembly" requires that six or more people assemble and agree to violate criminal laws with force or violence. Mo. Rev. Stat. § 574.040. A "riot" requires that the six or more assembled people actually violate criminal laws with force or violence. Mo. Rev. Stat. § 574.050. An unlawful assembly requires actions that make it reasonable for rational people in the area "to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts." *Abdullah v. County of St. Louis*, 52 F. Supp. 3d 936, 943 (E. D. Mo. 2014) quoting *State v. Mast*, 713 S.W.2d 601, 603-04 (Mo. Ct.

App. 1986).

By all accounts, plaintiffs Green and Coleman were not assembled with any group of six or more people for purposes of violating any criminal laws with force or violence.  At pages 34-35 of his deposition, plaintiff Green clearly indicates that he was not "assembled" with anyone but plaintiff Coleman.  Plaintiff Coleman details the entire incident on pages 19-44 and 47-50 of his deposition, and refutes that he was unlawfully assembled with anyone.  In addition to plaintiffs Coleman and Green, a disinterested witness, Alderman Antonio French was also in the parking lot and he noted that the two guys in the parking lot on the 11th, one with a white shirt and one with a black shirt, (Green and Coleman) were not assembled with anyone as well.  French dep. at 61-64.  The fact of the matter is that the officer defendants here were engaging in the very conduct that was condemned in *Abdullah v. County of St. Louis*.

> The top members of the unified command decided that they would use the failure-to-disperse law as their legal justification for the orders that all the demonstrators must keep moving, but they also knew that to arrest someone legally they would have to have probable cause to believe that six or more people were gathered for the purpose of violence and had refused an order to disperse. The policymakers knew the policy was being used against peaceful citizens but did not stop the practice.

*Id*. at 52 F. Supp.3d 945.

Interestingly, at most, the defendant officers observed Green and Coleman in the vicinity of other people in a parking lot.  They never observed any communication between Green and Coleman and any other person in the parking lot nor did they ever observe Green and Coleman acting in concert with any one else in the parking lot.  In fact, according to defendant Delia, the only basis for his belief that Green and Coleman were part of an unlawful assembly was because he heard some unidentified St. Louis County officers say the following:

-9-

Without being quoted, the officers were telling them to vacate the area, this is an unlawful assembly, on and on, and the men were kind of running forth and running back, using some profanity, but it was very clear to me that they were making no effort to get into a car and drive away, walk away, anything along those lines.

Delia dep at 19.

Equally, if not more significant is the fact that the basis for the arrests of Green and Coleman as relayed by defendant Delia to defendant DeVouton was because of an alleged "throwing motion that he had observed, " which he indicated is not a crime, and that in actuality, he just arrested Green and Coleman because defendant Delia told him to arrest them. DeVouton dep at 16.  The other involved defendant, Mckinnon, has informed  the he personally did not observe Green or Coleman involved in any illegal conduct.  McKinnon dep at 18.  Defendant Delia further admits that he observed Green and Coleman with cameras and presumed that they were taking photographs and that he directed their arrests.  Delia dep at 23-24. He did not prepare any paperwork whatsoever with respect to their arrests even though he ordered that the arrests take place.  *Id*. at 24-25.  And while defendant Delia indicates that he advised some unidentified person with the St. Louis County Police Department that Green and Coleman were arrested for "failure to disperse," when asked to provide the elements of the offense of failure to disperse he stated "Giving a lawful order to disperse the area of a crowd greater than I believe six people."  *Id*. at 28.

Of meaningful importance, however, is the fact that in order for there to be a refusal to disburse, there must be an unlawful assembly to begin with.  An "unlawful assembly" requires that six or more people assemble and agree to violate criminal laws with force or violence. Mo. Rev. Stat. § 574.040.  Inasmuch as there is no evidence, disputed or undisputed, indicating that Green and Coleman were part of an unlawful assembly, probable cause,  as a matter of law, did not exist for

-10-

the arrest of Green or Coleman for the offense of failure to disperse. *Abdullah, supra.*  To the extent

that there are any doubts in that regard, they  must be resolved by a jury. *Hoffmeyer, supra*.; *Vaughn*,

*supra*.

    **b.  Assault On A Law Enforcement Officer In The Third Degree**

    Under Missouri Law, the offense of assault on a law enforcement officer in the third degree

is set forth at §565.083.1 R.S. Mo.:[2]

> 1.  A person commits the crime of assault on a law enforcement officer . . . in the third degree if:
>
> (1)  Such person recklessly causes physical injury to a law enforcement officer . . .;
> (2)  Such person purposely places a law enforcement officer . . . in apprehension of immediate physical injury;
> (3)  Such person knowingly causes or attempts to cause physical contact with a law enforcement officer.

The only evidence even arguably supporting an assault is the contention by defendant Delia that he

observed plaintiffs Green and Coleman engage in a throwing motion but he did not know what they

were throwing.  Delia dep at 16.  Despite the fact that any suggestion that plaintiffs Green and/or

Coleman threw anything at the police or were acting as if they were throwing anything at the police

is unequivocally disputed, **plaintiff Green indicates that he never threw anything or made a**

**throwing motion, Green dep at 27, plaintiff Coleman never threw a rock, Green dep at 96;**

**neither plaintiff Green nor Coleman were observed throwing anything or attempting to throw**

**anything.  French dep at 63-64**.  Defendant DeVouton, on the other hand,  notes that engaging in

a throwing motion is not a crime.  DeVouton dep at 16.

_____

[2]  In what appears to be typographical error, the defendants refer to assault on a law enforcement officer in the third degree but reference R.S. Mo. §565.082.1(1) which is the statutory provision for assault on a law enforcement officer in the second degree.

In sum, even if one could consider a throwing motion as constituting an assault, two of the defendants, DeVouton and McKinnon never saw plaintiff Green or Coleman throw or pretend to throw anything, neither did Alderman French, and plaintiff Green specifically states that neither he nor Coleman threw anything. Consequently, while plaintiffs Green and Coleman submit that no probable cause for their arrest existed as to an assault, there certainly are no undisputed facts supporting a finding of probable cause and therefore, if this issue is to be considered at all, it is a jury question not suitable for consideration at the summary judgment stage of this proceeding. *Hoffmeyer, supra*.; *Vaughn*, *supra*.

4.    **In Addition To The Fact That No Probable Cause Existed For The Arrests Of Plaintiffs Green And Coleman For Any Offense, There Also Was No Arguable Probable Cause For Their Arrest For Any Offense**

In determining whether arguable probable cause exists in this case, the Court must determine whether the arrest of plaintiffs Green and Mitchell was based on an objectively reasonable—even if mistaken—belief that the arrest was based in probable cause. *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013). There plainly are no undisputed facts in this case regarding the issue of probable cause, nor arguable probable cause, as noted above. Furthermore, there was nothing at all objectively reasonable about the actions of the defendant officers when they made a conscious decision to force everyone to vacate from areas that they did not want them to be without regard for their civil rights.

a.    **Failure To Disperse**

The defendants aver that legal justification for the arrests of plaintiffs Green and Coleman existed because unidentified officers from St. Louis County determined that the protest area had to be cleared of people and that "it was an unlawful assembly." Mot. Mem at 7. It is significant to note

that none of the defendant officers indicates that he had been made aware of any "unlawful assembly."  Defendant Delia:

> We had proceeded down West Florissant with the County tactical operations, and at some point, before the arrest of these two men, a decision had been made by someone from the St. Louis County police department's upper echelon that what would have been protesting early in the day had now turned more violent and more civil disobedience, **but a decision was made by their command that we were going to clear the area of people.** [emphasis added].

Delia dep at 8.  Defendant DeVouton:

> We were in more of a support role on that date.  As we arrived in that general area, there were a quantity of individuals on the sides of the road, we exited from our vehicle and attempted to disperse the bystanders in and around the area.
>
> Q What do you mean by disperse, what does that term mean?
>
> A Have them leave.
>
> Q Why? What were they doing?
>
> A I couldn't tell you exactly what they were doing. We were responding to intelligence obtained by St. Louis County commanders.

DeVouton dep at 8-9.  Defendant McKinnon:

> As we approached them, after they refused to disperse the area, after several commands were given, Lieutenant Delia advised to take them into custody. I specifically did not handcuff anyone. I was present while Officer Devouton was handcuffing them.

McKinnon dep at 17.

The fact of the matter is that the only individual claiming that there was an unlawful assembly is Detective Menzenwerth, Menzenwerth dep at 66-67, who was not on the scene and would not be able to provide such testimony in court inasmuch as it is nothing more than

inadmissible hearsay that may not be used to support a motion for summary judgment.[3] *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008); *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

In proclaiming that arguable probable cause existed for the arrest of plaintiffs Green and Coleman, the defendant officers further posit the following:

> There was also arguable probable cause to believe Damon Coleman and Theophilus Green heard the officers' commands to leave and disperse. Ex. A, Lt. Delia Dep. 18:12–20:2 (—I witnessed several members of St. Louis County giving multiple commands for these men to leave. . . I would constitute the assembly occurred beforehand and everyone else chose to leave..); ex. I, Brandon McKinnon Dep. 12:23–13:4, Oct. 1, 2015 (—There were loud commands going over the St. Louis County Bear, their PA to disperse the area[.].); ex. J, DeVouton Dep. 13:9–14 (hearing St. Louis County police asking Mr. Coleman and Mr. Green to disperse for —a prolonged period of time. and that —[i]t was pretty clear both verbally and visually they were trying to get everybody to disperse.); ex. D, Damon Coleman and Theophilus Green Police Report; ex. E, Damon Coleman Dep. 41:24–42:1, Oct. 14, 2015 (told to leave or disperse after projectiles fired); ex. F, Theophilus Green Dep. 49:12–18, Oct. 26, 2015 (—You guys need to leave[.].); *see also* ex. G, Antonio French Dep. 32:14–36:7 (at least six people in the parking lot when the police instructed those present to disperse at 1:29 on the video); ex. H, Damon Coleman Video.

Mot. Mem. at 7.  Inasmuch as a charge of failure to disperse requires the existence of an unlawful assembly, and an "unlawful assembly" requires that **six or more people assemble and agree to violate criminal laws with force or violence**, Mo. Rev. Stat. § 574.040, and the defendants have failed to identify a single undisputed fact demonstrating that Green and/or Coleman assembled and/or agreed with anyone to violate criminal laws, no reasonably competent police officer could have believed that the arrests of Green and Coleman for the offense of failure to disperse was

---

[3]  The plaintiff submits that the suggestion that it is objectively reasonable for a police officer to rely upon information from an unidentified police officer that an unlawful assembly exists at a particular location and thereafter arrest everyone near that particular location that does not immediately leave the area for failure to disperse is legally untenable.

objectively reasonable.

**b.  <u>Assault On A Law Enforcement Officer In The Third Degree</u>**

1.  A person commits the crime of assault on a law enforcement officer . . . in the third degree if:

> (1)  Such person recklessly causes physical injury to a law enforcement officer . . .;
> (2)  Such person purposely places a law enforcement officer . . . in apprehension of immediate physical injury;
> (3)  Such person knowingly causes or attempts to cause physical contact with a law enforcement officer.

Pointedly, there is no evidence even arguably supporting an assault on a police officer charge in this case.  Defendant Delia, alone among the defendant officers, claims that he observed plaintiffs Green and Coleman engage in a throwing motion but he did not know what they were throwing. Delia dep at 16.  Despite the fact that any suggestion that plaintiffs Green and/or Coleman threw anything at the police or were acting as if they were throwing anything at the police is unequivocally disputed, **plaintiff Green indicates that he never threw anything or made a throwing motion, Green dep at 27, plaintiff Coleman never threw a rock, Green dep at 96; neither plaintiff Green nor Coleman were observed throwing anything or attempting to throw anything. French dep at 63-64**, and that defendant Delia has no idea of what, if anything, they were supposedly throwing,  Defendant DeVouton notes that engaging in a throwing motion is not a crime. DeVouton dep at 16.

Therefore, no reasonable objective officer could believe that probable cause existed for the arrest of plaintiffs Green and Coleman for the offense of assault on a police officer.  Qualified immunity shields law enforcement officers from suit for damages if "a reasonable officer could have believed the plaintiffs' arrests to be lawful, in light of clearly established law and the information

the officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, (1987).   Under settled law, defendants Delia, DeVouton and McKinnon would be entitled to immunity only if a reasonable officer could have believed that probable cause existed to arrest plaintiffs Green and Coleman. Probable cause existed if at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiffs had committed the offense of failure to disperse or assault on a police officer. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

The fact of the matter is this, at the time of the plaintiffs' arrests, the right to be free from a warrantless arrest unaccompanied by probable cause was well established and there are no material facts that dispute the clear determination that no probable cause existed for the plaintiffs' arrests for failure to disperse or any other charge.  As such, the defendants are not entitled to qualified immunity amounting to arguable probable cause.[4]

> 5.     **There Are No Undisputed Material Facts Supporting Summary Judgment In Favor Of The Defendant Officers With Respect To The Assault And  Battery Claim Of Plaintiffs' Green And Coleman**

According to plaintiff Coleman, he was kicked, shot several times with projectiles, hit with a stick, and dragged.  Coleman dep at 28-54.  He further made clear that every officer he saw that day had a rifle and was shooting at him.  *Id*. at 46.  According to plaintiff Green, the following transpired as he was trying to get back to the parking lot where his truck was parked:

> The officers were -- they were still throwing smoke canisters, then they got to throwing tear bombs, they were throwing like inches within you, they were exploding in your face, like.  So I'm just recording, because I don't even think like -- it was

---

[4] Similarly, no basis for official immunity exists.  *State ex rel. Twiehaus v. Adolf*, 706 S.W. 2d 443, 446 (Mo. 1986) (en banc); *Blue v. Harrah's N. Kan. City, LLC*, 170 S.W.3d 466, 479-80 (W. D. Mo. 2005).

unbelievable to me to actually see that going on. Like you could see it on TV, but to actually be the eyewitness is another thing, so I just kept recording.  And you could see them engaged with people down by the QuikTrip, and out of nowhere they turned and put fire on us. I'm looking like maybe, you know what I'm saying, they mistaken or something, so I made sure my hands were still in clear sight so they can't confuse anything, but yet they still fired. I got down on my knees to even be like I'm not a threat, it's like it's really nowhere I can go, because there's crowds of people, I don't want to pull off, run through nobody, and be blocking that way, so I'm just trying to stay on the side, out of sight, you know what I'm saying, but yet they still turned fire on us. Even while I was on my knees, I had to shield like myself and my back because they kept shooting.

Green dep at 31-32.  Between rubber bullets and mace pellets, he was hit at least five to six times

*Id*. at 38.

the first time they fired at us, and like they kept coming towards us, I don't want to stay there because apparently they don't want me right there, so I retreated to the back of the parking lot, and by that time some officers, I guess they came around other buildings, they'll tell me to get in my car and go, I'm like, "Okay, I'm trying to get to the car," but every time I walk forward they're shooting me. So I bagged (sic)back, like I'm just going to sit still, because those bullets hurt.

*Id*. at 44.

they never stopped shooting in our direction, so it was impossible. Like I had marks and dents in my truck from them shooting at us with the rubber pellets.

*Id*. at 50.

It is undisputed that the officers who approached and took plaintiffs Green and Coleman into

custody were the defendant officers:

As we approached them, after they refused to disperse the area, after several commands were given, Lieutenant Delia advised to take them into custody. I specifically did not handcuff anyone. I was present while Officer Devouton was handcuffing them.

McKinnon dep at 17.  As such, a reasonable jury could quite easily conclude that plaintiffs Green

and Coleman were assaulted by the defendant officers when they shot at them repeatedly with rubber

-17-

bullets, pellets and mace.

The defendant officers contend, nonetheless,  that it is undisputed that they did not fire less-lethal projectiles because they "were not carrying and did not use any firearms capable of discharging less-lethal projectiles."  Mot. Mem at 10. While it is true that the defendant officers were wearing gas masks that hid their identity, McKinnon dep at 13.  There is an internal dispute among the defendants as to the weapons carried.  Notwithstanding what they represent in their affidavits, defendant McKinnon indicated at pages 8-9 of his deposition that the people in his unit were carrying less-lethal shotguns.  In addition, plaintiff Coleman testified that every officer that he saw with a rifle was firing at them with less lethal munitions.  44-46.

Under Missouri law, an assault is "any unlawful offer or attempt to injure another with the apparent present ability to effectuate the attempt under circumstances creating a fear of imminent peril."  *Devitre v. Orthopedic Ctr. of St. Louis, LLC*, 349 S.W.3d 327, 335 (Mo. 2011).  Battery is defined as an intended, offensive bodily contact with another.  *Phelps v. Bross*, 73 S.W.3d 651, 656 (E. D. Mo. 2002).  Undeniably, a reasonable jury could find that plaintiffs Green and Coleman suffered an assault and battery at the hands of the defendant officers.  Concomitantly, summary judgment with respect to plaintiff Green and Coleman's assault and battery claim may not be granted.  *Liberty Lobby, Inc*., 472 U.S. at 428 (summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).[5]

**6.    The Facts Regarding Plaintiff Green And Coleman's § 1983**

_____

[5]  Inasmuch as the assault and battery claims of plaintiffs and Green and Coleman are not premised on any alleged negligence, sovereign immunity, pursuant to R.S. Mo. 537.600, has no applicability to those claims.

**Claims Are No Less Disputed Than Are The Facts Regarding
Their Common Law False Arrest And Assault And Battery Claims**

Plaintiffs Green and Coleman, in addition to asserting claims for the common law claims of false arrest and assault and battery, have also asserted claims for unlawful seizure and excessive force pursuant to 42 U.S.C. § 1983.  There is no dispute that plaintiffs Green and Coleman were seized, they were both arrested, and there is no dispute that they were both subjected to excessive force when they were shot with less than lethal projectiles.  As noted in Sections 3-5, supra., no probable cause existed for the arrest of plaintiffs Green and Coleman.   "The essential elements of a constitutional claim under § 1983 are (1) that the defendant acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 805 (8th Cir. 2012).  The defendant officers were irrefutably duly sworn law enforcement officers acting under color of law.  Likewise, "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Bechman v. Magill*, 745 F.3d 331, 334 (8th Cir. 2014) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).

Admittedly, the defendant officers could be entitled to qualified immunity unless they violated a clearly established right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation omitted).  Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the

governing standard for a Fourth Amendment unlawful arrest claim "is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996).  As explained above, however, no probable cause existed for the arrest of plaintiff Green and/or Coleman nor could any reasonably objective officer have concluded that arguable probable cause existed for either of their arrest.

Moreover, it is well established that force without reason is unreasonable.  *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008).  Plaintiffs Green and Coleman were shot with rubber bullets, rubber pellets, mace packets and other less than lethal projectiles and plaintiff Coleman was kicked, hit with a stick and dragged, for no reason other than sport as neither was armed or resisted the defendant officers in any way.  And while the defendant officers correctly note that *Graham v. Connor*, 490 U.S. 386, 397 (1989) has made it clear that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or an investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat to effect it," there is no legal authority for the proposition that force of any kind may be used to effectuate an arrest and/or seizure in the absence of at least arguable probable cause.  No basis for summary judgment exists as to the constitutional tort claims of plaintiffs Green and Coleman.

a. **The Law Regarding Probable Cause And Qualified Immunity Has Been Clearly Established For Decades**

As noted specifically above, "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Bechman, supra*. The defendant officers correctly note that qualified immunity protects "all but the

plainly incompetent or those who knowingly violate the law.." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Instead of pointing out the undisputed facts that either establishes probable cause or arguable probable cause, the defendant officers point out three alleged scenarios that were not clearly established which entitle them to qualified immunity. Mot. Mem at 17. However, the defendant officers ignore the fact that the Court must view the facts in the light most favorable to plaintiffs Green and Coleman and credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Torgerson, supra.* In addition, qualified immunity shields law enforcement officers from suit for damages if "a reasonable officer could have believed the plaintiffs' arrests to be lawful, in light of clearly established law and the information the officers possessed." *Anderson v. Creighton, supra*. The truth of the matter is that the defendant officers are trying to manufacture facts for purposes of summary judgment that are inconsistent with their deposition testimony. For instance, as plaintiffs Green and Coleman pointed out on pages 12-13 of this opposition, neither defendant Delia, DeVouton, or Mckinnon indicate in their sworn depositions that anybody from St. Louis County ever told them that there was an **unlawful assembly** where plaintiff Green and Coleman were located. As to arresting the plaintiffs for allegedly throwing unknown items, or making throwing motions, that makes no legal sense and is in fact inane.

In essence, were the Court to accept that plaintiff Green and Coleman were in a private parking lot that was being approached by the police, and while in the parking lot, they were taking photographs of the goings on in Ferguson, and had not assembled with anyone or engaged in any illegal activity of any kind, no lawful order for them to "move on," could have been given. *Abdullah v. County of St. Louis*, *supra*.   No basis for a charge of failure to disperse existed.   Mo. Rev. Stat.

§ 574.040, Mo. Rev. Stat. § 574.060.  Any marginally competent police officers or police officers

not  knowingly intent on violating the law would know that to be the case.  Accordingly, qualified

immunity is not available to the defendant officers.[6]

> **7.   Thomas Jackson Was The Chief Law Enforcement Officer In Ferguson, Mo.,
> At All Relevant Times And As Such May Not Absolve Himself Of Liability
> For The Unconstitutional Actions Of Law Enforcement Officers Taking Police
> Action In Ferguson, Mo., By Claiming To Have Abdicated His Authority**

According to the moving defendants,

> Thomas Jackson is entitled to summary judgment on all remaining counts
> because the undisputed evidence establishes Thomas Jackson was not personally
> involved in any of the alleged arrests, use of force, training, supervision, control,
> direction, monitoring, disciplining, or implementation of any policy or procedure
> which was the moving force behind any alleged constitutional right of any Plaintiff.

Mot. Mem at 23.  Chief Jackson, on the other hand, explained his job as Chief of Police thusly:

> It's essentially the executive officer, involves overall management, creation of
> policies and procedures, budgeting is a big part of it, reporting to the city manager
> directly, and overseeing training, equipment, and the various aspects of the police
> department, including detective bureau, patrol, communications, and corrections.

T. Jackson dep at 7.  Exhibit 9.  Plaintiffs' claim against Chief Jackson is not about who he may or

may not have arrested, or used force against, or trained or failed to train.  Rather, plaintiffs' claim

against Chief Jackson arises from his failure to properly supervise the law enforcement officers

taking police action in Ferguson, Mo., during the period of August 10 - 13, 2014, and for his failure

to assure that no unconstitutional practices and policies were used by law enforcement personnel

taking police action in Ferguson, Mo.

According to Chief Jackson, he called in the St. Louis County SWAT team on August 10,

---

[6]  The defendant officers are not being sued in their "official capacity" with respect to
plaintiff Green and Coleman's 42 U.S.C. §1983 constitutional torts claims.  There are only being
sued in their personal capacity.

-22-

2014, and although he stayed on the scene, he turned over his command to them.  T. Jackson dep at 30-36.  In more succinct terms, he abdicated his authority.  Because of this act of abandonment of the citizens of Ferguson, Mo., the defendants now advance the position that he is entitled to qualified immunity.  Conspicuously, the defendants fail to identify any legal authority whatsoever in support of the proposition that the Chief of Police of a town can avoid liability for unconstitutional practices used in his town by subordinate law enforcement personnel from his and other jurisdiction by simply verbally abdicating his command as was done by Chief Jackson.  T. Jackson dep at 37.

By his own admission, Chief Jackson was an executive officer and was responsible for the creation of the Ferguson police department's policies and practices.  T. Jackson dep at 7.  In addition, Chief Jackson never really gave up anything,

> I was policing the rest of the city and the protests that took place on South Florissant Road, so I had responsibility for everything but the violent protest area that was up on West Florissant.

T. Jackson dep at 61, and he is doing nothing now but trying to finagle his way out of a lawsuit that is calling him to task for allowing police officers in Ferguson to ignore the constitution in response to a situation that his department was totally unprepared to address.

> nobody could have ever imagined that what happened happened. It was unlike anything any of us have ever seen before.

T. Jackson dep at 53.

The defendants in this case seem to confuse the notion that because Chief Jackson was not the person directly responsible for certain operations or certain operations, he may not be held responsible.  The basis for his potential liability in this case is clearly spelled out in an applicable jury instruction that reads as follows:

If you find that the conduct of the subordinate (or supervised person) denied the plaintiff a right guaranteed by federal law, you must consider whether the supervisor (or supervisory official) caused that conduct. If the supervisor did cause the conduct, then he is liable under section 1983 for the denial of plaintiff's constitutional right.

The standards for assessing whether the supervisor proximately caused plaintiff's constitutional injury are different from the standards for assessing the subordinate's liability. If the subordinate denied plaintiff a constitutional right, a supervisor is not liable for such a denial simply because of the supervisory relationship.

But there are circumstances under which you may find that the supervisor has caused plaintiff's injury, and thus is liable for the illegal conduct of the subordinate. Two such circumstances exist. First, if you find that the supervisor has done something affirmative to cause the injury to the plaintiff—for example, by directing the subordinate to do the acts in question—you should find that the supervisor caused the injury. Second, if you find that the supervisor failed to carry out his duty to oversee the subordinate, knowing that his failure to do so probably would cause a deprivation of the plaintiff's rights by the subordinate, you should find that the supervisor caused the injury. A finding of either circumstance is enough to establish that the supervisor caused the injury. I will explain each of these in detail.

To find that the supervisor did something affirmative to cause injury to the plaintiff, you must find by a preponderance of the evidence that the supervisor was personally involved in the conduct that caused plaintiff's injury. Personal involvement does not mean only that the defendant supervisor directly, with his own hands, deprived plaintiff of his rights. The law recognizes that the supervisor can act through others, setting in motion a series of acts by subordinates that the supervisor knows, or reasonably. should know, would cause the subordinates to inflict the constitutional injury. Thus, plaintiff meets his burden of proof as to the personal involvement of the supervisor in the subordinate's conduct if he proves by a preponderance of the evidence that the deprivation of his right took place at the supervisor's direction, or with the supervisor's knowledge, acquiescence or consent. The supervisor may give his consent expressly or his consent may be implied because of his knowledge of or acquiescence in the subordinate's unconstitutional conduct.

In the absence of personal involvement, you may still find that the supervisor caused the injury to the plaintiff if you find that he failed to carry out his duty to oversee the subordinate. To make such a finding, you must conclude by a preponderance of the evidence that the supervisor had a duty to oversee the subordinate, that he grossly disregarded that duty, and that a reasonable person in the supervisor's position would have known that his dereliction of duty probably would cause a deprivation of rights.

-24-

Instruction 87-80, Modern Federal Jury Instructions, Sand, Seifert, Reiss, Batterman.  In this case,

Chief Jackson was involved in the implementation of policy:

> Again, we were all together and we were all discussing numerous responses to the situation, as were the principals, the SWAT commanders, but we were also in the fight . . . So we discussed every option as we went along as to what we should do.

T. Jackson dep at 56.  In fact, Chief Jackson specifically admits that he had a role in having people

arrested on the charge of failure to disperse:

> Q  Okay. But during the week of August 9th through 16th, there were people being
>
> arrested largely for the crime -- alleged crime of failure to disperse; isn't that correct?
>
> A Yes, I believe so.
>
> Q (by Mr. Lattimer) In fact, Ferguson police began the practice of arresting people
>
> for failure to
>
> disperse; isn't that correct?
>
> A I don't know that.
>
> Q Didn't you give a directive to your people to begin arresting for that charge?
>
> A On the 11th?
>
> Q No, during that week.
>
> A I don't recall specifically giving that order, but people would be arrested on the
>
> appropriate charge.
>
> Q Well, when you say appropriate charge, I mean, was there a discussion about what
>
> charges to use when arresting people?
>
> A Yes, sir.
>
> Q And wasn't it discussed that the charge would be failure to disperse?

A That's one of them, yes, sir.

Q And you were involved in that discussion, correct?

A I believe so, yes.

Q And that was a directive that you gave to your officers that they could utilize to

arrest folks, correct?

A Yes, sir.

T. Jackson dep at 67-68.

The court in *Abdullah, supra.,* addressed this very policy in October 2014, in the context of

a preliminary injunction:

> the Ferguson decision was made by policymakers gathered to plan an appropriate
> course of action for future events. The officers on the street who were telling people
> they would be arrested if they stood still were following the policy directives given
> at several roll calls on several different days.
> It is also significant that the policymakers actually knew that they could not lawfully
> arrest people simply for standing peacefully on the sidewalk. The top members of the
> unified command decided that they would use the failure-to-disperse law as their
> legal justification for the orders that all the demonstrators must keep moving, but
> they also knew that to arrest someone legally they would have to have probable cause
> to believe that six or more people were gathered for the purpose of violence and had
> refused an order to disperse. The policymakers knew the policy was being used
> against peaceful citizens but did not stop the practice.

52 F. Supp. 3d 945.  Defendant Jackson has admitted that he was one of those policymakers

responsible for using the failure to disperse statute unconstitutionally.  He is in no way entitled to

qualified immunity and there is not a single undisputed fact that says otherwise.[7]

### 8. The City Of Ferguson Is Just As Liable As Chief Jackson For Allowing The Constitutional Rights Of Citizens Within Its Boundaries To Be Disregarded

---

[7] In fact, while it is now suggested that Chief Jackson was somehow removed from the situation, Chief Jackson admits that he and Chief Belmar had joint command until August 14, 2014.

-26-

Municipal liability is analyzed under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny. In *Monell*, the Supreme Court held that municipalities may be liable for monetary, declaratory or injunctive relief under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality. *Monell*, 436 U.S. at 690. To establish liability for a "custom," plaintiff must show that there is: (1) a continuing, widespread, and persistent pattern of unconstitutional misconduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of plaintiff's constitutional rights. *Johnson v. Douglas Cnty Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013); *Jane Doe A v. Special Sch. Dist. of St. Louis*, 901 F.2d 642, 646 (8th Cir. 1990).

In arguing that there was no policy, custom or widespread and persistent pattern of unconstitutional misconduct, defendant Ferguson ignores the fact that its then Chief of Police says otherwise on pages 67-68 of his deposition and the court in *Abdullah, supra.*, also concludes otherwise. *Id*. at 945 . In addition, plaintiffs' expert has opined as follows:

> what I'm saying is that because of Chief Belmar's position, that there was joint command, that he and Jackson, City of Ferguson, St. Louis County, allowed  this environment to exist where police officers were just not held accountable, were not required to provide probable cause for arrest, not required to document the use of force, and that allowing that to exist is just inconsistent with police practices because they should have demanded, and Chief Belmar talks about that, that it was his understanding, it was his expectation that these arrests were documented, that these uses of force were documented and that was his expectation.  So he takes the position that's what we should have done, that's what he thinks they did, but in reality, they didn't do it contemporaneously with the incidents themselves.

Pusins dep at 275-76.  Mr. Pusins goes on to explain the potential consequences of allowing the environment discussed to exist.

-27-

You're going to violate people's civil rights by using force that you're not going to report that may be unreasonable, objectively unreasonable force, that you may be detaining people without -- without probable cause because you need to have somebody that provides some oversight to what the police officers are doing, and you do that through supervision. That standard in law enforcement because if you don't, as I said, you could have people arrested when probable cause did not exist. You could have use of force applied that's objectively unreasonable and not even report it, and that's unreasonable.

Pusins dep at 276.  Not unexpectedly, that is exactly what occurred in Ferguson during August, 2014. The plaintiffs were arrested on the bogus charge of failure to disperse, there was no probable cause for the charge of failure to disperse in any instance, there was no contemporaneous documentation associated with any of the arrests, and when force was used, there were no contemporaneous use of force reports associated therewith.  All of the plaintiffs were arrested in Ferguson which allowed this environment of lawlessness to exist.  Furthermore, not only does plaintiffs' expert call into question the conduct of Ferguson, so does the Department of Justice in an After-Action Assessment of the police response in Ferguson in 2014.  Exhibit 10.

There clearly is no basis for summary judgment as to the City of Ferguson.[8]  It allowed knowingly unconstitutional practices to be employed by law enforcement personnel and allowed an environment of lawlessness to exist that was a percolator for unlawful arrests and the improper use of force.[9]

Wherefore for the reasons set forth herein and in the record of this proceeding the plaintiffs

---

[8]  The plaintiffs agree that punitive damages may not be awarded against a municipality and therefore make no claim for punitive damages against the City of Ferguson.

[9]  In a shocking assertion, The City of Ferguson, Missouri asserts that the plaintiffs cannot show that it was responsible for the activity of St. Louis County police officers within its boundaries.  The plaintiffs disagree and maintain that the City of Ferguson had a responsibility, that it could not delegate, to assure that any law enforcement officer acting within its boundaries abide by the law and the United States Constitution.  Its position here may very well explain why the unlawful conduct that the plaintiffs experienced in August, 2014 occurred.

submit that the subject motion for summary judgment should be denied in all respects except insofar as defendant Cosma is concerned.[10]

                                        Respectfully submitted,

                                        By  /s/ Gregory L. Lattimer
                                        Gregory L. Lattimer [371926DC]
                                        1200 G Street, N.W., Suite 800
                                        Washington, D.C.  20005
                                        Tel. (202) 434-4513
                                        Fax: (866) 764-6442
                                        Lattlaw@aol.com

                                        Malik Z. Shabazz [458434DC]
                                        Black Lawyers for Justice
                                        1200 G Street, N.W., Suite 800
                                        Washington, D.C.  20005
                                        Tel: (202) 434-4528
                                        Fax: (202) 248-4478
                                        attorneyshabazz@yahoo.com

                                        Reginald A. Greene[308674GA]
                                        Greene Legal Group, LLC
                                        One Georgia Center, Suite 605
                                        600 West Peachtree Street, N.W.
                                        Atlanta, Georgia 30308
                                        Tel. (404) 574-4308
                                        Fax: (404) 574-4308
                                        rgreene@greenelegalgroup.com

                                        Counsel for the Plaintiffs

                            Certificate of Service

_____

        [10]  The plaintiffs do not oppose the instant motion with respect to defendant Cosma, and agree that all claims against him should be dismissed.

-29-

The undersigned certifies that a copy of the foregoing was served by the court's electronic

filing to all counsel of record this 25th day of May, 2016.


_____ /s/ Gregory L. Lattimer _____

Gregory L. Lattimer