**Robert R. Pusins & Associates, Inc.**
*Police Practices & Procedures Experts*
171 SE 14th Street
Pompano Beach, FL 33060
Ph. 954-303-2169 Fax 954-943-1797
robertpusins@att.net

EXHIBIT

A

December 13, 2015

Law Offices of Gregory L. Lattimer
1200 G Street, N.W. Suite 800
Washington, D.C. 20005

RE:   *Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*
*Eastern District*
*Case No.: 14-cv-01490 (HEA)*

Dear Mr. Lattimer:

I have been retained by the Law Offices of Gregory L. Lattimer in my capacity as a police practices and procedures expert in the referenced case.[1]  I was tasked to analyze the police conduct in the referenced case in order to offer opinions and conclusions as to the arrests of the plaintiff's as well as the police practices and procedures present in the case.   Among other issues, I was asked to formulate an opinion as to whether officers acted in accordance with widely accepted police practices, whether probable cause to arrest was articulated  and documented and was force applied in an objectively reasonably manner.

In pursuing my analysis, I reviewed the following documents and materials relating to the referenced case:

1. Complaint

---

[1]     My curriculum vita is attached, including my qualifications, a list of publications within the previous 10 years, and a list of testimony over the past four years. My rate of compensation is $300.00 per hour.

1

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

2. Third Amended complaint
3. Deposition of Tracey White
4. Deposition of William Davis
5. Deposition of Theophilus Green
6. Deposition of Damon Coleman
7. Deposition of Dwayne Matthews
8. Deposition of Antawn Harris
9. Deposition of Kerry White
10. Deposition of Kia Deytona Bowes
11. Deposition of Sandy Devonta Bowers
12. Deposition of Nathan Burns
13. Deposition of Jon Belmar
14. Deposition of Antonio Valentine
15. Deposition of Keith Eyer
16. Deposition of David Ryan
17. Deposition of David Devouton
18. Deposition of Michael McCann
19. Deposition of Terrence McCoy
20. Deposition of Aaron Vinson
21. Deposition of Joseph Patterson
22. Deposition of Brandon McKinnon
23. Deposition of Derek Jackson
24. Deposition of Matthew Delia
25. Deposition of William Bates, Jr.
26. Deposition of Justin Cosmo
27. Deposition of Richard Mundy
28. Deposition of Edwin Metzenwerth
29. Deposition of Antonio Dominic French
30. St. Louis County Justice Center Inmate Short Profile Booking form - Tracey A. White

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

31. St. Louis County Justice Center Inmate Short Profile Booking forms – William Davis

32. St. Louis County Justice Center Inmate Short Profile Booking forms - Damon Ladonte Coleman

33. St. Louis County Justice Center Inmate Short Profile Booking forms - Kai Deyonta Bowers

34. St. Louis County Justice Center Inmate Short Profile Booking forms - Sandy Devonta Bowers

35. St. Louis County Justice Center Inmate Short Profile Booking forms - Theophilus Green

36. St. Louis County Justice Center Inmate Short Profile Booking forms for: Kerry Rashaun White

37. St. Louis County Justice Center Inmate Short Profile Booking forms for: Nathan Burns

38. Saint Louis County Police Department Investigative Report 15-18619 (Antawn Harris)

39. Saint Louis County Police Department Investigative Report 14-44579 (Kia Bowers, Sandy Bowers, Monzell S. Jones, Derek J. Bower)

40. Saint Louis County Police Department Investigative Report 14-44389 (Nathan Burns)

41. Saint Louis County Police Department Investigative Report 14-44717 (Tracey White, William Davis)

42. Saint Louis County Police Department Investigative Report 15-9973 (Dwayne Matthews)

43. Saint Louis County Police Department Investigative Report 14-44393, (Theophilus Green and Damon Coleman)

44. Saint Louis County Police Arrest Record Information on Tracey White

45. Defendant's Exhibit G-2 (photo)

46. Defendant's Exhibit G-1 (photo)

47. Saint Louis County Arrest Report form F-287 (blank)

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

48. USDC Memorandum, Order and Preliminary Injunction, 10/6/14, by U.S. District judge Catherine D. Perry   USDC Order, 12/22/14 by U.S. District judge Catherine D. Perry

49. Initial Disclosures of Defendant's Jon Belmar and Saint Louis County

50. Plaintiff Nathan Burn's Answers to Defendants Jackson, Cosma, and the City of Ferguson Interrogatories to Plaintiff

51. Plaintiff Nathan Burn's Response to Defendants Jackson, Cosma, and the City of Ferguson Request for Production

52. Plaintiff Antawn Harris Response to Defendants Jackson, Cosma, and the City of Ferguson Request for Production

53. Plaintiff Antawn Harris's Answers to Defendants Jackson, Cosma, and the City of Ferguson Interrogatories to Plaintiff

54. Plaintiff Dwayne Matthews' Answers to Defendants Jackson, Cosma, and the City of Ferguson Interrogatories to Plaintiff

55. Plaintiff Dwayne Matthews' Response to Defendants Jackson, Cosma, and the City of Ferguson Request for Production

56. Objections and Responses of Defendant St. Louis County to Plaintiff's First Request for Production of Documents

57. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Michael McCann

58. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Terrence McCoy

59. Defendant David Ryan's Objections and Answers to Plaintiff's First Set of Interrogatories to Sergeant David Ryan

60. Defendant St. Louis County's Objections and Answers to Plaintiff's First Set of Interrogatories to St. Louis County

61. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Sergeant David Ryan

62. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer William Bates

4

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

63. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Daniel Hill

64. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Joe Patterson

65. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Nicholas Payne

66. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Aaron Vinson

67. Objections and Responses to Plaintiff's First Request for Production Documents to Defendant Officer Antonio Valentine

68. Defendant Joe Patterson's Objections and Answers to Plaintiff's First Set of Interrogatories to Officer Joe Patterson

69. Defendant Aaron Vinson's Objections and Answers to Plaintiff's First Set of Interrogatories to Officer Aaron Vinson

70. Defendant Daniel Hill's Objections and Answers to Plaintiff's First Set of Interrogatories to Officer Daniel Hill

71. Defendant William Bates' Objections and Answers to Plaintiff's First Set of Interrogatories to Officer William Bates

72. Defendant Antonio Valentine's Objections and Answers to Plaintiff's First Set of Interrogatories to Officer Antonio Valentine

73. U.S. Department of Justice Civil Rights Division, Investigation of the Ferguson Police Department, March 4, 2015

74. U.S. Department of Justice After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri

75. U.S. Department of Homeland Security, Center for Domestic Preparedness Field Force Operations and Field Force Command and Planning manuals

In the presentation of my opinions and conclusions, I may rely upon and utilize any of the case materials, including the materials identified above. I reached my

opinions and conclusions by applying my knowledge, specialized experience, training, education and skills to the facts and information furnished to me.  My opinions are provided with a reasonable degree of professional certainty within the field of law enforcement.

### Background

An assessment of individual police practices should be evaluated in as complete context as possible. In this case, as background, it noteworthy that the Ferguson Police Department (FPD) has a long and documented history of systemic unconstitutional policing in general and in particular, a pattern of stops without reasonable suspicion and arrests without probable cause in violation of the Fourth Amendment; infringement on free expression, as well as retaliation for protected expression, in violation of the First Amendment; and excessive force in violation of the Fourth Amendment. This fact was recently confirmed in detail by the United States Department of Justice (USDOJ) Civil Right Division in their investigation of the Ferguson Police Department. This documented history is germane because it is widely accepted and understood that incidents of unconstitutional policing occur in police departments in proportion to their organizational attitudes, values and beliefs (i.e., the police culture within a particular department). A department with a problematic use of unconstitutional practices and/or having chronic problems in this regard is more likely to produce incidents of misconduct and error. Here, the federal government, through the U.S. Department of Justice, made findings, including the following, which should be considered in an objective and impartial review of this case:

1. On March 4, 2015, the USDOJ found that the FDP's approach to law enforcement has led officers to conduct stops and arrests that violate the Constitution. Frequently, officers stop people without reasonable suspicion and/or arrest them without probable cause. (DOJ Report at 2)

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

2. The USDOJ found that FPD engages in a pattern of First Amendment violations in that FPD's approach to law enforcement results in violations of individuals' First Amendments rights. FPD arrests people for a variety of protected conduct: people are punished for talking back to officers, recording public police activates, and lawfully protesting perceived injustices. (DOJ Report at 24)

3. In particular to recording police activities, the USDOJ found that the FPD office routinely infringe on the public's First Amendment rights by preventing people from recording their activities. The First Amendment "prohibit(s) the government from limiting the stock of information from which members of the public may draw". *First Nat'l Bank v. Belloti, 435 U.S. 765, 783 (1978).* (DOJ Report at 26)

4. The USDOJ found that the FPD engages in a pattern of excessive force in violation of the Fourth Amendment. The finding that the FPD use of force is routinely unreasonable and sometimes clearly punitive is drawn largely from FPD's documentation; that is, from the officers own words. (DOJ Report at 29)

5. Also, the USDOJ found that the FPD's use of force review system is particularly ineffectual. Force frequently is not reported. When it is, there is rarely any meaningful review. Supervisors do little to no investigation; either do not understand or chose not to follow the FPD's use-of-force policy in analyzing officer conduct; rarely correct officer misconduct when they find it; and do not see the patterns of abuse that are evident when reviewing these incidents in the aggregate. (DOJ Report at 38)

Further, the Department of Justice (DOJ) determined that there was a need to assess the police response in Ferguson to determine if actions could be taken to improve situations like this in the future. As part of several DOJ initiatives and at the request of the St. Louis County Police Chief, the Office of Community

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

Oriented Policing Services (COPS Office) agreed to conduct an after-action assessment of the police response to the mass demonstrations in Ferguson.

The four core agencies involved in this assessment are the St. Louis County Police Department, the St. Louis Metropolitan Police Department, the Missouri State Highway Patrol, and the Ferguson Police Department. These departments were selected for the assessment because they were the primary responders to the demonstrations. The After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri was published in 2015.

Here again, the federal government, through the U.S. Department of Justice, COPS Office, identified themes which permeated all aspects of the police response to the mass demonstrations in Ferguson, including the following themes, which should be considered in an objective and impartial review of this case:

1. Inconsistent leadership - Inconsistencies in direction, incident management and tactical orders were apparent and particularly evident in the comments of frontline officers and supervisors. (COPS Office Report at 2)

2. Failure to understand the endemic problems in the community - There was insufficient concerns, and relationships between law enforcement and some community segments were lacking.

3. A reactive rather than proactive strategy - The police response to the demonstrations was generally reactive and did not appear to establish a strategic approach to effectively mitigate the complexities of issues and respond more effectively to the mass gatherings.

4. Use of ineffective and inappropriate strategies and tactics - There were instances where specific actions were taken that infringed upon constitutionally protected activities and were not aligned with current

8

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

national best practices. These strategies and tactics had the unintended consequences of escalating rather than diminishing tensions.

5. Lack of law enforcement response continuity – Complicating factors were presented by the response of smaller municipal law enforcement agencies in the region, each with disparate missions, policies, training, equipment, and policing cultures.

6. Arrest procedures -  When asked specifically about arrest guidelines and procedures, the assessment team received statements such as the following from those interviewed:

"there was no objective or strategy to manage the mass demonstrations, much less arrests"; "there was no plan in place for arresting people and no standard way to document the arrests…"; law enforcement on the scene stated they were "unclear who they could arrest". (COPS Office Report at 36-37)

7. Use of Force – The use of canines for crowd control in Ferguson was an inappropriate and ineffective strategy. (COPS Office Report at XVI)

As with the USDOJ Civil Right Division's investigation of the Ferguson Police Department, the federal government through the After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri also made findings, including the following, which should be considered in an objective and impartial review of this case:

1) The deployment of less-lethal weapons in the multiagency response to the demonstrations was not centralized or tracked. The unprecedented nature of this event does not justify the lack of documentation and need to track the use of less-lethal responses. (COPS Office report at 52)

2) The assessment team identified the lack of thorough documentation on the use of CS gas (tear gas), including justification, deployments strategies and outcomes. The team also identified instances of tear gas

9

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

being deployed inappropriately without proper warnings, without sufficient attention paid to safe egress, and without consideration for environmental conditions. (e. g. weather, wind direction, proximity to a densely populated area, potential impact on the safety of the citizens as well as law enforcement). (COPS Office report at 51)

3) Unified command created a vague and arbitrary derivative of the Missouri failure to disperse statute the "keep moving" order or the "five second rule", which violated citizen's right to assembly and free speech, as determined by a U.S. Federal Court Injunction. (COPS Office report at 64)

4) Unified command failed to establish a clearly marked First Amendment free speech zone until August 19, 2014. This delay, coupled with the "keep moving" order, had an overall effect of discouraging protesters from exercising the First Amendment rights.  (COPS Office report at 64)

5) Incident command did not ensure that factors regarding arrest decisions were established and adequately conveyed to operational supervisors or frontline officers.  (COPS Office report at 40)

## Professional Opinions/Conclusions and Basis for Opinions

### 1. Arrests were made without articulation and documentation of probable cause

The plaintiffs were arrested by law enforcement and subsequently transported to the St. Louis County Justice Center for booking processes. Documentation has been provided regarding the booking process through the IJMS Inmate Short Profile forms that include the defendants name, charge, arresting officer and other pertinent information. What is glaringly absent is probable cause for each of the arrests. Arresting officers did not complete police reports, supplemental reports, charging documents or affidavits to establish the required probable cause to affect the arrests of the plaintiffs in this case.

10

Reasonable and prudent law enforcement officers know and understand the principles of probable cause and arrests. The International Association of Chiefs of Police (IACP) National Law Enforcement Center defines an arrest as "taking a person into custody" and further defines probable cause as "when the facts and circumstances within an officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution to believe the suspect has committed, is committed or is about to commit an offense. For an arrest to constitute a reasonable seizure under the Fourth Amendment, it must be supported by probable cause, which exists only if "the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense at the time of the arrest". *Stoner v. Washington, 735 F.3rd 799, 803 (8th Cir. 2013)*

Documentation of the existence of probable cause to affect an arrest is best achieved through the completion of police reports and charging documents or affidavits by the arresting officers to articulate and attest to each arrestee's specific criminal act(s). While law enforcement is familiar with arrest procedures under normal conditions, agencies must plan and prepare for mass arrest operations. It is imperative that agencies maintain continuity and accountability of arrestees from the arrest site though the booking process. Standard prisoner processing procedures must begin at the time of arrest. These requirements include documentation arrest reports, charging documents or affidavits to include the probable cause but can also include  photograph, control numbers, and wrist bands;

The lack of sufficient documentation surrounding the arrest of each of the plaintiffs including the conduct of each of the plaintiffs and the conduct of

11

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

each of the law enforcement officers involved in the arrests of the plaintiffs causes the facts regarding the arrests to remain in dispute.

What is not is dispute is that the articulation and documentation of the probable cause to justify, support and to memorialize the probable cause of each of the arrests was not completed contemporaneously with the arrests or within a reasonable time frame. Disturbingly, the police reports were completed and approved in May of 2015, over eight (8) months after the arrests.  Such a delay in reporting is unreasonable.

As noted by the Department of Justice, "there was   no   objective   or strategy to manage the mass demonstrations, much  less arrests"; "there was no plan in place for enforcement on the scene      stated   they   were "unclear who they could arrest". (COPS Office Report at 36-37)

The failure to articulate and document the probable cause to justify, support and to memorialize the probable cause for an arrest contemporaneously with the arrest or within a reasonable time frame is not in line with widely accepted police practices, falls below the standard of care for arrests and is unreasonable and can lead to constitutional violations. Law enforcement officers are taught nationally that the articulation and documentation of the probable cause to justify and to memorialize the probable cause of each arrest is an essential element of policing and affords the defendants due process.

The arresting officers in the arrests of each of the plaintiffs chose not to follow the standard of care regarding arrests in each of the arrests of the plaintiffs to articulate and document the probable cause to justify, support and to memorialize the probable cause for an arrest contemporaneously with the arrests or within a reasonable time frame and that is

12

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

unreasonable. Further, the expectation that a law enforcement officer will have complete and accurate recall of the facts regarding a specific arrest that occurred months earlier in the midst of a civil disturbance such as the Ferguson demonstrations is unreasonable.

Reasonable and prudent law enforcement officers would have followed this standard of care and widely accepted police practice regarding arrests and articulated and documented the probable cause and memorialized the probable cause for an arrest contemporaneously with the arrests through a police report in a reasonable time frame.

## 2. Supervisory Oversight of Arrests and Articulation and Documentation of Probable Cause

The failure of supervisory oversight of the arrests through a review of the police reports and any associated charging documents or affidavits to confirm the existence of probable cause and that the elements of the offense are contained in the police report and charging documents is not in line with widely accepted police practices and falls below the standard of care for supervision and oversight of arrests and that is unreasonable and can lead to constitutional violations.

Reasonable and prudent supervisors of law enforcement officers are taught nationally and know that the widely accepted police practice and the standard of care for documentation of arrests is for supervisory oversight, contemporaneously with the arrests or within a reasonable time frame to confirm the existence of probable cause and that all of the elements of the offense are contained in the police report and any associated charging documents or affidavits.

13

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

The lack of sufficient documentation surrounding the arrest of each of the plaintiffs including the conduct of each of the plaintiffs and the conduct of each of the law enforcement officers involved in the arrests of the plaintiffs and of any supervisory review causes the facts regarding each of the arrests to remain in dispute.

The arresting officers in the arrests of each of the plaintiffs chose not to follow the standard of care regarding each arrest of the plaintiffs to articulate and document the probable cause to justify and to memorialize the probable cause for the arrest contemporaneously with the arrests or within a reasonable time frame and that is unreasonable.

Consequently, it was not possible for supervisors to conduct a review of the documentation of the arrests of the plaintiffs to confirm the existence of probable cause and that all of the elements of the offense are contained in the probable cause affidavit and police report, contemporaneously with the arrests or within a reasonable time frame and that is unreasonable and can lead to constitutional violations.

As mentioned previously, the police reports were completed and obtained final approval in May of 2015, over eight (8) months after the arrests. Such a delay in reporting and approval is unreasonable. Moreover, the fact that the reports were prepared by someone other than the arresting officer or any officer that was on the scene at the time of the arrest or communicated with any officer on the scene within a reasonable time after the arrest is unprecedented.

14

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

### 3.  Use of Force

Reasonable and prudent law enforcement officers know and understand that the use of excessive force by a law enforcement officer violates the Fourth Amendment. *Graham v. Conner, 490 U.S. 386, 394 (1989); Atkinson v. City of Mountain View, MO., 709 F.3d 1201, 1207-09 (8th Cir. 2013).* The constitutionality of an officer's use of force depends on whether the officer's conduct was 'objectively reasonable' in light of the facts and circumstances" which must be assessed "from the perspective of a reasonable officers on the scene, rather than with the 20/20 vision of hindsight". *Graham, 490 U.S. at 396.*

Reasonable and prudent law enforcement officers also know and understand that the failure to document and justify the use of force by law enforcement officers contemporaneously with the application of the force or within a reasonable time frame is not in line with widely accepted police practices, falls below the standard of care for the use of force, is unreasonable and resulted in the clear indifference to the rights of plaintiffs.

Reasonable and prudent law enforcement officers who serve as supervisors know and understand that the failure to conduct a supervisory review of all instances of use of force by law enforcements officers under their supervision to confirm the documentation, justification and the reasonableness of the force contained in police reports and use of force reports is not in line with widely accepted police practices and falls below the standard of care for arrests, is unreasonable and resulted in a display of clear and deliberate indifference to the rights of plaintiffs and the citizenry who they are sworn to serve.

15

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

As noted by the DOJ, the deployment of less-lethal weapons in the multiagency response to the demonstrations was not centralized or tracked. The DOJ also noted that the unprecedented nature of this event does not justify the lack of documentation and need to track the use of less-lethal responses. (COPS Office report at 52)

The DOJ further noted that the assessment team identified the lack of thorough documentation of the use of CS gas (tear gas), including justification, deployments strategies and outcomes. The team also identified instances of tear gas being deployed inappropriately without proper warnings, without sufficient attention paid to safe egress, and without consideration for environmental conditions. (e. g. weather, wind direction, proximity to a densely populated area, potential impact on the safety of the citizens as well as law enforcement). (COPS Office report at 51)

While the DOJ specifically reports on the deployment of less-lethal weapons and CS gas (tear gas), the documentation associated with the plaintiffs in this case failed to demonstrated the documentation of use of force, even use of force beyond less-lethal weapons and CS gas (tear gas) such as physical force, contemporaneously with the use of force or within a reasonable time frame. Such failure rendered any use-of-force review system or process to be essentially non-existent and ineffective in assuring that the force was used reasonably and that is an unequivocal deviation from applicable standards.

As with probable cause, when force is not reported, or documented contemporaneously with the use of force or within a reasonable time frame, and not reviewed through a use-of-force review system, such practice is not in line with widely accepted police practices and falls below

the standard of care for the use of force, is unreasonable and can lead to constitutional violations.

### 4. Decontamination and Medical Aid to Injured Prisoners

Reasonable and prudent law enforcement officers know and understand that the failure to establish decontamination procedures and provide decontamination and first aid treatment to arrested persons who have been contaminated by chemical munitions or injured by less lethal munitions is not in line with widely accepted police practices, falls below the standard of care for the use of such munitions, is indicative of deliberate indifference to the rights of citizens, is unreasonable and can lead to constitutional violations.

### Conclusion

In sum, the City of Ferguson, St. Louis County, Chief Jackson and Chief Belmar ("the municipal defendants") allowed an environment to exist in Ferguson, Missouri, following the death of Michael Brown, in particular the period of August 10-13, 2014, where law enforcement officers were not held accountable, were not required to provide probable cause for arrests and were not required to document the use of force. Allowing this environment to exist was inconsistent with all applicable standards of care and was in several respects, unprecedented in modern day law enforcement practices.

In allowing the environment discussed herein to exist, it was entirely foreseeable that constitutional rights would be violated, arrests without probable cause would be made and that force without reason would be used. The U.S. Department of Justice After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri detailed a situation that amounted to a complete failure of law enforcement to properly respond to its citizenry following

17

*Tracey White, et al v. Thomas Jackson, et al*
*In the United Stated District Court*
*Eastern District of Missouri*

the shooting death of Michael Brown. The records reviewed herein fully documents specific failures on the part of law enforcement amounting to policies and practices on the part of the defendants that exhibited a reckless disregard and deliberate indifference for the rights of citizens and was a proximate cause of the injuries suffered by the plaintiffs in this case.

This concludes my findings, conclusions and opinions at this time. I respectfully reserve the right to supplement or otherwise modify my opinions based on the receipt and examination of additional information.

Very truly yours,

Robert R. Pusins

EXHIBIT
B

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

Case No. 14-cv-01490 – HEA

```
TRACEY WHITE, et al.,              )
                                   )
     Plaintiffs,                   )
                                   )
     vs.                           )
                                   )
THOMAS JACKSON, et al.,            )
                                   )
     Defendants.                   )
- - - - - - - - - - - - - - - - - X
```

633 South Andrews Avenue
Suite 202
Fort Lauderdale, Florida
January 7, 2016
9:15 o'clock a.m.

- - - - - - - - - - - - - - - - - - -
DEPOSITION OF ROBERT R. PUSINS
- - - - - - - - - - - - - - - - - - -

1

2

APPEARANCES:

3

GREGORY L. LATTIMER, Esquire,

4    Appearing on behalf of the Plaintiffs.

5    MICHAEL E. HUGHES, Esquire,
     Associate County Counselor,

6    County of Saint Louis, Missouri,
     Appearing on behalf of the Defendants.

7

ROBERT T. PLUNKERT, Esquire,

8    Pitzer Snodgrass, P.C.,
     Appearing on behalf of the Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESS

ROBERT R. PUSINS

DIRECT EXAMINATION                                    PAGE

By Mr. Hughes........................................5

CROSS-EXAMINATION

By Mr. Plunkert...................................157

REDIRECT EXAMINATION

By Mr. Hughes.....................................254

CROSS-EXAMINATION

By Mr. Lattimer...................................268

RECROSS-EXAMINATION

By Mr. Plunkert...................................278

FURTHER DIRECT EXAMINATION

By Mr. Hughes.....................................280

1

2

3                          E X H I B I T S

4

5       DEFENDANT'S                                  PAGE

6          A    Fee and Retainer Agreement            23
           B    Income Records                        32
7          C    White/Davis Binder                   159
           D    Chief Belmar's Deposition/Notes      163
8          E    Coleman/Green Binder                 191
           F    Matthews/Burns Binder                230
9          G    Production Request Document          230
           H    Reviewed Materials Binder            232
10         I    DOJ Report                           233
           J    DOJ After-Action Assessment          233
11         K    JurisPro Advertisement               240
           L    HG Experts Advertisement             240
12         M    Notes                                241
           N    Mustafa Abdullah Order               242
13         O    Officer Richard Mundy Deposition     242
           P    Officer Justin Cosma Deposition      242
14         Q    Antawn Harris Deposition/Police
                   Report                            243
15         R    Correspondence                       243
           S    Expert Report Draft                  244
16         T    Brown Binder                         245
           U    FEMA Field Force Command and
17                 Planning Manual                   248

18

19

20

21

22

23

24

25

5

```
1          Deposition of ROBERT R. PUSINS, a Witness herein,

2     taken on behalf of the Defendants herein, for the

3     purpose of discovery and for use as evidence in this

4     cause, pending in the United States District Court of

5     the Eastern District of Missouri, Eastern Division,

6     before JENNIFER A. POLEO, Certified Shorthand Reporter,

7     a Notary Public within and for the State of Florida at

8     Large, pursuant to notice heretofore filed on the 7th

9     day of January, 2016, commencing at the hour of 9:15

10    o'clock a.m.

11                         – – –

12    Thereupon,

13                    ROBERT R. PUSINS,

14    having been first duly sworn, was examined and testified

15    upon his oath as follows:

16                    DIRECT EXAMINATION

17    BY MR. HUGHES:

18        Q.    State your name, please.

19        A.    My name is Robert Pusins, P–U–S–I–N–S.

20        Q.    Sir, you've given depositions before,

21    correct?

22        A.    Yes.

23        Q.    Can you give me an estimate of how many times

24    through the years you've given a deposition as an expert

25    witness, a paid witness?
```

6

```
 1          A.    Perhaps 20 depositions.

 2          Q.    And how many times have you given a

 3    deposition as a police officer?

 4          A.    I would say well over a hundred times that

 5    I've been deposed in my life as a law enforcement

 6    officer.

 7          Q.    And were those in criminal cases you gave

 8    depositions?

 9          A.    Yes.

10          Q.    Well, I'm not interested in that at the

11    moment, but what about civil cases?  How many times have

12    you given depositions in a civil case?

13          A.    Approximately 20 times if I had to estimate.

14          Q.    Okay.

15          A.    Without counting.

16          Q.    And those 20 times, were you or, I guess,

17    your department personally named as a defendant in a

18    lawsuit?

19          A.    No.

20          Q.    How many times did you give testimony in

21    civil cases where either you or your city or your

22    department was named as a defendant in a lawsuit?

23          A.    I believe once.

24          Q.    What were those other 19 times when you gave

25    depositions in civil cases?
```

1          A.     I gave depositions as an expert in -- in

2     police practices and police procedures.

3          Q.     To mean you gave depositions as an expert and

4     you did not get paid for it?

5          A.     I've always been paid for my depositions.

6          Q.     Right.  Okay.  But I asked you how many times

7     through the years you gave a deposition as a law

8     enforcement officer.

9          A.     I would say over a hundred times as a law

10    enforcement officer.

11         Q.     And most of them are criminal cases, and you

12    said about 20 times as a law enforcement officer you

13    gave depositions in civil cases?

14         A.     I understood your question to be how many

15    times have you been deposed in civil cases.

16         Q.     Right.

17         A.     My answer was I estimated 20.

18                You then asked me how many times have I been

19    deposed as a law enforcement officer, and my answer was

20    over a hundred.

21         Q.     I understand you said maybe 20 times as a

22    paid witness.

23                How many times did you give depositions that

24    were not criminal cases and were not as a paid witness?

25         A.     Perhaps once.

8

```
 1          Q.    And were you a defendant in the lawsuit
 2    then?
 3          A.    I was not.
 4          Q.    Well, you've obviously given a lot of
 5    depositions, so I'm going to be asking you a number of
 6    questions.
 7                If the answer to a question calls for a yes
 8    or a no response, can you first answer the question with
 9    either a yes or a no, and then if for some reason you
10    wish to expand on the answer, you can do so afterwards?
11                Is that fair?
12          A.    If it's possible to answer the question with
13    a yes or no, I will.
14          Q.    You'll try to?
15          A.    I will try to, yes.
16          Q.    But, you know, if you can answer with a yes
17    or a no and then expand if you wish to explain your yes
18    or no, can you do it that way?
19                MR. LATTIMER:  I'm going to object to that.
20                You can't tell the Witness how to answer a
21          question.
22                He's indicated that if the question calls for
23          a yes or no answer, he will provide a yes or no
24          answer if that's the answer that he deems
25          appropriate, but I strenuously object to you even
```

```
 1        suggesting as to how he should answer questions,

 2        and I directly tell the witness that he is not to

 3        answer questions the way you believe he should

 4        answer questions.

 5             He should answer the questions as he deems

 6        appropriate at all times.

 7   BY MR. HUGHES:

 8        Q.    Mr. Lattimer just gave a long statement.  Is

 9   he your attorney in this case?

10        A.    He is not.

11        Q.    Now, I understand you formed your opinions in

12   this case.  I want to ask you about that.

13             You know, first of all, I'm sure you've

14   spoken to Mr. Lattimer, maybe the other two attorneys

15   representing the Plaintiffs in this case, but I want to

16   know have you spoken to anyone else to help form your

17   opinions, such as, you know, a Chief of Police

18   somewhere, someone involved in law enforcement, a law

19   professor, a professional?

20        A.    No.

21        Q.    Have you done any research to help form your

22   opinions in this case?

23        A.    Yes.

24        Q.    What research did you do?

25        A.    Specifically I recall reviewing the standards
```

1    from the Commission on Accreditation for Law Enforcement

2    Agencies.

3              I also reviewed model policies from the

4    International Association of Chiefs of Police.

5              In my current occupation and position I

6    routinely review information from the Police Executive

7    Research Forum, from the Americans for Effective Law

8    Enforcement, from other sources of information regarding

9    law enforcement.

10        Q.    Is Wayne Schmidt still involved with the

11   AELE?

12        A.    I don't know.

13        Q.    Okay.  Have you ever gone to any of their

14   seminars?

15        A.    I have.

16        Q.    Okay.

17        A.    So I -- I'm constantly reading, reviewing,

18   seeing material about --

19        Q.    Okay.

20        A.    -- current issues in law enforcement.

21        Q.    But in this I'm asking you did you do

22   specific research -- not just your, you know, general

23   stuff you do every day but specific research for this

24   case?

25              Did you pick up something and look at it?

```
 1          A.    Yes, and that's what I described.

 2          Q.    Okay.

 3          A.    But I also am trying to explain that in

 4     addition to that specific research, I also glean

 5     information that may be pertinent to this case from my

 6     normal course of activities with the Broward Sheriff's

 7     Office.

 8          Q.    With what?

 9          A.    With the Broward Sheriff's Office.  That's

10     where I'm employed.

11          Q.    Did you do any research to gather facts that

12     would be helpful in forming your opinions in this case?

13          A.    No.

14          Q.    Now, I looked at your resume and I see that

15     you have a Bachelor's Degree in sociology from the

16     University of South Florida; is that correct?

17          A.    Yes.

18          Q.    What year did you obtain your degree from

19     University of South Florida?

20          A.    1974.

21          Q.    And what years did you take classes or attend

22     college at University of Southern Florida, South

23     Florida?

24          A.    1972 to 1974.

25          Q.    So did you go to somewhere before that, like
```

12

```
 1    a community college or some other college?

 2         A.    Yes.

 3         Q.    What was that?

 4         A.    I attended Miami-Dade Community College or at

 5    the time it was called Miami-Dade Junior College -- it's

 6    currently called Miami-Dade College -- from 1970 to

 7    1972.

 8         Q.    And other than your Bachelor's Degree, do you

 9    have any post-graduate degrees?

10         A.    I do not.

11         Q.    Did you ever attend any post-graduate -- did

12    you ever start any Master's program?

13         A.    No.

14         Q.    Have you ever served as a line commander in

15    SWAT or Tact?

16         A.    No.

17         Q.    Have you ever served as a line commander in a

18    Civil Disturbance Response Team?

19         A.    No.

20         Q.    Okay.

21         A.    But let me go back to the previous question

22    about SWAT.

23               SWAT was under my command for a number of

24    years when I was with the Fort Lauderdale Police

25    Department, but I was not the direct SWAT commander.
```

```
 1     The SWAT commander reported to me.

 2          Q.    So just so I understand, you've never been a

 3     Sergeant, Lieutenant or Captain responsible for the

 4     first line operation of SWAT?

 5          A.    That's correct.

 6          Q.    And you've never been a Sergeant, Lieutenant

 7     or Captain responsible for first line operation of

 8     Tact?

 9               MR. LATTIMER:  Of what?

10     BY MR. HUGHES:

11          Q.    You know, Tactical Operations Division.

12          A.    That's correct.

13          Q.    And you've never been a Sergeant, Lieutenant

14     or a Captain responsible for first line of Civil

15     Disturbance Response Team; is that correct?

16          A.    Correct.

17          Q.    Have you had any specific training in the

18     civil disturbance response?

19          A.    Yes.

20          Q.    I assume you had it, of course, in the Police

21     Academy?

22          A.    Yes.

23          Q.    Anywhere else?

24          A.    Yes.

25          Q.    Where?
```

1         A.     Throughout my career.  Field force training

2    was part of in-service training with the Fort Lauderdale

3    Police Department.

4              I've also had training on incident command,

5    both from the State of Florida, as well as I believe the

6    Department of Justice.

7         Q.     Well, I guess what I'm asking is, you know,

8    there would be like a specific 40-hour course you'd get

9    a certificate for in, I assume, Broward County and other

10   places for civil disturbance response.

11             Have you ever done that?

12             MR. LATTIMER:  Objection, assumes facts not

13        in evidence.

14             THE WITNESS:  I didn't bring my entire

15        training resume with me, but I'll repeat that

16        throughout my -- my career I've had in-service

17        training regarding field force responses,

18        participated in field force exercises.

19   BY MR. HUGHES:

20        Q.     Okay.

21        A.     But have I -- but I have not attended a

22   40-hour -- I don't recall attending a 40-hour class as

23   you're describing.

24        Q.     All right.  And you have no -- I've looked at

25   your curriculum vitae.

15

```
1              You have no command experience in civil

2    disturbances; is that correct?

3         A.    Correct.

4         Q.    So just so I understand, you've never been

5    standing commanding people in the middle of a riot?

6         A.    You would have to define a riot.  I've --

7    I've certainly stood in command of police officers

8    during disturbances during my career.

9         Q.    All right.  And you've never been the Chief

10   of Police of a police department?

11        A.    That's correct.

12        Q.    And the highest rank you had in the City of

13   Fort Lauderdale, Florida was Major?

14        A.    I was an Assistant Chief.

15        Q.    And -- okay.

16              That was for a year?

17        A.    It may have been longer than a year, but it

18   was somewhere around 2001, 2000 to 2001 or 2002,

19   somewhere in that range.

20        Q.    Did you then retire or what?

21        A.    I retired in 2004.

22        Q.    So in 2003 and 2004 you were not the

23   Assistant Chief?

24        A.    That's correct.

25        Q.    What were you?
```

1          A.     I was a Major.

2          Q.     Okay.  So you retired from the

3    Fort Lauderdale Police Department as a Major; is that

4    correct?

5          A.     Yes.

6          Q.     And that was in 2004?

7          A.     Yes.

8          Q.     So for eleven or twelve years you've not been

9    a member of any police department?

10         A.     For approximately eight years I was not a

11   member of a police department.

12                For the past three years I've been a member

13   of the command staff of the Broward Sheriff's Office

14   here in Fort Lauderdale, Florida.

15                I continue to serve in that capacity.

16         Q.     Well, what did you do for those eight years,

17   anything, before you went to the Broward County

18   Sheriff's Office?

19         A.     I consulted as an expert in police practices

20   and police procedures.

21         Q.     So presently and for the past three years

22   you've been employed with the Broward County Sheriff's

23   Office, correct?

24         A.     Yes.

25         Q.     And from what I read, you're head of

1      Community Services; is that correct?

2           A.    Yes.

3           Q.    And that includes things like communications,

4      public information officer, youth and neighborhood

5      services; is that correct?

6           A.    That's my general responsibilities, but I'm

7      involved in a lot more activities than those

8      activities.

9           Q.    You're not commanding any patrol officers?

10          A.    I am not.

11          Q.    Okay.

12          A.    Well, let me rephrase that.

13                I do have patrol officers all the way up to

14     Captains under -- under my command, and I've had Majors

15     under my command during my time with the Broward

16     Sheriff's Office.

17          Q.    Well, Broward Sheriff's Office, I know they

18     have a law enforcement division, I believe, detention,

19     administration, fire, rescue, things like that; is that

20     correct?

21          A.    Yes.

22          Q.    You're not in charge of those?

23          A.    Not those particular commands, but in the

24     Department of Community Services, there are other sworn

25     personnel that are assigned to that department, and I'm

1    the head of that department.

2         Q.    You're not patrolling the streets, though; is

3    that correct?

4         A.    Correct.

5         Q.    Now, we've been provided with a list of cases

6    where you gave deposition testimony going back to the

7    year 2009.

8              Is that up to date?  I mean, I guess there's

9    two listed in 2015.

10             Are there any other recent ones?

11        A.    No.  This seems to be complete.

12        Q.    Okay.  Thank you.

13             I see that you gave testimony in some

14   wrongful death cases; is that correct?

15        A.    Yes.

16        Q.    And I assume those cases you indicated that

17   excessive force was used, so excessive it caused a death

18   or contributed to cause a death?

19        A.    We would have to look at a specific case

20   'cause I'm not sure which case you're talking about.

21        Q.    Well, let me ask you this:  Have you ever

22   given testimony in any of these cases, have you given

23   testimony or in any case where you said that excessive

24   force was used such that would shock the conscience even

25   though there were little or no injuries and the

```
1    plaintiff was not admitted to the hospital for even one

2    night in any of these cases or any other cases?

3              MR. LATTIMER:  Are you talking about death

4         cases?

5    BY MR. HUGHES:

6         Q.    No, no.  I'm talking about cases where it

7    wasn't a death where you said, you know, there was

8    excessive force.

9              So excessive force often is such that would

10   shock the conscience, but has there ever been a case

11   where you said there was excessive force even though

12   there were little or no injuries to the plaintiff and

13   the plaintiff was not admitted to the hospital for even

14   one night?

15             MR. LATTIMER:  Objection as to relevance,

16        materiality, but you can answer to the extent you

17        can.

18             THE WITNESS:  Yes.

19   BY MR. HUGHES:

20        Q.    Which one was that?

21             MR. LATTIMER:  Same objection as to relevance

22        and materiality.

23             THE WITNESS:  Case Number 5, Scheib versus

24        Boderck.

25                        - - -
```

20

```
1    BY MR. HUGHES:

2         Q.    Do you recall what that was about?

3         A.    Yes.

4         Q.    What was it?

5         A.    Dr. Scheib was arrested by Deputy Boderck on

6    his property in Tennessee and he was charged with, if I

7    recall the facts correctly, he was charged with a

8    possession of a firearm by an intoxicated person, and

9    Deputy Boderck used force to take him into custody and I

10   don't recall that Dr. Scheib was hospitalized as a

11   result of that force.

12        Q.    Any others?

13        A.    Yes.  Fountain versus the City of Lakeland.

14        Q.    What number is that?

15        A.    Number 6.

16        Q.    All right.  You have that listed as a Terry

17   stop and false arrest, is that correct, and also force?

18        A.    Yes.

19        Q.    So what were the facts of that case?

20              MR. LATTIMER:  Again, objection as to

21        relevance and materiality, but you can answer the

22        question.

23              THE WITNESS:  Mr. Fountain was sitting in a

24        police -- in a -- in his vehicle when he was

25        approached by a police officer for the Lakeland
```

```
 1          Police Department.

 2              It was my opinion that the police officer did

 3          not have reasonable cause or reasonable suspicion

 4          to make that contact to start with, that

 5          Mr. Fountain was free to leave.

 6              Mr. Fountain tried to leave and force was

 7          used against him to take him into custody, and I

 8          don't recall if Mr. Fountain was hospitalized as a

 9          result of that force.

10  BY MR. HUGHES:

11      Q.    Do you recall what the injury was?

12      A.    I don't recall.

13      Q.    You don't?  Okay.

14            Anything else?

15      A.    Number 14, Gabriel DaSilva was -- he was

16  treated at a hospital and he was later hospitalized for

17  complications that arose out of his injury, and that

18  was --

19      Q.    He was hospitalized?

20      A.    He was treated at the hospital, so is that

21  something that you want to talk about?

22      Q.    Okay.  He was treated and released?  Okay.

23      A.    And then later hospitalized.

24      Q.    Later hospitalized.  Okay.

25            You testified against the Broward Sheriff's
```

1        Office?

2               A.      I did.

3               Q.      Anything else?

4               A.      On this list, no.

5               Q.      Okay.  Now, I was looking at this list, and

6        in every single case that you gave testimony for it was

7        on behalf of the plaintiff with one exception, and that

8        exception was where the plaintiff was a governmental

9        entity.

10                      Is that correct?

11              A.      On this list, yes.

12              Q.      Are there any cases where you've testified

13       for -- well, is there any cases where a police

14       department has hired you as an expert witness that you

15       gave testimony on?

16                      I know none are listed here, but has there

17       been any?

18              A.      I was hired by the Tallahassee Police

19       Department as an expert on a arrest case.

20              Q.      When was that?

21              A.      I don't recall the date.

22              Q.      Approximately how many years ago?

23              A.      Sometime between the time I retired from

24       Fort Lauderdale and the time in -- and the time I joined

25       the Sheriff's Office in 2013.

1          Q.     Did that go to trial or was your deposition

2     given?

3          A.     It was not.  It did not go to trial and I did

4     not give a deposition.

5          Q.     All right.  But they asked you to take a look

6     at this, is that correct, and you did?

7          A.     Correct.

8          Q.     We were furnished with your Fee and Retainer

9     Agreement that's dated August 19th, 2015.

10              I guess we might as well mark this A, I

11     guess.

12              (Thereupon, Defendant's Exhibit A was marked

13          for identification.)

14              MR. HUGHES:  Thank you.  You've all got a

15          copy?

16              MR. PLUNKERT:  Sure.  Is it the CV?

17              MR. LATTIMER:  No, the fee agreement.

18              MR. HUGHES:  I  mean, do you want it?

19              MR. LATTIMER:  No.  I just wanted to make

20          sure that was what I provided to you.

21              MR. HUGHES:  Okay.

22              MR. PLUNKERT:  By the way, you agree that

23          Mr. Hughes and I delivered two checks to you, one

24          for 1,250, the other for 1,250, before this

25          deposition began, right?

```
 1                    THE WITNESS:  Yes.

 2                    MR. PLUNKERT:  Okay.  That's all.

 3                    THE WITNESS:  Thank you.

 4     BY MR. HUGHES:

 5          Q.    So according to this, according to what was

 6     dated August 19th, 2015, you required a non-refundable

 7     retainer fee of $3,000; is that correct?

 8          A.    Yes.

 9          Q.    Was that sent to you by Mr. Lattimer, the

10     check?

11          A.    Yes.

12          Q.    Before Mr. Lattimer sent you the $3,000

13     check, did he discuss the case with you?

14          A.    Yes.

15          Q.    Okay.  Do you recall what he said about the

16     case?

17          A.    I don't recall the specific conversation, but

18     in general terms it had to do with would I be interested

19     in assisting his firm with a case out of Ferguson and

20     taking a look at the documents, and I -- I said, "Yes, I

21     would be interested in assisting you."

22          Q.    Did you take notes or type notes of what he

23     said to you?

24          A.    No.

25          Q.    And I mean, did he go into details about the
```

```
 1     facts of the case?

 2          A.    I don't recall whether he did or not or how

 3     detailed the description he gave me.

 4                I do recall in general terms that he

 5     indicated that he represented a number of plaintiffs who

 6     were arrested in Ferguson and wanted to know if I was

 7     interested in assisting him, and I said I was.

 8          Q.    Do you recall when he sent you the $3,000

 9     check?

10          A.    Yes.  It's in my notes.

11          Q.    When was it?

12                You have notes?  Okay.  Can you get those

13     notes?

14          A.    October 20th of 2015.

15          Q.    I'm sorry.  What?

16          A.    I received the retainer fee on October 20th

17     of 2015.

18          Q.    Now, according to the retainer agreement, you

19     bill monthly at $300 per hour; is that correct?

20          A.    Yes.

21          Q.    Just so I understand, it says your trial

22     testimony is $3,000 for each day.

23                Is that $3,000 for each day you're on the

24     witness stand?

25                Because you also say stand-by days are billed
```

```
 1   at $2,000 per day plus expenses, so can you explain that
 2   to us?
 3        A.   Yes.  If I'm testifying, my fee would be
 4   $3,000 per day.
 5             If I am not testifying but I'm on stand-by
 6   and I'm sitting in a hotel room someplace or in a
 7   hallway waiting to testify and I don't testify that day,
 8   I charge for my time.
 9        Q.   Okay.  And what you charge is $2,000 a day
10   or --
11        A.   Yes.
12        Q.   If you're asked to testify at trial in this
13   case, are you willing to come to St. Louis to give
14   testimony?
15        A.   Yes.
16        Q.   Do you already have it on your calendar?
17        A.   No.
18        Q.   And then for any depositions including
19   today's deposition, you required a flat rate of $2,500;
20   is that correct?
21        A.   Yes.
22        Q.   And I think your fee says that's for seven
23   hours of testimony?
24        A.   I'm here for the whole day.
25        Q.   Okay.
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
 1          A.    And if the testimony goes seven hours, I'm
 2    here at your pleasure.
 3          Q.    So you charged us more than $300 an hour; is
 4    that correct?
 5          A.    I guess if you did the math.
 6                What I charge is a flat fee because I
 7    dedicate this -- I block out this whole day for
 8    deposition.
 9          Q.    All right.  How much time have you spent on
10    this case so far?
11          A.    I haven't kept my time entry sheet up to
12    date, but I'm going to say somewhere in the -- in the
13    vicinity of fifteen hours or more.
14          Q.    How many?
15          A.    Fifteen hours or more.
16          Q.    Have you read all the police reports that
17    were sent to you?
18          A.    Yes.
19          Q.    Have you read all of the depositions that
20    were sent to you?
21          A.    Yes.
22          Q.    It looks like a 176-page COPS Report was sent
23    to you and a 184-page After-Assessment Report was sent
24    to you.
25                Did you read those?
```

```
 1          A.    Yes.

 2          Q.    You said it was just fifteen hours reading

 3     all that?

 4          A.    No, I didn't say that.  I said I estimated --

 5     I haven't kept my time up to date, but in scanning what

 6     I have right here, I came up with a quick fifteen

 7     hours.

 8                It's probably a lot more.  I just don't have

 9     a definitive number for you because I haven't checked.

10          Q.    Would it be over a hundred hours?

11          A.    No.

12          Q.    Could it be over 80 hours?

13          A.    No.

14          Q.    Could it be over 40 hours?

15          A.    Probably not.

16          Q.    Have you billed Mr. Lattimer or anyone

17     else -- your fee agreement indicates you will bill

18     monthly, so have you been billing monthly to him?

19          A.    No, I am not.

20          Q.    Have you sent them any bill yet other than --

21     you know, after you received the initial retainer of

22     $3,000?

23          A.    No.

24          Q.    Have you reviewed any other cases from

25     Mr. Lattimer?
```

```
 1        A.     Yes.

 2        Q.     How many?

 3        A.     One.

 4        Q.     Is that pending?

 5        A.     Yes.

 6        Q.     What is that called?

 7        A.     Grimes, G-R-I-M-E-S, versus Washington, D.C.

 8   or the District.

 9        Q.     What is Grimes' first name; do you know?

10        A.     I don't recall.

11               MR. LATTIMER:  Keith.

12               MR. HUGHES:  Thank you.

13   BY MR. HUGHES:

14        Q.     So is that Washington, D.C., their police

15   officers or police department?

16        A.     Yes.

17        Q.     Do you know who's representing them?

18        A.     I do not.

19        Q.     Are they government employees, like me,

20   or --

21        A.     I don't know.

22        Q.     Is that set for trial?

23        A.     I don't know.

24        Q.     When were you retained in that case?

25        A.     I don't recall the date that I was retained.
```

30

```
 1          Q.    What is that case about?
 2          A.    It's about a repeated police response to
 3   Mr. Grimes' apartment with allegations that a sexual
 4   assault is in progress.
 5               The calls were made by a person who suffers
 6   from mental illness and culminated in an arrest and
 7   detention of Mr. Grimes.
 8          Q.    So you said that's pending, so was this
 9   retention like in the last year or within the last two
10   years?
11          A.    Yes.
12          Q.    Have you reviewed any other cases for
13   Mr. Malik Shabazz, M-A-L-I-K Shabazz or Mr. Reginald
14   Greene?
15          A.    No.
16          Q.    Did Mr. Lattimer ever tell you how he got
17   your name?
18          A.    He may have, but I don't recall.
19          Q.    I mean, your name is out there, like for
20   example, your website advertises your services as an
21   expert witness; is that correct?
22          A.    No, I don't have a website.
23          Q.    You don't have a website?  I thought you did.
24   Okay.
25               How do people learn that you're out there as
```

```
 1     an expert witness for police practices?

 2          A.    I'm hoping it's from referrals from other

 3     attorneys that I've worked for, and I also advertise on

 4     two specific Internet directories --

 5          Q.    Okay.

 6          A.    -- for experts.

 7          Q.    That's what I saw.  Okay.

 8                In addition to advertising on two Internet

 9     directories, do you advertise in other places, you know,

10     magazines for attorneys or --

11          A.    No.

12          Q.    I know the tax year just ended this past

13     week, but have you calculated how much you earned in the

14     year 2015 for your consultation practice?

15          A.    Yes.

16          Q.    How much is it?

17          A.    15,000.

18          Q.    Do you know what your income was for the year

19     2014 --

20          A.    Yes.

21          Q.    -- for consultation?

22                MR. PLUNKERT:  2015?  Do you mean 2015?

23                MR. HUGHES:  '14.  He said 2015 already.

24                MR. PLUNKERT:  Oh, sorry, sorry.

25                MR. HUGHES:  It was 15,000.
```

```
 1              THE WITNESS:  2014 my income was 26,000 and
 2         change, $26,340.
 3    BY MR. HUGHES:
 4         Q.    And 2013?
 5         A.    16,249.
 6         Q.    And 2012?
 7         A.    55,789.
 8         Q.    Can I see what you're looking at?
 9         A.    Sure.  (The Witness complied.)
10         Q.    And according to this, your consulting income
11    in 2011 was $101,505; is that correct?
12         A.    Yes.
13         Q.    Do you have an extra copy of this?
14         A.    You could have that copy.
15              MR. HUGHES:  Why don't we mark that as
16         Exhibit B.
17              (Thereupon, Defendant's Exhibit B was marked
18         for identification.)
19    BY MR. HUGHES:
20         Q.    For the record, would you just tell us what
21    Exhibit B is?
22              How would you describe that?
23         A.    It's a response to your request that I
24    produce records of my income for my consulting business
25    for the last four years.
```

```
 1          Q.     Okay.

 2          A.     So I went back to 2011, which would actually

 3    be five years because it would include 2015.

 4          Q.     I guess the 2011, your income was 101 -- your

 5    consulting income was $101,505, but in 2011 you were not

 6    working for Broward County Sheriff's Department; is that

 7    correct?

 8          A.     Correct.

 9          Q.     So is that typical of what you were earning

10    up to that point for the like five years before then?

11          A.     I would say 2011 was a good year.

12          Q.     Yeah?

13          A.     So I may not have cracked a hundred thousand

14    in the previous years.

15          Q.     By the way, I saw in your resume your

16    address.

17                 You don't live in the City of

18    Fort Lauderdale; you live in Pompano Beach?

19          A.     Pompano.

20          Q.     Pompano Beach?

21          A.     Yes.

22          Q.     Is that a suburb?

23          A.     Yes, it's an adjoining city.

24          Q.     Yeah?

25          A.     And I just happened to look at my notes here,
```

```
 1   so earlier I said I made 15,000 in 2015, but looking at

 2   my note, I believe it's only 13,000 so far.

 3        Q.   Okay.

 4        A.   Or in 2015.

 5        Q.   All right.  Okay.  That's fine.

 6             MR. PLUNKERT:  Do you mind if I take a look

 7        at that?

 8             MR. HUGHES:  Sure.

 9             MR. PLUNKERT:  Thank you.

10   BY MR. HUGHES:

11        Q.   Now, under Rule 26 of the Federal Rules of

12   Civil Procedure you're required to prepare a report that

13   contains a complete statement of all of your opinions.

14             You understand that?

15        A.   Yes.

16        Q.   And we were furnished an 18-page report.

17             That is dated December 13th, 2015.  This is

18   the report that you prepared?

19        A.   Are you going to hand it to me?

20        Q.   Yeah, sure.

21        A.   Yes.

22        Q.   So does that express all of your opinions in

23   this case?

24        A.   As of today, and if I'm asked other opinions,

25   I'll be glad to provide them.
```

1      Q.    Well, okay.  I mean, we prepared for the

2  opinions listed in the 18-page report.

3             Are there additional opinions that you know

4  you're going to render?

5      A.    No.

6      Q.    You know, on Page 11 of your report you

7  indicate that probable cause exists if the totality of

8  facts based on reasonably trustworthy information would

9  justify a prudent person -- I guess you mean a prudent

10 police officer -- in believing the individual arrested

11 had committed an offense at the time of the arrest.

12             Here, I have a copy.

13     A.    Are you asking me a question or --

14     Q.    If you want to look at it.

15             But when you give opinions regarding

16 probable cause, that's what you rely on, just so I

17 understand?

18             MR. LATTIMER:  Where are you talking about?

19        You're on Page 12 where?

20             MR. HUGHES:  11.

21             MR. LATTIMER:  11?

22             MR. HUGHES:  Yeah.

23             THE WITNESS:  When I give opinions on

24        probable cause, I'm relying on all of my training,

25        knowledge, experience in over 30 years of law

```
1           enforcement including this statement about probable

2           cause.

3    BY MR. HUGHES:

4           Q.    But you agree probable cause exists if in the

5    totality of facts based on reasonably trustworthy

6    information a prudent person would believe the

7    individual arrested had committed some offense at the

8    time of the arrest; is that correct?

9           A.    I would believe that, yes.

10          Q.    And then on Page 15 you talk about

11   constitutionality of an officer's use of force, and you

12   indicate that it depends on whether the officer's

13   conduct was objectively reasonable in light of the facts

14   and circumstances which must be assessed from the

15   perspective of reasonable officers on the scene rather

16   than 20/20 vision or hindsight; is that correct?

17          A.    Yes.

18          Q.    All right.  Vision of hindsight.  Okay.

19                So in assessing whether or not, you know, an

20   officer used too much force, you do rely on what is

21   objectively reasonable in light of the facts and

22   circumstances which must be assessed from the

23   perspective of reasonable officers on the scene; is that

24   correct?

25          A.    Yes.
```

```
 1              Q.     All right.  Your report talks about an

 2      After-Action Assessment; is that correct?

 3              A.     Yes.

 4              Q.     You referred to that.

 5                     And that After-Action Assessment concentrated

 6      on 16 days in Ferguson; is this correct?

 7              A.     Yes.

 8              Q.     So for at least 16 days and perhaps longer,

 9      but the After-Action Assessment covered a period of 16

10      days when there was rioting and unrest in Ferguson; is

11      that correct?

12              A.     Yes.

13              Q.     And you personally have never been involved

14      in anything like that where there was 16 or more days of

15      civil unrest and rioting; is that correct?

16              A.     Yes.

17              Q.     And it would be a fair statement that the

18      Department of Justice has never called you up for advice

19      on what to do when there is civil unrest or rioting in

20      any city; is that correct?

21              A.     That's correct.

22              Q.     And neither has any other city police

23      department?

24              A.     That's correct.

25              Q.     And the fact that this civil unrest and
```

```
 1    rioting occurred at least 16 days, it indicates that

 2    there was some unprecedented conditions occurring; is

 3    that correct?

 4         A.   I don't know if I would agree with

 5    unprecedented conditions because there has been civil

 6    unrest and disturbances in quite a number of cities in

 7    our country over decades.

 8         Q.   Okay.  Very good.

 9              So tell me about some of them.  Tell me what

10    you know about the history of civil unrest in our

11    country over decades.

12              MR. LATTIMER:  Objection as to relevance and

13         materiality.

14              THE WITNESS:  There's been civil disturbances

15         and unrest in quite a number of our cities over the

16         years.

17    BY MR. HUGHES:

18         Q.   Well --

19         A.   Including New York City, Washington, D.C.,

20    Baltimore, Miami.  The list goes on.  Detroit,

21    Chicago.

22              So there have been civil unrests.

23         Q.   I guess Watts too?

24         A.   Yes.

25         Q.   Cincinnati?
```

```
 1          A.     Yes.

 2          Q.     Do you know how many people were killed in

 3   Watts by police officers?

 4          A.     No.

 5          Q.     Do you know how many people were killed in

 6   Detroit by police officers?

 7          A.     Are you speaking of being killed during civil

 8   disturbances?

 9          Q.     Yes.  Yes, I'm limiting it to that.

10          A.     No.

11          Q.     I apologize --

12          A.     I don't know.

13          Q.     -- for not making that clear.  Okay.

14                 What about in New York City?

15          A.     I wouldn't know the answer to any of

16   those --

17          Q.     Okay.

18          A.     -- disturbances.

19          Q.     But you know in these other cities when

20   there's been large-scale civil unrests, spontaneous

21   rioting, people were killed at the hands of police; is

22   that correct?

23                 MR. LATTIMER:  Objection as to relevance and

24          materiality.

25                          - - -
```

```
 1    BY MR. HUGHES:

 2         Q.    I mean, you know that from a historical

 3    standpoint as a police expert even?

 4         A.    Yes, people have been killed by the police.

 5         Q.    Do you know how many people were killed in

 6    Ferguson at the hands of police?

 7         A.    I don't --

 8              MR. LATTIMER:  Objection as to relevance and

 9         materiality.

10    BY MR. HUGHES:

11         Q.    You don't know?

12         A.    I started to answer and he objected.

13         Q.    Okay.

14         A.    One person that I'm aware of that was killed

15    at the hands of the police.

16         Q.    Well, that's one person I haven't heard of.

17    Who was that?

18              I mean, I'm not aware of that.

19         A.    Michael Brown was killed at the hands --

20         Q.    Oh.

21         A.    -- at the hands of the police to answer your

22    question.

23         Q.    Okay.  Michael Brown was killed by a police

24    officer after which there were at least 16 days of

25    rioting, civil disturbances; is that correct?
```

41

```
1            A.    Yes.
2            Q.    During this 16 days of rioting and civil
3     disturbances how many people were killed in Ferguson at
4     the hands of police?
5                  MR. LATTIMER:  Objection as to relevance and
6            materiality.
7                  THE WITNESS:  I'm not aware of any.
8     BY MR. HUGHES:
9            Q.    How many people were seriously injured in
10    Ferguson during this time of civil unrest and rioting at
11    the hands of police?
12           A.    I don't know.
13           Q.    Now, when this Ferguson rioting was
14    occurring, were you paying any attention to it?
15           A.    I --
16           Q.    Were you watching CNN, reading newspapers;
17    were you paying attention?
18           A.    I was aware to a certain degree what was
19    going on in Ferguson.
20           Q.    What do you mean by that?
21           A.    Through media reports.
22           Q.    When you said you were aware to a certain --
23    I mean, did people in the Broward County Sheriff's
24    Department talk about it?
25           A.    Yes.
```

1          Q.     And did your colleagues talk about it in

2     Broward County and any other people you consider a law

3     enforcement colleague; did they talk about it?

4          A.     Yes.

5          Q.     And did you hear that people were amazed at

6     the incredible restraint used by the police?

7               MR. LATTIMER:  Objection as to relevance and

8          materiality.

9               THE WITNESS:  I don't recall specifically

10          hearing that somebody was amazed at the restraint

11          shown by the police.

12     BY MR. HUGHES:

13          Q.     All right.  Well, what did you hear from

14     colleagues?

15          A.     General conversations as anybody would have

16     when there's a incident going on in our country or an

17     incident going on in our world that's related to law

18     enforcement.

19          Q.     What were your colleagues saying about the,

20     you know, command that was handling the Ferguson

21     uprising, civil disturbance?

22          A.     I don't recall any specific recollection of

23     comments about the command of the police in response to

24     the disturbance in Ferguson.

25          Q.     Just so I understand, things were going on in

1    Ferguson for really longer than 16 days but 16 days that

2    was concentrated on by the After-Action Assessment and

3    your colleagues really had no comments that you can

4    recall about the command of the police in Ferguson or

5    the restraint that was used?

6                    MR. LATTIMER:  Objection as to relevance and

7         materiality.

8    BY MR. HUGHES:

9         Q.    Just so I understand.

10        A.    I don't recall with specifics conversations

11   that took place in August of 2014 as we sit here in

12   January of 2016, so I don't think it will be fair to try

13   to recall with specificity comments regarding the

14   command of Ferguson.

15        Q.    Well, you know, I'm not necessarily trying to

16   be fair.  You're a paid witness.

17              You know, you don't remember any comments; is

18   that correct?

19        A.    You're asking me to describe conversations

20   and specific comments, and I don't have that recall of

21   specific comments that would be able to answer your

22   question.

23              Of course there was discussions about what

24   was going on in Ferguson, but I don't recall

25   specifically comments that were made about the command

```
 1    of law enforcement in Ferguson.
 2         Q.   By the way, getting back to a little bit
 3    about your experience, you indicate that you've never
 4    been a line commander in a SWAT or a Tact or a Civil
 5    Disturbance Unit.
 6              Have you ever deployed tear gas yourself?
 7         A.   No.
 8         Q.   And have you ever deployed Mace, you know,
 9    what people commonly call Mace anyway?
10         A.   I don't recall deploying Mace or an aerosol
11    spray.
12         Q.   All right.  Did you ever have Mace, you know,
13    with you as a police officer?
14         A.   Yes.  In the early '70s aerosol sprays were
15    introduced as a less lethal weapon to the
16    Fort Lauderdale Police Department, and I seem to have a
17    recollection that I was -- went through training and was
18    assigned an aerosol spray as a less lethal weapon.
19         Q.   Do you have any expertise in Mace?
20         A.   You would have to describe "expertise".
21         Q.   Well, I mean, do you know -- you know, good
22    point.
23              Have you ever been purposely sprayed with
24    Mace?
25              Let me ask you that.
```

```
 1            MR. LATTIMER:  Objection as to relevance and
 2       materiality.
 3            THE WITNESS:  I've been purposely exposed to
 4       CS gas, and I may have been exposed to Mace, but
 5       it's been quite a long time ago, so I don't have
 6       specific recollection of that.
 7   BY MR. HUGHES:
 8       Q.    Well, you know, I've been purposely exposed
 9   to CS gas too in basic training in the United States
10   Army so, you know, is that when you were exposed?
11            Were you in the military?
12       A.    I was not.
13       Q.    So you were purposely exposed to CS tear gas
14   when?
15       A.    In the Police Academy, that's where I was
16   purposely exposed.
17            I was also inadvertently exposed to CS gas in
18   the middle of a riot on Fort Lauderdale Beach where CS
19   gas was deployed and my gas mask was not functioning
20   properly and was exposed to the gas and suffered from
21   the effects of that exposure.
22       Q.    You threw me off.
23            You just said you were in the middle of a
24   riot in Fort Lauderdale Beach.
25            I know Fort Lauderdale Beach used to be and
```

```
 1    maybe still is, but not to the extent it once was, a

 2    place for college kids to go on spring break; is that

 3    correct?

 4         A.    Yes.

 5         Q.    Was there some sort of disturbance with the

 6    college kids that you were talking about?

 7         A.    No.

 8         Q.    When you said middle of a riot on

 9    Fort Lauderdale Beach, tell me about that riot.

10         A.    So basically I would describe it as a civil

11    disturbance on New Year's Eve in the strip area of

12    Fort Lauderdale Beach where crowds of people were taking

13    over the streets, blocking traffic, causing damage to

14    vehicles and property and field force units were

15    mobilized to respond to that, and I was part of that

16    response.

17         Q.    Did that just last New Year's Eve and that

18    was it?

19         A.    On that occasion, yes.

20         Q.    Okay.

21         A.    But it also was almost an annual event, and

22    we had to be prepared for New Year's Eve on our beach

23    each and every subsequent year.

24         Q.    When you say "civil disturbance", was it just

25    New Year's Eve revelers causing a civil disturbance
```

```
 1    or what?

 2         A.    Actually, they were people that were causing

 3    the disturbance on New Year's Eve.

 4              I don't know whether they were New Year's Eve

 5    revelers or if they came out with the specific purpose

 6    of causing a disturbance.

 7         Q.    You said it became an annual event or almost

 8    an annual event and it happened on New Year's Eve; is

 9    that correct?

10         A.    Yes.

11         Q.    What year?

12         A.    This would be in the '70s.

13         Q.    Do you know what the cause of the New Year's

14    Eve event and annular events in the '70s was?

15         A.    No.

16         Q.    I mean, were people putting up signs saying,

17    you know, "More beach time," or anything like that?

18         A.    No.  I think it was just people came out to

19    the beach and -- to celebrate and there was a -- people

20    also came out to the beach to cause problems, and as a

21    result problems were caused, traffic was blocked,

22    streets were taken over by the people, and the police

23    responded to that and at different times tear gas was

24    deployed and --

25         Q.    Now, with your department when tear gas was
```

```
1   deployed on New Year's Eve, was that just a line officer
2   that made the decision on his own or is that something
3   that, you know, there was a specialized unit that was
4   trained in the use of tear gas and when to use it and
5   then they had to go up the chain of command before tear
6   gas was issued or deployed?
7       A.    Tear gas would have been deployed at the
8   direction of a supervisor or command personnel, but
9   we're also talking 40 years ago, so if you're asking me
10  for specifics --
11      Q.    Okay.
12      A.    -- I can't help you.
13      Q.    Okay.  Do you have any experience as a K9
14  officer?
15      A.    No.
16      Q.    Have you ever supervised K9 officers?
17      A.    K9 Unit was under my command, but I was not
18  the direct supervisor --
19      Q.    Okay.
20      A.    -- of K9.
21      Q.    You were not the Sergeant or Lieutenant?
22      A.    Correct.
23      Q.    Did Fort Lauderdale ever use K9s for crowd
24  control?
25      A.    No.
```

```
 1          Q.     Okay.

 2          A.     Or at least -- at least not to my knowledge.

 3          Q.     Fine.  But Fort Lauderdale did have K9s; is

 4   that correct?

 5          A.     Yes.  Throughout my entire career, which

 6   started in 1974, we did have K9s, criminal apprehension

 7   K9s.

 8          Q.     And even though you're no longer a member of

 9   the Fort Lauderdale Police Department, would it be a

10   fair statement that the police department still has K9s

11   for criminal apprehension?

12          A.     Yes.

13          Q.     And what about the Sheriff's Department of

14   Broward County?

15          A.     Yes.

16          Q.     Have you ever been Maced yourself?

17          A.     I may have been.  I just don't recall if I

18   was Maced as part of training.

19          Q.     Well, I'm not comfortable with "may have

20   been".

21                 I think if you've been Maced, you'd remember

22   it.

23                 I mean, I think that's something that hurts.

24                 MR. LATTIMER:  Objection, argumentative.

25                 THE WITNESS:  I'm trying to recollect from 30
```

1          plus years ago if I was exposed to Mace, and

2          because of memory, I don't want to fill in the

3          blanks and assume that I was.

4              I do have memories of seeing Mace or OC spray

5          applied to cotton swabs and Q-tips and wiped under

6          a person's eyes that they can experience.

7              I just don't recall if that was me or -- or

8          if I just seen it.

9    BY MR. HUGHES:

10        Q.    Okay.  Wait.  You really threw me for a loop

11   there.

12            You've seen what, Mace used with a cotton

13   swabs or Q-tips and then --

14        A.    As part of training, yes.

15        Q.    Oh, okay.  Well, do you know what the best

16   treatment is for someone who's been Maced?

17            MR. LATTIMER:  Objection as to relevance and

18        materiality.

19            THE WITNESS:  Treatment includes flushing of

20        the eyes and the face with water.

21   BY MR. HUGHES:

22        Q.    Tell me -- I mean, that's a little

23   astonishing to me.

24            Tell me where you learned that.

25        A.    I learned it -- I'm aware of that through my

1       years of experience with law enforcement.

2             Q.    Really?

3                   So if I told you that the best treatment for

4       Mace is fresh air and time, it will clear up, would you

5       agree with that?

6             A.    I would agree that that would -- would help

7       and --

8             Q.    And --

9             A.    And perhaps -- again, we're talking about

10      Mace and CS gas, and I do recall being -- having eyes

11      flushed out with exposure to CS gas and I do agree that

12      fresh air assists with OC spray, but I also believe

13      flushing of the eyes will be of assistance, as well.

14            Q.    Here's a question for you.

15                  Have you ever seen what happens to someone

16      who flushed out their eyes with water, you know, shortly

17      thereafter?

18            A.    Don't recall.

19            Q.    Well, I think if you were there and did it or

20      if you tried to flush out your own eyes, you would

21      recall, but --

22                  MR. LATTIMER:  Who said he did?

23      BY MR. HUGHES:

24            Q.    But are you aware of anyone teaching you that

25      the best thing to do if someone's been Maced is to flush

```
 1     out the eyes?
 2              MR. LATTIMER:  Objection, relevance and
 3          materiality.
 4              THE WITNESS:  Okay.  Sitting here right now I
 5          don't recall the specific instruction regarding
 6          decontamination of OC spray.
 7     BY MR. HUGHES:
 8          Q.   Well, here's another question for your
 9     experience.
10              Have you ever used rubber bullets?
11          A.   No.
12          Q.   Do you even know what rubber bullets are?
13          A.   Yes.
14          Q.   Do you know any police department that uses
15     rubber bullets?
16          A.   No, but I am aware of police departments that
17     use projectiles that are made of plastic, and often
18     times people may confuse those projectiles with rubber
19     bullets.
20          Q.   Here we are in the Fort Lauderdale area,
21     Florida, but you're testifying about events that took
22     place in Ferguson, which is in St. Louis County; is that
23     correct?
24          A.   Yes.
25          Q.   And tell me what you know about St. Louis
```

53

```
 1    County just to make sure I understand.

 2              You know, for example, is the City of

 3    St. Louis part of St. Louis County; do you know?

 4              MR. LATTIMER:  Objection as to relevance and

 5         materiality.

 6              THE WITNESS:  It is not.

 7    BY MR. HUGHES:

 8         Q.   Do you know that St. Louis County Police

 9    Department would patrol unincorporated areas of

10    St. Louis County and would also patrol areas where

11    municipalities do not have their own police department?

12              MR. LATTIMER:  Objection as to relevance and

13         materiality.

14              Mr. Pusins is an expert witness who is here

15         to testify with regard to the practices and

16         policies that are to be used by police departments

17         nationally.

18              It doesn't matter if that police department

19         is in St. Louis County.

20              It doesn't matter if it's LA County.

21              It doesn't matter if it's New York City.

22              It doesn't matter if it's Washington, D.C.

23              It doesn't matter if it's Duval County in

24         Florida or Dade County in Florida.

25              His only reason for being here is to talk
```

1    about the policies and procedures consistent with

2    his report, and he has not offered any opinions

3    regarding the geography of Missouri, nor where

4    people are going to --

5              MR. HUGHES:  How about if I --

6              MR. LATTIMER:  Let me finish.  Let me finish.

7    Don't do that.

8              Nor has he been engaged to testify as to

9    where police may or may not patrol.

10             So this is an expert deposition.  This has to

11   do with policies, procedures and opinions.

12             He's giving the opinions that he's going to

13   offer.

14             He's not going to offer any opinions about

15   geography.

16             He's not going to offer any opinions about

17   the stuff you're talking about now.

18             MR. PLUNKERT:  Then just make it a continuing

19   objection.

20             MR. HUGHES:  Yeah, you can make a continuing

21   objection.

22             MR. LATTIMER:  You know that's not going to

23   work.  Wait.

24             There's no need in going back and forth with

25   me about this because you know that's not going to

```
 1          work.
 2               Let's just move on, and let's try to keep the
 3          deposition about what we're talking about and not
 4          these extraneous issues that aren't going to be a
 5          part of his testimony, nor am I going to offer
 6          them, nor has he been engaged to testify about
 7          them.
 8     BY MR. HUGHES:
 9          Q.    Would you like to answer the question?
10          A.    Could you repeat the question?
11               MR. HUGHES:  Would you read back the
12          question, please?
13               (Thereupon, the requested question was read
14          back.)
15               THE WITNESS:  Yes.
16     BY MR. HUGHES:
17          Q.    On Page 1 of your report, among other things,
18     in the first paragraph you indicated that you were asked
19     to formulate opinions on whether probable cause to
20     arrest occurred and whether force was applied in an
21     objectively reasonable manner; is that correct?
22          A.    I don't think that's what it says.
23          Q.    Well, I mean, you were asked to address some
24     issues, and at least two of the issues that you were
25     asked to address were whether probable cause -- whether
```

1    or not there was probable cause to arrest and whether or

2    not force was applied in an objectively reasonable

3    manner.

4              Is that a fair statement?

5              MR. LATTIMER:  That misstates the report.

6    BY MR. HUGHES:

7         Q.   Okay.

8              MR. LATTIMER:  Objection.

9    BY MR. HUGHES:

10        Q.   Is that --

11        A.   No.

12        Q.   Well, so you were not asked to determine

13   whether or not probable cause to arrest and you were not

14   asked to determine whether or not force was applied in

15   an objectively reasonable manner?

16        A.   What my report says was that I was asked to

17   formulate an opinion as to whether officers acted in

18   accordance with widely accepted police practices,

19   whether probable cause to arrest was articulated and

20   documented and was force applied in an objectively

21   reasonable manner.

22        Q.   Oh, okay.  So you're not going to give any

23   opinions on whether or not there was probable cause to

24   arrest?

25        A.   If I'm asked -- if you ask me if there was

```
 1    probable cause, I'll offer that opinion.
 2         Q.    Okay.
 3         A.    But that's what it says.
 4         Q.    And you're not going to offer any opinions on
 5    whether or not force was applied in an objectively
 6    reasonable manner?
 7         A.    No, I will.
 8         Q.    Hmm?
 9         A.    I'm -- I will offer that opinion.
10         Q.    Well, in your report you never went into
11    detail with any of the individual Plaintiffs on whether
12    or not there was probable cause to arrest and whether or
13    not probable cause -- and whether or not force was
14    applied in an objectively reasonable manner.
15         A.    What my report says --
16         Q.    Is that correct, you did not list that in
17    your report?
18              MR. LATTIMER:  List what?
19    BY MR. HUGHES:
20         Q.    As to, let's say, Tracey White, as to Nathan
21    Burns, as to different people, you did not say in this
22    case there was not probable cause to arrest, in this
23    case force was not objectively reasonable?
24         A.    What I'm saying is that the probable cause
25    and whether force was applied in an objectively
```

```
 1    reasonable manner was not articulated by the police

 2    officers.  That's what I'm saying.

 3         Q.    Okay.

 4         A.    So when I reviewed the documents and I

 5    reviewed the statements of the Plaintiffs and I reviewed

 6    the police reports that were completed by Detective

 7    Menzenwerth and when I reviewed the depositions, I

 8    realized that the officers who made the arrests and who

 9    applied the force never documented the probable cause,

10    never documented the use of force.

11              And what I'm saying is that the failure to

12    document both the probable cause and the use of force is

13    not consistent with widely accepted practices.

14         Q.    You've read each and every report; is that

15    correct?

16         A.    Yes.

17         Q.    Would you agree that each and every report

18    where someone was arrested contains the reasons for the

19    arrest?

20         A.    It contains information about the arrest.

21              I would not agree that it contains probable

22    cause to make the arrests.

23         Q.    Would you agree that each and every police

24    report documents, you know, the probable cause for

25    arrest and the use of force --
```

```
 1              MR. LATTIMER:  Objection, asked and

 2         answered.

 3    BY MR. HUGHES:

 4         Q.    -- if force was used?

 5         A.    No.

 6         Q.    First of all, do you know how many Plaintiffs

 7    had force used against them by the St. Louis County

 8    police officers?

 9         A.    Not totally.

10         Q.    Can you give me the names of any Plaintiff

11    who had force used against him by St. Louis County?

12              MR. LATTIMER:  Are you asking him about

13         St. Louis County as opposed to other police

14         departments?

15              MR. HUGHES:  Yes.

16              MR. LATTIMER:  Okay.  I'll object to

17         relevance and materiality, but --

18              THE WITNESS:  It's going to take a while, so

19         what we may want to do is take a break and I'll be

20         glad to --

21    BY MR. HUGHES:

22         Q.    Well, okay.

23         A.    Because I'm going to have to look at my --

24         Q.    Let's do it this way.  I'll move on.

25         A.    Okay.
```

```
 1        Q.    I'll start talking about some individual

 2   Plaintiffs.

 3              So without looking at your notes and reports,

 4   you cannot tell me, first of all, off the top of your

 5   head which Plaintiffs were arrested by St. Louis County

 6   officers and which Plaintiffs had force used against

 7   them by St. Louis County officers, is that correct, just

 8   off the top of your head?

 9        A.    No.

10              MR. LATTIMER:  Objection as to relevance and

11        materiality.  Nor can I.

12              THE WITNESS:  No.

13   BY MR. HUGHES:

14        Q.    So --

15        A.    I'm not agreeing with you.

16        Q.    Okay.  So you do know it off the top of your

17   head?

18        A.    I know people who have been arrested.  I know

19   people who have been arrested by St. Louis County, but

20   I'm not going to guess.

21              And when we have the number of Plaintiffs

22   that we have and the number of police agencies that are

23   involved, I'm going to refer to my notes to make sure

24   I'm giving an accurate --

25        Q.    Okay.
```

```
 1          A.     -- reflection of my review.

 2          Q.     Let's talk about Tracey White and William

 3   Davis.

 4                 You would agree that their arrest was on

 5   Wednesday, August 13th, 2014?

 6          A.     Yes.

 7          Q.     And I guess one time that I have is about

 8   7:30 p.m.; is that relatively accurate in your mind?

 9          A.     I'm seeing 15:30 on the police report.

10          Q.     Oh, okay.  So you've read the police

11   report --

12          A.     Yes.

13          Q.     -- is that correct?

14                 You've read the depositions of Tracey White

15   and William Davis?

16          A.     Yes.

17          Q.     You've read the depositions of the Detectives

18   and Sergeants involved?

19          A.     Yes.

20          Q.     You know the Neighborhood Enforcement Team

21   was helping with the skirmish line?

22          A.     Yes.

23          Q.     You know the crowd was told to move up the

24   street and they did?

25          A.     Yes.
```

1          Q.    And two of the people who moved up the street

2     were Tracey White and William Davis?

3          A.    Yes.

4          Q.    And once they moved up the street, did you

5     know there was a problem with a truck that had a trailer

6     that got stuck at a fence?

7          A.    Yes.

8          Q.    And you're aware the police were trying to

9     help that truck driver to get out?

10         A.    Yes.

11         Q.    And you're aware it sort of became an event

12    in itself and the crowd was told to move away from the

13    truck?

14              MR. LATTIMER:  Objection, relevance and

15         materiality, misstates the evidence, and there are

16         no facts to support what you're saying.

17              THE WITNESS:  I'm aware that the police were

18         trying to assist the vehicle from being caught in

19         that predicament and to allow the vehicle to move

20         on and that they were dealing with the crowd at the

21         same time.

22    BY MR. HUGHES:

23         Q.    And so the police did tell the crowd to move

24    away from that area where the truck was in that

25    predicament, the truck and trailer?

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
 1              MR. LATTIMER:  Objection.  There's nobody who
 2         says that in this case.
 3              THE WITNESS:  I don't recall reading that the
 4         police made those specific instructions.  Perhaps
 5         they did.  I don't know.
 6    BY MR. HUGHES:
 7         Q.    Well, you recall that Tracey White and
 8    William Davis were told to move and they were given two
 9    areas to move; one was a parking lot and one was a
10    street?  Do you recall that?
11         A.    I recall that they were told to move, yes.
12         Q.    And do you recall they were given, you know,
13    a couple areas where they could move?
14              MR. LATTIMER:  Objection.  There's nothing in
15         this case that says that.
16              THE WITNESS:  I recall reading in some
17         depositions that they were directed to a particular
18         area.
19              I don't recall whether it was a parking lot
20         or what it was, to allow for Mrs. White's husband
21         to come collect her.
22    BY MR. HUGHES:
23         Q.    Okay.  And then you're aware that they did
24    not move?
25              MR. LATTIMER:  Objection as to relevance and
```

```
 1              materiality, misstates the evidence.

 2    BY MR. HUGHES:

 3         Q.    You're aware they did not go to that area

 4    that you just said, a parking lot or whatever?

 5              MR. LATTIMER:  What parking lot are you

 6         talking about?

 7              THE WITNESS:  I recall testimony that they

 8         were directed to a street further on where the

 9         husband of Tracey White can come and collect her.

10    BY MR. HUGHES:

11         Q.    And you --

12         A.    I don't remember a parking lot --

13         Q.    Okay.

14         A.    -- or anything else.

15         Q.    That's fine.  But they did not go to that

16    street?

17         A.    No.

18         Q.    And can you tell me how many times you

19    remember she was told to leave to go to that street?

20         A.    No.

21         Q.    More than once?

22         A.    I wouldn't argue that.

23         Q.    Okay.  And do you recall the number of times

24    that William Davis was told to leave to go down to that

25    street?
```

65

```
1          A.     No.

2          Q.     More than once?

3          A.     I wouldn't argue that either.

4          Q.     Do you recall if Mr. Davis was told that if

5     he, you know -- that after being told more than once

6     that if he didn't go down to that street, he would have

7     to be arrested?

8                 MR. LATTIMER:  Objection.  There was never

9            anybody who testified in this case to any such

10           thing.

11                MR. HUGHES:  Sure, he did.  Terrence McCoy

12           did, but go on.

13                THE WITNESS:  I don't recall.  What I do

14           recall, though, was that the reports that you're

15           talking about from Menzenwerth were completed up to

16           eight months after this event and nothing was

17           completed contemporaneously with the event.

18                So when I look at reports that were completed

19           by somebody that was not there through an

20           investigation, I have to question the -- the

21           thoroughness of those statements and the accuracy

22           of those statements.

23    BY MR. HUGHES:

24         Q.     Well, you know, I don't think I talked about

25    Menzenwerth's report, but I guess -- so you've read the
```

1    report.

2              I also asked you if you read the depositions

3    of all the police officers and whether you read the

4    depositions of Tracey White and William Davis.

5         A.    Yes.

6         Q.    So you've read all those?

7         A.    Yes.

8         Q.    So have I said anything that was different

9    from what was in those depositions, as well as the

10   report?

11        A.    That they were -- can you repeat what you

12   said?

13             If you're talking about giving direction and

14   asking them to move, I would agree with that.

15        Q.    Okay.

16        A.    And I did agree with that.

17        Q.    So looking at the totality of facts, you

18   know, what you've agreed to, that there was unrest, the

19   crowd was told to go up the street, they did, and then

20   they were told to -- then you have this truck and

21   trailer stuck and it's in a predicament and then the

22   crowd was told to go down the street and then Tracey

23   White didn't and William Davis didn't.

24             Now, looking at the totality of facts based

25   on reasonable, trustworthy information, would a prudent

67

```
1    police officer believe that Tracey White and William
2    Davis had committed some offense when they refused to
3    obey the directions of the police officers?
4              MR. LATTIMER:  Are you asking him to assume
5         those facts?
6              MR. HUGHES:  My question stands for itself.
7              MR. LATTIMER:  No, it can't, because he's an
8         expert and you have to ask him -- if you're asking
9         him to assume certain facts, that's one thing.
10             If you're telling him that those are the
11        facts, that's something else.
12             Are you asking him to assume those facts?
13             MR. HUGHES:  We've gone through the facts.
14             MR. LATTIMER:  No.  You've gone through your
15        facts.
16             MR. HUGHES:  We've gone through the facts.
17        He's read the facts.  He's agreed with them.
18             MR. LATTIMER:  No, he hasn't.
19             MR. HUGHES:  Yes, he has.
20             MR. LATTIMER:  Are you asking him to assume
21        that those are the facts?
22             MR. HUGHES:  Look, I'm paying for this
23        deposition, so why don't you make a legal objection
24        if you want to make a legal objection and then let
25        him answer the question.
```

```
 1              MR. LATTIMER:  One more time, are you asking

 2         him to assume those facts?

 3              MR. HUGHES:  Assume those facts that he

 4         agreed to, yeah.

 5              MR. LATTIMER:  Okay.  Assuming those facts.

 6         All right.

 7              THE WITNESS:  Is there a question?

 8    BY MR. HUGHES:

 9         Q.    Yeah.

10              MR. LATTIMER:  He wants you to assume those

11         facts, and based upon those facts, was there

12         probable cause for a reasonably prudent police

13         officer to make an arrest for any offense?  That's

14         what he said.

15              MR. HUGHES:  Would you please read back the

16         question?

17              (Thereupon, the requested question was read

18         back.)

19              THE WITNESS:  Okay.  I would have to start my

20         answer with --

21    BY MR. HUGHES:

22         Q.    Well, excuse me.  You need to answer --

23              MR. LATTIMER:  You cannot tell him how to

24         answer a question.  You cannot tell him how to

25         answer a question.  You cannot tell him how to
```

```
 1          answer a question.

 2                 Now, either you accept his answer --

 3                 MR. HUGHES:  I'm not going to tell him --

 4                 MR. LATTIMER:  Okay.  But you can't direct

 5          him.  You can't do anything.

 6                 You asked a question.  If you want an answer,

 7          let him answer and then you follow up, but you're

 8          not going to tell him how to answer questions.

 9                 That's not going to happen.

10    BY MR. HUGHES:

11          Q.    At the beginning of the deposition I asked

12    you if a question called for a yes or no, you answer

13    yes or no, and then if you want to expand upon it, you

14    can.

15                 MR. LATTIMER:  And I told you at the

16          beginning of the deposition that he would not do

17          that and no witness that I --

18                 MR. HUGHES:  First of all --

19                 MR. LATTIMER:  No witness --

20                 MR. HUGHES:  For the record, would you stop

21          yelling?

22                 MR. LATTIMER:  I'm not yelling.

23                 MR. HUGHES:  Yes, you are.

24                 MR. LATTIMER:  No witness --

25                 MR. HUGHES:  You're yelling.  You're raising
```

1          your voice, like you always do.

2                MR. LATTIMER:  Just like you.

3                MR. HUGHES:  No.

4                MR. LATTIMER:  No witness is going to answer

5          a question based upon how you tell them to answer a

6          question, not one that I'm associated with.

7                So if you want an answer --

8                MR. HUGHES:  No.

9                MR. LATTIMER:  If you want an answer --

10               MR. HUGHES:  Are you advising an expert

11         witness not to answer a question?

12               MR. LATTIMER:  No.  I'm telling you he's

13         going to answer the question, but he's not going to

14         answer the way you want him to answer it.

15               I'm telling him to answer the question and

16         I'm telling you to let him answer the question.

17               MR. HUGHES:  Just so that I understand, are

18         you telling him how to answer the question?

19               MR. LATTIMER:  No.  I'm telling him not to

20         let you tell him how to answer the question.

21               Don't try to flip the script.

22               You're the one trying to tell him how to

23         answer the question.

24               MR. HUGHES:  Obviously you're trying to tell

25         him how to answer the question.

```
 1              MR. LATTIMER:  No.  I'm trying to tell him to

 2         answer the question.

 3              MR. HUGHES:  You're not making a legal

 4         objection.

 5              MR. PLUNKERT:  Gentlemen, gentlemen, stop.

 6         Just let the man answer the question.

 7              MR. LATTIMER:  Thank you.

 8    BY MR. HUGHES:

 9         Q.   Would you like the question repeated?

10         A.   Yes.

11              (Thereupon, the requested question was read

12         back.)

13              THE WITNESS:  I can't tell you -- answer that

14         question because part of your qualification was

15         that it's based on reasonable and trustworthy

16         information, and I would offer that a police report

17         that was generated eight months later is not

18         reasonable and trustworthy information.

19              I would also look at the deposition of

20         Detective Menzenwerth, who clearly indicated that

21         he had to fresh the memory of the officers as to

22         what happened.  He refreshed the memory of every

23         officer that he spoke to.

24              So your qualification that it was reasonable

25         and trustworthy I do not agree with.
```

```
 1    BY MR. HUGHES:

 2         Q.    Let me ask you --

 3         A.    And at that point I'm going to ask that we

 4    take a break.

 5         Q.    If you want to take a break, that's fine.

 6    How long of a break do you want?

 7         A.    Five minutes.

 8              MR. HUGHES:  Fine.

 9              (Thereupon, a recess was taken at 10:53 a.m.,

10         after which the deposition continued at 11:00

11         a.m.)

12    BY MR. HUGHES:

13         Q.    I guess we're back on the record.

14              Oh, by the way, I could hear you talking

15    outside.

16              You were talking to Mr. Lattimer during the

17    break?

18         A.    Yes.

19         Q.    What were you talking about?

20         A.    He was talking about your method of

21    questioning.

22         Q.    What did he say?

23         A.    I --

24         Q.    I heard you talking most of the time and

25    usually he talks very loud.  I didn't hear him.
```

```
 1        A.    But you heard me?

 2        Q.    I heard you, so --

 3        A.    I remember him saying --

 4        Q.    Every time he's talked in this room he's

 5    raised his voice, but when he's talking to you, I could

 6    not hear him at all, so what did he say?

 7        A.    He talked about your questioning and that you

 8    try to slide in facts that may not be in evidence and

 9    he's not going to allow you to do it and he's going to

10    object.

11        Q.    And I heard you talking mostly, and what did

12    you say?

13              MR. LATTIMER:  Well, if you heard him, why

14        are you asking him what he said?

15              THE WITNESS:  I don't recall what I said.

16    BY MR. HUGHES:

17        Q.    All right.  You know, I used this term

18    reasonably trustworthy information only because that's

19    what you wrote on Page 11 of your report.

20              So I'll just leave out what you said in your

21    Page 11.

22              Would you agree that a police officer on the

23    scene with the facts that you agreed to, for example,

24    that there was police concern because of disturbance,

25    the police -- the people were asked to go up the street,
```

```
 1    people did, including Tracey White and William Davis,

 2    and then once up the street there was a truck with a

 3    trailer that was in a predicament, I think is the words

 4    you used, and then the police were trying to help that

 5    truck in the predicament and they told people in the

 6    crowd, including Tracey White and William Davis, to go

 7    to a street down the street, and Tracey White and

 8    William Davis did not after being asked to do so more

 9    than once.

10          So my question to you is would you agree that

11    there is arguable probable cause for the police officer

12    right there on the street to believe that these

13    individuals had committed some type of an offense?

14          MR. LATTIMER:  Objection.  You keep saying

15       that he agreed to something, which he did not do,

16       but based upon assuming those facts, you can answer

17       the question to the best that you can.

18          THE WITNESS:  It's such a convoluted question

19       and --

20    BY MR. HUGHES:

21       Q.   The question narrows down -- I tried to

22    refresh your memory on the facts that I believe you

23    agreed to, but Mr. Lattimer wants me to say assume

24    those facts to be true, so the question is not

25    convoluted.
```

1              It's wouldn't you agree there is arguable

2     probable cause to believe that they had committed some

3     offense?

4         A.    No.

5         Q.    So are you saying that people or police

6     officers in Broward County and Fort Lauderdale don't

7     arrest people for failure to obey reasonable orders of a

8     police officer or interfering with a police officer?

9              MR. LATTIMER:  Objection.  There's no such

10            crime as failure to obey a lawful order.

11            THE WITNESS:  I imagine -- I would have to

12            imagine that we do arrest people.

13    BY MR. HUGHES:

14        Q.    Okay.

15        A.    But when we talk about the totality of

16    circumstances in this case and you have Tracey White and

17    her son who were in the McDonald's and ordered, not

18    asked, ordered to leave the McDonald's, ordered to

19    travel up a street, ordered to go to another location

20    and she's trying to find a way that she can be with her

21    husband and find a location where she can locate --

22    where he can locate her, I don't know that it's

23    reasonable to assume that she committed a crime when

24    she's ordered to do something that -- I don't know that

25    that's reasonable.

1           She doesn't have any choice.

2           She was pushed into this crowd, and when she

3    was initially arrested, she was initially charged with

4    failure to disperse, and I don't believe there was

5    probable cause that she violated the -- the crime of

6    failure to disperse.

7        Q.    You say she was charged with failure to

8    disperse based upon what?

9        A.    Based upon the booking form that I read.

10       Q.    So you're not basing that based upon the

11   deposition testimony of the officers or the police

12   report; is that correct?

13       A.    She was initially charged with failure to

14   disperse.  Then --

15       Q.    You're just saying the booking form at the

16   Justice Center in St. Louis County listed that charge as

17   failure to disperse?

18       A.    Yes.  Let me rephrase that.

19       Q.    Okay.

20       A.    When I look at the booking form for Tracey

21   White and her son, the booking form indicates they were

22   both charged with failure to disperse.

23           There was not probable cause at the time to

24   charge them with failure to disperse.

25       Q.    Okay.  Well --

```
1          A.     I'm not finished.

2          Q.     Okay.

3          A.     Then we have Menzenwerth who comes in

4    sometime later, reviews booking forms, reviews arrests,

5    gathers facts, interviews police officers, has to

6    refresh their memory as to what happened, and then he

7    eventually has the charge changed or the charge is

8    eventually changed from failure to disperse to

9    interfering.

10                I don't find that credible or trustworthy.

11         Q.     All right.

12         A.     And that's the whole thrust of my position

13   with this case, is that you have police officers who

14   made arrests who never documented or articulated in any

15   fashion in a written form the probable cause that they

16   used to make the arrest.

17                Later, eight months later you have

18   Menzenwerth producing police reports after his

19   investigation, and I'm saying that is not trustworthy,

20   that is not credible, and it falls below the standards

21   of care and widely accepted police practices regarding

22   arrests.

23         Q.     I don't think you listened to my question.

24                I'll get to that, but before I do, I just

25   thought of something.
```

1              Have you ever taught in your experience like

2       a teacher at the Police Academy?

3          A.    No.

4          Q.    Have you ever been a teacher for continuing

5       education of police officers?

6          A.    No.

7          Q.    Okay.  So you've never been a teacher at

8       all?

9          A.    I've been a teacher in law enforcement for 40

10      years in that I -- as a detective, as a supervisor, as a

11      commander we're teaching people every single day.

12         Q.    But not as a classroom instructor?

13         A.    Correct.

14         Q.    All right.  And my question was -- I did not

15      ask you was there probable cause to believe that they

16      committed the crime of failure to disperse.

17              My question was was there arguable probable

18      cause that they committed some offense?

19         A.    Not to my knowledge.

20         Q.    So when police officers on the scene in

21      Ferguson, when there's a situation with this truck, when

22      the police officers on the scene told them to go down

23      the street and they refused to do so, you're saying,

24      just so I understand and, you know, so people can read

25      your deposition, other police officers, arguable

79

```
 1     probable cause that -- there was no arguable probable

 2     cause that she, Tracey White, or he, William Davis,

 3     committed some offense?

 4               MR. LATTIMER:  Objection.  He's already

 5          answered the question and --

 6               MR. HUGHES:  Okay.

 7               MR. LATTIMER:  -- we do take offense with you

 8          trying to intimidate the Witness by telling him

 9          that you're going to show his deposition to other

10          police officers.

11               MR. HUGHES:  I'm not going to show --

12               MR. LATTIMER:  Let me finish.  Let me

13          finish.

14               I think that is highly, highly

15          unprofessional for you to suggest to this man that

16          he ought to be mindful of his answer because his

17          deposition is going to be read by other law

18          enforcement officers.

19               MR. HUGHES:  If someone was in a teaching

20          capacity.

21     BY MR. HUGHES:

22          Q.   Go on.  So anyway, you heard the question.

23               Do you want the question repeated or not?

24          A.   I believe the thrust of your question was was

25     there probable cause to arrest them for any offense, and
```

1    any offense is open-ended.

2                I'm not hearing probable cause to arrest them

3    and you're saying "any offense".

4                I don't know what you're talking about by

5    "any offense".

6         Q.    Well, you know, interfering with an officer,

7    not obeying lawful commands of a police officer.

8                You might be able to think of some other

9    offenses, but was there arguable probable cause that

10   they committed those offenses or some other offense?

11        A.    In my mind, no.

12        Q.    Okay.  You just mentioned inside McDonald's

13   and, boy, I didn't even mention that, but as long as you

14   did, I will.

15               In your --

16               MR. LATTIMER:  We know.  That was the point.

17   BY MR. HUGHES:

18        Q.    In your report you indicated you read the

19   Complaint and the Third Amended Complaint; is that

20   correct?

21        A.    Yes.

22        Q.    And you're aware that the allegations made by

23   Tracey White and William Davis in their Complaint and

24   their Third Amended Complaint are not true?

25               MR. LATTIMER:  Objection as to relevance and

```
 1            materiality.

 2                 THE WITNESS:  Can you be specific?  If you're

 3            talking about the allegations --

 4   BY MR. HUGHES:

 5       Q.   Well, first of all, Paragraph 41, I know you

 6   read her deposition.  You said so.

 7                 It said on August 13th, 2014 they were

 8   attending a Peace and Love Rally that was sponsored by

 9   her AME Church group.

10                 You're aware that's not true, it was not her

11   AME Church group?

12                 MR. LATTIMER:  Objection as to relevance and

13            materiality.

14                 THE WITNESS:  I don't argue that.

15   BY MR. HUGHES:

16       Q.   And it says that inside the McDonald's Ryan,

17   McCoy, McCann and Cosma appeared in Army uniforms

18   carrying rifle sticks and wearing helmets and they

19   ordered White to get out.

20                 You're aware that's not true from reading her

21   deposition and reading Mr. Davis' deposition?

22                 MR. LATTIMER:  Objection as to relevance and

23            materiality and misstates the facts.  That's

24            absolutely true.

25                 MR. PLUNKERT:  You may answer.
```

1          THE WITNESS:  I recall Tracey White being in

2     a McDonald's and being ordered to leave, and then

3     she went outside, had a conversation with Sergeant

4     Ryan and wanted to reenter and she was not able

5     to.

6  BY MR. HUGHES:

7     Q.    You don't recall her testifying that she

8  stepped outside on her own because of her cell phone

9  and --

10     A.    Yeah, she may have stepped out.

11     Q.    She was never ordered to leave?

12     A.    But then she could not reenter but then she

13  was ordered to leave the McDonald's property and to go

14  up the street.

15     Q.    And it's alleged that after her son exited

16  the restroom, Plaintiff White was thrown to the ground

17  and handcuffed, and then during the process of being

18  arrested, Plaintiff White realized her son's iPad was in

19  her hand and summoned her son to retrieve the item, and

20  when he did, a police officer named McCoy placed the

21  minor under arrest.

22          You agree that that's completely untrue?

23          MR. LATTIMER:  Objection as to relevance and

24     materiality.

25          THE WITNESS:  Yes.

1    BY MR. HUGHES:

2         Q.    Now, are you going to render any opinions

3    regarding the force used against Tracey White?

4         A.    No.

5         Q.    So there was no excessive force by St. Louis

6    County against Tracey White; is that correct?

7              MR. LATTIMER:  Objection.  That's not what he

8         testified to.

9    BY MR. HUGHES:

10        Q.    Is that correct?

11        A.    I'm trying to recall Tracey White's

12   testimony.

13             I know that police officers claim there was

14   no excessive force, and I believe Tracey White may have

15   said that her arms were pulled and she may have been

16   dragged, but I don't recall specifically an issue with

17   excessive force.

18        Q.    Well, see, I only have one chance to take

19   your deposition, and based on your 18-page report, you

20   didn't say anything about her specific arrest or any

21   force in your report, but you said, well, you know, if I

22   ask that, I'll render opinions.

23             So I'm at a loss.

24             Now, you're saying you can't remember off the

25   top of your head.

 1                   You should have put it in your report if

 2      you're going to testify to that.

 3                   So my question to you right now, are you

 4      going to be rendering any opinions at trial that there

 5      was excessive force used against Tracey White by the

 6      St. Louis County police officers?

 7           A.    If I'm asked about that, I will respond to

 8      it.

 9           Q.    What is the opinion that you'll be giving?

10           A.    It depends on the question.  As of today --

11           Q.    Well, was there excessive force in the

12      constitutional sense used against Tracey White by

13      St. Louis County police officers?

14           A.    I'm not aware of any.

15           Q.    Okay.  What about William Davis?  Yeah,

16      William Davis.

17           A.    I'm not aware of any.

18           Q.    All right.  By the way, before I get off the

19      subject of William Davis and Tracey White, Mr. Plunkert

20      was going to ask you this, but I'll just ask you,

21      neither one of them were arrested by or touched by

22      someone named Officer Cosma; isn't that correct?

23           A.    There's no indication that she was, no.

24           Q.    Right.  So you're not going to be rendering

25      any opinions with regard to Tracey White or William

```
 1      Davis regarding Officer Cosma; is that correct?

 2           A.    Correct.

 3           Q.    All right.  Let's talk about Dwayne Matthews.

 4                 That also was August 13th -- well, you know,

 5      actually, before we go to August 13th, you mentioned

 6      Michael Brown was killed on August 9th; is that

 7      correct?

 8           A.    Yes.

 9                 MR. LATTIMER:  No.  He indicated Michael

10           Brown was killed.

11      BY MR. HUGHES:

12           Q.    Okay.  He was killed.  Do you know what date

13      that was?

14           A.    August 9th.

15           Q.    And did unrest begin that day?

16           A.    No.

17           Q.    Well, did it begin the 10th?

18           A.    I believe it began the 10th.

19           Q.    And I mean, you read the COPS Report.  You

20      read the After-Action Report.

21                 I guess you watched -- what national news

22      media do you watch, by the way?

23           A.    Various.

24           Q.    Well, what's your channel of choice if

25      there's a civil unrest going on somewhere?
```

```
 1              MR. LATTIMER:  Objection as to relevance and

 2         materiality.

 3              THE WITNESS:  I don't have a channel of

 4         choice.  I'll be surfing to look to see what's

 5         being projected on the screen, and if it catches my

 6         interest, I'll stop and listen and watch.

 7    BY MR. HUGHES:

 8         Q.    So I mean, for Ferguson rioting did you turn

 9    on MSNBC, Fox News, CNN?

10              Is there any particular station of choice

11    that you watch?  Al Jazeera?

12         A.    No.

13         Q.    All right.

14         A.    But back to your question about when did the

15    civil disturbances start, there was disturbances that

16    were in effect during the processing of the crime scene

17    on the 9th, so --

18         Q.    Thank you.

19         A.    -- there were people that were there.

20         Q.    You did a little reading then.  Okay.

21              And do you know what sort of code was issued

22    on the 9th?

23         A.    I'm not sure if the code was -- there was a

24    code 1000 and then a code 2000.

25              I don't recall exactly what day those codes
```

87

```
1    were issued.

2            They could have been issued on the 9th or

3    also on the 10th.

4        Q.    You said there's some disturbance on the

5    9th.

6            Let's go on to the 10th.  Would you tell me

7    what you read about that?

8            And I guess without putting words in your

9    mouth, would you recall there was significant rioting,

10   looting, burning, anything --

11       A.    Yes.

12       Q.    -- going on?

13       A.    Yes.

14       Q.    That was on the 10th?

15       A.    Yes.

16       Q.    What about the 11th?

17       A.    Yes.

18       Q.    12th?

19       A.    Yes.

20       Q.    13th?

21       A.    Yes.

22       Q.    Going back to Dwayne Matthews, Wednesday,

23   August 13th, there had been a few days of -- well, you

24   just agreed to significant rioting and then that night

25   there's looting, I think a building got burned down;
```

88

```
 1       would you agree with that --

 2                  MR. LATTIMER:  Objection --

 3       BY MR. HUGHES:

 4            Q.    -- or not?

 5                  MR. LATTIMER:  -- relevance and materiality,

 6            misstates the facts.

 7                  THE WITNESS:  Yes.

 8       BY MR. HUGHES:

 9            Q.    And then Dwayne Matthews is in the area of

10       West Florissant and Highmont?

11            A.    Yes.

12            Q.    There was a crowd, a large crowd, unruly

13       crowd; would you agree?

14                  MR. LATTIMER:  You're asking him if he was

15            there?

16                  MR. HUGHES:  No.  I'm asking him what he's

17            read.  He's got lots of notes, lots of reports,

18            lots of depositions.

19                  THE WITNESS:  Yes.

20       BY MR. HUGHES:

21            Q.    And would you agree rocks and bottles were

22       being thrown at police?

23            A.    Apparently.

24            Q.    Gunshots could be heard?

25            A.    Yes.
```

1          Q.    A Molotov cocktail was thrown on a roof

2     nearby West Florissant and Highmont?

3          A.    That was reported, yes.

4          Q.    All right.  The crowd was ordered to

5     disperse?

6          A.    Probably.

7          Q.    Tear gas was deployed?

8          A.    Yes.

9          Q.    Will you agree there's probably significant

10    tear gas deployed?

11              MR. LATTIMER:  Objection.  He couldn't

12         possibly know that.

13              THE WITNESS:  I would say that tear gas was

14         deployed.

15              I don't know whether it was -- how you would

16         define "significant".

17    BY MR. HUGHES:

18         Q.    All right.  Fair enough.

19              So tear gas deployed, crowd is dispersing.

20    You know that from what you've read; is that correct?

21         A.    Yes.

22         Q.    And you know there's a police skirmish

23    line?

24         A.    Yes.

25         Q.    And in front of the skirmish line there's

```
 1    tear gas?

 2          A.     There's tear gas all over.

 3          Q.     And then one person comes -- let's go back a

 4    little bit further.

 5                 The street there in Highmont is a dark

 6    street; would you agree with that?

 7                 MR. LATTIMER:  How could he possibly know

 8          that?

 9    BY MR. HUGHES:

10          Q.     From what you read?

11                 MR. LATTIMER:  Objection.

12    BY MR. HUGHES:

13          Q.     You either agree or you don't agree.

14          A.     I don't know whether it was dark or not.  It

15    happened at night.

16                 I'm not sure what kind of illumination may

17    have been there.

18          Q.     A person coming toward the police skirmish

19    line, running on a street which may or may not have been

20    dark, coming through the tear gas, coming through

21    smoke -- will you agree that smoke was deployed from

22    what you read?

23          A.     Yes.

24          Q.     And although the rest of the crowd is

25    dispersing, although a crowd is dispersing, one person
```

```
 1     is coming towards the police in a skirmish line through

 2     the smoke, through the tear gas, running at the police

 3     skirmish line, his hands may be up, may or may not be

 4     up, but he says his hands are up and something's in his

 5     right hand.

 6                 Now, if you were hired by the police

 7     department to do some classroom teaching or if you were

 8     an on-the-line commander, which you never were, but

 9     would you advise your officers to yell at him to, "Go

10     back, go back"?

11                 Yes or no?

12                 MR. LATTIMER:  Objection, calls for the

13            Witness to assume facts not in evidence.

14                 MR. HUGHES:  Oh, there's plenty.  That's in

15            evidence all over the place, but go on.

16                 MR. LATTIMER:  He doesn't testify that he was

17            running and you know it.

18                 He testified he got off a bus and he was

19            walking towards the police.

20     BY MR. HUGHES:

21         Q.    Okay.  I'll say a person is coming towards a

22     police line on a street that may or may not have been

23     dark, coming through smoke, coming through tear gas with

24     his hands up, maybe with his hands up, and if so, he has

25     something in his hand, but he's coming at the police
```

```
 1    skirmish line.

 2              My question was if you were an on-line

 3    commander, you'd have to speculate since you never were

 4    in this situation, or if you were an instructor, would

 5    you believe it is good advice to have officers yell at

 6    him to go back?

 7         A.   Not necessarily.

 8         Q.   If you don't yell at him to go back, what

 9    would you advise your officers to do?

10              MR. LATTIMER:  Objection as to relevance and

11         materiality.

12              THE WITNESS:  Attempt to assess the intent of

13         the person.

14              As you said, he was walking towards the

15         police.  He had his hands up.

16              There may have been an issue that he needed

17         to communicate to the officers.

18              You have to assess what's going on and not

19         just make an assumption that you have to turn him

20         around.  You don't know why he's coming towards

21         you.

22    BY MR. HUGHES:

23         Q.   But you know there's been a few days of

24    significant rioting; is that correct?

25         A.   Yes.
```

1          Q.     Burning, looting, throwing things at police?

2          A.     Yes.

3          Q.     And you have the crowd dispersing but one

4     person doesn't coming towards the police, and you know

5     at least from the testimony of the police officers that

6     they were yelling at him to go back, and one detective,

7     Joe Patterson, even removed his gas mask, exposed

8     himself to tear gas and yelled at him to, "Go back, go

9     back"?

10               MR. LATTIMER:  Objection, misstates the

11          facts.

12               What he said was, "Get on the ground."

13               Nobody told him to get back and you know

14          this.

15               MR. HUGHES:  No.

16               MR. LATTIMER:  It's not the facts in this

17          case.

18               MR. HUGHES:  It's certainly --

19               MR. LATTIMER:  But if you can assume that

20          fact and answer that question, please do.

21               Stop misstating the facts in the case.

22               MR. HUGHES:  I'm not misstating the facts.

23     BY MR. HUGHES:

24          Q.     You've read the deposition of Joe Patterson,

25     so despite what Mr. Lattimer's trying to tell you to

1    plant in your mind now, you've read those, and if you

2    think I just said something to you that was not

3    accurate, if you think Joe Patterson said something

4    different, you can correct me.  Okay?

5              If you think the other officer said something

6    different, you can correct me.

7              So, you know, did you read that officers

8    testified that they yelled at him to go back and one of

9    them, Joe Patterson, even took off his gas mask and

10   exposed himself to tear gas and told him to go back?

11             MR. LATTIMER:  Same objection.

12             THE WITNESS:  Officers did indicate that

13        Detective Patterson removed his –– and he himself

14        indicated he removed his gas mask to try to

15        verbalize commands to Mr. Matthews.

16   BY MR. HUGHES:

17        Q.    And despite that, this man kept coming

18   towards the police skirmish line; is that correct?

19        A.    Yes.

20        Q.    Now, could there be some concern by the

21   police right there on the scene looking at the totality

22   of facts, what's objectively reasonable in light of the

23   facts and circumstances which must be assessed not from

24   20/20 vision of hindsight but what must be assessed from

25   the perspective of reasonable officers on the scene?

1          So I'm asking you to look at it from that

2     point.

3          I guess you would agree, would you not, that

4     lethal force should not be used or do you?

5          Do you think lethal force could have been

6     used at that point?

7          A.    No.

8          Q.    So non-lethal force could be used; would you

9     agree with that?

10         A.    No, not right off the bat.

11         Police officers are trained to continually

12    assess situations and to continually make threat

13    assessments, so the fact that somebody is coming towards

14    the skirmish line -- and Mr. Matthews doesn't claim that

15    he was running.

16         He says he was walking with his hands up.

17    That does not -- would not indicate automatically that

18    Mr. Matthews is a threat to the police officers that

19    would require a response with force.

20         Q.    Why don't you tell me what you believe the

21    facts that are true with regard to Dwayne Matthews, what

22    facts you believe to be true which will be used by you

23    in the formation of your opinions.

24         MR. LATTIMER:  Objection.  That's an improper

25         thing for an expert to do.

```
1              MR. HUGHES:  That's exactly what experts do.

2              MR. LATTIMER:  Experts do not assume any

3         facts to be true.

4              The jury determines credibility.

5              Experts make opinions based upon the facts

6         that they have in hand.

7              They don't make credibility determination

8         about the facts.

9              MR. HUGHES:  Okay.

10             MR. LATTIMER:  And if you have an expert

11        that's done that, then you have been dealing with

12        an incompetent and stupid expert.

13   BY MR. HUGHES:

14        Q.   What opinions will you be rendering regarding

15   Dwayne Matthews?  That's the first thing I want you to

16   answer.

17             And then after that I want you to tell me

18   what facts you assume to be true that support your

19   opinions.

20        A.   My opinion regarding the incident involving

21   Dwayne Matthews is that the arresting officers, as well

22   as other officers who were there as witnesses or who

23   assisted, failed to document probable cause in any

24   written report or charging document at any time, and

25   that is not consistent with police practices.
```

```
 1              My also -- my second opinion regarding Dwayne

 2    Matthews is that the police used force against

 3    Mr. Matthews and, again, failed to articulate why they

 4    used force, what was the justification, why it was

 5    objectively reasonable for them to use the force in any

 6    fashion.

 7              They failed to complete a Use of Force Report

 8    on that force.

 9              They failed to have -- a -- a supervisor

10    failed to review that Use of Force.

11              Supervisors also failed to review the arrest

12    because there was no documentation for them to review,

13    and those failures are not consistent with police

14    practices.

15              Then you have Menzenwerth eight months later

16    putting together a police report in an attempt to

17    provide probable cause for the arrest, as well as

18    explaining what happened.

19              And to me, that process is inconsistent with

20    widely accepted police practices, falls below the

21    standard of care.

22              So when you have Mr. Matthews giving his

23    deposition and his explanation of what happened and we

24    know that when somebody gets arrested or has force used

25    against them by the police, that's a significant moment
```

1    in their lives.

2            We also know that when police officers make

3    arrests or use force, the standard response is to

4    complete reports as contemporaneously as possible, and

5    when you do it eight months later through Menzenwerth

6    and through his investigation where he had to refresh

7    the memory of the officers as to what took place, the

8    credibility and accuracy and thoroughness of those

9    reports are called into question.

10           And that's a decision for the jury to

11   determine who's credible, because we have a dispute of

12   the facts between police officers and Mr. Matthews, and

13   that is the opinion that I'll be offering.

14       Q.    So just so I understand -- I paid attention

15   to what you just said.

16           Are there any other opinions you're going to

17   be rendering with regard to Dwayne Matthews that you

18   have not already told us?

19       A.    I'm not aware of any as I'm sitting here

20   right now.

21       Q.    And you have not expressed any other opinions

22   in your 18-page written report with regard to Dwayne

23   Matthews; is that correct?

24       A.    Yes.

25       Q.    All right.  So, you know, you read the

1    Complaint, you read the Third Amended Complaint.  The

2    issues in the Complaint and the Third Amended Complaint

3    center around whether or not there's probable cause to

4    arrest and whether or not the force used was excessive.

5              You're aware of that?

6        A.    Yes.

7        Q.    So you have not expressed any opinions

8    regarding those issues.

9              Your opinions is is failed to articulate,

10   failed to complete a Use of Force Report, failed to have

11   supervisor review, prepared a police report eight months

12   later.

13             So I mean, that's fine, just so we understand

14   what your opinions are.

15       A.    What you're saying, and I've said it a

16   couple times already this morning, is that we have a

17   dispute of the facts between the people that were

18   arrested, and you can go to -- we can go through each

19   one of these arrests and I would apply the same

20   reasoning, that people were arrested, force was used

21   against some of them, and there's a dispute of facts as

22   to what happened.

23             You have the Plaintiffs giving their

24   version.

25             You have the police officers giving their

100

1    version through Menzenwerth eight months later, and what

2    I'm trying to say is that when police officers make

3    arrests and when force is used, there's a process that

4    is standard in law enforcement in this country, and that

5    is to articulate probable cause so that the people who

6    were arrested have an opportunity to defend those

7    charges.

8            The prosecutor has an opportunity to decide

9    whether he's going to file charges, and folks like you

10   and the others in this room have an opportunity to see

11   what happened should there be a civil suit.

12           But when you don't do a police report until

13   eight months later, then what the police say is called

14   into question as to thoroughness and accuracy because of

15   the -- of the time and the way these investigations were

16   handled, and then it becomes a matter for the jury to

17   determine credibility as to whether the Plaintiffs were

18   correct or whether the police officers were correct, and

19   we do -- I'm almost finished.

20       Q.   Okay.

21       A.   And we do have some police officers who

22   indicated that they didn't remember and that Menzenwerth

23   helped them, and one police officer indicated that he

24   made at least 300 arrests since the Ferguson arrests,

25   and I will tell you from a law enforcement perspective

101

1    that it's very difficult to recall with specificity

2    what happened 300 arrests ago, let alone eight months

3    ago.

4              That's why police officers are taught

5    nationally to document arrests and force as soon as

6    possible, generally by the end of their shifts that day,

7    and that those reports and use of force uses are

8    reviewed by supervisors to ensure that all of the

9    elements of the crime are included in the report and the

10   charging documents and that the force that was used was

11   within policy and was reasonable.

12             And in this case it did not happen.

13   Q.   So I'm happy to move on because you have

14   not -- as I understand it, you're going to try to assist

15   the jury in determining who is credible?

16   A.   No, I didn't say that.  What I said was --

17   Q.   But you don't have opinions -- you have not

18   yet expressed an opinion regarding probable cause to

19   arrest or arguable probable cause to arrest or whether

20   or not the force used was objectively reasonable?

21   A.   Okay.  I'm going to go back to your

22   statement.

23             I did not say I'm going to assist the jury in

24   determining who's credible.  That's their

25   responsibility.  Not mine.

102

1          I will explain what police practices are in

2    this country, widely accepted police practices are

3    regarding arrests, probable cause and the use of force.

4          They'll make the determination whether the

5    police are credible or whether the Plaintiffs are

6    credible or somewhere in between.

7          That's not my function.

8    Q.    Just so we understand too, you just said you

9    said must document by the end of the day.

10   A.    That's not what I said.

11   Q.    Well, I typed it as you were saying it, so I

12   think that's what you said.

13        MR. LATTIMER:  It doesn't matter what you

14        think.  He's telling you that's not what he said.

15        MR. HUGHES:  He did say it.

16        MR. LATTIMER:  Okay.

17        MR. HUGHES:  But anyway --

18        MR. LATTIMER:  The record will speak for

19        itself.

20        MR. HUGHES:  The record will speak for

21        itself.

22   BY MR. HUGHES:

23   Q.    Do you want to correct that?

24   A.    Yes, because I did not say that they must do

25   that by the end of the day.

```
1               They must do that as soon as reasonably

2       possible and generally that's by the end of their shift,

3       by the end of their day.

4               Of course there are circumstances that would

5       prevent that from happening or allow officers to

6       complete a report at a later time, but eight months

7       later, that's unreasonable.

8          Q.    You did read, I'm sure, deposition after

9       deposition after deposition of the police detectives who

10      said at the end of their shifts they spoke to their

11      immediate supervisor and debriefed them on everything

12      they did, that would be any arrests?

13              MR. LATTIMER:  Objection, mischaracterizes

14          testimony.

15      BY MR. HUGHES:

16         Q.    Is that correct?

17         A.    They talked about debriefings.

18         Q.    Right.

19         A.    I don't know what they discussed during a

20      debriefing, but I can assure you that a debriefing is

21      not articulation or documentation of probable cause in a

22      police report or a charging document.

23              It's not a sworn instrument where they are

24      attesting that the --

25         Q.    Are police reports sworn instruments?
```

104

```
 1              MR. LATTIMER:  Let him finish his answer.

 2     BY MR. HUGHES:

 3         Q.    Are police reports sworn instruments?

 4              MR. LATTIMER:  Let him finish his answer,

 5         please.

 6              You cannot do this.  If he's going to answer

 7         questions, he's going to answer questions, but

 8         you're not going to talk while he's answering.

 9              It's not going to happen.  Why do you keep

10         doing it?

11              MR. HUGHES:  The objection is he didn't

12         finish his answer.

13              MR. LATTIMER:  I said that and you did it

14         again.

15     BY MR. HUGHES:

16         Q.    Okay.  Go on.

17         A.    Unfortunately when these interruptions

18     happen, I lose my train of thought, but typically police

19     officers, after they make an arrest they will complete a

20     charging document of some fashion.

21              In Florida those charging documents are sworn

22     to.

23              They will also complete police reports.

24         Q.    And --

25         A.    And we know that force was used because the
```

1    officers acknowledged force being used.  We know force

2    was used.

3         Q.    Okay.

4         A.    The practice in law enforcement is that when

5    force is used, you will document that use of force

6    through a Use of Force Report.

7               You will do it in your -- you will document

8    it in your police report, and those police reports and

9    Use of Force Reports will be reviewed by supervisors to

10   ensure that the force was used within policy and was

11   objectively reasonable, and in this case it was never

12   done.

13              So a briefing, an after-action briefing at

14   the end of the day to tell -- to tell a supervisor about

15   your activities is not a substitute for documentation of

16   arrests or force.

17        Q.    I will say on the record that we have

18   furnished Mr. Lattimer -- a long time ago, I can't

19   remember the date offhand -- the Use of Force Report in

20   the Dwayne Matthews case.

21              So my question to you is did he ever furnish

22   to you the Use of Force Report in the Dwayne Matthews

23   case?

24        A.    I have not seen that, no.

25        Q.    So when you said and when you've testified

```
 1    that we failed to complete a Use of Force Report, you

 2    only say that because you personally have not seen one;

 3    a Use of Force Report was not furnished to you --

 4              MR. LATTIMER:  Nor to me.

 5    BY MR. HUGHES:

 6         Q.    -- by Mr. Lattimer?

 7              MR. HUGHES:  Oh, yes, it was.

 8              MR. LATTIMER:  Nor to me.  A Use of Force

 9         Report was not prepared after this incident and you

10         know it.

11              Nothing was prepared in this case until

12         Menzenwerth got involved eight months later.

13              MR. HUGHES:  We sent you a Use of Force

14         Report.

15              MR. LATTIMER:  You did not.  We've been over

16         this a thousand times, and you keep claiming that

17         you've given us reports, and every time we go

18         through this, we find out that you didn't.

19              That's why we had to have additional

20         depositions, and here you are again.

21    BY MR. HUGHES:

22         Q.    Do you have something to say?

23         A.    I do.

24         Q.    Okay.

25         A.    I just want to make it clear that a Use of
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
 1    Force Report is not articulation of the force in a

 2    narrative in a police report.

 3              A Use of Force Report is a separate report

 4    that describes the force that was used.

 5         Q.    Right.

 6         A.    I just want to make sure we're on the same

 7    page.

 8         Q.    I know, and that was furnished.  That was

 9    prepared and that was furnished.

10              Let me ask you this:  Who normally prepares a

11    Use of Force Report?

12         A.    The police officer that used the force.

13         Q.    It's not supervisors gathering --

14         A.    No.

15         Q.    -- the Use of Force Report?  Okay.

16         A.    No.  A supervisor will review the Use of

17    Force, and some agencies have supervisor's Use of Force

18    Reports or the Force Report itself has a section for the

19    supervisor to add comments and sign off on it.

20         Q.    Now, what do you believe to be true, the

21    facts, with regard to Dwayne Matthews' arrest that would

22    support your opinions?

23              And I'm not asking you to talk about

24    Menzenwerth.

25              I'm talking about Wednesday, August 13th and
```

```
 1    any facts that you believe to be true that support your

 2    opinions.

 3         A.    Yes.

 4               MR. LATTIMER:  Which opinions?

 5    BY MR. HUGHES:

 6         Q.    Go ahead.

 7               MR. LATTIMER:  Do you know what he's talking

 8         about?  What opinions are you talking about?

 9    BY MR. HUGHES:

10         Q.    I'm asking you -- you've expressed your

11    opinions.

12               Now, as far as on the scene Wednesday, August

13    13th in the area of West Florissant and Highmont, what

14    facts do you believe to be true that support your

15    opinions?

16         A.    Mr. Matthews was arrested.  Mr. Matthews had

17    force used against him.

18         Q.    Anything else?

19         A.    I think the facts about the incident itself

20    remain in dispute, but what's not -- not in dispute is

21    the fact that Mr. Matthews was arrested and a police

22    report was not completed that articulated probable cause

23    within a reasonable period of time, that a charging

24    document articulating probable cause was not completed

25    within a reasonable period of time and that a Use of
```

```
 1    Force Report was not completed or at least I haven't
 2    seen one.
 3              And if you didn't complete a police report or
 4    a charging document, there cannot be a review by a
 5    supervisor.
 6              And if you don't complete a Use of Force
 7    Report, it's impossible for a supervisor to review that
 8    force.
 9         Q.   Let's talk about Kerry White, Sandy Bowers
10    and Kai Bowers.
11              Now, your written report didn't go into any
12    specifics with regard to those three; would you agree
13    with that?
14         A.   Yes.
15         Q.   Okay.  So are you going to be expressing any
16    opinions regarding their arrests or any force used or
17    not?
18         A.   Yes.
19         Q.   And what opinions are you going to be
20    rendering?
21         A.   The same opinions that I rendered on the last
22    discussion about Mr. Matthews, and if you want me to go
23    through that again, I can.
24         Q.   So your opinions that you'll express at trial
25    with regard to Mr. White, Mr. Bowers and Mr. Bowers is
```

1      that Menzenwerth's report was prepared eight months

2      later and the jury should determine who's credible?

3            A.    All right.  Let me go through my opinions,

4      that way we make sure they're all included.

5            Q.    Okay.

6            A.    My opinions would be that those three parties

7      were arrested by the police, that force was used against

8      all three of them, that the arresting officers failed to

9      complete a police report or a charging document and

10     failed to articulate probable cause to make an arrest.

11            The officers involved also failed to complete

12     a Use of Force Report describing their force.

13            A supervisor failed to review the

14     non-existent -- did not have the capability of reviewing

15     a non-existent Use of Force Report to determine if the

16     force was within policy and was reasonable.

17            The same supervisors or other supervisors

18     also did not have an opportunity to review the probable

19     cause to ensure that the reports were complete and that

20     the elements of the crime existed and were articulated

21     in the documentation.

22            And that falls below the standard of care for

23     arrests and force.

24            And now you have a dispute of facts between

25     the arrested parties and the police officers.

111

1              The arrested parties had a significant event

2       happen in their lives to be arrested, have their freedom

3       taken away from them, have force used against them from

4       police, and at the same time you have Menzenwerth go

5       back and interview officers and help them refresh their

6       memory about what happened, and he completed a police

7       report.

8              And my opinions are that's not within

9       widely accepted police practices regarding arrests or

10      force.

11         Q.    You would agree that if force is not used,

12      then a Use of Force Report is not prepared?

13         A.    Yes.

14         Q.    And you read the depositions of the police

15      officers; is that correct?

16         A.    Yes.

17         Q.    You read the police report; is that correct?

18         A.    Yes.

19         Q.    And there is no force indicated that was

20      used -- none of the police officers indicated that they

21      used force in their deposition testimony; is that

22      correct?

23         A.    No.

24         Q.    Is that correct or no?

25         A.    No, that's not correct.

1          Q.     That's not correct?  Okay.

2          A.     If my memory stands correct, all three of the

3     occupants of the vehicle were removed from the vehicle

4     and placed on the ground, and when you take somebody and

5     put them on the ground, that is force.

6              It may not be force that resulted in an

7     injury or it may, but when you use more than routine

8     handcuffing procedures where the arrested party is

9     compliant and cooperative, if you use more than that,

10    that will trigger a requirement that you report that

11    force, and that includes taking somebody to the ground.

12         Q.     So you're going to talk about standards of

13    care, police practices, is that correct, standards of

14    care of police?

15         A.     Yes.

16         Q.     And you said they were placed on the ground.

17    It may not have resulted in injury, may or may not have;

18    is that correct?

19         A.     Yes.  Also the fact that they're taking

20    somebody to the ground, that's force and that is what

21    needs to be reported.

22         Q.     You know, again, I didn't have the benefit of

23    the report to prepare for since you did not specify

24    these three in your report, but you would agree that

25    they did not receive any medical treatment whatsoever

1    for any injury or perceived injury?

2         A.    I don't dispute that.

3         Q.    So as far as you know, those three people

4    were not injured?

5         A.    I believe one of them had to have some -- was

6    having some physical therapy for a back issue.

7         Q.    Some prior physical therapy?

8         A.    Yes, but I don't recall any report of injury

9    from that contact.

10         Q.    Now, you said that they were arrested by the

11    police.

12               You haven't indicated in your written report

13    or even now that there was not arguable probable cause

14    considering the totality of facts that they may have

15    committed some offense?

16         A.    Is that a question?

17         Q.    Yeah.  You have not said that.

18               MR. LATTIMER:  Said what?

19    BY MR. HUGHES:

20         Q.    You have not said that in the written report

21    or in your deposition; is that correct?

22               MR. LATTIMER:  Said what?

23    BY MR. HUGHES:

24         Q.    That there was not arguable probable cause.

25         A.    I haven't said that.

114

```
 1        Q.    Right, and you didn't put that in your
 2   written report either?
 3        A.    No, because I didn't read the probable cause.
 4              So are you trying to ask me to conclude that
 5   there was probable cause or are you just asking me did I
 6   comment on that?
 7        Q.    I mean, I just don't want to be surprised
 8   with an opinion at trial, so you're not rendering an
 9   opinion?
10        A.    I am not.
11        Q.    Okay.
12        A.    However, if you were to ask me do I believe
13   probable cause existed for the arrest of failure to
14   disperse, I will respond to that question.
15        Q.    Well, the question is whether or not there's
16   arguable probable cause to arrest people for some
17   offense.  I mean, that's what we talk about.
18        A.    Is that what you're asking me?
19        Q.    Yeah.
20              MR. LATTIMER:  You're asking about people or
21        asking about Mr. Bowers, the two Bowers and --
22              MR. HUGHES:  Bowers, Bowers and White, Kerry
23        White.
24              MR. LATTIMER:  Okay.
25              THE WITNESS:  In reading the documentation, I
```

```
 1          did not see probable cause to make the arrests that

 2          they did.

 3   BY MR. HUGHES:

 4          Q.     This happened like after midnight on August

 5   13th?

 6          A.     Yes.

 7          Q.     So again, there had been significant

 8   rioting?

 9          A.     Yes.

10          Q.     And there is a large crowd of people on a

11   street called Chambers Road that were throwing objects

12   at police, rocks, bottles, batteries, even occasional

13   gunfire; you don't dispute that?

14          A.     I don't dispute that.  That's been reported.

15          Q.     And the crowds were told to disperse?

16          A.     Yes.

17          Q.     The crowd did start to disperse?

18          A.     Yes.

19          Q.     Part of the skirmish line goes to a street

20   called Lorna Lane?

21          A.     Yes.

22          Q.     So because of the crowd, part of the crowd's

23   on Lorna Lane, part of the skirmish line is on Lorna

24   Lane; you don't dispute that?

25          A.     No.
```

116

```
 1          Q.     And the police radio had indicated right
 2     around this time that someone had been shot?
 3          A.     I don't recall that, but I don't dispute it.
 4          Q.     And then there's a police helicopter that
 5     radios that this white car with no headlights is driving
 6     on Lorna Lane towards the skirmish line?
 7          A.     I remember the police helicopter describing a
 8     car.
 9               I don't recall if the helicopter itself -- I
10     don't dispute it, where the -- they said that lights
11     were off.  Mr. White said the lights were on.
12          Q.     But you don't dispute that on Lorna Lane
13     there is this car, a white car driving towards the
14     police skirmish line?
15          A.     I don't dispute that.
16          Q.     And police officers testified they yelled at
17     the car to stop, but it kept coming towards the skirmish
18     line?
19          A.     I don't recall specifically that they yelled
20     for it to stop.
21               What I do recall is that the vehicle was
22     proceeding towards the skirmish line.  The car
23     eventually stopped and was approached by the police
24     officers.
25          Q.     Do you recall police officers testifying that
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

117

1    they went up to the occupants and said, "Why didn't you

2    stop?  Didn't you hear us yelling to stop?"

3              And the passengers said, "Yes, but the driver

4    kept going"?

5         A.    I heard -- I read that in the police reports,

6    yes.

7         Q.    And the police testimony?

8         A.    I don't dispute that.

9         Q.    So at that point you're saying, you know,

10   when the police officers are faced with being told --

11   first of all, on this night when the car is driving at

12   the skirmish line and then the police officers are told

13   that the occupants heard them yelling to stop but the

14   car kept going, you're saying that the officers at the

15   scene making a judgment on whether or not there's

16   arguable probable cause to arrest them for something

17   should not have thought there was arguable probable

18   cause to arrest them for something?

19        A.    Well, you said that the police officers knew

20   that the occupants heard them.  I don't know that

21   that's -- that's their opinion.

22        Q.    No, no.  That's what they testified.

23              MR. LATTIMER:  Who?

24              THE WITNESS:  The police officers may have

25        been yelling, but you just said the police officers

```
 1              knew that --

 2    BY MR. HUGHES:

 3         Q.    No.

 4         A.    -- the occupants heard them, and that's what

 5    I'm questioning.

 6         Q.    No.  What I said was when the police officers

 7    walked up to them and said, "Why didn't you stop?  Did

 8    you hear us yelling?" the occupants said, "Yes, but

 9    Mr. White kept driving."

10         A.    That's what the police officers said.

11         Q.    Yeah.

12         A.    I don't know that that's --

13         Q.    In their deposition.

14         A.    I don't know that that's factual, but that's

15    what they said.

16         Q.    If that is factual, would a police officer on

17    the scene have arguable probable cause to think that

18    these people should be arrested for something?

19         A.    Not --

20              MR. LATTIMER:  Objection as to relevance and

21         materiality.

22              THE WITNESS:  Not necessarily.  You have to

23         investigate to find out what is going on.

24              There may be some legitimate reason for that

25         vehicle continuing on.
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
 1              Maybe the -- the vehicle did -- the occupants

 2        or the driver did not hear the command to stop.

 3              I don't know what his reasoning is, but what

 4        we do know is that he came -- he was approaching,

 5        and you used the term "driving at".

 6              I would say he was approaching -- they were

 7        approaching each other as the skirmish line is

 8        walking, the vehicle is traveling, and at some

 9        point the vehicle stopped and I believe he pulled

10        to the right and then they were approached by the

11        police officers and subsequently arrested for

12        failure to disperse.

13   BY MR. HUGHES:

14        Q.    Who said that the skirmish line was

15   approaching?

16        A.    That's what I gathered from the facts,

17   because they were walking down the street.

18        Q.    I mean, once they saw the car coming towards

19   them, are you saying any police officers said they

20   kept going towards the car themselves, the skirmish

21   line?

22        A.    I didn't follow that last question.

23        Q.    All right.

24        A.    What I'm trying to describe is in my

25   understanding of this incident is that the police
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

1    officers are moving down the street, they're walking.

2    There's a vehicle with them.

3            There's a white vehicle that is now heading

4    in the direction of the police officers.  They're

5    approaching each other.

6            The vehicle stops.  The occupants and the

7    driver are subsequently arrested.

8            And I'll go back to the same argument,

9    that -- or the same opinion.  It's a fact that those

10   three were arrested, White and the two Bowers.

11           The police officers who arrested them did not

12   complete a police report, did not articulate probable

13   cause in a police report or any charging document.

14           Force was used.  Even if it's minimal force

15   by taking somebody to the ground, that is force that

16   would trigger the necessity to have a Use of Force

17   Report completed.

18           A Use of Force Report was not completed.

19           Subsequently it could not be reviewed by a

20   supervisor to determine if it was within policy or was

21   objectively reasonable.

22           Because a police report was not completed or

23   a charging document, a supervisor could not confirm that

24   probable cause was articulated in those documents to

25   ensure completeness and thoroughness.

121

```
 1            That is -- and then you have Menzenwerth

 2   eight months later going back and completing police

 3   reports, refreshing memory.

 4            That is not consistent with widely accepted

 5   police practices regarding arrests and force.

 6            So what -- and what you end up with is you

 7   have the testimony of the three people who were

 8   arrested, significant events in their lives, versus the

 9   testimony of officers from -- through Menzenwerth, and

10   it's up to the jury to determine credibility.

11       Q.   Now, you know, all of the St. Louis County

12   police officers, and I'll say the same about the

13   Maryland Heights officers in a minute, but all the

14   St. Louis County police officers, you've read their

15   depositions, right?

16       A.   Yes.

17       Q.   You would agree that they're all very smart

18   officers and all very well trained?

19            MR. LATTIMER:  Objection, relevance and

20       materiality.  How could he possibly know how smart

21       officers are?

22            THE WITNESS:  I don't know how smart they are

23       and I don't know how well trained they are, but I

24       would accept that the officers are certified -- the

25       officers are certified by the State of Missouri to
```

```
 1              be police officers.
 2        BY MR. HUGHES:
 3              Q.    You say you don't know how smart they are.
 4                    I mean, many, if not most of the officers,
 5        have higher degrees than you do?
 6                    I mean, you read their depositions.
 7              A.    Yes.
 8              Q.    Okay.  And --
 9              A.    Having a degree does not equate to
10        intelligence --
11                    MR. LATTIMER:  Trust me.
12                    THE WITNESS:  -- or how smart you are.
13                    MR. LATTIMER:  It doesn't.  That's for sure.
14        BY MR. HUGHES:
15              Q.    And I don't mean to disparage.
16                    I think very highly of routine patrol
17        officers.
18                    I don't mean to disparage them, but all of
19        these --
20              A.    To help you --
21              Q.    Wait, wait, wait.  Let me finish the
22        question.
23                    Okay.  You want to help me somehow?
24              A.    I would say that if they have degrees or
25        higher degrees, that they're educated.
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

123

```
 1              I would help you by saying if -- if they're
 2   police officers for St. Louis County, they've achieved a
 3   certain amount of -- of training that's prescribed by
 4   the State to be police officers, and I will give them
 5   that, of course.
 6              But you asked me --
 7       Q.    Okay.
 8       A.    -- that they're smart and something else,
 9   which I can't --
10       Q.    Well, as I started to say in the question,
11   I'm not at all disparaging routine patrol officers.
12              I think very highly of them, but you're aware
13   that each one of these detectives who are being sued, I
14   mean, one of them is a Sergeant, was a Sergeant, then
15   has since been promoted to a Sergeant, but then all the
16   ones who aren't Sergeants, I mean, they're not routine
17   patrol officers.  They're part of, you know, elite teams
18   that they have to apply to and be recommended for and,
19   you know, they have to, you know, get recommendations,
20   you know.
21              MR. LATTIMER:  Is there a point here?
22   BY MR. HUGHES:
23       Q.    You read, you know, that these people were
24   part of the Neighborhood Enforcement Team and part of
25   the Drug Street Team; is that correct?
```

124

```
 1          A.    Yes.
 2               MR. LATTIMER:  Objection as to the relevance
 3          and materiality.
 4     BY MR. HUGHES:
 5          Q.    Those are elite officers; you would agree
 6     with that?
 7               MR. LATTIMER:  How would he know?
 8               THE WITNESS:  I would say they are.
 9               MR. HUGHES:  Because he's an expert.  He was
10          a police officer for years.
11               THE WITNESS:  I would say that those are
12          police officers that are in specialized units that
13          are with more responsibility than a standard patrol
14          officer.
15               I would also say that these specialized,
16          educated, trained police officers know that when
17          you make an arrest, you're required to document the
18          arrest.
19               You're required to articulate probable cause
20          in a police report and a charging document.
21               You are required to complete a Use of Force
22          Form.
23     BY MR. HUGHES:
24          Q.    Okay.
25          A.    And I would also offer that these officers,
```

1    these specialized -- these officers that are in

2    specialized units chose not to do that, and that is

3    below the standard of care of widely accepted police

4    practices regarding arrests and use of force.

5         Q.    So again, you want to talk about standard of

6    care and widely -- what was the words --

7         A.    Widely accepted police practices, and I'll

8    also offer they violated their own policies.

9              Without even seeing their policies, I can

10   tell you that they have a policy that requires them to

11   articulate probable cause and complete a police report

12   upon arrest and to complete a Use of Force Form.

13             And they have a policy that requires a

14   supervisor to review an arrest report and sign off on it

15   and to approve it and to review and investigate use of

16   force.

17        Q.    Okay.

18        A.    And they violated their own policies.

19        Q.    Now, you never personally were in a

20   specialized unit like the Drug Street Team; is that

21   correct?

22        A.    I was in --

23        Q.    I mean, you know --

24        A.    Was I in the Drug --

25        Q.    Core person as an -- yeah, go on.  You can

126

```
 1    answer.
 2         A.    No, I was not in a Drug Unit, nor was I in
 3    a --
 4         Q.    Neighborhood Enforcement?
 5         A.    -- Neighborhood Enforcement Unit, but what I
 6    do have is seven years of experience --
 7         Q.    Okay.  But --
 8              MR. LATTIMER:  Huh-uh, huh-uh.  Don't do it.
 9         Don't do it.
10              THE WITNESS:  -- seven years of experience as
11         an investigator, including two years of homicide
12         and about five years of investigating --
13    BY MR. HUGHES:
14         Q.    All right.  Well --
15         A.    -- major violent crimes and I've made
16    countless arrests.
17         Q.    All right.
18         A.    And I've -- I've used force, and I know that
19    when I make an arrest, I'm required to document the
20    probable cause in that arrest -- in that report, in that
21    charging document, and when I used force, I've filled
22    out Use of Force Forms.
23         Q.    Okay.  So you said you were in homicide, I
24    guess.
25              So anyway, that's a specialized unit; is that
```

```
 1    correct?

 2         A.    As a detective I was in a specialized unit

 3    for seven years.

 4         Q.    But you know someone in specialized units,

 5    they have to apply for those specialized units, they

 6    have to be interviewed for them and they have to have

 7    recommendations for them?

 8                 MR. LATTIMER:  Objection as to relevance --

 9                 THE WITNESS:  Generally.

10                 MR. LATTIMER:  -- and materiality.

11    BY MR. HUGHES:

12         Q.    What was your answer?

13         A.    Generally.

14         Q.    So you're putting yourself in this category

15    because you're in homicide, but you know people in

16    specialized units are, you know, a little bit more

17    special, a little bit even more training; is that

18    correct?

19         A.    It depends on what unit and what agency and

20    what kind of function they're performing.

21         Q.    So you did not have extra training when you

22    were in homicide?

23         A.    No, I did have extra training.

24         Q.    Okay.

25         A.    But what I'm offering is that, as you said
```

128

1   earlier, these officers in the Street Enforcement Unit

2   and Drug Enforcement Unit who have additional training,

3   who are selected, who are interviewed, who are -- who

4   did apply, that -- not disparaging patrol officers, but

5   these are -- you used the term "elite".

6           I would say these are more specialized

7   officers.

8           These officers even more so than new police

9   officers know the requirements for arrests, reporting

10  and use of force reporting.

11          They know it even better based on their

12  experience, yet they failed to do it.

13  Q.   Now let's talk about -- and Mr. Plunkert's

14  going to ask you questions about Damon Coleman and

15  Theophilus Green, but I'm going to talk about them a

16  little bit.

17          That happened Monday, August 11th around 8:30

18  at night.

19          Does that sound reasonably correct to you?

20          Maybe it's sooner than that.  I don't know,

21  but --

22  A.   I'm seeing on the report 20:30 hours or 8:30

23  at night.

24  Q.   All right.  Just so we understand, you're not

25  going to be giving testimony against any individuals of

129

```
 1    St. Louis County police officers with regard to Damon
 2    Coleman and Theophilus Green; is that correct?
 3         A.    Yes, correct.
 4         Q.    Are you going to be rendering opinions about
 5    Maryland Heights officers?
 6         A.    Yes.
 7         Q.    And you know they're members of the Civil
 8    Defense Response Team, I believe?
 9         A.    I know they responded to the incident.  Is
10    that what you're speaking of?
11         Q.    No.
12         A.    As a response --
13         Q.    Well, getting back, like you said with the
14    other officers, St. Louis County, you said you don't
15    know the training, so you're not going to be giving any
16    opinions regarding the training; is that correct?
17         A.    No.  I'm going to assume that they are
18    certified by the State of Missouri and have achieved the
19    necessary training requirements to have that
20    certification.
21         Q.    So as far as you're concerned, all the
22    St. Louis County police officers and the Maryland
23    Heights officers were trained, were well trained; is
24    that correct?
25         A.    You threw the word in "well".
```

130

```
1          Q.    Okay.

2          A.    I'm going to say --

3          Q.    Do you want to qualify it?

4          A.    Yes.

5          Q.    Are you agreeing that all the St. Louis

6    County police officers and Maryland Heights officers

7    were trained, were certified by the State?

8          A.    Yes.

9          Q.    And as far as their specific training

10   records, you don't even know what they are; is that

11   correct?

12         A.    Correct.

13         Q.    But you don't dispute that they're trained?

14         A.    No.

15         Q.    None of these officers were, you know,

16   rookies put in a situation where, you know, they were

17   right out of the Academy; is that correct?

18         A.    Correct.

19         Q.    Now, again, Damon Coleman and Theophilus

20   Green, there had been -- let's say this was August 11th,

21   so August 10th was -- well, I guess you already

22   testified that August 9th there might have been some

23   disturbance and August 10th there was some significant

24   rioting?

25         A.    Yes.
```

```
 1          Q.    You know, a building burned, looting, things

 2    thrown?

 3          A.    Yes.

 4          Q.    And on Monday, August 11th, 8:30, you don't

 5    dispute the crowd was told to disperse, but Green and

 6    Coleman didn't disperse?

 7                Well, first of all, you don't dispute the

 8    crowd was told to disperse?

 9          A.    I believe it was reported that the crowd was

10    told to disperse.

11          Q.    Did you see the video, by the way?

12          A.    No.

13          Q.    You know, Mr. Lattimer's video, his clients

14    had cell phones where they were recording.

15                So that wasn't provided to you?

16          A.    I didn't see a video, no.

17          Q.    And in that video I just represented to you

18    that you can see some people dispersing, but anyway, so

19    do you dispute one way or another that some people were

20    dispersing --

21          A.    I have no reason to dispute --

22          Q.    -- after the police told them to disperse?

23          A.    I have no reason to dispute that.

24          Q.    And you have no reason to dispute that

25    Mr. Green and Mr. Coleman did not disperse?
```

132

1              MR. LATTIMER:  Objection.  There's no facts

2         to support that.

3              THE WITNESS:  I think the testimony -- the

4         testimony from Mr. Green and Mr. Coleman was that

5         they were trying to get back to their vehicle so

6         that they could leave the area and they couldn't do

7         so, and there were police coming from different

8         directions that prevented them from doing so and

9         they were also aware of less lethal rounds being

10        fired and they were -- or they were getting down,

11        they were concerned about their own safety, so they

12        didn't make it to their vehicle.

13   BY MR. HUGHES:

14        Q.    You read the depositions of the Maryland

15   Heights Lieutenant and two Maryland Heights officers

16   with the Civil Response Defense Team?

17        A.    Yes.

18        Q.    You saw that the Lieutenant believed that he

19   saw them throwing something, saw them perhaps throwing

20   rocks?

21        A.    I believe the Lieutenant said that he saw a

22   throwing motion but did not see what they were throwing

23   or if they were throwing anything.

24        Q.    And at least in the deposition, I guess, you

25   read that a voice was heard saying, "Quit throwing

133

```
1    rocks, bro"?

2         A.    Yes.  And let me -- let me clarify or add to

3    my previous statement.

4              The Lieutenant said that he did see throwing.

5    He couldn't tell what -- what they were throwing.  He

6    doesn't know -- he saw throwing motions.

7              The question was, "So these individuals, you

8    saw them in a throwing motion, but you don't know what

9    they were throwing?"

10             He said, "Yes."

11             So he didn't -- that's what he said.

12             But yes, he -- I did hear the testimony

13   of -- that there was a audio that said, "Stop

14   throwing --"

15        Q.    "Rocks, bro"?

16        A.    "-- rocks bro," yes.

17        Q.    All right.  And when the Maryland Heights

18   Lieutenant and the officers went over to arrest them,

19   Mr. Coleman and Mr. Green didn't offer any resistance;

20   is that correct?

21        A.    I think that's what I read, yes.

22        Q.    So you would not be expressing any opinions

23   regarding force that was used?

24        A.    No, because we -- again, we have a dispute of

25   facts.
```

134

```
 1          Q.     What's the dispute?

 2          A.     I think, if I'm correct, Green and Coleman

 3     claim that they were thrown to the ground, that force

 4     was used against them, and we have the police officers

 5     that say they did not.

 6                 So again, we have a situation where an

 7     individual's arrested, a significant event in his life

 8     claiming that force was used against him.

 9                 Then you have police officers that did not

10     complete police reports or force reports

11     contemporaneously with the incident but did so eight

12     months later with Menzenwerth who had an opposite

13     opinion.

14                 So we have a dispute of the facts, and that's

15     really up to the jury to determine whether force was

16     used against them or not.

17          Q.     You did not put in the report, so I guess we

18     weren't prepared for it, I don't know where in those

19     depositions they said they were thrown to the ground,

20     but you think somewhere in the depositions they may have

21     said that?

22                 MR. LATTIMER:  They were shot repeatedly,

23          thrown to the ground, manhandled and handcuffed.

24          That's what they said in the deposition.

25                 MR. PLUNKERT:  What's the objection?
```

135

1              MR. LATTIMER:  I said what I said.

2              THE WITNESS:  So let's go through their

3         deposition, and this is the deposition of Damon

4         Coleman.

5              He said he was -- he had six bruises that he

6         believes came from projectiles from police

7         officers.

8              He said he felt six different impacts.  He

9         was hit in the chest.  He had Mace hit him in the

10        face or what may have turned out to be a pepper

11        ball hit him 'cause he -- he felt the effects of

12        Mace.

13             He says that he was kicked, he was struck

14        with an asp or a stick.

15             So without going through the rest of the

16        deposition, I'm going to say --

17   BY MR. HUGHES:

18        Q.    All right.

19        A.    -- that Mr. Coleman does claim that force

20   was --

21        Q.    Did either --

22             MR. LATTIMER:  Let him finish.

23   BY MR. HUGHES:

24        Q.    Did either one of them have medical

25   treatment?

136

```
 1          A.     I don't believe so.

 2          Q.     Let's talk about Antawn Harris.

 3                 What opinions --

 4                 MR. LATTIMER:  A-N-T-A-W-N.

 5                 MR. HUGHES:  Antawn.

 6                 MR. LATTIMER:  A-N-T-A-W-N.   You're calling

 7          him "Antoine".

 8   BY MR. HUGHES:

 9          Q.     Antawn.  Okay.  Are you going to render any

10   opinions with regard to Antawn Harris and St. Louis

11   County?

12          A.     Yes.

13          Q.     What opinions?

14          A.     That force was used against him that was not

15   documented by those that used the force.

16          Q.     And --

17          A.     And my same opinion would be that that's not

18   consistent with widely accepted police practices

19   regarding the use of force.

20          Q.     Force was used against Antawn Harris by whom,

21   just so we understand?

22          A.     I don't think we know who used the force.

23          Q.     Okay.

24          A.     But let me look -- let me look at

25   Menzenwerth's report.
```

137

 1            We don't know who used the force against

 2       Antawn.

 3            Q.    All right.  Now, you don't know who used the

 4       force against Antawn Harris, but you will not be saying

 5       that force was pursuant to the official policy, you

 6       know, of St. Louis County; is that correct?

 7            A.    Can you repeat that question?

 8            Q.    Yeah.  I guess I didn't ask a good question.

 9            You said the force was not documented.  Are

10       you going to say that the official policy of St. Louis

11       County is don't document force, use of force?

12            And if so, what is the specific policy?

13       Identify it.

14            A.    I would say that the St. Louis County Police

15       Department has a -- without even seeing it, I know that

16       they have a policy regarding a documentation of force.

17            Q.    Okay.

18            A.    But I would also offer that in the arrests

19       that we're talking about, and we're not talking about

20       one arrest, we're talking about a series of arrests by

21       different officers, sometimes the same officers where

22       force was used, arrests were made and none of it was

23       documented by the arresting officers or those that used

24       the force itself.

25            So they have a policy that says you should

138

1    document probable cause in arrests.

2            There's another policy that says you should

3    document force, but these officers, all of these

4    officers violated that policy, and perhaps it became the

5    custom and the practice during the riots --

6        Q.    Okay.

7        A.    -- not to do so, and that would not be

8    consistent with widely accepted practices.

9        Q.    You're not aware of any custom prior to

10   August 11th, 2014; is that a fair statement?

11       A.    I am aware of the --

12       Q.    And if so, identify it.

13       A.    Okay.  The Department of Justice conducted an

14   investigation of the Ferguson Police Department where

15   they've identified a custom and practice of arrests

16   without probable cause, force that was used that was not

17   documented and not reviewed by supervisors.  That's for

18   Ferguson.

19            I don't -- they did not investigate St. Louis

20   County for that, but what they did say in the Department

21   of Justice After-Action Report of the civil

22   disturbances, they did indicate that force was not

23   documented and was not tracked and should be.

24            They also indicated that even though we're in

25   a -- the police officers found themselves in a difficult

1    situation, in the middle of a riot, that does not

2    alleviate them of the responsibility to complete

3    those -- to track and document force.

4        Q.    I notice you did pick out a few things that

5    were said in those reports and you included them in your

6    18-page written report; is that correct?

7        A.    Yes.

8        Q.    And so what you're saying is you read the

9    176-page COPS Report and 184-page After-Action Report,

10   and after doing that you repeated some things, such

11   as you said force was not documented and tracked?

12       A.    Yes.

13       Q.    Okay.

14       A.    And one of the reasons why --

15       Q.    But --

16       A.    -- often times I do that in my reports is

17   because I've had attorneys, defense attorneys question

18   me about my opinions and say, "Well, that's your

19   opinion, and who else's opinion is it?"

20            So often times I provide supportive material

21   that would convey to the reader that this is not just my

22   opinion.  This is widely accepted police practices.

23       Q.    Yeah, yeah.

24       A.    And that's why I included the Department of

25   Justice's reports.

140

```
 1          Q.     Let's go back to my question.

 2                 My question was -- and I wasn't asking your

 3     opinion in my question.

 4                 My question was with regard to facts.

 5                 It was prior to August 11th, 2014 there is no

 6     custom of St. Louis County that you're aware of --

 7          A.     Yes.

 8          Q.     -- is that correct?

 9          A.     Yes, correct.

10          Q.     I guess you're aware that Mr. Harris had a

11     photograph that was, you know, posted on his Twitter

12     account or he posted on the Internet that showed the

13     bridge of his nose up here, you know, redness,

14     swelling?

15          A.     Yes.

16          Q.     And you're aware that this happened on a day

17     when, you know -- August 11th there had been significant

18     rioting the night before and also then on this date; is

19     that correct?

20          A.     Yes.

21          Q.     Which included rocks being thrown?

22          A.     Yes.

23          Q.     So you don't even know how he received this

24     injury where he had some redness and swelling at the

25     bridge of the nose; is that correct?
```

141

1        A.      No.  I wasn't there.

2        Q.      Right.

3        A.      But I -- we have his statement, his

4   deposition and then you have police officers that saw

5   him and then had a vision blocked by a vehicle and then

6   subsequently saw him on the ground, so no, I don't know

7   how he received that injury.

8        Q.      So I mean, as far as you know, he could have

9   been injured by a rock; is that correct?

10        A.      I don't know how he -- how he -- what

11   projectile struck him.

12        Q.      And as far as you know, you said, you know, a

13   vehicle drove by.

14               Do you know whose vehicle that was?

15        A.      I believe it was -- I'm going to look at it

16   right now.

17               It was the St. Louis Metropolitan Police

18   Department's SWAT vehicle.

19        Q.      So that's the City of St. Louis?

20        A.      Yes.

21        Q.      You're aware of that?

22        A.      Yes.

23        Q.      So it was not a St. Louis County vehicle?

24        A.      The vehicle was not a St. Louis County

25   vehicle.

```
 1          Q.     So --

 2          A.     Well, the officer that saw him before and

 3     after was with the St. Louis County Police.

 4          Q.     Yeah, an officer that was on the street; not

 5     in the vehicle?

 6          A.     Yes.

 7          Q.     And do you even know what his injury was,

 8     what his diagnosis was?

 9          A.     I believe his father took him to the

10     hospital, but I don't recall what the diagnosis was.

11          Q.     Were you furnished his medical records in the

12     emergency room?

13          A.     I don't recall whether I was or not.

14          Q.     If I told you that the diagnosis was a

15     contusion and abrasion, which is a bruise and a scrape,

16     and he was discharged one hour -- less than an hour

17     after being seen by an emergency room nurse, would you

18     have any reason to dispute that?

19          A.     No.

20          Q.     Let's talk about Nathan Burns, Monday, August

21     11th, around 11:00 p.m. or 11:30 p.m.

22                 This happened at the West Florissant and

23     Highmont Drive area?

24          A.     Yes.

25          Q.     Again, you don't dispute there was rioting
```

143

1      the night before and that night too?

2             A.     Do not dispute that.

3             Q.     And you don't dispute that the crowd was

4      being told to disperse?

5             A.     There's been reports of that, so I don't

6      dispute it.

7             Q.     You don't dispute that rocks are being thrown

8      at police?

9             A.     Do not dispute it.

10            Q.     And what opinions are you going to be

11     rendering with regard to Nathan Burns?

12            A.     The same opinions I rendered on every other

13     arrest in that Nathan Burns was arrested by St. Louis

14     County Police Department, that the arresting officers

15     failed to document probable cause in an arrest report

16     and in a charging document.

17                   Because they failed to document it in a

18     report or a charging document, there could be no

19     supervisory review to ensure that the report and the

20     elements of the crime were contained in the report by a

21     supervisor.

22                   And I also know that force was used against

23     Nathan Burns, and the same officers failed to document

24     that force in a Use of Force Report, and by doing so,

25     they failed to allow for a supervisory review of the

144

```
 1     force to ensure that it was within policy and that it

 2     was objectively reasonable.

 3               I'm also of the opinion that by Menzenwerth

 4     doing a report eight months later through his interview

 5     and refreshing process of their memory, that -- all of

 6     that is inconsistent with police practices and would

 7     also be in violation of their own policies regarding

 8     arrests and force.

 9     Q.    When you say you know force was used against

10     Burns, can you specify what force you're talking about?

11     A.    Nathan Burns reports that he was pepper

12     sprayed, he was drenched with the spray.

13               It soaked through his clothes, so it was not

14     just one application of pepper spray.

15               He had his hair pulled.  He was slammed to

16     the ground.

17               He -- a police officer put a finger in his

18     ear.

19               He claims another police officer reached into

20     his pants with -- and touched his private parts with --

21     with -- I believe he may have said there was Mace on the

22     officer's hands or he used Mace to spray him even

23     further, so he claims that there was force.

24               Officers of the St. Louis Metropolitan Police

25     Department deployed -- let me -- let me rephrase -- let
```

1    me strike that.

2              So officers of the St. Louis Metropolitan

3    Police Department deployed OC spray at persons.

4              One of them may have been Burns.  They don't

5    really say that for clarity in their report.

6         Q.    Again, the Metropolitan Police Department is

7    the City Police Department?

8         A.    Correct.

9         Q.    Okay.

10        A.    So that's the information we have from

11   Mr. Burns.

12        Q.    Now, Mr. Burns testified, correct me if I'm

13   wrong, that he offered no resistance; is that correct?

14        A.    I don't dispute that.

15        Q.    Now, you would agree then that if you're

16   talking about the OC spray, that was done by the City

17   Police Department, the St. Louis Metropolitan Police

18   Department; is that correct?

19        A.    There's a -- a -- first of all, there's a

20   report that the Metropolitan Police Department used OC

21   spray.

22              That doesn't mean other agencies didn't --

23   did not use OC spray.  We do know that they did.

24        Q.    Yeah.  Okay.  Did anyone see a St. Louis

25   County police Department use OC spray?

146

```
 1          A.    I didn't see it reported.

 2          Q.    Well, did even Nathan Burns see a St. Louis

 3    County Police Department use OC spray?

 4          A.    I don't think he -- he was able to identify

 5    who used OC spray, but what he did say was that the

 6    arresting officers used OC spray on him and those were

 7    McCann, McCoy and Hill of the St. Louis County Police

 8    Department.

 9                The other thing I would say about Nathan

10    Burns is that he was turned over to -- to paramedics and

11    then to the hospital, so he was never even taken into --

12    to be booked in either -- in the County Jail.

13          Q.    Are you confusing Nathan Burns with somebody

14    else?

15          A.    I don't think so.  I'm -- I'm reading from my

16    notes.

17          Q.    Yeah.

18          A.    And I'm saying he was turned over to

19    paramedics, hospitalization, then home.

20          Q.    You have notes, you know, summarizing your

21    notes of --

22          A.    No.  Right here I have TOT paramedics, then

23    arrow to hospital and then home 'cause it was unknown

24    who transported him.

25          Q.    Okay.  Are you thinking of Dwayne Matthews
```

```
 1    there?

 2         A.    No, because Dwayne Matthews was escorted by

 3    two females and eventually made his way home and was

 4    transported to the hospital.

 5         Q.    That's what you think?

 6         A.    Yeah.

 7         Q.    All right.  It would be --

 8         A.    Oh, wait.  No.  Wait a minute.  Matthews was

 9    not transported -- Matthews was arrested and booked.

10               Nathan Burns I think was the one that was

11    turned over to the paramedics because of all of the OC

12    spray that he claimed he had.

13         Q.    So you're again saying that Dwayne Matthews

14    was arrested and booked?

15         A.    We can go back and look at Dwayne -- let me

16    pull out the Dwayne Matthews files.

17         Q.    It would have been easier if you would have

18    put these things in your report so --

19         A.    Well, the thrust of my report still -- it

20    doesn't matter what happened to these individuals

21    afterwards.

22               The thrust of my report is the fact that the

23    arrests were not documented, nor was the force

24    documented.

25         Q.    So well, anyway, let's concentrate on Nathan
```

1    Burns.

2              So just so I understand, as you sit here

3    today, you're not going to testify as far as you know

4    that there's no arguable probable cause to arrest Nathan

5    Burns because you believe he was not arrested, he was

6    just turned over to paramedics right away and then taken

7    to the hospital; is that correct?

8         A.    Let me review the record.

9              MR. LATTIMER:  That's a negative question.

10        What is the question?

11             THE WITNESS:  No.  Nathan Burns was taken to

12        the Justice Center.

13   BY MR. HUGHES:

14        Q.    All right.  Okay.  So --

15        A.    So my note there was incorrect.

16        Q.    All right.  Are you going to be rendering any

17   opinions regarding arguable probable cause for the

18   arrest of Nathan Burns?

19        A.    I'm going to offer the same opinions I've

20   offered in my report and I've gone over with each and

21   every arrest.

22        Q.    Well, just so we understand, Nathan Burns,

23   your opinions will be -- oh, wait.

24              You already said report eight months later,

25   refreshed memory, inconsistent with police practices and

```
1     violation of own policies regarding arrest; is that

2     correct?

3          A.    And use of force.

4          Q.    And use of force.

5               I guess you're accepting -- well, you're

6     accepting, since you mentioned it as possibly true, that

7     Mr. Burns was slammed into the ground, a police officer

8     put his finger in his ear, another police officer

9     touched his private parts and this was with Mace; is

10    that correct?

11         A.    Mace on -- what Mr. Burns testified to in his

12    deposition, that a police officer had Mace on his hands

13    and reached into his pants and touched his private

14    parts.

15         Q.    All right.

16         A.    And I'm not -- again, the problem with each

17    of these arrests is that you have somebody being

18    arrested, force being used against them.

19              It's a significant event in their life and

20    they're reporting that this is what happened.

21              You then have police officers who normally

22    would report arrests and probable cause and force

23    contemporaneously.

24              When they do it eight months later through

25    Menzenwerth and we have Menzenwerth indicating that he
```

150

1    had to refresh the memory of all of the officers and go

2    over the facts with them, their -- that report becomes

3    less credible, calls -- calls into question the accuracy

4    and thoroughness of the reporting.

5              And that is why police officers are taught

6    nationally when you make an arrest, you document it as

7    soon as possible, as soon as practical.  It's usually

8    done before the end of the shift.

9              When you use force, you document it so that

10   years later there's no question about what they remember

11   because they put it in the police report

12   contemporaneously with the event.  Police officers are

13   taught this from day one.

14             And I'm going to -- I started law enforcement

15   in 1974.

16             A lot of things have changed in law

17   enforcement since 1974.

18             What has not changed, what remains in effect

19   today is that when you make an arrest, you articulate

20   probable cause in a police report, in a charging

21   document.

22             What remains in effect is that when you use

23   force, you report that force and document it.

24             What remains in effect is police reports and

25   probable cause affidavits are to be reviewed by

151

```
1    supervisors.

2              What remains in effect is Use of Force

3    Reports are to be reviewed and investigated by -- by

4    supervisors.

5              That has not changed.

6              And that never happened in any of these

7    arrests.

8         Q.    Can I finish my question?

9         A.    And that is -- that is not consistent with

10   widely accepted police practices.

11        Q.    You indicated that you accept Mr. Burns'

12   statement that his hair was pulled, he was slammed into

13   the ground, a Mace-coated finger was placed in his ear,

14   another police officer with Mace on his hand touched his

15   private parts, and I guess you're saying that if that

16   force was used, then of course a Use of Force Report

17   should be prepared, but you understand the police

18   officers testified that the County police officers used

19   no force against Mr. Burns; the City Police Department

20   put OC spray on him?

21             MR. LATTIMER:  That's not true at all.  That

22        misstates the facts.

23             THE WITNESS:  You started your long

24        statement with I accepted those facts as reported

25        by Burns.
```

```
 1                  I never said I accepted those facts.

 2                  Those facts remain in dispute --

 3      BY MR. HUGHES:

 4           Q.    Okay.

 5           A.    -- because the police officers failed to

 6      document anything that -- failed to document the arrest,

 7      the probable cause and force.

 8           Q.    You read the police officers' testimony.  You

 9      know they testified they used no force, the County

10      police officers testified they used no force against

11      him, correct?

12           A.    I'll accept that's what --

13           Q.    Okay.

14           A.    -- they said.

15           Q.    And if they used no force against him, then

16      they're not required to do a Use of Force Report; is

17      that correct?

18           A.    Correct.

19           Q.    But on whether or not force was used, were

20      you furnished with the medical records of Mr. Burns at

21      the Justice Center when he was seen by an intake nurse

22      who took his history and physical?

23           A.    I don't recall at this moment whether I did

24      or not.

25           Q.    Well, let me tell you that when you listed
```

153

1    earlier in your report everything that you reviewed, you

2    did not list that you reviewed the medical records of

3    Nathan Burns.

4             So am I to assume that you were not furnished

5    those medical records?

6         A.    If I did not list them in my report, then I

7    did not review them.

8         Q.    Okay.

9         A.    Because I would have listed everything that I

10   did review, unless it was included somewhere else where

11   I missed it or bunched it together, but I don't recall

12   reading medical reports and -- on Nathan Burns.

13        Q.    So were you aware that Nathan Burns did not

14   mention to the nurse that he was suffering any effects

15   from Mace?

16        A.    Am I aware or not aware?

17        Q.    Are you aware?

18        A.    That he did not mention.  I'm not aware of

19   the conversation, so I can't be aware of what he may or

20   may not have said.

21        Q.    So I mean, if the medical records indicate

22   that he did not have any mention of the effects of Mace

23   and he had no complaint of pain except for a backache

24   but he said he had a recurrent problem in the lumbar

25   area that he was seeing some other doctor for, would you

154

1    have any reason to dispute that?

2         A.    If there's a -- I'm not sure how you're

3    asking --

4         Q.    Well -- well -- well -- well -- well, let me

5    say this.

6         A.    Go ahead.

7         Q.    If it's true that he had no complaints of

8    pain other than the backache that he was already getting

9    treatment for and he had no complaints of the effects of

10   Mace when he was seen by the intake nurse at the Justice

11   Center after he was arrested, would that suggest to you

12   that there was no force used against him except for the

13   Mace, but with fresh air and time the Mace had even --

14   you know, the effects were gone by then?

15        A.    No.

16             MR. LATTIMER:  That's beyond his expertise

17        anyway.

18   BY MR. HUGHES:

19        Q.    Tell us why the answer is no.

20        A.    Because you're saying that because something

21   is not included in the report, a medical report, that it

22   didn't happen.

23             Of course it could have happened.

24   Anything -- he could have told the nurse anything or a

25   lot of things.

155

1         Q.    All right.

2         A.    But because she didn't record it, it doesn't

3    mean it didn't happen.

4               So you're asking me to come to a conclusion

5    that he didn't say something because it wasn't mentioned

6    in the report.

7               What I can conclude is that it wasn't

8    mentioned in the report.

9               That's all I can conclude.

10        Q.    Are you going to give an opinion that there

11   was not arguable probable cause to arrest Nathan Burns?

12        A.    No.  My opinions are going to be dealing

13   with --

14        Q.    That's fine.

15        A.    -- the failure to articulate probable cause.

16        Q.    But if an officer truly did pull him by the

17   hair while he was not resisting and then put a finger in

18   his ear with Mace and touched his private parts with

19   Mace, then I guess your opinion is that would be

20   excessive; is that correct?

21        A.    Yes.

22        Q.    Okay.

23        A.    But back to whether there was probable cause

24   or not, I'm going to -- what I'm saying is that there's

25   a dispute of facts because of what Nathan Burns says

156

```
1       versus what the police officers say, and when the police
2       officers say something through Menzenwerth eight months
3       later --
4               Q.    Yeah?
5               A.    -- the credibility --
6               Q.    Well --
7                     MR. LATTIMER:  Let him finish.  Let him
8               finish.
9                     THE WITNESS:  -- the accuracy and the
10              thoroughness is questioned --
11                    MR. LATTIMER:  Let him finish.
12                    THE WITNESS:  -- and that's a determination
13              for the jury to decide who's credible.
14      BY MR. HUGHES:
15              Q.    I just don't want any surprises at trial and
16      that's why I asked you if you would be giving an opinion
17      and I'll accept the answer you just gave me --
18              A.    Okay.
19              Q.    -- regarding arguable probable cause.
20                    MR. LATTIMER:  The man's opinions are set
21              forth in his report and they're very clear.
22                    MR. HUGHES:  Well, I need a little water,
23              but I still have a little bit more to go, but I'd
24              be happy to let Tom Plunkert talk about his
25              people.
```

157

```
 1              MR. PLUNKERT:  Bob, Bob.

 2              MR. HUGHES:  Bob Plunkert.  I'm thinking of

 3         his dad.  Bob Plunkert.

 4              MR. PLUNKERT:  Why don't we take a short

 5         break.

 6              (Thereupon, a recess was taken at 1:10 p.m.,

 7         after which the deposition continued at 1:50

 8         p.m.)

 9                        CROSS-EXAMINATION

10    BY MR. PLUNKERT:

11         Q.    On the record, "pew" like a church pew is

12    how you say "Pusins" and I will remember when it comes

13    up.

14              Mr. Pusins, my name is Bob Plunkert.

15              I represent the City of Ferguson and Tom

16    Jackson, Justin Cosma and the Maryland Heights police

17    officers, which are Brandon McKinnon, Matt Delia and

18    Ryan Devouton.

19              You're aware of that, correct?

20         A.    Yes.

21         Q.    And if I refer to the last three individuals

22    that I named, is it okay to refer to them as the

23    Maryland Heights police officers?

24         A.    Yes.

25         Q.    We were off the record making small-talk and
```

158

```
1     I was asking you for your position, because out of
2     respect, I refer to officers in their rank.
3               You informed me that currently the position
4     that you are serving with Broward County Sheriff's
5     Department is a civilian position but has a comparable
6     rank; is that right?
7          A.    Yes.
8          Q.    Okay.
9          A.    So --
10         Q.    Go ahead.
11         A.    My rank is -- my position is Executive
12    Director.
13         Q.    So you said just to call you Bob, right?
14         A.    Bob works well.
15         Q.    I want to begin with -- I mean, as you know,
16    the Defendants that I represent have kind of different
17    incidents, so I'll try to take one incident at a time if
18    that's okay with you.
19         A.    Okay.
20         Q.    I'll try to do the one that I believe will be
21    far shorter first, which will be the Tracey White and
22    William Davis claim.
23         A.    Yes.
24         Q.    Do you have a binder for them?
25         A.    Yes.
```

1        Q.    Do you mind if I mark that binder?

2              (Thereupon, Defendant's Exhibit C was marked

3        for identification.)

4  BY MR. PLUNKERT:

5        Q.    Sir, this binder that we've marked as

6  Exhibit C is a binder in your file for this case that

7  pertains to the arrests of Tracey White and William

8  Davis, correct?

9        A.    Yes.

10       Q.    Now, we can bypass a lot of this work here.

11            Earlier you had some questions regarding

12  Justin Cosma.

13            Do you remember those questions?

14       A.    Yes.

15       Q.    I'm going to be pretty direct on these.

16            In your thorough review of the case, at any

17  point did you come across any evidence that Justin Cosma

18  was involved in the arrest of either Tracey White or

19  William Davis?

20       A.    No.

21       Q.    To a reasonable degree of certainty Justin

22  Cosma was not involved in the arrest of William Davis or

23  Tracey White, correct?

24       A.    Correct.

25       Q.    To a reasonable degree of certainty Justin

160

```
 1    Cosma did not use any force against William Davis or
 2    Tracey White, correct?
 3         A.    Correct.
 4         Q.    Now, are you familiar with who Tom Jackson
 5    is?
 6         A.    Yes.
 7         Q.    You're aware that he has retired from the
 8    City of Ferguson Police Department as of around March of
 9    2015, correct?
10         A.    Yes.
11         Q.    Tom Jackson to a reasonable degree of
12    certainty was not involved in the arrest of Tracey White
13    or William Davis, correct?
14         A.    He wasn't personally involved, correct.
15         Q.    Okay.  He did not use any force with respect
16    to the arrests of William Davis and Tracey White,
17    correct?
18         A.    Correct.
19         Q.    Now, you mentioned he was not present.
20               Did Tom Jackson have any involvement at all
21    in those arrests?
22         A.    Oh, I believe he did.
23         Q.    And what is that?
24         A.    When I look at the deposition of Chief Belmar
25    from the St. Louis County Police Department, he clearly
```

1    indicates in his deposition that Chief Jackson and him

2    were incident commanders over the events that took place

3    until Captain Johnson of the Missouri State Police was

4    appointed by the Governor, I think it was on perhaps the

5    14th.

6            So Chief Belmar takes the position that it

7    was a joint command and, yes, Chief Jackson was involved

8    and participated in the command of that response to the

9    riots.

10       Q.    And you have read Chief -- well, let's say

11   Tom Jackson's deposition transcript, correct?

12       A.    You know, I did not.  I looked for it in the

13   files and looked several times, and I did not come

14   across it, so I did not -- I don't have a record of

15   seeing or having that deposition.

16       Q.    All right.  You agree that if Tom Jackson

17   spoke to the topic of that joint command, that it's

18   something that is pertinent to that opinion that you

19   just gave, correct?

20       A.    Yes.

21       Q.    And we'll use the word "joint command".

22   That's something that Chief Belmar used, correct?

23       A.    I believe so.  I'm happy with that.

24       Q.    And is that Chief Belmar's deposition that

25   you have in front of you, sir?

```
1          A.     It is.

2          Q.     And I see you have some notes on it?

3          A.     Yes.

4          Q.     We can do this at any appropriate time and

5    whatever fashion that you'd like, but I'd like to mark

6    your file.

7                 If that's a portion of a bigger folder, we

8    can mark the bigger folder.

9          A.     No.

10         Q.     Okay.

11         A.     This is his deposition with my notes attached

12   underneath the cover.

13                MR. PLUNKERT:  Can we mark this as Exhibit D,

14         please?

15                MR. LATTIMER:  The deposition?

16                MR. PLUNKERT:  Yes.

17                THE WITNESS:  It's a deposition transcript of

18         Belmar.

19                MR. PLUNKERT:  Which contains notes.

20                MR. LATTIMER:  Why don't you just take the

21         notes as opposed to the deposition?  Why are we

22         putting a deposition in another deposition?

23                MR. PLUNKERT:  Because I'd like to and there

24         are highlights.

25                             - - -
```

163

```
1                    (Thereupon, Defendant's Exhibit D was marked

2           for identification.)

3    BY MR. PLUNKERT:

4           Q.    Sir, I have just handed what we marked as

5    Chief Belmar's deposition with your notes and your

6    highlights as Exhibit D, correct?

7           A.    Yes.

8           Q.    I'll hand it back to you, but I'm flipping it

9    to a certain page for your reference in answering the

10   following questions.

11                   And by the way, this exhibit is two-sided.

12                   All right.  And can you turn to Page 66?

13          A.    Let me just do this first.

14          Q.    Sure.

15          A.    Yes.

16          Q.    And I've noticed that you've highlighted a

17   portion of Exhibit 66 where Chief Belmar is speaking of

18   the joint command with Chief Jackson, correct?

19          A.    Yes.

20          Q.    Now, I noticed that you didn't highlight the

21   question and answer immediately thereafter, unless I'm

22   reading incorrectly and correct me if I'm wrong, where

23   he speaks to -- thank you -- the very following line,

24   19, the question is whether Chief Belmar was ultimately

25   in charge, correct?
```

164

```
 1          A.     Yes.

 2          Q.     And he responds he is, correct?

 3          A.     Yes.

 4          Q.     Now, I want you to assume -- I know you

 5     haven't read Tom Jackson's deposition.

 6                 I want you to assume that Tom Jackson

 7     testified by joint command, he had indicated that Tom

 8     Jackson was Chief and in charge of certain areas of

 9     Ferguson while Chief Belmar -- and I'm speaking about

10     before the 14th.

11          A.     Yes.

12          Q.     And after the 9th while Chief Belmar was in

13     charge of the West Florissant area and the protests and

14     the immediately surrounding areas.  Okay?

15          A.     Yes.

16          Q.     Now, assuming that, I want you to -- well,

17     this arrest of Tracey White and William Davis, that was

18     off of West Florissant, correct?

19          A.     Yes.

20          Q.     And in the immediately surrounding areas,

21     correct?

22          A.     Yes.

23          Q.     You agree that Chief Belmar was ultimately in

24     control and in charge of that area, correct?

25          A.     According to his own testimony, yes, but he
```

1    also says that's in joint command with Chief Jackson,

2    but I understand that is what he says.

3          Q.    With all that information, I'll ask you in

4    your opinion who in the joint command, where does the

5    buck stop?

6                Who is in charge of the area where Tracey

7    White and William Davis were arrested?

8          A.    I think I'm the wrong person to be asking

9    who's ultimately in command.

10         Q.    Okay.

11         A.    We do have the testimony of Chief Belmar, who

12   indicates there's a joint command, but then he talks

13   about ultimate command.

14               I think the follow-up question could have

15   been, "What exactly does that mean?  What does it mean

16   by ultimate person in this situation?" because that's

17   what it says, "You're the ultimate person in this

18   situation?"

19               It doesn't say, "You're the ultimate

20   commander?"

21               It says, "You're the ultimate person?"

22               I don't really know what that means.

23         Q.    So is it my understanding that you don't have

24   enough information to answer that question and offer an

25   opinion?

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

1          MR. LATTIMER:  What question?

2          MR. PLUNKERT:  The one that I just asked,

3     sir.  He was just answering it the first time.

4          THE WITNESS:  What I answered earlier was

5     that Chief Belmar testified that there was a joint

6     command and Chief Jackson was part of that.

7          And Page 66, Line 14, we'll start at Line 11,

8     the question was, "So during that period of August

9     11th through the 14th you were the person in

10     charge, right?" question mark.

11          He says answering, "I shared that

12     responsibility with Chief Jackson."

13          And then he goes on to mention some others.

14          And then the follow-up question is, "Okay.

15     But you were the ultimate person in this

16     situation?"

17          I don't know what "ultimate person" is.

18     There could be many meanings to that, so I don't

19     want to conclude that that means that he's in

20     charge because a second ago he said he shared

21     responsibility.

22     BY MR. PLUNKERT:

23     Q.    And it may very well be that you cannot

24     render an opinion to a reasonable degree of certainty

25     on this, and I just want to know if you can or you

1    can't.

2              So I'll ask you based on your review of the

3    case and the files that were provided to you, do you

4    have an opinion to a reasonable degree of certainty who

5    was at the top of chain of command for the arrests of

6    Tracey White and William Davis?

7         A.   I -- I think I'm the wrong person to ask, so

8    I would say that you would have to ask Chief Jackson and

9    you would have to ask Chief Belmar, but according to

10   what I'm reading here, Chief Belmar claims that he

11   shared the responsibility.

12        Q.   Okay.

13        A.   So no, I can't tell you in certainty who was

14   in charge.

15             I can only tell you what the Chief reported

16   or testified to.

17        Q.   With respect to those two arrests, Tracey

18   White and William Davis, who was the final policymaker?

19             And if you're not familiar with the term,

20   that's a term of law that comes from 1983.

21             Are you familiar with that?

22        A.   Why don't you go ahead and explain it to me

23   because I'm not an attorney and I wouldn't want to

24   misinterpret a term of law.

25        Q.   Well, we'll go with who is it at any

168

1    governmental entity, whether it be the County or the
2    City of Ferguson, and if you don't know, again, just
3    tell me you don't have an opinion on it and we can move
4    on, who was the final policymaker regarding the arrests
5    of Tracey White and William Davis?
6        A.   I don't know for certain, but what I would
7    offer is that if you have two Chiefs, one from the City
8    of Ferguson and one from St. Louis County who are in
9    joint command, that they're both responsible for the
10   policies and the actions of the officers during that
11   event.
12            Now, that's a layman's response.
13            A legal decision is beyond my scope of
14   expertise.
15       Q.   And again, that aspect of joint command and
16   who's ultimately at the top of the chain, you just
17   referenced you don't have an opinion as to that, right?
18       A.   I'm saying according to Belmar, they're --
19   they're both -- they shared responsibility and that's
20   the language that he used, he shared that responsibility
21   with Chief Jackson.
22       Q.   Well, okay.  And I thought you didn't have an
23   opinion.
24            Do you have an opinion as to the joint
25   command and who was ultimately in charge of that area?

169

```
 1        A.    Yes, I do have an opinion --

 2        Q.    Okay.

 3        A.    -- based on what Chief Belmar is stating, and

 4   he's stating that he shared the responsibility with

 5   Chief Jackson.

 6              I can only accept what he says without any

 7   further information or questioning of Chief Belmar or

 8   questioning of Chief Jackson.

 9              I -- I accept what he says, that it's a joint

10   responsibility.

11        Q.    Do you accept at least for those two areas

12   what he says, that he was ultimately in charge?

13        A.    No, 'cause I don't know what the ultimate

14   person means.

15              It doesn't say he was ultimately in charge.

16              It says, "But were you the ultimate person in

17   this situation?"

18              You're inferring that that's what it means.

19              I don't know if that's what it means or if

20   that's what he's responding to.

21        Q.    Do you --

22        A.    It's more of a question for him than for me I

23   would think.

24        Q.    Well, if you're going to render opinions,

25   it's a question for you.
```

```
 1              Go ahead.  I mean, what I'm trying to get at
 2    here is -- first of all, the word "ultimate" means last,
 3    correct?
 4              MR. LATTIMER:  Under whose definition?
 5    BY MR. PLUNKERT:
 6         Q.   Well, we can pull out that dictionary if you
 7    want, but "ultimate" means last, doesn't it?
 8         A.   Perhaps.  I'll take your word for it.
 9         Q.   Okay.
10         A.   There's probably a number of definitions of
11    "ultimate", but perhaps that's one of them.
12              MR. LATTIMER:  I can assure you that
13         "ultimate" doesn't mean last, and you can pull out
14         whatever dictionary you want.
15    BY MR. PLUNKERT:
16         Q.   We will.
17              Well, it just so happens that since we're at
18    a court reporting office, we have a 10th edition of
19    Merriam-Webster's Collegiate Dictionary; is that right,
20    sir?
21         A.   Yes.
22         Q.   And you believe this to be an authoritative
23    work on definitions of words, don't you?
24              MR. LATTIMER:  Objection.  This man is not
25         here to testify about what is an authoritative book
```

```
 1            on words.
 2       BY MR. PLUNKERT:
 3            Q.    Subject to that, you may answer.
 4            A.    I'm not -- I will accept what's in the book,
 5       but I'm not an authoritative on dictionaries or words or
 6       say that this is the only source of definitions.
 7            Q.    And excuse my reach.  I'm just trying to keep
 8       the place.
 9                  And if you can read the first definition of
10       "ultimate".
11            A.    Farthest, comma, last, final.
12            Q.    Last, final, right?
13            A.    Do you want me to keep this open?
14            Q.    No.  That's okay.  That's all we need.
15                  You would agree that last, final, those are
16       definitions for "ultimate", correct?
17            A.    Yes.
18            Q.    You agree that Chief Belmar said he was
19       ultimately in charge of the area, correct?
20                  MR. LATTIMER:  He's answered that four times
21            and he's read to you that Chief Belmar never said
22            that.  Chief Belmar never said that.
23                  Are you going to keep asking the same thing
24            here?
25                              - - -
```

```
1     BY MR. PLUNKERT:

2          Q.    Subject to that, you may answer.

3                MR. LATTIMER:  The last time, one more time,

4          read to him what it says.

5                THE WITNESS:  I go back to Line 14.

6     BY MR. PLUNKERT:

7          Q.    I'm asking about 19.

8                MR. LATTIMER:  No, no.  Let him finish.  You

9          said answer the question.

10               If you want to keep asking this same old

11         question, then let him answer the question the way

12         he wants to answer the question again.

13    BY MR. PLUNKERT:

14         Q.    Sir, is it true that Chief Belmar said,

15    "Okay.  But you were the ultimate person in the

16    situation?"

17               He responded, "I was, yes."

18         A.    That's what the --

19               MR. LATTIMER:  He's read that four times.

20    BY MR. PLUNKERT:

21         Q.    Okay.

22         A.    That's what the transcript says.

23         Q.    Do you disagree with that line of his?

24         A.    I don't disagree that it's here.  I don't

25    have a complete understanding of any conversations that
```

173

1    he may have had with Chief Jackson regarding the shared

2    responsibility that he mentioned on Line 14, so I don't

3    know what he's meaning by saying, "You're the ultimate

4    person?"

5              I don't know what he's trying to say, but

6    what I am agreeing with is that -- what it says.

7         Q.    Okay.

8         A.    But you're asking me to interpret his

9    meaning, and that's what I'm saying, I can't do that.

10        Q.    You agree that Tom Jackson's testimony may

11   fill in the blanks where that line is concerned?

12        A.    From Tom Jackson's point of view, it could,

13   potentially.

14        Q.    And from the joint command definition that

15   those two had worked out?

16        A.    From Chief Jackson's point of view, perhaps,

17   but I don't know if that syncs with what Chief Belmar is

18   saying or was thinking.

19        Q.    All right.  Well, I want you to read Page 107

20   of Tom Jackson's transcript that I have here on my

21   computer.

22        A.    Okay.

23        Q.    And I can pull it over to you.

24        A.    Can I scroll down?

25        Q.    Of course.

174

```
 1          A.    Okay.

 2          Q.    Have you read that fully, sir?

 3          A.    Yeah, but don't take it away.  I need to --

 4          Q.    I do too.

 5                Do you agree in the West Florissant protest

 6    area, the highest ranking officer on the site was

 7    Lieutenant Colonel Dierkes who reported to Chief

 8    Belmar?

 9                MR. LATTIMER:  Objection.  How would he know

10          that?

11                MR. PLUNKERT:  He just read Tom Jackson's

12          deposition.

13                MR. LATTIMER:  Are you asking what he read or

14          what he knows?

15                MR. PLUNKERT:  After he's read it, I'm asking

16          what he knows.

17                MR. LATTIMER:  How could he know that?

18    BY MR. PLUNKERT:

19          Q.    Subject to that objection, sir, you may

20    answer.

21          A.    What Chief Jackson says is that the

22    Lieutenant Colonel was in charge.  Show it back to me.

23          Q.    Of course.  Of course.

24          A.    And that he would -- according to Chief

25    Jackson, the highest ranking officer in that area would
```

175

```
 1      have been Lieutenant Colonel Dierkes, D-I-E-R-K-E-S.

 2                   And he would report to Chief Belmar.  That's

 3      what Jackson says.

 4           Q.    And you hadn't read that before today,

 5      correct?

 6           A.    No, I don't recall seeing that.

 7           Q.    You don't have any reason to dispute this or

 8      give an opinion against the credibility of Tom Jackson

 9      when he says that, do you?

10           A.    No.

11           Q.    Do you accept that to be true?

12           A.    I accept that that's his opinion that he

13      articulated in the deposition.  I don't know whether it

14      was true or not.

15           Q.    And maybe I can wind it down this way.

16                   You don't have any opinions regarding who was

17      ultimately in charge in the area where Tracey White and

18      William Davis were arrested, correct?

19                   MR. LATTIMER:  He's answered that question

20            five times.

21                   THE WITNESS:  My opinion is that according to

22            Chief Belmar, there's a joint command.

23                   According to Chief Jackson, St. Louis County

24            is responsible for a certain area and Ferguson is

25            responsible for a different area, but they're still
```

176

 1              joint command, and I don't know that because they

 2              separated areas where the police officers are going

 3              to be.

 4                   That responsibility separated also when you

 5              have a joint command.

 6    BY MR. PLUNKERT:

 7         Q.    And so do you have an opinion as to who was

 8    ultimately in charge?

 9         A.    They're both in charge is -- is -- based on

10    what Chief Belmar says, they're both in charge, so I

11    wasn't there.  I didn't have conversations with them.

12              I can only garner what each of them said, so

13    if Belmar says they're both in charge, I'm going -- I'm

14    accepting that.

15         Q.    Let me offer it this way.

16              Can't there be joint command of a

17    municipality with different geographical areas having a

18    different person at the top of the chain?

19         A.    Yes.

20         Q.    Isn't it true that's what happened here with

21    St. Louis County and the City of Ferguson?

22         A.    I don't know whether it was true or not

23    because Belmar takes the position that there's joint

24    command.

25         Q.    Correct.

177

```
 1              Who was ultimately in charge of the Ferguson
 2   Police Department in that area?
 3              MR. LATTIMER:  Six times you've asked the
 4         same question.
 5   BY MR. PLUNKERT:
 6         Q.    The Ferguson Police Department in that area.
 7   That's not at this page right here.
 8         A.    Okay.  It's difficult for me to answer that
 9   question.
10              The question should be posed to the two
11   people that were in charge.  That's Belmar and Jackson.
12              I can only refer to Belmar's testimony where
13   he claims it's a joint command.
14         Q.    Okay.
15         A.    I'm accepting that.
16              What else can I do other than say, "Chief
17   Belmar, you're wrong."
18              He's saying there's a joint command.
19         Q.    No.  I'm not asking you to say, "Chief
20   Belmar, you're wrong."
21              I'm just trying to have you reconcile the
22   19th line, the 19th and 20th lines with the previous
23   lines that you mentioned joint command.
24              MR. LATTIMER:  He's an expert witness.  He's
25         not here to reconcile anything.
```

178

```
 1            All he can do is tell you what information he
 2       has.
 3            He's not opining about who had ultimate
 4       command.
 5            All he's opining about is that these were the
 6       two people who were in charge.
 7            These are the two people who had established
 8       policy and these are the policies that were
 9       deficient and this is why.
10            His job is not to reconcile whether it was
11       one or the other.
12  BY MR. PLUNKERT:
13       Q.   Well, sir, then you aren't here to render an
14  opinion as to who the final policymaker was with respect
15  to the arrest of Tracey White and William Davis,
16  correct?
17            MR. LATTIMER:  Final policymaker -- first of
18       all, you're talking about something that's not
19       involved --
20            MR. PLUNKERT:  Make a form objection.  We
21       need to move this along and all you're doing is
22       making speaking objections.
23            MR. LATTIMER:  You keep asking him the same
24       questions over and over again and you're talking
25       about a policymaker.
```

```
 1            A final policymaker is not the ultimate

 2       person necessarily.

 3            In other words, you could have a Mayor --

 4            MR. PLUNKERT:  Now this is coaching the

 5       witness.  This is coaching the witness.

 6            MR. LATTIMER:  You can have a Chief of Police

 7       who's a final policymaker.  That doesn't mean

 8       anything.

 9            MR. PLUNKERT:  Stop, stop.  This is an

10       improper objection under the Rule 30.

11            MR. LATTIMER:  What's improper is everything

12       you're doing.

13            You're asking an expert about reconciling

14       testimony.

15            MR. PLUNKERT:  At this point I'm --

16            MR. LATTIMER:  How crazy is that?

17            MR. PLUNKERT:  -- putting you on notice that

18       I am going to ask for relief if you do not keep

19       your brief, concise objections pursuant to Rule 30,

20       because if you say anything more, this witness will

21       hear you and that could affect the testimony.

22            MR. LATTIMER:  Don't threaten me.  Don't

23       threaten me.

24  BY MR. PLUNKERT:

25       Q.   Subject to that, sir --
```

180

```
 1                MR. LATTIMER:  Do not threaten me, and before

 2          you -- if you want to threaten me, you might as

 3          well go ahead and do what you got to do because you

 4          can assure yourself that once you start threatening

 5          me, this is going to take a whole different

 6          position, but don't threaten me.

 7     BY MR. PLUNKERT:

 8          Q.    Subject to that objection, you may answer.

 9          A.    Can you repeat the question?

10          Q.    Sir, you don't have an opinion as to who the

11     final policymaker was with respect to the arrests of

12     Tracey White and William Davis?

13                MR. LATTIMER:  He's not here to opine about

14          final policymakers.

15                MR. PLUNKERT:  I'm asking him.

16                MR. LATTIMER:  And I'm telling you what he's

17          here to opine about.

18                MR. PLUNKERT:  Are you telling him how to

19          answer?

20                MR. HUGHES:  Just make an objection and he'll

21          answer.

22                MR. LATTIMER:  One more time, you ain't got

23          nothing to do with this.  This ain't your witness.

24     BY MR. PLUNKERT:

25          Q.    You may answer, sir.
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

181

```
 1          A.    I'm trying to pose my response.
 2                What I know is from the deposition of Chief
 3    Belmar, and he says it's a joint command.
 4                What you showed me was that Chief Jackson
 5    says it's a joint -- I think he said it was a joint
 6    command too but they had different areas of
 7    responsibility.
 8                So I'm going to -- if you are -- if you're
 9    asking me for an opinion, they're both in charge.
10                I don't know what else I can tell you.  They
11    admitted that there's a joint command.
12          Q.    I'm asking final policymaker, not in charge,
13    right now for this question.
14                So is that your response for who's the final
15    policymaker?
16                MR. LATTIMER:  Calls for a legal conclusion.
17    BY MR. PLUNKERT:
18          Q.    You may answer.
19                MR. LATTIMER:  To the extent you can.
20                THE WITNESS:  I'm not sure what you mean by
21         "final policymaker".
22    BY MR. PLUNKERT:
23          Q.    Who arrested Tracey White?
24          A.    Police officers.
25          Q.    With which jurisdiction?
```

1       A.    St. Louis County Police Department.

2       Q.    Do you recall what officers?

3       A.    Yes.

4       Q.    Okay.

5       A.    David Ryan, McCoy, Murphy, McCann.  These

6  were the police officers that were involved in that

7  situation.

8       Q.    Did you watch the video of the arrest?

9       A.    I did not.

10      Q.    Did you know that there were St. Charles

11 police officers around?

12      A.    Yes.

13      Q.    But your opinion is that it was -- well, let

14 me ask you this:  Did a St. Charles police officer

15 actually handcuff Tracey White?

16      A.    I don't believe so.

17            MR. LATTIMER:  Relevance, materiality.

18 BY MR. PLUNKERT:

19      Q.    Now, do you have any evidence that those

20 St. Louis County officers that you just named were

21 familiar with any City of Ferguson Police general order

22 or policy?

23      A.    I don't know.

24      Q.    You don't know whether the City of Ferguson

25 had any policies which were any sort of motivating

183

1    factor behind those County officers, do you?

2          A.    I don't know what that question means.  Can

3    you rephrase that?

4          Q.    Sure.  Well, if those St. Louis County

5    officers weren't aware of the City of Ferguson general

6    orders, you would agree with me, right?

7          A.    I don't know whether they were or not.

8          Q.    Then you don't know if somehow the general

9    orders of the City of Ferguson had any impact on that

10   arrest whatsoever, do you?

11         A.    Correct.

12         Q.    All right.  Now, when you cite to the DOJ

13   Report in your report, what did the City of Ferguson

14   policies and procedures have to do with any of the

15   arrests in this case?

16         A.    They weren't involved in the arrests.  It was

17   St. Louis County that was involved in the arrests, but

18   there was still a joint command, so I don't know the

19   answer to that question as to what influence or

20   direction may have come out of that joint command from

21   Ferguson.  I -- I don't know.

22         Q.    And you're aware the DOJ had critiques of the

23   policies and procedures of the City of Ferguson,

24   correct?

25         A.    Yes.

184

```
1          Q.    And as you sit here today to a reasonable

2     degree of certainty, you're unable to say whether any of

3     those policies and procedures had any influence at all

4     on any of the arrests that are at issue in this

5     lawsuit?

6          A.    Yeah, I'm not pointing to any policy or

7     procedure.

8          Q.    And you're not aware of whether Tom

9     Jackson -- let me ask you this:  Did Tom Jackson have to

10    get consent from the City Manager to pass any general

11    order?

12         A.    I don't know whether he did or not.

13         Q.    Do you know if Tom Jackson passed all of the

14    policies and procedures that were in place on August 9th

15    of 2014 with the City of Ferguson?

16              MR. LATTIMER:  Objection as to relevance and

17         materiality.

18              THE WITNESS:  If Tom Jackson passed them?

19    BY MR. PLUNKERT:

20         Q.    If he was the one who authored them.

21              MR. LATTIMER:  Objection as to relevancy and

22         materiality.

23              THE WITNESS:  No, I don't know that he

24         authored them.

25                          - - -
```

```
1      BY MR. PLUNKERT:

2           Q.    Okay.

3           A.    But when policies and procedures are produced

4      by law enforcement agencies, it's ultimately the -- the

5      Chief, if you will, in this case who's -- who's

6      approving it and responsible for those policies and

7      procedures.

8           Q.    Are you familiar with the City of Ferguson

9      ordinances and City Code with respect to the duties of

10     the City Manager, the duties of the City Council and the

11     duties of the Police Chief?

12              MR. LATTIMER:  Objection as to relevance and

13          materiality.

14              THE WITNESS:  No.

15     BY MR. PLUNKERT:

16          Q.    Are you familiar with any general order of

17     the City of Ferguson?

18          A.    Not off the top of my head unless it's

19     something that was in the DOJ Report where they talked

20     about general orders, no.

21          Q.    Did you read Menzenwerth's deposition

22     transcript?

23          A.    Yes.

24          Q.    Do you have it with you?

25          A.    I do not.
```

186

```
 1        Q.    That's okay.  I do.

 2              And you are free to look at this Page 2,

 3   sir.

 4              I know we're working on one copy, so I don't

 5   want you to think I'm keeping it from you.  Okay?

 6        A.    Yes.

 7        Q.    Let me ask you, sir, I know you have read it

 8   once before, but I'd like to refresh your recollection,

 9   if you go to Page 70, read 70 and 71, if you would.

10        A.    Start at the top of 70 or --

11        Q.    Sure.  They kind of drag into the

12   conversation about joint command and you'll see where it

13   picks up.

14              MR. LATTIMER:  70?

15              THE WITNESS:  This is 70.  Do you want me to

16        go into 72?

17   BY MR. PLUNKERT:

18        Q.    Unless there's more discussion -- it's all

19   about the joint command obviously, so without having it

20   in front of me, wherever it stops.

21        A.    Okay.  Okay.

22        Q.    Do you recall reading that testimony that was

23   on Pages 70 through 72?

24        A.    Yes.

25        Q.    Do you agree that that testimony is
```

```
1     consistent with the concepts of a joint command, that

2     St. Louis County was in charge of the areas of West

3     Florissant and the protesting in the immediately

4     surrounding areas while the City of Ferguson was in

5     charge of the remainder of the City of Ferguson, right?

6          A.    According to Menzenwerth, yes, that's his

7     testimony.

8          Q.    Do you disagree with any of his testimony on

9     this topic?

10         A.    Again, I go back to the statement of Chief

11    Jackson that says that there's a joint command and the

12    question of who is ultimately responsible or what the

13    joint command consisted of should be referred to Chief

14    Jackson and Chief Belmar.

15              You're asking me to reach an opinion or a

16    conclusion regarding joint command based on limited

17    testimony in a deposition when we know in reality this

18    extensive conversation is about joint command and that's

19    not included in the testimony, so I can only base it on

20    what Belmar said.

21              If there's more to it, they have to answer

22    that and clarify that.

23         Q.    Do you recall reading Sergeant Ryan's

24    deposition testimony on this topic?

25         A.    I recall reading his deposition.  I don't
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

1    recall specifically on this topic, but we can go to it.

2         Q.    Do you recall reading Officer Mundy's

3    testimony on this topic?

4         A.    He's a Sergeant, Sergeant Mundy.

5         Q.    Sergeant, yes.

6         A.    Yes, I do recall reading his deposition, but

7    I don't have an independent recollection of the

8    discussion on this particular topic.

9         Q.    Do you have any evidence that any of the

10   officers that arrested Tracey White or William Davis

11   reported to any officer with the City of Ferguson,

12   including Tom Jackson?

13             MR. LATTIMER:  Objection as to relevance and

14        materiality.

15             THE WITNESS:  The only evidence that I would

16        point to is Tom -- Chief Belmar's statement that

17        it's a joint command.

18             There's no evidence that they reported to

19        anybody in specific command for the City of

20        Ferguson other than joint command with Chief

21        Jackson being co-commander with Belmar.

22   BY MR. PLUNKERT:

23        Q.    And I understand you're speaking in a

24   generality.

25             I'm asking do you have any specific evidence

189

```
 1     that any of the arresting officers with respect to

 2     Tracey White and William Davis relayed any information

 3     on this arrest to Tom Jackson or a City of Ferguson

 4     officer?

 5          A.    No.

 6          Q.    Do you have any evidence that any of the

 7     arresting officers on -- and I'm talking about now all

 8     of the Plaintiffs in this lawsuit, if any of those

 9     arresting officers ever reported that arrest to an

10     individual with the City of Ferguson including Tom

11     Jackson?

12          A.    No.

13          Q.    Okay.

14          A.    I'm not -- there's no evidence that I've

15     seen.  That's all I can report on.

16          Q.    Where was Justin Cosma when Tracey White and

17     William Davis were arrested?

18          A.    I don't remember.  We can look in his

19     deposition and see what he said, but I don't have an

20     independent recollection other than to recall that he

21     was not involved with the arrest.

22          Q.    Do you recall that he was involved in the

23     arrest of a reporter at the McDonald's?

24          A.    I remember the reporter being arrested, and

25     if Cosma was involved, I don't dispute that.
```

1          Q.    You read William Davis' and Tracey White's

2     deposition testimony, correct?

3          A.    Yes.

4          Q.    You remember that they said that Justin Cosma

5     wasn't involved in their arrest, correct?

6          A.    Again, we know that there was 20 some odd

7     depositions that were taken, and you're asking me if I

8     have a specific recollection of a statement about

9     Cosma.

10              I don't have a specific recollection, but if

11    you're -- I don't dispute that he was not involved with

12    the arrest.

13         Q.    Is there any reason -- I think I know the

14    answer to this -- is there any reason to believe that

15    Justin Cosma was involved in their arrest?

16         A.    No.

17         Q.    Do you recall this lawsuit being published in

18    the papers?

19         A.    No.

20         Q.    Are you aware of how much money the

21    Plaintiffs are requesting from a jury?

22              MR. LATTIMER:  Objection as to relevance and

23         materiality.

24              THE WITNESS:  I think the Complaint indicated

25         1.5 million per count, so perhaps three million per

1          Plaintiff, but I do recall reading it in the

2          Complaint, but I don't have -- didn't memorize it.

3     BY MR. PLUNKERT:

4          Q.    To your knowledge did Tom Jackson have any

5     specific involvement by being present in any of the

6     arrests of any of the individuals in the lawsuit?

7          A.    No.

8          Q.    Okay.

9          A.    Being present?

10         Q.    Yes.

11         A.    No, he was not present during any of the

12    arrests.

13         Q.    Are you aware of any orders of Tom Jackson

14    that weren't contained in general orders that any

15    officers followed in this lawsuit?

16         A.    No.

17         Q.    Let's turn our attention to the second of the

18    two, sir, and that would be the Theophilus Green and

19    Damon Coleman arrests.  Okay?

20         A.    Yeah.

21         Q.    Do you mind if we mark that binder of your

22    folder as E?

23         A.    I don't mind.

24               (Thereupon, Defendant's Exhibit E was marked

25          for identification.)

192

```
1    BY MR. PLUNKERT:

2         Q.    Sir, you've just placed an exhibit sticker,

3    E, on your binder, correct?

4         A.    It's -- it's on the lower left corner,

5    right.

6         Q.    Yes.  And these are your working notes and

7    documents that you have received that you attribute to

8    these two arrests, correct?

9         A.    These are my working notes and documents that

10   were printed and included in these -- in this binder,

11   yes.

12        Q.    You agree that these three Maryland Heights

13   police officers that we've referenced before that are

14   involved in this arrest did not arrest any other

15   individuals for the period of unrest other than

16   Theophilus Green and Damon Coleman, right?

17             MR. LATTIMER:  Objection.  How would he

18        possibly know that?

19   BY MR. PLUNKERT:

20        Q.    Subject to that --

21        A.    Initially that was their testimony.

22        Q.    Yes.

23             MR. HUGHES:  Can I look at this for a

24        minute?

25             THE WITNESS:  (The Witness complied.)
```

193

```
 1                 MR. HUGHES:  Thank you, sir.
 2    BY MR. PLUNKERT:
 3        Q.    Earlier I believe you mentioned a couple
 4    comments about Florida law, and obviously we're
 5    discussing Ferguson ordinances and the State of
 6    Missouri statutes with respect to Missouri law,
 7    correct?
 8        A.    Yes.
 9                 MR. LATTIMER:  Objection.  This is not a case
10             based upon Missouri law or statutes.  This is based
11             upon Federal constitutional law.
12    BY MR. PLUNKERT:
13        Q.    Sir, you agree that probable cause to commit
14    a crime, the crime can be defined by a state or by a
15    municipality, can't it?
16        A.    Yes.
17        Q.    Now, failure to disperse was the charge for
18    which these individuals Damon Coleman and Theophilus
19    Green were arrested, right?
20        A.    Yes.
21        Q.    You agree in order to have arguable -- well,
22    Mr. Lattimer pointed out that the Constitution is
23    something that's at issue in this case, correct?
24        A.    Yes.
25        Q.    You're familiar with the Fourth Amendment,
```

```
1    correct?

2         A.    Yes.

3         Q.    You're familiar that an arrest must be

4    supported by arguable probable cause, correct?

5         A.    Yes.

6              MR. LATTIMER:   Objection.   What does

7         "arguable" mean?

8    BY MR. PLUNKERT:

9         Q.    Now, sir, you also agree that probable

10   cause -- let me ask you this:   Assault on a police

11   officer is a crime in Ferguson is, correct?

12        A.    I would assume so.

13        Q.    You agree that throwing an object at an

14   officer would constitute assault on a law enforcement

15   officer, correct?

16        A.    Perhaps in Ferguson or in Missouri, but in

17   Florida it would be considered a battery.

18        Q.    Okay.   Both -- all of which are crimes,

19   correct?

20        A.    Yes.

21        Q.    Now, you've served as an officer and you've

22   probably made countless arrests, correct?

23        A.    Yes.

24        Q.    In making your arrests, some of the arrests

25   that you have made at least have been based upon
```

```
 1    information that you've received from other individuals,

 2    correct?

 3         A.    Yes.

 4         Q.    In other words, you will formulate probable

 5    cause statements in your jurisdiction sometimes based

 6    upon things that you did not personally observe,

 7    correct?

 8         A.    Yes.

 9         Q.    That's something that officers do frequently

10    in the course of arresting suspects, correct?

11         A.    Yes.

12         Q.    And you believe that it's reasonable for

13    officers to rely on reports of officers and certain

14    witnesses in doing so, correct?

15         A.    Yes.

16         Q.    Do you know what the elements are for failure

17    to disperse?

18         A.    I believe I do.

19         Q.    What are they?

20              MR. LATTIMER:  Objection as to relevance and

21         materiality.

22              THE WITNESS:  Again, I'm not an attorney.

23         I'm not -- I don't practice law in -- in Missouri,

24         but for failure to disperse it has to be six or

25         more people who are engaged in a criminal activity
```

196

1           and refuse to disperse.

2    BY MR. PLUNKERT:

3           Q.    And there needs --

4           A.    Something in that general statement.

5           Q.    Okay.  And I think what you're referring to

6    might be what's called an unlawful assembly, right?

7                 Tell me what an unlawful assembly is under

8    Missouri law.

9           A.    Again, I'm not going to try to guess what it

10   is.

11                I'll accept your definition of what unlawful

12   assembly is.

13                I'm not going to guess because I'm not a

14   lawyer.

15          Q.    Well, you're familiar with Lieutenant Delia's

16   testimony; you read that, correct?

17          A.    I read it, yes.

18          Q.    And you agree that at one point in time

19   St. Louis County determined that an unlawful assembly

20   had taken place, correct?

21          A.    I don't have any information to dispute

22   that.

23          Q.    And you agree at that point in time they

24   informed Lieutenant Delia that an unlawful assembly was

25   present and to clear the area, correct?

1          A.     I believe so.

2          Q.     And you believe it was reasonable for

3     Lieutenant Delia to rely on that information from

4     St. Louis County in reporting that an unlawful assembly

5     had taken place, correct?

6          A.     Yes.

7          Q.     Now, you also agree that if an individual in

8     the unlawful assembly was seen with a hand throwing

9     motion, you agree that that supports a possible assault

10    on a law enforcement officer, correct?

11         A.     Well, it would depend on where the motion

12    is -- how the motion is made, where the motion is

13    directed, what's in the hand.

14             So there's some possibilities there, and one

15    of the possibilities is that it would be, in my term, a

16    battery on an officer.

17         Q.     I want you to assume that the hand throwing

18    motion was toward a law enforcement officer or a group

19    of law enforcement officers, okay?

20         A.     Yes.

21         Q.     And assuming that, you agree that in order to

22    arrest an individual on that, you don't have to

23    actually see what the object is that is being thrown,

24    correct?

25         A.     I don't think it's a violation of any statute

1    or law or ordinance that a throwing motion is a

2    violation, so I don't think that is sufficient probable

3    cause to make an arrest.

4         Q.    And in your work as an expert and in law

5    enforcement, are there any treatises or authoritative

6    works on which you rely with respect to probable cause

7    and excessive force?

8         A.    No.

9         Q.    So is there any supportive material that

10   supports what you just said there?

11             MR. LATTIMER:  What?

12             THE WITNESS:  Can you tell me what I just

13        said?

14   BY MR. PLUNKERT:

15        Q.    Sure.  About just a motion not being enough

16   to support a probable cause finding.

17        A.    A motion by itself would not cause a

18   reasonable police officer to assume that a battery or an

19   assault just took place.

20        Q.    You agree that Theophilus Green and Damon

21   Coleman were instructed to disperse and clear the area,

22   correct?

23        A.    I believe they indicated that they may have

24   been, and they also indicated that they -- they couldn't

25   because they were blocked in.

1          Q.     Have you watched the video?

2          A.     No.

3          Q.     You in the files that you have in this case

4     have not watched the cell phone video of Damon Coleman

5     capturing the encounter with the Maryland Heights police

6     officers; is that right?

7          A.     That's right.

8          Q.     Do you think that's important in rendering an

9     opinion that you review it?

10               MR. LATTIMER:  Opinion about what?

11               MR. PLUNKERT:  In this case.

12               THE WITNESS:  Well, I don't know what's on

13          the video, so I can only offer an opinion, and the

14          opinions that I offered were based on the

15          information and materials that was provided to me.

16               So you're now asking me if -- if there's

17          something else that would be important.

18               Well, I don't know what's on it, so it's hard

19          for me to answer that question.

20    BY MR. PLUNKERT:

21         Q.     How long did it take for Theophilus Green and

22    Damon Coleman to attempt to leave pursuant to the

23    command?

24         A.     I don't know.  I don't remember.

25         Q.     You agree that the crime of failure to

1    disperse can -- and all of the elements can be met at

2    one point in time and then later the individuals may

3    decide to leave but there's still probable cause to

4    arrest on the initial failure to leave, correct?

5         A.    That's a legal conclusion and I don't dispute

6    it, but that's -- again, that calls for a legal

7    conclusion that I'm not qualified to answer.

8         Q.    Well, you're an officer that's opining about

9    probable cause to arrest for crimes being committed,

10   aren't you?

11        A.    Yes.

12        Q.    And I'm asking you as an expert if you have a

13   situation where an individual is part of an unlawful

14   assembly and does not disperse pursuant to commands and

15   it takes time for the officers to get to those

16   individuals and then late in the game the individuals

17   want to get away, they have still committed the crime at

18   the first instance of failure to disperse; wouldn't you

19   agree?

20             MR. LATTIMER:  Are you asking him to assume

21        those facts?

22             MR. PLUNKERT:  No facts.  I think that's a

23        hypothetical.

24             MR. LATTIMER:  Okay.  That's what

25        hypotheticals do, assume facts.

```
1              THE WITNESS:  So the police officers see an

2         unlawful -- unlawful assembly and an order is given

3         and the police officers confirm that those within

4         the crowd heard the unlawful order and did not

5         comply, could they eventually arrest them for that

6         violation?  Is that your question?

7    BY MR. PLUNKERT:

8         Q.    Yes, sir.

9         A.    The answer is yes.

10        Q.    And that is to say that the officers have to

11   use a megaphone to give that command and it takes, let's

12   say, let's just assume a minute for the officers to

13   actually get up to a distance where you can place

14   handcuffs on the individuals and those individuals then

15   say, "I'm going to leave," you agree that the crime has

16   already been committed of failure to leave, correct?

17              MR. LATTIMER:  It calls for a legal

18        conclusion.

19   BY MR. PLUNKERT:

20        Q.    Failure to disperse I should say.  Go ahead.

21        A.    We would have to confirm that the people who

22   were arrested heard the command to leave, that they had

23   an opportunity to leave, and if they did not leave, an

24   arrest could be made subsequent to that time.

25        Q.    If you assume that they heard it and that
```

1    they had the opportunity, with those assumptions, you

2    would agree that that would be a proper arrest for

3    failure to disperse, correct?

4         A.    If you -- I'm trying to work through your

5    qualification of proper arrest.  Would that be a lawful

6    arrest or what are you trying to assume?

7         Q.    Supported by arguable probable cause, sir.

8         A.    It could be, yeah.

9         Q.    Did you read Antonio French's deposition

10   transcript?

11        A.    Did I?

12        Q.    You know that he was in the same parking lot

13   as Theophilus Green and Damon Coleman, correct?

14        A.    Yes.

15        Q.    You agree that there were six or more

16   individuals in that parking lot, correct?

17        A.    There may have been six or more individuals

18   in the parking lot.  I don't believe that the people

19   that we're talking about were with those six or more,

20   but they may have been present when others were there,

21   and I'm not sure of how close they were or what they

22   were all doing.

23        Q.    And you recall Antonio French heard the

24   commands that were given to Theophilus Green and Damon

25   Coleman to disperse and leave the area, correct?

```
 1          A.    I don't dispute that.

 2          Q.    You agree that Antonio French had the

 3   opportunity to leave the area, correct?

 4          A.    I don't recall his testimony, whether he had

 5   the opportunity to leave or whether he was boxed in in

 6   some fashion.  I don't recall specifically.

 7          Q.    Did you view the portion of Antonio French's

 8   vehicle that he shot outside of his car as he was

 9   leaving the area?

10               MR. LATTIMER:  Are you asking about a video?

11               MR. PLUNKERT:  Yes, sir.

12               THE WITNESS:  I didn't see any videos.

13               MR. LATTIMER:  I thought he's already told

14       you that.

15   BY MR. PLUNKERT:

16          Q.    Well, it's a different video.  Have you seen

17   any videos in this case?

18               MR. LATTIMER:  None.

19               THE WITNESS:  I have not seen any videos in

20       this case.

21   BY MR. PLUNKERT:

22          Q.    Do you have any opinions that the Maryland

23   Heights officers made an unlawful arrest of either Damon

24   Coleman or Theophilus Green?

25          A.    No.  I don't have an opinion about that
```

1    because it goes to the same argument or opinion that I

2    offered before, that the Maryland Heights police

3    officers did not complete a police report, did not

4    articulate probable cause and it wasn't articulated

5    until eight months later, six to eight months later by

6    Menzenwerth.

7              So again, we're in that same dispute of facts

8    where you have the Plaintiffs, Mr. Green and

9    Mr. Coleman, saying this is what happened and you have

10   the police officers saying something different but

11   through Menzenwerth eight months later.

12        Q.   Okay.

13        A.   And when we have that kind of a delay in

14   reporting, it raises questions about credibility,

15   accuracy and thoroughness of the reports, which is why

16   police officers complete reports contemporaneously with

17   the action that they take.

18              That's the standard of care.  That's the

19   widely accepted police practice, and they didn't do that

20   in this case.

21        Q.   And I want to ask you some questions about

22   what you just went through.

23              And so I understand, I think you answered my

24   question, so I understand it, you do have those

25   opinions, but specifically with respect to whether the

1    three officers had probable cause at the time of the

2    arrests, you don't have opinions as to that, correct?

3          A.    I didn't look at this case to form those

4    opinions.

5          Q.    Sure.

6          A.    I looked at this case to see whether the

7    practice -- the police practices that they followed were

8    consistent with widely accepted practices.

9               I didn't get into trying to make a

10   determination if probable cause existed or did not exist

11   because we have a conflict of testimony, a conflict

12   between the Plaintiffs and the officers, which is

13   further aggravated by the delay in reporting, which in

14   my estimation adds to the -- the credibility and

15   thoroughness and accuracy of the police officers.

16         Q.    Were there any less lethal munitions that

17   the three Maryland Heights officers had on them that

18   day?

19         A.    I don't recall.  We'd have to go through

20   their specific depositions to see what they reported.

21         Q.    And maybe I'll do it this way.

22              As you sit here you cannot recall any

23   evidence that supports that any of the three Maryland

24   Heights officers fired any less lethal munitions at

25   either Theophilus Green or Damon Coleman, correct?

```
1          A.     No.

2          Q.     Not correct?

3          A.     No, you're correct.

4          Q.     I am correct.  All right.  I'm not pulling

5     one on you.

6                 I haven't heard any evidence that they've

7     been armed with any less lethal munitions.

8                 I just want to make sure your understanding

9     is consistent with mine.  Fair?

10         A.     Yes.

11         Q.     Okay.  And again, understanding what you just

12    said about probable cause, I believe it's the same way,

13    you're not rendering any opinions with respect to

14    whether any of the three Maryland Heights police

15    officers used force that was excessive on either

16    Theophilus Green or Damon Coleman, correct?

17         A.     Correct.

18         Q.     Now let's talk about what you did formulate

19    now that we have those two out of the way.

20                You mentioned there was a delay in report

21    writing, correct?

22         A.     Yes.

23         Q.     When Theophilus Green and Damon Coleman were

24    conveyed to individuals, it was to the St. Louis County

25    Conveyance Team, correct?
```

1          A.    Yes.

2          Q.    And we've heard this term, Lieutenant Delia

3    was part of an Arrest Team, correct?

4          A.    Yes.

5          Q.    You agree that in times of civil unrest, it

6    may be a good idea to have an Arrest Team and a

7    Conveyance Team, correct?

8          A.    Yes.

9          Q.    And you agree that if you take certain

10   Arrest Team officers off of what we could call the

11   front line for an extended duration, that could

12   compromise certain safety issues on the front line,

13   correct?

14         A.    Potentially.

15         Q.    Okay.

16         A.    However, the -- I'll just leave it at that

17   and let you ask the next question.

18         Q.    Okay.  And the thought behind the Arrest Team

19   and the Conveyance Team is so you could have an Arrest

20   Team convey individuals that had been arrested and then

21   return to the front line in a more expeditious fashion,

22   correct?

23         A.    No.  The purpose of an Arrest Team is to --

24   let's start off with this.

25              You have a skirmish line and those are the

```
1    front-line officers usually equipped with shields and

2    gas masks, helmets, face plates, often times other

3    weapons.

4            The Arrest Team generally are in a field

5    force formation or generally behind the skirmish line,

6    and when they see individuals in the crowd or in front

7    of the skirmish line that need to be arrested, the

8    Arrest Team would go forward as a group, take that

9    person into custody and bring them back behind the

10   skirmish line for processing.

11           This is where I believe the ball was dropped

12   by the arresting officers.  There should have -- and

13   their command.

14           There should have been a process established

15   for booking procedures that would allow those officers

16   to quickly complete a probable -- what we would refer to

17   in Florida as a Probable Cause Affidavit that would

18   define the elements of the crime and that this person

19   committed it and witnessed by these people, and that

20   becomes your charging document.

21           When you -- when agencies don't -- when

22   agencies skip that process, then the probable cause gets

23   lost.

24           It's happened in other agencies and then you

25   start getting into issues of violating people's civil
```

1     rights because we don't know what people were arrested

2     for.  We don't know what the probable cause was.

3              So the way it should happen is there should

4     be a booking process even if it's an -- it's an

5     abbreviated booking process, to allow the prisoner to

6     then be transported to jail and let the officer get back

7     up onto the line to assist, but even if you don't want

8     to do it right then and there, there should be some

9     other process that will take place that day so that

10    those arrests and the probable cause and the use of

11    force are captured.

12             You can't drop that as a -- which is a

13    standard requirement for arrest and use of force and say

14    that the reason we didn't do it is because we're in a

15    riot.

16             Even the Department of Justice recognizes

17    that when they talk about documenting and tracking use

18    of force.

19             You have to do it, and the fact that you're

20    in a riot does not excuse you from doing it.

21             And if you can't do it, then perhaps those

22    arrests are not as important as you -- as you think they

23    are.

24             Because you need to protect people's civil

25    rights and provide them due process, and you do that by

1    documenting probable cause.

2         Q.    You agree that the City of Ferguson does not

3    have any requirement that you set forth a Probable Cause

4    Affidavit, meaning sign and sworn to, correct?

5         A.    I will take your word at that; however, at

6    some point I'm going to assume that at some point sworn

7    testimony has to be provided regarding probable cause to

8    a Magistrate or --

9         Q.    That is correct, and it can be done orally,

10   can't it?

11        A.    Yes.

12        Q.    And that means live testimony coming in in an

13   ex parte fashion by any officer having the information,

14   correct?

15        A.    Yes.

16        Q.    Now, you don't need a signed, sworn affidavit

17   in order to get a warrant or to have a judge agree there

18   was probable cause for their arrest, correct?

19        A.    No.  If you provide oral testimony, perhaps

20   that would be acceptable in Missouri.

21        Q.    And you agree that the State of Missouri does

22   not have any requirement that there be a signed, sworn

23   affidavit to support probable cause at the time of the

24   arrest?

25        A.    I will take your word for it, that it doesn't

1    require an affidavit, but it does at some point require

2    sworn testimony.

3         Q.    Agreed.  And you agree that the Federal

4    Constitution does not require that it be in writing; it

5    just requires that there be sworn testimony at a certain

6    point, the rebuttal for presumption is within 48 hours

7    of the warrantless arrest?

8         A.    I'll accept that.

9         Q.    So then you agree that -- well, you remember

10   that these officers, the Maryland Heights officers, one

11   of them conveyed information to the Conveyance Team

12   regarding the arrests, correct?

13        A.    Yes.

14        Q.    And you agree that one of the three Maryland

15   Heights officers certainly had the capability of

16   appearing before a Magistrate and testifying to

17   obtain -- on a probable cause hearing having a judge

18   rule there is probable cause within a certain amount of

19   time after those arrests?

20        A.    I'll accept that.

21        Q.    So you agree that failure to provide a

22   written Probable Cause Affidavit doesn't violate the

23   Constitution in itself?

24        A.    Correct.

25        Q.    And you agree that no individual has a right

212

```
1    to have a police report prepared within a day or within

2    two days, correct?

3         A.    Correct.

4         Q.    Your opinion is with respect to what the

5    standard in national practices are, right?

6         A.    Yes.

7         Q.    Your opinion with respect to the report

8    writing doesn't affect whether someone's civil rights

9    have been violated, correct, with report writing?

10        A.    Well, it would depend on what's in the

11   report, but if you're talking about the function of

12   completing a report, yes.

13        Q.    How are you doing?  Keep going?

14        A.    Sure.

15        Q.    Okay.  What I'm doing is I'm going to try and

16   not -- I swear, I'm going to try and not ask you the

17   same things.

18              I'm going to flip through your report and

19   I'll try to make this quick and painless, sir.

20              MR. LATTIMER:  Too late.

21              MR. PLUNKERT:  For everyone, right?

22   BY MR. PLUNKERT:

23        Q.    The DOJ Report with respect to the City of

24   Ferguson's policies and procedures, you agree that that

25   does not have any direct bearing on any of the arrests
```

1   in this case, correct?

2         A.    Correct.

3         Q.    Now, I understand that you cited the COPS,

4   and the COPS Report discusses documentation, and I think

5   we've discussed documentation fairly thoroughly, haven't

6   we?

7         A.    Yes.

8         Q.    And we've covered your opinions on that,

9   haven't we?

10        A.    Yes.  I thought so.

11        Q.    Yes.

12              And I guess the best way to -- and if you

13   have it in front of you, feel free to look at your

14   report.

15              We can take it 1 through, I think, 5 that you

16   have.

17              It's bullet point 1.

18              MR. LATTIMER:  It's right there.

19   BY MR. PLUNKERT:

20        Q.    It's Page 10.

21        A.    Okay.

22        Q.    You agree that in your report you've

23   enumerated your opinions 1 through 5, correct?

24        A.    Yes.

25        Q.    Excuse me.  Excuse me.  1 through 4.

```
 1              A.     1 through 4.

 2              Q.     That's my fault.  Okay.

 3                     Those are all the opinions you have in this

 4      case, aren't they?

 5              A.     Those are the only opinions that I -- that

 6      are in my report, but if I'm asked other opinions, I'll

 7      be -- try to provide them.

 8              Q.     Now, under opinion Number 1 we just finished

 9      discussing, and that I think thoroughly -- arrests were

10      made without articulation and documentation of probable

11      cause.

12                     We've discussed that, haven't we?

13              A.     Yes.

14              Q.     That's not a constitutional opinion, is it?

15                     MR. LATTIMER:  What does that mean, a

16              constitutional opinion?

17      BY MR. PLUNKERT:

18              Q.     I think we just covered it.

19                     The articulation documentation of probable

20      cause in these affidavits, that doesn't affect someone's

21      civil rights, correct?

22              A.     In affidavits, you're correct.

23              Q.     Okay.

24              A.     Because you indicated that you can make an

25      oral testimony.
```

```
 1        Q.    Now, supervisory oversight, let me ask you

 2   this:  Who was the supervisory oversight for the three

 3   Maryland Heights police officers during the arrests?

 4        A.    Whoever the Lieutenant would have been

 5   reporting -- reporting to during this engagement.

 6        Q.    You agree that was to St. Louis County,

 7   correct?

 8        A.    I don't know who he directly reported it.

 9   Whether there was another Maryland Heights officer or

10   Captain who he may have reported to, I -- I just don't

11   know.

12        Q.    So with respect to opinion Number 2, you

13   don't have any opinion to a reasonable degree of

14   certainty whether an individual's civil rights were

15   affected with respect to the arrests of Theophilus Green

16   and Damon Coleman, correct?

17        A.    Based on Number 2?

18        Q.    Yes, sir.

19        A.    No.

20        Q.    That is correct?

21        A.    Yes.

22        Q.    I'm turning to use of force.

23              We have, I think, gone through these before,

24   Damon Coleman and Theophilus Green, and your dispute is

25   with the documentation of any force used, correct?
```

216

```
1          A.    My dispute is that the two Plaintiffs in this

2    case claim that force was used and that eight months

3    later the police officers through Menzenwerth claim that

4    no force was used, and that's going to be a question for

5    the jury as far as credibility, so I would say, though,

6    that if -- if force was used, that it should have been

7    documented.

8                I understand that the Maryland Heights police

9    officers claim that they didn't use force and, you know,

10   I understand that, but I also understand that the

11   Plaintiffs' claim that there was, so there's still a

12   dispute of facts.

13         Q.    Was there any evidence, and using any of the

14   evidence that can conclude what Plaintiffs testified to,

15   that the force which was used was by a Maryland Heights

16   police officer?

17         A.    No.

18         Q.    Now, there is a citation to CS gas --

19         A.    Hold on one second with that last question.

20               So for Theophilus Green, he apparently was

21   just -- there was no hands-on force to him, so there

22   would be no claim that Maryland Heights specifically

23   applied any force, but let me go through Damon Coleman,

24   because I think he said something different.

25         Q.    And let me focus my question while you're
```

1    going through that, it's not just whether force was

2    used but if that force was by a Maryland Heights

3    officer.

4         A.    Understood.  Okay.  Damon Coleman indicated

5    that he was kicked and he was struck with an asp, baton

6    or a stick, and he indicated that during the arrest the

7    arrest was made by the Maryland Heights police

8    officers.

9         Q.    You would agree there were several officers

10   in that area, including County officers, as well,

11   correct?

12        A.    Yes.

13        Q.    Okay.  With that in mind, you agree

14   Mr. Coleman was never able to state whether it was a

15   Maryland Heights officer that was responsible for any of

16   that action?

17        A.    Correct.

18        Q.    And so take your time.

19             So based on your review now, my original

20   question, which I think I know the answer to, after

21   you've had a chance to look through that, you have not

22   seen any evidence in this case that with respect to the

23   arrests of Theophilus Green and Damon Coleman that any

24   force which was used was by a Maryland Heights police

25   officer, correct?

```
1              MR. LATTIMER:  Objection, mischaracterizes

2       the testimony.

3              He just said he was hit and kicked with a

4       baton when he was arrested.

5  BY MR. PLUNKERT:

6       Q.    You may answer.

7       A.    What Damon Coleman says, during the time he

8  was arrested he was kicked and struck, and he was

9  arrested by a Maryland Heights police officer.

10             He himself cannot confirm who arrested him or

11 who caused that -- who -- who used that force against

12 him, but one can conclude or at least infer that if the

13 arresting officers were the ones that kicked and hit

14 him, then it would have been the Maryland Heights

15 officers because the other ones didn't arrest him.

16      Q.    But you can't state if it were even a

17 Maryland Heights officer to a reasonable degree of

18 certainty which one it would have been, can you?

19      A.    Correct.

20      Q.    Okay.

21      A.    Because -- because Damon Coleman can't.  I

22 wasn't there.

23             He was the one that was claiming -- he's the

24 one that was claiming force was used against him, and if

25 he can't identify who used the force, then I certainly
```

```
1    can't.

2         Q.    You have no evidence that Justin Cosma used

3    any less lethal munitions including tear gas, correct?

4         A.    Correct.

5         Q.    You have no evidence that suggests any of the

6    three Maryland Heights officers used any less lethal

7    munitions including tear gas, correct?

8              MR. LATTIMER:  Objection.  He just testified

9         that he was hit was an asp and a baton.

10   BY MR. PLUNKERT:

11        Q.    Munitions being the key word.

12        A.    I don't recall any testimony that they

13   used -- from the officers that they used munitions or

14   that Damon Coleman or Theophilus Green could identify

15   who used any other less lethal weapons.

16        Q.    Okay.  Then I think that moves us along to

17   opinion Number 4, and you spoke about decontamination

18   and medical aid to injured prisoners.

19              Do you have any evidence that -- and I want

20   to confine this to Theophilus Green and Damon Coleman.

21              Do you have any evidence that there was a

22   denial of medical care to either of those two

23   individuals?

24        A.    Not that I recall.

25        Q.    And when you speak of decontamination, I know
```

1    you put it here, can you just in layman's terms explain

2    for us what that is?

3         A.    So when police agencies or police officers

4    are using munitions that contain CS gas or OC spray,

5    there should be a process set up as far as a response to

6    a civil disturbance that would allow for decontamination

7    of those chemicals on those that may have been

8    contaminated, whether it was people who have been

9    arrested, police officers themselves or bystanders who

10   were not engaged in any protests or under arrest.

11        Widely accepted police practices regarding

12   the use of those chemicals would have a process to

13   assist with decontamination of those chemicals and

14   providing medical aid to those injured, if anybody was

15   injured, and you would do that in a different location

16   where those folks could be taken to be treated.

17        Q.    In the sense of a different location, you

18   mean in a civil unrest atmosphere, correct?

19        A.    Yes.

20        Q.    Okay.

21        A.    And it's the same thing with the booking

22   process that I talked about.

23        Obviously you're not going to try to document

24   and book people in the middle of a civil unrest.

25        You would have a staging area or an area

```
 1    where those processes can be set up and conducted.

 2         Q.    And did St. Louis County have any

 3    decontamination procedures?

 4         A.    Not that I'm aware of.  I don't remember.  I

 5    don't recall.

 6         Q.    Where would this separate area be?

 7         A.    It could be wherever it was appropriate as

 8    determined by those in command.

 9              So one of the things that you -- we set up

10    when you have civil disturbances is command posts.  You

11    set up media posts.  You set up a decontamination and

12    medical aid post.

13              You would set up a booking process, so you

14    would set it up wherever you could as long as it was in

15    a safe, secure environment where people can be brought

16    there and processed.

17         Q.    And that's something that pertains to the

18    command structure, correct, that it be in place?

19         A.    Yes.

20         Q.    And specifically you don't expect front

21    line -- we'll call it the skirmish line individuals to

22    perform decontamination procedures right then and there,

23    correct?

24         A.    Correct.

25         Q.    You don't expect Arrest Team individuals to
```

1    perform it when they arrest them, do you?

2         A.    I agree.

3         Q.    Okay.

4         A.    You do not.

5         Q.    Paramedics, do you expect them to be

6    involved?

7         A.    Absolutely.

8         Q.    Do you believe that the Maryland Heights

9    officers should have decontaminated Theophilus Green or

10   Damon Coleman at any point?

11        A.    If they could as they were taking them back,

12   yes.

13             If they can assist them in some fashion, yes,

14   but I also recognize that police officers are not

15   paramedics and if there are paramedics set up and that

16   you can bring these folks to, that's where you should

17   bring them so they're equipped and trained and have the

18   ability to decontaminate and treat these people.

19        Q.    Let me ask you are you critical of the three

20   Maryland Heights officers in regard to decontamination

21   and their behavior in the arrests?

22        A.    In regards to decontamination?

23        Q.    Yes, sir.

24        A.    No.

25        Q.    Or medical aid to injured prisoners, same

1      question, are you critical of them?

2           A.    No.

3           Q.    Okay.

4           A.    But if there was a -- if -- if -- if there

5      was CS gas and -- and OC spray, they should have taken

6      them to receive some treatment.

7                 I'm not saying they themselves should have

8      offered the treatment.

9           Q.    And at least at this point you're not

10     critical of their behavior?

11          A.    Correct.

12          Q.    You mentioned 1972.

13                The benefit of 1972 -- I mentioned 1972.  You

14     said in the '70s there was a riot on the beach in

15     Fort Lauderdale and that that was subject to police

16     response, correct?

17          A.    In the '70s.

18          Q.    Yes.

19          A.    Yes.

20          Q.    Have you ever heard of something called the

21     Monster?

22          A.    Yes.

23          Q.    Describe what the Monster is.

24          A.    It's an armor-plated vehicle that is -- you

25     may describe it as a -- the size of a Winnebago and it

```
 1      has solid rubber tires.  It has bullet-proof glass.  It

 2      has tear gas ports.  It has a loud PA system.

 3              It also has chains that drop down from the

 4      body of the vehicle to the ground to try to prevent

 5      anything from being thrown or pushed underneath the

 6      vehicle.

 7              It's a -- it's referred to casually as the

 8      Monster, but it's a response vehicle.

 9          Q.    An armored police vehicle?

10          A.    Yes.

11          Q.    Is it still in function today?

12          A.    It is.

13              MR. HUGHES:  Is that in Fort Lauderdale?

14              THE WITNESS:  Yes.

15      BY MR. PLUNKERT:

16          Q.    Have you ever driven it?

17          A.    No.  You have to have special training to

18      drive it.

19          Q.    Do you disagree with it being used in a

20      situation where there is civil unrest?

21          A.    No.

22          Q.    You don't disagree with the vehicles that

23      were in use in the Ferguson response, do you?

24          A.    I don't disagree that the vehicles -- with

25      the vehicles being in use.
```

```
 1              How the vehicles were used as reported by DOJ

 2    I do have a concern about.

 3         Q.    Were rubber bullets used?

 4         A.    Nobody from -- nobody from the law

 5    enforcement side confirmed that -- that rubber bullets

 6    were used, and Chief Belmar indicated that they were not

 7    used, so there's no evidence that rubber bullets were

 8    used.

 9         Q.    Let me ask you some questions about what kind

10    of an expert that you're not, and this is pretty much

11    for the record.

12              You're not a human factors expert, correct?

13         A.    Correct.

14         Q.    You're not a psychologist, correct?

15         A.    Correct.

16         Q.    You're not a medical physician, are you?

17         A.    I am not.

18         Q.    You're not a psychiatrist, are you?

19         A.    No.

20         Q.    So you're not an expert on injuries, are

21    you?

22         A.    No.

23         Q.    Have you been sued?

24         A.    Yes.

25         Q.    You were sued in the late '70s or the early
```

1    '80s regarding the arrest of an individual with respect

2    to charges of fraud, right?

3        A.    Yes.

4        Q.    What is it that the individual complained of

5    or said that happened?

6        A.    I was a detective and there was another

7    detective that was investigating this person and

8    persons for fraud, and we tracked them to a hotel on the

9    beach.

10           We knew that there was a luxury vehicle that

11   was on the hotel property that they had -- that this

12   person had arrived in and we wanted to make contact with

13   him and we eventually did and we arrested him, seized

14   the vehicle and we also seized 17,000 -- if my memory's

15   correct, $17,000 in cash.

16           This person was tried and convicted,

17   sentenced to prison.

18           While he was in prison he sued myself and the

19   other detective pro se for unlawful seizure I would

20   imagine.

21           I really don't remember, but the case was

22   eventually disposed of.

23       Q.    Something handwritten I'm sure?

24       A.    I think it was.

25       Q.    You agree that from time to time someone may

227

```
 1    raise an allegation against a police officer for

 2    something, and just because they allege it, it doesn't

 3    mean it actually happened, correct?

 4         A.    Correct.

 5         Q.    And in that case you agree what they alleged

 6    isn't what happened?

 7         A.    Correct.

 8         Q.    Did it have to do with force used, as well,

 9    not just the seizure?

10         A.    I don't recall an allegation of force.

11         Q.    What was the disposition?

12         A.    To my knowledge it was either dismissed --

13    I'm going to assume it was dismissed.

14         Q.    You don't have any information, knowledge

15    that it was settled or anything --

16         A.    No.

17         Q.    -- like that?

18         A.    No.

19         Q.    Now, the second one -- there are two times

20    total that you've been sued, correct?

21         A.    Yes.

22         Q.    The second time was in 2001 about some

23    nightclub?

24         A.    Yes.

25         Q.    All right.  What is it that they said you
```

```
1    did?

2         A.    In 2001 I was the Assistant Chief and we had

3    a nightclub on the beach that was violating the City

4    ordinance regarding the admission of underaged people.

5              Their contention was that they were a

6    restaurant, and if you're a restaurant in the City of

7    Fort Lauderdale, underage people can be admitted, but if

8    you're a nightclub, you must be 21 or older.

9              They were putting out free buffet food and

10   claiming that they were a restaurant.

11             We investigated and determined that they were

12   not, in fact, a restaurant.

13             We went through a whole process of education,

14   encouragement, enforcement, and then we started

15   arresting the managers who were on duty at the time we

16   found underaged people inside this nightclub.

17             Eventually a lawsuit was filed against myself

18   and the Chief of Police in Federal Court, and that was

19   eventually dismissed, as well.

20        Q.    Was it for unlawful arrests?

21        A.    I believe so.

22        Q.    And nothing to do with force?

23        A.    Yeah, nothing to do with force.

24        Q.    So they complained that you arrested them

25   without probable cause, correct?
```

1          A.    No.  They complained that the police

2    department arrested them, that individual police

3    officers arrested them at my direction because I was an

4    Assistant Chief.  I didn't arrest anybody.

5              The Chief did not arrest anybody, but as the

6    command of the agency, we were targeted as those

7    responsible for the arrests.

8          Q.    I see.  And did you direct your officers to

9    make that arrest?

10         A.    Yes.

11         Q.    And the Chief did, as well?

12         A.    Yes.  We had meetings regarding what approach

13   we were going to take with this nightclub and their

14   activities, and it was determined that we would enforce

15   the City ordinance and we did.

16         Q.    Now, in comparison, you don't have any

17   evidence that Tom Jackson ever directed the arrest of

18   any of the Plaintiffs, correct?

19         A.    No, I don't have any evidence.

20         Q.    What was the disposition of this --

21         A.    Dismissed again.

22         Q.    Okay.  What else is in your file that you

23   brought?

24         A.    Well, I brought a lot of stuff because I was

25   asked to bring --

```
 1          Q.    Yeah?

 2          A.    -- a lot of stuff.

 3                So this is a file on --

 4          Q.    Go ahead.  I'll listen to you.

 5          A.    -- Dwayne Matthews/Nathan Burns.

 6          Q.    Would you mind marking that binder, sir?

 7          A.    No.

 8                (Thereupon, Defendant's Exhibit F was marked

 9          for identification.)

10                THE WITNESS:  Let me try to get organized

11          here before we --

12                MR. HUGHES:  F is what?

13                THE WITNESS:  Dwayne Matthews and Nathan

14          Burns.

15                (Thereupon, Defendant's Exhibit G was marked

16          for identification.)

17     BY MR. PLUNKERT:

18          Q.    And Exhibit G that was just marked by

19     Jennifer is in front of you right here.

20                That's the document that you mentioned you

21     read and were trying to bring documents to satisfy that,

22     correct?

23          A.    Yes.

24          Q.    To your knowledge, did you comply with the

25     full requests that are in that?
```

1          A.     I did.

2          Q.     So we have three binders that I marked so

3     far, and is there anything else that you brought?

4          A.     Yeah, there's a lot.

5          Q.     Oh, gosh.

6          A.     This is a binder on -- 'cause one of the

7     items that was requested, any materials that you -- that

8     you reviewed, so I reviewed a lot of materials, and as I

9     said earlier in my deposition, I review materials all

10    the time as part of my function with the Sheriff's

11    Department.

12         Q.     Okay.

13         A.     So I reviewed the President's Task Force on

14    21st century policing.

15                I reviewed settlement agreements between the

16    DOJ and Albuquerque, Cleveland and Newark.  They're

17    here.

18                MR. HUGHES:  If I may interrupt, it said any

19         materials that you relied upon to form your

20         opinions.  Are you saying --

21                THE WITNESS:  There's information in here

22         about documentation on use of force and arrests.

23                So when you say "rely upon", I use materials

24         like this to assist me in not -- to assist you in

25         that it's just not my opinion that the reports

```
 1          should be or arrests should be documented or force

 2          should be documented.

 3              This is supportive documentation for those

 4          opinions.

 5   BY MR. PLUNKERT:

 6      Q.    So you rely upon that binder in front of you

 7   that we're going to mark in making that opinion?

 8      A.    No.

 9      Q.    Oh.

10      A.    I rely on my training, my knowledge, my -- my

11   skills and my education to know what the practices are

12   regarding force and reporting.

13              It's supportive -- those opinions are

14   supported by documents like this from DOJ that -- that

15   agrees with what I'm saying.

16      Q.    And you've just referenced "like this".

17              Let's go ahead and mark what you just touched

18   when you said "like this" that we've been discussing as

19   Exhibit H.

20              (Thereupon, Defendant's Exhibit H was marked

21          for identification.)

22              THE WITNESS:  This is the investigation of

23          the Ferguson Police Department.  Would you like

24          that?

25                              - - -
```

1     BY MR. PLUNKERT:

2          Q.    I have a copy but we can mark yours.  Did you

3     make any notes in it?

4          A.    I don't know.

5          Q.    You have some tabs.  We'll mark it.

6          A.    Okay.

7               (Thereupon, Defendant's Exhibit I was marked

8          for identification.)

9     BY MR. PLUNKERT:

10         Q.    It's my understanding you did not rely upon

11    the DOJ Report dated March 4th of 2015, which is now

12    marked as Exhibit I, in rendering your opinions; you

13    believe they're supportive of a few of them?

14         A.    Yes.

15         Q.    Okay.

16         A.    This is the After-Action Assessment of the

17    police response to the demonstrations by DOJ.

18             MR. PLUNKERT:  We can mark it as J.

19             (Thereupon, Defendant's Exhibit J was marked

20         for identification.)

21             THE WITNESS:  This is a binder of --

22    BY MR. PLUNKERT:

23         Q.    I was going to ask you a question about this.

24         A.    Okay.

25         Q.    Actually on the Ferguson, what does Exhibit I

234

```
1     support?  Which opinion of yours does Exhibit I

2     support?

3            A.    The fact that arrests must be -- let me look

4     at it.

5            Q.    Sure.

6            A.    Well, it supports my position that you must

7     arrest people with probable cause and you must use

8     reasonable force.

9            Q.    Anything else?

10           A.    I'm looking through it.

11                 It supports my opinion that arrests must be

12    supported by probable cause.

13           Q.    And those that you have said so far, you

14    agree those are general constitutional principles,

15    correct?

16           A.    Yes.

17           Q.    All right.  Anything else in there?

18           A.    They talk about detaining an officer --

19    detaining an individual without articulable reasonable

20    suspicion of criminal activity or arrest of a person

21    without probable cause.

22                 They're being critical of those types of

23    arrests.

24                 It supports my opinion that if you make an

25    arrest, you have to have probable cause.
```

1        Q.    Again, another general constitutional

2    principle, correct?

3        A.    Yes, and I think that's what we're going to

4    see here in -- in general.  The same thing with

5    excessive force.

6        Q.    Would it be safe to say that the support that

7    you find in Exhibit I is for general constitutional

8    principles?

9        A.    Yes.

10       Q.    You would agree that there's no specific

11   reference to any events in there that have an impact on

12   your opinion, like a specific event?

13       A.    Yes.

14       Q.    And also, you agree that any of the arrests

15   in this case, those are not contained in Exhibit I or

16   referenced in Exhibit I, are they?

17       A.    They are not, you're correct.

18       Q.    So kind of full circle, you could learn the

19   general principles that are stated in Exhibit I in other

20   documents such as case law which state the general

21   principles in constitutional law, correct?

22       A.    Yes.

23       Q.    And anything beyond that that you can point

24   to?

25       A.    Let me just -- there was -- let me just keep

1    looking.

2                Yes, it talks about the Ferguson Police

3    Department's use of force review system being

4    ineffectual, essentially non-existent, which is

5    supporting my opinion about -- that any time an officer

6    uses force, a supervisor must respond to investigate,

7    must complete a Use of Force Report and so forth.

8                And it also mentions on Page 38 that perhaps

9    the greatest deviation from Ferguson Police Department's

10   use of force policies is that officers frequently do not

11   report the force they use at all.

12        Q.    The Ferguson officers?

13        A.    Yes.

14        Q.    What bearing does that have -- and to be

15   certain, there are no Ferguson officers making any

16   arrests of the Plaintiffs in this case, right?

17        A.    Correct.

18        Q.    Okay.

19        A.    But what it does is support my position that

20   if you're going to use force, you have to report it.

21        Q.    The general principle?

22        A.    Yes.

23        Q.    I see.

24                You agree that what you report doesn't affect

25   whether there is probable cause to make the arrest,

```
1    correct?

2         A.    What you report on force?

3         Q.    Yes.

4         A.    Yes.

5         Q.    And you would agree that what you report on

6    the use of force doesn't impact whether excessive force

7    was used, correct?

8         A.    No.  What you report doesn't change what

9    happened.  Is that what you're trying to say?

10        Q.    Yes.  And even whether you report it doesn't

11   change what happened, correct?

12        A.    Correct.

13        Q.    And I think you finished flipping through

14   that.

15              Is there anything beyond what we've discussed

16   in Exhibit I that supports what you've said today that

17   you believe?

18        A.    I didn't go through every page.  I think that

19   there may have been language here about documentation of

20   arrests, as well.

21        Q.    Okay.

22        A.    So -- which goes back to my opinion that

23   arrests should be documented in police reports.

24        Q.    Anything other than that in Exhibit I?

25              I want to make sure why you're using "I".
```

1    Anything other than what you've told me so far?

2         A.    Not that I am aware of so far.

3         Q.    Other documents you have?

4         A.    Yep.  Let me get to these.

5               This is a deposition of Justin Cosma.

6         Q.    Okay.

7         A.    Deposition of Richard Mundy.

8               This is the Judge's order from the District

9    Court.

10        Q.    Was it Abdullah, right?

11        A.    Yes.  You had asked for my current Rule 26, I

12   believe, so that's there.

13        Q.    Okay.

14        A.    This is the actual -- you had asked for my

15   fee agreement, which is here.

16        Q.    Okay.  I think we marked that one too.

17        A.    I think you have one that's marked.  You had

18   also asked for documentation about past -- past fees

19   that I've charged.

20              So I went back as far as 2011, and I found a

21   deposition from 2011 where I charged $2,500.

22        Q.    Okay.

23        A.    You also asked for documentation about my

24   fees from four years ago I think is what it may have

25   said.

1          Q.     Sure, and I think we got that in the fee

2     agreement that you provided us, the stuff that we've

3     marked.

4          A.     Well, this is a -- this is an E-mail from

5     2011, which -- so as far back as 2011 I was charging

6     $300 an hour and a 10-hour retainer, so here's an E-mail

7     that supports that.

8          Q.     Okay.

9          A.     You had asked for a list of my advertising,

10    so I advertise with JurisPro, so here is my -- Juris,

11    J-U-R-I-S, Pro Expert Witness Directory, so I have a

12    print-out of everything there.

13         Q.     Okay.

14         A.     I also have a print-out of my advertising

15    from HG.org, which is another expert witness directory.

16              MR. HUGHES:  Could we mark those as

17         exhibits?

18              MR. PLUNKERT:  I'm going to try to mark them

19         all.

20              If there's a good way, Bob, that we can mark

21         all of these as a group or whatever you would like

22         to do to make it orderly.

23              MR. HUGHES:  You can mark some as a group,

24         but how about the advertising as K and L.

25                             - - -

1              (Thereupon, Defendant's Exhibits K and L were

2         marked for identification.)

3              THE WITNESS:  In the advertising you had also

4         asked for copies of different CVs that I may have

5         had over the years, so just for explanation, what I

6         do with my CV, I keep it current, so I've changed

7         it over the -- I've eliminated things that were

8         dated that I didn't think were important anymore to

9         my current work, and I've added things that -- such

10        as my current position.

11             I did find a CV from 2011, which doesn't

12        include my current work, and may have included some

13        of my professional activities that I have since

14        eliminated from my CV because it's really not

15        applicable anymore 'cause it's -- it's dated and so

16        forth, so there's an extra CV in here.

17   BY MR. PLUNKERT:

18        Q.    Okay.

19        A.    So if you wanted to mark those separately.

20             MR. HUGHES:  "K" is JurisPro.  "L" is

21        HG.org.

22             Is this your old CV?

23             THE WITNESS:  No.  The old CV is under the

24        JurisPro.

25                         - - -

```
 1      BY MR. PLUNKERT:

 2           Q.    Exhibit K is the JurisPro document that you

 3      just described?

 4           A.    Yes.

 5           Q.    And Exhibit L is --

 6           A.    HG Experts.

 7                 MR. HUGHES:  And just to make it clear,

 8           attached to Exhibit K is an old CV?

 9                 THE WITNESS:  Correct.

10      BY MR. PLUNKERT:

11           Q.    Do you want to shove all those in that one

12      and mark it as --

13           A.    Well, these are notes, but I have other notes

14      that I can probably put in that grouping.

15           Q.    Okay.  And, sir, can you mark "M" as your

16      notes?

17           A.    Yes.

18           Q.    And it's in a manila folder, correct?

19           A.    Yes.

20                 (Thereupon, Defendant's Exhibit M was marked

21           for identification.)

22                 THE WITNESS:  Okay.  This is my notes from

23           the deposition of Menzenwerth.  I'll just put that

24           in my notes.

25                                 - - -
```

```
 1    BY MR. PLUNKERT:

 2         Q.    Yes, that's great.

 3         A.    Nathan Burns, this will go in the Nathan

 4    Burns file.

 5         Q.    You can slide that in the binder.  That

 6    sounds great.

 7         A.    This is the Mundy depo.  I don't know where

 8    you want this.  And the Justin Cosma depo if you want

 9    that.

10         Q.    I guess unless you have a spare manila

11    folder, we'll just individually mark them.

12         A.    I don't.

13              (Thereupon, Defendant's Exhibits N, O and P

14         were marked for identification.)

15    BY MR. PLUNKERT:

16         Q.    Sir, Exhibit N is the Abdullah order; is that

17    correct?

18         A.    Yes.

19         Q.    Exhibit O is your highlighted copy, I

20    believe, two-sided of Richard Mundy?

21         A.    Yes.

22         Q.    Exhibit P is your highlighted copy of Justin

23    Cosma?

24         A.    Okay.

25         Q.    What don't we have marked?
```

```
1          A.    This is the depo of Antawn Harris, as well as

2     the police report regarding him, and I thought I had a

3     clip.

4          Q.    Keep it together.  We'll mark it.

5                (Thereupon, Defendant's Exhibit Q was marked

6          for identification.)

7     BY MR. PLUNKERT:

8          Q.    Sir, Exhibit Q is deposition of whom again?

9          A.    Antawn Harris, as well as the arrest report.

10         Q.    Thank you.

11               MR. HUGHES:  You mean the police report of

12         Antawn Harris?

13               THE WITNESS:  Yes.  Here's all the

14         correspondences with myself and Mr. Lattimer and

15         his firm.

16               MR. PLUNKERT:  We'll mark that one.

17               (Thereupon, Defendant's Exhibit R was marked

18         for identification.)

19    BY MR. PLUNKERT:

20         Q.    Exhibit R is your correspondence with

21    Mr. Lattimer in this lawsuit, correct?

22         A.    Yes.

23         Q.    And then you have I believe what you want to

24    mark as a group, which is a big brown folder, right?

25         A.    Yes.
```

1          Q.     And what is that?

2          A.     So I have a billing folder.

3          Q.     Okay.

4          A.     I have the report, the Ferguson report.   I

5     have -- I included this in case it came up, but it

6     didn't come up, so it's copies of certifications of

7     recent training that I've had.

8                 I don't know if you're interested on that or

9     not.

10         Q.     I trust it.   I'm sure it's true.

11         A.     I mean, do you want me to include this?

12         Q.     Feel free to include it in the folder, sure.

13                I just don't need to ask you about any of

14    it.

15         A.     I'm going to stick it in the back of billing

16    for now.

17         Q.     Sure.

18         A.     Here's a draft, expert report.

19                MR. HUGHES:  We'll actually mark that

20         separately.

21                THE WITNESS:  Should I put it in the folder?

22                (Thereupon, Defendant's Exhibit S was marked

23         for identification.)

24    BY MR. PLUNKERT:

25         Q.     What we marked as Exhibit S is a draft of

```
 1      your report, correct?

 2          A.    Yes.

 3          Q.    And you've placed that inside a brown binder,

 4      which we should probably now mark as Exhibit T; is that

 5      correct?

 6          A.    Yes.

 7                (Thereupon, Defendant's Exhibit T was marked

 8          for identification.)

 9                THE WITNESS:  The next folder is use of force

10          articles and policies that I review periodically

11          when I'm dealing with a use of force case.

12      BY MR. PLUNKERT:

13          Q.    That's also in Exhibit T, correct?

14          A.    Yes.

15          Q.    Okay.

16          A.    I also have use of force policies from the

17      IACP and position papers.

18                I have another folder just called Resource

19      Material, which is, again -- has some articles about

20      DOJ, review of Ferguson about crowd management and

21      protecting civil rights.

22                It also contains some CALEA, the Commission

23      on Accredication of Law Enforcement Agencies, standards.

24          Q.    And all those documents plus the IACP

25      document is contained in Exhibit T, correct?
```

246

```
 1          A.    Yes.

 2          Q.    Okay.

 3          A.    I think that's the loose stuff for now.

 4                I have another binder with all the

 5   interrogatories --

 6          Q.    Okay.

 7          A.    -- and answers.

 8                MR. HUGHES:  We don't need that.

 9   BY MR. PLUNKERT:

10          Q.    Unless you made notes on it, we don't need

11   it.

12          A.    I don't think I made any notes.

13          Q.    That probably didn't have much influence on

14   your opinions, did it?

15          A.    (The Witness shook head in the negative.)

16          Q.    That's a no, right?

17          A.    No.  Sorry.

18                These are just more notes on individuals that

19   I'll put in the binders.

20          Q.    Okay.  Just state which binder it's going in.

21          A.    So this is going into the Tracey White

22   folder.

23          Q.    Oh, they're all named?  You can just put them

24   in.  That's okay.

25                MR. HUGHES:  It's your handwritten notes?
```

247

```
 1              THE WITNESS:  Yes.
 2    BY MR. PLUNKERT:
 3         Q.    That's okay.  We don't have to do it on the
 4    record.  I'll trust you to put it in.
 5         A.    This is Dwayne Matthews.
 6              MR. HUGHES:  They're being placed where?
 7              THE WITNESS:  In the front pocket of the
 8         binders of the appropriate --
 9    BY MR. PLUNKERT:
10         Q.    That's great.
11              Any other documents that we haven't marked?
12         A.    I'm looking.  You wanted everything.
13              This box, and I think there's a cover,
14    contains the files of Kerry White and the two Bowers and
15    my notes.
16         Q.    Okay.
17         A.    When these were printed, they were not
18    printed with a three -- three holes punched, so I
19    couldn't put them in a binder and just stuck them in
20    here.
21              MR. HUGHES:  Can I see that?
22              THE WITNESS:  (The Witness complied.)
23    BY MR. PLUNKERT:
24         Q.    It's his folks, so it's up to him.
25         A.    I'm sorry?
```

1          Q.     It's his folks, so it's up to him if he wants

2     to mark them.

3          A.     Oh, okay.  I think that's basically it.

4                 Oh, wait a minute.

5                 This is a FEMA Field Force Command and

6     Planning Manual, which talks about the things that I

7     talked about regarding arrest teams, booking processes,

8     things of that nature.

9                 MR. PLUNKERT:  What is the next exhibit, U I

10         think?

11                (Thereupon, Defendant's Exhibit U was marked

12         for identification.)

13    BY MR. PLUNKERT:

14         Q.     Sir, we've marked that as Exhibit U,

15    correct?

16         A.     Yes.

17         Q.     Anything else?

18         A.     No.

19         Q.     All right.  Thank you for bringing those and

20    thank you for patiently marking those as we went through

21    them.

22                We will figure out what to copy, what to scan

23    at another point in time, but they'll just be part of

24    the record as exhibits.

25                I have just a few more questions on things

249

```
 1     that I was thinking of.
 2                Have you ever been boots on the ground during
 3     a riot?
 4          A.    Yes.
 5          Q.    Okay.
 6                MR. HUGHES:  Other than the New Year's Eve
 7          riot?
 8                THE WITNESS:  Well, that's what I'm referring
 9          to.
10                MR. LATTIMER:  One at a time.  One at a time.
11     BY MR. PLUNKERT:
12          Q.    Other than that New Year's Eve riot?
13          A.    It was an annual event, so I have a specific
14     recollection of -- of one because I was -- I received a
15     dose of CS gas, so that's -- is strong in my memory, but
16     I'm sure I was out there for other events on New Year's
17     Eve.
18                I just don't have specific details about that
19     information.
20          Q.    Did you deploy any less lethal munitions?
21          A.    No.
22          Q.    Were you on a skirmish line?
23          A.    Yes, I was.
24          Q.    Did you make any arrests?
25          A.    No.
```

 1          Q.    Were you assaulted?

 2          A.    No.

 3          Q.    Was there any verbal abuse that you

 4     received?

 5          A.    Yes.

 6          Q.    Such as what?

 7          A.    Again, this was 40 years ago or so.

 8          Q.    Okay.

 9          A.    I don't recall exactly what they said, but I

10     can tell you it wasn't complimentary.

11          Q.    Sure.  And you have not been a sworn police

12     officer for approximately ten years; is that right?

13          A.    Correct.

14          Q.    Do you have the authority to make an arrest?

15          A.    Today?

16          Q.    Yes.

17          A.    No, I do not.

18          Q.    I assume that there is continuing education

19     in Florida in order to maintain a license to be an

20     officer?

21          A.    Yes.

22          Q.    And that licensure, what do you call it?

23          A.    Certification.

24          Q.    And is that certification up to date?

25          A.    No.

1          Q.    Okay.

2          A.    And the continuing education is not -- the

3    last time I had continuing education was in 2008.

4                I took a 40-hour course, which is required

5    every four years, so from 2008 through 2012 I would have

6    met the continuing education requirements.

7                What happened, though, was because my --

8    because of my retirement from Fort Lauderdale Police and

9    my not being employed by a law enforcement agency, it

10   exceeded eight years.

11               In order for me to be certified, I don't have

12   to go back to the full Academy to be certified again,

13   and I made a determination I wasn't going to do that

14   because of practical reasons, because in order to

15   qualify for a State pension, which is different from the

16   Fort Lauderdale pension, I would have to serve eight

17   years with the Sheriff's Office to vest.

18               I knew I was not going to be with the

19   Sheriff's Office for eight years, so I made a decision

20   I'm not going to go back to the Academy.  I'll serve in

21   a civilian capacity, which I do today.

22         Q.    You agree with respect to the Federal

23   Constitution an arrest must be supported by a probable

24   cause for any crime, correct?

25         A.    Yes.

1        Q.    Not necessarily the crime that was envisioned

2    at the time of the arrest, correct?

3        A.    Yes.

4        Q.    And you agree that the prosecutor is really

5    the one that brings the charges formally?

6        A.    Yes.

7        Q.    And the police officers technically recommend

8    what the charge is, right?

9             MR. LATTIMER:  Objection, relevance and

10            materiality, misstates the facts.

11            THE WITNESS:  Police officers make arrests

12            based on what they believe is probable cause to

13            charge somebody with a particular crime.

14             If at the time they presented a case to the

15            prosecutor a determination is made that another

16            charge is more suitable, then that could be made,

17            but the -- the arresting officers arrest somebody

18            based on what they believe at the time is -- is

19            probable cause for a particular crime.

20   BY MR. PLUNKERT:

21        Q.    And in your experience as an officer,

22   everyone that you arrest isn't necessarily prosecuted,

23   correct?

24        A.    Correct.

25        Q.    I mean, there's sometimes a little bit of a

253

1  rubbing of the wrong way between law enforcement and the

2  prosecutors because sometimes prosecutors will just

3  choose with prosecutorial discretion not to prosecute

4  someone that the officers had seen commit a crime,

5  correct?

6      A.   Correct.

7      Q.   And sometimes those charges, as you

8  mentioned, may change if the prosecutor sees elements to

9  another crime in the review of the file, correct?

10     A.   Yes, absolutely.

11     Q.   And sometimes that's an outstanding warrant,

12  correct?

13     A.   Yes.

14     Q.   And are you aware that Theophilus Green had

15  outstanding warrants at the time of his arrest?

16     A.   Yes.

17     Q.   And you agree that supports probable cause to

18  arrest someone on that warrant alone, correct?

19     A.   Yes.

20     Q.   In other words, it's not a warrantless arrest

21  at that point; it is an arrest on a warrant, right?

22     A.   Yes.

23     Q.   And a magistrate has already determined

24  probable cause, right?

25     A.   Yes.

```
 1              MR. PLUNKERT:  Well, I appreciate your time

 2         today and your patience.  That's all the questions

 3         I have for you.

 4              THE WITNESS:  Okay.  Thank you.

 5                        REDIRECT EXAMINATION

 6    BY MR. HUGHES:

 7         Q.    I have a few more.

 8              You just mentioned you reviewed use of force

 9    policies from IACP, correct?

10         A.    Yes.

11         Q.    You're not going to be testifying that

12    St. Louis County's use of force policy is deficient in

13    any way, are you?

14         A.    No.

15              MR. LATTIMER:  I thought it was IAACP.

16              THE WITNESS:  No.  It's International

17         Association of Chiefs of Police, IACP.

18    BY MR. HUGHES:

19         Q.    We touched upon this earlier today, but when

20    you're talking about decontamination and medical aid to

21    prisoners, you're talking about when chemical munitions

22    are used there should be a process set up to allow for

23    decontamination from these chemicals.

24              Are you saying for CS tear gas and even Mace

25    there should be something other than fresh air and
```

1    time?

2         A.    Yes.

3         Q.    And you said it's widely accepted practices.

4              Any of the exhibits here, all your stuff

5    here, does anything here say, anything that you brought

6    say that there's a widely accepted practice that there

7    must be decontamination set up for tear gas?

8         A.    Yes.  In the Field Force Command and Planning

9    Manual produced by FEMA.

10             MR. LATTIMER:  What's the exhibit number?

11             THE WITNESS:  This is Exhibit Number U.

12             On Page TT-22 it talks about decontamination,

13        and it says that decontamination procedures and

14        on-site facilities must be coordinated with the

15        fire department, emergency medical services and

16        hospitals.

17             Arrested people who are contaminated must be

18        decontaminated and treated.  Procedures need to be

19        developed to handle both cooperative and

20        uncooperative arrestees.

21   BY MR. HUGHES:

22        Q.    Does it say what decontaminated procedures

23   would be?

24        A.    I don't know whether it does or not.  It gets

25   into detail further on.

```
 1                 There are other manuals that are produced by
 2      FEMA regarding field force, and perhaps those manuals
 3      are more specific about setting up decontamination
 4      procedures.
 5           Q.    I mean, you mentioned one time on New Year's
 6      Eve tear gas, you were subject to tear gas.
 7                 How were you decontaminated in that case?
 8           A.    I really couldn't tell you what happened back
 9      then.
10           Q.    It was just fresh air; isn't that correct?
11           A.    No.  I think my response was I don't
12      recall --
13           Q.    Okay.
14           A.    -- whether I was treated or what happened
15      because it was so long ago.
16           Q.    Okay.
17           A.    But I'll also -- on -- in Section RCA-29
18      there's another section on decontamination of riot
19      control agents, and again, it talks about the
20      requirement to have decontamination procedures not only
21      for -- for law enforcement first responders, other
22      police officers, arrested persons and community
23      members.
24           Q.    And again, what are the decontamination
25      procedures?
```

```
 1          A.    They should have decontamination kits

 2    consistent of a decontamination site, water sources,

 3    exhaust fans, paper towels, spray bottles containing

 4    water, a change of clothing, plastic bags, tools to

 5    mark --

 6          Q.    Is it for --

 7                MR. LATTIMER:  Let him finish.  Let him

 8          finish.  Let him finish.

 9                THE WITNESS:  And there's also

10          decontamination considerations for the arrested and

11          the detained.

12    BY MR. HUGHES:

13          Q.    Is this for tear gas?

14          A.    This is for riot control agents.

15          Q.    Which is what?

16          A.    Which includes --

17          Q.    Do we know what that is?

18          A.    Yes.  It includes chemical agents, such as

19    tear gas and OC spray.

20                Those are the agents that were deployed

21    during this response to the disturbances.

22                And what I'm suggesting to you is that if

23    you -- if you're going to deploy chemical agents in this

24    setting where people who are arrested, people who are

25    actually other police officers or community members, you
```

1    should have a process to assist them with

2    decontamination of those agents.

3         Q.    Do you --

4         A.    And FEMA in their Field Force Command and

5    Planning Manual specifies that you need to do that.

6         Q.    Can you cite me or tell me what the

7    decontamination procedures are of the Broward County

8    Sheriff's Department, your employer?

9         A.    We turn that responsibility over to the

10   Department of Fire Rescue, and they would be the ones

11   who have that expertise as to what they would do to

12   establish those procedures.

13         We do have training, joint department

14   training with Fire Rescue and the Department of Law

15   Enforcement regarding responses to civil disturbances,

16   and the decontamination process is part of that response

17   plan.

18         And another part of the response plan is the

19   booking procedure that I mentioned before because that's

20   the widely accepted practice for police response to

21   civil disturbances.

22         Q.    Regarding your bullet point number 2,

23   supervisory oversight --

24              MR. LATTIMER:  He's talking about your

25         report.

```
 1    BY MR. HUGHES:

 2         Q.    Of your report.

 3         A.    Yeah.

 4         Q.    You don't have any opinion whether the civil

 5    rights of any particular Plaintiff in this case were

 6    affected with regard to supervisory oversight?

 7         A.    No.  I think that's a determination that's

 8    made by the jury, and my opinion would be that to assist

 9    the jury is to explain to them that when you make an

10    arrest, that there has to be supervisory oversight of

11    those arrests and those reports, as well as supervisory

12    oversight of the use of force to ensure that the force

13    was within policy and was with -- and was objectively

14    reasonable.

15         Q.    Do you have any idea of how many supervisors

16    were present that were nearby with all of the particular

17    Plaintiffs in this case?

18         A.    No, and I'll also make mention that there

19    were supervisors that were responsible for some of the

20    force and were involved in some of the arrests, so I

21    would not expect a supervisor to investigate his own use

22    of force.

23         Q.    What supervisor was involved in use of force

24    of any of the Plaintiffs?

25         A.    Well, if you look at -- Sergeant David Ryan
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
 1     took Kerry White to the ground, if I remember

 2     correctly.

 3          Q.     Tracey White?

 4          A.     Kerry White.

 5          Q.     Kerry White.  You said Sergeant David Ryan?

 6          A.     I believe so, but let me further qualify

 7     that.

 8                 If a supervisor in any of these arrests used

 9     force or -- used force, then he should not review his

10     own use of force.

11                 Somebody else -- his supervisor or somebody

12     of a higher rank should review his use of force.

13          Q.     Do you have an estimate as to how much time

14     the particular officers that are being sued by Dwayne

15     Matthews spent with Dwayne Matthews?

16          A.     No.

17          Q.     Do you have an estimate of time, a particular

18     amount of time that the particular officers sued by

19     Nathan Burns spent with Nathan Burns?

20                 MR. LATTIMER:  Objection as to relevance and

21          materiality.

22                 THE WITNESS:  No.

23     BY MR. HUGHES:

24          Q.     Do you have an opinion as to the length of

25     time that the officers involved in the arrest of Bowers,
```

1     Bowers and Kerry White spent with Bowers, Bowers and

2     Kerry White?

3                    MR. LATTIMER:  Objection as to relevance and

4          materiality.

5                    THE WITNESS:  No.

6     BY MR. HUGHES:

7          Q.    You understand that these were officers who

8     were on skirmish lines and had to go back to their

9     skirmish lines?

10         A.    I understand that these were officers that

11    were involved in the skirmish lines and was part of

12    Arrest Teams who determined and decided to go back to

13    the skirmish lines.

14         Q.    I mean, you're not aware that they had, you

15    know, command officers nearby that had these detectives

16    back on the skirmish lines right away?

17         A.    I'm not aware of the -- any command officers

18    that were given direction.

19                What I am aware of is that the officers made

20    arrests and they turned the arrested parties over to

21    another police officer, who subsequently turned them

22    over to a transport officer in just about all of these

23    cases, and -- let me finish.

24         Q.    Okay.

25         A.    And they decided that they were going back to

```
 1    the skirmish line instead of completing a police report

 2    at the time.

 3              That's a decision that -- that was made,

 4    and -- and that's what happened.

 5              I also know that these police officers were

 6    on 12-hour shifts.

 7              It was reported that they were working

 8    12-hour shifts.

 9              At some point they were relieved from their

10    duty and had time at that point to document their

11    activities and their arrests.

12        Q.    Going back to decontamination, in your report

13    you do not explain which Plaintiffs, if any, you are

14    talking about that should have been decontaminated.

15              Are you specifying any of the particular

16    Plaintiffs in this case?

17        A.    No.  I would -- I would just say that they

18    failed to establish those procedures, and any one of the

19    Plaintiffs who was subject to chemical agents should

20    have had the opportunity to be decontaminated.

21        Q.    Can you tell me which Plaintiffs were

22    subjected to anything that needed to be decontaminated?

23        A.    The Plaintiffs that were subject to CS gas

24    and those that were subject to OC spray.

25              At this stage of the day, I don't recall what
```

1    Plaintiffs in particular were complaining that they were

2    subject to chemical agents.

3           Whoever those Plaintiffs were, if any, they

4    should have been decontaminated and treated.

5    Q.    You were talking before about -- saying that

6    there's a dispute with regarding to facts in this case.

7           Are you saying that whenever a police report

8    is prepared within a day or so of the arrest, that then

9    there is no dispute regarding the facts of the arrest

10   between the police and the arrestees?

11   A.    No.  What I am saying is that when a police

12   report is completed contemporaneously with an arrest,

13   the likelihood of the police report to be complete or --

14   or the memory of the officer to recall what took place

15   is better than eight months later when his memory has to

16   be refreshed by an investigator.

17          And when you do something that's eight months

18   later through an investigator who had to refresh the

19   officer's memory, the credibility of the officer's

20   account comes into question as opposed to if he

21   completed his police report contemporaneously when other

22   officers who were there completed supplemental reports,

23   then you have more support and credibility for your

24   position.

25          When you don't do it or you have somebody

1    else do it eight months later, it raises questions as to

2    the accuracy, thoroughness of those reports, and that's

3    where I say that there is a dispute as to facts.

4           And again, that's not for me to determine

5    what facts are correct.  That's a decision for the

6    jury.

7       Q.    It's a decision for the jury, but you would

8    agree that if the police reports are accurate, then in

9    each instance involving each Plaintiff there was

10   arguable probable cause to arrest?

11          MR. LATTIMER:  Objection.  He's answered the

12          question with respect to every Plaintiff both by

13          you and Mr. Plunkert all day.

14   BY MR. HUGHES:

15      Q.    Would you like to -- you were interrupted.

16   He's trying to tell you what to say, but --

17      A.    I don't know that he's trying to tell me what

18   to say.  You're going to have to ask it again or have it

19   read back.

20      Q.    Okay.

21          (Thereupon, the requested question was read

22          back.)

23          THE WITNESS:  No, I would not because there

24          were some cases where with the example of Kerry

25          White and the Bowers, there was only three of them

```
1              in the vehicle, and I don't know how they would be

2              considered with a group of six or more when they

3              were in a vehicle.

4                   So I would question whether that's -- whether

5              there was probable cause to make the arrest for

6              failure to disperse.

7    BY MR. HUGHES:

8         Q.   Well, the question wasn't if the police

9    reports are accurate if there's probable cause to arrest

10   for failure to disperse.

11             The question was if the police reports are

12   accurate in each instance involving each Plaintiff,

13   there is arguable probable cause to arrest for

14   something?

15             MR. LATTIMER:  Objection, asked and

16        answered.

17             THE WITNESS:  I'm going to say no, because if

18        the police report regarding Kerry White and the

19        Bowers, if it's accurate, and what the police

20        report says is that there's three of them in the

21        car and they were charged with failure to disperse

22        but there was only three of them when it's my

23        understanding that there needed to be six of them

24        or more, I would not agree that there's probable

25        cause to arrest them.
```

```
 1    BY MR. HUGHES:

 2         Q.    So whether or not there's probable cause to

 3    arrest or not is not dependent upon when the police

 4    report is prepared?

 5         A.    Yes.  We -- we went through that earlier.  I

 6    agree with you.

 7         Q.    And whether or not excessive force was used

 8    or not is not dependent upon when the police report is

 9    prepared?

10         A.    Correct.

11         Q.    All right.  You had one decision, Mustafa

12    Abdullah, which had something to do with the free speech

13    zone on August 19th, is that correct, Keep Moving?

14         A.    Yes.

15         Q.    Okay.

16         A.    The Five Second Rule.

17         Q.    The Five Second Rule.

18               Obviously it has nothing to do with these

19    particular Plaintiffs since there wasn't any Five Second

20    Rule involving them, Keep Moving rule, but did

21    Mr. Lattimer explain why he sent that to you?

22         A.    No.

23         Q.    You referred to one of those reports saying

24    there wasn't tracking of force.

25               Were you actually saying there wasn't
```

```
1    tracking of use of less lethal force?

2              Isn't that what the report was talking

3    about?

4         A.   It may have been talking about less lethal

5    force, but if -- if the Department of Justice is

6    critical that the agency did not track less lethal

7    force, I'm going to go out on a limb and say you know

8    what, they also didn't track other forces that were

9    used, such as taking people to the ground.

10             That should have been tracked and documented,

11   as well, because that's the standard.

12             Even though the Department of Justice may not

13   have mentioned that, it does not mean you shouldn't

14   track -- you should only track less lethal force.

15             You should track all force that's being

16   used.  That's the standard of care.  That's the

17   widely accepted police practice in -- in the United

18   States --

19        Q.   Okay.

20        A.   -- regarding force.

21        Q.   So you understand that when you talk about

22   standards of care, what you call standards of care and

23   when you talk about practices of police, that doesn't

24   necessarily coincide with a constitutional violation; is

25   that correct?
```

```
1          A.     That's correct.

2                 MR. HUGHES:  All right.  Okay.  I guess

3          that's all.

4                 Do you have any other questions, Bob?

5                 MR. PLUNKERT:  I think Greg might.

6                 MR. HUGHES:  Hmm?

7                 MR. PLUNKERT:  I think Greg might.

8                        CROSS-EXAMINATION

9     BY MR. LATTIMER:

10         Q.     Just a couple things.

11                I wanted to clarify something Mr. Plunkert

12         asked you about reporting.

13                He asked you about were you aware of any

14         reports of any of the arrests in the City of Ferguson;

15         do you remember that?

16         A.     I'll accept that, but go ahead.

17         Q.     Okay.

18                MR. HUGHES:  Excuse me.  While you're asking

19         him, could you find Exhibit R?  Can I see that, the

20         correspondence with Mr. Lattimer?

21                MR. LATTIMER:  So you want me to stop and

22         wait for him to find that?

23                THE WITNESS:  What do you want me to do,

24         guys?

25                MR. HUGHES:  Well, I just thought you
```

```
 1            could --
 2                 MR. LATTIMER:  Well, he can't answer my
 3            questions and find it.
 4                 THE WITNESS:  (indicating).
 5                 MR. HUGHES:  Thank you.
 6                 MR. LATTIMER:  So do you want me to wait or
 7            what?
 8                 MR. HUGHES:  If you thought I rudely
 9            interrupted you --
10                 MR. LATTIMER:  You did.  You did.  You know
11            you rudely did.
12                 MR. HUGHES:  -- I apologize.
13                 MR. LATTIMER:  But anyway, can I continue or
14            do you want me to wait?
15                 MR. HUGHES:  Yes.  Yes, you may.
16                 MR. LATTIMER:  All right.
17       BY MR. LATTIMER:
18            Q.   What I was asking you was about a question
19       that Mr. Plunkert asked about reporting of any of the
20       arrests to the City of Ferguson.
21                 Are you with me so far?
22            A.   Yes.
23            Q.   All right.  Now, in this case when the
24       arrests were made, did you determine where the people
25       were taken, the Plaintiffs?
```

```
 1          A.    When I looked at the investigative report, it

 2    seems to indicate that they were taken to Central County

 3    Precinct -- no.  I'm sorry.  I'm going to -- they were

 4    taken to the County Jail.

 5          Q.    All right.  So is it your general

 6    understanding they were taken to County Jail or Ferguson

 7    County Jail, as well?

 8          A.    I don't recall.  I'd have to look at each

 9    individual one to see what the report says.

10          Q.    Let's assume for purposes of this question,

11    because I don't want to have you dig through all this

12    stuff, that some were taken to St. Louis County and some

13    were taken to City of Ferguson.  Okay?

14          A.    Okay.

15          Q.    And when they were taken to those particular

16    jails, when they were taken to these particular

17    facilities, nothing was included that would indicate

18    the basis for the charges against them, nothing in

19    writing.

20          A.    Correct.

21          Q.    Okay?  I want you to assume that.  All right?

22          A.    Yes.

23          Q.    Both with respect to St. Louis County and

24    City of Ferguson, correct?

25          A.    Yes.
```

1          Q.    Now, in your opinion what should have

2     occurred at that point?

3               MR. PLUNKERT:  I'll object as to form.

4               THE WITNESS:  In my experience county jails

5          should not accept prisoners without the

6          presentation of probable cause.

7     BY MR. LATTIMER:

8          Q.    And when you take people into custody without

9     a determination of probable cause, is that consistent or

10    inconsistent with national standards?

11         A.    It's inconsistent with the American

12    Correction Association's standard that probable cause

13    should be presented at the time a prisoner is turned

14    over to correction personnel.

15         Q.    All right.  Now, are you aware in this case

16    of any documentation being prepared with regard to

17    probable cause for any of the Plaintiffs?

18         A.    No, other than by Detective Menzenwerth.

19         Q.    Let me clarify.

20               Are you aware of any contemporaneous

21    documents being prepared?

22         A.    No.

23         Q.    Are you aware of any of the Plaintiffs being

24    taken before a Magistrate and sworn testimony presented

25    with respect to a probable cause determination?

```
1              A.      No.

2              Q.      And were you aware of anything at all that

3       was prepared by any Police Department with respect to

4       these individuals being taken to a jail or a detention

5       facility and documents were provided indicating that

6       probable cause existed for their arrest?

7              A.      No.

8              Q.      And then you were asked -- this is the last

9       little thing -- you were asked by Mr. --

10             MR. PLUNKERT:  Plunkert?  Hughes?

11      BY MR. LATTIMER:

12             Q.      No, Hughes, about the timing of the reports

13      in that when you prepare a report, it does not indicate

14      whether or not probable cause existed.

15             Do you recall that?

16             A.      Yes.

17             Q.      What is the significance of the preparation

18      of contemporaneous reports?

19             A.      There's a lot of significance because it

20      allows the people who have been arrested to understand

21      what they have been arrested for and what the police

22      department -- what the police officers are saying to

23      help them prepare a defense against those charges.

24             It allows prosecutors to be able to bring

25      forward appropriate charges for those that have been
```

```
 1     arrested.
 2              It also allows for accountability and
 3     transparency that this is not -- we don't function in a
 4     police state, that police officers are required to
 5     justify the actions that they take, and they do that
 6     through police reports.
 7          Q.   Okay.
 8          A.   So there's a lot of implications as to why
 9     you want to do a police report.
10              And the other issue is you want to do it
11     contemporaneously because that's when it's fresh in your
12     mind.
13              That's when the incidents have happened in
14     the recent past, and you can recall what happened with
15     clarity, with detail and put that information into the
16     report.
17              What happens with memory and what happens
18     when you're doing something eight months later, you --
19     your memory fades.  It deteriorates.
20              Sometimes you're filling in the gaps with
21     what you think happened.
22              Sometimes your memory is contaminated from
23     talking to others or as in the case with Menzenwerth,
24     you're being -- your memory's being refreshed -- well,
25     it may not be your memory that's being refreshed.
```

```
 1                It's the information that he's giving you

 2      that causes you to think this is what happened when, in

 3      fact, it may not.

 4                So in police -- in the police profession

 5      people -- police officers are taught from day one if you

 6      don't document things, it didn't happen.

 7                You have to document everything that you do.

 8                It's a standard that I learned in 1974 in the

 9      Police Academy and it has not changed and it's still

10      current today.

11           Q.   Now, the last thing on Page 17 of your

12      report -- do you have that in front of you?

13           A.   I don't know where it is.

14                MR. HUGHES:  I have an extra copy I think.

15                THE WITNESS:  17?

16      BY MR. LATTIMER:

17           Q.   17.

18           A.   This one doesn't have 17.

19           Q.   How about taking mine.

20                MR. HUGHES:  Sorry about that.

21      BY MR. LATTIMER:

22           Q.   And I'm going to draw your attention to the

23      part that talks about conclusion.

24                Do you see that?

25           A.   Yes.
```

275

```
1            Q.    And you talk about an environment that was

2       allowed to exist --

3            A.    Yes.

4            Q.    -- in Ferguson.

5                  Do you see that?

6            A.    Yes.

7            Q.    Now, when you talk about environment, explain

8       exactly what it is you're talking about.

9            A.    I'm talking about the activities of the

10      police officers that were involved in this response to a

11      civil disturbance and the civil disturbance itself, but

12      what I'm saying is that because of Chief Belmar's

13      position, that there was joint command, that he and

14      Jackson, City of Ferguson, St. Louis County, allowed

15      this environment to exist where police officers were

16      just not held accountable, were not required to provide

17      probable cause for arrest, not required to document the

18      use of force, and that -- allowing that to exist is just

19      inconsistent with police practices because they should

20      have demanded, and Chief Belmar talks about that, that

21      it was his understanding, it was his expectation that

22      these arrests were documented, that these uses of force

23      were documented and that was his expectation.

24                 So he takes the position that's what we

25      should have done, that's what he thinks they did, but in
```

276

1      reality, they didn't do it contemporaneously with the

2      incidents themselves.

3           Q.    All right.  And what other foreseeable

4      consequences of the failure to take such actions --

5      failure to make sure that that environment does not

6      exist?

7                MR. PLUNKERT:  That calls for speculation.

8           He may answer.

9                THE WITNESS:  You're going to violate

10          people's civil rights by using force that you're

11          not going to report that may be unreasonable,

12          objectively unreasonable force, that you may be

13          detaining people without -- without probable cause

14          because you need to have somebody that provides

15          some oversight to what the police officers are

16          doing, and you do that through supervision.

17               That's standard in law enforcement, because

18          if you don't, as I said, you could have people

19          arrested where probable cause did not exist.

20               You could have use of force applied that's

21          objectively unreasonable and not even report it,

22          and that's unreasonable.

23     BY MR. LATTIMER:

24          Q.    And would it be fair to say that because we

25     give police officers extraordinary power, we have to

```
 1      hold them accountable for the actions that they take?

 2                   MR. PLUNKERT:  Object to the form.  You can

 3           answer.

 4                   THE WITNESS:  Absolutely, and that's why

 5           police departments require reporting.

 6                   That's why -- that's why they require

 7           reporting of use of force.

 8                   And let me -- and now that you're mentioning

 9           this --

10                   MR. PLUNKERT:  Move to strike as narrative

11           and non-responsive.

12      BY MR. LATTIMER:

13           Q.    You can answer.  You can go ahead.

14           A.    Even Menzenwerth says that he was directed

15      to -- to complete these reports not for any purpose

16      other than to comply with Uniform Crime Reports, and he

17      says that he was directed by somebody in command level.

18                   And that is absolutely not the reason why you

19      want to document use of force in arrests.

20                   It's part of it.  You have to document

21      arrests for the Uniform Crime Report, but that cannot be

22      your -- your -- your sole focus or reason for having

23      Menzenwerth go back and try to re-create these reports.

24                   Not for Uniform Crime Reports.  It's for

25      doing the right thing, documenting arrests and
```

```
1    documenting use of force.

2         Q.    And when an environment -- would it be

3    correct to say that when an environment of

4    unaccountability exists, that that is an environment

5    that is ripe for violations of the constitutional rights

6    of the citizen?

7              MR. PLUNKERT:  Object to the form as leading.

8         You can answer.

9              MR. HUGHES:  I join.

10             THE WITNESS:  Yes.

11             MR. LATTIMER:  Thank you.  That's it.

12                    RECROSS-EXAMINATION

13   BY MR. PLUNKERT:

14        Q.    To touch on these questions that you just

15   answered -- I'm not going into anything else -- did

16   Theophilus Green or Damon Coleman, were they kept more

17   than 48 hours in the St. Louis County Jail?

18        A.    I don't believe so.

19        Q.    You agree that failure to provide

20   documentation contemporaneously with an arrest to the

21   person that's intake at jail doesn't violate any

22   constitutional provision, does it?

23        A.    No.

24        Q.    Okay.

25        A.    But it would violate a standard of the
```

1    American Correction Association, which would -- which

2    says before you accept a prisoner, you have to make sure

3    that there's probable cause to accept them.

4            And in this case there was no probable cause

5    that -- or probable cause that was documented.

6        Q.    Sure, and I understand your national standard

7    part, and I'm separating that from a constitutional

8    amendment that bars against it.

9            There's no constitutional amendment that is

10   violated by failing to provide a contemporaneous

11   documentation at an arrest, correct?

12       A.    That's correct.

13       Q.    And the three Maryland Heights officers, do

14   you know whether they knew the report wouldn't be

15   written for eight months when they made the arrest and

16   conveyed them?

17       A.    No.

18       Q.    They didn't have reason to know it would take

19   that long, did they?

20       A.    No.

21       Q.    Was anyone at the City of Ferguson tasked

22   with the assignment to write any reports about any of

23   these arrests?

24       A.    I don't know.

25       Q.    Do you believe that the Municipality of

1    Ferguson influenced St. Louis County's policies and

2    procedures and the environment?

3              Did I understand that right?

4         A.    No.  What the report says is that they

5    allowed an environment to exist where you didn't have to

6    document arrests, where you didn't have to document use

7    of force.

8         Q.    In Ferguson which report are you talking

9    about, the DOJ?

10        A.    My report.

11        Q.    Oh, okay.  Okay.  So when you say "they", are

12   you talking about the City of Ferguson, St. Louis County

13   or what?

14        A.    Yes.  Ferguson, St. Louis County, Chief

15   Jackson and Chief Belmar, because it's my understanding

16   from Belmar's deposition that there was joint command.

17        Q.    Do you think that Menzenwerth was influenced

18   at all by any environment that may or may not have been

19   created by the City of Ferguson?

20        A.    I don't know.

21             MR. PLUNKERT:  That's all I have.  Mike, what

22        do you think?

23                  FURTHER DIRECT EXAMINATION

24   BY MR. HUGHES:

25        Q.    This was marked, I think, as Exhibit R.  It

```
 1        hasn't been marked.  This is the correspondence.

 2             A.    Wait a minute.

 3                   MR. LATTIMER:  It was in a manila folder --

 4                   MR. PLUNKERT:  It was in a folder.

 5                   MR. LATTIMER:  -- that has a sticker on it.

 6                   MR. PLUNKERT:  Right here.

 7                   MR. HUGHES:  Oh, right.  Okay.

 8        BY MR. HUGHES:

 9             Q.    Okay.  Defendant's Exhibit R has your

10        Consultant Expert Fee Retainer Agreement.

11                   It has your list of cases.  It has your

12        Curriculum Vitae and then it has E-mails that were

13        exchanged.

14                   It seems like it's mostly E-mails that were

15        sent to you by Mr. Lattimer and one or two E-mails sent

16        by you to him; is that correct?

17             A.    There's a few from Mr. Lattimer I think.

18             Q.    It's almost all from Mr. Lattimer, isn't it?

19             A.    No.

20             Q.    Okay.

21             A.    They're also from --

22             Q.    Or Mr. Lattimer's office?

23             A.    Yes.

24             Q.    Okay.

25             A.    These are all from Mr. Lattimer's office.
```

282

```
 1          Q.    And sandwiched in between two E-mails are two
 2    paragraphs, so I want to know -- it's one page with two
 3    paragraphs and it looks like it was sent near or about
 4    the time -- it looks like it could have been sent
 5    December 9th or perhaps December 13th.
 6               It's sandwiched in between E-mails December
 7    9th and December 19th.
 8               It's one page with two paragraphs.
 9               MR. LATTIMER:  It couldn't have been December
10       19th.
11    BY MR. HUGHES:
12          Q.    December 13th.
13          A.    Yes.
14          Q.    Do you see that?
15          A.    Yes.
16          Q.    Okay.  And is that something Mr. Lattimer
17    prepared or is that something you prepared?
18          A.    It's something that Mr. Lattimer and I
19    discussed, and Mr. Lattimer and I was trying to take
20    notes as we were discussing it, and he offered to, "How
21    about I just send you the language that I'm -- that
22    we're talking about?" and I said, "Send it to me," and
23    he did.
24          Q.    So Mr. Lattimer sent you some language?
25          A.    Yes.
```

1          Q.    Two paragraphs.

2                Could you read that for the record, what

3     Mr. Lattimer sent to you?

4                Well, first of all, before you do, can you

5     tell me when it was that Mr. Lattimer sent this to you?

6          A.    I think it was either the 13th or the 12th or

7     13th of December.

8          Q.    Okay.

9          A.    Somewhere in that --

10         Q.    And this was just prior to your final report;

11    is that correct?

12         A.    Yes.

13         Q.    Could you read to us what was typed up by

14    Mr. Lattimer's office and sent to you?

15         A.    "In sum, the City of Ferguson, St. Louis

16    County, Chief Jackson and Chief Belmar," parentheses,

17    "the Municipal Defendants allowed an environment to

18    exist in Ferguson, Missouri following the death of

19    Michael Brown, in particular the period of August 10th

20    through the 13th, 2014 where law enforcement officers

21    were not held accountable, were not required to provide

22    probable cause for arrest and were not required to

23    document uses of force.  Allowing this environment to

24    exist was inconsistent with all applicable standards of

25    care and was in several respects unprecedented in modern

284

1      day law enforcement practices.  In allowing the

2      environment to -- discussed herein to exist, it was

3      entirely foreseeable that the constitutional rights

4      would be violated, arrests without probable cause would

5      be made and that force without reason would be used.

6      The Department of Justice After-Action Report detailed

7      the situation that amounted to a complete failure of law

8      enforcement to properly respond to its citizenry

9      following the shooting death of Michael Brown.  The

10     records reviewed herein fully documents specific

11     failures on the part of law enforcement amounting to

12     policies and practices on the part of the Defendants

13     that exhibited a reckless disregard and deliberate

14     indifference for the rights of citizens as a proximate

15     cause of the injuries suffered by the Plaintiffs in this

16     case."

17              Q.    Okay.  Thank you.

18                    And you indicated earlier that somewhere in

19     all these things is an earlier draft; is that correct?

20              A.    Yes.

21              Q.    And that's been marked separately as an

22     exhibit?

23              A.    Or it could be in this folder, but it's there

24     somewhere.

25              Q.    All right.

```
 1        A.     Yes.

 2        Q.     And then during the course of your earlier

 3   draft and your final draft you had discussions with

 4   Mr. Lattimer; is that correct?

 5        A.     Yes.

 6        Q.     All right.  Do you think you could find the

 7   earlier draft just to make sure we have that?

 8        A.     It's right here.

 9        Q.     That's in a folder Exhibit S, as in Sam, and

10   it's dated December 11th, 2015.

11             So when you prepared this earlier draft

12   December 11th, 2015, did you send it to Mr. Lattimer to

13   review?

14        A.     I did.

15        Q.     And then he reviewed it and he gave you some

16   suggestions and then he also sent you two paragraphs

17   that were typed by somebody?

18        A.     No.  What happened was I sent this draft to

19   Mr. Lattimer.

20             I called him and asked him if he had a chance

21   to review it.  He said he did.

22             There was some typos that were in the report

23   that he pointed out to me, and then we also discussed

24   the conclusion or the ending summary of the report, and

25   he pointed out to me that I failed to summarize the
```

286

```
1    report.  It appeared that I failed to summarize the
2    report.
3              I looked at the report.
4              I says, "You're right."
5              I just kind of dropped off the edge.
6              So we discussed about how to tie the report
7    in together, come up with a summary.
8              We had discussions about the things that I
9    included in those last two paragraphs and we were over
10   the phone and I was having -- trying to make notes at
11   the same time to make sure that I was keeping track of
12   our discussion and the things that we talked about and
13   agreed upon.
14             And I said, "Help me out.  Just send me the
15   language and I'll take a look at it," instead of me
16   trying to put it together through some notes.
17             That's all it was.  So the only changes were
18   some typos that were made and adding a summary that we
19   both discussed in detail, we both agreed upon and I
20   included.
21        Q.   So once he had reviewed it, you both agreed
22   upon it and then he came up with your final draft?
23        A.   No.  You're still not hearing what I said.
24        Q.   No, I did.
25             MR. LATTIMER:  No, you didn't.
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

```
1     BY MR. HUGHES:

2          Q.    You had a first draft and then you had a

3     final draft?

4          A.    Okay.

5          Q.    And you discussed it in between; is that

6     correct?

7          A.    We discussed the need to have a conclusion or

8     a summary at the end of the report, and we discussed

9     what should be in that summary to tie it all together,

10    and we agreed upon the language of how to do that.

11               And as I said, I'm in a hotel at the time,

12    I'm trying to take notes so I can add those finishing

13    paragraphs, and I asked for his assistance.

14               "Listen, just send me what we just talked

15    about and I'll take a look at it and I'll include it in

16    the report."

17               So your inference that he sent it at his own

18    volition or his own -- or he decided to send it, no, we

19    discussed it.

20               We discussed the language.  We discussed the

21    issues that needed to be in the report and I added it.

22         Q.    And Robert R. Pusins & Associates,

23    Incorporated, is that an LLC corporation or --

24         A.    No, it's an S Corporation.

25         Q.    And are there any other employees besides
```

```
 1      you?

 2           A.     Periodically there are.

 3           Q.     Anyone to check on typos or --

 4           A.     No.

 5           Q.     Have you ever gone to Ferguson to look at the

 6      area where this occurred?

 7           A.     No.

 8           Q.     Have you ever spoken to any of the

 9      Plaintiffs?

10           A.     No.

11           Q.     Okay.

12           A.     I think you left out some of the other items

13      there.

14           Q.     These are in Exhibit R, which you have.

15           A.     Which one is R?

16           Q.     Correspondence.

17           A.     Correspondence.

18           Q.     That you just read for the record.

19           A.     Okay.  I'm sorry.

20                  MR. HUGHES:  All right.  I guess that's all I

21           have.

22                  THE COURT REPORTER:  Read or waive?

23                  THE WITNESS:  Do we want to read or waive?

24                  MR. LATTIMER:  We'll read.  How about that?

25                  THE WITNESS:  We'll read.
```

```
 1              MR. PLUNKERT:  Mike or Greg, if you guys

 2         don't have any dispute with this, why don't we

 3         leave the exhibits in the possession of Mr. Pusins.

 4              And, Mr. Pusins, would you agree not to

 5         destroy or change any of these exhibits?

 6              THE WITNESS:  I was hoping not to have to

 7         carry these home.  I was hoping just to give them

 8         to you.

 9              Yes, I will retain them.  I will not destroy

10         them or alter them in any fashion.

11              MR. PLUNKERT:  We'll contact you at a later

12         point in time if we want to request any or all of

13         the exhibits, and we can have the document copying

14         service come by and scan it.  Is that all right

15         with you?

16              THE WITNESS:  Yes.

17              MR. HUGHES:  Well, what I'd like to do before

18         I leave is do you have a copy machine here I

19         assume?

20              THE COURT REPORTER:  Yes.

21              MR. HUGHES:  Why don't we make, yeah,

22         Exhibits A, B, L and K part of the record just

23         attached to the deposition.

24              MR. PLUNKERT:  Do you want to have her just

25         scan it later?
```

```
 1              MR. HUGHES:  You know, which is a Consultant

 2        Fee Retainer Agreement, the Profit and Loss and

 3        then the advertising.  Okay?

 4              And then as far as the E-mails, Exhibit R,

 5        you know, the correspondence, I'd like to have that

 6        copied right now, if I could.  Thank you.

 7              I will order the transcript.

 8              THE COURT REPORTER:  Would you like a copy of

 9        the transcript?

10              MR. PLUNKERT:  Yes, I'll take a copy.

11              MR. LATTIMER:  Yes, I need a copy of the

12        transcript.  I'll take it.  Thank you.

13              (Thereupon, the deposition was concluded at

14        4:45 p.m.)

15              (Reading and formalities were not waived.)

16                             – – –

17

18              ------------------------------------

19                        THE WITNESS

20

21

22

23

24

25
```

PRESTIGE REPORTING SERVICE, INC. (954) 764-7297

1

2     STATE OF FLORIDA    )

3     COUNTY OF BROWARD   )

4

5         I, the undersigned authority, certify that ROBERT

6     R. PUSINS, personally appeared before me and was duly

7     sworn.

8

9

10        WITNESS my hand and official seal this 15th day of

11    January, 2016.

12

13

                    --------------------------------------
14                      JENNIFER A. POLEO, CSR
               Notary Public - Expires February 21, 2019
15                  Commission No. FF188226

16

17

18

19

20

21

22

23

24

25

1

2    STATE OF FLORIDA    )

3    COUNTY OF BROWARD    )

4

5        I, JENNIFER A. POLEO, CSR, certify that I was
     authorized to and did stenographically report the
     deposition of ROBERT R. PUSINS, that a review of the
6    transcript was requested; and that the transcript is a
     true and complete record of my stenographic notes.

7

8        I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
     am I a relative or employee of any of the parties'
9    attorney or counsel connected with the action, nor am I
     financially interested in the action.

10

11        Dated this 15th day of January, 2016.

12

13                    _____
                          JENNIFER A. POLEO, CSR
14

15

16

17

18

19

20

21

22

23

24

25

1

2                     Prestige Reporting Service, Inc.
                          633 South Andrews Avenue
                                Suite 202
3                       Fort Lauderdale, FL, 33301
                            (954) 764-7297

4

5    January 15, 2016

6    RE:  White, et al v. Jackson, et al

7    Dear Mr. Pusins:

8         Your deposition was taken in the above-styled case

9    on January 7, 2016.  At the time of your deposition you

10   exercised your right to read.  Please return the

11   enclosed errata sheet signed and notarized to our office

12   within 30 days.  If you wish to waive the reading and

13   signing of the deposition, please so advise.

14        If this deposition has not been signed by

15   February 15th, 2016, or the signature thereto waived, we

16   will forward the original to the attorney ordering same.

17   Should you have any questions, please feel free to

18   contact our office.

19   Sincerely,

20

21   Jennifer Poleo, CSR.

22   cc:  Michael E. Hughes, Esquire.

23   cc:  Robert T. Plunkert, Esquire.

24   cc:  Gregory L. Lattimer, Esquire.

25

1                              ERRATA SHEET

2                           NAME:_____

3                           RE:_____

4          The following corrections, additions or deletions
    were noted on the transcript of the testimony which I
5    gave in the above captioned matter, held on:

6    PAGE(S)      LINE(S)       SHOULD READ_____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23                           Signature:_____

24                           Date:_____

25