IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE et. al.,                    *

      Plaintiffs,                    *

      vs.                    *      Case No. 4:14-cv-01490 (HEA)

                          *

THOMAS JACKSON, et. al.,                    *

      Defendants.                    *

                          *

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION OF DEFENDANTS JON BELMAR, SGT. DAVID RYAN, OFFICER TERRENCE MCCOY, OFFICER MICHAEL MCCANN, DET. DERIK JACKSON, DET. JOE PATTERSON, DET. AARON VINSON, DET. WILLIAM BATES, DET. NICHOLAS PAYNE, OFFICER DANIEL HILL, OFFICER ANTONIO VALENTINE, AND ST. LOUIS COUNTY, MISSOURI FOR SUMMARY JUDGMENT**

Come now the plaintiffs, by and through counsel, and hereby submit their opposition to the motion of defendants Belmar, Ryan, McCoy, McCann, D. Jackson, Patterson, Vinson, Bates, Payne, Hill, Valentine, and St. Louis County.

## I.  Introduction

St. Louis County's liability is premised upon knowingly allowing a practice and policy of violating the civil rights of its citizens by law enforcement agencies following the shooting death of Michael Brown to exist; the liability of Chief Belmar is premised on the his failure to exercise proper supervisory authority by allowing a practice and policy of violating the civil rights of the City of Ferguson's citizens by law enforcement agencies following the shooting death of Michael Brown to exist; the liability of defendants Ryan, McCoy, McCann, D. Jackson, Patterson, Vinson, Bates, Payne, Hill, and Valentine is premised upon their actions as St. Louis County police officers in causing and/or allowing plaintiffs Tracey White, William Davis, DeWayne Matthews, Sandy

Bowers, Kai Bowers, Kerry White, Nathan Burns and Antawn Harris to be subjected, in some cases to a false arrest/imprisonment, subjecting them to an assault and battery, for causing and/or allowing them to be subjected to an unlawful and unwarranted seizure, and excessive force and/or for standing by while these 4th Amendment violations took place without intervening or attempting to intervene.

## II.  Statement Of Relevant Facts

On August 8, 2014, Travis Wilson of the Ferguson, Mo., police department and Michael Brown, a teenaged African American encountered one another.  A violent confrontation ensued, and Michael Brown, who was unarmed, was shot to death by Travis Wilson.  Although the fact that an unarmed African American was shot and killed by a police officer, is not an unusual event in the United States, the Michael Brown shooting was somewhat unique in that it occurred between 12:00 p.m. and 1:00 p.m. in the afternoon, and there were several independent witnesses.  As a result of the number of witnesses, technology and the internet, the shooting of Michael Brown was seen by millions of people.  The African American community in Ferguson was particularly enraged by what appeared to be an excessive use of force which culminated with Michael Brown being shot in the forehead with the final shot fired by an officer who had already shot Mr. Brown several times prior to that.

Public outrage about the shooting turned into protests which subsequently led to civil unrest in the streets of Ferguson.  In response, the Ferguson Police and the St. Louis County Police took up arms and in militaristic displays of force and weaponry engaged U.S. Citizens as if they were war combatants.  In doing so, the City of Ferguson and the St. Louis County Police Departments used wanton and unnecessary force and acted as if the civil rights of the citizenry that they encountered had been revoked during the period of August 11-13, 2014.

-2-

The plaintiffs in this case were all victims of the atrocities committed by the City of Ferguson and the St. Louis County Police Departments during that period.

1. **Relevant Facts Relating To The Arrest Of Tracey White And William Davis**

**From the deposition of Keith Eyre, the General Manager of the McDonald's Restaurant located at 9131 West Florissant in Ferguson, Mo.  (His deposition excerpts are provided as Exhibit 1).**

● He is the General Manager of the McDonald's Restaurant located at 9131 West Florissant. Dep at 6.

● He was working on August 13, 2014.  Dep at 8.

●  About 3-3:30 p.m. he left his restaurant and walked outside to see what was going on. Dep at 10.

● He went into the parking lot of the strip mall that was on West Florissant about halfway from his restaurant to Canfield.  Dep at 11.

● He observed a skirmish line of police and armored vehicles.  Dep at 12.

● The officers' backs were towards his restaurant at that time.  Dep at 12.

● "The main thing I just heard was over the speaker of the intercom from police officers was everybody must leave or people will be going to jail."  Dep at 13.

● He stayed there until the police turned around and told him that he had to leave the area. He then went back into his restaurant.  Dep at 14.

● He doesn't know if all of the officers turned around, he just knows that a group of officers then gathered up a skirmish line and began coming towards McDonald's. At that time he just went back to the restaurant and just stayed there.  Dep at 14.

- When they got close to his restaurant he went outside - - he then was approached by two officers who told him that it was advised that he should close the restaurant, that they were closing the area down, that there would be no police service in the area at that time, and that he needed to close it down for his safety because they were not answering any calls the rest of the night.  Dep at 17.

- This occurred about 3:30 to 4:00 p.m.  Dep at 17.

- As best he could tell these were St. Louis County Police Officers.  Dep at 18.

- The police did not negotiate this nor did he decide to close - - the police told him  - - we're closing the areas down, you need to close your restaurant, you know, how long would it take, ten minutes, you know, give me ten minutes, you know, we have customers in there, too, let the customers know this.  Dep at 19.

- At that point, he went around from table to table telling people that they would be closing in ten minutes and they should be prepared to leave.  Dep at 19.

- By the time he got done telling the last customer, that's when he walked towards -- back over towards where the police officers were at, and all the sudden he was told, "Change of plans, we're closing now."  Dep at 20.

- He made the announcement, and basically just kind of stepped out of the way, and then that's when the confrontation between the officers and the reporters happened.  Dep at 21.

- He had no intention of closing down when the police came into his restaurant and the only reason that he closed was because the police told him to close down.  Dep at 31.

**From the deposition of Tracey White.  (Her deposition excerpts are provided as Exhibit 2)**.

-4-

● She and her son went to the McDonald's Restaurant to await her husband who was going to pick them up.  Dep at 53.

● At the time of incident, William Davis was a 17 year old minor who was a high school student.  Dep at 8, 10-11.

● She attended a rally on August 13, 2014.  Dep at 45.

● She heard about the rally from Ms. Nodel, a fellow social worker, Dep at 45, and the media.  Dep at 47.

● it was supposed to be for healing and to help the community in just understanding the death of Mike Brown.  It was sponsored by the pastor of a church.  Dep at 46-47.

● Her husband dropped her and her son off at the rally.  Dep at 49.

● She noticed that police officers were not wearing badges or ID.  Dep at 70.

● Once she exited the McDonald's the police instructed the people on foot that they had to go onto a side street.  Dep 73.

● They instructed them to move back some, they instructed them to move back some more, they continued to move back, and then when she began to question, but she continued to move back, but continued to ask questions and tried to explain that her husband was coming to pick them up and would not know where they were.  Dep at 75.

● She was eventually arrested, and recalls the officer arresting her and arresting her son, and the officer saying something about "You shouldn't have opened your big mouth." Dep at 85.

● She asked the police how much further did they have to get pushed back into the neighborhood, she was told, "All right, that's it," and she was then grabbed and arrested.  Dep at 94.

● She had her son's iPad in her hand at the time and when the officer stepped forward and

-5-

arrested her she told her, "Here, get your iPad, William, get your iPad." When he stepped forward to retrieve the iPad, they arrested him as well.  Dep at 94-95.

● She is not certain of the names of any of the officers because they didn't have on badges. Dep at 99.

● There were four instances where excessive force used - - when she was thrown to the ground, when a knee was placed in her back, when the handcuffs -- the zip ties were placed on her wrists, and when she was placed in the vehicle.   Dep at 133.

● She observed the the police officers arrest her son for no reason at all.  Dep at 141.

● The video taken by the police shows an officer with a knee in her back at 1:45-1:46.  Dep at 198-99.

**From the deposition of William Davis.  (His deposition excerpts are provided as Exhibit 3)**.

● At the time of his deposition on September 29, 2015, he was a senior at Hazelwood Central High School.  Dep at 10.

● On August 13, 2014, he and his mother attended a peace rally and later went to the McDonald's Restaurant.  After they were there for about an hour or so - - a swarm of SWAT members and like police officers had burst into the McDonald's, and then the leader of the swarm, "told everybody to get the hell up, and then he was – he was saying like this McDonald's is not cooperating right, this and that, just saying like real bad things about that McDonald's.  And then so I decided to listen to him, get my stuff. And then but like as I was walking out, I was a little startled because I was trying to figure out what  was going on at first to see if they was pushing us out of nowhere or if they just wanted us to go, like walk off somewhere, so I was just looking around,

walking around  the McDonald's.  So I got my stuff and then I had walked out, and my mother was standing right there by the door talking to this other SWAT member that had on all black. And then I had walked out the McDonald's with my mother, and then we had walked across the McDonald's parking lot.  So we was walking to our right, and I turned my head, and I saw a group of police officers and like SWAT members in like different colored uniforms like forming a line, like drawing out sticks and stuff. And then we continued to walk to our right, and then we just stood there at first to figure out what was going on.  And then the SWAT members, they started to push us forward, they told us to move, so we started to move, and we were just continuing to walk. So like they still pushing us backward in this neighborhood that we didn't belong in, and he kept pushing us back. And then we had stopped for like -- for a little bit, we had stopped like several times. The first time we stopped because the officers had told us to stop, I don't know why, but they just told us to stop one time. And then the second time we walked again and then we stopped again, and then we walked and we stopped again, but the third time we stopped, we stopped because there was a truck that got stuck, this man had -- I guess he -- I think he had like ran into a pole or something like that, but his car was stuck in grass and he was trying to move his truck, and the officer just told him to get out of the car and just leave it there. So he just hopped out the car and his truck was there.

And then we continued to move forward. And then I turned my head, because I was trying to figure out where my mother was at, because like it was like a bunch of people walking with us, and I saw my mother getting locked up. And then she calls me over to get my iPad, so I walked over there to get it, and then as I got it, the officer, "Okay, so you're coming with us, too." So he just -- like he grabbed me by my -- on my shoulder and he turned me around, and then he put -- he put some plastic -- some plastic cuffs around me.  But before he did that, I had food in my hand, and then

when I told him this is my food, sir, he smacked my ice cream cone out of my hand, and then he shoved me, like turned me around, and he put the plastic handcuffs on me."  Dep at 23-28.

   ● After leaving the McDonald's, according to Plaintiff Davis, the following occurred - - at the time he and she were just following directions, just listening to what the officers was telling them to do, so they just continued to walk up the street, but his mom kept on trying to talk to the officers, telling them that they didn't belong to the area.  She was trying to tell them that they needed to stand  at the end of that street where the McDonald's was to wait for his stepdad to come pick them, but the officers weren't listening, and they kept pushing them farther into the neighborhood that they knew nothing about.  His mother was still trying to talk to the officers, like telling him that they needed to go home, and that her husband was trying to pick her and her son up.

   Shortly thereafter, one of the officers got upset and got an attitude and he just locked his mother up. As he was locking her up, she was telling her son get a CNN card from her and to come over there and get his iPad.  And then as plaintiff Davis walking over his iPad and CNN card, the officer, he said, "All right, then, we taking you in, too." So after he said that, he had his ice cream in his hand, and the officer smacked his ice cream out of his hand, and then turned him around and put plastic cuffs on him.  Dep at 49-51.

   ● At the time that he was arrested plaintiff Davis was worried, stressing out, didn't know what was going on, was scared and nervous, and  just couldn't believe that he got arrested.  He had never been arrested in his life, and when he was sent to jail and placed in a room with all of those grown men he was just shocked, and asked God what's going to happen to him in that room.  Dep at 94.

   ● Plaintiff Williams explained his bogus arrest thusly - - "The day I got arrested I was very

-8-

intimidated and very stressed out, worried, because the next day after I had got locked up and I got out of jail that day, I had came to school one day –  well, during that whole week I was very humiliated and embarrassed, because the kids at school and the teachers, the kids, they all talking about me, "Oh, you a criminal, I saw you on STL Mugshots, I don't want to work with you, you probably kill somebody," but I did none of that stuff.  Because when I was in English class, we was doing a group assignment, and I was trying to join in one group, and a girl said, "Oh, I can't work with a criminal, because I seen you on STL Mugshots." And I was like, "Well, you don't know nothing about it, so why would you just say I'm a criminal?" So I was very emotional about that that day and stressed out about that like throughout that whole week, there was kids talking about me and stuff calling me a criminal and stuff like that."  Dep at 107.

**From the deposition of defendant Ryan.  (His deposition excerpts are provided as Exhibit 4)**.

● He is a supervisor in the St. Louis County Police Department's neighborhood enforcement team.  Dep at 4.

● On August 13 he was assigned to the tactical operations unit as rear security, arrest team, and was the supervisor for any skirmish line that might form.  Dep at 9.

● Plaintiff Tracey White was told to go to Sharondale Street, and then she went to Sharondale Street, she was then told to go somewhere else.  Dep at 24.

● Ms. White told him that her husband was supposed to pick her son and her up from the McDonald's, nonetheless, she was forced to move away from the McDonald's up Ferguson, even though she informed the police that she did not know the area, and that her husband would not know where to pick her and her son up.  Dep at 24-25.

● William Davis was arrested for "Failing to move. Failing to move. I asked them -- Failure to move back to the place we asked him to move to, so he's not following directions, interfering with the duties of what we're doing."  Dep at 27.

● The officers who arrested plaintiff Tracey White and William Davis were under the supervision of the St. Louis County Police Department and Davis and he was running the scene. Dep at 38.

**From the deposition of Officer McCoy.  (His deposition excerpts are provided as Exhibit 5)**.

● According to this officer, plaintiffs Tracey White and William Davis were arrested for interfering with the duties of a police officer.  Dep at 50-51.

● The patrons in the McDonald's were told to leave and walk to Ferguson and then up to Sharondale.  They had two choices, walk where they were told to walk or stay and be arrested.  Dep at 66.

● It did not matter if they did not know where they were going.  Dep at 66-69.

● With respect to the arrest of William Davis, defendant McCoy recounted it thusly - -"So I told him that he'd still have to leave the area regardless of his mom being arrested, so either to go into the apartment complex or go further up the street to the next intersection. As far as his mom being arrested, he kind of looked over my shoulder and all he said was, "I don't have nowhere to go," and he said, "Don't hurt my mom." I was like, "They're not hurting her, they're trying to get her into custody."  And then after that I was like, "You still have to leave, we're giving you an opportunity to either go into the apartment complex or go up the street." And he kind of stared at me, didn't say anything. I was like, "Okay, now you're going to be arrested, I'm going to have to arrest you if you

don't choose either to go into the apartment complex or up the street." And he still kind of stayed there and stared at me, so then at that point I placed him under arrest.  Dep at 83-84.

It is against the backdrop of these facts that the moving defendants claim that they are entitled to summary judgment with respect to the claims of Tracey White and William Davis.

2.  **Relevant Facts Relating To The Arrest And Brutilization Of DeWayne Matthews**

**According to DeWayne Matthews**:

● He got off the bus at W. Florissant and Chambers, he walked to Kappel to make a right, he was directed by the police to go to W. Florissant and Highmont.  Dep at 14-15.  (Exhibit 6).

● As he walked toward Highmont he encountered tear gas.  Dep at 16.

● He was walking in the direction the police located at W. Florissant told him to walk. He was cooperating with them.  Dep at 17.

● As he was walking he was telling the police that he was not part of the protest he was just trying to go home.  Dep at 17.

● He had a bus transfer in his right hand that he was showing the police.  Dep at 17-18.

● He was walking with his hands up.  Dep at 18.

● The police shot him while his hands were up in the air.  Dep at 23.

● Before he heard shots fired, he heard no police officer say anything.  Dep at 23-24.

● The second round hit him in the stomach. The first round hit him in his arms and hand causing him to drop his transfer. When he was hit in the stomach, he stopped. They fired off another shot, it was a shotgun bean bag shot that hit him in his left shinn.  He fell into the creek, the police followed him and put his head underneath the water for about three to five seconds. He believes that he lost consciousness for a short period from the contact of his head hitting the concrete.  He was

-11-

lifted out of the water and slammed face first into the pavement where his face was scraped on the ground while using racial epithets.  After that, officers took turns punching and kicking him.  Dep at 24-25.

● Mr. Matthews kept telling the police "I'm not a part of the protest, I'm trying to go home. I'm not a part of the protest, I'm trying to go home." The police kept saying "you're resisting, "Stop resisting, I'm going to break your arm. Stop resisting, I'm going to break your arm."  He responded by telling them "Okay, I apologize, I'm just trying to go home, I'm just trying to go home," he was saying these things so that they would  stop beating him.  After they cuffed him, they maced him everywhere, in all the wounds in his face, his nose, his mouth, and then placed him in a van for about 45 minutes to an hour before they took him into Ferguson where he met with the ambulance. Dep 24-25.

● He realized that he had been struck by a bean bag round after they shot him with the shotgun. The first two shots he didn't know what -- if they were real bullets or anything, because of the burning, the burning sensation, and the flames from the assault weapons.  Dep at 27.

● One of the officers kicked him, another came over and kneed him while yet another was holding his back, he was kicked again, and punched. He was hit about five times from different people.   Dep at 30-31.

● After the police beat him they maced him.  Dep at 32.

● He was driven to the Ferguson Police Dept. in a van after being beaten and maced.  Dep at 34.

● Paramedics at the Ferguson Police Dept insisted that he go to the hospital.  Later on, he was released from the hospital.  Dep at 36.

-12-

**From the deposition of defendant Derik Jackson.  (His deposition excerpts are provided as Exhibit 7).**

● He is a detective with the St. Louis County Police Dept.  Dep at 4.

● After observing Mr. Matthews alone, and coming toward them, he heard him say that he was going home.  Dep at 11.

● He shot Mr. Matthews three time with his less lethal shotgun.  Dep at 11-12.

● The video of the incident involving Mr. Matthews does not show any people on the street other than police officers and Mr. Matthews.  Dep at 15.

● He shot Matthews because  - "He refused to comply with the orders of Detective Patterson at the time to turn around, he was part of a, you know, failure to disperse, we -- he was advised by Officer Patterson that he was under arrest because of his failure to comply with officers orders, he clenched his fists and ran towards officers and ran towards the skirmish line which made me fear, you know, that an assault was imminent by Mr. Matthews of either myself or officers on the skirmish line."  Dep at 28.

● He had no basis to use deadly force.  Dep at 30.

● He did not see a weapon in Matthews' hands.  Dep at 31.

**From the deposition of Joseph Patterson.  (His deposition excerpts are provided as Exhibit 8).**

● When he first encountered Matthews, he was alone.  Dep at 11.

● He could see someone come from the crowd, but due to the tear gas and smoke, he could not tell you that he specifically saw Mr. Matthews with a set number of individuals with him in his close personal space. He can tell you the area that he was occupying was deemed to be clear and he

-13-

was not allowed to advance past his line of police due that the fact it was, number one, an unlawful assembly, number two, there was an active crime scene.  Dep at 10.

- The only other people around when he encountered Matthews were other police officers. Dep at 20.

- People were not allowed to go home if they lived beyond the police line.  Dep at 27.

- He could see the palm of Matthews left hand, and he could see a cell phone in Matthews right hand, and that is when he was shot.  Dep at 42, 49.

- Detective Jackson announced less lethal, and that's just as a protocol, so that when the other officers heard what would sound similar to a gunshot is actually – it would be recognized as a less-lethal round so that there's not, what we talk about, is sympathetic fire that someone -- well, this guy's shooting so I need to shoot you, there must be some sort of danger, so he actually announced that it was a less-lethal round, and that's when he discharged the first round.  Dep at 42.

- After he was shot, Matthews fell into a culvert that had two to three feet of water. Detective Bates and Detective Vincent went and tried to grab him.  Dep at 51.

- He used OC spray on Matthews.  Dep at 53-54.

- The following colloquy fully explains the actions of the police:

Q Let me ask you something: What was the -- I take it that before you all deployed you all had a briefing?

A Yes, sir.

Q Did the constitution ever come up during any of these briefings?

A Yes.

Q And so you all were aware that people have constitutional rights?

-14-

A Correct.

Q And was your actions, was anybody talking about whether what you were doing was consistent or inconsistent with the constitution?

A What do you mean by what was I doing?

Q Your blocking off, telling people who even if they live there, they do not have the right to go home.

A **I would say due to the riotous behavior that, yeah, I mean, I would say that you can sacrifice a constitutional right to pass through an area that the police are intending to control to restore order**.  Dep at 56.

**From the deposition of William Bates.  (His deposition excerpts are provided as Exhibit 9)**.

- He did not see Mr. Matthews engage in any unlawful conduct nor did anyone tell him that Matthews was observed engaging in unlawful conduct.  Dep at 13.

- He was by himself when first observed.  Dep at 14.

- He was told that he was under arrest because he did not disperse from the area even though he was alone.  Dep at 15.

- He did not clench his fists when he saw the police, they were always clenched.  Dep at 20-21.

- No one asked him for ID, no one asked where he lived.  Dep at 21.

- In this particular case, Mr. Matthews was shot once, the gun was cocked again, he was shot again, and the gun was cocked again, and he was shot a third time at least.  Dep at 24.

- When Matthews fell into the ravine, he grabbed his right arm to get him out.  Dep at 37.

- The medic on the scene was telling the police to get off his back.  Dep at 40-41.

- Mr. Matthews was telling the police that he could not breathe.  Dep at 41.

-15-

**From the deposition of Aaron Vinson.  (His deposition excerpts are provided as Exhibit 10).**

- Matthews was taken into custody on Aug 13, 2014 for failure to disperse.  Dep at 8.

- The police can't just tell someone to move on if they are standing alone.  Dep at 29.

- He is not aware of any provision of the dispersement law that requires a person to disperse in a particular direction.  Dep at 30.

- Det. Patterson told Matthews to stop, which he did, and then he was shot by Det. Jackson, at least three times.  Dep at 34.

- After being shot, Matthews fell or went into the ravine that had water.  He went into the ravine to contact Matthews, whose head was underneath the water.  Dep at 35.

It is against the backdrop of these facts that the moving defendants claim that they are entitled to summary judgment with respect to the claims of plaintiff DeWayne Matthews.

### 3. Relevant Facts Relating To The Arrest Of Kerry White, Sandy Bowers and Kai Bowers

These three plaintiffs were pulled from a motor vehicle and arrested on the bogus charge of failure to disperse.  Each of them discussed the facts and circumstances of their arrest in deposition testimony.

**From the deposition of Sandy Bowers. (His deposition excerpts are provided as Exhibit 11)**.

- He was taking photographs of the events in Ferguson in August, 2014, with his phone but the police destroyed his phone.  Dep at 11-12.

- When he got arrested, he wanted to file a compliant against the police regarding his injuries but they all had their badges covered.  Dep at 24.

-16-

- On the night of the arrest they went to "Rally's" to get something to eat, and then they planned to go to Kerry White's aunt's house.  Dep at 43-44.

- They began driving and realized the street was blocked so they decided to turn around and pull off on one of the side streets and eat their food.  While sitting in the car the police surrounded them at gunpoint and took them out of the car.  Dep at 45.

- Kerry White was taking pictures, the police threw his camera on the ground and took his memory chip out of the camera, they took Mr. Bowers' phone and smashed it and were manhandling all three of them.  Dep at 55.

- The police came up to their car and shot off what appeared to be smoke grenades.  Dep at 69.

- The police were dressed like army men, not police officers and they were wearing brown or black uniforms with vests.  Dep at 70.

- The only thing he remembers the police saying was get out of the f - - king car.  Dep at 71.

- All of the officers had black tape over their name badges.  Dep at 71.

- He was not involved in any protest prior to being arrested.  Dep at 106.

**From the deposition of Kai Bowers. (His deposition excerpts are provided as Exhibit 12)**.

- He and his brother and Kerry White got to Ferguson about 5 or 6 and took pictures.  Dep at 36.

- They went to Rally's to get something to eat and then went back to take pictures on West Florissant.  Because Kerry was always looking for that perfect shot.  Dep at 55.

-17-

- The first time that he saw military vehicles was when they were on the street on which he got arrested.  Dep at 60.

- Once the police came, the door was opened and he was snatched from the vehicle, thrown to the ground where a caucasian police officer held him face down with a knee on his neck.  Dep at 106-08.

- He heard his brother telling the police to stop stepping on his phone.  Dep at 113.

- The officers acted like they were out of control.  Dep at 115.

**From the deposition of Kerry White. (His deposition excerpts are provided as Exhibit 13)**.

- The night that he was arrested, he was out to take photographs, he had  - - images of pretty much people hugging, he had images of police officers pointing -- from the truck, they were pointing a rifle at him, he got a couple shots of that.  Dep at 27.

- They initially parked in the parking lot of a church near West Florissant and Chambers and when he heard the police say to disperse from the area, he went to Lorna street and turned right. Dep at 35-36.

- While on Lorna, police approached them, began shooting tear gas at them, took his camera out of his hand and threw it on the ground.  Dep at 44.

- No one ever told them that they had to disperse from Lorna.  Dep at 87-88.

It is against the backdrop of these facts that the moving defendants claim that they are entitled to summary judgment with respect to the claims of plaintiffs Sandy Bowers, Kerry White and Kai Bowers.

### 4.  The Assault and Battery and Unlawful Seizure Against Antwan Harris

Mr. Harris explained what happened to him in his deposition.  **From the deposition of Antawn Harris. (His deposition excerpts are provided as Exhibit 14)**.

- He left his home and went outside about 7:00 p.m. on August 11, 2014.  Dep at 19-20.

- He walked from his apartment to Red's Barbecue located at the corner of West Florissant and Canfield Drive.  Dep at 20.

- When he went outside, he was just watching everybody just walking up and down the street, police came to disperse them, everybody left, he was just sitting there recording, just watching them, and they were throwing tear gas at people, wasn't nobody throwing nothing, they was just throwing tear gas at people, making everybody leave, they forced everybody to go toward Canfield Drive and forced them to walk into the apartments, even people who didn't even live over there. And once they got to where he was, nobody said anything like disperse, leave, go home, stop filming, stop recording, and he was just shot in the face.  Dep at 21.

- Mr. Harris couldn't see for about ten -- ten minutes after he was shot in the face.  He couldn't open his eyes, and his face was burning. Two young ladies that he did not know had to help him home.  The only other thing that he remembers about the aftermath is that all of the reporters on the scene were trying to photograph him.  When he finally made it home, his father came over to  and took him to the hospital.  Dep at 21-22.

- When he got shot in the face he was standing next to a reporter, closer to the police officers that was standing on West Florissant, he had his left hand up and he was filming with his right hand, and there was nobody around him throwing rocks or bottles.  Dep at 38-39.

- On August 11, 2014, he thought that it was important to show that he was not a threat because the police were throwing tear gas and aiming their guns at people.  Dep at 39-40.

- Just before he was shot in the face, he saw an officer aim a weapon at him and fire that weapon. Dep at 59.

**From the deposition of Det. Menzenwerth. (His deposition excerpts are provided as Exhibit 15)**.

- He is familiar with Antawn Harris, the guy who was shot between the eyes.  He investigated his injury.  Dep at 85.

- During the course of the investigation, it was learned that a St. Louis Metropolitan police department squad unit passed Mr. Harris in their tactical vehicle and Officer Poindexter's view was momentarily obscured by this vehicle. Once the vehicle passed Mr. Harris, Officer Poindexter noticed that Mr. Harris was on the ground as if unconscious. Seconds later Mr. Harris had been assisted to his feet by two unknown black female subjects who escorted  him out of Officer Poindexter's view.  Officer Poindexter is the closest person we have to someone who can account for Mr. Harris's injuries, but he claims not to have actually didn't actually seen how the injuries took place.  Dep at 88.

- On the date and at the location where Antawn Harris was shot in the face, the St. Louis County Police Department was in charge.  Dep at 89.

It is against the backdrop of these facts and others, that the moving defendants claim that they are entitled to summary judgment with respect to the claims of plaintiff Antawn Harris.

**5. Relevant Facts Relating To The Arrest Of Nathan Burns**

Mr. Burns stated the following about his arrest in his deposition.  **(His deposition excerpts are provided as Exhibit 16)**.

- At the time of the incident on August 11, 2014, he was on West Florissant, and the side

street was Westdell.  Dep at 9.

- He had never seen the police actually do anything like they were doing which was shooting at unarmed people.  They were shooting rubber bullets and mace balls.  Dep at 9.

- After the police pushed them onto a side street, was when he first heard anything about disperse.  The officers giving those orders were St. Louis County officers.  Dep at 11.

- The police told people to disperse but at the same time blocked all of the ways that one could leave the area.  Dep at 13.

- When he heard the order to disperse the first time, Mr. Burns explained his actions as follows:

"I was actually standing, it was a lady that was out there protesting, I was standing in her yard, I was standing like out of the street and everywhere, I was just basically waiting on it to pass by, because it was like they were shooting at everything moving, and like it was dark out at this time, it had gotten dark, but it was – it was dark, and at this point they were shooting and like throwing like cans of some type of smoke, so I was just really trying to stay out of sight really, like take cover basically, so I was standing in the yard on the side of a like big bush, maybe a seven-foot bush."  Dep at 14.

- He was initially with a group of protesters who were chanting "No Justice - No Peace" and holding signs.  They were not doing anything illegal.  He did not see anyone throwing rocks and he did not throw any rocks.  Dep at 16.

- While on Westdell St., he saw an armored vehicle come down the street with at least eight policemen hanging off the side.  The policemen jumped off the vehicle with their weapons, he immediately raised his hands and the police then lowered their weapons and began spraying

-21-

everyone with mace.  Dep at 17.

- He was sprayed with so much mace that his clothing was drenched.  Dep at 17-18.

- After being drenched with mace, he was grabbed by his hair and slammed to the ground. While on the ground he was maced repeatedly and otherwise threatened and abused.  Dep at 18-19.

- None of the officers who abused him had name tags.  Dep at 19.

- After he was put in cuffs, he was taken to a truck and the officers who accompanied him on that truck were all St. Louis County officers.  Dep at 22-23.

- The officers that arrested him got on the truck with him.  Dep at 29.

- After being taken into custody, the police had his phone.  He heard it ring and he asked an officer if he would answer it and the officer responded - - "Nigger, I don't know you, don't say nothing to me," something, that's like a paraphrase, but that's what he told me. He like looked at me, staring dead in my face and said, "Nigger, I don't know you, don't say nothing to me."  Dep at 33-34.

- He was held for 24 hours exactly, and when he was released, he was told that there were no charges.  Dep at 40.

- While in custody, one of the officers that arrested him placed his hands in plaintiff Burns' pants and groped is genitalia with mace on his hands.  Dep at 81-82.

**From the deposition of Christopher Shearer. (His deposition excerpts are provided as Exhibit 17)**.

- On August he and Nathan Burns went to West Florissant just to see what was going on. They had seen some of what was happening on tv, but it was history and they wanted to see it for themselves.  Dep at 10-11.

-22-

● They drove in Burn's car to West Florissant, and parked a street over because they could not park on West Florissant.  Dep at 11.

● Immediately after he heard the police tell everyone that they had to go to their homes, they started shooting tear gas, they backed into the neighborhood, and then tried to leave, but couldn't leave because the police had a part of West Florissant blocked off and that part of Chambers blocked off, so in between that you couldn't leave.  Dep at 22.


● When the police deployed tear gas initially, he and Burns ran and were able to escape the tear gas and the wooden pellets that the police were shooting.  Dep at 24.

● While there were other people who ran in the direction in which they ran, it was just he and Burns who were together.  Dep at 27.

● They made it back to the car and tried to leave the neighborhood but couldn't because the police had everything blocked.  Dep at 31-32.

● They were driving around in circles trying to leave the area without success so they eventually parked the car again.  Dep at 33-34.

● He heard the police announce that they needed all news outlets to leave.  Dep at 36.

● After making that announcement, the police started shooting tear gas again and he witnessed when "they shot a guy in the face with a rubber bullet.  Dep at 36.

● There was nobody shooting but the police.  Dep at 37.

● He and Burns were outside of the car, he recalls that after the police told the media to leave the line was coming closer, and once they got near them the police hopped off the SWAT truck, and they started  shooting tear gas into the crowd, and they came toward the protesters. Dep at 41.

-23-

- When the police began using mace he ran and got into Burn's car.  The car got maced but he did not.  Dep at 52-53.

**From the deposition of Officer McCoy.  (His deposition excerpts are provided as Exhibit 5)**.

- He was involved in the arrest of Nathan Burns.  Dep at 11.

- When the police approached the area where Burns was located, people ran(dispersed). Burns did not run but he was alone when he was arrested.  Dep at 23.

- When he got to Burns the people around him had dispersed, they had done what they were told to do and he was alone.  Dep at 25.

- He stayed there by himself and did not go with the other people.  Dep at 26.

- He was then taken into custody for failure to disperse, and he assisted in the arrest.  Dep at 26.

- No report was prepared before April 20, 2015, even though Burns was arrested on August 9, 2014.  Dep at 31.

He was assigned to work with an arrest team with St. Louis City Police.  Dep at 7

**From the deposition of Officer McCann.  (His deposition excerpts are provided as Exhibit 18)**.

- Burns was arrested at the corner of Highmont and West Florrissant.  Dep at 7.

- Cannot describe Burns (physical appearance).  Dep at 17.

- Did not prepare an arrest report for Burns.  Dep at 18.

- He arrested and cuffed Burns.  Dep at 35.

It is against the backdrop of these facts and others, that the moving defendants claim that they are entitled to summary judgment with respect to the claims of Nathan Burns.

**6.  Relevant Facts Relating To Plaintiffs' Claims Against The St. Louis County And**

-24-

**Chief Belmar**

      **Chief Belmar provided the following information in his deposition.  (His deposition**

**excerpts are provided as Exhibit 19)**.

      ● He has been Chief of Police in St. Louis County since January 31, 2014, and commands

850 sworn officers and a professional staff of 300.  Dep at 8.

      ● According to the County Charter, the Board of Police Commissioners is in charge of the

St. Louis County police department, and in that role they appoint and retain the chief and they

approve all the policies and general orders on the police department.  They also have other duties,

but they're my direct boss, and that is the Board of Police Commissioners appointed by the County

Executive, and then they are approved or ratified by the County Council.  Dep at 10.

      ● On August 11, 2014, the command structure in Ferguson, was Chief Belmar, Chief Tom

Jackson, Captain Ron Johnson from the highway patrol and Al Adkins from the St. Louis

Metropolitan Police Department.  Dep 32.

      ● Reports regarding the plaintiffs in this case were not prepared in the usual manner.  Dep

at 54-55.

      ● Chief Belmar was the incident commander beginning on August 11, 2014.  Dep at 66.

      ● From August 11-13, he and Chief Tom Jackson were in charge of police operations in

Ferguson, Mo. although, he was the ultimate person in charge.  Dep at 66.

      ● If a person was walking alone toward the police his arrest for failure to disperse would not

be appropriate.  Dep at 79.

      ● No documentation was prepared contemporaneously with the arrest of any of the plaintiffs.

Dep at 91.

● Chief Belmar agrees that "Law enforcement applied the 'keep moving' order broadly and without guidelines for officers that allowed for its legal application." He further admitted that the standing order on the failure to disperse charge should have been altered, and in fact, it subsequently was.  Dep at 98.

● Chief Belmar agrees 100% that the circumstances present on August 10-13 did not justify the lack of documentation and need to track the use of lethal – less-lethal responses.  Dep at 108.

● Prior to August 2014, officers in St. Louis County were trained to remove their name badges.  Dep at 117, 119.

● The only time that he is aware of officers removing their name badges is when they are told to do so during times of civil disturbance.  Dep at 120.

Plaintiffs' expert witness, Robert Pusins, in a report prepared in this case opined as follows:

> In sum, the City of Ferguson, St. Louis County, Chief Jackson and Chief Belmar ("the municipal defendants") allowed an environment to exist in Ferguson, Missouri, following the death of Michael Brown, in particular the period of August 10-13, 2014, where law enforcement officers were not held accountable, were not required to provide probable cause for arrests and were not required to document the use of force. Allowing this environment to exist was inconsistent with all applicable standards of care and was in several respects, unprecedented in modern day law enforcement practices.
>
> In allowing the environment discussed herein to exist, it was entirely foreseeable that constitutional rights would be violated, arrests without probable cause would be made and that force without reason would be used. The U.S. Department of Justice After-Action Assessment of the Police Response to the August 2014 Demonstrations in Ferguson, Missouri detailed a situation that amounted to a complete failure of law enforcement to properly respond to its citizenry following the shooting death of Michael Brown. The records reviewed herein fully documents specific failures on the part of law enforcement amounting to policies and practices on the part of the defendants that exhibited a reckless disregard and deliberate indifference for the right of citizens and was a proximate cause of the injuries suffered by the plaintiffs in this case.

-26-

Exhibit 20 at 17-18.  **In his deposition, Mr. Pusins provided the following information.  (His deposition excerpts are provided as Exhibit 21).**

● In forming opinions in this case he reviewed the standards from the Commission on Accreditation for Law Enforcement Agencies, model policies from the International Association of Chiefs of Police, information from the Police Executive Research Forum and Americans for Effective Law Enforcement.  Dep at 10.


● As Mr. Pusins explained in his deposition testimony, defendants' Belmar and St. Louis County's law enforcement actions amounted to policies and practices on the part of those defendants that exhibited a reckless disregard and deliberate indifference for the constitutional rights of its citizens:

Q.      And I'm going to draw your attention to the part that talks about conclusion.

Do you see that?

A.      Yes.

Q.      And you talk about an environment that was allowed to exist -

A.      Yes.

Q.      -- in Ferguson.  Do you see that?

A.      Yes.

Q.      Now, when you talk about environment, explain exactly what it is you're talking about.

A.      I'm talking about the activities of the police officers that were involved in this response to a civil disturbance and the civil disturbance itself, but what I'm saying is that because of Chief Belmar's position, that there was joint command, that he and Jackson, City of Ferguson, St. Louis County, allowed this environment to exist where

-27-

police officers were just not held accountable, were not required to provide probable cause for arrest, not required to document the use of force, and that -- allowing that to exist is just inconsistent with police practices because they should have demanded, and Chief Belmar talks about that, that it was his understanding, it was his expectation that these arrests were documented, that these uses of force were documented and that was his expectation.  So he takes the position that's what we should have done, that's what he thinks they did, but in reality, they didn't do it contemporaneously with the incidents themselves.

Q.      All right. And what other foreseeable consequences of the failure to take such actions - failure to make sure that that environment does not exist?

\*          \*          \*          \*          \*

THE WITNESS: You're going to violate people's civil rights by using force that you're not going to report that may be unreasonable, objectively unreasonable force, that you may be detaining people without -- without probable cause because you need to have somebody that provides some oversight to what the police officers are doing, and you do that through supervision.  That's standard in law enforcement, because if you don't, as I said, you could have people arrested where probable cause did not exist.

You could have use of force applied that's objectively unreasonable and not even report it, and that's unreasonable.

Q.      And would it be fair to say that because we give police officers extraordinary power, we have to hold them accountable for the actions that they take?

\*          \*          \*          \*          \*

THE WITNESS: Absolutely, and that's why police departments require reporting. That's why -- that's why they require reporting of use of force.  And let me -- and now that you're mentioning this --

\*          \*          \*          \*          \*

Q.      And when an environment -- would it be correct to say that when an environment of unaccountability exists, that that is an environment that is ripe for violations of the constitutional rights of the citizen?

\*          \*          \*          \*          \*

THE WITNESS: Yes.

Dep at 274-278.

It is against the backdrop of these facts and others, that the moving defendants claim that they are entitled to summary judgment with respect to the claims against Chief Belmar and St. Louis County.

The moving defendants' motion is entirely baseless.

### III.  Argument

#### 1.  Standard Of Review

Summary judgment is only appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(c)*; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine if the alleged undisputed facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248,  (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all reasonable and justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The nonmoving party may defeat summary judgment with factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d

671, 675, (D.C. Cir. 1999) (quoting *Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993))*, or provides

"direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338, (D.C. Cir. 2006).  On a

motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party

and credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge.  *Torgerson v. City of Rochester*, 643 F.3d 1031,

1042 (8th Cir 2011).

      2. <u>The Seizure And Arrest Of Tracey White And William Davis Was Unlawful</u>

      Not surprisingly, the movants here do not even suggest that probable cause, in the legal sense,

existed for the arrest of Tracey White or William Davis.  Instead, what they do is point to the fact that

her counsel inadvertently confused the facts leading up to the arrest of Ms. White and her son with the

facts associated with others and somehow attempt to have this court excuse their unlawful arrests.

Pointedly, however, the actual facts are no less alarming, illegal and unconstitutional.  Ms. White and

her son were in a McDonald's restaurant awaiting her husband to pick them up.  The police decided that

the McDonald's restaurant should close.  But for the police deciding that the restaurant should close, it

would have remained open.

      Q Now, on this day, the 13th, the day that these guys were arrested, you had no intention
      of closing down at the time the police had you close down; is that fair to say?

      A That's fair to say, yes, that's correct.

      Q And, in fact, the only reason that you closed down was because the police basically
      told you to close down?

      A That's correct.

Eyre Dep at 31.

      After forcing closure of the restaurant, the police decided that these people, who had not even

done anything arguably illegal, had to "move" when they said "move," or be arrested.  Det. McCoy

-30-

explained the situation precisely.

> Q All right. So you all recommended he close, and then Ms. White and her son were two of the patrons, and all the patrons were told to get out, two reporters, you all didn't think they moved fast enough so they were arrested, and the rest of the people were forced to leave the McDonald's and then forced to walk up toward Ferguson and then up Ferguson to Sharondale; isn't that right?
>
> Q Isn't that correct?
>
> A They were asked to leave McDonald's and they were asked to walk up Ferguson toward Sharondale.
>
> Q Asked? They were told. You didn't ask them anything, did you?
>
> A It's their choice, if they wanted to stay there, they could stay there and they would be arrested, it was their choice. They did have a choice.
>
> Q So the choice was to stay and be arrested or leave and not be arrested?
>
> A That was it.

McCoy Dep at 66.

Thus, what is undisputed is that the police forced people to "move" without legal cause.  The movants do not even attempt to provide any legal authority for forcing people who have not engaged in any illegal conduct to move from one place to another.

> Q And she was then moved away from the McDonald's up Ferguson, and she said that she didn't know this area, correct?
>
> A Correct, sir.
>
> Q And that her husband wouldn't know where to pick her up, right?
>
> A Correct, sir.
>
> Q And so she was told to go to Sharondale, and she went to Sharondale, right?
>
> A Correct, sir.
>
> Q And then when she got to Sharondale, her husband still hadn't picked her up, right?

-31-

A Correct.

Q And then she's told to move again, correct?

A Correct.

Ryan Dep at 24-25.  They ignore that point and incredulously, admit that the reason that Tracey White

and William Davis were arrested is because they did not move.

Q  All right. So because -- Well, let's go from Tracey right now. Her son, his mother's
arrested, he's not 18, he's a nonadult, his mother's arrested, and then he's arrested
because what?

A  Failing to move. Failing to move. I asked them -- Failure to move back to the place
we asked him to move to, so he's not following directions, interfering with the duties of
what we're doing. He's been told, instructed, he doesn't want to move.

Ryan Dep at 27.

"As a general rule the defense of probable cause is a question of fact for the jury." *Vaughn v.*

*Sears Roebuck & Co*., 643 S.W.2d 30, 33 (Mo. App. E.D. 1982). In claims under 42 U.S.C. § 1983,

where a genuine issue of fact on the existence of probable cause for arrest is presented, the question

should be submitted to the jury. *Hoffmeyer v. Porter*, 758 F.3d 1065, 1068 (8th Cir. 2014).

As indicated in the response to the defendants' alleged statement of material facts, there is not

a single undisputed material fact in this case.  Moreover, at no place in their motion do the defendants

suggest that probable cause existed for the lawful arrest of Tracey White or William Davis.

**a.  <u>Failure To Disperse/Move</u>**

"[A] person commits the crime of refusal to disperse if, being present at the scene of an unlawful

assembly, or at the scene of a riot, he knowingly fails or refuses to obey the lawful command of a law

enforcement officer to depart from the scene of such unlawful assembly or riot." Mo. Rev. Stat. §

574.060.   In order for there to be a refusal to disburse clearly, there must be an unlawful assembly or

a riot.  An "unlawful assembly" requires that six or more people assemble and agree to violate criminal

-32-

laws with force or violence. Mo. Rev. Stat. § 574.040. A "riot" requires that the six or more assembled people actually violate criminal laws with force or violence. Mo. Rev. Stat. § 574.050. An unlawful assembly requires actions that make it reasonable for rational people in the area "to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts." *Abdullah v. County of St. Louis*, 52 F. Supp. 3d 936, 943 (E. D. Mo. 2014) quoting *State v. Mast*, 713 S.W.2d 601, 603-04 (Mo. Ct. App. 1986).

By every account, plaintiffs T. White and W. Davis were not assembled with any group of six or more people for purposes of violating any criminal laws with force or violence.  In fact, these two plaintiffs were together in a restaurant that they were forced to leave by the police.  They were then forced by the police, once outside, to move again and again and again.  No authority exists for the actions of the police.  *Abdullah, supra.*, at 945. [to arrest someone legally they would have to have probable cause to believe that six or more people were gathered for the purpose of violence and had refused an order to disperse].  The fact of the matter is that no statute or ordinance gave the police any authority to force people who were not unlawfully assembled or participating in a riot to "move."  And there certainly is no basis that exists for the arrest of people who failed to "move."  In fact, Det. McCoy admitted that an arrest under such circumstances was at the discretion of each individual officer.  McCoy Dep at 86.  The *Abdullah* Court described the basis of the actions of the defendant officers thusly:

> it is an unwritten policy, given to officers at their roll calls, instructing them to order people to keep moving whenever the officers thought it was appropriate to do so. Some officers told everyone to keep moving, so if plaintiff was unlucky enough to be standing in the vicinity of those officers, he would be told to move. Some officers told people they would be arrested if they did not move . . . enforcement was entirely arbitrary and left to the unfettered discretion of the officers on the street . . . the keep-moving policy cannot meet constitutional standards for definiteness and clarity. [citations and internal quotation marks omitted].

*Id*. at 946. Collateral estoppel precludes any argument that the move along policy used against T. White

-33-

and W. Davis was lawful. No probable cause for their arrests otherwise exists, and conspicuously, the movants here offer nothing more than irrelevant attacks upon the credibility of Tracey White in defense of the unlawful and unconstitutional conduct of defendants, Ryan, McCoy and McCann.[1] *Torgerson* , *supra*.,(credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge).

### 3.  DeWayne Matthews Was A Victim Of Uncontrolled Law Enforcement

Once again it is apparent that the movants do not actually believe that summary judgment is appropriate in this case.  They have failed to identify a single material undisputed fact regarding the encounter with Mr. Matthews.  Mr. Matthews got off a bus at W Florrisant & Chambers where he encountered the police.  They directed him to walk to W. Florissant and Highmont, he complied.  He was going to check on is mother.  While walking as directed, Mr. Matthews encountered defendants D. Jackson, Vinson, McCoy, Bates, Patterson, Payne, and Valentine.  Because he was walking toward the police with his hands up, defendant D. Jackson admits that he shot Mr. Matthews at least three times with a less lethal shotgun.  After being shot in the shin, Mr. Matthews fell into a ravine that contained water.  The police went in after him and he was eventually pulled from the water by defendants Vinson and Bates. Before that occurred, however, he had his head pushed under the water for several seconds. He was then taken out of the water and beaten by the police.  After he was beaten, he was maced all over

---

[1]  The movants seek to portray defendant McCann as uninvolved.  "Officer Michael McCann was not involved in the arrests of either Tracey White or William Davis, but rather, he was nearby attempting to get the truck out of its predicament."  Mot. Mem. at 5.  Too be sure, Tracey White and her son were seized when they were forced out of the restaurant and forced to move in a direction dictated by the police or be formally arrested.  Officer McCann was involved in getting people out of the McDonald's, and forcing them to "move" or be formally arrested. McCann Dep at 40-41.  In addition, even if that were not the case, he can't escape bystander liability in this case.  He knew or should have known that his colleagues were engaging in illegal conduct, and did nothing to intervene although he had ample opportunity to do so.

his body and then placed in a van for 45-60 minutes, before being taken to a police station and then the hospital.  He was released from the hospital.

Oddly, the movants make no attempt to demonstrate that there are undisputed facts associated with the arrest and seizure of Mr. Matthews that would entitle them to summary judgment.  They make no attempt to establish probable cause for his arrest.  Indeed, the defendants do not even mention that Mr. Matthews, who was alone when he was arrested, was not even charged with a crime until after this lawsuit was initiated nor dom they try to explain how the charge of Refusal to Disperse makes any sense at all under when the requirements of the statute.  In order for there to be a refusal to disburse, there must be an unlawful assembly to begin with.  An "unlawful assembly" requires that six or more people assemble and agree to violate criminal laws with force or violence. Mo. Rev. Stat. § 574.040. The defendants offer no evidence of any kind that Mr. Matthews was ever with a group of six or more people much less that he was involved in any way with the violation of any criminal laws.  Incredulously, the defendant officers admit to shooting Mr. Matthews several times with a less lethal shotgun, admit that he fell into a water filled ravine as a result, admit that they removed him from the water, admit that they handcuffed him and sprayed him with mace, admit that they took him into custody, and admit that all of these actions were taken because he walked toward the police, alone and unarmed.

> Q His right. So his right hand he's holding what you believe was a cell phone and his left hand is extended -- well, his arm is extended –
>
> A I could see the palm of his left hand.
>
> Q You could see the palm of his left hand.
>
> A I could not see the palm in his right hand.
>
> Q Okay. And at that point, is that when he was shot?
>
> A After he continued moving forward. I saw the phone as he was approaching us, and, like I said, I'm not aware if a phone was recovered or not at the scene, and I discussed

this with the counsel before that there was –

Q All right. So let's pick up. As I understand it, the left hand is open, you could see the palm, and the   right hand you think had a cell phone?

A (Witness nods.)

Q And the hand is around that object?

A That's correct.

Q Okay. And it's at that point he's still advancing towards you?

A Yes, sir.

Q And it is at that point that he's shot?

A Well, first Detective Jackson announced less lethal, and that's just as a protocol, so that when we hear what would sound similar to a gunshot is actually – we recognize it as a less-lethal round so that there's not, what we talk about, is sympathetic fire that someone -- well, this guy's shooting so I need to shoot you, there must be some sort of danger, so he actually  announced that it was a less-lethal round, and that's when he discharged the first round.

Q And he does that so that other officers will not mistakenly believe that he perceives a threat requiring the use of deadly force?

A Correct. Because in that situation the use of deadly force would have not have been authored in that situation, so that that announcement's very important to the rest of us standing around.

Q Okay. And so he announces "Less lethal, less lethal," and Mr. Matthews is still coming towards the police with his left palm open and his right hand around an object that you believe was a cell phone?

A That I believe was a cell phone.

Q Yeah, that you believe was a cell phone, and that's when he shot?

A Yes.

Patterson Dep at 47-49.  In fact, the only basis for summary judgment offered by the movants is essentially that, **it wasn't as bad as Mr. Matthews says it was**.  Such a position is not and never has

-36-

been a basis for summary judgment.

4.      **The Seizure And Arrest Of Kai Bowers, Sandy**
        **Bowers And Kerry White Had No Lawful Basis**

It is undisputed that Kai Bowers, Sandy Bowers and Kerry White were arrested while riding in a motor vehicle operated by Kerry White.  The police arrested each of them and charged them with **Refusal to Disperse**. Exhibit   .  None of the police officers associated with the arrest of these plaintiffs even attempts to justify the charge of **Refusal to Disperse**.  In fact, they all basically say the same thing - - they saw a vehicle approach them, they yelled for it to stop, it did not immediately stop, they drew their weapons, the vehicle stopped before it reached them, they approached the vehicle and extracted the occupants and they were all arrested.  As noted earlier, the charge of failure to disperse requires, at a minimum an unlawful assembly or a riot.  An "unlawful assembly" requires that six or more people assemble and agree to violate criminal laws with force or violence. Mo. Rev. Stat. § 574.040. A "riot" requires that the six or more assembled people actually violate criminal laws with force or violence. Mo. Rev. Stat. § 574.050. An unlawful assembly requires actions that make it reasonable for rational people in the area "to believe the assembly will cause injury to persons or damage to property and will interfere with the rights of others by committing disorderly acts." *Abdullah supra.*  There is no evidence in this case that these plaintiffs were part of an unlawful assembly or riot.  The defendant officers themselves tell the Court that they were engaging in illegal conduct by making arrests that they could not have possibly believed were lawful.  Even the most incompetent police officer knows that three (3) people in a car does not equal a six (6) person group.  The failure to disperse law has the very specific requirement that six (6) people be assembled before they can be ordered to disperse, and it has a second very specific requirement that **they be ordered to disperse**.  In this case, while the officers claim to have told the plaintiffs to stop their vehicle, which in itself would seem to contradict an order to disperse,

-37-

none of them allege giving an order to disperse. There plainly was no legal basis for the arrest of Kerry White, Kai Bowers or Sandy Bowers. Under such circumstances, summary judgment is entirely inappropriate.

### 5. The Unlawful Seizure And Assault And Battery Inflicted Upon Antawn Harris

The essential facts in the case of Mr. Harris' seizure are pretty much undisputed. He left his home and went outside about 7:00 p.m. on August 11, 2014. When he went outside, he was just watching everybody walking up and down the street, police came to disperse them, he was just sitting there recording and just watching things happen. He observed the police begin throwing tear gas at the people and forcing them to leave. They forced everybody to Canfield Drive and made them go into the apartment complex, even if they did not live there. Once the police got to where he was, nobody said anything like disperse, leave, go home, stop filming, stop recording, he was just shot in the face. Just before he was shot in the face, he saw an officer aim a weapon at him and fire that weapon. Afterward, Mr. Harris was treated for his gunshot wound at the hospital and released to go home.

From August 11-13, Chief Jon Belmar and Chief Tom Jackson were in charge of police operations in Ferguson, Mo. although, Belmar was the ultimate person in charge. Belmar Dep at 66. As Mr. Pusins explained in his deposition testimony, defendants' Belmar and St. Louis County's law enforcement actions amounted to policies and practices on the part of those defendants that exhibited a reckless disregard and deliberate indifference for the constitutional rights of its citizens released. Pusins Dep at 274-78.

In sum, Mr. Harris' position is that when he was shot in the face on August 11, 2014, Chief Belmar was in charge of police operations. At that time, he had allowed an environment to exist where law enforcement officers were allowed to disregard the rights of citizens in order to address a civil unrest situation that he was ill equipped to address. St. Louis County bought in, Chief,

-38-

Jackson bought in and the City of Ferguson bought in.  By any means necessary was the battle cry

and the constitution was basically suspended for a period while "order" was restored.  Chief Belmar

admits that prior to August 2014, officers in St. Louis County were trained to remove their name

badges and that the only time that he is aware of officers removing their name badges is when they

were told to do so during times of civil disturbance.  Belmar Dep at 117-120.  Mr. Harris' seizure

was a direct and foreseeable consequence of the illegal policies and practices that Chief Belmar for

the most part developed and put in place.

> Both the St. Louis County Police Chief and the Precinct Captain who testified were
> directly involved in developing and enforcing the keep-moving strategy, along with
> the Highway Patrol Captain who had been placed in charge of the situation by the
> Governor. This was a deliberate strategy, developed after the unified command
> structure met and discussed options. It was communicated to the officers on the street
> at several different roll call meetings, and continued in use for a period of days (and
> according to at least one witness, is still in effect).

*Abdullah, supra.,* at 945.  The only basis for summary judgment offered by the movants appears to

be that Mr. Harris "has no evidence that the officer who shot him was a St. Louis County police

officer."  Mot. Mem at 15.  The relevance of that position cannot be discerned given that all officers

operating in Ferguson at that time did so on behalf of Chief Belmar and St. Louis County, did so

under the command of Chief Belmar and were guided by the practices and policies that he

established.

The movants have not even set forth a legal reason for summary judgment to be entered as

to the claims of Antawn Harris.

**6.     There Are No Undisputed Facts That Would Justify
Summary Judgment As To The Claims Of Nathan Burns**

It is apparent that the movants do not take the Federal Rues of Civil Procedure seriously.

-39-

Rule 56(a) provides in relevant part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

The movants, inexplicably, have moved for summary judgment and have not identified a single fact that they claim is undisputed, material and entitles them to summary judgment. With respect to Nathan Burns, nothing is different.

Disconcertingly, rather than identify undisputed material facts entitling them to summary judgment, the movants spend time trying to put a spin on the deposition testimony of Christopher Shearer which is more accurately set forth on pages 22-23 above. The more salient point is that the police defendants have a version of events, Mr. Burns and Mr. Shearer have a version of events which are set forth on pages 20-23 of this document and in Exhibits 16 & 17. Summary judgment can only be granted if there are no undisputed facts. *Taylor v. Nebraska*, 812 F.3d 637, 642 (8th Cir. 2016); *Turney v. Waterbury*, 375 F.3d 756, 759 (8th Cir. 2004) (Summary judgment is only proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law). Insofar as the arrest of Mr. Burns is concerned, there is a genuine issue as to every material fact. As such, summary judgment is not available as to his claims.

### 7.    Plaintiffs Claims Against Chief Belmar, Chief Jackson, The City Of Ferguson And St. Louis County Are More Than Viable

It has already been determined by a federal court that policy makers in Ferguson, conceived and implemented a practice of using the failure to disperse statute to violate the constitutional rights of individuals in Ferguson during August 2014. In fact, the court specifically identified Chief Belmar as one of the architects of that policy. *Abdullah, supra*., at 945. In an apparent attempt to

-40-

rewrite history, the movants deflect and ignore that fact and act as if everything was done by the book.  Plaintiffs expert has indicated otherwise, Exhibits 20-21, the Department of Justice has indicated otherwise, Exhibit 25, and Chief Belmar has begrudgingly indicated otherwise.  Belmar Dep at 79, 91, 98, 117, 119-120.  Each of the plaintiffs in this case who were actually arrested and charged, not surprisingly, were charged with Refusal to Disperse,[2]  Exhibit 23, the very charge that has already been determined to have been used inappropriately to violate the constitutional rights of people in Ferguson during August 2014, by Chief Belmar and other officials.  The movants cannot identify a single undisputed material fact in support of a contention that no unconstitutional policy was in place that led to the arrests and/or seizures of the plaintiffs or that such policies were not known to Chief Belmar, Jackson and other officials of St. Louis County and The City of Ferguson nor have they tried to do so.

### 8. In Addition To The Fact That No Probable Cause Existed For The Arrests Of Any Of The Plaintiffs For Any Offense, There Also Was No Arguable Probable Cause For Their Arrest For Any Offense

In determining whether arguable probable cause exists in this case, the Court must determine whether the arrest of any of the plaintiffs was based on an objectively reasonable—even if mistaken—belief that the arrest was based on probable cause.  *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013).  There plainly are no undisputed facts in this case regarding the issue of probable cause, nor arguable probable cause, as noted above.  Furthermore, there was nothing at all objectively reasonable about the actions of the defendant officers when they made a conscious decision to force

---

[2]  Plaintiff Antawn Harris was not arrested, he was just left beside the street bleeding. Plaintiff DeWayne Matthews was never booked, he was simply taken into custody after being shot repeatedly with a less lethal shotgun and beaten.  He was then taken to a hospital for treatment of his wounds and was released from the hospital to go home.

everyone to vacate from areas that they did not want them to be without regard for their civil rights.

### a. The Law Regarding Probable Cause And Qualified Immunity Has Been Clearly Established For Decades

As noted specifically above, "It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Bechman, supra*. The defendant officers correctly note that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Instead of pointing out the undisputed facts that either establishes probable cause or arguable probable cause, the defendant officers point merely point out their version of the facts and the plaintiffs' version of the facts. However, the defendant officers ignore the fact that the Court must view the facts in the light most favorable to the plaintiffs and credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Torgerson, supra*. In addition, qualified immunity shields law enforcement officers from suit for damages if "a reasonable officer could have believed the plaintiffs' arrests to be lawful, in light of clearly established law and the information the officers possessed." *Anderson v. Creighton, supra*. The truth of the matter is that all of the defendants in this case decided upon a course of conduct that was expedient without regard to its constitutionality. **I would say due to the riotous behavior that, yeah, I mean, I would say that you can sacrifice a constitutional right to pass through an area that the police are intending to control to restore order**. Patterson Dep at 56. No basis for a charge of failure to disperse existed with respect to any of the plaintiffs. Mo. Rev. Stat. § 574.040, Mo. Rev. Stat. § 574.060. Any marginally competent police officers or police officers not knowingly intent on violating the law would have known that to be the case. Accordingly, qualified immunity is not

available to the defendant officers.[3]

### 9.     Chief Belmar Was The Commander Of Police Operations In Ferguson, Mo., At All Relevant Times And As Such He Is Liable For The Unconstitutional Acts Of The Law Enforcement Officers Under His Command During That Period

The defendants in this case seem to confuse the notion that because Chief Belmar was not

personally responsible for the arrest, seizure or use of force against any of the plaintiffs, he may not be

held responsible.  The basis for his potential liability in this case is clearly spelled out in an applicable

jury instruction that reads as follows:

> If you find that the conduct of the subordinate (or supervised person) denied the plaintiff a right guaranteed by federal law, you must consider whether the supervisor (or supervisory official) caused that conduct. If the supervisor did cause the conduct, then he is liable under section 1983 for the denial of plaintiff's constitutional right.
>
> The standards for assessing whether the supervisor proximately caused plaintiff's constitutional injury are different from the standards for assessing the subordinate's liability. If the subordinate denied plaintiff a constitutional right, a supervisor is not liable for such a denial simply because of the supervisory relationship.
>
> But there are circumstances under which you may find that the supervisor has caused plaintiff's injury, and thus is liable for the illegal conduct of the subordinate. Two such circumstances exist. First, if you find that the supervisor has done something affirmative to cause the injury to the plaintiff—for example, by directing the subordinate to do the acts in question—you should find that the supervisor caused the injury. Second, if you find that the supervisor failed to carry out his duty to oversee the subordinate, knowing that his failure to do so probably would cause a deprivation of the plaintiff's rights by the subordinate, you should find that the supervisor caused the injury. A finding of either circumstance is enough to establish that the supervisor caused the injury. I will explain each of these in detail.
>
> To find that the supervisor did something affirmative to cause injury to the plaintiff, you must find by a preponderance of the evidence that the supervisor was personally involved in the conduct that caused plaintiff's injury. Personal involvement does not mean only that the defendant supervisor directly, with his own hands, deprived plaintiff of his rights. The law recognizes that the supervisor can act through others, setting in

---

[3]  The defendant officers are not being sued in their "official capacity" with respect to plaintiffs' individual 42 U.S.C. §1983 constitutional torts claims.  There are only being sued in their personal capacity.

motion a series of acts by subordinates that the supervisor knows, or reasonably. should know, would cause the subordinates to inflict the constitutional injury. Thus, plaintiff meets his burden of proof as to the personal involvement of the supervisor in the subordinate's conduct if he proves by a preponderance of the evidence that the deprivation of his right took place at the supervisor's direction, or with the supervisor's knowledge, acquiescence or consent. The supervisor may give his consent expressly or his consent may be implied because of his knowledge of or acquiescence in the subordinate's unconstitutional conduct.

In the absence of personal involvement, you may still find that the supervisor caused the injury to the plaintiff if you find that he failed to carry out his duty to oversee the subordinate. To make such a finding, you must conclude by a preponderance of the evidence that the supervisor had a duty to oversee the subordinate, that he grossly disregarded that duty, and that a reasonable person in the supervisor's position would have known that his dereliction of duty probably would cause a deprivation of rights.

Instruction 87-80, Modern Federal Jury Instructions, Sand, Seifert, Reiss, Batterman.  In this case, as noted above, the *Abdullah* court has already determined that Chief Belmar was the architect of an unconstitutional practice. *Id*. at 945. [The top members of the unified command decided that they would use the failure-to-disperse law as their legal justification for the orders that all the demonstrators must keep moving, but they also knew that to arrest someone legally they would have to have probable cause to believe that six or more people were gathered for the purpose of violence and had refused an order to disperse. The policymakers knew the policy was being used against peaceful citizens but did not stop the practice].  Chief Belmar is in no way entitled to qualified immunity and there is not a single undisputed fact that says otherwise.

## 10. The County of St. Louis Is Just As Liable As Chief Jackson For Allowing The Constitutional Rights Of Citizens Within Its Boundaries To Be Disregarded

Municipal liability is analyzed under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny. In *Monell*, the Supreme Court held that municipalities may be liable for monetary, declaratory or injunctive relief under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and

promulgated" by the municipality. *Monell*, 436 U.S. at 690. To establish liability for a "custom," plaintiff must show that there is: (1) a continuing, widespread, and persistent pattern of unconstitutional misconduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of plaintiff's constitutional rights. *Johnson v. Douglas Cnty Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013); *Jane Doe A v. Special Sch. Dist. of St. Louis*, 901 F.2d 642, 646 (8th Cir. 1990).

In suggesting that there was no policy, custom or widespread and persistent pattern of unconstitutional misconduct, defendant St. Louis County ignores the fact that then Chief of Police Thomas Jackson says otherwise on pages 67-68 of his deposition, Exhibit 24, and the court in *Abdullah, supra.*, also concludes otherwise. *Id*. at 945 . In addition, plaintiffs' expert has opined as follows:

> what I'm saying is that because of Chief Belmar's position, that there was joint command, that he and Jackson, City of Ferguson, St. Louis County, allowed  this environment to exist where police officers were just not held accountable, were not required to provide probable cause for arrest, not required to document the use of force, and that allowing that to exist is just inconsistent with police practices because they should have demanded, and Chief Belmar talks about that, that it was his understanding, it was his expectation that these arrests were documented, that these uses of force were documented and that was his expectation.  So he takes the position that's what we should have done, that's what he thinks they did, but in reality, they didn't do it contemporaneously with the incidents themselves.

Pusins dep at 275-76.  Mr. Pusins goes on to explain the potential consequences of allowing the environment discussed to exist.

> You're going to violate people's civil rights by using force that you're not going to report that may be unreasonable, objectively unreasonable force, that you may be detaining people without -- without probable cause because you need to have somebody that provides some oversight to what the police officers are doing, and you do that through supervision.  That's standard in law enforcement, because if you don't, as I said, you could have people arrested where probable cause did not exist.  You could have use of force applied that's objectively unreasonable and not even report it, and that's unreasonable.

Pusins Dep at 276.  Not unexpectedly, that is exactly what occurred in Ferguson during August, 2014.

-45-

The plaintiffs were arrested on the bogus charge of failure to disperse, there was no probable cause for the charge of failure to disperse in any instance, there was no contemporaneous documentation associated with any of the arrests, and when force was used, there were no contemporaneous use of force reports associated therewith.  The arrests occurred in Ferguson which allowed this environment of lawlessness to exist.  Furthermore, not only does plaintiffs' expert call into question the conduct of Ferguson, so does the Department of Justice in an After-Action Assessment of the police response in Ferguson in 2014.  Exhibit 25.

There clearly is no basis for summary judgment as to St. Louis County. It allowed knowingly unconstitutional practices to be employed by law enforcement personnel and allowed an environment of lawlessness to exist that was a percolator for unlawful arrests and the improper use of force.

Wherefore for the reasons set forth herein and in the record of this proceeding the plaintiffs submit that the subject motion for summary judgment should be denied in all respects.

-46-

Respectfully submitted,


By  /s/ Gregory L. Lattimer
Gregory L. Lattimer [371926DC]
1200 G Street, N.W., Suite 800
Washington, D.C.  20005
Tel. (202) 434-4513
Fax: (866) 764-6442
Lattlaw@aol.com

Malik Z. Shabazz [458434DC]
Black Lawyers for Justice
1200 G Street, N.W., Suite 800
Washington, D.C.  20005
Tel: (202) 434-4528
Fax: (202) 248-4478
attorneyshabazz@yahoo.com

Reginald A. Greene[308674GA]
Greene Legal Group, LLC
One Georgia Center, Suite 605
600 West Peachtree Street, N.W.
Atlanta, Georgia 30308
Tel. (404) 574-4308
Fax: (404) 574-4308
rgreene@greenelegalgroup.com

Counsel for the Plaintiffs


Certificate of Service

The undersigned certifies that a copy of the foregoing was served by the court's electronic

filing to all counsel of record this 28th day of June, 2016.


     /s/ Gregory L. Lattimer
            Gregory L. Lattimer

-47-