IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


TRACEY WHITE, et al.,          )
                               )
        Plaintiffs,            )
                               )
    vs.                        )     Cause No. 14-cv-01490-HEA
                               )
THOMAS JACKSON, et al.,        )
                               )
        Defendants.            )


DEPOSITION OF TERRENCE McCOY

Taken on behalf of the Plaintiffs

October 1, 2015


Reported by:  Christine A. LePage, CCR #1000

LePAGE REPORTING SERVICE
1465 Wilkesboro Drive
Dardenne Prairie, Missouri 63368
(314) 616-2113



1        Q        Neighborhood enforcement team.  Tell me about

2   what that.  What do they do?

3        A        Well, it's almost the same idea as hot spot

4   policing, wherever there was a crime trend within the

5   precinct we would go and try to address that and try to

6   figure out who was involved in what and try to help our

7   detectives procure the cases to stop like -- to prevent

8   like home burglaries, car larcenies, shootings, if there

9   was any kind of like drug activity going on, we would go

10  and pretty much patrol the area and try to build up as

11  much as information as we possibly could to help our

12  detectives out.

13       Q        Okay.  So you didn't respond to regular service

14  calls, you had a different type of role?

15       A        Yes.

16       Q        Okay.

17       A        We would when the precinct needed help.

18       Q        Okay.  And then tactical operations, tell me

19  about that.

20       A        Tactical operations unit, we're responsible for

21  being instructors at the academy, we do search warrants,

22  we respond to armed and barricaded subjects, we go out and

23  teach at schools, we train quite a bit.

24       Q        Train who?

25       A        We train other police officers, but we train

1      A      Yes.

2      Q      Were you involved in his arrest?

3      A      Yes.

4      Q      And what do you recall about it?

5             MR. HUGHES:  I just object to the form of the

6  question, it's just way overbroad, I mean, I'm just not

7  sure where you want him to start.

8      Q      (by Mr. Lattimer)  At the beginning.  What's

9  your recollection?

10     A      At the beginning of his arrest?

11     Q      Yeah.  Your interaction with Mr. Burns and the

12  situation giving rise to his arrest.

13            MR. HUGHES:  And just object also to the form,

14  it calls for a narrative.  But if you can answer, go

15  ahead, or try to figure out where you first saw him or

16  whatever, how you first got involved, and go from there.

17     A      As I recall there was a group of individuals

18  during the night of civil unrest.

19     Q      (by Mr. Lattimer)  Where were you at that time?

20     A      On West Florissant.

21     Q      Near what?

22     A      I think Highmont.

23     Q      I'm sorry?

24     A      Highmont, I believe that's the name of the

25  street.

1          A     Somewhere near Highmont and West Florissant.

2     Was it -- Yeah, I believe Highmont.

3          Q     And he was still with other people or was he

4     alone?

5          A     No, he was alone at this point.

6          Q     So he was alone?

7          A     He was alone, because as we approached, the

8     people that were around him ran away.

9          Q     So they dispersed?

10         A     They dispersed.

11         Q     Right, they dispersed, the other people, right?

12         A     Yes.

13         Q     And so at that point Mr. Burns was by himself?

14         A     There were people within the vicinity of him but

15    they were standing around, the group was still within, I

16    don't know, 20, 30 feet of him, some of them ran down the

17    street, behind houses, I'm not sure their exact location.

18         Q     But he wasn't standing with a group of people

19    when you took him into custody, right?

20         A     No.

21         Q     Okay.  So when you are telling people to

22    disperse, that person has to be with a group of people for

23    that to have any effect, don't they?

24              MR. HUGHES:  I just object to the form of the

25    question, it's argumentative, it's not clear what you're

1       A    Yes.

2       Q    And the law says that you may order people

3   assembled in a group of six or more to disperse; isn't

4   that correct?

5       A    Yes.

6       Q    Okay.  And so when you approached Mr. Burns, he

7   was not in a group of six or more when you took him into

8   custody; isn't that right?

9       A    When I approached him he was.  By the time I got

10  to him he wasn't.

11      Q    Right, because the group had dispersed, they had

12  done what you told them to do, correct?

13      A    Yes.

14      Q    Okay.  And so he was the only person left and he

15  wasn't assembled with anyone, was he?

16      A    Yeah, he wasn't.

17      Q    I'm sorry?

18      A    I said I don't believe that he was.

19      Q    Okay.  And so you all took him into custody

20  anyway because, in fact, he did not assemble with the

21  others and go with them, correct?

22           MR. HUGHES:  Object to the form of the question,

23  it's argumentative and misleading.

24      Q    (by Mr. Lattimer)  Isn't that correct?

25      A    Could you repeat the question?

1        Q    He didn't go with the other people and be in
2   their group, correct?
3            MR. HUGHES:  Object, it's vague as to when
4   you're talking about.  I assume you mean at the time he
5   was arrested he wasn't with a group?
6            MR. LATTIMER:  That's what we're talking about.
7        A    When he was taken into custody?
8        Q    (by Mr. Lattimer)  Right.  He didn't go with the
9   other people, right?
10       A    He didn't run to the yards that were right there
11  with him, no.
12       Q    So he stayed there by himself as opposed to
13  going with the other people, right?
14       A    Yes.
15       Q    And then you took him into custody because he
16  failed to disperse, correct?
17       A    Yes.
18       Q    All right.  Did you arrest him yourself or did
19  you assist somebody else?
20       A    I assisted somebody else.
21       Q    Did you prepare any paperwork, like a report of
22  this arrest?
23       A    I did not prepare a report for that particular
24  arrest.
25       Q    When you make arrests, do you prepare paperwork

1        A    Yes.

2        Q    So what I'm trying to understand is no report

3    was prepared by anybody prior to April 20th of 2015,

4    right?

5             MR. HUGHES:  Objection, calls for speculation,

6    conjecture on his part, and it's argumentative.  But go

7    on.

8        Q    (by Mr. Lattimer)  No report that had your input

9    was prepared prior to April 20 of 2015 because you didn't

10   talk to nobody before then, right?

11            MR. HUGHES:  Objection, argumentative.

12       A    No.

13       Q    (by Mr. Lattimer)  You had talked to somebody

14   before that?

15            MR. HUGHES:  I think he was agreeing with you.

16       A    I had not -- No, a report had not been prepared.

17       Q    (by Mr. Lattimer)  Wait a minute, let me back

18   up.  Maybe we all got this all confused, maybe I didn't

19   listen to you and didn't hear you because your counselor

20   is saying that obviously I missed it, so -- and sometimes

21   I do that, so let's go back.  What I thought you said was

22   that you didn't -- you talked to Menzenwerth and that

23   there was no input that you had given to anybody before

24   that time.  Now, am I right or wrong?

25            MR. HUGHES:  There's no input given --

1         MR. HUGHES:  Well, again, I just think that

2  question's way overbroad, it calls for a narrative, just

3  object to the form.

4     Q   (by Mr. Lattimer)  What do you remember?

5         MR. HUGHES:  Can you ask him a -- Can you be

6  more specific?

7         MR. LATTIMER:  Nope, can't.  I've never heard

8  that one before.

9         MR. HUGHES:  Well, it's argumen- -- Object, it

10  calls for a narrative answer.  You're not --

11         MR. LATTIMER:  What's narrative have to do with

12  it?  What's narrative have to do with it?  What objection

13  is that?

14         MR. HUGHES:  I mean, like do you remember the

15  arrest, do you remember the first time you saw him, I

16  mean, it's just so overbroad.

17         MR. LATTIMER:  I know, that's what you're asking

18  for, what do you remember.

19     Q   (by Mr. Lattimer)  I want to know what you

20  remember about it.  You say you recall it, so what do you

21  remember about it?

22     A   I remember they were arrested for interfering

23  with the duties of a police officer.

24     Q   For what?

25     A   Interfering with the duties of a police officer.

LePAGE REPORTING SERVICE

1    Q    Okay.  What does that mean, interfering with the

2    duties of a police officer?

3    A    A police officer is trying to carry out a

4    specific task relative to his job and this person is not

5    allowing that to happen.

6    Q    Okay.  What did they do to interfere with the

7    duties of a police officer?

8    A    A certain area was trying to be secured, the

9    threat of any kind of property damage or any violent

10   behavior that was occurring, and also to get a truck that

11   was stuck on the grass safely out of the area, they were

12   in a position that was preventing us from doing so.

13   Q    Where were they in relation to the truck?

14   A    Right where it needed to back up to get out of

15   the spot it was stuck in.

16   Q    Have you viewed the video?

17   A    Yes.

18   Q    And when's the last time you reviewed it?

19   A    The last time it was reviewed, Monday, this

20   Monday.

21   Q    Okay.  And having reviewed that, you saw them in

22   the location where the truck was, either -- the truck

23   couldn't back out, is that -- am I understanding that to

24   be your position?

25   A    Yes.

1       Q       (by Mr. Lattimer)  You read the report; isn't

2    that what it said?

3       A       We recommended he close.

4       Q       All right.  So you all recommended he close, and

5    then Ms. White and her son were two of the patrons, and

6    all the patrons were told to get out, two reporters, you

7    all didn't think they moved fast enough so they were

8    arrested, and the rest of the people were forced to leave

9    the McDonald's and then forced to walk up toward Ferguson

10   and then up Ferguson to Sharondale; isn't that right?

11              MR. HUGHES:  Object to the form of the question,

12   it's compound, it's misleading, it goes beyond the facts

13   of this case, the issues in this case.

14      Q       (by Mr. Lattimer)  Isn't that correct?

15      A       They were asked to leave McDonald's and they

16   were asked to walk up Ferguson toward Sharondale.

17      Q       Asked?  They were told.  You didn't ask them

18   anything, did you?

19      A       It's their choice, if they wanted to stay there,

20   they could stay there and they would be arrested, it was

21   their choice.  They did have a choice.

22      Q       So the choice was to stay and be arrested or

23   leave and not be arrested?

24      A       That was it.

25      Q       Okay.  So that was the choices that were offered

LePAGE REPORTING SERVICE

66

1    to the people who were visiting this business and not

2    engaging in any misconduct whatsoever, correct?

3        A    After the business closed it would have been

4    deemed trespassing, so, yes.

5        Q    And the only person that could have deemed it

6    trespassing would have been the business owner, correct?

7        A    Correct.

8        Q    And the business owner did not say that, did he?

9        A    He said he wanted everybody out of the

10   restaurant, so we asked them to leave.

11       Q    So the reason that Mr. Davis and Ms. White were

12   at the location they were at was because that's the choice

13   that the police officers gave them?

14       A    When they got to the location they were at, they

15   were given further direction as far as where they could

16   be.

17       Q    Okay.  You didn't answer my question.  My

18   question was how they got to that location.

19       A    They had to get there to get to the next

20   location.

21       Q    But they got to that location because that's

22   where the police forced them to go, correct?

23            MR. HUGHES:  Object to the form of the question.

24       A    They were asked to go in that direction.

25       Q    (by Mr. Lattimer)  They were asked by the police

1   to go in that direction or be arrested, right?  Right?

2        A    Yes.

3        Q    Okay.  And so when they got to the location that

4   the police told them to go to or be arrested, then you

5   told them what?

6        A    We told them to walk in a direction, go in this

7   direction.

8        Q    You told them they could what?

9        A    Go in a certain direction.  When they got to

10  this area, it was deemed that we wanted them to be either

11  here or here, (indicating,) in the apartment complex or

12  further up in the next intersection.

13       Q    And it didn't matter if they didn't live in that

14  apartment complex, right?

15       A    Could you repeat?

16       Q    It did not matter if they did not live in that

17  apartment complex, correct?

18       A    There's egress out of that apartment complex.

19       Q    I didn't ask about that.  I said it did not

20  matter if those people lived in that apartment complex?

21       A    No, it did not matter.

22       Q    It did not matter if they were familiar with the

23  area that you were taking them, correct?

24       A    That's why they were given an alternate route.

25       Q    What was the alternate route?

1      A     Directly up Ferguson toward the upper part of

2   Sharondale.

3      Q     The upper part of Ferguson?  They were given

4   that they could go Ferguson or they could go to the right?

5      A     They could go into the apartment complex or

6   continue to go up Ferguson.

7      Q     And go where?  Up Ferguson, go where?

8      A     To the next intersection.

9      Q     Where was that?

10      A     I believe it's called Sharondale Circle or

11   Sharondale Drive.

12      Q     And it didn't matter if they knew where they

13   were going, right?

14          MR. HUGHES:  Objection, argumentative.

15      Q     (by Mr. Lattimer)  Didn't matter if they was

16   familiar with their surroundings or not, correct?

17          MR. HUGHES:  Objection.  Same objection.

18      Q     (by Mr. Lattimer)  Right?

19      A     No.

20      Q     Didn't matter if they had someone who was coming

21   to pick them up so that they could take them out of the

22   area or not, correct?

23          MR. HUGHES:  Objection, argumentative.

24      A     They could have called a ride or something.

25      Q     (by Mr. Lattimer)  They could have called a ride

1                        CROSS-EXAMINATION

2    QUESTIONS BY MR. HUGHES:

3        Q    Actually I have a few questions, because I don't

4    think you went into this and I don't want any surprise --

5    claim of surprise at trial.  Officer McCoy, did you order

6    the arrest of Tracey White?

7        A    No.

8        Q    Now, with regard to William Davis, will you tell

9    us your conversation with Mr. Davis leading up to his

10   arrest?

11       A    At the point that his mom was being arrested he

12   was pretty much given directions to either go into the

13   apartment complex or go further up the street.

14       Q    You say he was pretty much.  Will you tell me

15   what you said to him and what he said to you and what you

16   said to him and what he said to you?

17       A    All right.  So I told him that he'd still have

18   to leave the area regardless of his mom being arrested, so

19   either to go into the apartment complex or go further up

20   the street to the next intersection.  As far as his mom

21   being arrested, he kind of looked over my shoulder and all

22   he said was, "I don't have nowhere to go," and he said,

23   "Don't hurt my mom."  I was like, "They're not hurting

24   her, they're trying to get her into custody."

25            And then after that I was like, "You still have

1    to leave, we're giving you an opportunity to either go

2    into the apartment complex or go up the street."  And he

3    kind of stared at me, didn't say anything.  I was like,

4    "Okay, now you're going to be arrested, I'm going to have

5    to arrest you if you don't choose either to go into the

6    apartment complex or up the street."  And he still kind of

7    stayed there and stared at me, so then at that point I

8    placed him under arrest.

9         Q    Okay.  And then when you placed him under

10   arrest, did he offer any resistance?

11        A    No resistance, he was completely compliant, he

12   still didn't say anything.

13        Q    Okay.  Thank you.  I don't have no other

14   questions.

15

16                    REDIRECT EXAMINATION

17   QUESTIONS BY MR. LATTIMER:

18        Q    I'm trying to understand something.  At the time

19   he was taken into custody, you were with his mother?

20        A    No, he was not arrested.  When you saw him in

21   that video, he was not under arrest.

22        Q    What do you call that?

23        A    Maybe detained, but he was not in handcuffs.

24        Q    Well, what was -- Handcuffs has nothing to do

25   with an arrest.  You can put people in handcuffs and not

1    being walked down the street.  Are you saying at that

2    point he was what?

3         A    He was still not under arrest.

4         Q    What was he?

5         A    You can say he was being detained, you can say

6    that.

7         Q    For what?

8         A    For interfering with the duties of a police

9    officer.  It had not been determined whether or not he was

10   going to go to jail yet.

11        Q    Well, wait a minute.  If it's an offense

12   committed in your presence, that's an arrestable offense,

13   isn't it, a misdemeanor or whatever, right?

14        A    Police officers have discretion.

15        Q    To arrest you or not?

16        A    Yes.

17        Q    And so you all were exercising your discretion?

18        A    Correct.

19        Q    And so you all took him into custody and then

20   you walked him down the street and then you used your

21   discretion as to arrest the 17-year-old whose mother has

22   been arrested and then he tells you he has nowhere to go;

23   is that what you're saying?

24        A    Repeat what you just said.

25        Q    That you all used your discretion here to arrest