IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al., )
)
    Plaintiffs, )
)
vs. ) Cause No. 14-cv-01490-HEA
)
THOMAS JACKSON, et al., )
)
    Defendants. )

VIDEO DEPOSITION OF JON BELMAR

Taken on behalf of the Plaintiffs

October 27, 2015

Reported by:  Christine A. LePage, CCR #1000

LePAGE REPORTING SERVICE
1465 Wilkesboro Drive
Dardenne Prairie, Missouri 63368
(314) 616-2113



PLAINTIFF'S EXHIBIT 19

1   A   February of '10 through July of '13.
2   Q   So how long have you been with the St. Louis
3   County police department altogether?
4   A   Twenty-nine years.
5   Q   Is that your only law enforcement position?
6   A   Yes, sir.
7   Q   So I take it you started off as an officer and
8   rose through the ranks to become chief?
9   A   Yes, sir.
10  Q   A success story if there ever was one?
11  A   I've been blessed.
12  Q   All right.  How many men do you command?
13  A   850 sworn police officers, approximately 300
14  professional staff, 1,100.
15  Q   And my understanding, the little I have, of law
16  enforcement in Missouri is that St. Louis County does not
17  include the City of St. Louis; is that correct?
18  A   It does not.
19  Q   Okay.  And the City of St. Louis is not even
20  part of the county; is that right?
21  A   No, they're their own county.  They're the
22  county of the City of St. Louis.
23  Q   Okay.  So they have a separate and distinct
24  police chief?
25  A   They do.

```
 1        Q    Oh, just about everybody?
 2        A    In one form or the other.
 3        Q    Okay.  And where is headquarters located?
 4        A    It's located here at the County government
 5   complex in Clayton.
 6        Q    And can you give me an overview of the chain of
 7   command from you down?
 8        A    Well, actually, according to the County Charter,
 9   the Board of Police Commissioners is in charge of the
10   St. Louis County police department, and in that role they
11   appoint and retain the chief and they approve all the
12   policies and general orders on the police department.
13   They also have other duties, but they're my direct boss,
14   and that is the Board of Police Commissioners appointed by
15   the County Executive, and then they are approved or
16   ratified by the County Council.
17             So I report to that member board, but I have
18   operational control over the police department.  Under me
19   is the deputy chief, Chief Kenny Cox.  I would like to
20   point out, however, I did not have a deputy chief in
21   August of 2014.
22             So in August of 2014, the way it would have
23   looked is I would have had a lieutenant colonel in charge
24   of patrol, a lieutenant colonel in charge of the Division
25   of Criminal Investigation, a lieutenant colonel in charge
```

```
 1  Patrol, Tom Jackson from the Ferguson police department, I
 2  believe Lieutenant Colonel Al Adkins.
 3       Q    When you say up there, where are you --
 4       A    I'm sorry, on West Florissant.  So I'm answering
 5  your question the long way.  So by this time the logistics
 6  are being primarily handled by St. Louis County, and you
 7  asked about the command, the command was myself, Tom
 8  Jackson, Al Adkins, and Ron Johnson.
 9       Q    Okay.  Now, Adkins is with who?
10       A    St. Louis Metropolitan police department.
11       Q    And Johnson is with who?
12       A    The highway patrol.
13       Q    Okay.  So those are the four main components?
14       A    Yes, sir.
15       Q    All right.  So on the 11th, tell me about that
16  day.
17       A    So during the day on the 11th, I don't recall
18  anything being all that remarkable during the daylight
19  hours.  On the evening of the 11th, I was up at the
20  command post, it might have been 8:30 -- it was good and
21  dark, so it was probably closer to 9:30, and I noted
22  Mrs. McFadden responded, Mrs. McSpadden, I'm sorry,
23  responded to the command post, because she wanted to
24  meet -- I don't know if she wanted to talk to my
25  detectives or what was going on, but I wanted to stay
```

```
 1  nothing.
 2       A    So the date of the occurrence was 8/13.
 3       Q    Of '14, correct?
 4       A    Right.  It was entered by Wolff on 2/20 and
 5  approved at 5/4.  So you are correct.  Thank you.
 6       Q    Okay.  And this one is with regard to Nathan
 7  Burns --
 8            MR. HUGHES:  We've been going for a while.  If
 9  you need a break, just say so.
10            THE WITNESS:  I'm okay.
11       Q    (by Mr. Lattimer)  You sure?  Do you need to
12  take a call?  I don't have a problem.
13       A    No, I'm fine.  Go ahead and finish this part and
14  we'll break before we get to the next part.
15       Q    Okay.  And this one involves Mr. Nathan Burns?
16       A    I'm sure you're accurate, because you were
17  before, so --
18       Q    Okay.  So I just want to verify that the
19  information contained in those reports with respect to the
20  dates of their preparation is accurate.
21       A    Yes, sir, they are.
22       Q    Okay.  And the reason that Detective Menzenwerth
23  was given that task this year is what?
24            MR. HUGHES:  Just object, it assumes facts not
25  in evidence, you're saying he was given the task this
```

```
 1  year, so that's why I'm objecting to it.
 2       Q    (by Mr. Lattimer)  Okay, let me back up, let me
 3  back up, let's clarify that.  I'm using this year as the
 4  date, because that's when the task was, according to the
 5  document, initiated.
 6       A    Yes, sir.
 7       Q    And in that regard, what I'm asking you is is
 8  the task that was initiated, was that initiated shortly
 9  after the directive was given?
10       A    Menzenwerth would have been given that task in I
11  would imagine the early fall of 2014.
12       Q    Okay.  So it is your understanding or belief
13  that the task was given to him in the fall of 2014 but
14  that he did not undertake it until this year?
15       A    He certainly didn't complete those until that
16  point in time, I cannot say when he undertook it.
17       Q    Okay.  And do you know what the delay -- why
18  there was such a delay?
19       A    I cannot imagine.  It could have been various
20  legitimate reasons, but you'd have to talk to Detective
21  Menzenwerth regarding that.
22       Q    Okay.  Would that be something that would be
23  consistent with your policy?
24       A    Well, again, typically we are able to produce
25  documents in a very timely manner; however, this was a
```

```
 1        Q    All right.  So with regard to -- You were in
 2   command of the incident -- You were the incident commander
 3   beginning on October 11th, correct?
 4        A    August 11th.
 5        Q    I'm sorry, I keep saying October.
 6        A    And we talked about that, but, yes.
 7        Q    And that extended to August 14th when I think
 8   the governor made Captain Johnson incident commander,
 9   correct?
10        A    One of two executive orders.
11        Q    All right.  So during that period of August 11th
12   through August 14th -- well, August 13th, you were the
13   person in charge, right?
14        A    I shared that responsibility with Chief Jackson,
15   and then I was fortunate enough to have Captain Johnson
16   and either Colonel Adkins or Major Jones from the
17   St. Louis Metropolitan police department assist me along
18   with my commanders.
19        Q    Okay.  But you were the ultimate person in this
20   situation?
21        A    I was, yes.
22        Q    All right.  So if -- The folks that were using
23   force, there were guidelines that you all explained to
24   them were the parameters in which force were to be used,
25   correct?
```

```
 1        Q    So you have to have a threat in order to use
 2   force, and the force continuum tells you that the amount
 3   of force that you can use decreases as the threat
 4   decreases, correct?
 5        A    Yes.
 6        Q    And increases as the threat increases, correct?
 7        A    Yes.
 8        Q    Okay.  So when we talk about use of force,
 9   you're looking at the threat level, right?
10        A    Yes.
11        Q    All right.  And just as with an arrest, you're
12   looking at the probable cause for the arrest based upon
13   the applicable law, correct?
14        A    Yes, sir.
15        Q    And an individual running along or walking along
16   a sidewalk towards the police, no one else with him, would
17   not fit within the category of failure to disperse, would
18   he?
19        A    If that's all that you're giving me, then I
20   would tell you no.
21        Q    All right.  And if that person were charged with
22   failure to disperse under those circumstances, that would
23   not be an appropriate arrest, would it?
24        A    If that's all you're telling me, no.
25        Q    Okay.  Now, in this -- in these plaintiffs, of
```

1  located on the corridor, but we were not happy with the
2  prisoner processing, and we realized that it needed to be
3  altered to where we were able to at a glance identify
4  certain things, what was the officer's name, what was the
5  suspect's name, what was the charges, where were they
6  going, different things like that that we realized that we
7  needed to do a better job of.
8      Q    So would you agree there was no standard way to
9  document arrests?
10     A    Now, there was a standard, but what I would tell
11 you is that we needed to get better at the standard way we
12 were doing it.
13     Q    Okay.  Now, "When people were arrested,
14 conditions of release varied depending on the agency
15 making the arrest."
16     A    That was true, yeah.
17     Q    All right.  And in this particular case with the
18 plaintiffs here, no documentation of any kind was prepared
19 contemporaneously with their arrest as far as you know,
20 correct?
21     A    Yes, I would have to depend on what you're
22 telling me to say that, yes.
23     Q    And you have no evidence to the contrary, right?
24     A    I do not.
25     Q    All right.  I'm still on 38, "There was no one

```
 1      A    Yes, sir.
 2      Q    And specifically Finding 19.
 3      A    Yes, sir.
 4      Q    "Law enforcement applied the 'keep moving' order
 5   broadly and without guidelines for officers that allowed
 6   for its legal application."
 7      A    During the day, I have already talked about that
 8   in federal court, and we should have altered the standing
 9   order on the failure to disperse, and, in fact, we did.
10      Q    And so would you agree that the failure to do
11   that led to constitutional violations?
12           MR. PLUNKERT:  Object to the foundation.
13           MR. HUGHES:  Yeah, and also as to particular
14   relevance in this particular lawsuit.  Are you asking did
15   that lead to a constitutional violation of, for example,
16   Tracey White or Antawn Harris or anyone else?  I mean,
17   there has to be some connection to this particular
18   lawsuit, right?  So is that what your question is?  Are
19   you asking him did this lead to maybe a false arrest
20   charge of William Davis and Tracey White or --
21           MR. LATTIMER:  You want me to have the court
22   reporter read it back?
23           MR. HUGHES:  Look, I made the objection.
24           MR. LATTIMER:  All right.
25           MR. HUGHES:  You can do what you want.
```

1  events, and when they happen, they can test the capacity
2  of any police department regardless of whether they have
3  10,000 people or 1,000 people.
4    Q    And so you would disagree with the next sentence
5  of that finding which is, "The unprecedented nature of
6  this event does not justify the lack of documentation and
7  need to track the use of less-lethal responses"?
8    A    I think we do need to document and I do think we
9  need to track the use of force.  I'm not saying -- Are we
10 talking about that or are we talking about time?
11    Q    Well, here they're saying the unprecedented
12 nature of this event does not justify the lack of
13 documentation and need to track the use of lethal --
14 less-lethal responses.
15    A    I agree 100 percent.
16    Q    Okay.  I'm on the same page.
17    A    Yes, sir.
18    Q    And the next finding, "The use of canines during
19 the Ferguson demonstrations raised many questions and
20 concerns and the assessment team determined the following:
21 The St. Louis County PD and Ferguson PD used canine units
22 for crowd control to protect the homicide scene on August
23 9th."  You were aware of that, right?
24    A    I was.
25    Q    And did you agree with that?

```
 1          A    Yeah, they did remove their name tags, and they
 2   did that because that was what they were trained to do
 3   prior to August of 2014.  So when I was trained as a
 4   police officer, when a four-year officer has been trained
 5   as a police officer, they were told to strip all the items
 6   off their shirts, take your ties off, wear long sleeves if
 7   they have them and button the sleeves down, that way they
 8   can't -- nothing can come -- accoutrements can come off of
 9   the uniform, they're all stuck on here with needles, so
10   that's why we did that.
11          So I didn't find that unusual when I first
12   noticed that, because that was the way I had been trained
13   and that's the way the police officers had been
14   instructed.  But then for whatever reason we started
15   talking about that, I think the patrol didn't take theirs
16   off, and then we decided as a command that it was a better
17   idea to make sure that we had the name tags on.  So I
18   don't think we got them on right away, it was probably a
19   week, could have been two days, I don't remember, though.
20          Q    (by Mr. Lattimer)  But that's what they were
21   trained to do?
22          A    Yes.
23          Q    Isn't that a way of hiding your identity?
24          A    I don't think that was why they were doing it
25   that way.  I don't ever think anybody was colluding to
```

1  say, hey, we're going to hide our identity, that's why
2  we're going to all get trained, POST certified trained,
3  and take our name tags off, I think that assertion is
4  ridiculous.  I think it has to do with the fact that they
5  didn't wear -- that I was trained not to wear badges
6  either, I mean, you just stripped all the way down with
7  that stuff.  That was the assertion made, but I can't
8  agree with that.
9      Q   How do you identify a police officer if you
10 don't have a name tag?
11     A   Well, it would be very difficult to.  But it's
12 the same way as trying to identify a police officer if he
13 has a raincoat on or if he's wearing a suit and tie or --
14 you know, that's something that we deal with all the time.
15 It doesn't seem that remarkable, except in this arena then
16 all of the sudden it was brought to the forefront.
17     Q   But doesn't that prevent any individual from
18 holding a police officer accountability who may have
19 engaged in inappropriate conduct?
20         MR. PLUNKERT:  Calls for speculation.
21         MR. HUGHES:  And argumentative.
22     A   I don't know what would prevent them from trying
23 to obtain the name of a police officer.
24     Q   (by Mr. Lattimer) But how do you do that, is
25 what I'm trying to understand, if you don't have any

```
 1  identifying markers?
 2      A    You could ask the police officer.
 3      Q    If the police officer has removed his name
 4  badge, you ask him his name and he's going to give it to
 5  you?
 6      A    Why wouldn't he?
 7      Q    Well, I'm trying to understand why would he
 8  remove it.  But you told me that he was trained to do
 9  that?
10      A    Yes, sir.
11      Q    And you gave a reason for that.  But why can't
12  you just stitch his name with a placard?
13      A    Well, because then everybody will have shirts
14  that are stitched with placards with their names on them
15  is one reason for that.  Again, there's all sorts of
16  mechanisms to be able to complain or begin to identify
17  police officers, you know, you can set that up a lot of
18  different ways.  Should we have somebody come up to us and
19  say -- and I don't think it mattered whether they had name
20  tags or not, "Hey, this just happened to me, this officer
21  just did that," the first thing we would always say is
22  what color uniform were they wearing at the time, so we
23  could begin to narrow it down.  And typically we would
24  always be able to find the officer that was being
25  complained upon, because we knew what post they were on or
```

```
 1   whatever.  We weren't adverse to doing any of this.
 2            But you asked me specifically about the name
 3   tags, I'm telling you why they weren't wearing the name
 4   tags, and I'm also going to tell you that in no measure as
 5   the police chief was I doing that in order to veil these
 6   names from the public.
 7       Q    Well, let me ask it this way:  Did they wear
 8   their name tags at other times?
 9       A    Yeah, they wear them every day just like I am
10   right now.
11       Q    And so under what circumstances would they be
12   told to remove them?
13       A    Typically they were -- The only time I'm aware
14   of is they were told to remove them when they were in a
15   situation regarding a civil disturbance response event.
16   It's been that way for my 29 years up until recently.
17       Q    And the purpose of removing the name tag was
18   what?
19       A    Well, again, let's start all over.  Pens, name
20   tags, badges, service bars, whatever, the purpose -- and
21   ties, take all that off, that way you don't have anything
22   loose hanging on you, you're going to have equipment over
23   the top of that, it tears stuff up, that's really why.
24       Q    So would you agree that that might look
25   differently to the public?
```