IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY WHITE, et al. )
)
    Plaintiffs )
)
v. ) Cause No. 14-cv-01490 - HEA
)
THOMAS JACKSON, et al. )
)
    Defendants. )

**TRIAL BRIEF OF DEFENDANTS JON BELMAR, SGT. DAVID RYAN, OFFICER TERENCE MCCOY, OFFICER MICHAEL MCCANN, DET. DERIK JACKSON, DET. JOE PATTERSON, DET. AARON VINSON, DET. WILLIAM BATES, DET. NICHOLAS PAYNE, OFFICER DANIEL HILL, OFFICER ANTONIO VALENTINE, AND ST. LOUIS COUNTY**

**Preliminary Statement**

This Trial Brief is being presented by the St. Louis County defendants, Jon Belmar, David Ryan, Terrence McCoy, Michael McCann, Derik Jackson, Joseph Patterson, Aaron Vinson, William Bates, Nicholas Payne, Daniel Hill, Antonio Valentine and St. Louis County, Missouri.

**Factual Issues**

Regarding all claims

The case of *Bernini v. City of St. Paul*, 665 F. 3d 997, 1003 (8th Cir. 2012) indicated that what is reasonable for a warrantless arrest in the context of a *potential* large scale riot (emphasis added) may be different from what is reasonable in the relative calm of a tavern with a dozen patrons. Plaintiffs repeatedly alleged in their various complaints and other pleadings that there had been civil unrest in the streets of Ferguson. Some of the plaintiffs described in their depositions some of this unrest. Michael Brown was shot and killed on August 9th, 2014.

1

Activity that could be described as a large scale riot occurred at least by August 10th, with looting, and the burning of the Quik Trip Store, and more. This rioting was occurring during the August 11th to 13th time period involving the plaintiffs and continued. Although the plaintiffs may attempt to say that at a particular moment, things appeared to be quiet, there should not be an issue that during the period of August11th to August 13th, there was either a large scale riot or a potential large scale riot occurring.

     Every officer who is being sued belonged to a specialized unit. Each one was very brave, well trained, and intelligent. They were assigned to areas where they were needed to assist. They would often be in the front of the line, they would attempt to disperse unruly crowds, and they would strive to keep close to each other while doing so. They took the abuse that was directed at them, they dodged things that were thrown at them, or they got hit, they often chose not to or often were told not to make arrests when they could have made arrests. Again, their main task was to disperse the unruly crowd to make the area safe, not to arrest people. When an arrest was made, it was made quickly and efficiently by these specialized officers, and then the arrested persons were turned over to conveyance officers, and then these highly trained officers went back to the front to try to keep the area safe. For every incident the officers who are being sued started out at what was called the command center and waited for assignments. Sometimes they waited a long time. They went to their assigned locations only after calls were received that help was needed. If they made an arrest, they did not spend much time with the person that they arrested, turning the arrested person over to conveyance officers and then these officers returned to the front line.

<u>Tracey White and William Davis event on August 13, 2014</u>

Tracey White sued St. Louis County police officers David Ryan, Terrence McCoy and Michael McCann for state and federal claims of false arrest and excessive force or battery. Not one of these St. Louis County officers actually handcuffed Tracey White. The arrest/handcuffing/ walking to conveyance vehicle was done by St. Charles County tactical operations officers. Sgt. David Ryan made the decision that Ms. White should be arrested, but that decision was made after numerous requests had been made to Ms. White to walk to another area. So there should be no issue as to Terrance McCoy and Michael McCann. William Davis also sued Ryan, McCoy and McCann for false arrest. The decision to arrest and the actual arrest of Davis was done by Officer Terrence McCoy. So there should be no factual issue with regard to Ryan and McCann. The factual issue regarding these arrests is whether there was arguable probable cause for the arrests of Tracey White and William Davis. There was unlawful activity the night before on that street. Planning was being done and decisions were being made to attempt to keep property and people safe. Sundown was approaching. People were asked to move for safety reasons. They moved. Then there was a pickup truck that was stuck. Safety was again a concern. A sergeant made what he called "an audible," a judgment call that involved that again involved safety. People were again told to disperse to a nearby street or parking lot. William Davis admitted in his deposition that the rest of the crowd other than him and his mom had moved down. White was arrested. Then Davis was again and again told that he needed to move or he would be arrested. He did not move and he was arrested without incident.

Despite a video that does not show any force being used against Tracey White whatsoever, and despite the fact that the video shows that as she was being escorted by St. Charles County tactical operations officers that Ms. White lifted her feet into the air, landing on the ground, Ms. White is apparently still claiming that she was thrown to the ground. But she

said that she cannot describe the officers who did that and does not know their names. The video shows these were not St. Louis County officers.

There is no excessive force claim or battery claim that is pending as to William Davis. Tracey White seems to still be claiming excessive force and assault and battery. But there is no dispute that no medical claim is being made by her. As mentioned, Tracey White was arrested and handcuffed and walked off by St. Charles County Tactical Operations Officers, not by any of the three named St. Louis County officers. Terrence McCoy very briefly grabbed as the St. Charles County officers handcuffed Ms. White. This resulted in no claim of injury.

Legal issues for the arrests of Tracey White and William Davis

The arguable cause is White and Davis interfered with the duties of police officers who were making decisions for public safety, who were preparing for expected burning, looting, and criminal behavior. Then the safety concerns expanded with the attempts to extricate a truck. White and Davis failed to disperse when asked to do so even though others did.

Dewayne Matthews event of August 13th 2014

DeWayne Matthews made allegations against 6 different St. Louis County detectives, Detectives Derik Jackson, Joe Patterson, Aaron Vinson, Will Bates, Matthew Burns, and Nicholas Payne, (Detective Matt Burns though was not named as a defendant). Matthews does not know what any of the six individual officers did to him, but the one thing that he says that he knows is that the officers who attacked him were wearing military uniforms. None of the officers that he is suing wore military uniforms that night. They all wore blue jeans and T-shirts and athletic shoes which are often referred to as tennis shoes. As members of the Bureau of Drug Enforcement, this was their normal uniform.

After waiting at the command center, these detectives were sent to the area of 9400 West Florissant because there was danger. People within a large unruly crowd threw objects, which included a Molotov cocktail. Gunshots were heard. Brave well trained detectives were at the front of the line. Supervisors were nearby. Those at a top level of the chain of command made a decision that the crowd needed to be dispersed. Announcements were made over loud speakers to disperse. These announcements were not made by the officers who are being sued, but by tactical operations. Smoke and tear gas were deployed, not by these officers but by tactical operations. The area became heavily saturated with smoke and tear gas. Detectives Derik Jackson, Joe Patterson, Aaron Vinson, Will Bates, Matt Burns and Nick Payne donned gas masks. The smoke, the tear gas, the announcements seemingly worked. The crowd started dispersing northbound. That is, the crowd was dispersing away from the police. Then suddenly someone emerged from the smoke and the tear gas, and kept coming toward the police, even though the rest of the crowd had moved away from the police. There is no dispute that Matthews kept coming through the gas and smoke toward police. The detectives on the front line yelled at him to stop and go back. One detective took off his gas mask amidst the tear gas, and yelled at him to stop and turn around. Matthews admitted in his deposition that he, (Matthews) was affected by the tear gas. Mathews kept coming and kept coming toward police and did not stop coming toward police until after he was struck by bean bag rounds fired from a less lethal shotgun by Detective Derik Jackson, who had yelled out "less lethal, less lethal," before firing. Det. Jackson did so because he feared an assault was imminent. All the officers considered this man running toward them to be a threat. The issue is whether under the circumstances the judgement on the scene to fire less lethal bean bag rounds was excessive. The related issues are whether Detective Derik Jackson is protected by Qualified Immunity and Official Immunity. The

5

decision to fire a less lethal bean bag weapon was a judgment call. Derik Jackson had no other contact with Dewayne Matthews because he had been designated the less lethal cover, and so he remained at his post when Matthews went into the nearby culvert.

Matthews alleges that he was then subjected to a "gruesome beating" by multiple officers that lasted a full 2-3 minutes, after which he claims he was soaked in Mace. He cannot name or describe the officers who engaged in the "gruesome beating" or Macing. He claims that he was not seen by paramedics for 45 minutes to an hour later. As mentioned earlier, the assignment of the officers was that if someone was arrested, that the arrested person would be turned over to conveyance officers as quickly as possible so that these officers could return to the skirmish line and face the crowd. So after Matthews was handcuffed he was turned over to conveyance officers who happened to be St. Charles County tactical operations officers, one of whom was a paramedic. Matthews, who had been hit by several bean rounds, and who had been in a scuffle while resisting officers, was conveyed to Christian Hospital, where the emergency room doctor did a thorough exam, indicated that Matthews appeared to be in moderate pain, ordered X Rays and CT scans, all of which turned out to be normal, and discharged Matthews from the emergency room at 1:15 a.m. Matthews had no follow up care from any health care provider.

Other than saying he was subjected to a gruesome beating by officers wearing military uniforms, Matthews does not know what the individual officers wearing blue jeans and T-shirts did during what was just described as a scuffle. The "scuffle" first consisted of Matthews falling into a concrete culvert that was perhaps 2-3 feet deep with water. Det. Vinson got in the water and tried to pull Matthews out of the steep culvert but was not able, and so Det. Bates pulled both Detective Vinson and Matthews from the water, and placed Matthews on flat ground to be handcuffed. Matthews did not allow himself to be handcuffed but rather thrashed, kicked and

flailed while Detective Burns (who is not a defendant) tried to hold Matthews down, and Detectives Vinson and Bates struggled to handcuff Matthews. Finally Detective Patterson alerted Matthews that he would use OC spray if he did not stop resisting; Mathews continue failing, then Det. Patterson gave a one second burst of spray, aiming in the area above the eyebrow of Matthews, after which Matthews stopped his flailing and kicking, was handcuffed and turned over to the St. Charles County personnel. No St. Louis County officer struck Matthews.

One legal dispute regarding Matthews is whether there was arguable probable cause to arrest him when, after the crowd dispersed away from the police, Matthews came toward the police, even while the police were telling him to stop and go back. Another legal dispute is whether the officers that he chose to sue can be liable for excessive force when he cannot describe what any force that any specific individual did to him, but he can only describe that they were wearing military uniforms when in fact they were not. In the alternative, if what the police detectives describe is taken as true, the legal issue is whether the force that they described was excessive, and whether they have qualified immunity and official immunity.

<u>Kerry White, Sandy Bowers and Kai Bowers event of August 12-13th, 2014</u>

These plaintiffs have named as individual defendants, St. Louis County police officers McCann, McCoy, Valentine and Hill. On the night of August 12th plaintiffs K. White, S. Bowers and K. Bowers had been aware of violence, had heard gunshots, had seen smoke, had seen tear gas and had heard loud speaker announcements telling people to disperse. Instead of going home or leaving Ferguson, they got into a motor vehicle and stayed in the area, with Kerry White driving. Shortly before or after midnight they drove onto a street called Lorna Lane, a dark street. No other traffic was on this street. Their vehicles' headlights were not on. As they drove down the street, they saw people scattering; some walking, some running. They kept

driving toward what was a police line. When they finally stopped very near to the police line they were arrested. After being arrested they were walked to Chambers and Lorna and were handed over to conveyance officers. They were taken to Clayton, booked, and released. None of them sought or received any medical treatment at any time that night or subsequent to that night for anything related to their arrest. Kerry White said he was not injured. Kai Bowers said that while he was being handcuffed one officer, who he cannot name, had a knee on his neck and shoulder which hurt at the time.

The neighborhood enforcement team, which included Officers McCann, McCoy, Valentine, and Hill, had been staged at the police command post after coming on duty on August 12th. After assistance was needed at West Florissant Ave, they were sent there, they arrived, they observed a gathering of a hundred or more people, they observed rocks and bottles and other objects being thrown at police, they heard sounds of gunfire, they heard threats from the crowd that police would be killed. Commanders were on the ground making decisions and giving guidance to the officers. The tactical operations team (not these neighborhood enforcement team officers) gave loud speaker announcement to the crowd to disperse. Tactical operations deployed smoke and tear gas. The crowd began moving back and then would re-form and would again throw objects at police. At one point close to but not yet at Lorna Lane, the throwing of objects intensified. More announcements to disperse were made, more tear gas and more smoke was deployed. Some of the crowd went to Lorna Lane. Before the police moved to Lorna Lane, the police were told by supervisors to stop and check up on each other for injuries. Then objects were still being thrown at police from the crowd on Lorna Lane. Announcements were made on Lorna Lane, tear gas was deployed on Lorna Lane, a police skirmish line began to move down Lorna Lane. Then suddenly there was a radio transmission from an air support helicopter that

said that there was a white vehicle with no head lights driving toward the police line on Lorna Lane. The helicopter shined its lights on the vehicle. Officers Valentine, Hill, Payne, McCann, and McCoy all observed this vehicle come toward them. The officers considered this car to be a threat and started yelling at the car to stop. Officer McCann even pulled off his gas mask to yell to stop. In the face of what was perceived by them to be a threat, the officers spontaneously pulled out their weapons. Finally the vehicle stopped near the police line. The driver held out his hand which contained a black object. He was told to drop it, and he did. The officers carefully approached the vehicle telling the occupants to show their hands, the occupants did, the occupants got out when commanded to do so; they were laid on the ground and handcuffed. Some of the officers asked these people if they had heard the commands to stop, after which the passengers said that they had but they were not driving. They were taken to a conveyance vehicle. Officers McCann, McCoy, Hill, Valentine and Payne resumed their assignment on the skirmish line to face the crowd. Kerry White had an outstanding warrant from the City of Maryland Heights.

The area at and near Lorna Lane was considered to be too dangerous to have a tow truck come to Lorna Lane.

The legal disputes is whether or not there was arguable probable cause to arrest the occupants of the vehicle driving toward police on this dangerous night while others were dispersing. It is not clear if these plaintiffs, who had no visible injuries and who were never treated by any health care provider are making a claim for excessive force, but if they are, the legal dispute is whether the force used was excessive for the circumstances that were presented and whether the officers have qualified immunity and official immunity.

Nathan Burns encounter on August 11, 2014 at or about 10:30 p.m.

Nathan Burns is suing Officers Terrence McCoy, Dan Hill and Michael McCann, but he does not know who they are, or what they did to him on the evening of August 11, 2014.

It is not in dispute that: Nathan Burns heard over loud speakers about three orders to disperse and he observed tear gas or smoke being deployed; Nathan Burns was with a friend Christopher Shearer, who also heard the announcements to disperse, and that Shearer left that area, so Shearer did not witness any encounter between Burns and the police; Mr. Burns was arrested, he was taken to the Justice Center, he was seen by an intake nurse, the medical records indicate that Burns was cooperative with the nurse and reported no limitations, he needed no special care, he had no complaints of being Maced, no complaints of an acute injury, but did mention recurrent lumbar pains for which he had been seeing a chiropractor; Mr. Burns did not tell his best friend, Christopher Shearer that he had been injured.

As mentioned, although Nathan Burns sued Officers McCoy, Hill and McCann, he does not know what they did to him. He alleges that there was a "chaotic situation" in the street, and that he was sprayed with Mace, and that some officer pulled his hair, slammed him to the ground, handcuffed him and then was again Maced. Later, it is alleged that some unknown officer stuck his finger in his ear and touched his genitals with Mace soaked hands.

On August 11th the neighborhood enforcement team reported to the police command center for staging and briefing and waited for an assignment. Officers Hill, McCann and McCoy were told to ride with a City of St. Louis tactical operations vehicle, because the City of St. Louis and the County of St. Louis radio systems could not then communicate with each other, and so these County officers had to be communications liaisons while also acting as arrest team officers. The County officers rode on the back of the City of St. Louis vehicle, with City of St. Louis police officers standing on the front.

The City of St. Louis tactical operations made several announcements to disperse and the City of St. Louis tactical operations dispersed tear gas and smoke. Much of the crowd, but not the entire crowd, dispersed. Some of those who did not disperse threw objects at the City of St. Louis vehicle. Nathan Burns was seen as one of the people throwing objects. The three County officers, who were standing on a skid or small platform at the rear of the vehicle, ducked to avoid objects thrown their way. Then the City of St. Louis police (not the County police) used an aerosol can about the size of a small fire extinguisher to deploy OC spray (Mace) at the group still remaining and still throwing objects. One of the persons that the City deployed the Mace toward was Nathan Burns. Those next to or near him away but Nathan Burns did not run away. The County officers had been generally instructed not to chase after those who ran away. The goal was to disperse the crowd and to be safe. Since Burns did not run away, and since he had not dispersed and since he had been seen throwing an object at the vehicle Officers Hill and McCoy approached Burns and placed flex cuffs on Nathan Burns uneventfully. Nathan Burns mentioned to Hill and McCoy that his eyes were burning from the mace, he was somewhat disoriented, but otherwise Burns was calm while talking. McCann's assistance with the cuffing was minimal because some of the City's mace had blown into his face. Essentially what McCann did was walk Burns to the conveyance van. Then Officers McCoy, Hill and McCann got back onto the City of St. Louis vehicle, in accordance with their assignment.

The legal dispute as to Nathan Burns is whether there was arguable probable cause for his arrest when admittedly the crowd was told to disperse, but he did not disperse, and further whether there was arguable probable cause to arrest him when he was observed to have thrown at the police. Regarding excessive force, the legal dispute is whether McCoy, Hill and McCann can be responsible for alleged excessive force when Burns cannot describe what they did, and

11

alternatively whether McCoy, Hill used excessive force for placing flex handcuffs on Burns without incident and then McCann assisted with walking Burns to the conveyance vehicle.

Antawn Harris incident on August 11, 2014 at 7:40 p.m.

There are no individual St. Louis County police officers sued for the alleged incident of Antawn Harris. The issue raised by Mr. Harris is whether Chief Belmar and St. Louis County failed to train and supervise.

Damon Coleman and Theophilus Green

Mr. Coleman and Mr. Green have named individual Maryland Heights police officers as defendants, and have not named any St. Louis County police officers.

Claims against St. Louis County and against Chief Jon Belmar individually and officially

The legal and factual issues were addressed by this Court in Doc # 70. One issue is whether Chief Belmar directly participated in any alleged constitutional violations involving any of the 10 plaintiffs. There is no dispute that Chief Belmar did not. Another issue set forth in Doc #70 is to determine whether there was a failure to train or supervise. There is no notice of a pattern of unconstitutional acts committed by subordinates, or deliberate indifference to or tacit authorization of those acts, or failure to take remedial action and proximate cause. These matters and more were addressed in Chief Belmar's affidavit filed in support of Defendants' Motion for Summary Judgment. These matters were also listed in the uncontroverted material facts. A summary of those facts appears on pages 40-42 of Defendants' Reply Memorandum, all of which are incorporated by reference. Under Federal Law Chief Belmar is protected by Qualified Immunity, and under state law Chief Belmar has official immunity for policy decisions.

Regarding St. Louis County, there are no facts that have been presented that prior to August 11-14th, 2014 that there was a widespread custom or official policy demonstrating a

continuing, widespread, persistent pattern of unconstitutional conduct by St. Louis County police. Regarding state law, governmental entities such as St. Louis County have immunity in tort unless an exception applies, but there is no dispute that there are no facts in this case presenting an exception to this rule.

**Authorities Relied on**

False arrest claims

Probable cause for a warrantless arrest exists when the police have knowledge of facts and circumstances warranting belief by a prudent person that an offense has been committed by the person arrested. *Beck v.* Ohio, 379 U. S. 89, 91 (1964). Probable cause exists when the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believer that a person has committed or is committing an offense. *Joseph v. Allen*, 712 F. 3d 1222, 1227 (8th Cir. 2013). The law does not required law enforcement officials to conduct a perfect investigation in order to avoid suit for false arrest. *Id*, citing *Stepnes v. Ritschel*, 663 F. 3d 952, 961 (8th Cir. 2011). Officers are not required to conduct a mini trial before an arrest, *Id.* . An officer is entitled qualified immunity for a warrantless arrest if the arrest was supported by at least "arguable probable cause." *Joseph v. Allen* at 1226 citing *Borgman v. Kedley*, 646 F. 3d 518, 522-23 (8th Cir. 2011). The fact that the person arrested is later found innocent is not material. *Joseph v. Allen* at 1226, citing *Linn v. Garcia*, 531 F. 2d 855, 861 (8th Cir. 1976).

Where, an arrest is supported by probable cause, then that arrest is justified *per se* under Missouri law and therefore cannot form the basis of a false-arrest claim. *Fisher v. Wal-Mart Stores, Inc.,* 619 F.3d 811, 820 (8th Cir. 2010).

What is reasonable for an arrest in the context of a potential large scale riot may be different from what is reasonable in the relative calm of a small business. *Bernini v. City of St.*

Paul, 665 F. 3d 997 (8th Cir. 2012). Police have inherent authority to order persons away from an area to be cleared for safety reasons. *Colton v. Kentucky*, 407 U. S. 104 (1972).

If someone has an outstanding warrant, probable cause for arrest is present. *Veatch v. Bartels Lutheran Home*, 627 F. 3d 1254, 1258 (8th Cir. 2010).

Excessive Force

The claim for excessive force should be analyzed under the Fourth Amendment objective reasonableness standard. *Foster v. Metro Airports Commission*, 914 F. 2d 1076, (8th Cir. 1990). The question for the jury is whether judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of force used. *Id*, at 1081, citing *Graham v. Connor*, 490 U. S. 386 (1989). Whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Foster v. Metro Airports Commission* at 1081. A police officer's use of force cannot be viewed in isolation, but must be considered in the light of all circumstances leading up to the arrest. *Bauer v. Norris*, 713 F. 2d 408, 412 (8th Cir. 1983). Additional considerations to determine the reasonableness of force used are the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 273 (2015). Also see *Putnam v. Gerloff*, 639 F.2d 415, 420 (8th Cir. 1981); *Rogers v. Rulo*, 712 F. 2d 363, 368 (8th Cir. 1983).

Qualified Immunity

Qualified Immunity protects government officials from liability for civil damages if they have not violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Akins v. Epperly*, 588 F. 3d 1178, 1183 (8th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U. S. 800, 818 (1982). This immunity permits government officers to make reasonable errors. *Habiger v. City of Fargo et al*, 80 F. 3d 289, 295 (8th Cir. 1996) and provides ample room for mistaken judgments. *Malley v. Briggs*, 475 U. S. 335, 343 (1986); *Borgman v. Kedley*, 646 F. 3d 518, 522 (8th Cir. 2011). The qualified immunity defense protects public officials unless they are plainly incompetent or knowingly violate the law. *Id.*, (Quoting *Hunter v. Bryant*, 502 U. S. 224, 229 (1991). Also see *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (citations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines (citation omitted)." *Luckert v. Dodge County*, 684 F. 3d 808, 817 (8th Cir. 2012). Whether an officer's use of force is excessive is a question of whether the force used was objectively reasonable under the particular circumstances. *Copeland v. Locke*, 613 F. 3d 875, 881 (8th Cir. 2010). Also see *Foster v. Metro Airports Comm'n*, 914 F. 2d 1076, 1082 (8th Cir. 1990). Whether a particular use of force is unreasonable must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Schoettle v. Jefferson* County, 788 F. 3d 855, 859 quoting *Graham v. Connor*, 490 U. S. 386, 396 (1989). Government officers are often forced to make split second judgments in circumstances that are tense and uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. *Id.*

Assault and battery under state law

In Missouri the standard for determining whether a law enforcement officer is liable for assault and battery is different from the standard for determining whether a private individual is

15

liable. *Washington v. Drug Enforcement Admin.*, 183 F. 3d 868, 874 (8th Cir. 1999). Under Missouri law, a governmental official is not answerable in damages for assault and battery unless he used more force than was reasonably necessary. *Neal v. Helbling*, 726 S. W. 2d 483, 487 (Mo. Ct. App. 1987). Further it has been held that an officer in the first instance is the judge of the manner and means to be taken in making an arrest, and unless a plaintiff can show that unnecessary force was used, courts will protect the officer. *Id* (citing *Manson v. Wabash Railroad Co.*, 388 S.W. 2d 54, 61 (Mo. 1960).

Official Immunity under State law

Under Missouri law, the doctrine of official immunity shields public officers and state officials from civil liability for injuries arising out of their discretionary acts, functions, or omissions performed in the exercise of their official duties. *Hawkins v. Holloway*, 316 F. 3d 777, 788-89 (8th Cir. 2003) (quoting *Harris v. Munoz*, 43 S. W. 3d. 384, 387 (Mo. Ct. App. 2001). Also see *Bachmann v.* Welby, 860 S. W. 2d 31, 33 Mo. Ct. App. 1993). Official immunity does not apply to acts done in bad faith or with malice. *Id.* Bad faith or malice generally requires actual intent to cause injury. *Blue v. Harrah's North Kansas City*, 170 S. W. 3d 466, 479 (Mo. Ct. App. 2005).

Training and supervision and Municipal Liability

Accreditation is prima facie evidence that standards and practices of an agency meet constitutional due process requirements. *Woe v. Cuomo*, 729 F. 2d 96, 106 (2nd Cir. 1984). Plaintiffs cannot prevail unless they can show deliberate indifference such as the supervisor having notice that the training and supervision were inadequate and likely to result in a

constitutional violation. *Andrews v. Fowler*, 98 F. 3d 1069, 1078 (8th Cir. 1996); citing *Thelma D. v. Bd. of Educ. Of City of St. Louis*, 934 F. 2d 929, 934 (8th Cir. 1991).

   The Plaintiff must present evidence that the claimed training was inadequate and that the alleged inadequacy caused the Plaintiffs' alleged injury. *See Tucker v. Evans*, 276 F.3d 999, 1003 (8th Cir. 2002) (citing cases in this Circuit that have held attendance at training academy and on-the-job training is sufficient for proper training). Failure to train or supervise can only be the basis for § 1983 liability in "limited circumstances." *City of Canton*, 489 U.S. at 387. Such circumstances occur where the municipality inadequately trains or supervises its employees, the failure to train is a municipal policy, and that policy causes the employee to violate a person's constitutional rights. *Id.* Even assuming that the Plaintiffs can identify a deficiency in the County's training, "the identified deficiency in a city's training program must be closely related to the ultimate injury such that the deficiency in training actually caused the police officer's offending conduct." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (internal citations and quotations omitted). St. Louis County did not have "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996) (quoting *Thelma D. by Delores A. v. Board of Educ.*, 934 F.2d 929 934 (8th Cir. 1991)).

  As an initial matter, an unconstitutional act on the part of a county employee is a prerequisite to imposing liability. *Reasonover v. St. Louis County, Mo et al*, 447 F. 3d 569, 583 (8th Cir. 2006); *Avalos v. City of Glenwood*, 382 f. 3d 792, 802 (8th Cir. 2004). St. Louis County cannot be held liable under a theory of respondeat superior. *Monell v. Department of Soc. Servs.*, 436 U. S. 658, 691 (1978); *Szabla v. City of Brooklyn Park, Minn*, 486 F. 3d 385, 389 (8th Cir. 2007. To establish a constitutional violation arising from a custom, a plaintiff must show that the

injury was "caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized." *Russell v. Hennepin County*, 420 F. 3rd 841, 849 (8th Cir. 2005), citing *Larson v. Miller*, 76 F. 3rd 1446, 1453 (8th Cir. 1996). In this instance, plaintiff must show that there had been a widespread and persistent failure to follow policy, that a policymaker was aware of this failure and was either deliberately indifferent to or tacitly approved of the conduct, and that the unconstitutional act was caused by the custom of failing to follow the policy. *Id.* Also see *Ware v. Jackson County, Mo*, 150 F. 3d 873, 880 (8th Cir. 1998), that misconduct must be so pervasive as to constitute a custom or usage with the force of law.

Under section 537.600 of the Missouri Revised Statutes, public entities enjoy sovereign immunity for state claims sounding in tort. *Gregg v. City of Kansas City*, 272 S. W. 3d 353, 358 (Mo. Ct. App. 2008). A public entity does not waive its sovereign immunity by an insurance policy where that policy includes a provision stating that the policy is not meant to constitute a waiver of sovereign immunity. *Brooks v. City of Sugar Creek*, 340 S. w. 3d 201, 208 (Mo. App. Ct. 2011), (quoting *Langley v. Curators of Univ. of Mo.*, 73 S. W. 3d 808, 811 (Mo. App. W. D. 2002) (citing *State ex rel. Bd. of Trustees v. Russell*, 843 S. W. 2d 353, 360 (Mo. banc 1992). A self-insurance policy, and even an excess policy does not waive sovereign immunity. Also see *State ex rel. Cass Medical Center v. Mason*, 796 S. W. 2d 621, 623 (Mo. bank 1990); *Topps v. City of Country Club Hills*, 272 S. W. 3d 409, 415-16 (Mo. Ct. App. 2006).

Punitive Damages

With regard to punitive damages, the defendant's conduct must be motivated by evil motive or intent or involve a reckless or callous indifference to the federally protected rights of others. *Hollins v. Powell*, 773 F. 2d 191, 197 (8th Cir. 1985). With every plaintiff and every

police officer involved in this case, there had been no involvement prior to the unrest in the streets that occurred. The time of the actual involvement with each plaintiff with any defendant was minimal, perhaps a minute to a few minutes, after which each plaintiff was turned over to other people who could convey the plaintiff. There is no evidence of evil motive or intent, and no evidence of any effort to hide any injury. As mentioned, the plaintiffs were immediately turned over to other people. Further the plaintiffs often had no injury, or after an initial emergency room visit there was no follow up treatment.

The Plaintiffs cannot recover punitive damages against Defendant St. Louis County, under both state and federal law. *Kline v. City of Kansas City*, 175 F.3d 660, 670 (8th Cir. 1999) (citing *Chappel v. City of Springfield*, 432 S.W.2d 810, 814-15 (Mo. 1968); *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, (1981) (municipality not liable for punitive damages under 42 U.S.C. § 1983).

Daubert Motions and Motions in Limine

These defendants incorporate by reference the "Daubert" Motions and the Motions in lime filed by these defendants and by the co-defendants, which motions explain other legal issues pertaining to different topics such as expert testimony and After Action Report.

**Conclusion**

Each defendant should be entitled to a Judgment in their favor on all issues.

Respectfully Submitted

PETER J. KRANE
COUNTY COUNSELOR

/s/ Michael E. Hughes
Michael E. Hughes #23360MO
Associate County Counselor
Mhughes2@stlouisco.com
Priscilla F. Gunn #29729MO
Assistant County Counselor
Pgunn@stlouisco.com
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042
(314) 615-3732 (fax)

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was served electronically via this Court's Electronic Filing System to all counsel of record this 12th day of September, 2016.

s/s Michael E. Hughes