## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| TRACEY WHITE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:14CV1490 HEA |
| | ) | |
| THOMAS JACKSON, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on the City of Ferguson, Thomas Jackson, Justin Cosma, Matt Delia, Brandon McKinnon, and Ryan Devouton's Motion for Summary Judgment, [Doc. No. 143] and John Belmar, David Ryan, Terrence McCoy, Michael McCann, Derik Jackson, Joe Patterson, Aaron Vinson, William Bates, Nicholas Payne, Daniel Hill, Antonio Valentine and St. Louis County, Missouri's Motion for Summary Judgment, [Doc. No. 158].  Plaintiffs oppose the motions.  For the reasons set forth below, the Motions are granted.

Initially, Plaintiffs agree that Defendant Cosma should be dismissed; he was not involved in any arrests of any Plaintiffs.  Accordingly, Defendant Cosma's Motion for Summary Judgment is granted.

## Facts and Background

Michael Brown, Jr. was shot and killed by a police officer on August 9, 2014, in the City of Ferguson, Missouri. In the hours and days that followed, large crowds gathered in Ferguson to protest Brown's death.

Plaintiffs are individuals who claim to have suffered violations of various rights between August 11 and August 13, 2014, in Ferguson.

Plaintiffs initiated this action several days days after the death of Michael Brown, Jr., and have filed their Third Amended Complaint.  Plaintiffs bring federal claims under 42 U.S.C. § 1983 for deprivation of their civil rights and for failure to train, supervise, and discipline. Plaintiffs bring state law claims for false arrest, intentional infliction of emotional distress, negligent supervision and assault and battery.

The undisputed facts of the occurrences of August 11, 2014 are as follows:

Lt. Delia, P.O. DeVouton, and P.O. McKinnon were performing duties as licensed peace officers at the request of St. Louis County, Missouri.  At least one officer of the St. Louis County Police Department determined the protest near West Florissant area had turned more violent and more civilly disobedient.  At least one officer of the St. Louis County Police Department determined the area near West Florissant constituted an unlawful assembly and informed Lt. Delia of the same.

Lt. Delia, P.O. DeVouton, and P.O. McKinnon heard police deliver several audible commands to the protesters, by-standers and other people to leave /

disperse the area near West Florissant. Lt. Delia, P.O. DeVouton, and P.O.
McKinnon were all present and did not observe Plaintiffs Coleman and Green
leave the subject area near West Florissant after being ordered to do so and before
Plaintiffs Coleman and Green were placed under arrest. Lt. Delia perceived
Plaintiffs Coleman and Green making throwing motions and throwing items
toward himself and toward other police officers.  P.O. McKinnon did not place
Plaintiffs Coleman or Green in handcuffs.

Neither Lt. Delia, nor P.O. DeVouton, nor P. O. McKinnon possessed nor
were equipped with any weapons or firearms capable of discharging less-lethal
projectiles such as rubber bullets, mace/pepper balls, or bean bags. Neither Lt.
Delia, nor P.O. DeVouton, nor P. O. McKinnon discharged any less-lethal
munitions in conjunction with the arrest of Mr. Damon Coleman and Mr.
Theophilus Green.  Neither Lt. Delia, nor P.O. DeVouton, nor P. O. McKinnon
observed each other ever discharge any less-lethal munitions in conjunction with
the arrests of Plaintiffs Damon Coleman and Theophilus Green.

Plaintiffs did not identify any of the three Defendant Maryland Heights
Officers (Lt. Delia, P.O. DeVouton, nor P. O. McKinnon) as an officer who
allegedly used force against them.  Plaintiffs state that the defendant officers were
wearing gas masks that hid their identity.

No force was used either against Ms. Tracey White or her son, William
Davis, inside the McDonald's off of West Florissant in Ferguson.  Tracey White

was arrested by a St. Louis County Police Officer and two St. Charles Police Officers.  William Davis was arrested by St. Louis County Officer Terrence McCoy.  Any officer associated with the arrests of either Ms. White or Mr. Davis was with either the St. Louis County Police Department or St. Charles Police Department.

Thomas Jackson was the Chief of the City of Ferguson in the subject time frame.

White's son at the time of the incident was 17 years old, and he was turning 18 the following month.

White denied under oath that she had ever been a party to an action filed in any court in Missouri. When told what is on Missouri Case Net, White agreed that she is a defendant in an action for nonpayment of a credit card. White then also agreed that in 2014 there was an order of protection served against her.  Pursuant to that order of protection, White agreed to stay 100 feet away from the home of the petitioner in that action.  In her deposition, White refused to answer the question asking what it was that she had done that led to a permanent order of protection being issued against her.  White also agreed that in 2008 she was arrested in Florissant, charged with interfering and resisting arrest, went to court, and the charge was dismissed. She also agreed that she was also charged with assault third and disorderly conduct in the municipality of Country Club Hills in 1999.

Before the Complaint in this lawsuit was filed, White discussed with her attorney what happened to her in this case.

Tracey White attended a rally on August 13th, 2014. This rally was sponsored by a pastor. Tracey White does not know who the pastor is. The rally was not sponsored by Tracey White's church, and she does not belong to an AME church.

After the rally White and her son William Davis walked to the McDonald's. She arrived at the McDonald's around 6:00 or 6:05 pm, and stayed there for about an hour. White walked out the door of the McDonalds and the reason for doing so was that her phone was not charged. Before White walked out of the McDonalds she had not seen any police officers. After she was outside she noticed one police officer who she described as an African American but was otherwise unable to say to which police department he belonged. Outside the McDonalds, White talked to the officer about her husband, while she waited for her son to come out. During their conversation, the officer told White that she and her son could wait on the corner when her son came out.

White was not thrown to the ground inside the McDonalds restaurant. Her son was not arrested inside the restaurant.

Outside the restaurant, there was a crowd of people who were instructed by police to move back, and they did as instructed.

The encounter of White with the police occurred on a side street.  She is not certain of the amount of time that elapsed between her leaving McDonalds and her arriving at the location where she was arrested; it could have been 30-45 minutes.  She remembers that on the other street, to which she and members of the crowd went, there was a truck that was stuck and trying to get out, and that this halted the movement of the crowd, and the movement of the police.  She recalls that the police were then directing the crowd to a different specific street.  She claims that when she asked a police officer how much farther do we have to get pushed back in this crowd, the police officer grabbed her, threw her to the ground, put his knee on her back and arrested her.  White does not know what color uniform this police officer was wearing.  White agreed that she was told to disperse and to keep moving backward.

When White viewed the video of her arrest during her deposition, she admitted that the video showed the truck that was stuck, it showed her, and it showed an officer placing hand ties on her.  She agreed that video showed an officer placing hand ties on her, and that she was not on the ground, and that there was no knee in her back.

The footage from the video shows White's son walking by holding an iPad in his hand, and so she agrees that the officer may have handed the iPad to her son.  White viewed footage showing where her son is walking, and that he was holding a soda and ice cream that were still in his hands.  She agrees that when her son was

walking by with the soda, ice cream sundae, and iPad in his hands, he was not handcuffed and he was not yet arrested.

The video footage then shows Tracey White walking with her hands behind her back; she agrees that at this point she is under arrest, and that she should be compliant and should walk with the officers. The footage then shows that White's hands have fallen out of the handcuffs. She disagreed on the record that she had been pulling her hands away to become uncuffed. When shown the footage, White admitted that she wasn't thrown to the ground.

White had never seen the police officers before this incident, and as far as she knows, the police officers did not know her. She is not certain about Officers McCoy, McCann and Ryan, and she does not know what these officers look like. She does not know what color uniform the officer who allegedly threw her to the ground was wearing. No racial epithets or slurs were used against Tracey White.

Tracey White observed her son being arrested. She cannot recall any force being used against her son, but she believes an ice cream that he was holding was knocked out of his hand.

No medical claim is being made by Plaintiff Tracey White.

Plaintiff William Davis is aware that there was civil unrest in the streets of Ferguson, that there was chaos, that buildings were burned, that there was looting, that there were gunshots in the streets of Ferguson, and that rocks and bottles were

thrown at police.  He had seen the Quik Trip burned down and the hair salon broken into.

After the shooting of Michael Brown, and before August 13, 2014, Davis had gone to Ferguson five times, three times with his mother and two times with his father.  On August 13, 2014, Davis' dad dropped off Davis and his mother, Tracey White near the burnt out Quik Trip.  Davis and White walked down the street where there was a peace rally, but he cannot remember if he heard any of the speakers at the rally.  He heard the police saying to get out of the street.  He and his mother left the rally after 10 minutes.  They walked 15 minutes to the McDonalds on West Florissant, and stayed there for about an hour.

At some point, White walked out of the McDonalds to look for her husband.  While White was outside, Davis remained inside the McDonalds for perhaps an hour.  He sat, ate food, and watched CNN.  No police office touched Davis inside the McDonalds.

After SWAT officers came inside the McDonalds and told people to leave, Davis walked out the door, where his mom was talking to a tall black SWAT officer, dressed in black, who was wearing a helmet.  The officer did not have any weapons or sticks in his hands.  Davis could not hear what the officer was saying to his mom because the officer was talking low and there was a lot of commotion in the background.

He saw the police or SWAT members forming a line.  After that, there was a large group of people, including Davis and his mother, who were moved up some street that he was not familiar with, but he and his mother were then following the directions of the police.

When his mother was arrested, all that Davis heard the officers say was "you're being arrested, you're being arrested."  He did not hear what the police said before this because of the commotion.

Davis remembers an officer saying to him that he was under arrest, whereupon he placed his hands behind his back and allowed himself to be handcuffed, and no force was used.  At this time, the rest of the crowd had moved on and had moved down.

Sgt. Ryan was dressed in a brown uniform with the external vest in front and the back.  Ryan testified that the officers under his command were wearing helmets due to the fact that on previous days, there had been shots to the head and rocks thrown at them.  He further testified that the officers wore vests because of what had been going on the nights before.

Ryan testified that the objective was to clear persons from the area to make sure they are safe securing businesses so that they are not looted or burned down.  Ryan further testified that the police wished to clear Ferguson Market by securing a line up toward Sharondale Ave. due to the fact that the evenings before, the police were attacked from people on the hill.  He further testified that the street to

the right is Ferguson Ave. and the first street off of Ferguson is Sharondale.  He further testified that there is a way out of the apartment complex; that there are two entrances along the street.

Ryan testified that in addition to the St. Louis County police being in the area, there were officers from St. Charles, Ferguson, and the Missouri Highway Patrol.

A truck had become stuck and Ryan had instructed officers to go talk to people to get them to move a little further up to where the police could get the truck out.  Everything would have to be cleared, and this was after he had instructed White to go up to the top of the hill on Sharondale.  White would be able to go into the apartment complex, or to keep walking on Ferguson Avenue, where she could have been picked up.  Police had been moving people in the area of Ferguson and Sharondale, but Ryan had to keep them moving from where the truck was located because he was trying to make sure nobody got hurt.  Ryan testified that White would be able to go into the apartment complex, or to keep walking to Ferguson Ave., where she could be picked up.

Those officers, who effectuated the arrest of Tracey White, did so under the supervision of Sgt. David Ryan, and St. Louis County police were in charge of the scene when Tracey White was arrested.

Officer Terence McCoy testified that the Neighborhood Enforcement Team is almost the same idea as hot spot policing. The Neighborhood Enforcement

Team tries to address crime trends and to prevent home burglaries, car larcenies, shootings, or drug activity in an area.  McCoy further testified that The Neighborhood Enforcement Team's duties include doing search warrants, responding to armed and barricaded subjects, instructing at the academy, teaching at schools, and training.  McCoy testified that there had been civil unrest in Ferguson; large crowds, property being destroyed, police officers assaulted by having things thrown at them, multiple shots fired, people injured, large crowds throwing rocks at officers.

With regard to Tracey White and William Davis, McCoy testified that what was occurring was that there was a certain area that was trying to be secured and there was a truck that was stuck and they were in the area where the police were attempting to get the truck out of the spot it was stuck in.  McCoy testified that the truck was hooked up to a trailer.

In the video Officer McCoy is shown grabbing Tracey White's left arm.

McCoy testified that Tracey White and William Davis were arrested because the police had asked them to leave the area and the police were trying to get the truck out of the area safely.  McCoy testified that White and Davis had been instructed to go into the apartment complex or up the street to the next intersection. McCoy did not order the arrest of Tracey White.

McCoy is the one who arrested William Davis; McCoy testified that Davis was told that he had to leave the area, and McCoy told Davis that the police are

not hurting his mom, and that he still had to leave the area; that "we're giving you an opportunity to either go into the apartment complex or go up the street;" that Davis stared, he didn't say anything, and then McCoy said: "I'm going to have to arrest you if you don't choose either to go into the apartment complex or go up the street. McCoy further testified that Davis just stayed there and stared. Then McCoy placed Davis under arrest.  There was no resistance, and Davis was completely compliant.

Regarding Tracey White and William Davis, McCann testified that he was in the area but did not make the arrest.  McCann testified that he was dealing with the truck that had gotten itself pinned between a street sign, had gone off the road, and was stuck.  McCann testified further that he was motioning the truck driver forward and back, and there was a group of people. McCann testified: "we were afraid they were going to get run over by this vehicle if it became unlodged quickly.  From what I remember the trailer was kind of like jackknifed." McCann testified further that "while maneuvered him forward, back, motioned this way, that way, and while they were dealing with crowds of people, the skirmish line was dealing with people.   Because this ....now became an event itself."   McCann testified further that he did not personally engage Ms. White or Mr. Davis.

On August 13, 2014, Dwayne Matthews said that he caught the 61 Chambers bus at the North Hanley Station and took it to West Florissant and Chambers.  Dwayne Matthews testified that he walked toward West Florissant

and Highmont.  He kept walking.  The tear gas got thicker.  He kept walking on

West Florissant.  It is "pretty dark."  There aren't many street lights.   It is dark

plus tear gas and smoke.  After Matthews got off the bus, and when he was at

the Elite Liquor store some unknown officers pointed him in the direction of

West Florissant and Highmont, then he walked in that direction, and tear gas

was getting thicker, he had his transfer in his right hand, and when he ran into

the officers he put his hands up.  According to the testimony of Dwayne

Matthews, when he saw the tear gas and smoke, if he had wanted to walk to a

parallel street, he could have walked down to West Florissant and made a right

on Highmont, which connects to South Dellwood.  From there he could have

made a right on South Dellwood, walked across the road closing, and then his

mother's house is right there.  Dwayne Matthews testified he had his hands in the

air and he said in one hand he held a bus transfer ticket.  Dwayne Matthews

testified that he walked toward a line of police officers, who he describes as

wearing military uniform(s) and gas masks.  Matthews walked through a cloud of

smoke and walked through tear gas.  Matthews was affected by the tear gas when

he was walking through the tear gas.  Matthews was shot with a first bean bag

round, but continued to move forward. Matthews said that he was hit in his

stomach, his arms, hand and pinkie (which he says caused his transfer to drop

from his hand), and in the left shin.  He fell into a creek where he was followed

by the police.  Matthews also described the shooting in the following ways:

"They shot me with the bean bag, I fell into the creek water, hit my head on the pavement, they drowned me for about five, six seconds;" " when they shot me with the bean bag, it took my leg off, like my leg just- by force it went off the pavement, so I'm standing on one leg and I'm leaning to the left, I fell by gravity;" "like you shot me, by force it took my leg off my feet, like I'm standing on one leg." Matthews also testified that after he fell into the creek, they "drowned me for about three to five seconds, I was unconscious from the contact of my head hitting the concrete." He was lifted out of the water after which his face was slammed into the pavement, his face was scraped on the ground, and then "they took turns punching, kicking me."  The police used racial slurs.  Meanwhile Mr. Matthews yelled out "I'm not part of the protest; I'm trying to get home.  Then he was cuffed after which he was "Maced" "everywhere" including his wounds, his face, his nose, and his mouth.  He called it gruesome.  Further describing the events, Matthews claimed that someone grabbed him by the throat, two others grabbed his arm, and one grabbed his legs. They flipped him over like a cross, his head was grabbed, and was slammed like a wrestling maneuver.  Further describing the incident, Matthews testified that one man was on his back with a knee and all of his weight on Matthews.  While this was occurring five or six officers were beating him; he was punched five or six times; his dreads were grabbed; and his face was scraped on the pavement. The beating lasted two to three minutes. During this time the officers were taking

turns just doing anything they wanted. Matthews was placed in a police van for

"45 minutes to an hour, burning, leg's fractured, and excruciating pain." Matthews

said he did not meet with an ambulance until 45 minutes to an hour later.  The

location of the paramedics that he finally saw was at the Ferguson police

department.  Matthews stated: "I was seen by paramedics once I got to Ferguson."

Matthews is unable to identify any of the officers who did this; he cannot say if

the officers were white or black, but says that they were all wearing military

uniforms, and were not wearing blue jeans or tennis shoes.  Matthews is not

aware of any witnesses to what he says happened to him; there were only the

officers and him.  The paramedics took Matthews to a hospital, where he was

seen and then released.  He went straight home thereafter.  When the paramedics

asked Matthews questions, he tried to be very honest.  At the hospital Matthews

tried to be very honest to the person who did the initial paperwork, he tried to be

very honest with the nurses who saw him, and he tried to be very honest with the

physicians who saw him.

Matthews has seen his medical records.  When asked if he disagrees with

what is in his medical records he answered no.  When read, the history that was

recorded by the paramedic said: "Patient states that he was walking through the

area and was told to evacuate by police.  Patient admits that he did not

immediately evacuate, was shot with rubber bullets and tear gas."  Matthews

denied that this is what he had said but instead stated: "I told them the same story

I told you."  Matthews was asked to admit as true that the doctor had asked him if he had lost consciousness and that Matthews had told the doctor no, Matthews stated: "I told the doctor the same story that I've told you."  Matthews disagreed with the doctor's assessment that Matthews appeared to be in moderate pain, but Matthews agreed that the doctor put his hands on him and palpated him and that the doctor examined his forehead, face, right upper abdomen, right upper leg, lower leg, pupils, ear, nose throat, neck, heart pulses, abdomen, and skin. Matthews agreed that after X-rays and CT scans were taken at the hospital, he was told that the results were normal.  Matthews agreed that he was not admitted to the hospital overnight as a patient; that he was discharged at 1:15 a.m.; and that a friend drove him home.  After the initial treatment at the emergency room, Matthews did not have any follow up care with any doctor, or with any psychiatrists or psychologists or licensed clinical social workers.

It was very dark in the area.  Not only was it night time, but there was smoke and tear gas.  While the movement of the police who were dispersing the crowd was northbound on West Florissant, Matthews emerged from the smoke heading southbound toward the police line.  Payne could hear Det. Joe Patterson yelling at Matthews to stop and turn around.  Although Payne was wearing a gas mask, he also was yelling at Mathews to stop.  Matthews continued coming towards the police line.  Payne saw that Matthews had his hands up, but because he kept coming toward the police after being told to stop, Payne still considered

Matthews to be a threat.  The member of their team who had been issued the less

lethal shotgun that night was Det. Derik Jackson.  After several commands were

made by Patterson, and by Payne, and by other detectives telling Matthews to

stop, Payne then heard Derik Jackson yell out the words "Less lethal, less lethal,

less lethal."  After those words were yelled out by Jackson, Jackson then fired the

less lethal shotgun.  Payne considered what Jackson did to be appropriate, and he

fully supports the firing of the less lethal rounds in the situation that occurred.

What Det. Payne believes that he saw next was Matthews stumble and fall into a

culvert that had water in it.  Payne observed first Vinson, followed by Bates

going to the culvert to get Matthews out.  Bates actually helped both Det. Vinson

and Dwayne Matthews out of the culvert onto a grassy area.  Payne observed that

Matthews was fighting and moving after being placed on the grassy area next to

the sidewalk.  Plaintiff Matthews said that he was compliant. During the struggle,

i.e. when Matthews kept moving and fighting, Payne and others yelled at

Matthews to stop resisting, and that he was under arrest.  Matthews kept moving

and fighting, and then Payne overheard Det. Patterson warn Matthews that he

would be pepper sprayed.  Then Payne observed one spray of OC spray, after

which the resisting stopped.  Matthews was handcuffed, searched and placed in a

sitting position.  After Matthews was sat up, he was leaning against the leg of

Payne.  Payne then assisted Matthews to his feet and walked Matthews to St.

Charles County SWAT officers, one of whom told Payne he was a paramedic.

After turning Matthews over to the St. Charles County paramedic and the St. Charles County SWAT officer, Payne and the other members of the team resumed their crowd control assignment on the police skirmish line.  Payne did not strike Matthews, and did not observe anyone else strike Matthews.

On the night of August 13, 2014, the members of the drug enforcement bureau, consisting of Detectives Derik Jackson, Joe Patterson, William Bates, Aaron Vinson, Nick Payne, and Matt Burns, under the supervision of Sgt. Brandt Wathen reported to the Buzz Westfall Command Post for instructions and assignment as needed.  At approximately 9 p.m. they were assigned to a police skirmish line on West Florissant near Highmont to act as an arrest team.  Sgt. Wathen was nearby as were higher ranked officers.  Their instructions included that all persons arrested should be turned over to conveyance officers, and then the arrest team would return to the skirmish line.  The detectives in this group were each wearing jeans, T-shirts, and a vest with the word "Police" on the front and back, and they had their badges exposed.  They were not dressed in military type uniforms.  After arrival, Burns noted rocks and bottles being thrown at the police, and a Molotov cocktail was thrown at a building near the police.  A different team, the Tactical Operations Division, made numerous orders for the crowd to disperse over loud speakers.   The decision to issue the orders to disperse were not made by the arrest team, but by others higher in the chain of command.

Smoke was deployed and tear gas was deployed (not by the arrest team, but by the Tactical Operations Division).  The decision to deploy smoke and tear gas was not made by the arrest team but by others higher in the chain of command. The smoke and the tear gas that was deployed, was deployed after numerous announcements had been made to disperse.  After smoke and tear gas was deployed, the crowd was dispersing.  While the crowd was dispersing, the arrest team remained on the skirmish line. While the crowd was dispersing, Det. Burns was standing on the skirmish line next to Jackson.  Det. Derik Jackson was on the other side of Det. Burns, and so Det. Burns believes that he was standing between Detectives Patterson and Jackson.  Burns suddenly observed Matthews come through the smoke and tear gas heading toward the police.  Burns observed that Matthews had clenched fists, and it appeared to Burns that Matthews was moving quickly.  Because the crowd was disbursing away from the police while Matthews was running toward the police, Burns "had no idea what he was doing, or why he was running toward police."  Matthews' actions put Burns on "higher alert."  Burns yelled at Matthews to stop and turn around; other officers near Burns yelled at Matthews to stop and turn around.  Det. Joe Patterson "somewhat removed his gas mask" exposing his mouth, and yelled loud commands, telling Matthews to stop and turn around.  Matthews continued coming at police.  With Matthews still coming at the police, Det. Burns could hear Det. Derik Jackson yell out the words: "Less lethal, less lethal, less lethal."  According to Matt Burns,

Matthews was hit twice with bean bag rounds that were not effective in stopping him.  Det. Jackson fired a third bean bag round that was effective.   Plaintiffs say that the 2nd round was effective, and the 3rd round caused Matthews to  fall into the creek.

As Matthews went into the culvert, from the perspective of Matt Burns, it appeared that Matthews had  jumped  into the culvert, rather than falling into the culvert.  Burns observed Detectives Vinson and Bates go to the edge of the culvert to try to retrieve Matthews, while it appeared to Burns that Matthews was trying to get away.  Matthews was pulled out of the culvert by Detectives Vinson and Bates, placed on flat ground, and then Det. Burns and others approached them.  Burns observed Matthews flailing and struggling, when officers were telling him to stop; while this was occurring, Det. Burns was attempting to hold Matthews.  Burns observed Det. Patterson deploy one short burst of OC spray in Matthews' facial area.  After the burst of OC spray, Matthews was handcuffed. The involvement of Det. Burns was to attempt to hold Matthews when he was flailing before the burst of OC Spray, and then after Matthews was handcuffed, to make sure that the handcuffs fit properly.  Burns had no other involvement. Matthews was turned over to St. Charles County SWAT team officers, one of whom was a tactical paramedic. Burns had not been aware that the St. Charles County paramedic had been recording what was happening, but the footage

confirms that Matthews was turned over to the St. Charles County officers.  Det.
Burns did not strike Matthews, and did not see anyone strike Matthews.

On August 13, 2014, as a member of the seven detective unit called the
Street Enforcement Team, Det. Derik Jackson was dispatched with the rest of the
team to the area of Canfield and West Florissant to assist with reinforcing the
skirmish line.  He and other Street Enforcement Team members were wearing
blue jeans, a shirt, a black clad vest that had the words "Police" on the front and
the back, and a neck badge.  When his team of officers reinforced the skirmish
line, they encountered a large crowd that was unruly, and had been throwing
rocks, bottles, and even a Molotov cocktail.  There were gunshots, which Derik
Jackson believed were directed at officers.  The street team members then also put
on their protective masks.

 A different team, called the Tactical Operations Team used loud speakers
to tell the crowd to leave, turn around, and go north on West Florissant.
According to Derik Jackson, a lot of peaceful protesters did leave.  Those who did
not leave continued to throw projectiles.

Tactical Operations then began to deploy smoke canisters.  As the line of
police advanced forward, there were still people who were still actively showing
aggression.  Derik Jackson noticed one individual with shoulder length hair come
forward on the east side of West Florissant south towards the police position.
Jackson testified that efforts were made to communicate with the individual, later

identified as Matthews. Clear verbal commands were given to him to turn around.
These efforts included Detective Patterson removing his gas mask and give
directions to Matthews to turn around.  Matthews kept coming toward the
officers.  Jackson testified that with Matthews still coming toward the officers,
Jackson feared that assault could be imminent, and he yelled out the words "less
lethal, lethal, less lethal."  He then fired what he believed to be three less lethal
rounds.

Mathews came toward officers. He ran toward the skirmish line, and Det.
Derik Jackson feared that an assault was imminent.  Det. Derik Jackson did not
see what was in Matthews' hands, but Jackson believed that Matthews' hands
were clenched.  Jackson believes that Mathews was struck with less lethal rounds
three times, after which Matthews went into a culvert.

 Det. Joseph Patterson testified that on August 13, 2014, he along with other
members of the Drug Enforcement Street Team were assigned to act as an arrest
team for the Bureau of Patrol Support and Tactical Operations Unit.  Patterson
testified that "at approximately 9 p.m. we were on the skirmish line near West
Florissant and Canfield when the crowd became hostile ...there was reports of
gunfire, there was at least one Molotov cocktail that was thrown and several
rocks and bottles."  Patterson testified that commanders on the scene had declared
an unlawful assembly, that there were dozens of warnings to disperse northbound
on West Florissant away from Canfield.  Patterson testified that 90% of the

crowd did disperse, but some in the crowd refused to leave, and then the skirmish line of police officers moved the remaining crowd toward Chambers Road.  This was occurring with a human chain of police officers.  On the interior of the chain of police officers, there were two armored vehicles equipped with loud speakers as well as police lights.  Also there were continual announcements made to the crowd to disperse. Patterson testified that there was also tear gas and smoke. Patterson testified that the SWAT officers were the ones who deployed tear gas. Patterson testified that "through the police radio we were getting reports that even at West Florissant and Chambers at the lot of the Mobil, they were also experiencing a hostile environment."   Patterson testified that as this report was occurring, the police line reached West Florissant and Highmont.  There they encountered the man later identified as Dwayne Matthews.  Patterson testified that Matthews "was running at us and he refused our orders to stop." Patterson testified that he (Det. Patterson) was wearing a gas mask, but that he (Det. Patterson) removed his gas mask, and told this man to stop.  The man stopped for a brief moment, but then continued moving forward.  Patterson testified that "I had no idea why a person would act so unreasonably after hearing so many warnings from those loud speakers..." Patterson testified that he (Det. Patterson) was standing in a cloud of tear gas when this was happening.  There was tear gas and smoke lingering in the area, and what Patterson said to Matthews was "this is the police, stop."  Patterson testified that after Matthews stopped for a brief

moment Matthews responded  "I'm coming through," and that it was at that point that Det. Derik Jackson shot at the man with his less lethal round.

When asked why Matthews was shot with less lethal, Det. Patterson answered that Matthews was shot "because he continued his forward advancement towards police officers after refusing dozens upon dozens of warnings ...we have no idea what his intentions are, especially after he proclaims to us that I'm coming through ....fearing an assault was imminent, that is when Detective Jackson first deployed the less lethal rounds."  Patterson testified that when the less lethal rounds were deployed, there was a lot of yelling going on. Patterson testified that when the less lethal round took, the man fell or hobbled or stumbled; there was a sort of a culvert that had probably two or three feet of water, and the man fell into that.  Patterson testified that he (Patterson) did not go into the culvert but went right up to the edge.  Patterson testified he observed Det. Vinson jump into the water to get Matthews out, and because the culvert was steep, Detective Bates was pulling out both Det. Vinson and Matthews.  Patterson testified he observed that after Matthews was pulled out of the water, Matthews was put on the ground, but Matthews was thrashing and kicking about.  Matthews was wet, the officers were wet, the officers were having a very difficult time securing Matthews' arms and legs, and the officers were saying "stop resisting, stop resisting."  Patterson testified that he observed Detectives Vinson and Bates struggle while attempting to place handcuffs on Matthews.  Patterson knew that

Det. Jackson had the less lethal, and knew that his sergeant had a (lethal) rifle. Det. Patterson realized that he was the only person to get this under control, and so after observing more thrashing, Patterson removed his department-issued OC standard personal use spray from his belt, gave a warning to Matthews, and then gave a one second burst of spray above the man's eyebrows. The spray took effect in a second or two and the man sort of gave up, and placed his hands behind his back.  Patterson testified that from that point, Matthews was immediately brought over to two St. Charles County SWAT officers, one of whom was a paramedic.  When Matthews was handed off to the St. Charles County medic, Mathews was calm and cooperative. Patterson testified that once they handed off Matthews to the St. Charles paramedic, that "we continued on;"...... "with the crowd being the way that it was a n d  the external circumstances of the situation, no one was allowed to be around there."

William Bates, Jr. is a detective with the St. Louis County police department.  On the night of August 13, 2014, Det. Bates was wearing blue jeans, a T-Shirt, and a clad black raid vest with a "Police" insignia on it.  The attire was typical attire for his unit.  There were six people from Bates'; but also on the skirmish line there were officers from other jurisdictions. Bates testified that on the night of August 13, 2014 he was assigned to the street team.   "We met up at the command post, we got...requested to come out there and join the skirmish line.....when it started to get darker...it turned more violent.  I remember

...threats and  people throwing bottles and rocks and....just yelling at us.  I remember there was a Molotov cocktail that was thrown ...landed on a roof."

Upon further questioning, Bates remembered "our tactical operations gave multiple commands for people to stop throwing bottles, stop throwing rocks ....pretty much stop throwing things at us.  The commands to disperse were generally made to the whole crowd.  As stated by Det. Bates: "the whole crowd as a whole was responsible for the throwing the bottles, the rocks, ...so at that time they made commands to disperse for everybody."  Bates testified that he first observed Matthews in the general area of Canfield and West Florissant after multiple commands had been given for the crowds to disperse.  There was tear gas, and some of the crowd was moving back but no one was coming toward the police.  Then "it shocked me when I saw him, Mr. Matthews, coming toward us."

Upon further questioning Det. Bates stated: "I just remember him coming straight at us."   Bates testified that he (Det. Bates) focused on Matthews' hands more than anything else to make sure he did not draw a weapon, "but he's still running at us, I remember hearing commands being given to him to stop, turn around, leave the area."

Bates testified that the skirmish line was in the street, but it extended to the grass part. When asked if Matthews was on the grassy knoll or the street when Det. Bates first saw him, Bates answered "I believe he was coming down the sidewalk .....from my recollection."  Bates remembers that his group was

furthest right than the rest of the skirmish line", and also remembers that there were points when he was in the grass.  Bates further testified that he remembers the man "refuses to stop," "somebody saying he was under arrest," and "he kept coming,...I remember hearing 'Less  Lethal' and "I thought I heard three of the bean bag rounds." Bates remembers that Mathews "kind of reacted to the first shot I don't know exactly where it hit him."  When Bates was asked if he saw Mathews fall into the ravine, his answer was: "He jumped into the ravine .....He took both of his feet and he jumped towards the ravine and into the ravine."

When questioned further, William Bates agreed that the "ravine...sort of fell off a cliff after that grassy knoll."   When asked whether he actually saw whether or not the bean bag shots took effect, Bates answered:  "Out there ....it was so smoky and tear gassy, so I couldn't see where they specifically hit him but.. .....I could definitely tell by his body reaction that .....he was hit by one of them at least." Bates further explained "The reaction was ....it's just like his body just moved a little bit, ....he still come forward." When questioned regarding what was done once Matthews was in the ravine, Bates answered: "Detective Vinson was trying to get a hold of Matthews ...he told Matthews to grab his hand .....and then basically I remember he was having trouble getting Matthews ...so I grabbed onto him (Vinson) and I grabbed onto Matthews, and kind of was both of them at the same time .....we all came, came out...to the top part ....and then there was multiple people getting in there, he was kicking and flailing and

everything like that, and basically we were telling him, you know, he's under arrest, put his hands behind his back, refused to do that, so there were multiple officers trying to, you know, assist in that once he got to the top, but then he was taken into custody."   Bates testified that after Matthews was handcuffed, he was turned over to a couple of other officers.  Bates does not know who the other officers were.  Bates had no other involvement with Matthews after that.

Aaron Vinson is assigned to the Bureau of Drug Enforcement as a detective. On August 13, 2014, Det. Vinson was with other members of the Street Enforcement Team assigned to the command post.  He was then dispatched to areas that needed reinforcements. Vinson was dressed in blue jeans, a department issued vest that was marked "Police" on the  front and back, and a badge hanging around his neck.  Vinson's unit consisted of six detectives, and a sergeant. Vinson was part of a skirmish line, on the eastern side of the line, which would be in the southbound lanes of traffic. Vinson testified that when he saw the man later identified as Dwayne Matthews, Matthews' fists were clenched.  Vinson observed Detective Patterson lift his gas mask, after which Vinson heard Det. Patterson tell Matthews that he could not come through there, and that he needed to go in another direction.  Several other detectives said the same thing, but Patterson is the only detective who lifted off his mask.  The first contact that Det. Vinson had with Matthews was after Matthews had been hit with the less lethal round(s) and was in the ravine.

Det. Vinson was the first detective to arrive at the ravine, followed by Detectives Bates, Patterson, and Burns.  Sgt. Wathen was present, but did not engage in any physical contact.   Vinson pulled Matthews out of the water, by wrapping his hand up in Matthews' shirt.  Vinson was assisted by Det. Bates. The assistance that Vinson remembers is that Det. Bates grabbed the arm of Detective Vinson.  Vinson said that Det. Bates did not grab the man, but rather assisted Vinson. The detectives were attempting to get Matthews to a flat surface so that neither Matthews nor the detectives would fall back into the ravine. Vinson testified that Matthews was thrashing his body and arms.  The detectives told Matthews to stop resisting.  Det. Patterson administered the department issued OC spray, the thrashing stopped, and Matthews was handcuffed.  Det. Vinson testified that once Matthews was placed on the flatter surface, Matthews continued to thrash about the ground, "his elbows were flying," and Matthews was told to stop resisting.

There is a video that shows this man being brought to the flat surface.  The video picks up after the man is brought out of the ravine. Vinson stated that he had grabbed the jersey worn by Matthews to pull Matthews out of the ravine.  He also grabbed Matthews' wrists and hands to handcuff Matthews, but did not touch any other parts of Matthews' body.

Kerry White has never been employed by any news agency.  White has never been paid for any media photographs that he has done.  Kerry White did

not have an employer that sent him to Ferguson.

Kerry White was arrested before midnight, perhaps around 10 p.m. Perhaps he was arrested at 10:45 p.m. With his camera, Kerry White took photos of the burned Quik Trip store, other places that were looted, people cleaning up, the liquor store that was looted, of stores around New Halls Ferry, broken glass, and racks and stuff knocked over. On the night that he was arrested, Kerry White was in the drivers' seat, Sandy Bowers was in the passenger seat, and Kai Bowers was in the back. On the night that he was arrested, Kerry White could hear distant gunfire coming from way down West Florissant. That night Kerry White observed maybe 75 people near the police line. He described this as a "hostile moment" where "people had their tempers and everybody was yelling." Kerry White could hear announcements from the police over a loud speaker, saying to disperse the area. Kerry White had noticed smoke. White did not initially see tear gas on Lorna Lane, but once the police started firing tear gas on Lorna Lane he was there. Kerry White saw the police at the end of Lorna. White was stopped on Lorna with his windows rolled up, but nonetheless could hear what was going on outside because "it was loud." He saw people running and he saw people dispersing. He estimates the number of people to be about 50. He cannot say the number of people who were in front of the police line because people were running and dispersing. He could not really count how many people there were. He heard a lot of what he described as negative comments directed

toward police, including shouting and all types of obscenities. He saw the police enter onto Lorna, like a police line. He turned the car around and then the police line began marching from the front, and they were being fired upon from the back. Kerry White made a U Turn and the police line was there. When he saw the police line, he pulled up a little, stopped, and held his camera out the window. The time between when the police turned onto Lorna Lane and when he was actually arrested was a matter of seconds. The police marched fast and surrounded the car quickly. A police officer snatched the camera out of Kerry White's hand and threw it to the ground. The officer who snatched the camera had a gas mask on. Kerry White described the size of his camera as "pretty big." White described the force that was used as "not out of the ordinary." He also said that "they slammed us to the ground and handcuffed us." Kerry White was not injured.

The occupants of the car were escorted by police to Chambers and Lorna. White did not hear any profanity. Kerry White had been initially placed in metal handcuffs. When he got to the back of the police van, the handcuffs were replaced with zip ties. White sat in the back of the wagon with Sandy and Kai Bowers for about 40 minutes. He was then taken to Clayton.

Kerry White found his camera inside his vehicle the day after he was arrested. The camera had not been taken to Clayton. The day after the arrest, Kerry White and Sandy Bowers returned to where they had been arrested. They saw empty canisters in the street, which Kerry photographed. Kerry described the

empty canisters as "expired flash bangs that was used by police."  There were
two of these.  Kerry White had an outstanding arrest warrant from the City of
Maryland Heights at the time of his arrest in Ferguson.

Sandy Bowers has never done professional work as a photographer.  The
event of this lawsuit occurred the night of August 12 to the 13, 2014  Sandy
Bowers does not recall what time he arrived in Ferguson the night of August l2
but it was early in the night, maybe 9 ish or 10.  He had been aware that there
was violence going on in Ferguson after Michael Brown's death, but the violence
was in the nighttime.  Prior to August 12, he had gone to Ferguson for a daytime
peaceful protesting, but August 12 was the first time that Sandy Bowers had gone
during the nighttime.  The time that Sandy Bowers went to Ferguson during the
day was after the riots, which is the day after the Quik Trip store burned.   The
night that Sandy Bowers was arrested was the first and only night that he was at
Ferguson at night (after the Michael Brown shooting).

Kerry White was driving a white Impala.  Sandy Bowers was in the back
seat behind the driver, and Kai Bowers was in the front seat of the car that Kerry
White was driving.  Sandy Bowers saw that the police had the street blocked off
at Chambers and West Florissant, and he saw smoke and gas.  The car was
moving towards Chambers on a street that could have been Lorna.

Sandy Bowers cannot recall that the street had any street lights.  There was
no other traffic on the street that Sandy Bowers can recall, but no more than 10

people rumbling past.  Regarding the ten people who were running, Sandy Bowers thought that they were dispersing.  Sandy Bowers does not recall if the headlights of the car they were in were on or not.

When the police officers came toward them, the police came in a formation like a triangle:  one officer got there first and went to Kerry's door; the other officers came around to the side of the car in a quick second; all that Sandy Bowers knows is that it happened so quick.  The brother of Sandy Bowers was on the other side of the car; Kerry White was in front of the car; Sandy Bowers could not see what was going on with them.  Sandy Bowers can only describe one of the officers as an African American.  The African American officer did not handcuff him but he was cussing.  When asked if he remembers anything the police were saying to him when they arrested him initially Sandy Bowers answered "get on the F-ing ground;" and then apparently the officers thought that he was not complying and so they said "they was going to break my arm or something like that;" but there were no racial slurs that were used.

Once he got arrested, Sandy Bowers noticed that there was a helicopter overhead that had "the lights on us."  The African American officer did not have gloves, (and that was how Sandy Bowers knew that he was an African American), and then there was a Caucasian officer who was decent, but he cannot describe any other officer because the officers had gas masks on and gloves, and suited up.

After the police put them in handcuffs, the police walked them to Chambers

Road, in front of the convenience store, sat the three of them on the curb and made them wait for the van.  After four or five minutes there, a van took them to Clayton.  At Clayton, "they did a book and release,"  which took about 4 or 5 hours.  This time in Clayton was spent in a holding area; he was not placed in a cell.

The next day, around 9 a.m. or 10 a.m., Sandy Bowers and Kerry White drove back to Lorna Lane where they found items such as casings from things like flash bombs and smoke bombs.  Sandy Bowers did not see any doctors or receive any medical care for whatever pain that he might have had after this incident.

The day after the Quik Trip burned, Kai Bowers and Sandy Bowers accompanied Kerry White to Ferguson as Kerry White took photos of the area.  There also were a lot of different newspaper, TV, and different cameramen also out there taking photos.

The night that Kai Bowers was arrested involved the night of August 12th carrying into August 13th , 2014.  On August 12th, Kai and Sandy Bowers and Kerry White arrived in Ferguson around 5 or 6 p.m.  After arrival they parked at Red's Barbecue lot.  Kai Bowers was involved in some protesting on August 12th.  The three of them arrived in late afternoon on the 12th and did not leave the area until they were arrested.  At about 10 p.m. the three of them went to Rally's on Chambers Rd. and Halls Ferry.  Before they went to Rally's, there was tear

gas.   After this tear gas they were able to get into their car at Red's Barbecue and leave.  They had been on West Florissant before they went to Rally's and when they were previously on West Florissant they heard police telling people to disperse.  They had previously left West Florissant when the police started tear gassing.  Kai Bowers was sitting in the front seat, his brother Sandy Bowers was in the back seat sitting behind the driver; the driver was Kerry White. When the three of them left Rally's, they started driving towards West Florissant.  Before they got to West Florissant, they turned onto the street that they later got arrested on.

Kai Bowers saw 20-30 people coming down the street, those people were scattering different ways.  When the three of them went down the side street, there was a military vehicle blocking the end, and there were people who were walking and then those people took off running. The military type vehicle was at Lorna and Kappel.  Kerry White pulled the car into a driveway to turn around, and then they saw another military type vehicle, and then the car pulled over (to the curb), and Kerry White held his hands out the window showing a camera. The police who came to the car were a combination of African American and Caucasian.  The police came to the car with weapons drawn, told them to get out of the car, told Kai Bowers to put his hands up, "they grabbed me out the car, put me down, put his knee in..."  When again describing this, Kai Bowers said that the officer "dragged me out of the car, put me on the ground, put his knee in the

back of my head, and held me with force." Kai Bowers did not go to the hospital, but because the officer had a knee on his neck and shoulder, "I felt like I was hurt." There was just one officer holding him down. What hurt Kai Bowers was not being taken to the ground, but the pressure on the neck and back.

Kai Bowers overheard Kerry White say to the police, don't break my camera, just put my stuff in the car.  Regarding the camera, Kai Bowers said that he saw an officer drop the camera. Explaining further he said: "I don't know exactly how he dropped it, it's just like the camera fell somehow, and then that's when Kerry was like, 'Oh, man, you trying to break my camera,' and then they picked it up.' After the officer picked it up, Kai saw the officer put the camera back in the vehicle.

Regarding being cuffed, Kai Bowers said "they zip-tied us all and they walked us down....next door to the liquor store."  They were transported in a police wagon to Clayton where they were booked and released.

Near midnight on August 12, 2014, the members of the Neighborhood Enforcement Team, which included Officer Michael McCann, were assigned to assist with what was going on near West Florissant and Chambers Road.  This group was assisting with a police line which, after midnight, reached Chambers Road and Lorna Lane.  Some of the crowd moved south on Lorna Lane, and the police line also moved onto Lorna Lane.  McCann was on the left side of Lorna Lane, and so were Officers Valentine and Hill. Warnings were given by tactical

operations to disperse on Lorna Lane; in addition tactical operations dispersed tear gas on Lorna Lane. McCann heard sounds of gunfire. McCann had also earlier heard threats from the crowd to kill police. McCann heard a radio transmission from a helicopter that there was a white vehicle heading toward the police line on Lorna. After McCann heard the radio transmission from the helicopter, he actually observed the car driving toward the police line, and observed that this car did not have its headlights activated. McCann removed his gas mask and yelled "Stop." He repeated this over and over.

The car did not stop until it was very near the police line. Before the car stopped, Officer McCann removed his weapon. McCann yelled out, show us your hands. Other officers also yelled this out. The occupants did show their hands.

When the driver showed his hands, there was a black object in one hand. Officer McCann yelled drop it; he did drop it. McCann approached the vehicle. Other officers approached the vehicle. There were at least two sergeants nearby. The driver was removed from the car, taken to the ground, and a pat down search was performed, all with very little force being used. Kerry White admitted to Officer McCann that he had heard the commands to stop.

Officer McCann believed in good faith that there was probable cause for arrest. McCann believes that he was polite and professional with Kerry White.

Observations were made of equipment inside the car. A discussion was had whether it was safe to leave the car on the street. A decision was made by a

sergeant.

On August 12-13, 2014, Officer McCoy was a member of the Neighborhood Enforcement Team. On August 12th continuing past midnight, McCoy's team was deployed to West Florissant to assist, and was assigned to be part of a skirmish line.  McCoy heard gunshots that seemed to be coming from West Florissant and Chambers Road, and heard gunshots that seemed to be coming from farther east on Chambers Road.  That night on West Florissant, McCoy saw objects thrown at police and heard threats directed at police.  McCoy heard several loud warnings on loud speakers instructing the crowd to disperse. He observed smoke. He observed the crowd begin to disperse, and then the police line moved east.

When the police line reached Chambers Road and Lorna Lane, some of the crowd moved to Lorna Lane, so many officers, including Officer Terence McCoy, also moved south on Lorna Lane.  Once the line moved onto Lorna Lane, members of the crowd were dispersing by running through yards and running away from the police line. McCoy then heard a report from a helicopter saying that a car was driving on Lorna Lane toward the police. After hearing the report from the helicopter, Officer McCoy then personally observed an automobile driving toward the police line with no headlights.  McCoy heard officers around him yelling for the car to stop, but the car did not stop.   McCoy pulled out his

weapon. McCoy thought that this was a danger, not only because the car was driving at the police line but also because he had earlier heard gunshots, and so this was a concern.  The car braked and stopped close to the police, McCoy and other officers yelled to the occupants to show their hands. McCoy approached a passenger, grabbed his arms, but otherwise did not use any force and did not place the passenger on the ground.

Officer McCoy overheard Officer Valentine ask a passenger if he had orders to stop, and overheard the passenger say yes.  McCoy observed what appeared to be expensive equipment inside the car and took part in a discussion whether or not the car with the equipment should be left on the street. McCoy expressed his opinion that it would be dangerous, his opinion being based on actually having this area as his permanent beat prior to what his present assignment was.

Officer Dan Hill was asked generally about circumstances where police would disperse crowds on August 11-13, 2014, in Ferguson, and he answered that under circumstances that it became violent unlawful assembly the commanders gave the police the directive when it wasn't safe to be out there, but other than that, they did not disperse anyone. Upon more general questioning, not specific to the plaintiffs, Hill described the police actions saying:  "I think we were incredibly restrained ....We did what our commander told us to do.....We did what we were told.

Hill testified that on August 13, 2014, after his unit had first been staged at the command post, his unit was deployed as a supporting role with the Tactical Operations Team to the area of Chambers and West Florissant. Hill testified that when they arrived, they saw the police units who had requested additional support; there was a large gathering; there were rocks and bottles being thrown; his unit was directed to form a scrimmage line. Hill testified there were numerous repeated commands from loud speakers for crowds to disperse, it was no longer a peaceful assembly, and they were subject to arrest. Hill testified that his unit was to be the arresting unit that would do the handcuffing; and he explained it further by saying "Our assignment was to support the tact unit, and if a commander decided that somebody needed to go to jail, they would direct us to that person and we would handcuff them."

Hill testified there was a steady movement up Chambers, the commanders were there on the ground and were concerned that some parts of the line were moving too far ahead and some were moving too slowly, and the commanders tried to keep everyone shoulder to shoulder; the movement was very coordinated from the commanders on the ground. Hill testified that when the line reached Lorna and Chambers Rd., that the large group basically broke up, and one group continued east on Chambers and another turned onto Lorna; Hill was then in the group of officers that turned onto Lorna.   Hill testified that orders were given, tear gas was deployed, and the crowd on Lorna began running in between houses

and into people's back yards. Hill testified that not everyone was dispersing. Hill testified that there was a heavy presence of gas in the air.

Hill testified that a "warning had been put out over the radio by the air unit" something to the effect that there was a car "approaching the scrimmage line." Hill testified that as the officers were in a line moving down the street, a vehicle was driving northbound on Lorna; numerous commands were given for the vehicle to stop. Hill perceived the vehicle as a threat. Hill described the movement of the vehicle as "driving at us;" at which point he drew his gun.  Hill testified that the vehicle drove "within 25 feet of us," and further testified that "I don't recall headlights being on," but conceded he does not remember if the headlights were on or off.   When the vehicle stopped, it pulled over; Hill approached the passenger door, and described the encounter as follows:  "We ordered them out. They complied.  We helped them to the ground.  They were flex cuffed with their hands behind their back.[sic]"  When further questioned, Officer Hill testified that when the vehicle stopped, that his approach to the vehicle "was a slow cautioned approach," and that he was yelling "Show us your hands, show us your hands," and that a lot of people were yelling. Hill testified that when he got to the passenger door, the door was open. Hill described his encounter with a passenger as "I may have had my hand on his hand, on his arm and assisted him going to the ground, I don't recall. ...it wasn't a big incident.  It wasn't a big production.  It was he got out of the car, got on the ground, laid down." Upon further

questioning, Officer Hill stated that he "was focused purely on the passenger," and so he has "no idea" how the driver got out of the car, and further stated that he did not see anyone thrown to the ground, and when asked if he was saying that all of the occupants got out of the vehicle and on the ground voluntarily, he answered "We directed them to, and they did voluntarily, yes." When asked to state the reason that the officers apprehended the occupants of the vehicle Officer Hill stated: "We had given numerous commands for everyone to flee the area, and they were approaching us, making no attempts to flee the area.  Like you pointed out earlier, they could have turned around and drove away, but they did not." Upon further questioning, Officer Hill stated, "Of all the things that he could have done, he chose to come toward us and approach us and put us in fear ......the totality of the situation from the last three or four days, we were doing everything as safely for everyone as we could." Hill testified that the arrested persons were then walked to an intersection and placed in a conveyance van.

Antonio Valentine was an officer on August 13, 2014, with the Neighborhood Enforcement Team.   When asked, Valentine testified that two of the six officers, including Valentine, who were part of the Neighborhood Enforcement Team are African American officers; the briefings after Officer Valentine's first day at the unrest included instruction on not to respond to banter directed at African American officers who were called out by others so as not to escalate or incite the crowd.

On August 12th when Valentine arrived on duty, there were briefings which included relaying information to supervisors who can relay back up to higher ups.  Briefings on when to disperse a crowd came from Valentine's chain of command.

On August 12th, when it was dark, Valentine's group was involved in a dispersal of a crowd when individuals were throwing rocks, liquor bottles, glass bottles, batteries, and water bottles at police.  Valentine additionally testified that members of the crowd also confronted officers and told them what they were going to do to the officers and that they would shoot the officers.  Valentine testified that on August 13th, 2014, ten or more commands were given to the crowd that they were not peacefully protesting anymore and that they needed to disperse; at that time "it wasn't just batteries and bottles of water, it was glass, bricks were thrown, we were being confronted, threatened, they were coming at us."  Additionally, Officer Valentine told his immediate supervisor that individuals were actually flanking the police by running in between the businesses like Exquisite Cuts and Zisser Tire.

In this area near the barber shop, Mr. Malik Shabazz was wearing a yellow shirt, khaki pants, and holding a bullhorn, and being an active participant. Valentine further testified that the officers were told to stop moving forward because the throwing of rocks, batteries and glass intensified.  Valentine further

testified that after it intensified, that more commands were given and then smoke and tear gas were deployed.  From the area where the officers were being flanked, there was debris or various items being thrown at the police.  Valentine further testified that after tear gas was deployed, the crowd started going back east on Chambers Rd; and  also the crowd went in multiple directions between businesses; the police did not pursue those that dispersed.  Valentine testified that the police line continued to move further east on Chambers, moving about 20-30 feet and then the crowd would stop and "engage" the police; then they reached the intersection of Chambers and Denis; then the intersection of Chambers and Vickie.  Valentine further testified that there was still a crowd of 40 to 50 people going back and forth, and also vehicles were involved darting in and out of adjacent streets. While this was going on, Officer Valentine learned of a call that one of the businesses further down was actually being looted.  When again asked whether people were pursued, Officer Valentine again stated that he and his unit did not pursue anyone.

When the police line reached Lorna, there was a command by higher ups to stop.  When the police line stopped at Lorna, the officers checked on each other to make sure there were no injuries; and further noted there had been persons and vehicles that had turned down Lorna, and persons going down Lorna cutting in between houses. Valentine testified further that it was being said that a large crowd was gathering on Lorna toward the middle of the street; he did not see that

because he was then facing Chambers, but there was a command to go down Lorna, and then he actually saw a crowd of 10 to 15 people on Lorna. Valentine testified that "we turned on Lorna and actually started to go down Lorna." Valentine testified that "From there, we actually (were) informed by the air unit that there was a white vehicle, no lights, that was actually headed back toward us." When questioned further on the role of the helicopter, Officer Valentine testified that the helicopter "brought it (the white vehicle) to our attention;" and upon even more questioning testified that the helicopter did shine its light on the white vehicle a few times.

Officer Valentine testified that the white vehicle "had no lights, it was roughly driving at approximately 20-25 miles an hour, was not swerving or anything, but it was coming at us, coming north on Lorna." Commands were given by police officers to "stop, pull over," the vehicle continue to travel, more commands were given. After five or six commands were given, officers drew their guns; he testified that no command was given to draw their weapons, but the officers did draw their weapons after the warnings were given. Valentine testified that the reason that they drew their weapons was that the vehicle with the headlights off was "actually coming at us," and further said "it was really not complying with our commands and it's still coming at us," and further stated "I felt threatened." Valentine testified that commands were given by the officers to the occupants, to "show me your hands," and then Valentine approached the rear

passenger door, opened the door, told the passenger to step out, took control of his left wrist, placed that behind the man's back, took control of the right arm, and assisted the man to the ground, did not throw the man to the ground.  Valentine patted down that man to make sure that he did not have any weapons, and placed him in flex cuffs.  Valentine testified that after handcuffing the man, Valentine asked if he had heard the commands to stop; with the response being "Yeah, we heard it, but he kept driving," while motioning to the driver.

Officer Valentine believed, based upon his training and experience, that there was probable cause to have this man arrested for something.

While other officers then maintained control of the people who had just been removed from the vehicle Officer Valentine inventoried the vehicle and found various electronic equipment. Valentine agreed that when a tow truck was initially requested, it was denied which means that either the tow truck driver or someone on behalf of the tow truck driver decided that it wasn't safe for the tow truck to come into that area to tow the car from Lorna Ave.

Valentine testified that he feels that he was adequately trained; that St. Louis County had conducted riot training or crowd control training the year prior, which was part of the in service training of the department which training was done annually if not biannually since 2011. When questioned regarding his reactions when he was called names by the crowd, and when others threatened to

kill the police, Officer Valentine answered: "I have a lot of self-restraint and tact," and that he understands that people say a lot of things in the heat of moments."

Nicholas Payne, St. Louis County police officer, assigned to the drug unit and has been for five years.  He has had formal training on crowd control; the last training prior to August 9, 2014, was about a month or two before.   The regular police gear for the men in his unit is blue jeans and T-shirts.

On August 13, 2014, (after midnight) the crowd was getting unruly; a hundred or more persons were in the crowd at Chambers Rd and West Florissant where there was yelling and throwing of objects and gunshots going on.  The order was given several times to disperse; the crowd was not disbursing; the crowd continued to throw rocks and bottles at the police; then a decision was made for the Tactical Operations Unit to begin using smoke and tear gas to disperse the crowd.  As the police were moving on Chambers from West Florissant, the crowd would be dispersed and then reformed, and rocks and bottles would be thrown at police again, after which the Tactical Operation Unit would deploy what they felt necessary to disperse the crowd.  When questioned regarding what Det. Payne's feelings were as they were going up Chambers with objects being thrown at him and cursing directed at them, Det. Payne answered: "The only thing I was probably worried about was being shot, at that point."

Then they went down Lorna; the numbers on Lorna were 20-25 people and they were throwing rocks and bottles and yelling.  As the police were moving on Lorna, Payne heard over the radio that there was a white vehicle approaching the police line. Payne drew his weapon because "the vehicle was moving and I was afraid I was going to be hit by a car."  Upon further questioning, Payne stated "As long as the vehicle is moving, I would consider it a threat."

When Payne first saw the vehicle, it was "Maybe 100 yards, maybe 100, 200 yards;" and Payne stated: "We were yelling for the vehicle to stop;" Payne considered the vehicle to be a threat.

Payne testified that Kerry White got out of the vehicle voluntarily, and that Kerry White laid on the ground, and that Det. Payne "assisted him in getting him into the flex cuffs and get him into custody."  Payne did put his hands on Mr. White to place him in custody once he was on the ground.

On August 11, 2014, at around 7:40 p.m. Antawn Harris was on West Florissant Ave. near the burned down Quik Trip.  He had seen tear gas and knew that the crowd was to disperse.  He was using his cell phone to film the police and the crowd.  While he was filming people throwing tear gas and people leaving, one police officer shot Harris in the face.  Harris has no evidence that the person who shot him in the face was a St. Louis County officer.  The officer was wearing riot gear, but Harris cannot say if this was a St. Louis County police officer or

not.  Harris agrees that in Harris' cell phone video that was still operating after he was hit, that Harris indicated on the video that Harris said that he did not know what hit him.  When asked isn't it true that on the video someone else is heard saying that maybe it was a BB, Harris answered "I don't know," and that someone else is heard saying it was a rock, Harris answered "I don't know."  From the knowledge of Harris, at the time when it happened, he did not know if he had been struck with a rubber bullet or a real bullet.  Neither Harris nor the people whose voices were heard on the video looked around to see if there was anything laying on the ground.   Harris does not know one way or the other if this was really a rubber bullet.  After he was hit, he walked home, and within 10 minutes of the incident a photo was taken of the bridge of his nose.  Before the photo was taken, he had not wiped off his face with a towel; he had not cleaned off his face.  There is no powder or powder spray on his face.

Five minutes after the photo was taken, the father of Mr. Harris took him to Christian Hospital Northwest emergency room.  Mr. Harris saw the nurse at 8 or 8:16 p.m.  At the E.R., Mr. Harris tried to give honest answers to questions that the nurse asked him. Harris told the nurse that he did not lose consciousness, he denied visual changes, but his eyelids felt heavy and it was difficult for him to open his eyes for 10 minutes.  It sounds relatively accurate to Harris that official hospital records show that his admission time was clocked in at 9:26 and his discharge time was 11:05 p.m.  After discharge from the hospital, Harris did not

follow up with another doctor for examination and did not ever get a prescription filled.  Harris has never been to any other doctor or health care provider or clinic relating to the injury.  Harris was treated at a hospital after August 11, 2014, for a problem unrelated to what happened on West Florissant.  During the subsequent unrelated treatment Harris gave a history that his vision was normal and he had no other complaints, other than the subsequent unrelated condition.   Mr. Harris was not arrested by any police department.

On August 11, 2014, Nathan Burns was arrested around 10:30 p.m. Before being arrested, Nathan Burns had heard police give orders to disperse, which orders were given over loud speakers.  Burns had heard "maybe three" orders to disperse that night.  At first Burns was with a large group of people; he cannot give a number, and then right before he was "Maced," people were scattered out into subgroups. When asked if he had wanted to leave, could he have gone through a yard, he answered "My car was actually on the street and I didn't want to leave my car out there." Before OC spray was used, Nathan Burns had observed tear gas or smoke being used, and heard three orders to disperse.  Burns does not know Detectives Terence McCoy, Dan Hill, or Mike McCann; and Nathan Burns does not know what they did the evening of August 11, 2014.

That night, Nathan Burns was transported to the Justice Center, which he refers to as the jail.  At the Justice Center there was a nurse who performed an

intake examination of Nathan Burns.  County Exhibit E, according to the
affidavit, are medical records of Nathan Burns kept in the ordinary course of
business of Saint Louis County Department of Public Health pertaining to Nathan
Burns on August 12, 2014.  The intake RN Assessment had a question: "Does
patient report having any limitation at the time?" The recorded answer is "No."
The intake RN Assessment contained a question: "Does patient require special
care for a physical condition at this time."   The recorded answer is "No."  The
Intake RN Assessment included the Word: "Behaviors."  The notation afterwards
is "Cooperative." The Intake RN Assessment included the words: "Current Chief
Complaint: Following that it is written:  "Other (Recurrent Lumbar pains past 2
months tx by Chiropractor."

Christopher Shearer considers Nathan Burns to be his best friend.  The area
that Nathan Burns and his best friend Christopher Shearer went to was within
walking distance of Nathan Burns' apartment. Burns and Shearer did not walk;
they drove in Nathan's car and parked on a street called Gage, over from West
Florissant.  Before tear gas was deployed, Mr. Shearer heard announcements from
police to "Go to your homes."  That announcement was made on the loud
speaker; Mr. Shearer cannot remember the number of times that the
announcement was made. Mr. Shearer was not subjected to tear gas.  Shearer had
run from where he had been and did not see Nathan Burns get "Maced."  Shearer
did not hear any police officer say anything directly to Nathan Burns because

Shearer did not even know where Nathan Burns was; when the police told Shearer to get off the street, Shearer drove off in Nathan's car.  Nathan Burns did not ever tell Christopher Shearer that he was injured at all by what happened that night.

On August 11, 2014, Officer Dan Hill was a member of the Neighborhood Enforcement Team, and reported to the Command Center for briefing and assignment. His team was assigned to be an arrest team, but in addition Officer Hill and Officer McCann were detached to be liaisons with the St. Louis Metropolitan Police Department (i.e. City of St. Louis Police Department) because the radio systems of the City and County police departments were unable then to communicate with each other.  Officers Hill and McCann were riding on a City of St. Louis Armored Vehicle which they called the "Bear" on West Florissant Ave.  While riding on the Bear, Hill and McCann stood on a skid, at the very rear, on the outside of the Bear.  City police officers were standing near them but in front of Hill and McCann.  Hill observed rocks and other objects thrown at police and heard announcements made by the City of St. Louis Tactical Operations over loud speakers commanding the crowd to disperse.  As Hill was riding on the outside of the Bear on West Florissant Ave. he could hear the City police officers yell "Duck," and as he ducked he could hear objects strike the Bear.  Hill observed rocks thrown at the Bear form a small group; then Hill observed a City of St. Louis tactical operations officer deploy Mace at the group;

then he observed people from that group scatter and run away, except that Nathan Burns, who was in the midst of the group, did not scatter and run away. The instructions that had been given to Hill's team that night was not to chase people who dispersed and ran away, but they could arrest someone, with probable cause, who did not run away. So Hill went to where Burns was standing to arrest Burns. The reason for arresting Burns was he had not dispersed, plus Hill had observed Nathan Burns to be standing within a small group of person throwing rocks at police, and Burns was then Maced by City police. Nathan Burns did not resist arrest. The arrest of Nathan Burns was uneventful, consisting of placing him on the ground, placing flex cuffs on him, picking him up, taking him to conveyance officers. After Burns was given to conveyance officers, Officer Hill returned to the Bear to resume his assignment. Officer Hill did not strike Nathan Burns and used what he called minimal and appropriate force.

Officer McCoy described the civil unrest in Ferguson to include large crowds, property being destroyed, police officers being assaulted by having things thrown at them, multiple shots fired, people injured, large crowds throwing rocks at officers. McCoy was involved in the arrest of Nathan Burns on West Florissant near Highmont. McCoy testified that that night McCoy was wearing brown pants, a black shirt with police officer vest and a helmet and boots. McCoy was part of the arrest team that night. McCoy testified that there was a different unit that had made several announcements from a "loud PA" to disperse;

after which a good portion of the crowd did disperse; but some members of the crowd continued to throw rocks.  McCoy testified that the police had been instructed not to chase anybody that ran from the group; Nathan Burns did not run; Burns was taken into custody.  McCoy testified that he assisted Officers Hill and McCann with the arrest.  McCoy testified that "we (the arrest team) pass(ed) him off ' to officers who transported Burns; Burns at that time was pretty disoriented because he had pepper spray in his face.  McCoy testified that Nathan Burns "told me his eyes were burning,. .... he was talking, he was very calm." McCoy testified that the deployment of OC spray was done by St. Louis City police as opposed to St. Louis County police.

On August 12, 2014, Officer McCann was involved in the arrest of Nathan Burns.  The arrest of Nathan Burns occurred at West Florissant and Highmont. Officer McCann testified that there were officers riding on running boards on the side of the armored vehicle. McCann testified that he had seen Nathan Burns "in a crowd of people at the intersection of Highmont and West Florissant, east end, I saw Mr. Burns throw a rock at the....we call it the Bear, it's an armored personnel vehicle that St. Louis City was using to move the crowds along." McCann testified that besides Mr. Burns, there were several rocks thrown; St. Louis City deployed Mace in the direction of the group that was throwing rocks. McCann testified that City officers who deployed Mace used an aerosol can that was about the size of a small fire extinguisher, to deploy the Mace. McCann,

when questioned further, repeated that it was Members of the St. Louis City police department who used OC spray on Mr. Burns.  Also when questioned further, Officer McCann repeated that Nathan Burns did throw a rock toward the vehicle; that officers were on the running boards holding onto the vehicle as it proceeded up West Florissant.  McCann testified that he was probably 2-3 feet from the City officer who used the OC spray; that some of the spray inadvertently went into McCann's eyes; that McCann nonetheless still walked in the general direction of where Nathan Burns had been standing and saw Officers Hill and McCoy place Burns under arrest;  that McCann believes that it was Hill and McCoy who cuffed Nathan Burns but McCann assisted with picking Burns up from the ground, placing him under arrest, and moving Burns to the sprinter van (where the conveyance officer was).

   Jon Belmar is chief of police of St. Louis County now and has been since January 31, 2014, and has responsibility for the overall operation of the St. Louis County Police Department, and overall responsibility for making sure that the department complies with accreditation standards, and the Board of Police Commissioners, per the County charter, approves policies.  Belmar has been a St. Louis County Police Officer for 30 years having risen through the ranks to chief.

   St. Louis County has been accredited by CALEA, the Commission on Accreditation of Law Enforcement Agencies, since 1988).  Belmar is familiar with CALEA, summarized CALEA in paragraphs 8, 10-20.  These include:

CALEA is the premier accrediting association within the United States, there is a rigorous accreditation process every three years which includes on site assessment, review of policies, procedures, and practices, the accreditation covers law enforcement, Communications, and training.  The last two accreditation cycles, which included the time period before and after the events mentioned in the lawsuit, St. Louis County met all 484 standards.  The areas involved in accreditation are Law Enforcement, Communications, and Training, and the review of the activity of the department during the preceding assessment cycle. As a result, the 2015 cycle included a review of the activity, the policies, the practices, and the training occurring during the Ferguson civil unrest time period were reviewed.

The hiring process of St. Louis County police officers includes background checks of driving history, criminal history, financial status, education verification, reference checking, checking of prior law enforcement and military employment when applicable including internal affairs history, testing, psychological test, polygraph test, and interview.  Belmar makes the ultimate decision on who to hire and has not hired anyone with a history of assaultive behavior, or a sustained complaint of excessive force or unlawful arrest, or anyone with a pattern of complaints involving unlawful arrests or excessive force, and is not aware that his predecessors.

St. Louis County has a Conduct and Discipline Rules and Procedure

Manual in place, and a discipline procedure in place. All allegations of employee misconduct are investigated by the Bureau of Professional Standards.   If there is a sustained complaint of excessive force or unlawful arrest the discipline is significant.  Arrests without probable cause are not tolerated and excessive force is not tolerated. CALEA requires 25 standards pertaining to internal affairs and disciplinary policies and procedures, and St. Louis County met all of them in the 2012 and 2015 reaccreditation process.

The training and certification of St. Louis County officers includes:  all officers must graduate from a police academy and must pass license exams, they must be POST certified (Peace Officer Standards and Training); there must be POST licensing of basic training centers and basic training instructors, and POST approval of curricula, there must be 48 hours of POST approved continuing education every 36 months.  Some specific ongoing training of St. Louis County officers includes the basis for warrantless arrests, probable cause, and use of force.

A few months before August of 2014, St. Louis County police officers were required to undergo Civil Disturbance Riot Training in the spring of 2014, by an instructor trained by the United States Department of Homeland Security. In addition to requiring its own officers to attend, St. Louis County invited police officers from municipalities located within St. Louis County to attend, and perhaps coincidentally, the City of Maryland Heights participated in the training,

and Chief Belmar himself attended.  Even before the Spring of 2014, Civil

Disturbance Training that was required for all officers.  New recruits have been

receiving Civil Disturbance and Riot Training for seven years.  Supervision of St.

Louis County police includes:  a chain of command; meeting CALEA standards

that apply to supervision, regularly evaluating supervisors, having a probationary

period for supervisors.

      The unprecedented events of Ferguson, which included gunfire, looting

and burning and other criminal activity, were addressed by Chief Belmar; actions

of the chief included telling his officers at the very beginning to remain calm and

maintain discipline, frequent contact with commanders of the Missouri Highway

Patrol and the St. Louis Metropolitan Police Department and others, providing

the bulk of the manpower, (who as mentioned were POST certified and well

trained as accredited by CALEA), working with and knowing the other

departments who were present such as the St. Louis Metropolitan Police

Department and Maryland Heights, and knowing that they are well trained and

professional; Chief Belmar personally remained present to supervise  during

heightened criminal activity, along with St. Louis County supervisors and

commanders who were actually on the ground supervising, and more.  Belmar has

no knowledge, or reason to believe that the officers from the City of St. Louis

and/or from the City of Maryland Heights who were in the Ferguson area

between August 11 and 13, 2014, were inadequately trained, or had a pattern of

making arrests without probable cause or of using excessive force.

Chief Belmar had had regular and frequent contact with both the Highway Patrol and the St. Louis Metropolitan Police Department ("SLMPD") prior to August 2014.  He viewed both of them to be highly competent and well trained law enforcement agencies. Chief Belmar knew that SLMPD was a CALEA certified agency in 2014. Belmar was not aware of a pattern of unaddressed unconstitutional behavior on behalf of any SLMPD officer.  Both the Highway Patrol and SLMPD brought their own senior level commanders and supervisors with them to Ferguson.

The City of Maryland Heights responded to the Code 2000 in Ferguson with police officers.  Belmar had worked with the Maryland Heights Police Department over the years, and knew the officers in that Department to be professional and well trained.

Maryland Heights responded as a unit with its own supervisors.  Belmar was comfortable that the Maryland Heights officers who were on the scene in the Ferguson area were properly supervised.  Belmar was aware that Maryland Heights had participated in the County Civil Disturbance Riot Training, and that all of its officers were POST certified.  Maryland Heights had participated in County Incident Control Training, where County officers trained with officers from other law enforcement agencies in the area to respond to a disaster.  Belmar was not aware of a pattern of unaddressed unconstitutional behavior on behalf of

any Maryland Heights police officer.  Chief Belmar personally remained present in the Ferguson area to supervise the police activities for as long as his physical stamina permitted during the heightened protesting and criminal activity in August, 2014.  Belmar had no personal involvement with the plaintiffs in this lawsuit (and it is not even alleged that he did), and has no knowledge that officers who were personally involved with them had had a pattern of arrest without probable cause or use of excessive force.

St. Louis County Self-Insurance Policy provides for coverage of "only those claims for which sovereign immunity is not authorized under Section 537.600 et seq. R.S.Mo. (2007 as amended)."  Under the first section, titled "NON-WAIYER OF SOVEREIGN IMMUNITY," the Policy states that the "County expressly does not hereby waive, and County does hereby avail itself of and reserve, any and all rights, immunities, protections and defenses available under Section 537.600 et seq., under any present and future state or federal provisions, or under common law as it develops."  Excess Insurance Coverage is not an issue in this case because there is either no injury or very minor injuries. But if the Excess Coverage were an issue, the County's Excess Insurance Contract with Starr Indemnity & Liability Company contains a statement expressly declaring that the policy does not include "coverage for any suit, claim or liability against which St. Louis County is immune pursuant to Sec. 537.600 R.S.Mo. et seq, or any other statute or law granting counties of the State of

Missouri governmental, or sovereign, immunity, to the fullest extent to which

such immunity is applicable."  Further, the policy clarifies that nothing in the

policy "shall be construed to broaden the liability of the Named Insured beyond

the provisions of Sections 537.600 to 537.610 of the Missouri Statutes. . . nor to

abolish or waive any defense at law which might otherwise be available to the

Named Insured, its officers or employees."

## Standard

Summary judgment is proper if the evidence, viewed in the light most

favorable to the nonmoving party, demonstrates no genuine issue of material fact

exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c); *Cordry v. Vanderbilt Mortg. & Fin., Inc.,* 445 F.3d 1106, 1109 (8th

Cir.2006) (quoting *Bockelman v. MCI Worldcom, Inc.,* 403 F.3d 528, 531 (8th

Cir.2005)).  The proponent of a motion for summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.

Catrett,* 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)).  The proponent

need not, however, negate the opponent's claims or defenses. *Id.* at 324–25.

In response to the proponent's showing, the opponent's burden is to "come forward

with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting

Fed.R.Civ.P. 56(e)). A "genuine" dispute of material fact is more than "some

metaphysical doubt as to the material facts." *Id.* at 586.

"[T]here is no issue for trial unless there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable ... or is

not significantly probative ... summary judgment may be granted." *Id.* at 249–50

(citations omitted).

## Discussion

> Official immunity protects public officials from liability for alleged acts of
> ordinary negligence committed during the course of their official duties for
> the performance of discretionary acts. acts. *Kanagawa v. State By and*
> *Through Freeman,* 685 S.W.2d 831, 835 (Mo. banc 1985). Whether an act is
> discretionary or ministerial depends on the "degree of reason and judgment
> required" to perform the act. *Id.*at 836.  An act is discretionary when it
> requires "the exercise of reason in the adaption of means to an end, and
> discretion in determining how or whether an act should be done or a course
> pursued."  *Rustici v. Weidemeyer,* 673 S.W.2d 762, 769 (Mo. banc 1984) *quoting*
> *Jackson v. Wilson,* 581 S.W.2d 39, 43 (Mo.App.1979).

*Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo.Banc.2006).

"Under Missouri law, the official immunity doctrine protects public officials from

liability for injuries arising out of their discretionary acts or omissions, but not

from liability in claims arising from their performance of ministerial acts."

*Reasonover v. St. Louis County, Mo,* 447 F.3d 569,  585 (8th Cir. 2006).   Official

immunity does not apply, however, to discretionary acts done in bad faith or with malice. *Id.; State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443, 446 (Mo. 1986) (en banc).  "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury." *Twiehaus,* 706 S.W.2d at 447.  "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another. An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* (internal punctuation and quoted case omitted). "Bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* (brackets and quoted case omitted). An allegation of "malicious motive or purpose or of conscious wrongdoing" is sufficient under Missouri law to preclude application of the official immunity doctrine. *See Twiehaus,* 706 S.W.2d at 447.

Official immunity " 'protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary [as opposed to ministerial] acts.'" *K.B. v. Waddle*, 764 F.3d 821, 824 (8th Cir. 2014) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)).

> "Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome a defendant's claim of qualified immunity, the burden falls on [plaintiffs] to show: '(1) the facts, viewed in the light most favorable to [plaintiffs], demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation.' " *Id.* (quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010)).

*Gilmore v. City of Minneapolis*, No. 15-2465, 2016 WL 4758552, at *2 (8th Cir. Sept. 13, 2016).

The court applies the doctrine of qualified immunity in a manner that "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir.2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

To determine whether a defendant is entitled to qualified immunity, the Court first considers whether the alleged facts demonstrate that his conduct violated a constitutional right and, if so, whether the right claimed was clearly established at the time of the alleged injury. *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir.2009).  "If the answer to either question is no," then the defendant is entitled to qualified immunity. *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir.2010).

Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated clearly established law. *Johnson v. Fankell,* 520 U.S. 911, 915, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997).

To defeat a claim of qualified immunity, a plaintiff alleging excessive use of force must present sufficient facts to show that the officer's conduct violated a constitutional right, and he also must establish that the constitutional right was clearly established.

*Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011).

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.' " *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). A law enforcement officer has probable cause "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.' " Id. at 523 (quoting *Fisher v. Wal–Mart Stores*, Inc., 619 F.3d 811, 816 (8th Cir. 2010)). If an officer arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists "if the mistake is 'objectively reasonable.' " *Id*. (quoting *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)).

*Gilmore v. City of Minneapolis*, No. 15-2465, 2016 WL 4758552, at *2 (8th Cir.

Sept. 13, 2016).

The Fourth Amendment precludes the use of excessive force by law-

enforcement officers. *E.g., Guite v. Wright,* 147 F.3d 747, 750 (8th Cir.1998).  The

question to be answered, therefore, is whether the amount of force used exceeds

the constitutionally permitted quantum of force. Not every push or shove by an

officer violates the Fourth Amendment. *Crumley v. City of St. Paul,* 324 F.3d 1003,

1007 (8th Cir.2003).  "[T]he right to make an arrest ... necessarily carries with it

the right to use some degree of physical coercion or threat thereof to effect it."

*Graham v. Connor,* 480 U.S. 386, 396 (1989).  Force used in making an arrest is

not excessive in violation of the Fourth Amendment if the "officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting them."

*Id.* at 397.  The severity of the crime at issue, whether the suspect poses an

immediate threat to the public or the officers' safety, and whether the suspect is

actively resisting or evading arrest are all relevant in determining whether the

officers in question acted reasonably. *Id.* at 396.  A court's reasonableness analysis

"must embody allowance for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.*

at 396–97. Ultimately, "the dispositive question is whether the officer's conduct

was objectively reasonable under the circumstances, as judged from the

perspective of a reasonable officer on the scene at the time the force was applied."

*Chambers,* 641 at 907, (citing *Graham,* 490 U.S. at 396); *Cook v. City of Bella*

*Villa,* 582 F.3d 840, 849 (8th Cir.2009)).

> When a supervising official who had no direct participation in an alleged
> constitutional violation is sued for failure to train or supervise the offending
> actor, the supervisor is entitled to qualified immunity "unless plaintiff proves
> that the supervisor (1) received notice of a pattern of unconstitutional acts

committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts. *Livers v. Schenck,* 700 F.3d 340, 355 (8th Cir.2012).

(1) This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient. "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* at 356. For purposes of this appeal, Krigbaum concedes that Edwards's sexual assaults deprived plaintiffs of a clearly established constitutional right to substantive due process when he committed "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." *Johnson v. Phillips,* 664 F.3d 232, 239 (8th Cir.2011) (quotation omitted).

*S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

A false arrest claim cannot succeed when there was probable cause. *Arnott v. Mataya*, 995 F.2d 121, 124 (8th Cir. 1993). "The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975). However, for qualified immunity analysis, the standard for probable cause is less demanding, and "the officers are immune from suit if they had a mistaken but objectively reasonable belief that [plaintiff] had committed a criminal offense." *Ransom v. Grisafe*, 790 F.3d 804, 813 (8th Cir. 2015) (internal quotation marks omitted). Immunity applies, therefore, when there is merely arguable probable cause for the arrest. *Id*.

Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an

unofficial custom, or (3) a deliberately indifferent failure to train or supervise. *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91 (1978); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388–89 (1989).

A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Ware v. Jackson Cnty., Mo.,* 150 F.3d 873, 880 (8th Cir.1998) (internal quotation marks and citation omitted). "[I]n order to state a viable § 1983 claim [ ], plaintiff is required to plead facts sufficient to show at least an inference that [her] constitutional rights were violated as a result of action taken pursuant to an official policy, or as a result of misconduct so pervasive among non-policymakers as to constitute a widespread custom and practice with the force of law." *Davis v. St. Louis County, Mo.,* 4:14CV1563 CAS, 2015 WL 758218, at *12 (E.D.Mo. Feb. 23, 2015) (citation omitted).

The record before the Court establishes that Defendants Ryan, McCoy, McCann, Derik Jackson, Patterson, Vinson, Bates, Payne, Hill, Valentine, Delia, DeVouton, and McKinnon are entitled to official immunity from Plaintiff's State law claims and Qualified Immunity from Plaintiff's Section 1983 claims.

With regard to the state law claims, Plaintiffs have completely failed to present any credible evidence that any of the actions taken by these individuals were taken with malice or were committed in bad faith.  The record is clear that at the time of the events detailed herein, the atmosphere surrounding the arrests was extremely intense and had turned violent.  Participants in what had turned from a peaceful assembly to unlawful assembly were advised to disperse.  Numerous warnings had been announced to the crowds to do so.  These defendants were advised by their superiors to arrest anyone who refused to disperse in accordance with the warnings.  Even after the announcement of the orders to disperse, the individual defendants gave repeated warnings to Plaintiffs that they must leave the area.  When Plaintiffs failed to do so, these individual defendants were compelled to follow the orders given to make arrests because an unlawful assembly/riot was occurring.

Plaintiffs attempt to avoid application of these immunity doctrines by arguing that none of the Plaintiffs could possibly be categorized as participating in an unlawful assembly by reason of the fact that there were never more than six plaintiffs assembled at any time during the events.  Plaintiff's interpretation seeks to magically carve out the individuals in isolation of the events that occurred.  Plaintiffs, however, fail to recognize that the immunity analysis encompasses the totality of the circumstances.  At the time of the events, the unlawful assembly which gave rise to these defendants' arguable probable cause was the entire

assembly of the protestors and not whether two or three Plaintiffs were gathered together.  These plaintiffs were a part of the greater sea of humanity that had converged upon the City of Ferguson, some of whom were throwing various objects at police with the intent to cause harm.  It is undisputed in the record that the individual defendants were reacting to their orders to arrest those that did not disperse, and more importantly were reacting to the threats of harm to themselves and the people, who were otherwise peaceable and following orders to disperse gathered, in the streets.  They acted without malice or bad faith; they clearly had arguable probable cause to arrest any individual who refused to comply with the orders to disperse.

Likewise, Plaintiffs' reliance on *Abhoullah v. County of St. Louis*, 52 F.Supp.3d 936 (E.D. Mo 2014) to support their argument that they were not a part of an unlawful assembly or a riot is misplaced.  As Defendants correctly point out, the events detailed in *Abhoullah* occurred after the events involved herein, and dealt with an arbitrary unwritten policy which required protesters to "keep moving" even absent any violence.  The events giving rise to this action are entirely different.  There was violence. There was chaos. There was a situation where the police and innocent protesters were at risk of being injured.  Nothing in *Abhoullah* attempts to prevent the police from taking necessary action in order to maintain the safety of themselves and the people they were there to protect.

Indeed, Judge Perry so indicated in her opinion the difference between an order to disperse and an order to "keep moving."

> [P]eople were not told to "disperse"—in other words, to leave the area. Instead they were told to keep moving. Second, the order was given even when there were fewer than six people gathered. The evidence included examples where the order was given to one person alone, to three people attempting to pray, to a reporter and one other person, as well as to larger groups. And the order was given to people who were doing nothing to indicate they intended to violate laws of any sort, much less to engage in violence. In fact, nearly all of plaintiff's fact witnesses testified that despite gatherings that were peaceful and law-abiding at the time, officers told people they must keep moving or they would be arrested. Unlike the defendant in *Mast,* who was told to disperse and was arrested only after his group wreaked significant havoc upon people and property, people in Ferguson were subject to the keep moving-rule for no reason other than that they were standing still on the public sidewalks.

*Abdullah,* 52 F. Supp. 3d at 944.

With respect to the specific claims of Plaintiff Matthews of excessive force, the record establishes that Plaintiff's claims cannot survive summary judgment. Although Matthews claims he was subjected to a "gruesome" beating by 5 or 6 officers, his own statements belie his position.  He told the paramedics that he was told to evacuate, he did not; he was shot with rubber bullets and tear gas after he did not heed the orders.  Matthews told hospital personnel that he did not lose consciousness, even though he claims he did.  The X Rays and CT scans that were taken were normal.  He was released from the emergency room and was not admitted to the hospital.  He had no follow up care.  Plaintiff Matthews cannot identify any one of the individual officers who he claimed attacked him.  He

described them as wearing "military uniforms" but the record establishes that all the officers involved were dressed in blue jeans and T-shirts, and wore vests with the word "police" in front and on the back with their badges exposed.  These officers used less than lethal ammunition to curtail Matthews' continued approach toward them after they told him several times to stop and disperse.

With respect to the excessive force claims of Kerry White, Sandy Bowers and Kai Bowers, the record clearly and plainly establishes that the alleged excessive force used was that which was, in the words of Plaintiff Kerry White, "not out of the ordinary."  None of these Plaintiffs have presented evidence of injury.

Plaintiff Burns alleges that he was maced all over his face and mouth, he tried to walk away from the chaotic situation," a police officer pulled his hair and slammed him to the ground, he was maced again and a police officer stuck his finger in his ear, another said they were going to kill him, and a policeman touched his genitals with mace soaked hand.  The uncontroverted facts, however establish that Plaintiff Burns heard the orders to disperse, had observed tear gas and smoke being used.  He did not disperse, rather, he remained at the location.  He does not know who the officers he has sued are, and does not know what they did August 11, 2014.  Indeed, the record establishes that it was St. Louis City police officers who actually deployed the spray on Plaintiff Burns.

After being transported to the St. Louis County Justice Center, Plaintiff Burns did not indicate to the nurse that he needed special care for his alleged injuries.  He reported no complaints relating to being maced, slammed to the ground, or having a finger put in his ear.

Plaintiffs Coleman and Green claim that they were struck by less than lethal projectiles and have sued Defendants Delia, DeVouton and McKinnon for excessive force.  Plaintiffs have failed to controvert the affidavits of these Defendants wherein they each aver they were not carrying and did not use any firearms during the night in question.  Neither Plaintiff can identify any of these officers as the one who used any type of force against them.  Their claims of excessive force and assault and battery necessarily therefore fail.

Plaintiffs Tracey White and William Davis both admit in the record that they were not hurt.  Their assault and battery claims accordingly fail.

Likewise, Plaintiff Harris cannot identify any officer who allegedly injured him.  As such, he fails to satisfy the burden of coming forward with admissible evidence in order to overcome the motion for summary judgment.

Regarding the claims against Defendants Belmar and Thomas Jackson and St. Louis County, because Plaintiffs have failed to overcome summary judgment on their claims against the individual police defendants, Plaintiffs cannot satisfy their burden of establishing supervisory liability or municipal liability.  *Brockinton v. City of Sherwood, Ark*, 503 F.3d 667, 674 (8th Cir. 2007).

**Conclusion**

The record before the court establishes that the individual police Defendants are entitled to official and qualified immunity from suit.  Plaintiffs have failed to establish that immunity does not apply.  As such, the supervisory defendants and St. Louis County are also entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that the City of Ferguson, Thomas Jackson, Justin Cosma, Matt Delia, Brandon McKinnon, and Ryan Devouton's Motion for Summary Judgment, [Doc. No. 143], is **GRANTED**.

**IT IS FURTHER ORDERED** that John Belmar, David Ryan, Terrence McCoy, Michael McCann, Derik Jackson, Joe Patterson, Aaron Vinson, William Bates, Nicholas Payne, Daniel Hill, Antonio Valentine and St. Louis County, Missouri's Motion for Summary Judgment, [Doc. No. 158], is **GRANTED**.

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 30th day of September, 2016.


_____
      HENRY EDWARD AUTREY
  UNITED STATES DISTRICT JUDGE