EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DWAYNE ANTON MATTHEWS, JR )<br>  Plaintiff      )<br>            )<br>v.             )<br>            )<br>JON BELMAR, et al.    )<br>            )<br>  Defendants.     ) | Cause No. 14-cv-01490 - HEA |

## TRIAL BRIEF OF DEFENDANTS CHIEF JON BELMAR, DET. JOE PATTERSON, DET. AARON VINSON, DET. WILLIAM BATES, DET. NICHOLAS PAYNE AND ST. LOUIS COUNTY. MISSOURI

**Preliminary Statement**

  This Trial Brief is being presented by defendants, Jon Belmar, Joseph Patterson, Aaron Vinson, William Bates, Nicholas Payne, and St. Louis County. Missouri.

  Many of plaintiff's claims listed in this 3rd Amended Complaint have already been dismissed and are not in issue.  Specifically the 8th Circuit Court in *White v. Jackson,* 865 F. 3d 1064 (8th Cir. 2017) affirmed the dismissal of plaintiff's  false arrest claims,  state law claims, claims against former defendant Derik Jackson, and the excessive force allegation where Matthews claimed he had been pushed  to the ground  with a  knee placed on his back in order to be handcuffed.

  The 8th Circuit determined that it is the role of the jury to resolve the allegations made by Matthews that his head was held underwater for three to five seconds, that after he was handcuffed, that  the officers took turns punching and kicking him for 2-3 minutes after which one officer saturated his entire body with Mace, and that the officers who this were wearing military uniforms including boots to knee pads.  The evidence will show these allegations are false.

1

**Facts and factual disputes regarding Dwayne Matthews on August 13, 2014**

In the area of West Florissant near Highmont on Wednesday August 13, 2014 people within a large crowd threw bottles and rocks at police, and then a Molotov cocktail was thrown on the roof of a nearby building    Announcements were made over loud speakers to disperse. These announcements were not made by the officers who are being sued, but rather by tactical operations.  Smoke and tear gas was deployed, not by these officers but by tactical operations. The area became heavily saturated with smoke and tear gas.  Detectives Derik Jackson, Joe Patterson, Aaron Vinson, Will Bates, Matt Burns and Nick Payne, who were on the front line, donned gas masks.  The smoke, the tear gas, and the announcements seemingly worked and the crowd started dispersing northbound.  In other words, the crowd was dispersing away from the police.  Suddenly one person emerged from the smoke and the tear gas advancing toward the police, even though the rest of the crowd was moving away from the police.  There is no dispute that Matthews kept advancing through the gas and smoke toward police.   The detectives on the front line yelled at him to stop and go back.  One detective, to make sure Matthews could hear, took off his gas mask and exposed himself to the tear gas to make sure that this man could hear the officers yelling.  Matthews kept advancing. The police felt threatened.  That night Det. Derik Jackson (who is no longer a defendant) was assigned to have a less lethal shotgun if needed. Fearing an assault was imminent Det. Jackson yelled out "less lethal, less lethal." Mathews was struck by the first round but kept advancing. Two more rounds were fired. Either the rounds caused Mathews to fall into an adjacent culvert or Mathews jumped into the culvert.

In his deposition, Matthews admitted that he had been walking on West Florissant, that it was dark, that he saw tear gas, that he saw smoke, and that he saw officers' flash lights.  When

2

he was asked to describe the officers he answered the officers were wearing military uniforms and gas masks   Matthews admitted that he walked toward the officers through a cloud of smoke and  through tear gas and he admitted that he was affected by the tear gas.  Regarding the less lethal shotgun being fired, Matthews admitted he heard shots, and he admitted that he got hit by shots and that after he was hit with the first round, he kept advancing.    He testified that the various rounds hit him in various parts of his body.  Mathews denied that he jumped into the culvert but testified that the shots caused him to fall into a culvert/creek, and that when he fell his head hit the concrete causing him to briefly lose consciousness.

Det. Vinson went down the culvert and reached out his hand, but Matthews did not grab his hand and so Vinson went into the water, tried to pull Matthews out but was not able to do so, and so Det. Bates reached out and pulled both Detective Vinson and Matthews from the water, and placed Matthews onto flat ground to be handcuffed.  Matthews resisted being handcuffed, by thrashing, kicking and flailing while Detective Matthew Burns (who is not a defendant) tried to hold Matthews down, and Detectives Vinson and Bates struggled to handcuff Matthews. Finally Detective Patterson alerted Matthews that he would use OC spray if he did not stop resisting; Mathews continued failing and kicking, then Det. Patterson gave a brief burst of spray, aiming in the area of the face after which Matthews stopped his flailing and kicking, was handcuffed and immediately turned over to officers on the back line, who as it turned out, were St. Charles County police and a paramedic.   The length of time that St. Louis County officers were involved with Matthews was very short. After turning him over to the back line officers, these detectives returned to the front line.

Matthews alleges that in the culvert/creek area he was held under water so long that he thought he would drown, after which he was handcuffed and then subjected to a "gruesome

3

beating" by multiple officers that lasted a full 2-3 minutes, claiming that he was punched, kicked and also his face was scraped on the concrete, after which he claims his entire body was saturated with Mace.

As mentioned, after Matthews was handcuffed he was turned over to back line officers, and these officers happened to be St. Charles County tactical operations officers, one of whom was a paramedic, and who, as it turned out, was wearing a "go pro" device that recorded various events. Also as mentioned, Matthews, had been hit by several bean bag rounds, and then resisted being handcuffed, and so he was conveyed by paramedics to Christian Hospital.

At his deposition Matthews testified that the Emergency room doctor ordered X rays and a CT scan after which the doctor told him that the test results were normal. Matthews was discharged at 1:15 a.m., got a ride home with a friend, (but does not now know his friend's address or telephone number) and did not follow up with a doctor, or any health care provider.

At his deposition Matthews did not know the names of the police officers that he is suing, he could not describe their height, weight or race; he just knows that they were wearing military uniforms. Detectives Jackson, Patterson, Vinson, Bates, Payne and Burns were not wearing military uniforms that night, rather each were wearing blue jeans, T-shirts and tennis shoes., which as members of the Bureau of Drug Enforcement, was their normal uniform.

**Facts and factual disputes regarding Jon Belmar and St. Louis County**

A motion for summary judgment to dispose of these claims without a trial has been filed and is pending. In addition, defendants are filing herewith a motion to bifurcate the "Monell" claim against St. Louis County and the failure to train claim against the Chief because an unconstitutional act on the part of a county employee is a prerequisite to imposing liability. *Reasonover v. St. Louis County, Mo et* al, 447 F. 3d 569, 583 (8th Cir. 2006); *Avalos v. City of*

4

Glenwood, 382 F. 3d 792, 802 (8th Cir. 2004) and St. Louis County cannot be held liable under a theory of respondeat superior.  *Monell v. Department of Soc. Servs.*, 436 U. S. 658, 691 (1978); *Szabla v. City of Brooklyn Park, Minn*, 486 F. 3d 385, 389 (8th Cir. 2007.

Regarding St. Louis County, there are no facts that have been presented that prior to August 11-14th, 2014  there was a widespread custom or official policy demonstrating a continuing, widespread, persistent pattern of unconstitutional conduct by County police.

Factually there is no dispute that Chief Belmar was not present on West Florissant at or near the time when Dwayne Matthews ran through the smoke and tear gas advancing toward police, and so there was no personal involvement of Chief Belmar with Matthews.

Jon Belmar, during a more than 30 year period, rose through the ranks to become chief of police.  He has overall responsibility to make sure the police department complies with accreditation standards.  St. Louis County is now and since 1988 has been accredited by CALEA, the Commission on Accreditation of Law Enforcement Agencies.   CALEA is the premier accrediting association within the United States, which requires a rigorous accreditation process every three years which includes on site assessment, review of policies and procedures, and practices, and training and law enforcement and communication.  There were accreditation cycles for the time period before and after the events mentioned in this lawsuit, and so the policies and practices and training during the Ferguson Civil Unrest were reviewed by this premier accrediting agency.  During these two accreditation cycles St. Louis County met all 484 standards.

The hiring process of St. Louis County officers includes background checks and reference checking.  If someone has prior law enforcement and/or military employment then the internal affairs history is checked.  The hiring process also includes testing, psychological test,

5

polygraph test and interview. Chief Belmar, who makes the ultimate hiring decisions is not aware of hiring anyone with assaultive behavior or a sustained complaint of excessive force or unlawful arrests or anyone with a pattern of complaints for these things. After someone is hired then Conduct and Discipline Rules and Procedure Manual are in place. All allegations of employee misconduct are investigated by the Bureau of: Professional Standards. If a complaint of excessive force or unlawful arrest is sustained, then the discipline is significant, and such conduct is not tolerated. Additionally, CALEA requires 25 standards pertaining to internal affairs and disciplinary procedures and policies, and St. Louis County met all of the standards in the accrediting times before and after the Ferguson unrest (2012 and 2015).

All St. Louis County officers must graduate from the police academy, must pass license exams, must be Police Officer Standards and Training (POST) certified. The basic training centers from which they graduate must be POST licensed and the instructors must be POST licensed. The curricula must be POST approved. Police officers must take 48 hours of continuing POST approved education every 36 months.

Included in the specific training of St. Louis County officers is the use of force; and in addition a written use of force policy was in effect. For at least the past nine years new recruits have received Civil Disturbance and Riot Training. But in addition all St. Louis County police officers, new and old, received mandatory training in Civil Disturbance and Riot training in the spring of 2014, which was before the Ferguson Civil Unrest. The training was conducted by an instructor who had been trained by the United States Department of Homeland Security.

In general the supervision of St. Louis County police officers includes a chain of command that meets CALEA standards for supervision, and includes regular evaluation of supervisors, and includes a probationary period for supervisors. During the unprecedented civil

unrest in Ferguson, Chief Belmar was personally present during heightened criminal activity, and so were St. Louis County supervisors and Commanders who were actually nearby on the ground supervising.  Both the Highway Patrol and the St. Louis Metropolitan Police Department had senior level commanders and supervisors at Ferguson during the Fergusson unrest.   The events in Ferguson included gunfire, looting, and burning and other criminal activity.  In addition to being on the ground, Chief Belmar was in frequent contact with commanders of the Missouri Highway Patrol and the St. Louis Metropolitan Police Department and other commanders who were POST certified and well trained, and were accredited.

There is no notice of a pattern of unconstitutional acts committed by subordinates, or deliberate indifference to or tacit authorization of those acts, or failure to take remedial action and proximate cause.

 **Authorities Relied on**

Excessive Force

The claim for excessive force should be analyzed under the Fourth Amendment objective reasonableness standard.  *Foster v. Metro Airports Commission*, 914 F. 2d 1076, (8th Cir. 1990).  The question for the jury is whether judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of force used.  *Id*, at 1081, citing *Graham v. Connor*, 490 U. S. 386 (1989).  Whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct.  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  *Foster v. Metro Airports Commission* at 1081.  A police officer's use of force cannot be viewed in isolation, but must be considered in the light of all circumstances leading up to the arrest.  *Bauer*

7

*v. Norris*, 713 F. 2d 408, 412 (8th Cir. 1983).   Additional considerations to determine the reasonableness of force used are the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 273 (2015).   Also see *Putnam v. Gerloff*, 639 F.2d 415, 420 (8th Cir. 1981); *Rogers v. Rulo*, 712 F. 2d 363, 368 (8th Cir. 1983).

Qualified Immunity

Qualified Immunity protects government officials from liability for civil damages if they have not violated clearly established statutory or constitutional rights of which a reasonable person would have known.  *Akins v. Epperly*, 588 F. 3d 1178, 1183 (8th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U. S. 800, 818 (1982).   This immunity permits government officers to make reasonable errors.  *Habiger v. City of Fargo et al*, 80 F. 3d 289, 295 (8th Cir. 1996) and provides ample room for mistaken judgments.  *Malley v. Briggs*, 475 U. S. 335, 343 (1986); *Borgman v. Kedley*, 646 F. 3d 518, 522 (8th Cir. 2011).  The qualified immunity defense protects public officials unless they are plainly incompetent or knowingly violate the law.  *Id*., (Quoting *Hunter v. Bryant*, 502 U. S. 224, 229 (1991). Also see *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (citations omitted).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines (citation omitted)." *Luckert v. Dodge County*, 684 F. 3d 808, 817 (8th Cir. 2012).   Whether an officer's use of force is excessive is a question of whether the force used was objectively reasonable under the particular circumstances.  *Copeland v. Locke*, 613 F. 3d 875, 881 (8th Cir. 2010). Also see *Foster v. Metro Airports Comm'n*, 914 F. 2d 1076, 1082 (8th Cir. 1990).   Whether a particular use of force is unreasonable must be judged

8

from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Schoettle v. Jefferson* County, 788 F. 3d 855, 859 quoting *Graham v. Connor,* 490 U. S. 386, 396 (1989). Government officers are often forced to make split second judgments in circumstances that are tense and uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. *Id*.

Training and supervision and Municipal Liability

It is well established that for municipalities or supervisory defendants sued in their individual capacities respondeat superior or vicarious liability will not attach under Section 1983. *City of Canton v. Harris,* 489 U. S. 378, 385 (1989); *Livers v. Shenck*, 700 F. 3d 340, 355 (8th Cir. 2012). Rather, a supervisory defendant, sued in his individual capacity, may be liable under Section 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation. *Brockington v. City of Sherwood,* 503 F. 3d 667, 673 (8th Cir. 2007) (citing *Tilson v. Forrest City Police Dep't,* 28 F. 3d 802, 806 (8th Cir. 1994). The Eight Circuit recognizes the following elements for supervisory liability under Section 1983 for failure to train or supervise: (1) notice of a pattern of unconstitutional acts committed by subordinates; deliberate indifference to or tacit authorization of those acts; (3) failure to take sufficient remedial action; and (4) proximate cause of the plaintiff's injury. *Livers* 700 F. 3d at 355. In order to show deliberate indifference or tacit authorization, the plaintiff must allege and ultimately prove that the supervisory defendant had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id* at 355-56 (quoting *Andrews v. Fowler*, 98 F. 3d 1069, 1078 (8th Cir. 1996).

Accreditation is prima facie evidence that standards and practices of an agency meet constitutional due process requirements. *Woe v. Cuomo*, 729 F. 2d 96, 106 (2nd Cir. 1984).

9

Plaintiffs cannot prevail unless they can show deliberate indifference such as the supervisor having notice that the training and supervision were inadequate and likely to result in a constitutional violation. *Andrews v. Fowler*, 98 F. 3d 1069, 1078 (8th Cir. 1996); citing *Thelma D. v. Bd. of Educ. Of City of St. Louis*, 934 F. 2d 929, 934 (8th Cir. 1991).

The Plaintiff must present evidence that the claimed training was inadequate and that the alleged inadequacy caused the Plaintiffs' alleged injury. *See Tucker v. Evans*, 276 F.3d 999, 1003 (8th Cir. 2002) (citing cases in this Circuit that have held attendance at training academy and on-the-job training is sufficient for proper training). Failure to train or supervise can only be the basis for § 1983 liability in "limited circumstances." *City of Canton*, 489 U.S. at 387. Such circumstances occur where the municipality inadequately trains or supervises its employees, the failure to train is a municipal policy, and that policy causes the employee to violate a person's constitutional rights. *Id*. Even assuming that the Plaintiffs can identify a deficiency in the County's training, "the identified deficiency in a city's training program must be closely related to the ultimate injury such that the deficiency in training actually caused the police officer's offending conduct." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (internal citations and quotations omitted). St. Louis County did not have "notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Larson v. Miller,* 76 F.3d 1446, 1454 (8th Cir. 1996) (quoting *Thelma D. by Delores A. v. Board of Educ.*, 934 F.2d 929 934 (8th Cir. 1991)).

To establish a constitutional violation arising from a custom, a plaintiff must show that the injury was "caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional misconduct that municipal policymakers were either deliberately indifferent to or tacitly authorized." *Russell v. Hennepin County*, 420 F. 3rd 841, 849 (8th Cir. 2005), *citing*

10

*Larson v. Miller*, 76 F. 3rd 1446, 1453 (8th Cir. 1996).  In this instance, plaintiff must show that there had been a widespread and persistent failure to follow policy, that a policymaker was aware of this failure and was either deliberately indifferent to or tacitly approved of the conduct, and that the unconstitutional act was caused by the custom of failing to follow the policy.  *Id*.  Also see *Ware v. Jackson County, Mo,* 150 F. 3d 873, 880 (8th Cir. 1998), that misconduct must be so pervasive as to constitute a custom or usage with the force of law.

Punitive Damages

With regard to punitive damages, the defendant's conduct must be motivated by evil motive or intent or involve a reckless or callous indifference to the federally protected rights of others. *Hollins v. Powell*, 773 F. 2d 191, 197 (8th Cir. 1985).   None of the police officers who are being sued had ever been involved with Dwayne Matthews prior to the time that Matthews advanced at them through the tear gas and smoke while the rest of the crowd was dispersing in other directions. The time of the actual involvement with Matthews was minimal, perhaps a few short minutes, after which Matthews was turned over to other officers.   There is no evidence of evil motive or intent, and no evidence of any effort to hide any injury.  Plaintiff's minor injuries can be explained by being hit by less lethal shotgun rounds, and falling into the culvert, and his brief scuffle with police while he was resisting. After Matthews was examined at the emergency room, told that all tests were normal, he was released, then had no follow up treatment any sort of health care provider.

The Plaintiff cannot recover punitive damages against Defendant St. Louis County, under federal law. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, (1981) (municipality not liable for punitive damages under 42 U.S.C. § 1983).

Daubert Motions  and Motions in Limine and Motion to Bifurcate

11

These defendants incorporate by reference the "Daubert" Motions and the Motions in lime and Motion to Bifurcate filed by these defendants.

**Conclusion:**

All defendants should be entitled to a Judgment in their favor on all issues tha are still pending

Respectfully Submitted

PETER J. KRANE
COUNTY COUNSELOR

 /s/ Michael E. Hughes
Michael E. Hughes #23360MO
Associate County Counsel
Mhughes2@stlouisco.com
Priscilla F. Gunn #29729MO
Assistant County Counselor
Pgunn@stlouisco.com
41 S. Central, Ninth Floor
Clayton, MO 63105
(314) 615-7042
(314) 615-3732 (fax)

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was served electronically via this Court's Electronic Filing System to all counsel of record this 21st  day of January, 2019.

 s/s Michael E. Hughes